GERALD SINGLETON (SBN 208783)
BRODY A. McBRIDE (SBN 270852)
SINGLETON LAW FIRM, APC
115 West Plaza Street
Solana Beach, CA  92075
Tel:    (760) 697-1330
Fax:    (760) 697-1329
Email:   gerald@geraldsingleton.com
         brody@geraldsingleton.com

JOHN BURTON (SBN 86029)
THE LAW OFFICES OF JOHN BURTON
The Marine Building
128 North Fair Oaks Avenue
Pasadena, California 91103
Tel:    (626) 449-8300
Fax:    (626) 449-4417
Email:   jb@johnburtonlaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| K.J.P., a minor, and K.P.P., a minor, individually, by and through their mother, LOAN THI MINH NGUYEN, who also sues individually and as successor in interest to her now deceased husband, Lucky Phounsy, and KIMBERLY NANG CHANTHAPHANH, individually,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, San Diego Sheriff WILLIAM GORE, San Diego Sheriff's Deputy FISCHER (#3003), Unknown San Diego Sheriff's Deputies, CITY OF SANTEE, SANTEE FIRE DEPARTMENT, Santee Fire Department Chief RICHARD MATTICK, Santee Fire Department Crewmember AARON BAGLEY, Unknown Santee Fire Department Crewmembers, LAKESIDE FIRE PROTECTION DISTRICT, Lakeside Fire Protection District Chief ANDY PARR; Lakeside Fire Protection District Crewmember MARC POYNTER, Lakeside Fire Protection District Crewmember AARON HACKETT | Case No. 15-cv-02692-H-MDD<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Lakeside Fire Protection District )
Crewmember DAVID CSIK, and )
Unknown Lakeside Fire Protection District )
Crewmembers, )
)
         Defendants. )
_____ )

## INTRODUCTION

1.      Plaintiffs sue to recover damages arising from the wrongful death of their father, husband, and son: Lucky Phounsy ("Lucky").

2.      On April 13, 2015, Lucky began experiencing symptoms of a mental health crisis, including paranoid delusions that someone was going to harm him and his family. Lucky called 911 for help.  The San Diego Sheriff's Department deputies who responded were unnecessarily confrontational, aggressive, and profane.  They refused to answer Lucky's questions, and insisted on restraining Lucky from the outset, increasing his paranoia.  The deputies' actions escalated an already tense, though under control, situation into violence.  Lucky became increasingly agitated and the deputies began using force on Lucky.  Deputies shocked Lucky repeatedly with a TASER, then used punches and baton strikes on Lucky.  Lucky retreated, after each affront, to family members who were present and able to calm Lucky with reassuring words, gestures, and touch.

3.      Ultimately, Sheriff's deputies hogtied Lucky and carried him out of the house, hidden from his family's view.   Before Lucky was loaded into an ambulance, the Santee Defendants report giving him multiple doses of benzodiazepine, a powerful chemical sedative that can impair breathing.  Defendants apparently kept Lucky hogtied in route to the hospital, and further compromised his ability to breath by putting some sort of sock on his face and holding him down in the gurney.  At some point before arriving at the hospital, Lucky's heart stopped.  While emergency room staff was, after several minutes of cardiac downtime, able to restart Lucky's heart, Lucky died a few days later as a result of his encounter with Defendants.

*//*

**JURISDICTION & VENUE**

4.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, as Plaintiffs assert causes of action arising under 42 U.S.C. § 1983, in addition to California causes of action that arise from the same controversy giving rise to Plaintiffs' 1983 claims.

5.     The Court has personal jurisdiction over all Defendants in this action, as all Defendants are situated or domiciled in the State of California.

6.     Pursuant to 28 U.S.C. § 1391, venue is proper in this District, as the events giving rise to this action occurred in the County of San Diego, California, which is located within the Southern District of California.

**PARTIES**

7.     K.J.P. is a minor domiciled in California.  K.J.P. was one of Lucky's two children.

8.     K.P.P. is a minor domiciled in California.  K.P.P. was Lucky's other child.

9.     Loan Thi Minh Nguyen ("Loan") is an individual domiciled in California. Loan was Lucky's wife.  In addition to suing individually, Loan sues as the successor in interest to Lucky's estate.  See Cal. Code Civ. P. § 377.32; Decl. of Loan Thi Minh Nguyen as Successor in Interest (attached hereto and incorporated by this reference).

10.     Kimberly Nang Chanthaphanh ("Kimberly") is an individual domiciled in California.  Kimberly was Lucky's mother.

11.     The County of San Diego ("County") is a municipal entity duly organized under California law.  The San Diego County Sheriff's Department ("Sheriff's Department") is the chief law enforcement agency for the County.

12.     William Gore ("Sheriff Gore") is an individual who, on information and belief, is domiciled in California and who was, at all times relevant to this complaint, the San Diego County Sheriff and, as such, a final policymaker for the Sheriff's Department, and for the County on matters relating to the Sheriff's Department and its deputies.

