

Transcript of the Testimony of:

# Aaron Hackett

K.J.P.

v.

County of San Diego

December 08, 2016

Volume I

LITIVATE REPORTING + TRIAL SERVICES
P: 877.771.3312 | F: 877.561.5538
www.litivate.com

```
 1                UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   K.J.P., a minor, and K.P.P., a minor,
     individually, by and through their
 5   mother, LOAN THI MINH NGUYEN, who else
     sues individually and as successor in
 6   interest to her now deceased husband,
     Lucky Phounsy, and KIMBERLY NANG
 7   CHANTHAPHANH, individually,

 8                         Plaintiffs,

 9     vs.                          CASE NO.
                                    15-cv-02692-H-MDD
10   COUNTY OF SAN DIEGO; ET AL.,

11                         Defendants.
     _____

12

13

14

15        VIDEOTAPED DEPOSITION OF AARON HACKETT

16

17                   Santee, California

18              Thursday, December 8, 2016

19

20

21

22

23

24   Reported by: Lorraine E. Mesker, RPR

25              CSR License No. 6499
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Aaron Hackett                                                December 08, 2016

```
 1                    UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF CALIFORNIA

 3
      K.J.P., a minor, and K.P.P., a minor,
 4    individually, by and through their
      mother, LOAN THI MINH NGUYEN, who else
 5    sues individually and as successor in
      interest to her now deceased husband,
 6    Lucky Phounsy, and KIMBERLY NANG
      CHANTHAPHANH, individually,
 7
                              Plaintiffs,
 8
        vs.                             CASE NO.
 9                                      15-cv-02692-H-MDD
      COUNTY OF SAN DIEGO; ET AL.,
10
                              Defendants.
11    _____

12

13

14

15

16

17

18
              Videotaped Deposition of AARON HACKETT,
19
      taken at Santee Fire Station, No. 4, 8950 Cottonwood
20
      Avenue, Santee, California, on Thursday, December 8,
21
      2016 at 9:03 A.M., before Lorraine E. Mesker,
22
      Certified Shorthand Reporter, in and for the State
23
      of California.
24

25
```

```
 1                    A P P E A R A N C E S

 2


 3      For the Plaintiffs:

 4              SINGLETON LAW FIRM, APC
                By:  BRODY A. McBRIDE, ESQ.
 5              115 West Plaza Street
                Solana Beach, California 92075
 6              760.697.1330; 760.697.1329 FAX
                Brody@geraldsingleton.com
 7


 8      For the Defendants County of San Diego:

 9              JAMES M. CHAPIN
                SENIOR DEPUTY COUNTY COUNSEL
10              1600 Pacific Highway, Room 355
                San Diego, California 92101-2469
11              619.531.5244; 619.531.6005 FAX
                James.chapin@sdcounty.ca.gov
12


13      For the Defendants City of Santee:

14              DALEY & HEFT, LLP
                By:  SAMUEL C. GAZZO, ESQ.
15              462 Stevens Avenue, Suite 201
                Solana Beach, California 92075-2099
16              858.755.5666; 858.755.7870 FAX
                Sgazzo@daleyheft.com
17


18      For the Defendants Lakeside Fire Protection District,
        Marc Poynter and David Csik:
19
                HAIGHT, BROWN, & BONESTEEL, LLP
20              By:  KEVIN M. OSTERBERG, ESQ.
                3750 University Avenue, Suite 560
21              Riverside, California 92501
                951.351.8300; 951.341.8309 FAX
22              Kosterberg@hbblaw.com


23      ALSO PRESENT:  NICHOLE LAKE, LEGAL VIDEOGRAPHER
24
                              --oOo--
25
```

Aaron Hackett                                                    December 08, 2016

```
 1                         I N D E X

 2                   INDEX OF EXAMINATION

 3

 4    EXAMINATION                                    PAGE

 5    By Mr. McBride                                   7

 6

 7

 8
              EXHIBITS MARKED FOR IDENTIFICATION
 9
      EXHIBIT              DESCRIPTION              PAGE
10
      Exhibit 1    Plaintiffs' Fourth Amended Notice   13
11                 of Deposition of Defendant Aaron
                   Hackett and Request for Production
12                 of Documents

13
      Exhibit 2    4-13-2015 Pre-Hospital Care Report  13
14

15
      Exhibit 3    County of San Diego Emergency       13
16                 Medical Services, Policy/Procedure/
                   Protocol, Subject:  Application of
17                 Patient Restraints

18
      Exhibit 4    County of San Diego Emergency       14
19                 Medical Services, Policy/Procedure/
                   Protocol, Subject:  Treatment
20                 Protocol - poisoning/overdose

21
      Exhibit 5    County of San Diego Emergency       15
22                 Medical Services, Policy/Procedure/
                   Protocol, Subject:  Treatment
23                 Protocol - Psychiatric/Behavioral
                   Emergencies
24

