K.J.P., *et al.*, v. COUNTY OF SAN DIEGO, *et al.*,
Case No. 15-cv-2692-H-MDD

**Expert Witness Report**
**of**
**Jerry Thrush, MD, FAAEM**

May 12, 2017

## I. Introduction

### a. Purpose of Report

I have been retained by the Singleton Law Firm for purposes of evaluating the records
and formulating expert opinions regarding the events surrounding Lucky Phounsy's
cardiorespiratory arrest on 4/13/2015 and ultimate declaration of brain death on
4/20/2015.

### b. Qualifications of Expert

I am a Doctor of Medicine licensed to practice medicine in the State of California and a
board certified specialist in emergency medicine by the American Board of Emergency
Medicine. I am a graduate of Stanford University School of Medicine and residency
trained in the specialty of emergency medicine. I have been board certified in emergency
medicine for approximately twenty-four years. I am in active practice at an acute care
facility that is a Level 2 Trauma Center in California. Before medical school I was trained
and certified as an EMT here in San Diego at Miramar College, and I have served as the
Director of EMS (Emergency Medical Services) at Loma Linda University Medical
Center, a level I Trauma Center, and have served as the medical director of LifeCare
Medical Transportation. A true and correct copy of my Curriculum Vitae is attached
hereto as **Exhibit 1**.

As a specialist in emergency medicine I am familiar with the clinical management of
agitated patients, psychiatric emergencies, use of restraints, airway and respiratory
management in emergency situations, management of patients with drug and alcohol
intoxication, overdose, and cardiac arrest and resuscitation, as well as of standard of care
as it applies to prehospital providers and emergency physicians. I am qualified to render
opinions in this regard.

### c. General Admonitions

In my opinion, based on my education, training and experience, the issues in this case are not within the scope of general knowledge of laypersons and would require expert opinion testimony from an appropriate practicing physician.

Based on my review of records incorporated herein as well as my education, training and experience in the field of emergency medicine and prehospital care, I have formulated opinions related to this litigation that I state below.

Because discovery in this matter is ongoing and is not complete, the opinions expressed herein are subject to further refinement prior to the time of my deposition in this matter, particularly to the extent I review additional records, discovery responses and deposition testimony, and in response to specific questions asked. I reserve the right to amend my opinions based on materials unavailable to me at the time of creation of this document.

## II. Case Synopsis (*Please note this is a synopsis and not intended as a complete case summary*)

My review of records in this case indicates that on 4/13/2015 Mr. Lucky Phounsy was a 32 year-old male who was married and had two young children. According to reports provided, on the date in question he was agitated and paranoid after sleep loss apparently following his recently attending the Coachella Music Festival, where by history he had been using marijuana and ecstasy, and perhaps other substances.

His family attempted to get him to sleep by giving him Benadryl but he remained paranoid, called 911, and indicated to the operator that someone was trying to "kill us." Initially two deputies responded to a private residence and entered. The patient became involved in an altercation during which he was tasered multiple times and all three primary combatants sustained non-life threatening injuries. Multiple backup deputies entered the house. Mr. Phounsy underwent a forcible takedown and restraint by 6 – 7 deputies, and ultimately he was restrained in handcuffs and leg restraints that were attached to a band around his waist (maximal restraints). He was carried out of the residence prone by deputies, placed on the driveway of the home prone where leg restraints were replaced, and he was kept prone until he was rolled onto his side. At this point, he was held down by deputies after being placed on the driveway, while maintained in maximal restraints. Photographs were taken of Mr. Phounsy on the driveway in restraints.

Paramedics evaluated and treated him on scene but claimed to have had difficulty obtaining vital signs and indicated they were unable to monitor him with an oxygen saturation monitor or obtain a blood pressure. Prior to transportation, in addition to physical restraints and manually being restrained by deputies, he was reportedly chemically restrained with Versed administered by the paramedics. The Versed dose of 5 mg was repeated for a total of 10 mg. Photographs were taken of Mr. Phounsy strapped on the ambulance gurney in maximum restraints.

When he was transported to the hospital, he remained in the maximal restraints previously applied by law enforcement. En route to the hospital he was further physically restrained by a sheriff's deputy riding in the ambulance, and a spit sock was placed over his head. He was not placed on oxygen and EKG (Electrocardiogram); oxygen saturation and end tidal CO2 (carbon dioxide) monitors were not used. During transportation he remained in the restraints while being held down by a deputy. At some point the patient sustained a cardiorespiratory arrest while he was in maximal restraints. After the ambulance arrived at the emergency department, the maximal restraints were removed. During his hospital course he was resuscitated in the emergency department after a documented eight minutes of CPR, but he was found by physicians to have had a prolonged cardiac arrest brain death, and multiorgan failure. Photographs were taken of Mr. Phounsy intubated an in a hospital gurney. Mr. Phounsy ultimately succumbed to brain death and was pronounced brain dead on 4/20/2015 at 1932 hrs.

### III. List of Records Reviewed

SDSD - Audio - 911 - Original Call (E2445548 PH01).wav
SDSD - Audio - 911 - Dispatch (E2445548 RADIO).wav
Heartland - Audio - 2015-04-13_22.25.07_Ch22.WAV
Heartland - Audio - 2015-04-13_22.25.24_Ch22.WAV
Heartland - Audio - 2015-04-13_22.26.21_Ch12.WAV
Heartland - Audio - 2015-04-13_22.31.48_Ch22.WAV
Heartland - Audio - 2015-04-13_22.32.54_Ch15.WAV
Heartland - Audio - 2015-04-13_22.35.01_Ch2.WAV
Heartland - Audio - 2015-04-13_22.35.01_Ch2.WAV
Heartland - Audio - 2015-04-13_22.35.01_Ch2.WAV
Heartland - Audio - 2015-04-13_22.35.01_Ch2.WAV
Heartland - Audio - 2015-04-13_22.37.33_Ch12.WAV
Heartland - Audio - 2015-04-13_22.45.29_Ch15.WAV
Heartland - Audio - 2015-04-13_23.09.11_Ch15.WAV
Heartland - EMS CAD.pdf
SDSD - CAD
Lakeside - EMT Cards - Csik.pdf
Lakeside - EMT Cards - Poynter.pdf
Lakeside - P&P Combined.pdf
Photographs:
     Attached to depositions reviewed as exhibits, some marked as pdf files
     Phounsy - Aerials - 8538 Holden Rd.pdf
     Phounsy - Aerials - Grossmont.pdf
     Phounsy - Photos - Lucky at Hospital Combined.pdf
     SDSD - Photos - Autopsy (All Combined).pdf
     SDSD - Photos - Brooke.pdf
     SDSD - Photos - Carbajal.pdf (Carbajal Exhibit 6)
     SDSD - Photos - Carpenter.pdf
     SDSD - Photos - Delgado

SDSD - Photos - Pugh.pdf
53 Photo of Mr. Phounsy on his right side on the ground
54 Photo 1 of Mr. Phounsy's right hand
55 Photo 2 of Mr. Phounsy's right hand
56 Photo of Mr. Phounsy's face, lying on his right side on the ground
57 Photo 1 of Mr. Phounsy on the gurney
58 Photo 2 of Mr. Phounsy on the gurney
59 - 62 photos of an Asian male
63 - 70 photos of a Caucasian male
71 - 72 photos of an Asian female holding a baby
75 – 76 photos of an Asian female
77 – 78 photos of a second Asian female
Policy and Procedures:
Santee - P&P - Psych Emergencies.pdf
Santee - P&P - Restraints.pdf
Santee - P&P - Versed.pdf
Santee - Report - Basic Fire Report (Bagley).pdf
5150 hold 4/13/15 at 2345 hrs.
Santee - Report - Patient Assessment Sheet - Lucky.pdf (handwritten)
Death Report (Pronounced by Dr. Pokala)
Life Sharing Form, signed by Michael Looney
Lakeside Fire Incident Note Run # 4990043 from 4/13/2015 2257 hrs.
Lakeside Fire incident note QCS # 4990043 Run 2015-41593 from 4/13/2015
Grossmont Hospital Medical Records and consultant notes
Deposition of Captain Aaron Bagley, November 17, 2016
Deposition of David Csik December 8, 2016
Deposition of Aaron Hackett December 8, 2016
Deposition of Daniel Nenow, November 17, 2016
Deposition of Adam Daniels, December 12, 2016
Deposition of Aaron Do, December 12, 2016
Deposition of Marc Poynter February 16, 2017
Deposition of Stephen Campman MD, March 17, 2017
Deposition of Aaron Brooke February 22, 2017
Deposition of Dean Allen February 21, 2017
Deposition of Janae Krull, February 23, 2017
Deposition of Fischer February 23, 2017
Deposition of Billy Joe Tennison III, February 22, 2017
Deposition of Tamani Pugh February 21 2017
Deposition of Michael Lee February 24, 2017
Deposition of Sandra Janet Carbajal February 22, 2017
Deposition of Jenny Martinson, February 21, 2017
Santee - Report - ME - Autopsy Rprt.pdf
SDSD - ME - Investigative Report 2.pdf
SDSD - ME's Report - Supplement.jpg
SDSD - Rprt - Allen - Intrvw Stmnt.pdf
SDSD - Rprt - Allen.pdf

4

SDSD - Rprt - Bloch - Det. (Autopsy).pdf
SDSD - Rprt - Brannan - Det.pdf
SDSD - Rprt - Brayman - Det.pdf
SDSD - Rprt - Brooke - 5150.pdf
SDSD - Rprt - Brooke - Intrvw Stmnt.pdf
SDSD - Rprt - Brooke.pdf
SDSD - Rprt - Carbajal - Intrvw Stmnt.pdf
SDSD - Rprt - Carbajal.pdf
SDSD - Rprt - Carpenter - Det.pdf
SDSD - Rprt - Chandler (Collins' 1st Stmnt).pdf
SDSD Report 002-JK.pdf Interview with Krull by Patterson
SDSD Report, Martinson OO2-JM.pdf
SDSD - Rprt - Collins - Intrvw Stmnt.pdf
SDSD - Rprt - Delgado (Krull's 2nd Stmnt).pdf
SDSD - Rprt - Fischer - Intrvw Stmnt.pdf
SDSD Officer Report Fischer (Deposition of Fischer Exhibit 2)
SDSD Follow up Investigative report Interview of Tennison (Deposition of
Tennison Exhibit 3)
SDSD Officer Report Tennison (Deposition of Tennison Exhibit 2)
SDSD Officer Report (Deposition of Pugh Exhibit 2)
SDSD Follow-up Investigative Report of Pugh (Deposition of Pugh Exhibit 3)
SDSD Officer Report of Lee (Deposition of Lee Exhibit 2)
SDSD Follow-up Investigative Report of Lee (Deposition of Lee Exhibit 3)
SDSD Crime/Incident Report of Carbajal (Carbajal Exhibit 3)
SDSD Officer Report Carbajal (Carbajal Exhibit 3)
SDSD Follow-up Investigative Report interview of Carbajal by Patterson (Carbajal
Exhibit 4)
SDSD Officer report Martinson (Martinson Exhibit 2)
SDSD Follow-up Investigative Report Interview of Martinson by Patterson (Martinson
Exhibit 3)

## IV. Opinions

### a. Overview of Opinions

Evidence in this case was provided from multiple viewpoints and over an extended
period. Much evidence was congruent but some areas were contradictory. This final
summary is not meant to be comprehensive, but to provide a brief structured overview
and synopsis of my opinions. A discussion of individual opinions point by point is
included in the following section.

