Daley & Heft, LLP
Attorneys at Law
Robert R. Heft, Esq. (SBN 076739)
Mitchell D. Dean, Esq. (SBN 128926)
Samuel C. Gazzo, Esq. (SBN 212405)
Lee H. Roistacher, Esq. (SNB 179619)
462 Stevens Avenue, Suite 201
Solana Beach, CA  92075
Telephone:  (858) 755-5666
Facsimile:  (858) 755-7870
E-mail:    rheft@daleyheft.com
           mdean@daleyheft.com
           sgazzo@daleyheft.com
           lroistacher@daleyheft.com

Attorneys for Defendants, City of Santee,
Santee Fire Captain Aaron Bagley, and Santee
Firefighter/Paramedic Aaron Hackett

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| K.J.P., a minor, and K.P.P., a minor, individually, by and through their mother, LOAN THI MINH NGUYEN, who also sues individually and as successor in interest to her now deceased husband, Lucky Phounsy, and KIMBERLY NANG CHANTHAPHANH, individually,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO; San Diego Sheriff WILLIAM GORE; RICHARD FISCHER; KEVIN RALPH; MARCOS COLLINS; JANAE KRULL; SANDRA (JANET) CARBAJAL; BILLY TENNISION, III; DEAN ALLEN; MICHAEL LEE; JENNY MARTINSON; TAMANI PUGH; AARON BROOKE; JOVONNI SILVA; CITY OF SANTEE; AARON BAGLEY; AARON HACKETT; AARON DO; ADAM DANIELS; DANIEL NEOW; LAKESIDE FIRE PROTECTION DISTRICT; MARC POYNTER; DAVID CSIK,<br><br>Defendants. | Case No.:  15cv2692-H-MDD<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RENEWED SUMMARY JUDGMENT MOTIONS BY DEFENDANTS CITY OF SANTEE, SANTEE FIRE CAPTAIN AARON BAGLEY, AND SANTEE FIREFIGHTER/ PARAMEDIC AARON HACKETT**<br><br>Date:          April 8, 2019<br>Time:          10:30 a.m.<br>Courtroom:      15A<br>Judge:          Marilyn L. Huff<br><br>Complaint Filed:   December 1, 2015<br>Trial Date:        None set<br><br>Magistrate Judge: Mitchell D. Dembin |

1

## TABLE OF CONTENTS

2

Page

3 INTRODUCTION ............................................................................... 1

4 AUTHORITY .................................................................................... 2

5 PLAINTIFFS' CLAIMS ..................................................................... 2

6 FACTS ............................................................................................. 3

7     A.    Sheriff's Department Responds To Phounsy's 911 Call ................... 3

8     B.    City Paramedics Arrive And Deputies Subsequently Bring
9         Phounsy Out Of The House Handcuffed And In Full Law
        Enforcement Restraints ................................................................... 3

10     C.    Hackett's Assessment And Treatment of Phounsy ........................... 4

11     D.    Lakeside Paramedics Arrive ........................................................... 6

12     E.    Transporting Phounsy To The Hospital ........................................... 7

13 QUALIFIED IMMUNITY MANDATES SUMMARY JUDGMENT FOR
BAGLEY AND HACKETT ON PLAINTIFFS' § 1983 CLAIMS. ..................... 9

14     A.    14th Amendment Failure To Provide Medical Care Claim ............. 10

15
16         1.    Prong One: No Violation Of Phounsy's 14th
           Amendment Right To Medical Care ..................................... 10

17            a.    Neither Bagley Nor Hackett Had Any Obligation
18               Under The 14th Amendment To Provide Any
              Medical Care To Phounsy Because He Was
19               Never In Either's Custody ........................................... 10

20            b.    Assuming Bagley Or Hackett Had A 14th
              Amendment Obligation To Provide Phounsy
21               With Medical Care, Neither Acted With
              Deliberate Indifference ............................................. 14

22               i.    Applicable Standard - Subjective
23                    Deliberate Indifference ...................................... 14

              ii.    Analysis .............................................................. 15

24         2.    Prong Two: Absence Of Clearly Established Law ............... 18

25     B.    14th Amendment Right To Familial Association Claim ................. 20

26         1.    Prong One: No Violation Of Plaintiffs' 14th
27            Amendment Familial Association Rights .............................. 21

28

# TABLE OF CONTENTS (CONTINUED)

Page

         a.    No Underlying Violation By Bagley Or Hackett Of Phounsy's 14th Amendment Right To Medical Care .................................................................. 21

         b.    No Conscience Shocking Conduct ............................ 21

      2.    No Clearly Established Law .................................... 22

SUMMARY JUDGMENT FOR THE CITY OF THE *MONELL* CLAIM IS PROPER.............................................................................................. 23

    A.    No Underlying 14th Amendment Violation .................................... 23

    B.    No City Poicy, Custom, Practice Or Training Decficiency Was The Moving Force Behind Any Violation Of Phounsy's 14th Amendment Right To Medical Care........................................... 23

      1.    No Unconstitutional Policy/Custom/Practice........................ 23

      2.    No Constitutionally Deficient Training................................. 24

      3.    No Ratification......................................................................... 25

SUMMARY JUDGMENT ON THE WRONGFUL DEATH CLAIM IS PROPER.............................................................................................. 25

CONCLUSION........................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson for Anderson v. City of Minneapolis*
  2018 WL 1582262 (D. Minn. Mar. 30, 2018)...........................................14

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986) ..........................................................................2

*Ashcroft v. al-Kidd*
  563 U.S. 731 (2011) ....................................................................18, 19

*Bias v. Moynihan*
  508 F.3d 1212 (2007) ...................................................................3, 26

*Bd. of Cty Comm. v. Brown*
  520 U.S. 397 (1997) ........................................................................23

*Brown ex rel. Brown v. Jenne*
  122 So.3d 881 (Fl. Dist. Ct. App. 2012) .......................................12

*Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*
  318 F.3d 473 (3d Cir. 2003)......................................................10, 21

*Campbell v. State Dep't of Soc. & Health Servs.*
  671 F.3d 837 (9th Cir. 2011).............................................10, 11, 16

*Celotex Corp. v. Catrett*
  477 U.S. 317 (1986) ..........................................................................2

*City of Canton v. Harris*
  489 U.S. 378 (1989) ..............................................................23, 24, 25

*City of Escondido v. Emmons*
  139 S.Ct. 500 (2019) ......................................................................18

*Clouthier v. County of Contra Costa*
  591 F.3d 1232 (9th Cir. 2010)......................................................23, 25

*Connick v. Thompson*
  563 U.S. 51 (2011) .........................................................................24

*Cty. of Los Angeles v. Heller*
  475 U.S. 796 (1986) ........................................................................23

*Cty. of Sac. v. Lewis*
  523 U.S. 833 (1998) ........................................................................20

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*
  489 U.S. 189 (1989) ...................................................................Passim

*Devereaux v. Abbey*
  263 F.3d 1070 (9th Cir. 2001).........................................................2

iii

*District of Columbia v. Wesby*
    138 S.Ct. 577 (2018) .................................................................................18, 19, 20

*Dougherty v. City of Covina*
    654 F.3d 892 (9th Cir. 2011).........................................................................24

