# Exhibit 1

Exhibit 1   Page 1



# LITIVATE
## REPORTING + TRIAL SERVICES

## ORIGINAL TRANSCRIPT

Transcript of the Testimony of:

# Aaron Jacob Brooke

K.J.P.

v.

County of San Diego

February 22, 2017

Volume I

P: 877.771.3312 | F: 877.561.5538 | litivate.com

Exhibit 1   Page 2

Aaron Jacob Brooke                                    February 22, 2017

1      Q    Based on what you heard going on in the
2    call, would you have considered that a higher
3    priority call or a lower priority call?
4      A    I don't remember enough about the call to
5    even make that judgment.
6      Q    All right.  At some point did you hear a
7    call for cover to that 8385 Holden Road address?
8      A    Yes.
9      Q    And what did you do when you heard the
10   cover call?
11     A    Immediately started driving towards Santee.
12   Code 3 response.
13     Q    What was your unit designator at the time?
14     A    50 Paul 7 Charles.
15     Q    About how long did it take you to get
16   there?
17     A    I would estimate four to five minutes.
18   Closer to five probably.
19     Q    How tall are you?
20     A    About six foot.
21     Q    How much did you weigh back then?
22     A    I don't know.  I'll be fair and say 215,
23   220.
24     Q    Is that about what you weigh now?
25     A    No.  I'm about 225 now.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 1   Page 3

Aaron Jacob Brooke                                    February 22, 2017

1      Q      So you've gained a little weight.

2      A      It's back and forth a little bit, yeah.

3      Q      All right.  Were you in pretty good shape

4  back then, though?

5      A      Decent, yeah.

6      Q      Or are you in better shape now?

7      A      I don't know.  I couldn't answer that

8  question fairly.  I would say the same.  That's an

9  honest answer.

10          MR. CHAPIN:  It depends who you're talking

11  to.

12          THE WITNESS:  Yeah, I guess.

13  BY MR. McBRIDE:

14      Q      Were you going to the gym regularly at the

15  time?

16      A      Yes.  I've always lifted weights.

17      Q      Okay.

18          So when you got there on scene, what did

19  you see outside the house?

20      A      As soon as I arrived, we heard yelling and

21  commotion from in the house.  I was pretty far back.

22  There was a few cars in front of me.  So I had to

23  run up the hill, run toward the house.

24          I remember seeing the garage door open, and

25  people going through the garage to the inside door.

Aaron Jacob Brooke                                    February 22, 2017

```
 1           When I got in he was already on the ground,
 2   and I saw several deputies trying to control him on
 3   the ground.
 4      Q    All right.  So did you arrive at the same
 5   time as other deputies?
 6      A    I did.  We -- it was -- I don't know how
 7   many people had pulled in front of me.  I don't
 8   remember.
 9           But I remember kind of almost a caravan of
10   people coming all different directions almost
11   meeting up at a certain intersection.  I mean, not
12   staged or anything but people flowing in.
13      Q    All right.  So you entered through the
14   garage?
15      A    Correct.
16      Q    And when you got into that little hallway,
17   you saw Mr. Phounsy already on the ground?
18      A    I saw somebody on the ground, yes,
19   surrounded by several deputies.
20      Q    Was he on his stomach?
21      A    Yes.
22      Q    How many deputies were on him?
23      A    I couldn't give an accurate count.  I
24   remember looking for a limb or something I could
25   help with, and it looked like everyone -- it looked
```