//

13. Kevin Ralph (#3519) ("Ralph") is an individual who was, at all times relevant to this complaint, employed as a Sheriff's Department sergeant with supervisory responsibilities over the Sheriff's Department corporals and deputies named herein.

14. Richard Fischer (#3003) ("Fischer") is an individual who was, at all times relevant to this complaint, employed as a Sheriff's Department deputy.

15. Marcos Collins (#7127) ("Collins") is an individual who was, at all times relevant to this complaint, employed as a Sheriff's Department corporal.

16. Janae Krull (#0072) ("Krull") is an individual who was, at all times relevant to this complaint, employed as a Sheriff's Department deputy.

17. Sandra (Janet) Carbajal (#3141) ("Carbajal") is an individual who was, at all times relevant to this complaint, employed as a Sheriff's Department deputy.

18. Billy Tennison, III (#4986) ("Tennison") is an individual who was, at all times relevant to this complaint, employed as a Sheriff's Department deputy.

19. Dean Allen (#4591) ("Allen") is an individual who was, at all times relevant to this complaint, employed as a Sheriff's Department deputy.

20. Michael Lee (#6227) ("Lee") is an individual who was, at all times relevant to this complaint, employed as a Sheriff's Department deputy.

21. Jenny Martinson (#0601) ("Martinson") is an individual who was, at all times relevant to this complaint, employed as a Sheriff's Department deputy.

22. Tamani Pugh (#7231) ("Pugh") is an individual who was, at all times relevant to this complaint, employed as a Sheriff's Department deputy.

23. Aaron Brooke (#2820) ("Brooke") is an individual who was, at all times relevant to this complaint, employed as a Sheriff's Department corporal.

24. Jovonni Silva (#2586) ("Silva") is an individual who was, at all times relevant to this complaint, employed as a Sheriff's Department deputy.

25. Ralph, Fischer, Collins, Krull, Carbajal, Tennison, Allen, Lee, Martinson, Pugh, Brooke, and Silva may hereinafter be referred to, collectively, as the "Sheriff's Department Defendants."

26.     The City of Santee ("City") is a municipal entity duly organized under California law.  The Santee Fire Department is the City's chief provider of emergency fire and medical services.

27.     Aaron Bagley ("Bagley") is an individual who was, at all times relevant to this complaint, employed as a fire captain for Santee Fire Department.

28.     Aaron Hackett ("Hackett") is an individual who was, at all times relevant to this complaint, employed as a firefighter/paramedic for the Santee Fire Department.

29.     Aaron Do ("Do") is an individual who was, at all times relevant to this complaint, employed as a firefighter/engineer for the Santee Fire Department.

30.     Adam Daniels ("Daniels") is an individual who was, at all times relevant to this complaint, employed as a firefighter/paramedic for the Santee Fire Department.

31.     Daniel Neow ("Neow") is an individual who was, at all times relevant to this complaint, employed as a firefighter/paramedic for the Santee Fire Department.

32.     Bagley, Hackett, Do, Daniels, and Neow may hereinafter be referred to, collectively, as the "Santee Fire Department Defendants."

33.     The Lakeside Fire Protection District ("District") is a municipal entity duly organized under California law.

34.     Marc Poynter ("Poynter") is an individual who, at all times relevant to this complaint, was employed as a firefighter/paramedic for the District.

35.     David Csik ("Csik") is an individual who, at all times relevant to this complaint, was employed as a firefighter/paramedic for the District.

36.     Poynter and Csik may hereinafter be referred to, collectively, as the "District Defendants."

37.     Each individually named defendant acted under color of law and within the scope of his or her agency and employment.

/ / /

/ / /

/ / /

## CALIFORNIA CLAIMS FILING REQUIREMENTS

38.     With regard to Plaintiffs' state-law causes of action, Plaintiffs have complied with California's government tort claims requirements as set forth in California Government Code §§ 900 et seq.

## GENERAL ALLEGATIONS

39.     K.J.P. and K.P.P. were the minor, biological children of Lucky and Loan, Lucky's wife.  Prior to Lucky's death, he and Loan lived with their two children in the County.  Kimberly was Lucky's mother.  Both Loan and Kimberly witnessed the abuse Sheriff's Deputies inflicted, abuse that ultimately caused Lucky's death.

40.     On Monday, April 13, 2015, Lucky, his wife, Loan, and their two children were at the home of Lucky's mother and step-father to celebrate Lucky's son's birthday.

41.     Lucky had been experiencing severe insomnia during the preceding days, and had slept very little during the previous 72 hours.  The cause of the insomnia has not been determined, but was not due to acute drug intoxication.  Over the course of the day, Lucky experienced symptoms that included auditory hallucinations and paranoid delusions.  Lucky was terrified that unknown assailants were preparing to harm him, his wife, his children, and others in his family.  Concerned, Loan called a psychiatrist for advice, who recommended Lucky get some sleep.