25    Exhibit 6    4-13-2015 Incident Detail Report     42
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Aaron Hackett                                            December 08, 2016

```
 1                    I N D E X (CONTINUED)

 2

 3              EXHIBITS MARKED FOR IDENTIFICATION

 4     Exhibit              Description              Page

 5     Exhibit 7    Google Maps aerial view of 8538    68
                    Holden Road
 6

 7     Exhibit 8    Patient assessment sheet           83

 8

       Exhibit 9    Google Maps aerial view of 8538    84
 9                  Holden Road

10

       Exhibit 10  Three photographs                  128
11

12     Exhibit 11  Three photographs                  160

13

       Exhibit 12  Ambulance photograph               166
14

15

              (Exhibits attached to the transcript.)
16

17

18

19

20

21

22

23

24

25
```

```
 1                      AARON HACKETT,

 2   having stated or affirmed under penalty of perjury

 3   before the Certified Shorthand Reporter, Lorraine E.

 4   Mesker, that the testimony to be given will be the

 5   truth, the whole truth, and nothing but the truth,

 6   testified as follows:

 7

 8           MR. McBRIDE:  Sorry.  We had a --

 9           THE REPORTER:  Okay.

10           THE VIDEOGRAPHER:  Good morning.  Here begins

11   Media No. 1 of deposition of Aaron Hackett, Volume I, in

12   the matter of K.J.P., et al, versus County of San Diego,

13   et al.  This is -- this case is in the United States

14   District Court of Southern -- District Court, Southern

15   District of California.  The case number is

16   15-CV-02692-H-MDD.

17           Today's date is December 8th, 2016, and the

18   time is 9:04.  This deposition is being held at the

19   Santee Fire Station, No. 4, 8950 Cottonwood Avenue,

20   Santee, California 92071.

21           The videographer is Nicole Lake, here on behalf

22   of the plaintiff.

23           Would counsel please identify yourself and

24   state whom you represent.

25           MR. GAZZO:  Sam Gazzo for the City of Santee.
```

1          And is -- this is the 2015 version.  Do you

2    know what changes, if any, were made in this 2015

3    version?

4          A.   I'd have to look to make sure.

5               As far as the second page, which is probably

6    the most relevant to this case --

7          Q.   Yeah.

8          A.   -- those are all the same.

9          Q.   Okay.  And we --

10         A.   To the best of my knowledge.

11         Q.   And we can talk about that a little bit later.

12              Let me show you the last one.  We'll mark this

13   as Exhibit 5.

14              (Exhibit 5 was marked for identification.)

15              THE WITNESS:  All right.

16   BY MR. McBRIDE:

17         Q.   And what is Exhibit 5?

18         A.   It's S-142, the combative patient protocol, San

19   Diego protocol.

20         Q.   And this is the 2015 version, correct?

21         A.   Correct.

22         Q.   And --

23         A.   I -- I did not look to see the date, so you'll

24   have to tell me.

25         Q.   Okay.  Well, it says 2015 there at the top.

1      A.    All right.

2      Q.    Do you know what changes, if any, were made

3  between this and the 2014 version?

4      A.    There were no changes, to the best of my

5  knowledge.

6      Q.    All right.  So anything other -- well,

7  actually, so you referenced a report drafted by Marc

8  Poynter --

9      A.    Yes, sir.

10     Q.    -- that you reviewed.

11     A.    I've given that to my attorney, so --

12     Q.    All right.  Can you describe that report for

13  me?  How many pages, do you know?

14     A.    I believe it's about one page.

15     Q.    And can you just give me an idea, generally,

16  the information contained in that one-page report.

17     A.    It's basically his understanding of the events

18  of that night.  Basically his -- describing the events

19  that took place, what happened, treatments throughout

20  his on-scene contact with the patient, as well as

21  transport.  So basically the gist of it is in the PCR,

22  there.

23     Q.    Okay.  So a lot of what's contained in the

24  history and the PCR --

25     A.    Yes, sir.

1      Q.   All right.  How long was this additional piece
2   that you saw?
3      A.   It would all be an estimation.  Maybe a foot.
4   Maybe two.
5      Q.   Did you see the hand -- or the leg cuffs
6   actually secured to the handcuffs directly?
7      A.   To my knowledge, no.
8      Q.   Do you recall what color this extra piece was
9   that connected the two?
10     A.   My best guess is black.
11     Q.   I don't want you to guess.
12     A.   That's just -- well, then, I am not sure.
13     Q.   So you don't know what color this --
14     A.   No, sir.
15     Q.   How were the deputies carrying Mr. Phounsy out?
16  What position was he in as they were carrying him?
17     A.   I would say the way they carried him out is not
18  on the ground, but he was basically in a prone position
19  while being carried out.
20     Q.   And were they carrying him by the cord, by the
21  cuffs?  How did they have -- how did the deputies --
22     A.   They appeared to be carrying him by the cord.
23     Q.   So his legs and hands were bending back as they
24  carried him?
25     A.   To the best of my recollection, yes, sir.

1    Q.   And how did they set him down?  Did they drop

2    him?

3    A.   They put him down as easily as you can put down

4    an individual that is aggressively fighting to get out

5    of restraints.  So they put him down, but there was some

6    force there.

7    Q.   Did you see what part of Mr. Phounsy struck the

8    ground first?

9    A.   No, sir.

10   Q.   Did Mr. Phounsy hit his head or his face, at

11   that point, that you saw?

12   A.   To the best of my knowledge, no, sir.

13   Q.   Did the deputy --

14   A.   I didn't get a clear look at him, so --

15   Q.   Do you know, did Mr. Phounsy fall more than a

16   foot when the deputy set him down?