In this report I have called attention to multiple issues and opined regarding the impact of
factors that contributed to outcome of Mr. Phounsy's cardiorespiratory arrest, multiorgan
failure, and brain death.

I have opined on such, but not limited to, effects of law enforcement dispatch and

response, absence of Psychiatric Evaluation Response Team (PERT) intervention before escalation to violence, failure of initial handcuff application, use of taser, use and release of maximal restraints, forceful law enforcement restraint during transport, paramedic monitoring, out of hospital treatment and protocol use, hospital resuscitation and medical care, medical examiner report and conclusions. There were some areas of additive effects and issues of particular concern were identified and discussed.

In summary, Mr. Phounsy called 911 in a plea for help because of paranoia with additional complaint of alleged recent drug use and sleep deprivation. There was no PERT dispatch although a PERT officer indicated that he was sitting in the station. When help arrived in the form of non-PERT officers, this paranoia drove Mr. Phounsy to resist and fight back after a deputy attempted to put a handcuff on him in context of him asking not to be handcuffed. This resistance escalated when Mr. Phounsy was tasered, and, after a violent fight with deputies, Mr. Phounsy was subdued and restrained by forcible takedown involving multiple officers, as well as by some reports, assistance by family members in the household. He was then restrained with handcuffs placed behind his back, his legs were also restrained and attached to a band around his waist by means of a cord (maximal restraints). There were multiple references to "downward pressure," and body weight used to restrain or apply force to Mr. Phounsy.

Ultimately, when deputies finally placed him in handcuffs and restraints, Mr. Phounsy was placed prone and held down by numerous deputies. After he was carried out of the house but before he was put on the gurney photographic evidence demonstrates he was cyanotic. Paramedics reportedly gave him two doses of Versed, but no significant amount was found in either his blood or his urine. Although initial attempts to obtain oxygen saturation were reported, they could reportedly not be obtained in spite of documentation by 22:52 consistent with a mental state of eye opening and withdrawal to pain. Such exam findings are consistent with a Glasgow Coma Scale (GCS) of 7. This conflicts with the paramedic notes recording a GCS of 13. In spite of this diminished mental status and cyanosis, no oxygen was applied, he was not repositioned, and EKG, oxygen saturation and end tidal $CO_2$ monitoring, were not used.

When cardiorespiratory arrest was noted, the preponderance of evidence indicates that it took a few minutes for the ambulance to arrive at the hospital and park, where another deputy assisted, for the restraints to be removed. Some restraints had to be cut. More likely than not, there was a significant delay in identification of cardiac arrest when it occurred.

Upon arrival in the hospital with end tidal $CO_2$ measurement of 86, initial cardiac rhythm of asystole, and, as we would later learn, interval development of brain death and multiorgan failure, it is apparent that cardiopulmonary arrest without meaningful CPR was prolonged.

Autopsy revealed the findings expected with brain death and multiorgan failure, but also revealed a comorbid contributing cardiac condition. While I found no evidence that that this condition was known prior to the event, I agree with the medical examiner in the

6

regard that it was contributory rather than the causative factor for cardiorespiratory arrest. I do note that the medical examiner relied on multiple facts not evident in the case in developing his conclusions.

In conclusion, in all reasonable medical probability, it is more likely than not that Mr. Phounsy would have survived and not sustained cardiorespiratory arrest, or if he had still sustained cardiac arrest he would have been resuscitated with preserved neurologic and organ function if the following had occurred: (please note that in my opinion some factors to be additive).

- If there was a response by officers trained in psychiatric response to the 911 call that could provide verbal de-escalation and arrange transportation to a medical facility without escalation to violence.
- If he was not kept in the prone position for a prolonged time and restrained by downward force by multiple officers until respiratory compromise began, then continued to be restrained without repositioning, monitoring or oxygenation as below.
- If he was not held down further while in route to the hospital, especially with firm pressure on his head with possible shoulder/torso pressure by a heavy, strong, non-medically trained individual his face pointed away from paramedic, and head covered by spit bag.
- If he had been positioned on his back in four point restraints in a timely manner before his cardiorespiratory arrest.
- If he were given high flow oxygen by mask and his breathing not restricted.
- If medical monitoring devices including oxygen saturation, EKG monitors and end tidal $CO_2$ monitors were applied, observed and when indicated, early resuscitative measures were taken.
- If, considering there were monitoring devices applied and oxygen delivered, and if he was not taken out of restraints by the time cardiac arrest occurred, if he had then been immediately taken out of handcuffs and maximal restraints without delay and CPR started at once.

In my opinion it is evident that Mr. Phounsy was held in a prone position in the house, while being carried out of the house and when set down and while restraints were re-applied outside of the house. Law enforcement depositions appeared to generally agree that there was little done to check to see if the restraints were applied correctly and Mr. Phounsy could breathe after application. By at least the time Mr. Phounsy was placed in the driveway, after law enforcement detainment and restraint, photographic evidence demonstrates that he was already cyanotic, and in all reasonable medical probability this indicates he was already near death, but, in my opinion, in all reasonable medical probability could have been resuscitated at this point with little or no residual effects.

In my opinion it is evident that deputies involved received prospective training and continuing education in maximum restraint application, and a supervising deputy, Deputy Ralph, was present on scene. There was however, little evidence that Mr. Phounsy's

restraints were checked by officers to see that they were applied properly and that he could breathe. While this law enforcement training course was not provided for my review, such review may be helpful as it was relied upon by the deputies in their duties. Exact training of officers with regard to prevention of positional asphyxia, checking the restraints and monitoring breathing is unclear.

In my opinion, in this case, there is substantial evidence that the paramedics at scene were prospectively aware of the known risk of cardiac arrest in maximum restraints. David Csik discussed such risk with his supervisor Captain Bagley. In spite of this discussion there was no advice given to reposition the patient to prevent cardiac arrest, apply oxygen, or use medical monitoring equipment, and these interventions were not carried out.

In my opinion it is evident that by 22:52 the paramedic notes indicated that Mr. Phounsy had eye opening to pain and was withdrawing to pain. Although a GCS of 13 was recorded in the paramedic note, it was not supported by paramedic documentation. Given this documented neurologic status, and considering photographic evidence outlined elsewhere in this document, in all reasonable medical probability more likely than not, at this point Mr. Phounsy could have been placed safely on his back in four point restraints.

Had Mr. Phounsy been placed in soft restraints and re-positioned on his back before his cardiopulmonary arrest, it is even more likely than not that he would have arrived at the hospital without having sustained cardiorespiratory arrest. If, in spite of oxygen, monitoring and optimal positioning, he still sustained cardiorespiratory arrest, it would have been identified immediately and effective CPR would have been possible at once. In the case of immediately identified cardiorespiratory arrest and CPR initiated within seconds of arrest, Mr. Phounsy would have more likely than not survived with a great degree of neurologic recovery, if not neurologically intact.

### b. Opinions, Point by Point

**It is my opinion that the call went out to the 911 call center as a psychiatric emergency related complaint, yet law enforcement response did not utilize available psychiatric resources.** There was some conflicting evidence of Mr. Phounsy having underlying psychiatric disease. Whether or not Mr. Phounsy had underlying psychiatric disease, mixed psychiatric disease and drug induced psychosis, or had strictly drug-induced psychotic symptoms, he called for help, had not threatened to harm himself or others, and did not resist until officers were unsuccessful at placing handcuffs on him. His behavior escalated after he was tasered. My opinion is that, when feasible, the emergency response should be for a psychiatric emergency, when, for example, officers trained in de-escalation of psychiatric emergencies such as PERT officers are available, they should be dispatched and respond.

My opinion is that Mr. Phounsy's call to the 911 center was in all reasonable medical probability *psychiatric* in nature irrespective of whether it caused by lack of sleep, psychosis, drugs or some combination thereof. A review of the sound file of the call to

8

the 911 Call Center by Lucky Phounsy himself indicates the following: In his own voice reasonably calm voice he says, "someone trying to kill us." Another calm voice, "Greg" came on the line and indicated that there was no one trying to kill anyone, that it was a matter of drugs and paranoia. There was no complaint of overdose. There was no indication that anyone on scene had a weapon or was threatening to harm themselves or anyone else. He, "Greg," indicated, they, on scene, were trying to get the person calling, Lucky Phounsy to a hospital.

There is some limited evidence in this case that supports underlying previous psychiatric disease. In the 5150 hold written by Deputy Brooke the following was documented, "According to Lucky's mother he has been housed in psychiatric housing in the past." My opinion is this may be consistent with previously existing psychiatric disease. However, no old medical or psychiatric records were supplied in this case. Because there are no old medical or psychiatric records supplied in this case I cannot opine definitively regarding the presence or absence of pre-existing psychiatric disease. According to the Officer Report of Tennison, the PERT officer who interviewed Greg Kelly at the time of the incident, Greg stated, "Phounsy started to hear things and was paranoid. Phounsy believed someone was after him."

In her deposition, on page 27; 11- 21 Tamani Pugh recalls that the call went out by dispatch something to the effect of a "Possible 5150."

In her deposition on page 29; 4 – 6 Sandra Carbajal indicates that, "I just remember hearing that Deputy Krull and Corporal Collins received the radio call of a subject that believed someone was after him."

My opinion is that the presentation of "hearing things" and "paranoia" in the event of psychosis based on underlying psychiatric disease without drug use, in all reasonable medical probability would have been essentially the same

In this case my opinion is that it is apparent that a PERT deputy *was* available, in fact a PERT deputy, Deputy Tennison did respond to the scene after events escalated to violence. In his deposition, on page 49; 18 – 21 Deputy Fischer indicates that Deputy Tennison was there and that he was a PERT deputy.

In his deposition on page 30; 9 – 11, Billy Joe Tennison III, the PERT officer on duty indicates that he can be assigned to a call at dispatch.

On page 38; 18 – 19 Billy Joe Tennison III indicates at the time of the call he was, "sitting in the office." Furthermore, on page 48; 7 – 11 Billy Joe Tennison III indicates it took him five minutes to get to the scene from the office.

In her deposition, page 176; 17, Janae Krull indicates that they did not call PERT, "Because there's no way we would have let them in the house." This statement appears to have been in context of after escalation of the encounter to violence. In fact a PERT officer *did* respond and *did* come to the scene, but only after "Code Cover" was called.

The fact that patient had an involved wife and family is also evident. This fact is clear in the throughout the notes: "Greg" and a female (possibly the patient's wife) were present at the time of 911 call. On page105; 13 – 14, of her deposition, Janae Krull indicates, that Mr. Phounsy's wife came out and kind of put her hand on his chest. On page 106; 16 – 18 Janae Krull indicates, in her deposition, that Mr. Phounsy's wife said, "Calm down. Calm down. They're here to help you. Just stop. Calm down. Calm down." Mr. Phounsy's wife was present and spoke with Captain Bagley. She was also present and breast-feeding infant with another two-year-old child in waiting area during pastoral care by evidence of pastoral care note.

My opinion is that family can be helpful when recruited to calm agitated psychiatric patients at the scene if utilized by responders with training in de-escalation. When the actual 911 call is played back, in my opinion, the tone of voice exhibited by "Greg" suggests caring and compassion for Mr. Phounsy. A trained provider can recruit such an individual in all reasonable medical probability to assist in calming and gaining cooperation of the patient at scene. It is evident that Mr. Phounsy's wife also attempted to calm him, but there was no trained psychiatric evaluator to direct and assist her.

My opinion is that in event of a psychiatric response of PERT officers, verbal de-escalation techniques, Mr. Phounsy in all reasonable medical probability could have been transported to an emergency psychiatric facility without escalation to the violence that resulted in fighting, and, more likely than not, he would have arrived to a treatment facility without cardiorespiratory arrest and not suffered brain death and multi-organ failure.