*Farmer v. Brennan*
    511 U.S. 825 (1994) .......................................................................................15

*Gausvik v. Perez*
    392 F.3d 1006 (9th Cir. 2004).......................................................................21

*Gillette v. Delmore*
    979 F.2d 1342 (9th Cir. 1992).................................................................23, 25

*Gonzalez v. City of Anaheim*
    747 F.3d 789 (9th Cir. 2014)....................................................................21, 22

*Gohranson v. Snohomish Cty.*
    2018 WL 5921012 (W.D. Wash. Nov. 12, 2018) .......................................15

*Gordon v. Cty. of Orange*
    888 F.3d 1118 (9th Cir. 2018).........................................................14, 15, 17

*Hall v. Ramsey Cty.*
    801 F.3d 912 (8th Cir. 2015).................................................................15, 19

*Hamby v. Hammond*
    821 F.3d 1085 (9th Cir. 2016).......................................................................10

*Henry A. v. Willden*
    678 F.3d 991 (9th Cir. 2012).........................................................................10

*Hunter v. Cty. of Sacramento*
    652 F.3d 1225 (9th Cir. 2011).......................................................................24

*Jackson v. Schultz*
    429 F.3d 586 (6th Cir. 2005).................................................................12, 13

*Jackson v. Wilkins*
    2011 WL4529631 (W.D. Mich.Sept. 30, 2011)..........................................12

*Jones v. Las Vegas Metro Police Dep't*
    873 F.3d 1123 (9th Cir. 2017).......................................................................21

*Kentucky River Med. Ctr v. McIntosh*
    319 S.W.3d 385 (Ky. 2010) ..........................................................................21

*Kingsley v. Hendrickson*
    135 S.Ct. 2466 (2015) ...................................................................................15

*Kisela v. Hughes*
    138 S.Ct. 1148 (2018) ...................................................................................18

*Kramer v. Cullinan*
    878 F.3d 1156 (9th Cir. 2018).......................................................................19

iv

*Lane v. Franks*
    134 S.Ct. 2369 (2014) ................................................................. 19

*Lemire v. Cal. Dep't of Corr. & Rehab.*
    726 F.3d 1062 (9th Cir. 2013) ...................................................... 20

*Lipscomb v. Simmons*
    962 F.2d 1374 (9th Cir. 1992) ...................................................... 11

*Lolli v. County of Orange*
    351 F.3d 410 (9th Cir. 2003) ........................................................ 11

*Mattos v. Agarano*
    661 F.3d 433 (9th Cir. 2011) .......................................................... 9

*Messerschmidt v. Millender*
    132 S. Ct. 1235 (2012) .................................................................. 9

*Monell v. Department of Social Services*
    436 U.S. 658 (1978) ............................................................... *Passim*

*Morales v. Fry*
    873 F.3d 817 (9th Cir. 2017) ........................................................ 19

*Mullenix v. Luna*
    136 S.Ct. 305 (2015) ............................................................... 9, 18

*Patel v. Kent School Dist.*
    648 F.3d 965 (9th Cir. 2011) ........................................................ 16

*Pearson v. Callahan*
    555 U.S. 223 (2009) ....................................................................... 9

*Peete v. Metro Government*
    486 F.3d 217 (6th Cir. 2007) ................................................... 10, 12

*Porter v. Osborn*
    546 F.3d 1131 (9th Cir. 2008) ............................................ 20, 21, 22

*Rankin v. Klevenhagen*
    5 F.3d 103 (5th Cir. 1993) ............................................................ 15

*Schaefer v. Goch*
    153 F.3d 793 (7th Cir. 1998) ........................................................ 21

*Schwartz v. Lassen Cnty. ex rel. Lassen Cnty. Jail*
    628 Fed. Appx. 527 (9th Cir. 2016) ............................................. 21

*Sharp v. Cty. of Orange*
    871 F.3d 901 (9th Cir. 2017) ................................................... 19, 20

*Simmons v. Navajo Cty.*
    609 F.3d 1011 (9th Cir. 2010) ...................................................... 14

*Tatum v. Moody*
    768 F.3d 806 (9th Cir. 2014) ........................................................ 21

v

*Toguchi v. Chung*
 99 F.3d 911 (9th Cir. 1996) ...................................................................15, 16

*Tubbs v. Gohrman*
 539 Fed. Appx. 788 (9th Cir. 2013) ...............................................................21

*White v. Pauly*
 137 S. Ct. 584 (2017) ........................................................................... *Passim*

*Wilkinson v. Torres*
 610 F.3d 546 (9th Cir. 2010) .........................................................................22

*Zion v. Cty. of Orange*
 874 F.3d 1072 (9th Cir. 2017) ........................................................................22

**Statutes**

42 U.S.C. § 1983 ...................................................................................2, 3, 10, 23

Fed. R. Civ. P. 56 .........................................................................................2

Cal. Wel. & Inst. Code, § 5150 .....................................................................3, 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

On April 13, 2015, Lucky Phounsy – suffering from drug and sleep deprivation induced psychosis – called 911 and reported unknown assailants were trying to harm him.  Two San Diego County Sheriff's deputies initially responding were injured in a significant fight with Phounsy.  Many deputies arrived on scene and went into the house where the fight with Phounsy continued.  City of Santee ("City" or "Santee") medical personnel subsequently arrived, finding and treating the two injured and bleeding deputies that were outside while Phounsy was still inside fighting with deputies.  Several deputies eventually carried a handcuffed and fully restrained yet still fighting Phounsy outside, placing him in the driveway.  At the direction of Santee Fire Captain Aaron Bagley, Phounsy was immediately assessed and treated by Santee firefighter/paramedic Aaron Hackett.  Phounsy was thereafter loaded into an ambulance from the Lakeside Fire Protection District for continued assessment/treatment by Hackett (and a Lakeside paramedic) and transport to the hospital.  Phounsy went into cardiac arrest during transport, was revived, but he died a few days later.

Plaintiffs, Phounsy's surviving family members, assert federal and state law claims against the City, Bagley and Hackett.  As this Court ordered, defendants bring this renewed summary judgment motion subsequent to the Ninth Circuit remanding for factual findings on each individual defendant's specific conduct.  Doc. Nos. 156, 157.

All plaintiffs' claim are dependent on establishing a violation of Phounsy's 14th Amendment right to medical care, which plaintiffs cannot.  Bagley and Hackett are entitled to qualified immunity because paramedics responding to a scene to treat an injured person in law enforcement custody have no 14th Amendment obligation to provide any medical care because Phounsy was never in Bagley/Hackett's custody.  Even if they did, neither Bagley nor Hackett were

11000-0001073

1  deliberately indifferent to Phounsy's medical needs.   Further, no clearly
2  established law existed in April 2015 imposing a 14th Amendment obligation on
3  paramedics to treat an injured suspect in law enforcement custody.   Nor was the
4  law so clearly established in April 2015 such that, under the specific facts of this
5  case, all reasonable paramedics would have known beyond debate that Bagley's
6  or Hackett's conduct violated the 14th Amendment.