Aaron Jacob Brooke                                        February 22, 2017

```
 1    like there was enough deputies to at least try and
 2    control certain limbs.  So four at that point.
 3    Maybe five.  I'm not sure.
 4         Q    Did you see any family members in the
 5    hallway or any individuals who were not law
 6    enforcement personnel?
 7         A    At that point I -- I don't remember.  After
 8    the fact, but I don't remember during that part.
 9         Q    What was Mr. Phounsy doing when you first
10    stepped in?
11         A    I could still hear him yelling, groaning
12    real loud.  So it -- in my perspective, he was
13    hearing that, but it appeared that he was trying to
14    get loose from whatever kind of holds my partners
15    were trying to get.
16         Q    But you couldn't really see him one --
17    moving one way or another because he was covered by
18    so many deputies?
19         A    I could see his back.  I could -- I thought
20    I could -- it's so hard to remember.  I remember
21    seeing his back.
22         Q    All right.  So -- and this is according to
23    a summary prepared by a Homicide detective of your
24    interview.  But this will be Exhibit 4, page No. 4.
25              They attribute this statement to you.  By
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 1   Page 6

Aaron Jacob Brooke                                    February 22, 2017

```
 1    the time you arrived most of the deputies were

 2    already inside the house.  You could only see a

 3    portion of Mr. Phounsy's face.  Mr. Phounsy was

 4    gritting his teeth while moaning and grunting.  It

 5    appeared Mr. Phounsy was trying to get away from the

 6    deputies.

 7             A, do you remember telling the deputies

 8    that in the interview?

 9       A    I don't remember most of that interview

10    with Homicide.

11       Q    Okay.

12       A    It's been so long.  But . . .

13       Q    B, does that -- I mean, is that the way you

14    remember the hallway when you walked in and what was

15    going on?

16       A    The way I remember it now is coming in and

17    seeing several deputies trying to control someone on

18    the ground.

19             And by the time I could look at the scene

20    and assess what was going on, I remember seeing his

21    back, because that's when I actually decided to do

22    something.  But if I said it then, I'm sure it's

23    true.  I just can't remember now.

24       Q    Okay.  Did you -- was anybody saying

25    anything in the hallway?
```

Exhibit 1   Page 7

Aaron Jacob Brooke                                    February 22, 2017

```
 1        A     I remember a lot of shouting.  "Stop
 2   resisting.  Calm down."  Can't remember anything
 3   else.
 4        Q     So, other than Mr. Phounsy kind of groaning
 5   and screaming, you remember deputies shouting
 6   commands to --
 7             MR. DEAN:  Misstates his testimony as to
 8   "screaming."  He said "yelling."
 9             MR. McBRIDE:  Yelling.  I apologize.  Thank
10   you.
11   BY MR. McBRIDE:
12        Q     Other than Mr. Phounsy yelling and -- all
13   you heard were deputies giving Mr. Phounsy commands?
14        A     That's what I can remember now, yes.
15        Q     So were multiple deputies giving
16   Mr. Phounsy commands?
17        A     I assume so, yeah.
18        Q     All right.
19             So you said just a moment ago when you saw
20   Mr. Phounsy's back, that's when you decided to do
21   something.  What did you decide to do?
22        A     Pulled my X2 taser from my holster, placed
23   it against the -- I believe it was the right side of
24   his back under his right shoulder and gave a
25   three-second burst, drive stun, to his back.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 1   Page 8

Aaron Jacob Brooke                                    February 22, 2017

1        Q      Why did you do that?

2        A      To get some kind of pain compliance.  I was

3   hoping it would cause him to stop resisting at that

4   point where deputies could get him under control and

5   get him in handcuffs.

6        Q      When you walked in was Mr. Phounsy already

7   handcuffed?

8        A      No.

9        Q      Did he have -- was either of his hands

10  cuffed?

11       A      I don't remember.

12       Q      Did you see any handcuffs on any hand?

13       A      I don't remember.

14       Q      So you're positive at the time you drive

15  stunned him he was not cuffed?

16       A      I'm positive he was not handcuffed.

17       Q      I see.

18       A      Hands together, yes.

19       Q      How long after you drive stunned him was he

20  cuffed?

21       A      After I drive stunned him I immediately

22  holstered.  It had no effect or not the desired

23  effect I wanted.