42.     After his family's attempts to get Lucky to sleep with over-the-counter medications were unsuccessful, Lucky's family called a nearby hospital for advice. Lucky, at this point overcome with fear for his own and his family's safety, called 911 to report that unknown assailants were trying to harm him.

43.     When San Diego Sheriff's Deputies and, later, EMTs and paramedics arrived, they each demonstrated a lack of adequate training and understanding with regard to dealing with (and especially diffusing) individuals in the throes of a psychotic episode.

/ / /

/ / /

44.     At first relieved to see two Sheriff's Department deputies (Collins and Krull), Lucky was compliant.  He turned around and placed his hands above his head as instructed.  When the deputies told Lucky they were going to handcuff him, however, Lucky became frightened and confused.  The deputies did nothing to de-escalate the situation, as they were aggressive and profane.  They refused to answer Lucky's questions.  Lucky was, at that point, literally incapable of understanding why those he called for help were treating him like a criminal.

45.     As Krull handcuffed Lucky's right wrist, Collins fired his TASER Model X26 at the unarmed Lucky, puncturing Lucky's skin with half-inch darts and shocking him with powerful pulses of electricity, inducing excruciating pain and severe muscle contractions.

46.     The deputies' unnecessarily aggressive and combative actions provoked an irrational response.  Lucky and Collins fought for seconds before they separated.

47.     As Lucky retreated from Collins, Lucky's step-father, Greg Kelley, took Lucky by the shoulders and began calming him.  Krull then approached Lucky and his stepfather with her baton raised.  Lucky was able to defend himself from Krull's baton strike.  Collins then shot Lucky again with his TASER.  After recovering, Lucky again retreated, this time to his wife.

48.     Loan put her arms on Lucky's shoulders and began calming him. A deputy then shot Lucky with a TASER for a third time.

49.     After Lucky recovered, Lucky's step-father and brother-in-law were again able to calm Lucky by hugging him.  Additional San Diego Sheriff's Department personnel then burst through the door, shoved Lucky's stepfather and brother-in-law out of the way, and tackled Lucky to the floor.  As more deputies arrived, several deputies converged on Lucky, restrained him violently and in an unsafe manner, then carried him outside.  The additional Sheriff's Department personal that arrived on scene and assisted in restraining Lucky included Ralph, Fischer, Carbajal, Tennison, Allen, Lee, Martinson, Pugh, Brooke, and Silva.

50.     At various times, during this incident various Sheriff's Deputies along with EMTs and paramedics from the Santee Fire Department and Lakeside Fire Protection District, subjected Lucky to unnecessary and excessive force and potentially lethal restraints, including, but not limited to, excessive deployment of A TASER against Lucky, hogtying, and chest compressions.

51.     EMTs and paramedics from the City of Santee's Fire Department were called around 10:25 p.m.  The first two sets of medical providers — hereinafter referred to as "E5" (a fire engine company with emergency medical equipment) and "M5" (an ambulance crew of two or three) — arrived on scene around 10:32 p.m. and 10:33 p.m., respectively.  The M5 crew deliberately treated the superficial, non-life-threatening injuries of the deputies who had engaged Lucky first, then transported those deputies to Grossmont Hospital. The M5 and E5 crew members were grossly negligent and deliberately indifferent to the health and welfare of Lucky, who was in a significantly more medically compromised condition than the deputies. They acted in this fashion pursuant to the policy, practice and custom of the City of Santee and the Santee Fire Department to give medical evaluation and treatment triage priority to law enforcement officers over civilians, and to reduce priority for people who have been involved in altercations with the police.  Eventually, according to the reports, an E5 crewmember asked a deputy on scene whether Lucky would need medical attention and was told that Lucky "would need medical care."  The E5 crewmember then requested another ambulance unit.  EMTs and paramedics from the Lakeside Fire Protection District were called around 10:37 p.m., and "M2" (an ambulance crew of two or three) arrived on scene around 10:47 p.m.

52.     E5 crewmembers report that they "assessed and treated" Lucky.  The E5 crewmembers' report does not explain what, if anything, this entailed.  Plaintiffs contend that the evaluation and treatment was grossly negligent and deliberately indifferent to Lucky's health and welfare. According to the M2 crewmembers' report of what happened, at 10:39 p.m., the E5 crewmembers injected Lucky (intra-muscularly) with a

benzodiazapine sedative. M2 crewmembers claim that, when they arrived, E5 crewmembers gave Lucky a second dose of the sedative at 10:50 p.m.  Santee paramedics may have given as many as three doses of benzodiazapine to Lucky.