17   A.   I mean, with them carrying him from the cord,

18   with the average height of a person, so maybe two feet,

19   something like that.

20   Q.   Is the distance that he fell when the deputies

21   set him down or dropped him?

22   A.   Possibly.  Possibly.

23   Q.   I am just asking what you saw, not what

24   possibly happened.  Did the deputies drop him?

25   A.   He was -- he was set down, but forcefully, like

1   I said.  So whether it was a drop or -- I am not

2   entirely sure.

3        Q.  So the distance that you think he was set down

4   forcefully was about two feet?

5        A.  Yes, sir.

6        Q.  Would you mind on Exhibit 7 -- can you indicate

7   with another circle and put an "L" in it, if you can,

8   the area to which Mr. Phounsy was brought out by the

9   deputies and set down forcefully.

10        A.  (Witness complies.)

11            MR. McBRIDE:  All right.  And for the record,

12   Mr. Hackett has drawn a circle, it looks like, in the

13   middle of the driveway, and put an "L" in the middle.

14            MR. GAZZO:  Can I just ask what do the letters

15   signify?

16            MR. McBRIDE:  "L" is for Lucky, and "D" is for

17   deputy.

18            MR. GAZZO:  Okay.  Thank you.

19   BY MR. McBRIDE:

20        Q.  Okay.  So as Mr. Phounsy is being brought out,

21   is he saying anything?

22        A.  No, sir.

23        Q.  Are the deputies saying anything?

24        A.  I would say everything at this point is

25   unintelligible, so, no, sir.

1      Q.    Did you have it prior to giving this first
2    Versed shot?
3      A.    I am not 100 percent certain.
4      Q.    All right.  So you said that Mr. Phounsy -- the
5    reason you gave the Versed is because he matched a
6    couple of conditions in your protocol.  Which conditions
7    specifically?  Let's go through those.
8      A.    So he's a combative, agitated patient.
9      Q.    All right.
10     A.    As well as he met the excited delirium
11   protocol.
12     Q.    Okay.  So talk to me about this combative
13   patient.  What do you need to see?  What requirements
14   need to be met before you can give this Versed, pursuant
15   to the standing protocol, as it pertains to a combative
16   patient?
17     A.    Right.  Well, I mean, if you look in the
18   protocol, it is very vague.  There is no -- beyond it
19   saying a combative or aggressive patient, there is
20   nothing else beyond that.  So he presented as a
21   combative and aggressive patient.
22     Q.    So why give the Versed, though?
23     A.    To a combative or aggressive patient?
24     Q.    Yeah.  I mean, what does the Versed do?
25     A.    The Versed is going to act as a form of a

1   chemical restraint for this type of patient.  It is

2   going to get them to relax.  The goal is for them to

3   relax.  If they are relaxed, then we can actually assess

4   them in a more thorough manner.  And that was my goal

5   with Mr. Phounsy.

6       Q.   All right.  And what about the excited

7   delirium?  How do you know when somebody is suffering

8   from excited delirium?

9       A.   Well, I mean, ultimately I think excited

10  delirium can be a little idiopathic, similar to seizures

11  can be, where they don't really have the best

12  understanding of it.

13          However, based on this protocol, he's an

14  aggressive, combative patient.  He's kind of meeting the

15  different things that the protocol states about them,

16  where -- sudden onset of paranoia, violent behavior,

17  sometimes that coincides with the use of stimulant

18  intoxicants, such as cocaine, methamphetamines, or PCP.

19  So I went down that route, as well.

20      Q.   All right.  Now, what are you allowed to do --

21  and if you need to see Exhibit 5, that's standing

22  protocol S-142.

23      A.   Uh-huh.

24      Q.   If you have a combative patient, what are you

25  allowed to do without obtaining additional hospital

1    still continually shaking around.

2         So we decided to just monitor the patient.  He

3    was continuing to fight the deputy.  Continued to

4    monitor the rise and fall of his chest, to make sure

5    that he was breathing, to make sure that he was on his

6    side.  Those are the signs and symptoms that we were

7    basically looking at at this point, because we weren't

8    able to get these readings based on his presentation.

9    Q.   So once you actually started assessing and

10   treating Lucky after you had gone down and grabbed your

11   equipment and given him the Versed, who was in charge of

12   Lucky, were you or were the deputies?

13   A.   I was in charge of Lucky at that point.

14   Q.   He was your patient?

15   A.   He was my patient.  However, scene management,

16   based on his presentation, the deputies were still a

17   large part of that.

18   Q.   So when you gave Lucky this injection, this

19   first injection of Versed, were the deputies still

20   holding him down in the manner you had previously

21   described?

22   A.   Yes, sir.

23   Q.   At any point did the deputies keep you from

24   Lucky?

25   A.   No, sir.

 1  patient.  So based on him continuing to fight, I was

 2  unable to do that.

 3  BY MR. McBRIDE:

 4      Q.   What about an oxygen mask?

 5      A.   He -- as far as an oxygen mask is concerned,

 6  with the way that he was thrashing around, there was no

 7  guarantee that the oxygen mask would stay on his face.