**It is my opinion that officers failed to safely restrain Mr. Phounsy after they attempted to place him in handcuffs.** The consensus of reports, interviews and depositions indicate that Mr. Phounsy violently resisted only *after* officers attempted to handcuff him when he did not expect it. The preponderance of his fighting with officers appears to be related to attempting to escape.

Evidence presented indicates before he that time of contact, he complied with deputies and asked only *not to be placed in handcuffs*. Evidence also indicates that Mr. Phounsy was not under arrest at the time the handcuffs were placed although the transporting deputy, Deputy Fischer indicated that, on page 101; 22 – 25, that he was, "in charge" of Mr. Phounsy because, "he was in custody."

According to the deposition of Deputy Carbajal on page 36; 14 – 18 30; 17 – 22 she indicates that deputies are trained to actually make sure if you're going to put cuffs on somebody you get both on so these kinds of situations don't arise.

My opinion is that in all reasonable medical probability, in event of placing Mr. Phounsy in restraints without losing control of him partly restrained, there would not have been escalation to further violence, and, more likely than not, Mr. Phounsy would have arrived

to a treatment facility without cardiorespiratory arrest and not suffered brain death and multi-organ failure.

**It is my opinion that officers placed Mr. Phounsy in a prone position during initial restraint, carried him out of the house in a prone position, and, that he remained in a prone position in the driveway until leg restraints were re-applied and he "calmed down." These, in all reasonable medical probability, were contributory factors in the development of the respiratory compromise that ultimately led to Mr. Phounsy's cardiorespiratory arrest.** The deposition of Deputy Tennison indicated that he was *kept* prone until he calmed down after the leg portion of the maximal restraints were reapplied by Deputy Martinson. On page 80; 13 – 17 of his deposition, Billy Joe Tennison III indicates while they were waiting for him to calm down he was in a prone position. He apparently remained prone for one to three minutes in the driveway according to Billy Joe Tennison III. The above-mentioned restraint occurred with multiple officers holding downward pressure on him. My opinion is that by this point respiratory compromise had certainly began, that ultimately caused cardiorespiratory arrest, brain death and multi organ failure. This point was recorded by photographic evidence as discussed below.

In all reasonable medical probability, if Mr. Phounsy would have been placed in restraints without being positioned in the prone position for an extended period of time, and without multiple officers applying downward pressure, more likely than not, the respiratory compromise that began at least at that time Mr. Phounsy was in the driveway would not have begun. If such respiratory compromise had not begun, Mr. Phounsy would have, in all reasonable medical probability arrived to a treatment facility without cardiorespiratory arrest and not suffered brain death and multi-organ failure.

**It is my opinion that, by consensus of the deposition testimony of the deputies involved, the majority of deputies did not check to see if the restraints were applied properly or that they saw any other deputy do so. In addition, nearly all deputies involved testified that they did not check to see if Mr. Phounsy could breathe after application of maximum restraints. This too was a factor in the development of the respiratory compromise that led to Mr. Phounsy's cardiorespiratory arrest.**

Specifically, on page 70; 4 -7, Billy Joe Tennison III indicates he did not check the restraints to see if they were applied properly. Furthermore, on page 74; 22-25 Billy Joe Tennison III indicates he does not recall at any point seeing a deputy checking Mr. Phounsy to make sure he was breathing after the restraints were applied. And Tamani Pugh indicates on page 56; 21 – 24 of her deposition that she did not personally check Mr. Phounsy there in the hallway to make sure he was breathing after the restraints were applied. Michael Lee indicates on page 62; 5 – 8 of his deposition that he did not check the restraints to see if they were applied correctly. Furthermore on page 62; 9 – 10 Michael Lee indicates that he did not check to see if Mr. Phounsy could breathe. Michael Lee also indicates on page 62; 13 – 15 that he did not see any deputies check the restraints to make sure they were applied correctly. Furthermore, Michael Lee indicates on page 62; 5 – 8 that he did not check the restraints to see if they were applied correctly. Finally, Michael Lee indicates on page 62; 13 – 15 that he did not see any deputies check

11

the restraints to make sure they were applied correctly. Additionally, Sandra Carbajal indicates in her deposition on pages 45; 1 – 5 and 29; 4 – 6 that, she did not check to make sure Mr. Phounsy could breathe after the restraints were applied. And Sandra Carbajal indicates on page 45; 20 - 23 that, she did not see any other deputy check Mr. Phounsy's breathing there in the hallway after the restraints were applied. What's more, on page, 59; 5-6 Deputy Fischer indicates that he did not check Mr. Phounsy's maximum restraints to see that they were applied correctly. And, Deputy Fischer indicates on page 59; 15 – 18 that he did not see any other deputies check Mr. Phounsy to be sure that he cold breathe.

The only deputy who indicated she checked breathing was deputy Carbajal, on 45; 16 – 19 of her deposition Sandra Carbajal indicates that, she was "visually watching his face to make sure he's breathing" when he was "outside." And the only deputy who indicated that she checked to see if the maximum restraints were applied correctly was deputy Martinson on page 47; 12 – 15 where she indicates, they checked to see that the maximum restraints were placed correctly, although her testimony in this area is somewhat confounding as the deputies, as above, indicated they did not see anyone check the restraints. However, on page 45; 5 – 6 of her deposition, Tamani Pugh indicates that the cord cuffs were initially applied correctly but, "wasn't as tight as you wanted them."

My opinion is that consensus of the deputies testimony indicates that leg portion of the maximal restraints was applied in such a manner that they came loose by the time Mr. Phounsy was carried outside. My opinion is that the consensus of the deputy's testimony agrees that the restraints were not checked to see if they were applied properly, although one deputy, Pugh, indicates the thought the cord cuffs were applied correctly but not, "as tight as you wanted them."

So, if the restraints had been checked for correct position inside the house, he would not likely have had to be place prone in the driveway and kept that way for re application and, "until he calmed down."

Furthermore, multiple deputies, as above, indicated that they did not check if he could breath after maximal restraints were applied. The fact is, cyanosis is evident in photographs in the driveway. In all reasonable medical probability Mr. Phounsy was experiencing trouble breathing by that point.

It is my opinion that because of this requirement for re-application of leg restraints that Mr. Phounsy was kept in the prone position for longer than necessary once moved to the driveway. It is my opinion that multiple deputies did not check to see if Mr. Phounsy could breathe adequately. Furthermore, it is my opinion, that, by this point in the driveway, the onset of the respiratory compromise began, that in all reasonable medical probability, and more likely than not caused Mr. Phounsy's cardiorespiratory arrest.

**It is my opinion that paramedics documented consideration for safety of the community and responding personnel their medical decision-making to continue the restraints at initial evaluation, and in that regard followed protocol S-422. However,**

**my opinion is also that the paramedics and deputies did not consider the safety of the patient, as photographic evidence indicates the patient was cyanotic in the driveway.**

My opinion is, as above, if respiratory compromise had been identified by the paramedics and rapid repositioning occurred, especially in tandem with application of high flow oxygen by face mask, in all reasonable medical probability, and more likely than not, Mr. Phounsy would have arrived to a treatment facility without cardiorespiratory arrest and not suffered brain death and multi-organ failure.

**It is my opinion that respiratory status was not monitored by end tidal CO2, EKG or pulse oximitry, and direct visualization of the airway and facial skin was impaired by position and application of a spit sock. This too was a factor in the development of the respiratory compromise that led to Mr. Phounsy's cardiorespiratory arrest.**

According to protocol S-142, supplied in the deposition of Aaron Hackett, Exhibit 5, under "BLS," one must "Ensure patent airway and ventilate PRN," O2 saturation PRN, and under ALS, Monitor EKG and Capnography PRN. In this case a combative behavior was identified, and a GCS of 13 was indicated in the PCR (Patient Care Report). However, on the basis of the documentation in the PCR, a GCS of only 7 can be calculated as below.

In the Patient Care Record 10:52 PM "BRIM: Noted breathing is full & effective. The patient as a GCS verbal response of 1 (no response). Eye exam reveals eyes opening to pain. Noted the patient withdraws to pain.." [sic] In my opinion, paramedic documentation is medically consistent with GCS 7 *not* a GCS of 13. My calculation is as follows:

Verbal response 1 (no response)
Eye opening 2 (opening to pain)
Motor 4 (withdraws to pain)

Total 7

Multiple photographs supplied in the case also support my calculated GCS of 7. My opinion is that a patient with a GCS of 7, who responds by withdrawing to pain, medical monitors can be applied. The medical monitoring devices listed above are not painful.

In addition, I am concerned that direct visualization of the airway and facial skin color was, by all reasonable medical probability, obscured by spit sock application. And furthermore, visualization of chest movement was, by all reasonable medical probability, somewhat obscured by presence of Deputy Fischer actively restraining Mr. Phounsy inside the ambulance. On page 172; 1 – 3 and 21-24 of his deposition, Aaron Hackett indicates that, Deputy Fischer was restraining Mr. Phounsy head and torso / shoulder area for the majority of the duration of the ambulance ride. Per Deputy Fischer's Officer's

report, Mr. Phounsy was positioned on his left side, and in his deposition he reiterated this. Deputy Fischer also indicated that he was seated on the passenger's side of the ambulance, and the treating paramedics on the driver's side seat opposite him and at the head of Mr. Phounsy respectively. In summary, regarding monitoring, I find that there was no monitoring by EKG monitor. There was no monitoring by end tidal CO2 monitor. There was no monitoring by pulse oximitry. And there was a spit sock on the patient's head and a deputy with hands on his torso / shoulders that obscured vision of chest movement and airway.

My opinion is, in all reasonable medical probability, and more likely than not, Mr. Phounsy could have been monitored with medical monitoring devices if he was withdrawing to pain and had a GCS as supported in the paramedic note, and as supported by photos. And, because of the absence of monitoring; impending respiratory failure, was not detected and cardiorespiratory arrest occurred. In, addition the failure to detect the *impending* respiratory failure, the *actual* cardiac arrest was not detected by medical monitoring at the time that it occurred because of the absence of such medical monitors. These factors were significant components of the prolonged cardiorespiratory arrest that was associated with brain death and multiorgan failure.

**My opinion regarding application of the spit sock, is that the prehospital protocol S-422 was not followed as written. This too was a factor in the development of the respiratory compromise that led to Mr. Phounsy's cardiorespiratory arrest.**

Evidence is confounding as to why the spit sock was applied. According to the protocol S-422, the spit sock may be applied if the patient is actively spitting. In addition, according to this protocol, a surgical or oxygen mask may be used, and if this method *fails*, a lightweight mesh hood (a spit sock) may be used. After reviewing the records I find little evidence that Mr. Phounsy was actively spitting, although in the addenda of Hackett created on 4/30/15 for the incident on 4/13/15 Mr. Hackett indicates that, "Deputy Fischer stated that the patient was attempting to spit on him." Paramedic documentation on the date of service does not appear justify the use of the mesh hood in detail in Hackett's note. On page 182; 6-9 of his deposition, Aaron Hackett indicates that, he put the "spit sock" on Mr. Phounsy's head at the request of Deputy Fischer because he said he felt like he was being spit at, Although on page182; 15 Aaron Hackett indicates that he did not see Mr. Phounsy spit. This record seems to be contradicted by testimony of Deputy Fischer in his deposition, where on page 104;1 – 7 Deputy Fischer indicates that he doesn't remember asking for a spit sock or Mr. Phounsy spitting on him.