### AUTHORITY

8  Summary judgment is proper where there is "no genuine dispute as to any
9  material fact" and the defendant "is entitled to judgment as a matter of law."
10  Fed. R. Civ. Proc. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
11  Disputes over irrelevant facts will not preclude summary judgment.   *Anderson v.*
12  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A defendant meets its summary
13  judgment burden by: (1) producing evidence negating an essential element of the
14  plaintiff's claim or (2) by pointing out through argument the absence of evidence
15  to support an element of the claim.   *Devereaux v. Abbey*, 263 F.3d 1070, 1076
16  (9th Cir. 2001) (en banc).   The burden then shifts to the plaintiff to produce
17  admissible evidence demonstrating a jury could return a plaintiff's verdict.
18  *Anderson*, 477 U.S. at 256.

### PLAINTIFFS' CLAIMS

20  Plaintiffs assert on Phounsy's behalf a 42 U.S.C. § 1983 cause of action
21  against Bagley and Hackett alleging a violation of Phounsy's 14th Amendment
22  right to medical care.   Doc. No. 50, ¶¶ 64-68.   Plaintiffs allege "deliberate
23  indifference" by Bagley and Hackett to Phounsy's need for medical care by
24  treating injured deputies before Phounsy.   *Id.* at ¶ 58(g), (h).   Plaintiffs further
25  allege Bagley and Hackett were "deliberately indifferent" because they
26  compromised Phounsy's ability to breathe and ignored that Phounsy stopped
27  breathing.   *Id.* at ¶¶ 3, 58(f), 66.   Against the City, plaintiffs assert on Phounsy's
28  behalf a § 1983 municipal liability claim under *Monell v. Dep't of Soc. Serv.*, 436

U.S. 658 (1978), alleging unconstitutional policies and practices, deficient training, and ratification of unconstitutional conduct. *Id.* at ¶¶ 69-73.

On their own behalf, plaintiffs assert a § 1983 claim against Bagley and Hackett under the 14th Amendment for loss of familial association, and a state law wrongful death claim against Bagley, Hackett and the City alleging the violation of Phounsy's 14th Amendment right to medical care caused his death. *Id.* at ¶¶ 117-126.

## FACTS

### A.      Sheriff's Department Responds To Phounsy's 911 Call

On April 13, 2015, Phounsy - in a "psychotic state" and suffering from auditory hallucinations and paranoid delusions, called 911 and reported unknown assailants were trying to harm him.  Separate Statement Of Facts, Fact 1 (Fact 1). Two San Diego County sheriff's deputies responded to Phounsy's home, and were injured in a significant fight with Phounsy.  Fact 2.  Responding to an emergency "code cover" call, many other deputies arrived on scene and went into the house where an extensive struggle with a screaming, growling, kicking and fighting Phounsy continued.  Fact 3.  Phounsy was taken into custody by deputies under Welfare & Institutions Code section 5150, and was also charged with resisting and assault on a peace officer.[1]  Fact 4.

### B.      City Paramedics Arrive And Deputies Subsequently Bring Phounsy Out Of The House Handcuffed And In Full Law Enforcement Restraints

Bagley and Hackett (and Aaron Do) arrived at Phounsy's house around 10:32 p.m. on a City fire engine.  Fact 5.  A City ambulance with two other paramedics also arrived.  Fact 6.  Captain Bagley was in charge of the City

///

―――――――――――――――

[1] "Under section 5150, an officer may detain any person the officer determines, 'as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled.' [Citation] *Bias v. Moynihan*, 508 F.3d 1212, 1220 (9th Cir. 2007).

3

1  paramedics, but other individual paramedics would be responsible for patient

2  care upon Bagley's assignment.  Fact 7.

3       City personnel immediately encountered two visibly injured deputies

4  outside Phounsy's house while Phounsy was still inside with other deputies. Fact

5  8.  Bagley directed City paramedics to assess and treat the injured deputies.  Fact

6  9.  Once learning from deputies that Phounsy would likely need medical

7  attention when brought outside, and since the City ambulance would be

8  transporting the injured deputies, Bagley requested a second ambulance around

9  10:37 p.m.  Fact 10.

10      Deputies subsequently carried a combative Phounsy out of the house,

11  handcuffed and in "full law enforcement restraints" (i.e., four point restraints

12  with Phounsy's arms and legs secured behind his back).  Fact 11.    The deputies

13  laid Phounsy in the driveway, rolling him on his side into a "recovery position."

14  Fact 12.  Because Phounsy was still resisting and fighting, several deputies held

15  Phounsy in place on the ground.  Fact 13.  Because Phounsy was fully restrained,

16  deputies monitored Phounsy's breathing.  Fact 14.

17  **C.    Hackett's Assessment And Treatment Of Phounsy**

18      At Bagley's direction, Hackett immediately began assessing Phounsy.

19  Fact 15.  Bagley did not assess or treat Phounsy.  Fact 16.

20      Hackett's initial visual assessment confirmed Phounsy was on his side

21  breathing without difficulty.  Fact 17.  Indeed, Phounsy continued resisting and

22  fighting despite being fully restrained and held down by multiple deputies.  Fact

23  18.  To allow better assessment and treatment of Phounsy, Bagley and Hackett

24  discussed using a sedative to calm Phounsy.  Fact 19.  Emergency Medical

25  Services protocol allows giving combative patients 5 mg of Versed every ten

26  minutes.  Fact 20.  Bagley and Hackett agreed Phounsy met the protocol.  Fact

27  21.  Hackett retrieved his medical "gear" and returned to Phounsy about a minute

28  later.  Fact 22.

4

Hackett's initial goal was to calm Phounsy so he could effectively assess and treat him. Fact 23. Because Phounsy was still fighting and resisting, Hackett gave Phounsy a 5 mg injection of Versed at 10:39 p.m. Fact 24. The Versed had minimal effect; Phounsy continued to resist and fight. Fact 25. Hackett then tried to calm Phounsy by talking to him. Fact 26. Phounsy only grunted in response. Fact 27.

Hackett managed to assess Phounsy's breathing and vital signs. Fact 28. Hackett confirmed the law enforcement restraints allowed Phounsy to take full breaths, and deputies holding Phounsy down were not impeding his breathing. Fact 29. A respiratory assessment revealed Phounsy was breathing with no respiratory problems. Fact 30.

Hackett next assessed Phounsy's orientation. Fact 31. Phounsy did not verbally answer questions, audibly responding with moans and grunts. Fact 32. Phounsy would at times open his eyes when Hackett spoke to him, and would respond to physical stimulus (e.g., a pinch). Fact 33. A check of Phounsy's eyes revealed no evidence of a stroke or brain bleed. Fact 36. Hackett also confirmed Phounsy had movement in all four extremities. Fact 35.

With a stethoscope, Hackett confirmed Phounsy was breathing. Fact. 36. Hackett also located a strong radial pulse, but the handcuffs and Phounsy's continued movement precluded Hackett from getting an exact pulse rate or blood pressure reading. Fact 37. Phounsy's continued movement also precluded Hackett from getting an oxygen saturation reading. Fact 38. Hackett did, however, confirm Phounsy had a strong heart rate of 120 beats per minute with uncompromised breathing. Fact 39. Hackett also confirmed Phounsy had warm and sweaty skin. Fact 40. Hackett observed no cyanosis.[2] Fact 41.