24              I remember taking hold of his left hand or

25  left wrist.  I was able to get control of it,

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 1   Page 9

Aaron Jacob Brooke                                    February 22, 2017

1    pushing it behind his back.  I don't remember the

2    length of time when he was finally handcuffed.

3    Could have been minutes.  I'm not positive.

4         Q    All right.  Are you sure you only pulled

5    your trigger once?

6         A    Yes.  Drive stunned him, yes.

7         Q    And when -- the X2 when you're drive

8    stunning, is it like when it's in probe mode, you

9    pull the trigger, and it automatically cycles for

10   five unless you put the safety on?

11        A    No.  The X2 has buttons on the side and

12   then a trigger.  So, if I were to pull the trigger,

13   it would -- two probes shoot out.  I hit the button

14   on the side, which is just the arc.

15        Q    All right.

16             So it will arc as long as you pull the

17   trigger and, when you let go of the trigger, it

18   stops arcing?

19        A    The button, yes.

20        Q    Yes.

21        A    No trigger.  Yes.

22        Q    I'm sorry.  The -- the drive stun button?

23        A    Yes.

24        Q    Okay.

25             Let me show you what I've marked as --

Aaron Jacob Brooke                                          February 22, 2017

1     well, let me ask you this first.  What specifically

2     was Mr. Phounsy doing when you deployed your taser

3     and in drive stun mode on him?

4         A     Resisting -- resisting any and all attempts

5     from my partners to get him in handcuffs.

6         Q     And when you say "resist," specifically

7     what was he doing?

8         A     He was -- it looked like he was pulling

9     away from all my partners, tensing his body,

10    actively resisting any commands to follow

11    instructions.

12        Q     Whose instructions?

13        A     Deputies.

14        Q     But numerous deputies were giving him

15    numerous instructions; right?

16        A     I'm sure everyone one was telling -- I

17    don't know about everyone.  But I heard numerous

18    commands of "Stop resisting."  I mean, people were

19    shouting commands trying to get him under control.

20        Q     All right.  At any point did you see

21    Mr. Phounsy strike any of the deputies?

22        A     No.

23        Q     At any point did you see Mr. Phounsy kick

24    any of the deputies?

25        A     No.

LITIGATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 1   Page 11

Aaron Jacob Brooke                                    February 22, 2017

```
 1                  (Whereupon Exhibit 5 was marked for
 2            identification, a copy of which is
 3            attached hereto.)
 4   BY MR. McBRIDE:
 5      Q    Okay.  Let me show you what I'll mark
 6   Exhibit 5.  Have you seen this -- well, I'll show it
 7   to your counsel first and then I'll show it to you.
 8                  (Attorney-client discussion off the
 9            record.)
10            THE WITNESS:  I don't remember looking at
11   it.
12   BY MR. McBRIDE:
13      Q    Do you recognize what Exhibit 5 is?
14      A    It's the download of my taser.
15      Q    Have you ever at any point looked at the
16   data download for your taser?
17      A    No.
18      Q    All right.  I'll take that back from you,
19   then, if you don't mind, deputy.
20      A    Sorry.
21      Q    No problem.  Okay.  So according --
22            MR. McBRIDE:  And, just for the record,
23   this is a several-page document.  It's Bates
24   numbered CSD176 -- oh, I remember what I did.
25   Because it's 110 pages, I have the first page, the
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 1   Page 12

Aaron Jacob Brooke                                        February 22, 2017

 1   relevant portions for our date, and then the last

 2   page.  So I have Bates number CSD176 and it skips to

 3   CSD279, 281 -- 176, 279 and 281.  So I have the

 4   first page, the page dealing with April 13th, 2015,

 5   and then the last page.

 6            MR. DEAN:  What exhibit is it?

 7            MR. McBRIDE:  Exhibit 5.

 8            MR. DEAN:  Thank you.

 9   BY MR. McBRIDE:

10      Q    So, according to your download, you pulled

11   the trigger twice, your taser arced for three

12   seconds, and then again a second later for another

13   second.

14            Does that seem about right?

15            MR. DEAN:  Misstates his testimony about

16   pulling the trigger.

17   BY MR. McBRIDE:

18      Q    Or hitting the drive stun button on your

19   taser.

20      A    The button for three seconds sounds right,

21   yeah.

22      Q    But you don't remember hitting it again?

23      A    How long after was it?

24      Q    I'll give you a copy.  Turn to the second

25   page, if you would.  If you go down to line 2826.

Aaron Jacob Brooke                                      February 22, 2017