53.    Available reports state that the doses of sedative had no effect on Lucky–a physiological impossibility.  Subsequent toxicological testing at Grossmont Hospital (as well as similar testing performed by the County Medical Examiner) revealed no benzodiazepine in Lucky's blood, which is also impossible given the Santee paramedics reports of having administered multiple doses to a conscious, active individual.  And M2 crewmembers' report that they were able to further assess and treat Lucky, including lifting him onto a gurney and checking his carotid, apical, and radial pulses.  This is inconsistent with their claim that Lucky was "still extremely combative."  In short, whether Lucky was appropriately sedated is an unknown yet material fact in this case.

54.    In any event, Lucky was put into a District ambulance, still hogtied, and restrained either face down or on his side. Finally, around 11:03 p.m., Defendants and Lucky left for Grossmont Hospital.  M2 crewmembers were accompanied by E5 crewmembers and by Sheriff's Deputy Fischer (#3003), who, according to the M2 crewmembers, "forcibly restrain[ed][Lucky]'s torso and head" during the drive to Grossmont Hospital.

55.    Despite the fact that Lucky desperately needed to be able to breathe freely because: (1) he was in a psychotic state to begin with, (2) had been in an altercation with deputies, (3) had been shocked with a TASER X26 at least three times, (4) had been injected with two or three doses of a powerful sedative, (5) was supposedly being observed by four people in the ambulance, and (6) was hogtied in Sheriff's Department restraints during his ambulance ride, paramedics put a sock over Lucky's face.

56.    At some point before Lucky was transferred to the care of Grossmont Hospital, Lucky stopped breathing, and his heart stopped beating.  Plaintiffs are informed and believe that this happened at minimum several minutes before arrival at the hospital and was either not observed or ignored by the paramedics and deputies.  M2

crewmembers claim they started chest compressions and BVM (bag-valve-mask) ventilations, <u>then</u> removed all restraints (although it is unclear how paramedics could have started chest compressions on a hogtied patient who was lying on his side or stomach).  M2 crewmembers claim all of this occurred as they pulled into the bay of the emergency room at the hospital, and that the Sheriff's Department restraints were removed after they parked.

57.   The Grossmont Hospital ER staff commenced CPR and restarted Lucky's heart.  They then initiated a cooling protocol that would have saved Lucky and his main organs had the cardiac downtime reported by Defendants been accurate.  Because of extensive anoxic brain injury that took place over a longer period of time than that reported, however, Lucky never recovered, and died a few days following his encounter with Sheriff's deputies, EMTs, and paramedics.

58.   The following wrongful conduct, among other things, all of which was conducted deliberately and with deliberate indifference to Lucky's health, safety and welfare, proximately caused this avoidable tragedy:

a.   The responding Sheriff's Department deputies used excessive force against Lucky, including the gratuitous use of the TASER X26, punches, baton strikes, hogtying, chest compressions, and physical restraints in the ambulance while being transported to the hospital.

b.   The responding deputies acted pursuant to a policy, practice, and/or custom of infringing the rights of the general public through the use of force without legal justification.

c.   The Sheriff's Department and responding fire departments failed to adequately train their personnel to appropriately and safely respond to and deal with situations involving individuals suffering from psychosis, mental illness, and/or mental disabilities (whether permanent or temporary).

/ / /

d.   The responding deputies discriminated against, and failed to accommodate Lucky's disability, because of their perceptions of Lucky's disability and mental health.

e.   Plaintiffs are informed and believe that, when learning of the events giving rise to this claim, the County's final policymakers (including Sheriff Gore) ratified the acts of the County employees, including the responding Sheriff's Department deputies.

f.   The responding paramedics and EMTs failed to use appropriate restraining methods, and failed to provide necessary and adequate medical care, and thus, were a proximate cause of Lucky's death.

g.   The responding deputies, paramedics, and EMTs triaged the minor, non-life-threatening injuries of deputies over Lucky's life-threatening conditions and thereby were a proximate cause of Lucky's death.

h.   The responding paramedics and EMTs acted pursuant to a policy, practice, and/or custom of triaging, without medical or legal justification, the less critical medical needs of law enforcement officers over the more critical needs of others, and downgraded the priority medical needs of persons who had been involved in altercations with the police.

i.   Plaintiffs are informed and believe that, when learning of the events giving rise to this claim, the City of Santee's final policymakers (including Chief Richard Mattick) ratified the acts of the City's employees, including the responding EMTs, paramedics, and firefighters.

j.   Plaintiffs are informed and believe that, when learning of the events giving rise to this claim, the Lakeside Fire Protection District's final policymakers (including Chief Andy Parr) ratified the acts of the District's employees, including the responding EMTs, paramedics,

1   and firefighters.

2       k.      Up through the time Lucky was transferred to the care of Grossmont

3              Hospital, the responding deputies, EMTs, and paramedics

4              compromised Lucky's breathing (through the use of electrical

5              weapons, physical restraint, and/or chemical sedation) to the point of

6              inducing death by cardiac arrest and/or asphyxiation.