 8      Q.   Did you ever try to put it on him?

 9      A.   No, sir.

10      Q.   Why not?

11      A.   Because he --

12           MR. GAZZO:  Asked and answered.

13           THE WITNESS:  Sorry.  So he was continuing to

14  thrash around.  I feel we are kind of all over the place

15  chronologically, but he continued to thrash around.  He

16  was able to take full -- full breaths with full rise and

17  fall of his chest.  He was on his side.  He didn't have

18  any sort of cyanosis around his lips.  He didn't look to

19  me in any way, shape, or form like he required to be

20  placed on an oxygen mask.

21  BY MR. McBRIDE:

22      Q.   But S-134 says "as soon as able, high flow

23  oxygen, ventilate."

24      A.   The protocol may state that, but I am assuming

25  that the protocol would want you to have a reason for

1    placing that patient on oxygen.  If they don't appear to

2    have any sort of respiratory compromise or shortness of

3    breath, I don't tend to place patients on high-flow

4    oxygen.

5        Q.   Okay.  Well, you testified you thought Lucky

6    met the criteria for excited delirium, right?

7        A.   Yes, sir.

8        Q.   That's why you gave the Versed?  Or one of the

9    reasons.

10       A.   Yes, sir.

11       Q.   And it says, under excited delirium, as soon as

12   able, "high-flow oxygen, ventilate."

13            So you made the decision to disregard that

14   portion of the protocol.  Is that what you are saying?

15            MR. GAZZO:  Misstates testimony.

16   Argumentative.

17            THE WITNESS:  I would say that he didn't

18   require it at that time, and due to the amount of

19   shaking and combativeness, the likelihood of being able

20   to keep an oxygen mask on was going to be slim to none.

21   BY MR. McBRIDE:

22       Q.   You'll agree that at some point he required

23   oxygen?

24       A.   Yes, sir.

25       Q.   All right.  So you give the Versed.  What

1   happens at that point, the first injection?

2       A.   After the first injection, I went back, I

3   sharped my medication.  I kind of gave him like a minute

4   or so to kind of relax and hopefully the medicine will

5   start kicking in.  When I've given it in the past, you

6   can tell very quickly when it starts to kick in.  And by

7   all accounts, shortly thereafter, Lucky appeared to

8   start to relax, like he was succumbing to the effects of

9   the medication, like it was working as it was supposed

10  to, to chemically restrain him.

11      Q.   All right.  And you gave that injection in

12  his -- basically his left thigh?

13      A.   Left or right thigh -- sorry.  Sorry.

14           MR. GAZZO:  Misstates testimony.  I think he

15  testified twice right thigh.

16  BY MR. McBRIDE:

17      Q.   Okay.  Well, you said left thigh in your

18  previous interview, but if today it's right, then that's

19  what we'll go with.

20           Do you recall the time at which you gave this

21  first injection?

22      A.   I might have to refer to my report.

23      Q.   Sure.

24           And you are talking about Exhibit 2, the

25  pre-hospital care report?

```
 1    BY MR. McBRIDE:

 2        Q.    Okay.  What are the signs of a Versed overdose?

 3    Acute Versed intoxication?

 4        A.    I would say the side effects are respiratory

 5    depression and apnea.

 6        Q.    All right.  And in this case, in the ambulance,

 7    Lucky stopped breathing, right?

 8        A.    He stopped breathing, yes.  However, I believe

 9    that's speculative as to whether it was cardiac arrest

10    that led to him being apneic versus apnea that led to

11    cardiac arrest.

12        Q.    All right.  So after you gave the first Versed

13    injection, did you -- well, we'll get to that.

14              So did the first injection calm Lucky down?

15        A.    Yes.  It appeared to briefly calm him down.

16        Q.    All right.  So what did you do at that point?

17        A.    Now that he appeared to be calmed down, I kind

18    of let him know, hey, you know, I am here.  I am a

19    firefighter/paramedic.  I am here to help you.  Try to

20    relax.  I try to develop a rapport with my patients,

21    especially ones who are agitated or combative or have

22    maybe a psych history, or -- such as this call.  And I

23    am rapidly trying to assess his breathing, his

24    effectiveness of his breathing, his pulse rate.  Trying

25    to do a quick survey to assess any sort of signs of
```

1    trauma that I can see to his person, and trying to

2    gather some sort of information about him.  Typically

3    it's orientation questions.  So that's what I am doing

4    at this point.

5        Q.   Well, so walk me through exactly what you did.

6    I think you previously said you had done a BRIM

7    assessment on him?

8        A.   Right.  A BRIM.

9        Q.   Okay.  So walk me through that.

10       A.   So BRIM, "B" stands for breathing.  I am

11   looking at him.  I am assessing for the equal rise and

12   fall of his chest, checking lung sounds, looking to see

13   if there's any respiratory compromise.

14       Q.   And what did you learn?

15       A.   I found that he was breathing at a pretty rapid

16   rate.  He had clear lung sounds bilaterally, and he had

17   equal rise and fall of the chest.

18       Q.   Okay.  What did that indicate to you?

19       A.   That indicated to me that he was breathing just

20   fine on his own without any sort of issues.

21       Q.   And I think you had said previously 30 breaths

22   per minute?