The application of the spit sock was described in Hackett's deposition as above. In the deposition of Marc Poynter, he indicates he felt with regards to oxygen, it wasn't indicated. And in his deposition, on page 71; 21-25, David Csik indicates that he did not discuss the use of an oxygen mask with Poynter or Hackett because "it's not in our protocol." This is confounding, as it is in the protocol. Although a surgical mask is also listed as an option by protocol before spit sock, in my opinion, cyanosis is an indication for oxygen administration in this clinical context. On page 109; 5-8 of his deposition, Aaron Hackett indicates that there was no guarantee an oxygen mask would stay on. The

withholding of oxygen because of fear that an oxygen mask might fall off in context of a patient who is responding by withdrawal to pain and has been cyanotic and has diminished responsiveness is medically unfounded.

In summary, my opinion regarding spit sock application is that it was applied with no active spitting witnessed by the paramedic, without the indicated order of trial of other modalities, and, although paramedic involved, Hackett says Mr. Phounsy was spitting at Deputy Fischer, Deputy Fischer testified that he was not. In all reasonable medical probability the spit sock did obscure the paramedics vision of skin of lips and ears, where cyanosis can be monitored, and when used in lieu of oxygen, it was a factor that contributed to the respiratory insufficiency that ultimately ended in cardiorespiratory arrest, brain death and multiorgan failure.

My opinion regarding oxygen mask use is that tissue oxygenation in this case by all reasonable medical probability was worsened without application of oxygen. The patient was cyanotic in multiple photographs in wile in the driveway. If oxygen mask *was* used with high flow oxygen it may have in all reasonable medical probability delayed cardiorespiratory arrest, but could only *prevent* cardiac arrest if respiratory excursion was adequate. To be clear, in all reasonable medical probability, -- layman's terms – even if high flow oxygen is applied by mask, if a patient cannot adequately move his chest to move gas in and out, or the airway is obstructed the patient will still die from respiratory insufficiency.

**It is my opinion that aggressive or violent behavior may be a symptom of a medical condition and that this was not considered.** In protocol S-422 subsection D it directs that, "Prehospital personnel must consider that aggressive or violent behavior may be a symptom of a medical condition." In all reasonable medical probability any violent thrashing or attempts to raise his head that Mr. Phounsy exhibited that began after maximum restraint in the driveway and cyanosis was evident was medically likely caused and or made worse at that point by respiratory compromise, and that such compromise was further worsened during transportation and ultimately ended in cardiorespiratory arrest, brain death and multiorgan failure. Prior to transportation, as above, photographs indicate cyanosis. Cyanosis denotes failure of oxygenation, a *medical condition* that can, and does cause combative behavior *especially* if associated with being restrained in a manner that one has any restriction of respiratory excursion and impairment of respiration. This is compounded, in my opinion after exertion when, physiologically a patient already has lactic acidosis that the body attempts to correct by hyperventilation.

Although respirations were variably noted in the PCR as "shallow but effective" and with "full tidal volume," and in depositions, "skin signs" and "capillary refill" were reportedly evaluated, the cyanosis identified on images speaks for itself. Although the dark ambient lighting outside is mentioned in the deposition of Poynter, identification of skin signs per se indicates that there *was* light for evaluation.

In summary, if the medical condition, lack of tissue oxygenation was identified and treated with high flow oxygen and repositioning, in all reasonable medical probability,

more likely than not, cardiorespiratory arrest with resultant brain death and multiorgan failure would not have occurred.

**My opinion on Versed administration is that it was not a factor in this case:** Versed administration, and repeat dosage were indicated and within protocol. Versed used can be associated with respiratory compromise that ultimately ends in respiratory arrest that can lead to cardiorespiratory arrest, especially in the context of alcohol use. In this clinical context, Versed use was appropriate, weighing risks and benefits; although it is not clear when the photographs on the driveway were taken with respect to Versed administration. Monitoring was recommended by protocol but not undertaken. My major concern with Versed use is the photographic evidence demonstrating cyanosis. The time of photographs related to use of Versed is not clear.

Although Versed may cause respiratory arrest and apnea, especially in context of alcohol intoxication, this will, an all-reasonable medical probability be preceded by progressive sedation rather than continuous violent thrashing or attempts at lifting the head. Such movement followed by cardiorespiratory arrest with an end tidal CO2 of 86 is, in all reasonable medical probability caused by restriction of ventilation as in Mr. Phounsy's clinical context.

However, because by toxicology blood and urine testing does not appear that a significant amount of Versed was absorbed. It was not a factor. In fact, it suggests that the blood flow was low, either before, during, or not long after the reported administration of Versed, or that cardiorespiratory arrest occurred shortly after the reported administration of Versed.

**My opinion regarding the method of restraint use and monitoring of patient's vital signs and restriction of the ability to protect the patient's airway is that restraint position used impaired monitoring of the patient's airway, and this was a factor in the development of the respiratory compromise that led to Mr. Phounsy's cardiorespiratory arrest.**

Under paramedic protocol S-422 E. it states, "The method of restraint used must allow for adequate monitoring of vital signs and shall not restrict the ability to protect the patient's airway." There is evidence that the method of restraint in this case did not allow for adequate monitoring of vital signs. In the deposition of Aaron Hackett 125; 11-15 Aaron Hackett indicates that he could not get a blood pressure measurement in the ambulance because of *positioning of the arm being flexed.* In addition on page 146; 8 Marc Poynter indicates that he was unable to bet a blood pressure because of the "position that he was in with the handcuffs."

The confounder here is that there was also documentation throughout the case that the patient was continuously moving and it was difficult to obtain vital signs because of "movement." Further, it was also documentation by the addenda of Aaron Hackett that "Vitals were monitored based on his movement," per the Deposition of Hackett Exhibit 3 Prehospital Care Report 4/30/2015 2:59:09 added to the Lakeside Pre-Hospital Care

Record of 4/13/2015. In my medical opinion monitoring of movement is *not* equal to monitoring vital signs and such dependence may lead to a false sense of security about adequacy of ventilation. In this case documentation supports GCS of 7, as above. In a retrospective review I am unable to determine any medical reason why vital signs cannot be obtained when a patient is obtunded to the degree of a GCS of 7, withdrawing to painful stimuli. The fact that Deputy Fischer was forcibly restraining the patient was in all reasonable medical probability an additional factor that de facto caused difficulty in obtaining vital signs en route as during much of the transport.

Changes in vital signs may herald cardiorespiratory arrest, but in cases of combative behavior they can be certainly difficult. The records are confounding in regards to combative behavior and documentation supporting a GCS of 7 as chronicled above. In all reasonable medical probability with a GCS 7, with motor status of withdrawing to painful stimuli, vital signs should more likely than not be obtainable. In this case of prolonged cardiorespiratory arrest it is beyond reasonable medical probability that vital signs changed prior to the identification that cardiorespiratory arrest occurred. Monitoring vital signs would have allowed intervention to avoid or delay cardiorespiratory arrest.

**My opinion regarding sufficient slack in the restraint device to allow the patient to straighten the abdomen and chest and to take full tidal volume breaths is that it is unclear whether, in spite of documentation that the patient could truly take full tidal volume breaths. Regarding paramedic protocol S-422 Subsection F; it requires that restraints must provide sufficient slack in the restraint device to allow the patient to straighten the abdomen and chest and to take full tidal volume breaths. This was also a factor that in all medical likelihood contributed to Mr. Phounsy's cardiorespiratory arrest.** Effective tidal volume at scene was charted prior to being placed in ambulance. In spite of this documentation there was obvious cyanosis visible in multiple photographs taken of Mr. Phounsy while restrained in the driveway. Therefore, given the photographic evidence provided in this case, this calls into question whether there was truly sufficient slack in the restraint device to allow adequate respiration. Given the presence of cyanosis in the photographs in all reasonable medical probability respirations *were* restricted at least in part by the device and by superimposed positioning and physical restraint, although the effect of maximal restraint is difficult to separate in this case from the superimposed effect of added physical restraint (i.e. the fact that Mr. Phounsy was held down).

In all reasonable medical probability, the factors mentioned above were additive in preventing gas exchange resulting in Mr. Phounsy's cardiorespiratory arrest that led to brain death and multiorgan failure. The sum total of all variables was greater than can be explained by added individual parts. In all reasonable medical probability the factor most pivotal regarding restraint en route to the hospital was the added application of force by Deputy Fischer over the head and by some evidence, torso / shoulder until the time that cardiorespiratory arrest was noted. On page 172; 25 and 173; 1- 3 of his deposition, Aaron Hackett indicates that, Deputy Fischer was restraining Mr. Phounsy's "torso and head" until the point when he and Mr. Poynter determined that Mr. Phounsy had coded.

In Deputy Fischer's Officers Report (Deposition of Fischer, Exhibit 2), Deputy Fischer indicates that Mr. Phounsy "stopped resisting," and it was one to two minutes later when he "stopped breathing and had no pulse."

I note that the restraint protocol requires the continuous presence of law enforcement agents if restraints are applied by law enforcement. The de facto reason for presence of law enforcement is to provide safety of personnel, and to provide the ability to release restraints (locking handcuffs), that paramedics cannot release.  Aaron Hackett, in his deposition, indicated on page 192; 19-21 that he believed that Deputy Fischer had a key to the handcuffs. Furthermore on page193; 16-19 Aaron Hackett indicates that his belief is that the deputies have keys to handcuffs with them as common practice. Marc Poynter also indicated this belief. In my opinion, a reasonable and prudent paramedic would hold this belief.

In this case it is evident that law enforcement was present, however there is evidence that actual additional physical restraint was in all reasonable medical probability deleterious, prevented direct visualization of airway and effectiveness of breathing and likely further impaired gas exchange by direct pressure over the head and torso. In addition it was apparent that there was by consensus of reports and depositions, a delay of several minutes until restraints could be removed after arrival and parking in the ambulance bay.

**My opinion regarding the attempt to modify restraints to a medically accepted standard prior to transport is that this modification, though considered, may not have been actually attempted**. **Failure of modification of restraints was a factor in cardiorespiratory arrest in this case.** While there is consistent deposition evidence of consideration of modification of restraints, actual attempts modification is inconsistently documented, thus I am unable to determine if actual modification of restraints was attempted or simply considered Paramedics seem to document a trial of release in their notes, although law enforcement depositions appear to agree that no one saw or assisted with such an attempt.

I certainly see documentation of consideration of risks vs. benefits were considered and it was reportedly determined by consensus of law enforcement and prehospital personnel that restraints could not be safely removed at scene or at initiation of transport. This consideration seems incongruous with the appearance of cyanosis provided in photographic evidence discussed below. Restraints were not *actually* modified en route until after cardiorespiratory arrest was noted, then they could not be removed in a rapid manner and the consensus of all documentation appears to point to the fact that restraints were not actually removed until after arrival to the hospital.

In all reasonable medical probability, and more likely than not, when a patient is obtunded to the degree of withdrawal to pain and eye opening to pain and when they are cyanotic restraints can be modified. Furthermore, failure of rapid removal of restraints was a substantial factor that contributed to the duration of the prolonged cardiorespiratory arrest that led to multiorgan failure and brain death.  See discussion above regarding presence of law enforcement and outcome.

**My opinion regarding selection by the paramedics of Psychiatric/Behavioral Emergencies (S-142) and Application of Patient Restraints (S-422), County of San Diego Emergency Medical Services Policy/Procedure/Protocol is that they were appropriately selected, but variably applied. This variable application in areas described above contributed to Mr. Phounsy's cardiorespiratory arrest.** Paramedic protocol identification was appropriate and medically indicated. Poisoning / Overdose protocol (S-134) was appropriate to consider, but not indicated in all reasonable medical probability. Please see other sections on restraint and monitoring regarding my opinions on application of protocols.