_____

[2] Cyanosis is a physical sign causing bluish discoloration of the skin and mucous membranes. Cyanosis is caused by a lack of oxygen in the blood." http://medical-dictionary.thefreedictionary.com/Cyanosis.

Hackett next intended to place Phounsy on a heart rate monitor and again try to get a blood pressure reading. Fact 42.   Phounsy, however, suddenly escalated his fighting with the deputies holding him down, thus hindering Hackett's ability to further assess Phounsy.   Fact 43.   Fearing for his safety, Hackett stepped back.  Fact 44.  Around the same time (10:47 p.m.), a Lakeside ambulance arrived with paramedics Marc Poynter and David Csik.  Fact 45.

**D.    Lakeside Paramedics Arrive**

Lakeside paramedics brought a gurney to the driveway.  Fact 46.  Lucky was still on his side in the driveway in full law enforcement restraints.  Fact 47. Lakeside paramedics were briefed on the situation.  Fact 48.

Phounsy was observed breathing on his own, and still actively thrashing and moving about despite being in full law enforcement restraints and being held down by several deputies.  Fact 49.  Bagley, Hackett, and Poynter discussed how to get Phounsy out of the law enforcement restraints onto the gurney and into the gurney's soft medical restraints, and also discussed giving Phounsy another dose of Versed to calm him down and facilitate the transfer.   Fact 50.   Because Phounsy was still fighting and resisting, a decision was made - consistent with protocol - to give Phounsy a second 5 mg dose of Versed.  Fact 51.  Deputies were still holding Phounsy down due to his continued resistance.   Fact 52. Hackett gave Phounsy the injection at about 10:50 p.m.  Fact 53.

Once again, the Versed did not have the desired calming effect as Phounsy continued to resist and fight. Fact 54.  Nonetheless, an attempt was made to take Phounsy out of the law enforcement restraints.  Fact 55.  But after removing one arm from the restraints, Phounsy continued resisting and a deputy advised "its not going to happen"; it was apparent that Phounsy needed to remain in the law enforcement restraints for his safety and the safety of paramedics and deputies. Facts 56, 57.  Protocol allows keeping law enforcement restraints on a person for safety reasons. Fact 58.

Still handcuffed and in full law enforcement restraints, and still fighting, deputies lifted Phounsy onto the gurney placing him on his side where Phounsy continued taking full breaths. Fact 59. Deputies had to hold Phounsy on the gurney because of his continued resistance. Fact 60. Hackett again saw no cyanosis on Phounsy. Fact 61.

Once on the gurney, Phounsy was "seat belted" over his knees and torso/shoulders while still on his side. Fact 62. The "seat belts" did not appear to impact Phounsy's breathing. Fact 63. Phounsy was observed taking full breaths. Fact 64. Based on this observation, no oxygen mask was necessary and it would have come off anyway due to Phounsy's continued movement. Fact 65. Phounsy's constant movement also precluded using an EKG monitor. Fact 66.

**E.    Transporting Phounsy To The Hospital**

Phounsy was loaded into the Lakeside ambulance for transport to the hospital. Fact 67. Phounsy was still handcuffed, in full law enforcement restraints, and positioned on his side. Fact 68. Hackett was in the back of the ambulance with Lakeside paramedic Poynter and a deputy. Fact 69. Bagley was not present. Fact 70. Because Phounsy was still in law enforcement restraints, protocol mandated a deputy ride in the back of the ambulance with Phounsy. Fact 71. While in the ambulance, Phounsy was in the custody of the sheriff's department. Fact 72.

With lights and siren, the ambulance proceeded to the hospital with Hackett (and Poynter) continually monitoring Phounsy's airway, breathing and circulation despite Phounsy's continued resistance. Facts 73, 74. Phounsy's constant movement precluded using an oxygen mask. Fact 75. Phounsy's constant movement also precluded using an oxygen monitor on his finger and a blood pressure cuff on his arm. Fact 76. Phounsy's skin signs continued to show

normal circulation, and his capillary refill was normal.[3]   Fact 77.   Attempts to obtain Phounsy's radial pulse rate were unsuccessful because of Phounsy's continued resistance. Fact 78.   The deputy was trying to help by holding Phounsy's head down because of Phounsy's constant movement.   Fact 79. The deputy was not impairing Phounsy's breathing.   Fact 80.   Phounsy was continually observed taking full breaths and he continued resisting.  Facts 81, 82.

At some point, Hackett placed a "spit sock" over Phounsy's head.  Fact 83. A "spit sock" is a lightweight mesh hood that prevents body fluid transmission but neither restricts breathing nor the ability to monitor respiration.   Fact 84. Protocol allows for a "spit sock" to be used to prevent body fluid transmission. Fact 85.  While the "spit sock" was on, Phounsy was continually seen breathing and his circulation and capillary refill remained normal.  Fact 86.

Phounsy remained combative.   Fact 87.   But, Hackett (and Poynter) continued to monitor Phounsy's breathing and circulation.  Fact 88.  Just before the 11:11 p.m. arrival at the hospital, Phounsy suddenly stopped moving and breathing. Fact 89.  The "spit sock" and at least some part of the law enforcement restraints were immediately removed, Phounsy was immediately rotated from his side to his back (as much as possible given the restraints), and Hackett (and Poynter) immediately started CPR with bag valve mask ventilation and 100% oxygen. Fact 90.  Hackett updated the hospital on Phounsy's change in condition and CPR with ventilation continued until arrival at the hospital and Phounsy's care was transferred to hospital personnel in the emergency room.   Fact 91. Phounsy died a few days later.  Fact 92.

///

///

///

_____

[3] Capillary refill is a test to determine blood flow, and generally involves placing pressure on the nail bed and measuring the time it takes for the color to return. https://medlineplus.gov/ency/article/003394.htm

## QUALIFIED IMMUNITY MANDATES SUMMARY JUDGMENT FOR BAGLEY AND HACKETT ON PLAINTIFFS' § 1983 CLAIMS

"[Q]ualified immunity is important to society as a whole and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quotation marks and citations omitted). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 213 (2009).

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 132 S.Ct. 1235, 1244 (2012) (quotation marks and citations omitted). Thus, qualified immunity protects officials from liability for "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231; *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc). "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quotation marks and citation omitted).

A qualified immunity analysis is two pronged, *Mattos*, 661 F.3d at 440, and "the Court considers only the facts that were knowable to the defendant" in its analysis. *White,* 137 S. Ct. at 550. This Court first determines whether an official's conduct violated a constitutional right. *Mattos*, 661 F.3d at 440. If not, qualified immunity shields the government official from suit. If a constitutional violation did occur, this Court next determines whether the "constitutional right was clearly established in light of the specific context of the case' at the time of

the events in question." *Id.* (quotation marks and citations omitted). The "fact-specific, highly contextualized nature of the [qualified immunity] inquiry does not depend on which particular constitutional right a given plaintiff claims the officials have violated." *Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016).