```
 1        A     Mm-hmm.
 2        Q     I know that the time was synced at the end
 3   of this.  So this time is inaccurate.
 4              But it says that on April 13th, 2015, at
 5   22:03:16 it arced for three seconds.  And then at
 6   22:03:21 it arced again for a second.  So that means
 7   two seconds later it arced again.
 8        A     It's possible.
 9        Q     Okay.  That's fine.  All right.
10              Is that the only -- well, did you use any
11   other force on Mr. Phounsy there in the hallway
12   other than deploying your taser on him?
13        A     Yes.
14        Q     What else did you do?
15        A     Body weight.  I eventually was able to get
16   ahold of his left wrist and get it behind his back,
17   holding it there using my downward body weight.
18        Q     Okay.  Did you see any of the other
19   deputies use any amount of force on Mr. Phounsy?
20        A     I saw people holding limbs, and I'm
21   assuming they were using downward body weight.  But
22   that's the extent of what I saw.
23        Q     You didn't see any deputies strike
24   Mr. Phounsy?
25        A     No.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 1   Page 14

Aaron Jacob Brooke                                    February 22, 2017

1      Q     Did any of the other deputies tell you to

2   stop deploying your taser against Mr. Phounsy?

3      A     No.

4      Q     So how long did it take to get Mr. Phounsy

5   cuffed after you arrived?

6      A     I'm not positive.  Several minutes.

7      Q     Less than five?

8      A     I can't say.  I don't remember.

9      Q     More than a minute?

10      A     Yes.

11      Q     What happened -- did you see who actually

12   handcuffed Mr. Phounsy?

13      A     I believe -- if I can review my report, if

14   you don't mind.

15      Q     Please.

16      A     So I was able to get my handcuffs on his

17   left wrist.  And then I believe -- I don't remember

18   who -- who got the cuff on the other hand.  I know

19   it wasn't me.

20          But I ended up getting my handcuff on his

21   left wrist and just holding it there.  I don't

22   remember who it was that was actually able to finish

23   the handcuffs.

24      Q     All right.  What happened after you got the

25   cuffs on Mr. Phounsy?

Aaron Jacob Brooke                                      February 22, 2017

```
 1        A    As soon as his hands were cuffed behind his
 2   back, I immediately looked up to assess what else
 3   was going on in this house, and I saw Deputy Collins
 4   down by Phounsy's feet.
 5             Marcos looked exhausted.  Never seen him
 6   like that.  Not only that, he was bloody.  His face
 7   was covered in blood and so was his uniform.
 8             I immediately popped up and grabbed him and
 9   started escorting him out of the house when Krull
10   followed us.  Deputy Krull.
11        Q    I see.  So after you guys got Lucky, or
12   Mr. Phounsy, in handcuffs, you grabbed Deputy
13   Collins and you exited the house?
14        A    Correct.
15        Q    So you didn't see the deputies put
16   Mr. Phounsy in maximum restraints?
17        A    No.
18        Q    You didn't participate in putting
19   Mr. Phounsy in maximum restraints?
20        A    No.
21        Q    Your cuffs were used, though, to handcuff
22   Mr. Phounsy?
23        A    At least one of his wrists, yes.
24        Q    So the cuffs that were actually locked on
25   on both wrists, those were your cuffs?
```