7   ## FIRST CAUSE OF ACTION

8   ### 42 U.S.C. § 1983 – Excessive Force

9   **(By Lucky's Successor in Interest against Sheriff's Department Defendants)**

10       59.    All preceding paragraphs are incorporated by this reference.

11       60.    Loan asserts this claim as Lucky's successor in interest against all named

12   and currently unknown defendants acting in their individual capacities.

13       61.    Sheriff's Department Defendants violated the Fourth Amendment when, on

14   April 13, 2015, they unnecessarily escalated a situation, and then used unreasonable and

15   excessive force on Lucky, namely, attempting to physically restrain Lucky upon initial

16   contact, shocking Lucky multiple times with a TASER Model X26, striking Lucky with

17   fists and batons, hogtying Lucky, possibly injecting Lucky with sedatives, and

18   compressing his chest in a manner that interfered with normal respirations.

19       62.    As a direct and foreseeable result of these defendants' unreasonable and

20   excessive uses of force, Lucky died.  Lucky therefore suffered special and general

21   damages, including those arising from Lucky's pre-death pain and suffering, along with

22   further damages according to proof at the time of trial.

23       63.    In using the force described above, these defendants recklessly disregarded

24   Lucky' constitutional rights.  As such, these defendants' actions justify an award of

25   punitive damages in an amount to be determined at the time of trial.

26   / / /

27   / / /

28   / / /

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 – Denial of Medical Care

### (By Lucky's Successor in Interest Against Sheriff's Department Defendants, Santee Fire Department Defendants, and District Defendants)

64.     All preceding paragraphs are incorporated by this reference.

65.     Loan asserts this cause of action as Lucky's successor in interest.

66.     In failing to provide Lucky the medical attention he needed, the individual Sheriff's Department Defendants, Santee Fire Department Defendants, and District Defendants violated Lucky's Fourteenth Amendment right to due process by being deliberately indifferent to Lucky's serious medical needs.  Those present knew they were compromising Lucky's ability to breathe freely, and they failed to take reasonable steps to ensure Lucky could breathe freely.

67.     As a direct and foreseeable result of these defendants' deliberate indifference to Lucky's serious medical needs, Lucky died.  Lucky therefore suffered special and general damages, including those arising from Lucky's pre-death pain and suffering, along with further damages according to proof at the time of trial.

68.     In disregarding Lucky's inability to breathe freely, these defendants recklessly disregarded Lucky' constitutional rights.  As such, these defendants' actions justify an award of punitive damages in an amount to be determined at the time of trial.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983 – Monell

### (By Lucky's Successor in Interest Against Municipal Entity Defendants)

69.     All preceding paragraphs are incorporated by this reference.

70.     Loan asserts this cause of action as Lucky's successor in interest.

71.     The County, Santee, and the District are each liable for the deprivation of Lucky's constitutional rights under Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978), and its progeny, which hold that municipal entities may be held liable for violations of Constitutional rights committed by its employees if

the violations arose from:

a.      a widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a custom or usage" with the force of law;

b.      the ratification of the illegal and unconstitutional conduct by an individual with final policy-making authority; and/or

c.      a failure to adequately train municipal employees resulting in the deliberate indifference to the constitutional rights of citizens.

72.      The County, Santee, and the District are liable under Monell, in that Lucky's death was not only a result of an unconstitutional practice or custom (namely, a practice or custom of using excessive and unreasonable force on individuals in the midst of a mental health crisis), it was also the result of a failure to train deputies, EMTs, and paramedics to appropriately deal with such individuals. Indeed, the uniformity in which multiple deputies, EMTs, and paramedics acted in reckless disregard of Lucky's rights demonstrates the existence of such a practice or custom, and lack of adequate training. Furthermore, the City of Santee and the Santee Fire Department had a policy and practice of giving priority to the medical needs of law enforcement officers over those of other people who might present with more serious, life-threatening conditions, such as Lucky's, and downgrading priority to persons such as Lucky who had been involved in an altercation with a law enforcement officer. Moreover, upon learning of the conduct giving rise to Lucky's death, the County's, Santee's, and the District's final policymakers (including Sheriff Gore, Chief Mattick, and Chief Parr) ratified the conduct, approved it, and imposed no discipline because of it. As a direct and legal result of the County's, Santee's, and the District's systematically unconstitutional acts and omissions, Lucky died.

73.      Lucky therefore suffered special and general damages, including those arising from Lucky's pre-death pain and suffering, along with further damages according to proof at the time of trial.

## FOURTH CAUSE OF ACTION

### Battery

### (By Lucky's Successor in Interest Against County and Sheriff's Department Defendants)

74. All preceding paragraphs are incorporated by this reference.

75. Loan asserts this cause of action as Lucky's successor in interest.

76. On April 13, 2015, Sheriff's Department Defendants used unreasonable and excessive force on Lucky. Because these defendants' uses of force on Lucky were without legal justification, it was tortious.