23       A.   About 30 breaths per minute, so a little

24   shallow.

25       Q.   Shallow but effective.

1      Q.   All right.  So the handcuffs were preventing

2   you from performing at least that portion of your BRIM

3   assessment as you normally would?

4      A.   The handcuffs prevented me from -- and his

5   fighting prevented me from getting a rate from his

6   radial pulse.

7      Q.   Okay.

8      A.   It didn't prevent me from feeling a radial

9   pulse, which would heighten my sense -- my index of

10  suspicion that we may be going down a shock-type route

11  with him.  Basically --

12     Q.   What do you mean by that?

13     A.   So basically, when your body goes into shock,

14  it will start to profuse blood to your core and

15  vasoconstrict to your extremities.  So that's when you

16  check a radial pulse.  And if there's no radial pulse,

17  then you move up the chain, basically, to brachial and

18  then the carotid.

19     Q.   I see.

20          So at this point Mr. Phounsy was much more

21  relaxed?

22     A.   He appeared much more relaxed at this point.

23     Q.   So as you are doing this BRIM assessment, why

24  not put him on oxygen?

25     A.   At this point I am just trying to get through

1   my assessment.  Trying to get as many vitals as I can.

2        Q.   Why not put him --

3        A.   I am working by myself at this point.

4        Q.   Okay.  Why not put him on a heart rate monitor?

5   Or put a heart rate monitor on him at that point?

6        A.   At this point I am working by myself, and I am

7   kind of working with the tools I had.  If he had

8   continued to relax, I would have done that shortly

9   thereafter.

10       Q.   At any point did you ask Captain Bagley for

11  assistance, either from Mr. Daniels or Mr. Do or Captain

12  Bagley?

13       A.   By the time that this is all happening,

14  Firefighter Daniels, as well as Firefighter Nenow were

15  off scene, to the best of my knowledge.  I'm not

16  entirely sure where Engineer Do was at this moment in

17  time, and Captain Bagley was speaking with the spouse.

18       Q.   Did you ask for help at any point?

19       A.   I did not ask for help at this point.

20       Q.   You could have used help, though?

21       A.   We could always use more --

22            MR. GAZZO:  Calls for speculation.

23            THE WITNESS:  We could always use more hands on

24  scene, but at this point, I did not call or request for

25  any additional help.

1   portion of the report whether or not Mr. Phounsy was

2   overheating, right?

3       A.   No, sir.

4       Q.   And is that one of the signs of somebody who is

5   potentially suffering from excited delirium?

6       A.   There is the potential that they could become

7   hyperthermic, yes.

8       Q.   But you did not see that here?

9       A.   To the best of my recollection of the events,

10  no, sir.

11      Q.   Did you check Mr. Phounsy's blood pressure?

12      A.   That was my -- that was my next step in my

13  assessment.  And by this point, it appeared that the

14  Versed was no longer working.  He resumed struggling on

15  the ground with the deputies causing me to take a step

16  back and allow them to assume, you know, their role

17  within the scene.

18      Q.   How long did it take you to go through -- well,

19  let me ask this.  How long did it take you to administer

20  that first shot of Versed?  From the time you started

21  drawing the medication, until it was fully administered?

22      A.   I mean, this is just a guesstimate, but it's

23  not going to take me very long to do that.  Within a

24  minute.

25      Q.   How long did it take you to get through this

1   portion of your BRIM assessment that we just discussed,

2   all the way up to blood pressure where Mr. Phounsy

3   starts --

4       A.   I would say within maybe a couple minutes tops.

5   Something like that.

6       Q.   So two to three?

7       A.   Two to three minutes, maybe.

8       Q.   Okay.  So what do you do at this point?  You

9   step back?

10      A.   At this point I am kind of stepping back.  I'm

11  trying to tell Mr. Phounsy to relax, and he's just

12  continuing to kind of fight with deputies on the ground.

13      Q.   He's still fully retained, though?

14      A.   Yes, sir.

15      Q.   Is he on his stomach?

16      A.   He's still on his side.

17      Q.   Which side?  Right or left?  Do you remember?

18      A.   I am not sure off the top of my head, no, sir.

19      Q.   So in your previous -- so was it that you

20  attempted to get his blood pressure and could not, or

21  you did not attempt?

22      A.   At this point, I can't remember which one I

23  did, sir.

24      Q.   So previously you said that you did not attempt

25  it because Lucky was too violent and combative?

Aaron Hackett                                        December 08, 2016

1      Q.   You believed he had consumed drugs?

2      A.   Yes, sir.

3      Q.   He had been Tased?

4      A.   Yes, sir.

5      Q.   And he was placed in maximum restraints?

6      A.   Yes, sir.

7      Q.   So these patients pose a significant risk of

8   cardiac arrest, correct?

9      A.   Yes, sir.

10     Q.   And you believed Mr. Phounsy was suffering from

11  excited delirium?

12     A.   I believed that that was potentially what the

13  underlying cause of his condition was.

14     Q.   So you were aware of the significant risk that

15  Lucky posed for going into cardiac arrest?

16     A.   Yes, sir.

17     Q.   Was there any discussion of this risk among you

18  and the other medics?

19     A.   Yes, sir.

20     Q.   Who?

21     A.   I believe it was David Csik that brought it up

22  several times.  We all know the risks here with this

23  type of patient.