**My opinion on the discussion regarding the possibility of impending cardiac arrest on scene is that there was an opportunity for scene command to give direction and or reminders to change position and restraints, apply oxygen and use monitoring equipment to prevent cardiac arrest. Paramedic Csik and Captain Bagley discussed the possibility of cardiac arrest at scene. There was opportunity for interventions, as discussed elsewhere in this document that would, more likely than not, in all reasonable medical probability have been life saving.** In spite of this, there was no documented advice by Captain Bagley to the treating paramedics of the importance of repositioning, monitoring to prevent cardiac arrest, to continue to continue to try to monitor by EKG, capnography or oxygen saturation monitoring or of the application of high flow oxygen. There was opportunity for interventions that in all reasonable medical probability more likely than not, would have been factors that would have culminated in the prevention cardiorespiratory arrest that would have prevented brain death and multiorgan failure. These interventions, as described above, would have been effective given respirations were not restricted to the point of insufficiency by active restraint (i.e. being held down to the point that respirations were ineffective), and that action was to have been taken on the basis of patient monitoring.

On page 14; 9 of his deposition, Captain Bagley indicated that, "I'll take command of an emergency scene." On page 104; 24,25 page 105; 1 – 13 Captain Bagley indicated a discussion of possible cardiac arrest, discussed possibly taking Mr. Phounsy out of restraints to assess him better, but, "not to necessarily avoid cardiac arrest." David Csik indicated in his deposition on page 68; 1- 6 that he discussed the possibility with Captain Bagley but there was no advice given in his record of repositioning, applying oxygen or monitoring devices.

In summary, it is my opinion that the risk of cardiac arrest in law enforcement applied maximal restraints was known and discussed prospectively on scene by a scene commander, there was not a record of direction, reminder or admonition given to change of position to prevent cardiac arrest, administer oxygen or apply monitoring in this clinical context. The change in outcome in all reasonable medical probability has been discussed above in terms of repositioning, applying oxygen and monitoring in this clinical context.

19

**My opinions regarding photographs of Mr. Phounsy on the gurney (deposition Csik 6a, b; Deposition of Hackett Exhibit 11) is that they indicate multiple findings relevant to the case as discussed below:**

My opinion is that there is a strap over the chest visible in the images. It appears snugly applied and extends under his right pectoral muscle and over his left pectoral muscle on image A. A strap over the chest, in this area, if tight will restrict breathing, especially if combined with physical restraint and a spit sock, especially when exacerbated by physical exhaustion, pre-existing cyanosis and lactic acidosis from struggle. In the image, (Deposition of Csik Exhibit 6 and Hackett, Exhibit 11) labeled A, the belt appears to compress the subcutaneous fat on his right side and is taught on his anatomic left. This finding suggests it is at least quite snug if not tight. On page 159; 19-22 Aaron Hackett indicates that if seat belts were on the chest they may affect ability to breathe depending on how tight they were placed. Seatbelt during transport is required by good practice of field medicine. I agree with the opinion of Hackett, that if tight they may affect the ability to breathe. In this clinical context, any restriction of chest movement can impair gas exchange and may increase likelihood of respiratory compromise and cardiorespiratory arrest. Effects to restrict respiration are additive, their sum is greater than the individual components.

In his deposition, Michael Lee indicated on page 108; 22 - 25 that he put or helped to apply the orange gurney straps on Mr. Phounsy but on page 109; 15 – 17 Michael Lee also indicates that he did not check the strap to make sure Mr. Phounsy could still breathe after he attached it. On page 109; 18 – 21 Michael Lee indicates that he did not see anybody else check it to make sure Mr. Phounsy could still breathe after he attached it.

My opinion is also that Mr. Phounsy is also not completely positioned on his left side in the images provided. In (Deposition of Csik Exhibit 6 and Hackett, Exhibit 11) image A, in particular, if one were to draw an imaginary line between Mr. Phounsy's shoulder blades and compare it with the plane of the gurney, such a line would create an angle of more than 45 degrees if measured from the front of Mr. Phounsy's body. Such positioning is still greater than 45 degrees on image B. This position is not completely on the side, and will restrict breathing when in maximal restraints. Effects to restrict respiration are additive, their sum is greater than the individual components.

My opinion is that Mr. Phounsy's eyes also remain in same position two consecutive frames although his head is rotated to his anatomic left in frame B when compared with frame A. The occiput, or back of the head, remains on the gurney. This is consistent with his right shoulder being moved slightly forward and his head flopping downward. This is concordant with GCS 7 as discussed earlier in this report. The right eye is slightly open, and the left is still closed. Lack of other significant movement is evident in two frames is also consistent with somnolence. Such somnolence is multifactorial and may be related to respiratory compromise with hypercarbia, drug use and withdrawal and Benadryl. After being placed in the ambulance in all reasonable medical probability, continued struggling is most likely consistent with respiratory distress from restriction of gas exchange.

20

My opinion is that Mr. Phounsy's lips are somewhat dusky in (Deposition of Csik Exhibit 6 and Hackett, Exhibit 11). This is more prominent in image A than image B. When these are compared with images on Hackett's Exhibit 10, A and B there is a clear difference in the color of the lips. In those images Mr. Phounsy is intubated and on the ventilator getting oxygen. In Hackett's Exhibit 10 A and B the lips are clearly pink. In those images he is well oxygenated. If all of the above images are compared with images in Pugh's photos supplied under SDSD – Photos – Pugh.pdf where in image 53 Mr. Phounsy's lips and ear are cyanotic. This indicates lack of oxygen. In image 54 of the same file, Mr. Phounsy's hand is visible; in my opinion the nail bed is somewhat cyanotic. On page 56 of the above-mentioned file there is a close up of Mr. Phounsy's face. In this image, his face is resting on concrete pavement and this image clearly demonstrates rather severe cyanosis. For further reference, these can also be compared to image 60 of the same file of a gentleman of Asian descent in a blue shirt. His lips are not cyanotic.

My opinion, as referenced elsewhere in this document, is that after being held prone, placed in maximal restraints, and moved outside, Mr. Phounsy is cyanotic. Medically this demonstrates a potentially life threatening situation by this point. Immediate action is indicated in terms of positioning, oxygen application and monitoring to save his life. As there is some improvement in in cyanosis when Mr. Phounsy was placed on the gurney, I interpret this as an indication that death may be imminent, but would not in all reasonable medical probability remain imminent were appropriate interventions taken at that point.

**My opinion regarding delayed notation by the paramedic Hackett is that these were created much later than is usual and customary and this must be taken into consideration when interpreting them.** According to Paramedic Hackett's addenda (Deposition of Hackett Exhibit 2,) the event occurred on 4/13/2015 and the addenda were created 4/30/2015. Deposition evidence clarifies that creation of such late addenda is unusual. This factor is difficult to interpret in this context. Although created later than customary, and by request of supervisor, these addenda were in fact created much *earlier* than deposition or interview evidence was collected. My opinion is that the addenda still have value but the unusual nature of their late entry bears consideration.

**My opinions regarding the notation on the Lakeside Prehospital Care Record of 4/13/2015 02:59:09, "The patient's vitals were monitored based on his movement, as assessed by both paramedics and Deputy Fischer (who was forcibly restraining the patient's torso and head.)" are as follows:** There is no medical basis for monitoring vitals by movement as stated elsewhere in this document. Hypotensive patients may still move. Even a reasonable and prudent layperson may interpret respiratory movements that are ineffective or even agonal post-cardiac arrest as effective. Agonal movement may occur well after cardiac activity that produces a pulse ceases and patient has sustained cardiac arrest. No blood pressure or pulse was documented at this juncture to refute or affirm movement correlated with vital signs. Furthermore, my opinion is that deputies do not assess patients for medical purposes.

According to the Incident Report of Carbajal (Carbajal Exhibit 2 page 8, "Several deputies and I were holding Lucky as he was still resisting on the Gurney. [sic]" This indicates not one but *several* deputies held him down after he was placed on the gurney.

Regarding the force on Phounsy's head and torso, it is elaborated in multiple areas. In the Investigative report by B Patterson's interview of Deputy Fischer, Patterson indicated, on page 4/6 that Deputy Fischer indicated that he "Had to maintain pressure on Phounsy so the paramedics could attempt to treat Phounsy." The need for this "pressure" so the paramedics could attempt to "treat" him remains vague. There was no oxygen, no IV, no monitor and no discernable "treatment" evident.

In his deposition, Deputy Fischer also indicates that he held him down, "hard." Specifically, on page 96; 4- 8 Deputy Fischer states that he was holding Mr. Phounsy's head, "a good 9 to 10" and agreed it was "essentially as hard as you could hold someone down."

More evidence including the deposition of Deputy Fischer indicated that he was six feet tall, weighed 220-225 lbs., worked out regularly, and had been previously employed lifting boxes in a warehouse. (Deposition of Deputy Fischer page 18; 10 – 11 Deputy Fischer indicates that he worked in a warehouse lifting boxes). On page 43 12 – 14 Deputy Fischer indicates that he is six foot and weighed, "220, 225" at the time. Page 43; 18 – 19 Deputy Fischer indicates that he went to the gym regularly back then [at the time of the incident].

Forcible restraint in this context by a strong, heavy, non-medically trained individual, particularly around head and torso is likely to limit respiratory excursion and to have been the pivotal factor when superimposed on maximal restraints, suboptimal position, lack of supplemental oxygen, spit bag application, and seatbelt restraints, especially in context of lactic acidosis from exertion, catecholamine release from excitement and with pre-existing cyanosis, all without high flow oxygen. This opinion is based on compiling evidence in the case, especially the transient improvement in cyanosis on the gurney as mentioned above.

**My opinion regarding the timing of the cardiorespiratory arrest is that it occurred much earlier than documented or identified, and this led to a prolonged cardiopulmonary arrest.** Although an arrest time or down time of 5 – 6 minutes alone without adequate CPR can certainly be enough to cause irreversible brain injury, brain death and multi organ failure, such irreversible brain injury and brain death is often mitigated by therapeutic hypothermia. Therapeutic hypothermia was given in this case. It is, in all reasonable medical probability likely that cardiac arrest occurred much earlier than the documented minutes before arrival. It appears by summary of evidence cardiac arrest was noted at 23:09 or 23:10.

There is inconsistency in the notes: According to the investigative report by B Patterson's interview of Deputy Fischer, Patterson indicated, on page 4/6 that Fischer indicated to

him, "They had just arrived at the hospital when this [cardiorespiratory arrest] happened." This statement is not consistent with the deposition or records of paramedics Poynter, Hackett, and Csik that indicate movement ceased and cardiopulmonary arrest occurred several minutes before they arrived at the hospital.

**My opinion regarding downtime as reported by the Medical Examiner is that it may refer to pre-arrest downtime and was prolonged, consistent with the prolonged cardiopulmonary arrest, brain death and multiorgan failure recorded in the medical records.** Although is unclear to what "downtime" the Medical Examiner Investigator Julio Estrada refers in his report of 8 minutes, I have reviewed it as follows. Evidence in the emergency note indicates that Mr. Phounsy was given about 8 minutes of CPR in the ER from 23:15-23:23 before return of spontaneous circulation (ROSC). Usual and customary use of the word "downtime" in emergency departments in my experience is to refer to time *before* CPR is initiated, although some extend it to total arrest time. In my practice I differentiate it into downtime before effective CPR and total arrest time and my belief is that this is usual among emergency physicians. In the Medical Examiner's downtime, I find the downtime ill defined, however, all evidence points to it being prolonged given the outcome and presenting rhythm of asystole and finding of end tidal $CO_2$ of 86 as documented in the note of Dr. Pokala. In his report, although a bit unclear, Mr. Estrada may have determined 8 minutes with no effective CPR with an additional 8 minutes with CPR for a total arrest time of 16 minutes before ROSC. I find a downtime of about 8 minutes before effective CPR as most medically likely and in all reasonable medical probability most consistent with brain death and multiorgan injury. My opinion is that prolonged cardiorespiratory arrest occurred and led directly to brain death and multiorgan failure.