**A.     14th Amendment Failure To Provide Medical Care Claim**

**1.     Prong One:  No Violation Of Phounsy's 14th Amendment Right To Medical Care**

**a.     Neither Bagley Nor Hackett Had Any Obligation Under The 14th Amendment To Provide Any Medical Care To Phounsy Because He Was Never In Either's Custody**

The "Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression." *Deshaney v. Winnebago Dep't of Soc. Servs*, 489 U.S. 189, 196 (1989).  There is accordingly no 14th Amendment right to state provided medical care or competent rescue services, even if services are provided. *Id.* at 196-197; *Peete v. Metro. Gov't*, 486 F.3d 217, 223 (6th Cir. 2007); *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 478 (3d Cir. 2003). An exception to this general rule exists when the government places someone in custody.[4]  "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the ... the Due Process Clause." *DeShaney*, 489 U.S.

---

[4] The Ninth Circuit calls this exception the "special relationship exception." *Campbell v. State of Washington Dep't of Soc. & Health Servs.*, 671 F.3d 837, 842 (9th Cir. 2011).  Another exception is the "state- created danger exception" which "creates the potential for § 1983 liability where a state actor 'creates or exposes an individual to a danger which he or she would not have otherwise faced.' [Citation]." *Id.* at 845.  Plaintiffs do not pursue the "state-created danger" exception, but it would be inapplicable anyway because it only "applies in situations where the plaintiff was directly harmed by a third party." *Henry A. v. Willden*, 678 F.3d 991, 1002 (9th Cir. 2012).

at 200. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* *"[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause...."* *Id.* (emphasis added). Thus, one in state custody has a due process right under the 14th Amendment not to have state custodial officials (i.e., those imposing the restraint of personal liberty) remain deliberately indifferent to his serious medical needs. *Lolli v. Cty. of Orange*, 351 F.3d 410, 418-19 (9th Cir. 2003).

Neither Bagley nor Hackett were "custodial officials" owing Phounsy any 14th Amendment obligation to provide him with medical care. *See Lipscomb v. Simmons,* 962 F.2d 1374, 1379 (9th Cir. 1992) (en banc) ("[C]ustody cases such as *DeShaney* ...stand for the proposition that the government has an affirmative obligation to facilitate the exercise of constitutional rights by those *in its custody* only when the *circumstances of the custodial relationship* directly prevent individual exercise of those rights.") (emphasis added). The deputies, not Bagley or Hackett, at all times had custody of Phounsy. Deputies took Phounsy into custody under Welfare and Institutions Code section 5150. And deputies put Phounsy in handcuffs and full law enforcement restraints *before* either Bagley or Hackett ever saw Phounsy. Phounsy remained this way at the scene and in the ambulance where a deputy was required to ride with Phounsy because he had been fully restrained by deputies and was still in the custody of the deputies. Clearly, neither Bagley nor Hackett "'t[ook] [Phounsy] into [their] custody and h[e]ld him there *against his will*.'" *Campbell,* 671 F.3d at 842 (quoting *DeShaney*, 489 U.S. at 199-200). Indeed, a paramedic does not become a "custodial official" having 14th Amendment obligations to provide medical care

by responding to a scene and providing medical care and hospital transport to a suspect already in the custody of, and restrained by, law enforcement. *See Peete*, 486 F.3d at 220, 223 (paramedics assumed no 14th Amendment obligations to provide medical care when responding to 911 call and restraining for treatment and safety a man having an epileptic seizure even though the man "was restrained while he was unconscious" because "the defendants' actions were undertaken in an effort to render medical treatment" and the case is "easily distinguished from the archetypical custody exception case where jail or prison officials fail to provide medical treatment to an incarcerated individual"); *Jackson v. Schultz*, 429 F.3d 586, 588-90 (6th Cir. 2005) (holding no "custody" sufficient to trigger a constitutional duty to provide medical care where paramedics placed gunshot wound victim into ambulance and started transporting him to the hospital because there was no "restraint of personal liberty" by the paramedics); *see also Brown ex rel. Brown v. Jenne*, 122 So. 3d 881, 890 (Fla. Dist. Ct. App. 2012) (" We have been unable to find a case in which the deliberate indifference claim has been successfully maintained against emergency personnel, as such claims have been limited to cases involving medical care during pre-trial detention and imprisonment. Indeed, federal courts have consistently held that there is no federal constitutional right to rescue services.").

"Custody" for purposes of the 14th Amendment requires "'restraints of personal liberty' similar to the restraints in *DeShaney* through 'some state action that applies *force (or threat of force)* and *show of authority* made with the *intent of acquiring physical control*". *Jackson*, 429 F.3d at 590 (emphasis added). There was no such state action by either Bagley or Hackett. *Id.* ("[T]he proper custody inquiry is whether the EMTs engaged in a 'restraint of personal liability' similar to the restraint mentioned in *DeShaney*"). Instructive is *Jackson v. Wilkins*, 2011 WL 4529631 (W.D. Mich. Sept. 30, 2011), where the district court

1  granted summary judgment to a paramedic and EMT on a 14th Amendment

2  failure to provide medical care claim.[5]  The decedent was in law enforcement

3  custody after being arrested subsequent to a chase and fight.  *Id.* at *2.  The

4  decedent displayed signs of a medical emergency while in jail, and a paramedic

5  and EMT arrived at the jail where they removed the decedent from his cell and

6  placed him on a gurney and into the ambulance for transport to the hospital.  *Id.*

7  Medical care was provided to the decedent in the ambulance, but the ambulance

8  did not leave the jail for more than a half hour.  *Id.*  The decedent died a couple

9  hours after arriving at the hospital.  *Id.* at *3.  Relying on *Jackson* and *DeShaney*

10 to grant summary judgment to the paramedic and EMT on a 14th Amendment

11 medical care claim because they were not "custodial officials" for purposes of

12 the 14th Amendment's obligation to provide medical care to a pretrial detainee,

13 the court reasoned as follows:

> Although the state does have a duty to provide adequate medical care to incarcerated prisoners and pre-trial detainees, *Jackson*, 429 F.3d at 589, this obligation only attaches to the entity which has taken an individual into custody. 'When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.' *DeShaney*[,] [ ], 489 U.S. [ ] [at] 199–200 [ ]. But 'custody' involves 'restraints of personal liberty' requiring 'some state action that applies force (or threat of force) and show of authority made with the intent of acquiring physical control.' *Jackson*, 429 F.3d at 590. '[T]he overarching prerequisite for custody is an affirmative act by the state that restrains the ability of an individual to act on his own behalf.' [Citation]. Here, [decedent's] 'personal liberty' was not restrained by Medic 1 Defendants. Although [he] was unable to care for himself due to his medical state, there is no affirmative action by Medic 1 Defendants applying force or threat of force to acquire physical control of Jackson. That was done initially by the Benton Harbor Defendants and later by the Berrien County Defendants. Accordingly, Jackson was not in the 'custody' of the Medic 1 Defendants, and Plaintiff may not rely on the custody exception with respect to these defendants.

_____

[5] The district court also granted summary judgment to other defendants, and on appeal as to those defendants, the Sixth Circuit affirmed in part and reversed in part.  *See Jackson v. Wilkins*, 517 F. App'x 311 (6th Cir. 2013).

13

*Id.* at \*4; *see also Anderson for Anderson v. City of Minneapolis*, 2018 WL 1582262, at \*17 (D. Minn. Mar. 30, 2018) (Dismissing 14th Amendment medical care claim against paramedics because "[i]ndividual Defendants in this case are not alleged to have constrained Anderson's liberty by handcuffing him or applying some other restraint. Anderson's liberty was regrettably constrained by his incapacity, which was not caused by the Individual Defendants.").