Aaron Jacob Brooke                                          February 22, 2017

```
 1        A    I don't.

 2        Q    Okay.

 3             What did you do after Deputy Collins and

 4   Deputy Krull left in the ambulance?

 5        A    I don't think it's in my report.  But I

 6   remember walking through the house looking for some

 7   of Deputy Collins' stuff from his belt.  It wasn't

 8   in my report.

 9             But eventually once Lucky was loaded on the

10   ambulance, it was decided that Deputy Fischer was

11   going to ride inside the ambulance, and I would

12   follow behind in a patrol vehicle.

13        Q    All right.  Let me ask you a couple of more

14   questions about the scene before we move on to that.

15             After Deputy Collins and Krull left in the

16   ambulance, how much longer were you on scene there?

17        A    I don't remember.  I don't remember.

18        Q    All right.  But you do remember walking

19   back inside to try to retrieve some of Deputy

20   Collins' items?

21        A    Yes.

22        Q    Did you have any discussions with any

23   family members while you were inside the house?

24        A    I know I saw -- I think it was an older

25   male, older white male.  I know we had a few words
```

Aaron Jacob Brooke                                                February 22, 2017

1      Q      Yes.

2      A      He was not.  He was in the house.

3      Q      Did you see him in the driveway at any

4   point before Deputy Collins and Krull left in the

5   ambulance?

6      A      I don't remember.

7      Q      So did you at any point during the incident

8   at all see Mr. Phounsy on the ground in the

9   driveway?

10     A      No.

11     Q      When you saw Mr. Phounsy for the first time

12  in the driveway on the gurney, what was his

13  demeanor?  Had he calmed down since the hallway?

14     A      I don't remember.

15     Q      How was he fastened to the gurney, do you

16  remember?

17     A      He was in maximum restraints, and I think

18  they had the -- I remember -- if I can remember

19  correctly, the two belts that go over and make sure

20  he doesn't fall off the gurney.

21     Q      Was he on his -- was he in a prone

22  position?  Was he on his back?  How was he fastened

23  to that?

24     A      On his side.

25     Q      So, obviously, to put somebody in maximum

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 1   Page 18

Aaron Jacob Brooke                                      February 22, 2017

```
 1    hospital.
 2        Q    All right.
 3        A    I mean, I could see the hospital, like
 4    Emergency bay.  We were right there.
 5        Q    And what did you think when you heard that
 6    over the radio?
 7        A    It's not good.
 8        Q    So after hearing that, how long did it take
 9    you to get into the ambulance bay at Grossmont?
10        A    Where we were?  Maybe a minute.  Minute and
11    a half.
12        Q    So what happened when you got to the
13    ambulance bay?
14        A    So they pulled into the bay.  I'm obviously
15    in a patrol car so I'm not going to.  I pulled up
16    right there, though.  So I'm close.
17             Got out of my car.  I ran over to the back
18    of the ambulance.  It was already open for me.  And
19    I started cutting the restraints off his feet.
20    Paramedics were telling me to.  They were already
21    starting CPR.
22        Q    All right.  You say they were starting CPR.
23    What leads you to believe they were just starting
24    when you opened the door?
25        A    It looked like they were already giving him
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 1   Page 19

Aaron Jacob Brooke                                    February 22, 2017

1    compressions when I ran up.  So they were in the
2    middle of, you know, giving him medical response
3    when I ran up.
4        Q    All right.  So did you remove the handcuffs
5    from Mr. Phounsy?
6        A    The only thing I remember doing is cutting
7    his -- his feet restraints off.
8        Q    All right.
9            When I look at your report -- it looks like
10   Exhibit 3 -- the very last page, page 3, first
11   sentence,
12            "At 2312 hours, we pulled into
13            Grossmont Hospital.  Deputy Fischer and I
14            removed the handcuffs from Lucky's wrists
15            and the maximum restraints from his
16            feet."
17            In reading that, does that refresh your
18   recollection as to whether you personally helped
19   take the cuffs off of Mr. Phounsy?
20       A    In reading that, I mean, that could mean
21   me.  I'm just -- it could mean I uncuffed it -- I
22   uncuffed 'em myself or I'm just assisting Deputy
23   Fischer.  I mean, I wrote it, so it happened.  But I
24   don't know if he actually unlocked or I unlocked or
25   we both unlocked, but we removed them.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 1   Page 20

Aaron Jacob Brooke                                    February 22, 2017

1   told you?

2       A    I know they went in and contacted him.   I

3   don't know what room it was in the house.   And I

4   think at some point they tried to detain him, and

5   then -- and then it went bad.

6       Q    Anything else you remember about what they

7   told you?

8       A    I don't know if it was Marcos or Janae.

9   But I know at one point it crossed their mind that

10  deadly force was an option because they didn't see

11  themselves winning at that point.   They were

12  exhausted.

13      Q    So one or both of them told you that they

14  had wanted to use deadly force against Mr. Phounsy?

15          MR. DEAN:  Misstates his testimony.

16          THE WITNESS:  I don't know which one it

17  was.  But deadly force had crossed their mind that

18  it could be -- it could have been used if it had

19  gone on longer than it had.

20  BY MR. McBRIDE:

21      Q    That they believed they would have been

22  justified in using deadly force is what they told

23  you?

24      A    I don't think we took it that far as far as

25  being justified or not at that point.   It was just

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 1   Page 21

Aaron Jacob Brooke                                    February 22, 2017