77. Lucky did not, at any time, consent to these defendants using any kind of force on him.

78. As a direct and foreseeable result of these defendants' uses of force, Lucky died. Lucky therefore suffered special damages, along with further damages according to proof at the time of trial.

79. These defendants' conduct was a substantial factor in causing Lucky's injuries.

80. Because these defendants acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by their conduct pursuant to California Government Code § 815.2.

## FIFTH CAUSE OF ACTION

### Cal. Civ. Code § 52.1 – Bane Act

### (By Lucky's Successor in Interest Against County and Sheriff's Department Defendants)

81. All preceding paragraphs are incorporated by this reference.

82. Loan asserts this cause of action as Lucky's successor in interest.

83. Sheriff's Department Defendants interfered, or attempted to interfere, with Lucky's rights under the U.S. and California Constitutions to be free from unreasonable seizures and uses of force.

84.     Lucky reasonably believed that, if he exercised his rights, these defendants would commit violence against him.  Indeed, these defendants did commit violence against Lucky when, in response to Lucky's questions about their actions, these defendants became aggressive before attempting to illegally restrain Lucky, thereby escalating an already tense situation, resulting in these defendants using a significant amount of force on Lucky, and ultimately resulting in Lucky's death.

85.     As a direct and foreseeable result of these defendants' actions, Lucky died. Lucky therefore suffered special damages, along with further damages according to proof at the time of trial.

86.     Because these defendants acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by their conduct pursuant to California Government Code § 815.2.

## SIXTH CAUSE OF ACTION

### 42 U.S.C. § 12132 – Americans with Disabilities Act

### (By Lucky's Successor in Interest Against County and Sheriff's Department Defendants)

87.     All preceding paragraphs are incorporated by this reference.

88.     Loan asserts this cause of action as Lucky's successor in interest.

89.     On April 13, 2015, Lucky had a disability as defined in 42 U.S.C. § 12102. At a minimum, Sheriff's Department Defendants perceived Lucky as suffering from such a disability.

90.     When Collins and Krull arrived, no one was in danger.  See Schreiner v. City of Gresham, 681 F. Supp. 2d 1270, 1279 (D. Oregon 2010) ("[o]nce the area was secure and there was no threat to human safety, the [defendants] would have been under a duty to reasonably accommodate [plaintiffs] disability in handling and transporting him to a mental health facility") (quoting Hainze v. Richards, 207 F.3d 795, 802 (5th Cir. 2000)).  Indeed, Lucky was the one who called 911 for help.  Collins and Krull needed only to listen to Lucky, interact with him respectfully (by, for example, answering his

questions), then drive him to the hospital for psychiatric treatment. Instead, Sheriff's Department Defendants came in with "guns blazing," behaving aggressively toward Lucky, refusing to answer his questions, and insisting on restraining him from the get go.

91.   Sheriff's Department Defendants acted aggressively toward Lucky because of his actual or perceived disability. That is, these defendants discriminated against Lucky because of Lucky's actual or perceived disability. This unnecessary escalation of an already delicate situation ultimately led to the Sheriff's Department Defendants' use of repeated and increasing levels of restraint and force, which uses of restraints and force ultimately caused Lucky's death. Title II of the ADA provides that the Sheriff's Department Defendants had a duty to make reasonable accommodations in dealing with Lucky, including, for example, being civil and respectful upon first contact. See 42 U.S.C. § 12182(b)(2)(A). Collins and Krull failed to comply with this duty.

92.   As a direct and foreseeable result of these defendants' actions, Lucky died. Lucky therefore suffered special damages, along with further damages according to proof at the time of trial.

93.   Because these defendants acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by their conduct pursuant to California Government Code § 815.2.

## SEVENTH CAUSE OF ACTION

### Cal. Civ. Code §§ 51, 51.7 – Unruh Civil Rights Act

### (By Lucky's Successor in Interest Against the County and Sheriff's Department Defendants)

94.   All preceding paragraphs are incorporated by this reference.

95.   Loan asserts this cause of action as Lucky's successor in interest.

96.   To the extent Lucky's rights under the ADA were violated, Lucky's rights under the Unruh Civil Rights Act were also violated. See Cal. Civ. Code § 51(f).

97.   On April 13, 2015, Lucky suffered from a mental disability as defined by California Civil Code § 51(d)(1) and California Government Code § 12926(j). At a

minimum, Collins and Krull perceived Lucky as suffering from such a mental disability.

98. Sheriff's Department Defendants acted aggressively toward Lucky because of his actual or perceived mental disability. This unnecessary escalation of an already delicate situation ultimately led to these defendants' use of repeated and increasing levels of restraint and force, which uses of restraints and force ultimately caused Lucky's death.