24     Q.   So what specifically did you do before Medic 2

25  arrived to mitigate this risk of Lucky -- or Mr. Phounsy

1   2-cc vials.  So 1 cc equals 5 milligrams.  1 cc had been

2   withdrawn and given in the initial dose.  An additional

3   1 cc was withdrawn the second time to give the second

4   dose of 5 milligrams, for a total of 10 milligrams of

5   Versed.

6       Q.   All right.  So who made the decision to give

7   the second dose of Versed?

8       A.   Marc and I both decided that was the best

9   course of action, to give a second dose of Versed.

10      Q.   All right.  And what was the route of the

11  administration for the second dose?

12      A.   Once again, through the thigh.

13      Q.   Same spot?

14      A.   It's been a while, so to the best of my

15  knowledge, it could have been in the left or the right

16  thigh.  It doesn't matter.

17      Q.   Did you go through Phounsey's clothes again?

18      A.   Once again, I believe I did, but it's been a

19  while.

20      Q.   Do you know the time you gave this second dose?

21      A.   I believe, according to my report, at 2250.

22      Q.   Okay.  And is this time also an approximation?

23      A.   It is an approximation based on the timeline of

24  events.

25      Q.   So it's possible it could have been earlier or

1  four-point restraint utilizing soft Velcro and full

2  restraints for his ankles and his wrists.

3      Q.   All right.  So what do you do after you give

4  the injection?  The second injection?

5      A.   Once again, we were waiting a few minutes

6  trying to see if there's a change in his behavior.  And

7  then from there, we actually are attempting to get him

8  restrained in our restraints.

9      Q.   Did law enforcement and the sheriff's deputies,

10 did they request a second dose, or was that -- that was

11 all the medical personnel?

12     A.   That was all medical personnel.

13     Q.   And was Lucky still in the same position, as

14 you've indicated on Exhibit 7, when the second dose was

15 given?

16     A.   Yes, sir.

17     Q.   Still maximum restrained?

18     A.   Yes, sir.

19     Q.   Deputies were still forcefully holding him

20 down?

21     A.   Yes, sir.

22     Q.   All right.  How long do you wait for that

23 second dose to kick in before you begin to try to switch

24 out the restraints?

25     A.   I believe we gave him a few minutes.  He still

```
 1   impinge his ability to breathe.
 2           MR. McBRIDE:  All right.  Let me show you what
 3   we'll mark as Exhibit 11.  And I assume you've all seen
 4   this.  I'll pass it over.
 5           (Exhibit 11 was marked for identification.)
 6   BY MR. McBRIDE:
 7      Q.   Now, the photographs in Exhibit 11 appear to
 8   show Mr. Phounsy strapped somehow.  Is that how he was
 9   strapped to the gurney?
10      A.   Based on that photo, I would have to say that
11   is how he was strapped to the gurney.
12      Q.   And it appears that the strap is going directly
13   around his chest.  At least in 11A.  And for the record,
14   this is a two-page document.
15      A.   It looks like it is going around his wrist and
16   his elbow and then over to the other side.
17      Q.   It doesn't look to you like that is around his
18   chest area?
19      A.   It goes over his chest, but it is starting at
20   his wrist -- or excuse me.  It looks like the upper part
21   of his arm and elbow, and then going around towards his
22   chest, yes.
23      Q.   And does it appear that he is almost supine
24   rather than on his side in these photos?  To you?
25      A.   Maybe based on that photo, but I was in the
```

1   back of the ambulance transporting, and he was on his

2   left side.

3       Q.   So you would agree that -- at least as far as

4   Exhibit 11 is concerned, it appears that he is in an

5   almost supine position, right?

6       A.   I'd say he is still on his left side.

7       Q.   And when you -- all these times you've

8   described him on his left side, is that what you meant,

9   he was -- as depicted in Exhibit 11?

10      A.   I would say more than -- more so than that.

11      Q.   Okay.  But you would agree that he does not

12  look fully on his side --

13      A.   He is not fully on his side in the picture at

14  that moment in time, no, sir.

15      Q.   Now, do you remember when Mr. Phounsy was in

16  the ambulance, him being almost supine like that?

17      A.   No, sir.

18      Q.   Now, did you check these seat belts prior to

19  loading Mr. Phounsy into the ambulance to make sure that

20  he could achieve full tidal breaths?

21      A.   We were monitoring that the whole time.  That

22  was something that we were looking for.  That was very

23  important to us, is that he could take full tidal

24  breaths.

25      Q.   And what would indicate to you that he could

1   Mr. Phounsy is still resisting you?

2       A.   Pretty regularly.

3       Q.   Every minute?

4       A.   I would say probably somewhere -- within that

5   realm, yes.

6       Q.   Every couple of minutes?

7       A.   Every minute, two minutes, something like that.

8       Q.   How many times total did you ask Deputy Ficher

9   whether or not Mr. Phounsy is still resisting?

10      A.   I don't -- I can't recall, so I am not -- I

11  can't give you a number for sure.

12      Q.   And Mr. Csik was driving the ambulance, right?

13      A.   Yes, sir.

14      Q.   So who is in overall charge of Mr. Phounsy

15  there in the ambulance?