**It is my opinion that restraints were not removed until several minutes after cardiorespiratory arrest and this delay contributed to brain death and multiorgan failure. Although there is some degree of inconsistency about exactly when the restraints removed, my opinion is that they were not removed until after the ambulance arrived Grossmont Hospital and was parked in the ambulance bay. I find that the best evidence supporting this is the objective report of Carbajal in her investigation of the injuries sustained by Deputies Krull and Collins, (Carbajal Exhibit 2; 9 "Upon arrival to Grossmont hospital, Deputies Fischer and Brooke removed the handcuffs from Lucky's wrists and the maximum restraints from his feet."**

My opinion is that cardiac compressions initiated in restrained position are not effective. Further evidence for this is the end tidal $CO_2$ of 86, and the brain death, and multiorgan failure is associated with ineffective CPR and prolonged down time.

My opinion regarding responsibility of restraint removal is that such responsibility lies with the law enforcement agency applying the restraints if beyond the scope of the paramedic providers to apply. Paramedics were unable to remove law enforcement restraint, as they do not posses a key. Paramedics do not apply maximal restraints, and to my knowledge, are not trained in their removal.

My opinion regarding the timing of removal of restraints in event of cardiorespiratory arrest is that removal should be immediate, within seconds, to portend any meaningful chance of successful CPR and resuscitation.

**It is my opinion that Mr. Phounsy's care while in the emergency department and hospital, met standard of care and he was afforded the best opportunity for recovery.** He received appropriate resuscitative efforts in the emergency department resulting in return of spontaneous circulation (ROSC). Dr. Pokala and her consultants also treated him appropriately.  In all reasonable medical probability, any difference in hospital care would not have prevented multiorgan failure or brain death. Furthermore, in my opinion, consideration for and tissue donation request was appropriate in this clinical context

**My opinion regarding lack of finding of benzodiazepine on urine drug screen is that it suggests it was not likely a factor causing cardiorespiratory arrest, brain death or multiorgan failure.**  In my opinion the lack of finding a benzodiazepine suggests differential diagnosis: Drug used not identified on toxic screen. Drug metabolized prior to screen. Stated drug that should be found (e.g. cocaine) not used. Low blood flow. Cardiac arrest. The lack of benzodiazepine on the urine drug screen is likely multifactorial. Factors that may contribute include:

1. **Drug not absorbed rapidly due to site of injection.**
   i. Drug injected to tissue other than muscle. Fat absorption is more variable than muscular route.
   ii. Poor localized blood flow at site of injection secondary to position of limb or persisting muscular contraction.
   iii. Poor systemic blood flow (low blood pressure).
   iv. Cardiac arrest near the time of medication administration with further low systemic blood flow to the extremities.
   v. Some combination of the above.
2. **Drug dilution**. E.g. bladder full prior to administration dilute amount of drug present in sample.
3. **Drug excretion.** Drug is excreted in the kidneys. In this case renal failure developed secondary to prolonged cardiorespiratory arrest. There would have been poor renal blood flow prior to sample collection.
4. **Drug error:** Drug may not have been administered.

**My opinion on lack of finding of benzodiazepine on blood drug screen also suggests a differential diagnosis.**

1. **Drug not absorbed rapidly due to site of injection.**
   i. Drug injected to tissue other than muscle. Fat absorption is more variable than muscular route.
   ii. Poor localized blood flow at site of injection secondary to position of limb or persisting muscular contraction.

    iii.  Poor systemic blood flow (low blood pressure).
    iv.  Cardiac arrest near the time of medication administration with further low systemic blood flow to the extremities.
    v.  Some combination of the above.
2.  **Drug error:** Drug may not have been administered.

My opinion in conclusion regarding Versed, after reviewing both urine and blood screens, is that Versed administration did not directly cause cardiopulmonary arrest, brain death or multiorgan injury.

**My opinion regarding presenting rhythm, as asystole is that as presenting rhythm asystole is consistent with a prolonged down time.** Asystole, as opposed to ventricular tachycardia, ventricular fibrillation or even pulseless electrical activity (PEA) suggests a prolonged down time. Such prolonged down time in all reasonable medical probability caused brain death and multiorgan failure.

My opinion regarding presenting end-tidal $CO_2$ of 86 is that it is consistent with a prolonged down time without effective ventilation or CPR. An initial end tidal $CO_2$ of 86 as documented in the note of Dr. Pokala is consistent with a period of blood flow without adequate ventilation. For reference, a usual end tidal $CO_2$ is normally in the range of about 35.  During cardiorespiratory arrest with CPR it drops to around 10, but with high quality CPR it can be a little higher, but usually not much more than about 20, unless return of spontaneous circulation ROSC has occurred in my experience. In such case, it increases to around 30. In all reasonable medical probability, this finding of an end tidal $CO_2$ of 86 is a "smoking gun" consistent with objective evidence of totally ineffective CPR prior to arrival in the ER. As above, ineffective CPR in all reasonable medical probability is associated with increased downtime was directly associated with brain death and multiorgan failure.

**My opinion regarding hyperkalemia, is that in all reasonable medical probability it did not cause cardiorespiratory arrest in this clinical context**. In this case the elevated potassium is thought to by Dr. Pokala to be related to Etomidate use. Etomidate is known to increase potassium levels. There was no baseline potassium lab provided by previous records. Rhabdomyolisis, renal insufficiency, muscular trauma as well as Etomidate, can drive potassium upward; In this case, as documented above, there was cyanosis evident before Mr. Phounsy was placed on the gurney. It improved after being placed on the gurney. Mr. Phounsy was actively being held down, passively restrained his end tidal $CO_2$ was 86, which is consistent with non-ventilation. In my opinion, in all reasonable medical probability these factors caused the cardiorespiratory arrest rather than the potassium level.

**My opinion regarding the use of therapeutic hypothermia is that it was medically indicated, and portended increased likelihood of neurologic recovery but there would have been no change in outcome had it not been used.** In this case, the body temperature of Mr. Phounsy was lowered from normal, kept low for a prolonged period and then raised back to normal body temperature during his treatment in the intensive

care unit. This is known as therapeutic hypothermia. It is indicated in cardiac arrest with coma. Although its best usefulness is in ventricular fibrillation or ventricular tachycardia related cardiac arrests I feel its use was indicated to give Mr. Phounsy the best chance for meaningful neurologic recovery. The fact that in spite of its use there was still brain death is consistent with a prolonged cardiorespiratory arrest prior to effective CPR.

**My opinions on the Autopsy Report are summarized as follows:**

For frame of reference, the autopsy includes the following findings:

I.      History of cardiorespiratory arrest with anoxic encephalopathy
   a. Cerebral swelling with herniation and microscopic ischemic changes
   b. Resolving, recent myocardial infarct, mitral papillary muscle
   c. Renal tubular necrosis

II.     Atherosclerotic cardiovascular disease
   a. Left ventricular myocardial hypertrophy
   b. Focal marked cardiac arteriosclerosis

III.    Multiple healing abrasions and contusions of the face, scalp, torso and upper and lower extremities (including wrist, ankle and lower torso injuries consistent with restraint).

IV.     Cutaneous injuries of the back consistent with conducted energy weapon.

**My opinion on cardiorespiratory arrest:** I agree that Mr. Phounsy died of cardiorespiratory arrest. Evidence in this case further supports respiratory insufficiency from inadequate gas exchange as the proximal cause of cardiorespiratory arrest, and not a primary cardiac event. In layman's terms, in my opinion, Mr. Phounsy died because his breathing was impaired when he not only needed to breathe, he needed to *hyperventilate*.

**My opinion on anoxic encephalopathy:** I agree anoxic encephalopathy was the cause of brain death. It was caused from a primary cardiorespiratory arrest from respiratory insufficiency. In layman's terms Mr. Phounsy's brain died because it didn't get enough oxygen (suffocated) for a prolonged period.

**My opinion on cerebral swelling with herniation and microscopic ischemic changes:** this was evidence of anoxic encephalopathy. In layman's terms this is evidence that the brain is swollen, has started to squeeze through the hole in the bottom of the skull (herniation), and has changes seen under the microscope of tissue injury from being without oxygen.

**My opinion on myocardial infarct:** A small focal infarct occurred in the mitral papillary muscle and was resolving by the time of death. In layman's terms this is a small heart attack (heart cell death) in the muscle that assists with the mitral heart valve function. This was in all reasonable medical probability a result of the cardiorespiratory arrest and or CPR. A further contributor to this small focal

infarct may have been underlying heart disease. If this would have been a primary cause of death, medically I would have expected fulminant heart failure with fluid build up in the lung because of heart valve failure. That did not occur. To summarize, in all reasonable medical probability this small focal infarct did not cause the cardiorespiratory arrest in this case.

**My opinion on renal tubular necrosis:** This is evidence under the microscope of the acute kidney injury sustained by Mr. Phounsy. In layman's terms – this is evidence seen under the microscope, that kidneys were severely hurt because of being without oxygen for a prolonged period.

**My opinion on atherosclerotic cardiovascular disease, left ventricular myocardial hypertrophy and focal marked cardiac arteriosclerosis:** This is evidence of blood vessel disease and heart dysfunction caused by build up of plaque inside the heart arteries, which is not unusual even in someone of Mr. Phounsy's age. In layman's terms, Mr. Phounsy had some buildup of deposits inside his heart arteries that likely caused the left side to become enlarged. This could have been related to factors such as his heredity, high blood pressure, diet or drug use, but was definitely present before this event, and likely was a contributor to his death but not a primary cause.

**My opinion on multiple healing abrasions and contusions:** This finding of abrasions and contusions was extensively chronicled from page 7 – 10 of the autopsy report. In layman's terms there was significant evidence of traumatic injury (scrapes, cuts, bruises etc.) that took more than two pages of a thirteen-page autopsy report to describe. My opinion is that this is consistent with a detailed report of the traumatic injuries that Mr. Phounsy sustained.

**My opinion on cutaneous injuries of the back consistent with conducted energy weapon:** This shows findings consistent with being tased. My opinion is that this demonstrates proof that Mr. Phounsy was shot with a Taser weapon in probe mode.

**My opinion on temperature on arrival:** Dr. Campman also indicates that the patient was "afebrile on arrival." While this is technically correct, shortly after arrival hospital records page1296/1848 at 23:51 on 4/13/2015 Mr. Phounsy's temperature is recorded at 38.1. My opinion is that temperature *was* elevated and in this clinical context a part of muscular activity from struggle with superimposed finding consistent with excited delirium.

**My opinion on midazolam (Versed) intoxication:** Dr. Campman indicates that Mr. Phounsy "did not have signs of benzodiazepine toxicity, and did not have toxic concentrations of midazolam [Versed] in his blood collected shortly after his sudden arrest." My opinion is that in all reasonable medical probability Mr. Phounsy did not die because of the injection of Versed. See my previous statements on Versed elsewhere in this document.