**b.** **Assuming Bagley Or Hackett Had A 14th Amendment Obligation To Provide Phounsy With Medical Care, Neither Acted With Deliberate Indifference**

**i.** **Applicable Standard - Subjective Deliberate Indifference**

In April 2015, Ninth Circuit precedent required a plaintiff maintaining a 14th Amendment medical care claim to establish "subjective deliberate indifference," which required proof that a state actor subjectively knew of and disregarded a serious medical need. *Simmons v. Navajo Cty.*, 609 F.3d 1011, 1017 (9th Cir. 2010). This was the same subjective deliberate indifference standard applied to 8th Amendment medical care claims brought by prisoners. *Id.* However, *Gordon v. Cty. of Orange*, 888 F.3d 1118 (9th Cir. 2018) established a new "objective deliberate indifference" standard eliminating the subject intent element. *Id.* at 1120, 1124-1125. Under *Gordon*, "the elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved-making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Id.* at 1025. "'With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that

14

1    will necessarily 'turn[ ] on the facts and circumstances of each particular case.' "

2    *Id.* at 1071. "The 'mere lack of due care by a state official' does not deprive an

3    individual of life, liberty, or property under the Fourteenth Amendment."' *Id.*

4    "Thus, the plaintiff must 'prove more than negligence but less than subjective

5    intent-something akin to reckless disregard.'" *Id.* This *Gordon* standard is

6    materially different than the subjective deliberate indifference standard. *See*

7    *Gohranson v. Snohomish Cty*. 2018 WL 5921012, at *2 (W.D. Wash. Nov. 13,

8    2018) (discussing change in standard and additional requirements for those

9    providing medical care to pretrial detainess after *Gordon*).

10      Because *Gordon's* new objective deliberate indifference standard was not

11    the liability standard in April 2015, it has no application here. Because the

12    question is whether Bagley's or Hackett's conduct violated the 14th Amendment

13    in April 2015, their conduct must be measured under the then-existing subjective

14    deliberate indifference standard. *See Hall v. Ramsey Cty*, 801 F.3d 912, 918 n. 3

15    (8th Cir. 2015) (because objective deliberate indifference test for pretrial

16    detainees' 14th Amendment excessive force claims established in *Kingsley v.*

17    *Hendrickson*, 135 S.Ct. 2466 (2015) was not the governing standard at the time

18    of defendant's conduct, defendant's conduct had to be evaluated under the

19    subjective deliberate indifference standard existing before *Kingsley*); *Rankin v.*

20    *Klevenhagen*, 5 F.3d 103, 108-109 (5th Cir. 1993) (holding district court erred in

21    applying law in effect at time it decided summary judgment motion by not

22    applying law in effect when corrections officer used allegedly excessive force

23    against pretrial detainee).

24    **ii.   Analysis**

25      A subjective deliberate indifference standard focuses "on what a

26    defendant's mental attitude actually was." *Farmer v. Brennan,* 511 U.S. 825, 839

27    (1994). Inadvertance or negligence, even gross negligence, in diagnosing or

28    treating a medical condition does not constitute deliberate indifference. *Toguchi*

1   *v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004).  Deliberate indifference thus
2   "requires a culpable mental state, meaning that the state actor must recognize an
3   unreasonable risk and actually intend to expose the plaintiff to such risks without
4   regard to the consequences to the plaintiff."  *Campbell*, 671 F.3d at 846
5   (quotation marks omitted).  Stated another way, deliberate indifference requires
6   "the defendant know[ ] that something is going to happen," "ignore[ ] the risk
7   and expose[ ] the plaintiff to it."  *Patel v. Kent School Dist*., 648 F.3d 965, 974
8   (9th Cir. 2011) (quotation marks and citations omitted).

9       Meritless is plaintiffs' claim that Bagley and Hackett were deliberately
10  indifferent to Phounsy's need for medical care by treating the injured deputies
11  first.   Doc. No. 50, ¶ 50(g).  The injured deputies were treated first simply
12  because they were outside in need of medical care and Phounsy was still inside
13  fighting with deputies.

14      Equally meritless is plaintiffs' claim that Bagley and Hackett were
15  deliberately indifferent to Phounsy's medical needs by compromising his ability
16  to breath and by failing to recognize his compromised breathing.  Doc. No. 50,
17  ¶¶ 3, 58(f), 66.

18      Regarding Bagley, a supervisor, the evidence establishes he ordered
19  Hackett to assume care over Phounsy as soon as deputies brought Phounsy
20  outside.   Bagley did not assess or treat Phounsy, and did not ride in the
21  ambulance. So other than directing Hackett to treat Phounsy, Bagley's
22  involvement was limited to discussing with others the Versed protocol and how
23  to get Phounsy out of the law enforcement restraints.  Bagley certainly did
24  nothing to impair Phounsy's ability to breathe.  And even assuming Phounsy was
25  having trouble breathing at some point, there is no evidence that Bagley knew
26  this and did nothing about it.

27      Regarding Hackett, he immediately assessed Phounsy after deputies
28  brought him outside and continually monitored and assessed Phounsy at the

scene and in the ambulance.  At the scene, Hackett assessed Phounsy's breathing and found it normal; ensured the law enforcement restraints did not impair Phounsy's breathing; assessed Phounsy's orientation; checked Phounsy's pulse; confirmed Phounsy had a strong and regular heartbeat; administered Versed pursuant to protocol to facilitate further treatment and assessment; assessed Phounsy's response to physical stimulus; checked for a stroke or brain bleed; confirmed movement of all four extremities; observed Phounsy had warm, sweaty skin; unsuccessfully tried to get Phounsy out of the law enforcement restraints; confirmed the gurney seatbelts did not impair Phounsy's breathing; and never observed any cyanosis.  On the way to the hospital, Hackett continually confirmed Phounsy was still breathing normally; confirmed Phounsy's skin signs showed normal circulation; confirmed Phounsy's capillary refill was normal; and attempted without success, because of Phounsy's constant movement, to place an oxygen monitor and blood pressure cuff on Phounsy; and again, observed no cyanosis.