```
 1        A    No.
 2        Q    Are you aware of any other deputies making
 3   any efforts to get a warrant to draw blood from
 4   Mr. Phounsy?
 5        A    No.
 6        Q    So what exactly did you do to place a
 7   formal 5150 hold on Mr. Phounsy?
 8        A    Based on the totality of everything that
 9   happened that night, I thought it was a good idea to
10   do that.  I filled out the form, spoke with the
11   nurse, and the nurse took the form from me.
12        Q    So, at the time you placed a 5150 hold on
13   Mr. Phounsy, what was your understanding of his
14   medical condition?
15        A    He was being -- at that point he was
16   revived, and he was alive, and he was on a
17   ventilator.
18        Q    All right.  And, according to the charge
19   nurses that you were in contact with, what was his
20   prognosis at that point?  Or do you remember?
21        A    Based off reading my report today, he
22   didn't have any significant injuries.  But they were
23   still awaiting blood tox and head scans and stuff
24   like that.
25        Q    Were you asked to place a 5150 hold on
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 1   Page 22

Brooke

## DECLARATION UNDER PENALTY OF PERJURY

I, AARON JACOB BROOKE, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on February 22, 2017; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

DATED THIS __3ʳᵈ__ day of __APRIL__,

20__17__, at __SAN DIEGO__, __CA__.
               (City)        (State)

_____
AARON JACOB BROOKE

Page 81

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 1   Page 23

Aaron Jacob Brooke                                                    February 22, 2017

```
 1                     CERTIFICATE OF

 2        CALIFORNIA CERTIFIED SHORTHAND REPORTER

 3            I, the undersigned, a Certified Shorthand

 4   Reporter of the State of California, do hereby

 5   certify:

 6            That the foregoing proceedings were taken

 7   before me at the time and place herein set forth;

 8   that any witnesses in the foregoing proceedings,

 9   prior to testifying, were placed under oath; that a

10   verbatim record of the proceedings was made by me

11   using machine shorthand which was thereafter

12   transcribed under my direction; further, that the

13   foregoing is an accurate transcription thereof.

14            The dismantling of this transcript will

15   render the reporter's certificate null and void.

16            I further certify that I am neither

17   financially interested in the action nor a relative

18   or employee of any attorney of any of the parties.

19            Reading and signing was requested.

20            IN WITNESS WHEREOF, I have this date

21   subscribed my name.

22

23   Dated:  March 3, 2017

24                              KATHLEEN S. McLAUGHLIN
                                CSR No. 5845
25
```