99. As a direct and foreseeable result of these defendants' actions, Lucky died. Lucky therefore suffered special damages, along with further damages according to proof at the time of trial.

100. These defendants' conduct was a substantial factor in causing Lucky's death.

101. Because these defendants acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by their conduct pursuant to California Government Code § 815.2.

## EIGHTH CAUSE OF ACTION[1]

### Negligence

### (By Lucky's Successor in Interest Against the County and Sheriff's Department Defendants)

102. All preceding paragraphs, except those falling under the First through Seventh Causes of Action, are incorporated by this reference.

103. Loan asserts this cause of action as Lucky's successor in interest.

104. The Sheriff's Department Defendants who interacted with Lucky on April 13, 2015, owed Lucky a duty of ordinary care and skill.

105. Sheriff's Department Defendants breached this duty when they unnecessarily escalated a situation resulting in the use of force and restraints that led to Lucky's death.

---

[1] Plaintiffs strike previously numbered paragraphs 108 through 113 only to comply with the Court's October 11, 2016 Order and not because Plaintiffs intend to abandon their negligence allegations against the Santee Fire Department and District Defendants. Indeed, as set forth in Plaintiffs' concurrently filed Motion for Reconsideration, Plaintiffs contend they should be allowed to prove the Santee Fire Department and District Defendants were grossly negligent in their handling of this incident.

106.   As a direct and foreseeable result of these breaches of duty, Lucky died. Lucky therefore suffered special damages, along with further damages according to proof at the time of trial.  These defendants' negligence was a substantial factor in causing Lucky's death.

107.   Because these individual defendants acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by the Sheriff's Department Defendants' conduct pursuant to California Government Code § 815.2.

108.   The conduct of the Santee Fire Department Defendants, and the District Defendants who interacted with Lucky on April 13, 2015, constituted not only negligence, but gross negligence—an extreme departure from what a reasonably careful professional under like circumstances would do, and a failure to exercise any reasonable care for Lucky. Their conduct evidenced a conscious and deliberate disregard of known risks of death or severe injury.

109.   Santee Fire Department Defendants breached this duty when they delayed assessment and treatment to Lucky, then administered multiple doses of sedatives to Lucky without proper monitoring, and permitted Lucky to remain restrained while in route to the hospital.

110.   District Defendants breached this duty when they administered sedatives to Lucky and permitted Lucky to remain unreasonably restrained and untreated while in route to the hospital.

111.   As a direct and foreseeable result of these breaches of duty, Lucky died. Lucky therefore suffered special damages, along with further damages according to proof at the time of trial.

112.   These Santee Fire Department and District Defendants' gross negligence was a substantial factor in causing Lucky's death.

113.   Because these individual defendants acted within the scope of their employment, the City and the District are vicariously liable for the harm proximately caused by their subordinates' conduct pursuant to California Government Code § 815.2.

# NINTH CAUSE OF ACTION

## Negligent Hiring, Retention, Supervision

## (By Lucky's Successor in Interest Against Sheriff Gore)

108. All preceding paragraphs are incorporated by this reference.

109. Loan asserts this cause of action as Lucky's successor in interest.

110. Sheriff Gore had a duty to ensure those the Sheriff's Department hired, retained, and supervised were fit to perform their respective duties.

111. Sheriff's Department Defendants were each unfit and/or incompetent to perform their respective duties as law enforcement officers.

112. Sheriff Gore's subordinates were unfit and/or incompetent in a way that created a particular risk to the public, in that they:

  a. used excessive force against Lucky, including the gratuitous use of the TASER X26, punches, baton strikes, hogtying, chest compressions, and physical restraints in the ambulance while being transported to the hospital;

  b. discriminated against, and failed to accommodate Lucky's disability, because of their perceptions of Lucky's disability and mental health;

  c. triaged the minor, non-life-threatening injuries of deputies over Lucky's life-threatening conditions and thereby were a proximate cause of Lucky's death; and

  d. compromised Lucky's breathing (through the use of electrical weapons, physical restraint, and/or chemical sedation) to the point of inducing death by cardiac arrest and/or asphyxiation.

113. Sheriff Gore should have known, prior to this incident, that his subordinates were unfit and/or incompetent as described in Paragraph 108, above.

114. The unfitness and/or incompetence of Sheriff Gore's subordinates, as described above, caused Lucky's death.

/ / /

115.   As a direct and foreseeable result of Sheriff Gore's failure to, with due care, hire, retain, and/or supervise his subordinates, Lucky died.  Lucky therefore suffered special damages, along with further damages according to proof at the time of trial.

116.   Because Sheriff Gore acted in the scope of his employment, the County is vicariously liable for the harm proximately caused by Sheriff Gore's negligent conduct pursuant to California Government Code § 815.2.