16           MR. OSTERBERG:  Objection.  Vague and ambiguous

17  as far as "overall charge."

18           THE WITNESS:  I will -- due to him being the

19  transporting medic, I guess you could say Marc Poynter.

20  However, similar to on scene, as we discussed, the issue

21  with the restraints, I feel like we were all responsible

22  for Mr. Phounsy's care.

23  BY MR. McBRIDE:

24      Q.   So if you had believed something needed to

25  happen in that ambulance on which Mr. Phounsy's life

1   depended, and Deputy Ficher disagreed, could you

2   override him?  Say, for instance, "Remove Mr. Phounsy

3   from those restraints."  Or --

4           MR. OSTERBERG:  Calls for speculation.

5   BY MR. McBRIDE:

6       Q.   -- "stop holding his head down."  Could you

7   have asked the deputy to stop that?

8           MR. GAZZO:  Calls for speculation.

9           THE WITNESS:  I mean we have a very good, close

10  working relationship with the deputies.  I am sure that

11  if I asked him to remove the restraints or if a patient

12  was in a relaxed enough state to remove his restraints

13  safely, I would have had that dialogue if it occurred.

14  BY MR. McBRIDE:

15      Q.   Okay.  So what happened?  What happened next?

16          MR. OSTERBERG:  Calls for a narrative.

17  BY MR. McBRIDE:

18      Q.   Well, let me break it up.

19          So in the ambulance, do you have the ability to

20  provide an O2 mask?

21      A.   We would if I thought the patient needed it,

22  and if he would be able to keep it on.

23      Q.   So you do have oxygen in the ambulance and

24  you've got a mask.  You could hook a patient up if you

25  wanted to?

1          MR. OSTERBERG:  And you've asked this question

2     20 times so far.

3          MR. McBRIDE:  I haven't at this point.  At this

4     point in the incident.

5          THE WITNESS:  All right.  So going along with

6     my testimony -- my previous testimony, based on his

7     movement, based on the fact that we are not seeing any

8     signs of respiratory compromise at this point, we didn't

9     feel that he required an oxygen mask.

10    BY MR. McBRIDE:

11       Q.   Is protocol here in San Diego to wait until

12    somebody goes into cardiac arrest before putting them on

13    oxygen?

14          MR. OSTERBERG:  Objection.  Overbroad.  Vague

15    and ambiguous.  Calls for speculation on a case-by-case

16    basis.

17          MR. GAZZO:  Lacks foundation.

18          MR. CHAPIN:  Argumentative.

19          THE WITNESS:  I would say based on my training,

20    education, and experience, that you tend to look for

21    signs and symptoms of respiratory distress prior to

22    putting -- treating patients.

23    BY MR. McBRIDE:

24       Q.   So did you also place a spit sock on Lucky's

25    head?

1      A.    I did.

2      Q.    Did you do it, or did Mr. Poynter?

3      A.    I did.

4      Q.    At any point while you were in the back of the

5   ambulance, did you see Lucky spit?

6      A.    Deputy Ficher was facing his head.  Deputy

7   Ficher made the request.  Due to his positioning and the

8   potential for him to be spit on, and the fact that he

9   said he was being -- he felt like he was being spit at,

10  I didn't question his judgment, and I placed a spit sock

11  on Mr. Phounsy's head.

12     Q.    I appreciate your answer, but my question was:

13  at any point while in the back of the ambulance, did you

14  see Mr. Phounsy spit?

15     A.    I did not see it, no, sir.

16     Q.    Okay.  What does the protocol say about placing

17  spit socks on a patient's head?

18     A.    It just states that you can place it on their

19  head for basically body substance isolation.

20     Q.    Is there any preconditions to that?

21          MR. GAZZO:  Vague and ambiguous.

22          THE WITNESS:  Based on the protocol, you can

23  use an oxygen mask, you can use a surgical mask, or you

24  can use a spit sock.

25  ///

1   BY MR. McBRIDE:

2       Q.    Do you have to try to place an oxygen mask on

3   their head before you use a spit sock?

4       A.    You can use an oxygen mask or a surgical mask.

5       Q.    Are you supposed to try those first, and only

6   if those are ineffective do you then put the spit sock

7   on the face?

8       A.    Per the protocol, there is that ordering;

9   however I used the spit sock.

10      Q.    So you did not attempt to use a surgical mask

11  or an oxygen mask before putting the spit sock on

12  Mr. Phounsy?

13      A.    No, sir.

14      Q.    Why not?

15      A.    Just because of the way he was having to be

16  controlled, I felt the spit sock was more appropriate,

17  and that's what I used.

18          MR. McBRIDE:  All right.  I'm going -- we can

19  mark this as Exhibit 13.  It's got a Bates number of

20  Santee 0089.

21          Let me actually show it to you guys first and

22  tell me if you recognize this, Mr. Hackett.

23          Oh, you know what?  Actually --

24          MR. OSTERBERG:  You have a bigger version?

25          MR. McBRIDE:  Yeah, we've got it in Exhibit 3,

1   so I'll take that back.  That's so hard to read anyway.