**My opinion on drug use and Medical Examiner's drug screens is that in all reasonable medical probability these drugs did not cause cardiorespiratory arrest culminating in brain death and multi organ failure.** It appears by report that a trace amount of MDMA ("ecstasy") and some THC were detected in this case. Furthermore, these findings, in context of evidence that Mr. Phounsy used these drugs days previously and had played with children earlier in the day are consistent with these not being significant factors. Urine screens were positive for Levetiracetam, Acetaminophen, Lidocaine, Metoprolol, Fluconazole, Metoclopramide, and Laudanosine. These were consistent with medical interventions.

**My opinion regarding pain and suffering is as follows:** Regarding the issue of *pain and suffering*, it is clear that in all reasonable medical probability the injuries sustained by Mr. Phounsy were painful. Mr. Phounsy was subdued with not only taser, but with aid of being struck by deputies with fists, knees and law enforcement baton. Some evidence was brought forward to indicate that he might have been set down hard enough on the driveway after being carried out of the house that one individual, Daniel Nenow on Page 76; 13-16 of his deposition thought he heard Mr. Phounsy's head hit the ground when he was set down by officers. On pages, 55; 25 and 56; 1 of his deposition, Stephen Campman MD, indicates that tasers cause "Pretty significant pain." And on page 86; 15 – 21 of her deposition, Janae Krull indicates, after Collins tased Mr. Phounsy she could hear the taser crackling and then could hear Mr. Phounsy "groan."

The fact that Mr. Phounsy was cyanotic as evidenced by photographs while in restraints in the driveway in context of continued severe struggle worries me a great deal, and, in all reasonable medical probability indicates a severely uncomfortable degree of respiratory distress. To elaborate, I have stated elsewhere in this report, in this clinical context, and given the fact that Mr. Phounsy sustained cardiorespiratory arrest while restrained *and* forcibly held down is consistent with my opinion that in all reasonable medical probability gas exchange was restricted.

Such restriction of gas exchange with struggle, while being forcibly held down in restraints in all reasonable medical probability caused severe air hunger. Such air hunger and inability to breathe is tantamount to the suffering of torture. The fact that Versed was administered might have been fortuitous if it had been systemically absorbed from the perspective that it may have partially mitigated the terrible suffering that Mr. Phounsy no doubt endured in the final moments of consciousness.

## V. Final Statement and Additional Notations

I have reviewed the material as requested in this case and enumerated multiple opinions. All opinions contained herein are my own independent opinions. As

indicated, all opinions are subject to ongoing discovery in this case. As discussed, in this case there are areas where multiple factors were at work and there are areas where the sum total of effects is greater than their individual parts.  By all reasonable medical probability the arrest occurred because of failure of *ventilation* (breathing) rather than strictly poor oxygenation. In my opinion both lack of ventilation and failure of oxygenation occurred and culminated in cardiorespiratory arrest, which led to prolonged downtime, brain death and multiorgan injury.

Jerry Thrush, MD, FAAEM

# CURRICULUM VITAE

*Jerry Thrush, MD, FAAEM*

**ADDRESS:**

Jerry Thrush, M.D.                                      Jerry Thrush, M.D., Thrush MD Inc.
Department of Emergency Medicine     and:     PO Box 7286
Sharp Memorial Hospital                             San Diego, CA 92167
7901 Frost Street
San Diego, CA 92123-2701                             Thrush@cox.net

**PHONE:**

Hospital (858) 939-5611
Fax (619) 222-5563

**ABOUT DR. THRUSH**

*Dr. Thrush is a residency-trained, board certified specialist in emergency medicine with experience in emergency medical services, EMS medical directorship, and quality improvement. In addition he has specialized training in hyperbaric medicine, and the medical aesthetic procedures including laser, injectables, advanced injectables and dermal fillers. He began his career as an Emergency Medical Technician (EMT) before completing an undergraduate degree in biology research and advancing to Stanford University School of Medicine.  After medical school, he completed specialty training in emergency medicine at Loma Linda University Medical Center where he completed his final residency year as Chief Resident in Emergency Medicine.  After specialty training he became a full time faculty member at Loma Linda University School of Medicine, Department of Emergency Medicine; then director of Emergency Medical Services (EMS) at Loma Linda University Medical Center, followed by medical directorship of LifeCare Medical Transportation.  In 1994, Dr. Thrush moved to San Diego, and exchanged a career in academics for community hospital emergency medicine. He has been a Sharp Healthcare affiliated physician since 1992.*

**EDUCATION**

| | | |
|---|---|---|
| Stanford University School of Medicine | M.D. | 1988 |
| Loma Linda University – Biology Research Curriculum | B.S. | 1984 |
| Miramar College – Emergency Medicine | E.M.T. | 1981 |

**POSTGRADUATE SPECIALTY TRAINING**

| | | |
|---|---|---|
| Loma Linda University Medical Center (LLUMC)  Department of Emergency Medicine | Chief Resident Year | 1990-1991 |
| Loma Linda University Medical Center  Department of Emergency Medicine | Emergency Medicine  Residency | 1988-1991 |

**CERTIFICATES, LICENSES** *and/or* **SPECIAL TRAINING**

Advanced Cardiac Life Support (ACLS) Instructor (previous)
Advanced Trauma Life Support (ATLS) Provider trained
American Board of Emergency Medicine certified (Date of Certification: 1993, re-certified 2003, 2013
    through 2023
Emergency Medical Services Medical Director (NAEMSP course trained)
Basic Trauma Life Support (BTLS) Instructor
California Physician and Surgeon License / DEA Certificate
Disaster Medical Direction (DMD) trained (ACEP)
Pediatric Advanced Life Support (PALS) Instructor (re-certified 2017 )
Pilot Certificate (solo) FAA
Medical Aesthetics Training: Laser, National Laser Institute              2017
Medical Aesthetics Training: Injectables, National Laser Institute        2017
Medical Aesthetics Training: Advanced Injectables, National Laser Institute    2017
NOAA – UHMS Diving and Hyperbaric Medicine (National Oceanic and Atmospheric Administration)
Oregon Physician and Surgeon License
SCUBA International Diver Certificate / NASDS
Urban Search & Rescue (FEMA) trained
Residential Care for the Elderly Administrator Certificate, State of California,
    Department of Social Services                  2011-2013

**MEMBERSHIPS**

American Academy of Emergency Medicine
    Founding member and Fellow Status (FAAEM)        1993 - Present
American College of Emergency Physicians
    Fellow Status (FACEP)             1993-1998
Stanford University Alumni Association           1988- Present
Stanford University Medical Alumni Association       1988- Present
Inland Counties Disaster Medical Assistance Team (DMAT CA-2)    1991-1998

**CLINICAL APPOINTMENTS**

Sharp Memorial Hospital / Trauma Center:    Senior Staff Physician,    1994 - Present*
                                   Emergency Department

    *Cabrillo campus to 1999

**CLINICAL APPOINTMENTS -** *previous*

LifeCare Medical Transportation, Medical Director        1994-1996
Loma Linda University Medical Center: Director of Emergency Medical Services (EMS) 1991-1992
    LLUMC Staff physician, Clinical Faculty, Emergency Department    1991-1996
    LLUMC BTLS Instructor              1991-1996
    LLUMC Life Support Education, ACLS and PALS Instructor    1991-1996
Rancho Springs Medical Center: Staff Physician
    (previously Sharp Murrieta during practice)  Emergency Department    1992-2003
Redlands Community Hospital: Staff Physician and Quality Improvement
    Management Co-director             1992-1996
Riverside General Hospital-University Medical Center: Associate Consultant

|  |  |  |
|---|---|---|
| Division of Hyperbaric Medicine, Department of Medicine | | 1991-1996 |
| Sharp Memorial Hospital – Cabrillo Campus | | 1994-1999 |
| Ethics Committee | | 1998-2000 |
| Sharp Chula Vista Medical Center: | Staff Physician, Emergency Department | 1995-2000 |

**NON-CLINICAL APPOINTMENTS -** *previous*

San Bernardino County Board of Supervisors: Emergency Medical Care Committee
      Member
Crafton Hills College Paramedic Program: Guest lecturer

**UNIQUE CLINICAL EXPERIENCES**

| | |
|---|---|
| United States Public Health Service Disaster Medical Assistant Team (DMAT) | |
|     field response, Atlanta, GA Olympic Games Event | 1996 |
|     field response, CA Northridge Earthquake | 1994 |
| Republican National Convention at San Diego, | 1996 |
| San Diego Crew Classic | 1995, 1997 |
| Surgical Experience in Central America. Clinica Bella Vista, Chiapas | |
|     Mentor:  Hugo Mauricio, M.D. | 1988 |
| Cardiology Experience in the British Health Care System | |
|     Royal Sussex County Hospital, Brighton, England. | |
|     Mentor: Dr. Douglas Chamberlain | 1987 |

**DIVERSE LEADERSHIP EXPERIENCES**

| | |
|---|---|
| Emergency Medicine Residents Association (EMRA) – national program representative | |
|     from LLUMC Emergency Medicine Residency Program | 1989-1991 |
| Stanford University School of Medicine, Admissions Committee | 1986-1987 |
| Loma Linda University; Student Senate, Senator | 1982-1983 |
| Loma Linda University; Men's Dormitory Council, President | 1982-1983 |
| Loma Linda University; Men's Dormitory Council, Vice-President | 1981-1982 |
| Loma Linda University; Association of Future Physicians, President | 1981-1983 |

**DISTINCTIVE RESEARCH EXPERIENCES**

Hypberbaric Medicine Elective, Department of Baromedicine, Memorial Medical Center
    of Long Beach
    Directors; GB Hart, M.D., and M Strauss, M.D.
    Research Subjects: 1) Role of hyperbaric oxygen in frostbite.   2) Emergency indications
for hyperbaric oxygen therapy.                                                      1989

Research Assistant, Department of Plastic and Reconstructive Surgery, Stanford University
    Faculty: Thomas Sergott, M.D., Assistant Clinical Professor, Plastic Surgery
    Research Subjects; 1) Delayed hypersensitivity to the polydimethylsiloxane polymer
          used in prosthetic implants.   2) A histologic comparison of lyoplilized and
          irradiated cartilage for implantation.                      1986

Undergraduate Research Thesis, Department of Biology, Loma Linda University
    Mentor: Douglas Eddleman, Ph.D.
    Research Subject: Ployploidy induction in mammals using the micotubule

inhibitor colcemid.                                                                        1982-1984

Research Associate, American Heart Association Student Research Grant, University of
        California San Diego Medical Center
        Director: Julie Swain, M.D., Department of Cardiovascular Surgery
        Research Subject: Metabolic effects of an ectothermic pH management
            protocol for patients on cardiopulmonary bypass.                          1983

**COLLEGIATE ACADEMIC HONORS**

Highest Honors, Biology Research Curriculum Bachelor of Science
        Loma Linda University                                                      1984
President's Letter of Recognition, Loma Linda University                          1981-1984
Dean's Letter of Recognition, Loma Linda University                              1982-1984
Who's Who Among Students in American Colleges and Universities                   1982-1984
National Dean's List                                                             1982-1984


**OTHER HONORS**

Who's Who Among International Professionals                                        1986
Worldwide Who's Who
        Emergency Medicine Industry Professional of the Year                       2013