No admissible evidence establishes Phounsy had any problems breathing prior to suddenly going into cardiac arrest in the ambulance.  But even assuming he did, there is no evidence establishing Hackett knew this and did nothing about it.  Hackett repeatedly checked and confirmed Phounsy was breathing.  And considering Phounsy was constantly resisting and fighting, Phounsy was obviously breathing.  As soon as Phounsy suddenly stopped breathing in the ambulance, Hackett immediately commenced CPR, tried to get Phounsy out of the law enforcement restraints, and CPR continued until Phounsy's care was turned over to hospital staff.[6]

---

[6] Even if *Gordon's* objective deliberate indifference standard applied, there was no 14th Amendment violation.  Indeed, plaintiffs cannot meet *Gordon's* first and second elements – that an intentional decision regarding confinement exposed Phounsy to a serious risk of harm.  *Gordon*, 888 F.3d at 1025.  Assuming Phounsy was "confined" when in law enforcement custody, neither Bagley nor Hackett made any intentional decisions regarding this confinement.  Moreover, neither Bagley nor Hackett failed to "take reasonable available measures to abate

17

## 2.     Prong Two:  Absence Of Clearly Established Law

"[Qualified] immunity protects all but the plainly incompetent or those who knowingly violate the law." *White*, 137 S. Ct. at 551.  "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quotation marks and citations omitted). "A clearly established right is one that is 'sufficiently clear that *every reasonable official* would have understood that what he is doing violates that right.' [Citation]." *Mullenix*, 136 S. Ct. at 308 (emphasis added); *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).  Thus, to be clearly established, the legal principal or "particular rule the plaintiff seeks to apply" "*must be settled law*" under "*then-existing precedent*" and "[i]t is not enough that the rule is suggested by then-existing precedent." *Wesby*, 138 S. Ct. at 590 (emphasis added); *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (right must be "'clearly established' at the time of the challenged conduct").  Broad constitutional principles are categorically insufficient to constitute clearly established law.  *White*, 137 S. Ct. at 552; *Mullenix*, 136 S. Ct. at 308.  Indeed, "clearly established" law requires a "high degree of specificity" and may not be defined at a "high level of generality."  *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curium); *Kisela*, 138 S. Ct. at 1152; *Wesby*, 138 S. Ct. at 590.  In other words, "*existing precedent* [must have] placed the statutory or constitutional question beyond debate" under the "*particularized*' . . . *facts of the*

---

[a risk of harm to Phounsy], even though a reasonable official in the circumstances would have appreciated the high degree of risk involved-making the consequences of the defendant's conduct obvious."  *Id.*  First, there were no "obvious consequences" from any conduct by Bagley or Hackett given Phounsy was continually observed breathing.  Second, reasonable measures were taken when removal of the full law enforcement restraints was attempted but proved unsuccessful.

18

1    *case*" and in light of the "*particular conduct*" of the defendant.  *White*, 137 S. Ct.

2    at 552 (emphasis added).  "Otherwise, the rule is not one that *'every reasonable*

3    *official*' would know."  *Wesby*, 138 S. Ct. at 590 (emphasis added).  "So long as

4    existing case law 'did not preclude' an official from reasonably believing that his

5    or her conduct was lawful, the official has a right to qualified immunity."

6    *Kramer v. Cullinan*, 878 F.3d 1156, 1163 (9th Cir. 2018) (quoting *Lane v.*

7    *Franks*, 134 S. Ct. 2369, 2381 (2014)).

8         Plaintiffs have the burden of proving that Bagley or Hackett violated

9    clearly established law.  *Kramer*, 878 F.3d at 1164.  "Plaintiffs must point to

10   prior case law that articulates a constitutional rule specific enough to alert

11   [Bagley and Hackett]… that their particular conduct was unlawful.  To achieve

12   that kind of notice, the prior precedent must be 'controlling'—from the Ninth

13   Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts

14   outside the relevant jurisdiction."  *Sharp v. Cty. of Orange*, 871 F.3d 901, 911

15   (9th Cir. 2017).  Plaintiffs must thus show the particular conduct of Bagley and

16   Hackett was clearly precluded under precedent existing in April 2015.  *Wesby*,

17   138 S. Ct. at 590; *al-Kidd*, 563 U.S. at 735; *Kramer*, 878 F.3d at 1163.  To do

18   this, plaintiffs must accordingly show two things.  Plaintiffs must first show it

19   was clearly established in April 2015, *under the specific facts and circumstances*

20   *of this case*, that Bagley or Hackett had a 14th Amendment obligation to provide

21   Phounsy with any medical care.  Even if plaintiffs can show this, plaintiffs must

22   also show clearly established law existed in April 2015 making it obvious to

23   every reasonable paramedic, *under the specific facts of this case*, that Bagley's or

24   Hackett's conduct violated the 14th Amendment.  *Id.*; *see Morales v. Fry*, 873

25   F.3d 817, 823 (9th Cir. 2017) ("In recent years, the Court has tightened the

26   inquiry to focus closely on an analysis of existing precedent.  In 2011, the Court

27   clarified that while it 'do [es] not require a case directly on point ... existing

28   precedent must have placed the statutory or constitutional question *beyond*

19

1   *debate*," such that "every" reasonable official—not just "a" reasonable official—

2   would have understood that he was violating a clearly established right.'

3   [citation]."). Plaintiffs can show neither.

4        It was not clearly established in April 2015 that paramedics had any 14th

5   Amendment obligation to provide medical care to one in law enforcement

6   custody, either at the scene of an incident or during transport to a hospital.

7   Neither the Supreme Court nor the Ninth Circuit had said so, nor was there a

8   consensus of persuasive authority placing the matter beyond debate. *White*, 137

9   S. Ct. at 552; *Sharp*, 871 F.3d at 911. Further, no case from the Supreme Court

10  or Ninth Circuit, or any other court, had ever addressed the unusual factual

11  situation presented in this case, much less held that either Bagley's or Hackett's

12  conduct at the scene, or Hackett's conduct in the ambulance, violated one's 14th

13  Amendment right to medical care. Indeed, that this "case is [factually] unusual .

14  . . is 'an important . . . indication . . . that [Bagley's and Hackett's] conduct did

15  not violate a 'clearly established' right." *Wesby*, 138 S. Ct. at 592 (quoting *White*,

16  137 S. Ct. at 552).

17  **B.    14th Amendment Right To Familial Association Claim**

18       Family members can assert a 14th Amendment substantive due process

19  claim for the loss of familial association caused by a family member's death.

20  *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013).

21  This substantive due process claim requires establishing conduct that "shocks the

22  conscience." *Cty. of Sac. v. Lewis*, 523 U.S. 833, 846, 849-50 (1998); *Lemire*,

23  726 F.3d at 1075; *Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008).

24  Negligence, even gross negligence, is not conscience shocking conduct. *Lewis*,

25  423 U.S. at 849-50. "[O]nly the most egregious official conduct" violating the

26  "decencies of civilized conduct" is conscience shocking. *Id.* at 846.

27  ///

28  ///

**1.      Prong One: No Violation Of Plaintiffs' 14th Amendment Familial Association Rights**

**a.      No Underlying Violation By Bagley Or Hackett Of Phounsy's 14th Amendment Right To Medical Care**

A 14th Amendment loss of familial association claim requires an underlying violation of the decedent's constitutional rights. *Gausvik v. Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004); *Schaefer v. Goch*, 153 F.3d 793, 799 (7th Cir. 1998); *Schwarz v. Lassen Cty.* 628 Fed. Appx. 527, 528 (9th Cir. 2016); *Tubbs v. Gohrman*, 539 Fed. Appx. 788 (9th Cir. 2013).  As already explained, neither Bagley nor Hackett violated Phounsy's 14th Amendment right to medical care.