## TENTH CAUSE OF ACTION

### Wrongful Death

### (By K.J.P., K.P.P., Loan, Kimberly Against All Defendants)

117.   All preceding paragraphs are incorporated by this reference.

118.   Under California Code of Civil Procedure § 377.60, each Plaintiff is an individual authorized to bring a cause of action grounded in Lucky's wrongful death. K.J.P. and K.P.P. were Lucky's minor children.  Loan was Lucky's wife, and Kimberly was Lucky's mother.

119.   As set forth in the First through Ninth Causes of Action, Lucky died as a result of Defendants' tortious conduct.

120.   As a direct and foreseeable result of Lucky's death, Plaintiffs have suffered economic and non-economic damages.  Plaintiffs have lost the benefit of the financial support that Lucky would have provided to them during the remainder of his life, or the remainder of each of Plaintiffs' lives, whichever is shorter.  Plaintiffs have lost any gifts or other benefits they expected from Lucky.  Plaintiffs have incurred funeral and burial costs.  Plaintiffs have lost the reasonable value of household services that Lucky would have provided.

121.   Plaintiffs have lost Lucky's love, companionship, comfort, care, assistance, protection, affection, society, and moral support.  K.J.P. and K.P.P. have further lost Lucky's training and guidance.  Loan has further lost the enjoyment of a romantic partner.

/ / /

**ELEVENTH CAUSE OF ACTION**

**42 U.S.C. § 1983 – Substantive Due Process**

**(By K.J.P., K.P.P., Loan, Kimberly Against All Defendants)**

122.   All preceding paragraphs are incorporated by this reference.

123.   As set forth in the First through Ninth Causes of Action, Lucky died as a result of Defendants' deliberate indifference and conscious shocking conduct.

124.   As a result of Lucky's death, Plaintiffs were deprived of their Fourteenth Amendment right to familial companionship and society.  See, e.g., Smith v. City of Fontana, 818 F.2d 1411, 1419-20 (9th Cir. 1987).

125.   As a direct and foreseeable result of this denial of substantive due process, Plaintiffs have suffered economic and non-economic damages.  Plaintiffs have lost the benefit of the financial support that Lucky would have provided to them during the remainder of his life, or the remainder of each of Plaintiffs' lives, whichever is shorter. Plaintiffs have lost any gifts or other benefits they expected from Lucky.  Plaintiffs have incurred funeral and burial costs.  Plaintiffs have lost the reasonable value of household services that Lucky would have provided.

126.   Plaintiffs have lost Lucky's love, companionship, comfort, care, assistance, protection, affection, society, and moral support.  K.J.P. and K.P.P. have further lost Lucky's training and guidance.  Loan has further lost the enjoyment of a romantic partner.

**TWELFTH CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress**

**(By Loan Against County, Collins, and Krull)**

127.   All preceding paragraphs are incorporated by this reference.

128.   The conduct of Collins and Krull on April 13, 2015, was outrageous, in that these deputies unnecessarily escalated a tense, but under control, situation to the point that deputies used a significant amount of violence against Lucky to subdue him.  These deputies did so while his family, including Loan, watched.  And these deputies continued

to escalate the amount of force they were using even though Lucky's family had demonstrated, through gentle words and gestures, that such force was unnecessary.

129.   These deputies acted with reckless disregard of the probability that their actions would cause Loan severe emotional distress.

130.   Loan suffered severe emotional distress, in that she witnessed Deputies brutally beat her husband and the father of her children, including repeatedly shocking Lucky with a TASER, punching Lucky, striking Lucky with a metal baton, and tackling Lucky to the floor. Deputies then prevented Loan from going outside, where Deputies had hogtied Lucky, to comfort Lucky.

131.   Collins' and Krull's conduct was a substantial factor in causing Loan's severe emotional distress.

132.   Because the deputies acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by their conduct pursuant to California Government Code § 815.2.

## **PRAYER FOR RELIEF**

WHEREFORE, the foregoing allegations considered, Plaintiffs demand:

(1)   that judgment be rendered in favor of Plaintiffs and against Defendants on all causes of action asserted herein;

(2)   compensatory damages (including economic and noneconomic damages) as permitted by federal and state law, in amounts to be determined at trial;

(3)   punitive damages, against the individual defendants only, as permitted by federal law, and in an amount sufficient to deter and make examples out of these individuals, to be determined at trial;

(4)   reasonable attorney fees, expenses, and costs of suit pursuant to 42 U.S.C. §§ 1983-1988, California Civil Code §§ 52.1 et seq., and any other relevant statutory or case law; and

(5)   any and all other relief in law or equity to which Plaintiff may be entitled and which this Court deems just and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand, under the Seventh Amendment, a trial by jury as to each and every cause of action asserted herein.


Dated:  October 25, 2016                    SINGLETON LAW FIRM, APC

By:     */s/Brody McBride*
                Brody McBride, Esq.

Attorneys for Plaintiffs