2   So we can withdraw Exhibit 13.  We'll just look at

3   Exhibit 3.

4   BY MR. McBRIDE:

5       Q.   Under subsection "C" it says, "If the patient

6   is actively spitting, a surgical mask or oxygen mask

7   with a minimum flow for simple oxygen mask" and blah,

8   blah, blah, "for rebreather masks, may be placed over

9   the patient's mouth to protect EMS personnel and others.

10  If this method fails, a lightweight sheer protective

11  mesh hood may be used."

12           Is that your understanding?

13      A.   Yes, sir.

14      Q.   So you would agree that you are supposed to try

15  a surgical mask or an oxygen mask before putting a spit

16  sock on?

17      A.   Based on that protocol, yes.

18      Q.   So you would agree that you did not follow

19  protocol, at least as it applies to the spit sock?

20           MR. OSTERBERG:  Objection.  Calls for

21  speculation.  Argumentative.  Vague and ambiguous as

22  phrased as far as following protocol.

23           MR. GAZZO:  Join.

24           THE WITNESS:  I believed that a spit sock would

25  be better utilized in this situation due to the

1    A.   He is still on his left side.

2    Q.   What do you do at that point?

3    A.   At that point we have -- we talk to Deputy

4    Ficher, that you need to get him out of the maximum

5    restraints as quickly as possible.  At this point

6    firefighter/paramedic Marc Poynter is beginning chest

7    compressions.  I believe that I let the hospital know

8    that there was a sudden status change in our patient.

9    And I hooked up a bag-valve mask with 100 percent oxygen

10   and began to bag the patient per our CPR protocols.

11   Q.   How was Mr. Poynter doing chest compressions if

12   Mr. Phounsy is still on his side in maximum restraints?

13   A.   We were rotating him into a supine position as

14   best we could.  However, we still had to work with

15   Deputy Ficher to get those restraints off and get him

16   fully supine.

17   Q.   So when you say Mr. Poynter began CPR, this was

18   CPR being performed while Mr. Phounsy was still in

19   maximum restraints and in a recovery/supine position?

20        MR. GAZZO:  Vague and ambiguous as to time.

21        MR. OSTERBERG:  And also misstates his

22   testimony about rotating a patient, but go ahead.

23        THE WITNESS:  So we rotated the patient as best

24   we could to get him in the most supine position that we

25   could to allow for us to perform adequate compressions

1   while Deputy Ficher worked on getting those restraints

2   off.

3   BY MR. McBRIDE:

4       Q.   So you attempted to rotate Mr. Phounsy into a

5   supine position?

6       A.   As best we could, yes.

7       Q.   But you would agree, given the restraints, you

8   could not put him in a full supine position?

9       A.   No, sir.

10      Q.   You would agree that that's not -- those are

11  not ideal conditions under which to perform CPR, at

12  least effective CPR?

13      A.   I would agree that that is not an ideal way to

14  perform CPR.

15      Q.   Did Deputy Ficher immediately remove the

16  maximum restraints from Mr. Phounsy?

17      A.   He worked as fast as he could to remove those

18  restraints.

19      Q.   Did Deputy Ficher have a key to the handcuffs

20  with him?

21      A.   Yes, sir.

22      Q.   You saw the key?

23      A.   To the best of my knowledge he had a key.  He

24  was able to start getting the patient out of restraints.

25  So whether he used the key or some other method, I am

COUNTY OF SAN DIEGO EMERGENCY MEDICAL SERVICES
POLICY/PROCEDURE/PROTOCOL

No. S-142
Page: 1 of 1

SUBJECT:    TREATMENT PROTOCOL – PSYCHIATRIC / BEHAVIORAL
EMERGENCIES

Date: 7/1/2015

| BLS | ALS |
|---|---|
| • Ensure patent airway, $O_2$ and/or ventilate prn<br>• $O_2$ Saturation prn<br><br>• Treat life threatening injuries<br><br>• Attempt to determine if behavior is related to injury, illness or drug use.<br><br>• Restrain only if necessary to prevent injury. Document distal neurovascular status q15'. Avoid unnecessary sirens.<br><br>• Consider law enforcement support and/or evaluation of patient.<br><br>• Law enforcement could remove taser barbs, but EMS may remove barbs. | • Monitor EKG<br>• IV SO  adjust prn<br>• Capnography SO<br><br><br>**For Combative patient**:<br><br>• Versed 5mg IM/IN/IV SO, MR x1 in 10" SO |

Note:    For combative patient IN or IM Versed is preferred route to decrease risk of injury to patient and personnel.

**Use caution when considering Versed use with ETOH intoxication. Can result in apnea.**

Consideration for patients presenting with taser barbs:
• Taser discharge for simple behavioral control is usually benign and does not require transport to BEF for evaluation.
• Patients, who are injured, appear to be under the influence of drugs, present with altered mental status, or symptoms of illness should have a medical evaluation performed by EMS personnel, and transported to a BEF.
• If barbs are impaled in an anatomically sensitive location such as the eye, face, neck, finger/hand or genitalia do not remove the barb, patient should be transported to a BEF.

**Document revised: 7/1/2015**
**Approved:**

*[signature]*

**EMS Medical Director**



EXHIBIT 5
Hackett
Lorraine E. Mesker, CSR No. 6499

LITIVATE
REPORTING + TRIAL SERVICES