**LANGUAGES** – *other than English*

Spanish – spoken, written and understood at basic conversational level


**NON MEDICAL PUBLICATIONS**

The Fallen Leaf Anthology, Vol. 1                                                  2009
        Editors James Chandler and Jerry Thrush MD
        ISBN 978 – 1 – 60910–070–4
The Fallen Leaf Anthology, Vol. 2                                                  2010
        Editor, Jerry Thrush, MD
        ISBN 978 – 1 – 60910–596–9
From Paralysis to Praise
        Shirley Thrush, Edited by Jerry Thrush, MD                                 2010
        ISBN 978 – 1 – 55452–585–0
The Fallen Leaf Anthology, Vol. 3
        Editor, Jerry Thrush, MD
        ISBN 978 – 1 – 61434–881–8                                                2011


**MEDICAL PUBLICATIONS**


Bohr, T.W., Peterson, G.W., Thrush, J.H., et al, Decrement with repetitive stimulation in wound botulism
        (poster)
Thrush, J.H., Induction and Detection of Diploid Spermatozoa in the Mammal, 1984, Undergraduate Thesis
Thrush, J.H., Procedure for the examination of male mouse meiotic cell stages and their chromosomes,
        1983, Laboratory Exercise for use at Loma Linda University
Strauss, M.B., Meyer, G.W., and Thrush, J.H., Hyperbaric oxygen for frostbite. The Physician
        and Sportsmedicine., Vol 18 No 2 Feb 90

# COURTROOM AND DEPOSITION TESTIMONY

## 2013 - 2017

## JERRY THRUSH, M.D.

| Date | Case Name, Number and Location | Attorney | Testimony Type |
|------|-------------------------------|----------|----------------|
| 2-22-13 | **Larry Stephens vs. Charleston Station LLC** No. A598674 District Court Clark County Nevada | Robert Molina Las Vegas, NV | Trial Defense |
| Circa 2014 | **Kellie Parker vs. Michael Garcia et al** Case No. RIC 1208079 Superior Court of California for the County of Riverside | Lawrence Wong Orange, CA | Deposition Defense |
| Circa 2015 | **Thomas Ciccarelli, et al vs. Brent Jacobson, DO et al** Case No. MCC 1301148 Superior Court of California for the County of Riverside | Tamara Glaser San Diego, CA | Deposition Defense |
| Circa 2016 | **Giulian Grasso vs. Dignity Health et al** Case No. A 680572 District Court Clark County Nevada | Dan Carvalho Las Vegas, NV | Deposition Plaintiff |

# CURRICULUM VITAE

*Jerry Thrush, MD, FAAEM*

**ADDRESS:**

| | |
|---|---|
| Jerry Thrush, M.D. | Jerry Thrush, M.D., Thrush MD Inc. |
| Department of Emergency Medicine    and: | PO Box 7286 |
| Sharp Memorial Hospital | San Diego, CA 92167 |
| 7901 Frost Street | |
| San Diego, CA 92123-2701 | Thrush@cox.net |

**PHONE:**

Hospital (858) 939-5611                and:    Cell (619) 392-3343 * preferred
                                               Fax (619) 222-5563

**ABOUT DR. THRUSH**

*Dr. Thrush is a residency-trained, board certified specialist in emergency medicine, with experience in emergency medical services, EMS medical directorship, and quality improvement.  He began his career as an Emergency Medical Technician (EMT) before completing an undergraduate degree in biology research and advancing to Stanford University School of Medicine.  After medical school, he completed specialty training in emergency medicine at Loma Linda University Medical Center where he completed his final residency year as Chief Resident in Emergency Medicine.  After specialty training he became a full time faculty member at Loma Linda University School of Medicine, Department of Emergency Medicine; then director of Emergency Medical Services (EMS) at Loma Linda University Medical Center followed by medical directorship of LifeCare Medical Transportation.  In 1994, Dr. Thrush moved to San Diego, and exchanged a career in academics for community hospital emergency medicine.*

**EDUCATION**

| | | |
|---|---|---|
| Stanford University School of Medicine | M.D. | 1988 |
| Loma Linda University – Biology Research Curriculum | B.S. | 1984 |
| Miramar College – Emergency Medicine | E.M.T. | 1981 |

**POSTGRADUATE SPECIALTY TRAINING**

| | | |
|---|---|---|
| Loma Linda University Medical Center (LLUMC)  Department of Emergency Medicine | Chief Resident Year | 1990-1991 |
| Loma Linda University Medical Center  Department of Emergency Medicine | Emergency Medicine  Residency | 1988-1991 |

**CERTIFICATES, LICENSES** *and/or* **SPECIAL TRAINING**

Advanced Cardiac Life Support (ACLS) Instructor (previous)
Advanced Trauma Life Support (ATLS) Provider trained
American Board of Emergency Medicine certified (Date of Certification: 1993, re-certified 2003, 2013
     through 2023
Emergency Medical Services Medical Director (NAEMSP course trained)
Basic Trauma Life Support (BTLS) Instructor
California Physician and Surgeon License / DEA Certificate
Disaster Medical Direction (DMD) trained (ACEP)
Pediatric Advanced Life Support (PALS) Instructor (previous)
Pilot Certificate (solo) FAA
NOAA – UHMS Diving and Hyperbaric Medicine (National Oceanic and Atmospheric Administration)
Oregon Physician and Surgeon License
SCUBA International Diver Certificate / NASDS
Urban Search & Rescue (FEMA) trained
Residential Care for the Elderly   Administrator Certificate, State of California,
     Department of Social Services                                                  2011-2013


**MEMBERSHIPS**

| | |
|---|---|
| American Academy of Emergency Medicine | |
|     Founding member and Fellow Status (FAAEM) | 1993 - Present |
| American College of Emergency Physicians | |
|     Fellow Status (FACEP) | 1993-1998 |
| Stanford University Alumni Association | 1988- Present |
| Stanford University Medical Alumni Association | 1988- Present |
| Inland Counties Disaster Medical Assistance Team (DMAT CA-2) | 1991-1998 |


**CLINICAL APPOINTMENTS**

| | | |
|---|---|---|
| Sharp Memorial Hospital / Trauma Center: | Senior Staff Physician, Emergency Department | 1994 - Present* |
|     *Cabrillo campus to 1999 | | |


**CLINICAL APPOINTMENTS -** *previous*

| | | |
|---|---|---|
| LifeCare Medical Transportation, Medical Director | | 1994-1996 |
| Loma Linda University Medical Center: Director of Emergency Medical Services (EMS) | | 1991-1992 |
|     LLUMC Staff physician, Clinical Faculty, Emergency Department | | 1991-1996 |
|     LLUMC BTLS Instructor | | 1991-1996 |
|     LLUMC Life Support Education, ACLS and PALS Instructor | | 1991-1996 |
| Rancho Springs Medical Center:Staff Physician | | |
|     (previously Sharp Murrieta) | Emergency Department | 1992-2003 |
| Redlands Community Hospital: Staff Physician and Quality Improvement | | |
|     Management Co-director | | 1992-1996 |
| Riverside General Hospital-University Medical Center: Associate Consultant | | |
|     Division of Hyperbaric Medicine, Department of Medicine | | 1991-1996 |
| Sharp Memorial Hospital – Cabrillo Campus | | 1994-1999 |
| Ethics Committee | | 1998-2000 |

Sharp Chula Vista Medical Center:               Staff Physician,
                                                Emergency Department            1995-2000


**NON-CLINICAL APPOINTMENTS -** *previous*

San Bernardino County Board of Supervisors: Emergency Medical Care Committee
        Member
Crafton Hills College Paramedic Program: Guest lecturer


**UNIQUE CLINICAL EXPERIENCES**

United States Public Health Service Disaster Medical Assistant Team (DMAT)
        field response, Atlanta, GA Olympic Games Event              1996
        field response, CA Northridge Earthquake                    1994
Republican National Convention at San Diego,                        1996
San Diego Crew Classic                                              1995, 1997
Surgical Experience in Central America. Clinica Bella Vista, Chiapas
        Mentor:   Hugo Mauricio, M.D.                               1988
Cardiology Experience in the British Health Care System
        Royal Sussex County Hospital, Brighton, England.
        Mentor: Dr. Douglas Chamberlain                            1987


**DIVERSE LEADERSHIP EXPERIENCES**

Emergency Medicine Residents Association (EMRA) – national program representative
        from LLUMC Emergency Medicine Residency Program            1989-1991
Stanford University School of Medicine, Admissions Committee       1986-1987
Loma Linda University; Student Senate, Senator                    1982-1983
Loma Linda University; Men's Dormitory Council, President         1982-1983
Loma Linda University; Men's Dormitory Council, Vice-President    1981-1982
Loma Linda University; Association of Future Physicians, President  1981-1983


**DISTINCTIVE RESEARCH EXPERIENCES**

Hypberbaric Medicine Elective, Department of Baromedicine, Memorial Medical Center
        of Long Beach
        Directors; GB Hart, M.D., and M Strauss, M.D.
        Research Subjects: 1) Role of hyperbaric oxygen in frostbite.   2) Emergency indications
        for hyperbaric oxygen therapy.                             1989

Research Assistant, Department of Plastic and Reconstructive Surgery, Stanford University
        Faculty: Thomas Sergott, M.D., Assistant Clinical Professor, Plastic Surgery
        Research Subjects; 1) Delayed hypersensitivity to the polydimethylsiloxane polymer
                used in prosthetic implants.   2) A histologic comparison of lyoplilized and
                irradiated cartilage for implantation.             1986

Undergraduate Research Thesis, Department of Biology, Loma Linda University
        Mentor: Douglas Eddleman, Ph.D.

Research Subject: Ployploidy induction in mammals using the micotubule
inhibitor colcemid.                                                    1982-1984

Research Associate, American Heart Association Student Research Grant, University of
        California San Diego Medical Center
        Director: Julie Swain, M.D., Department of Cardiovascular Surgery
        Research Subject: Metabolic effects of an ectothermic pH management
                protocol for patients on cardiopulmonary bypass.              1983

## COLLEGIATE ACADEMIC HONORS

Highest Honors, Biology Research Curriculum Bachelor of Science
        Loma Linda University                                          1984
President's Letter of Recognition, Loma Linda University               1981-1984
Dean's Letter of Recognition, Loma Linda University                    1982-1984
Who's Who Among Students in American Colleges and Universities         1982-1984
National Dean's List                                                   1982-1984

## OTHER HONORS

Who's Who Among International Professionals                            1986
Worldwide Who's Who
        Emergency Medicine Industry Professional of the Year          2013

## LANGUAGES – *other than English*

Spanish – spoken, written and understood at basic conversational level

## NON MEDICAL PUBLICATIONS

The Fallen Leaf Anthology, Vol. 1                                      2009
        Editors James Chandler and Jerry Thrush MD
        ISBN 978 – 1 – 60910–070–4
The Fallen Leaf Anthology, Vol. 2                                      2010
        Editor, Jerry Thrush, MD
        ISBN 978 – 1 – 60910–596–9
From Paralysis to Praise
        Shirley Thrush, Edited by Jerry Thrush, MD                    2010
        ISBN 978 – 1 – 55452–585–0
The Fallen Leaf Anthology, Vol. 3
        Editor, Jerry Thrush, MD
        ISBN 978 – 1 – 61434–881–8                                    2011

## MEDICAL PUBLICATIONS

Bohr, T.W., Peterson, G.W., Thrush, J.H., et al, Decrement with repetitive stimulation in wound botulism
        (poster)
Thrush, J.H., Induction and Detection of Diploid Spermatozoa in the Mammal, 1984, Undergraduate Thesis
Thrush, J.H., Procedure for the examination of male mouse meiotic cell stages and their chromosomes,

1983, Laboratory Exercise for use at Loma Linda University

Strauss, M.B., Meyer, G.W., and Thrush, J.H., Hyperbaric oxygen for frostbite. The Physician and Sportsmedicine., Vol 18 No 2 Feb 90