**b.   No Conscience Shocking Conduct**

Depending on the situation, conscience shocking conduct is established by showing deliberate indifference or a purpose to harm.  *Porter,* 546 F.3d at 1137. The latter standard applies where, as here, insufficient time for deliberation exists.  *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797-98 (9th Cir. 2014) (en banc).  It is beyond dispute that paramedics "have little time for reflection, typically making decision in haste and under pressure."  *Brown*, 318 F.3d at 480. Indeed, "paramedics . . . are required to think and act quickly in the most time-sensitive and stressful of circumstances." *Kentucky River Med. Ctr. v. McIntosh*, 319 S.W.3d 385, 394 (Ky. 2010).  Here, both Bagley and Hackett made on-the-spot decisions in the field under difficult circumstances with little, if any, time for practical deliberation in the continually evolving and rapidly changing situation. *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1133 (9th Cir. 2017) (purpose to harm standard applies "where officers must react quickly to a rapidly changing situation"); *Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014) ("Deliberation is impractical . . . [in] 'fast paced circumstances . . . .'"); *Porter*, ///

1   546 F.3d at 1139 (purpose to harm standard applies in "quickly evolving and

2   escalating" situation).

3      A purpose to harm exists where "'actions were undertaken to . . . terrorize,

4   cause harm or kill'", *Porter*, 546 F.3d at 1141, or where actions are taken to

5   "bully" or "get even." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

6   For example, an officer "head-stomping a suspect curled up in the fetal position"

7   may constitute a purpose to harm unrelated to a legitimate objective because such

8   "brutal" conduct "is bound to offend even hardened sensibilities." *Zion v. Cty. of*

9   *Orange*, 874 F.3d. 1072, 1077 (9th Cir. 2017).   Here, there is no evidence

10  suggesting, much less establishing, that either Bagley or Hackett intended to

11  terrorize, harm or kill Phounsy or that either were bullying or trying to get even

12  with Phounsy.   Indeed, the evidence establishes they were trying to help

13  Phounsy.   In sum, Bagley directed Hackett to assess and treat Phounsy and

14  Hackett did assess and treat Phounsy the best he could under the circumstances.

15  There is nothing "conscience shocking" about the conduct of either.   Nor can

16  plaintiffs present any evidence of some ulterior motive by Bagley or Hackett for

17  this conduct.   *Gonzalez*, 747 F.3d at 798 (plaintiffs "produced no evidence that

18  the officers had any ulterior motives for using force").

19  **2.     No Clearly Established Law**

20     Since it was not clearly established in April 2015 that the 14th

21  Amendment required Bagley or Hackett to provide any medical care to Phounsy,

22  and it was not clearly established that Bagley's or Hackett's conduct violated the

23  14th Amendment, plaintiffs cannot show it was clearly established in April 2015

24  that either Bagley or Hackett engaged in "conscience shocking" conduct

25  violating plaintiffs' 14th Amendment association rights.

26  ///

27  ///

28  ///

## SUMMARY JUDGMENT FOR THE CITY ON THE *MONELL* CLAIM IS PROPER

### A.   No Underlying 14th Amendment Violation

There is no municipal liability under *Monell* absent an underlying constitutional violation. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curium).   Again, neither Bagley nor Hackett violated Phounsy's 14th Amendment right to medical care.

### B.   No City Policy, Custom, Practice Or Training Deficiency Was The Moving Force Behind Any Violation Of Phounsy's 14th Amendment Right To Medical Care

A municipality is not liable under § 1983 for an employee's unconstitutional conduct. *Monell*, 436 U.S. at 694.   Municipal liability exists only when, through deliberate indifference to the rights of citizens, the municipality's policy, custom, practice or lack of training is the moving force behind a constitutional violation. *Id.* at 694; *Bd. of Cty. Comm. v. Brown*, 520 U.S. 397, 400 (1997); *City of Canton v. Harris*, 489 U.S. 378, 392 (1989). Municipal liability may also exist where "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992). Ratification exists only when a final policymaker makes "a conscious, affirmative choice to approve [a subordinates unconstitutional conduct] and adopt [the conduct] as official policy." *Clouthier*, 591 F.3d at 1253.

### 1.   No Unconstitutional Policy/Custom/Practice

Plaintiffs allege it was City policy for paramedics to treat injured law enforcement before those injured in fights with law enforcement, and a policy also existed whereby paramedics would use excessive force against those having a mental health crisis.  Doc. No. 50, ¶¶ 51, 58 (g), (h), 72.  No such City policy, custom or practice existed.  Facts 93, 94.

///

23

### 2.   No Constitutionally Deficient Training

Plaintiffs allege inadequate training caused Phounsy to receive constitutionally deficient medical care from Bagley and Hackett.  Doc. No. 50, ¶ 72.  "[A] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. [Citation]." *Connick v. Thompson*, 563 U.S. 51 (2011).  This is because the "failure to train … must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' [Citation]." *Id.*; *City of Canton*, 489 U.S. at 388.  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.' [Citation]." *Connick*, 563 U.S. at 61; *City of Canton*, 489 U.S. at 390 (municipal liability exists "where - and only where - a deliberate choice to follow a course of action is made from among various alternatives").  "That a particular [employee] may be unsatisfactorily trained will not alone suffice to fasten liability on the city…."  *City of Canton*, 489 U.S. 390-91; *Dougherty v. City of Covina*, 654 F.3d 892, 901 (9th Cir. 2011).  Nor is it sufficient to show isolated or sporadic events attributable to a failure to train. *See Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011) (explaining *Monell* liability cannot be "predicated on isolated or sporadic incidents" and that "[t]he custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'[Citation]").

Because the City trains its paramedics, Fact 95, plaintiffs must prove "the need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *City of Canton*, 489 U.S. at 390.  Plaintiffs have no evidence that any training deficiency by the City was the moving force behind any alleged constitutional violation.

///

24

1
2
3
4

Nor do plaintiffs have evidence demonstrating deliberate indifference by the City to the rights of the public.  There is certainly no evidence of a pattern of similar constitutional violations by City paramedics tied to a known training deficiency. *Connick*, 563 U.S. at 62-64; *City of Canton*, 489 U.S. at 389, 392.

5

### 3.    No Ratification

6
7
8
9
10
11
12

Plaintiffs allege that Chief Mattick ratified the conduct of Bagley and Hackett.  Doc. No. 50, ¶58(I).  Ratification exists only when a policymaker makes a deliberate choice to adopt an employee's unlawful actions as policy. *Clouthier*, 591 F.3d at 1253; *Gillette*, 979 F.2d at 1346-47.  Ratification is not proven by mere acquiescence or a failure to discipline. *Clouthier*, 591 F.3d at 1253.  Plaintiffs have no evidence establishing that Chief Mattick adopted as official policy anything plaintiffs contend Bagley or Hackett did wrong.

13
14

### SUMMARY JUDGMENT ON THE WRONGFUL DEATH CLAIM IS PROPER

15
16
17

Plaintiffs' wrongful death claim is dependent on the existence of a 14th Amendment violation of Phounsy's right to medical care.  Because there was no violation, plaintiffs' wrongful death claim fails.

18

### CONCLUSION

19
20

For the reasons above, defendants respectfully contend that this Court must grant summary judgment on all plaintiffs' claims.

21

Dated: March 11, 2019                    Daley & Heft, LLP

22
23
24
25
26
27
28

By: */s/ Lee H. Roistacher*

Robert R. Heft
Mitchell D. Dean
Samuel C. Gazzo
Lee H. Roistacher
Attorneys for City of Santee, Santee Fire Captain Aaron Bagley, and Santee Firefighter/Paramedic Aaron Hackett