# Exhibit 2

Exhibit 2   Page 25



## ORIGINAL TRANSCRIPT

Transcript of the Testimony of:

# Richard Fischer

K.J.P.

v.

County of San Diego

February 23, 2017

Volume I

P: 877.771.3312 | F: 877.561.5538 | litivate.com

Exhibit 2   Page 26

Richard Fischer                                    February 23, 2017

1    deputies to these calls?

2         A    For those, yes.  It's -- you should I guess

3    you could say try to.

4         Q    Why do you do that?

5         A    For officer safety purposes.

6         Q    And that's your practice?

7         A    I try to, yes.

8         Q    Are you actually trained by the Sheriff's

9    Department for these types of calls or calls where a

10   person could potentially come -- become violent or

11   there's, you know, an unknown factor, are you

12   trained to bring more deputies?

13        A    I mean, we are, yes.  I mean, it's just --

14   it's more of a practice like -- it's not you shall

15   take another deputy with you, but it's just good --

16   especially deputies that have been on for a little

17   bit, it's good -- I mean, it's just almost common

18   sense to bring at least another -- one more cover

19   partner.

20        Q    All right.

21             At some point did you hear a call for cover

22   regarding the 8385 Holden road?

23        A    Yes.

24        Q    And what did you do at that point?

25        A    I got on the radio, because I was working

Richard Fischer                                    February 23, 2017

1   in Lakeside and I was in Santee.  So I just said

2   I'll be en route code and lights and sirens and

3   started going that way.

4        Q    What was your unit designator that night,

5   do you know?

6        A    I should have been 50 Paul 5 Charles, if

7   I'm . . .

8        Q    What was your physical description at the

9   time?

10       A    What do you mean?

11       Q    How tall are you?

12       A    I'm six foot.

13       Q    How much did you weigh at the time?

14       A    I would say 220, 225.

15       Q    Are you in more or less the same shape now

16   as you were back then?

17       A    I would say so, yes.

18       Q    Did you go to the gym regularly back then?

19       A    I try to, yes.

20       Q    I think you told the Homicide detectives

21   that you would go to the gym before work pretty much

22   every day.

23       A    Yes.  Well, I just want to clarify, because

24   I have a kid now.  So it's not as much -- quite as

25   often so -- but at that time I believe that's

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 28

Richard Fischer                                        February 23, 2017

```
 1   accurate.
 2        Q    I hear they take up a lot of your time.
 3             You were -- how old were you back then?
 4        A    2015?
 5        Q    Yes.
 6        A    I should be twenty -- was it April or --
 7        Q    April.
 8        A    It should be 29, I believe.
 9        Q    All right.  What time -- well, how long did
10   it take you to get there?
11        A    I know it took a couple minutes at least.
12   I can't give you an exact time frame.  But I know it
13   felt like a long time, but I know several minutes
14   for sure.
15        Q    When you got there were there already --
16   had secondary units already arrived?
17        A    Yes.
18        Q    So you were not the first backup deputy to
19   arrive on scene?
20        A    That's correct.
21        Q    What did you see when you pulled up front?
22        A    I remember just -- saw flashing lights,
23   obviously.  But then I ran straight to the hallway
24   and saw -- I'm sorry -- how to say his name.
25   Mr. Fonzi?
```

Richard Fischer                                          February 23, 2017

1         Q      Phounsy.

2         A      Phounsy?  On the ground.  I believe he was

3    already handcuffed at that time, and I saw him

4    struggling with several deputies on the ground.

5         Q      Okay.  So you parked, you jumped out of

6    your car, and you ran to the house?

7         A      Yes.

8         Q      How far away did you have to park?

9         A      I would say a couple houses.

10        Q      Did you enter through the front door or

11   through the garage?

12        A      I believe it was the garage.

13        Q      At the time were you wearing a vest?

14        A      Yes.

15        Q      Did you have front and back panels in?

16        A      Yes.

17        Q      So prior to getting out of your call --

18   sorry.  Prior to arriving but after getting the

19   cover call, did you look up any information about

20   the original call?  So any comments to the original

21   call?

22        A      I don't believe I did.  I was -- I remember

23   my computer was very slow, and I was just -- someone

24   put out over the radio -- I believe it's -- the

25   nearest cross street is Prospect, because the

Richard Fischer                                              February 23, 2017

```
 1    address street name didn't look familiar or sound
 2    familiar.
 3              So I remember I -- I don't think I had time
 4    to look at the call, especially what was being put
 5    out, broadcasted.  So I don't think I did, no.
 6        Q    So, when you showed up there on scene, all
 7    you knew about the call was what you had originally
 8    heard over the radio?
 9        A    Yes.
10        Q    And then the cover call?
11        A    The cover, yes.
12        Q    Okay.  So you walked inside.  How many
13    deputies were already there in the hallway?
14        A    A lot.  I want to say maybe like eight or
15    so.  Approximately.
16        Q    Did you see any -- I'll say family
17    members -- but any people who were not law
18    enforcement in the hallway?
19        A    I don't know where they were exactly.  They
20    were definitely in the house.  But they were there.
21    I'm not sure where I saw them.  Bedroom or whatnot.
22        Q    Okay.  You don't remember seeing any of
23    them in the hallway at that point?
24        A    I don't think so, no.
25        Q    But they could have been in the hallway?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 31

Richard Fischer                                    February 23, 2017

1       A    Right.  I'm not saying either way.  I can't

2    say for sure.

3       Q    So you said there was -- you remember there

4    being about eight deputies in the hallway?

5       A    Yes.

6       Q    What were these eight deputies doing?

7       A    They were in the process of -- well,

8    keeping him under control and max restrain him.

9       Q    All right.  So you said Mr. Phounsy was

10   already in handcuffs when you arrived?

11      A    I believe so, yes.

12      Q    And how was Mr. Phounsy situated?

13      A    He was in the prone position on his

14   stomach.

15      Q    Facing -- was his head facing towards you

16   when you walked into the hallway, or was he facing

17   away?

18      A    I believe he was facing toward me as you

19   walk in that way.

20      Q    And was he handcuffed behind his back?

21      A    Yes.

22      Q    So were these approximately eight deputies,

23   were they holding him down?

24      A    Yes.  They were -- some were holding him

25   down.  Some were trying to work -- maneuver the cord

Exhibit 2   Page 32

Richard Fischer                                    February 23, 2017

1  cuffs to get him max restrained.

2      Q    So when you walked in you saw the maximum

3  restraints out?

4      A    I believe I did, yes.

5      Q    What was Mr. Phounsy doing when you walked

6  in?

7      A    He was just struggling.  He was just moving

8  side to side, just tried -- I don't know the right

9  word for it.  But he was just really being

10 aggressive.  Just trying to escape is what it looked

11 like.

12     Q    With eight deputies on him, I would imagine

13 most of Mr. Phounsy was covered up.  Is that a fair

14 statement?

15     A    Well, the sides of him were.  But I could

16 still have a good picture of him.

17     Q    What portions of Mr. Phounsy could you see

18 when you walked in?

19     A    I saw his back, his legs, parts of his head

20 here and there.  They were trying to keep that

21 controlled as well.

22     Q    Was Mr. Phounsy saying anything?

23     A    I don't remember him saying anything.

24     Q    Do you recall Mr. Phounsy saying anything

25 at any point during the incident?

Exhibit 2   Page 33

Richard Fischer                                    February 23, 2017

```
 1    other deputies were around me so . . .
 2        Q    Okay.  So when you walk in the door, what
 3    do you do?
 4        A    Well, I'm running over to them, and I just
 5    ask, "Hey, what do you guys need?"  Because, like I
 6    said, he was pretty sounded.
 7             And then someone just somebody said, "Help
 8    with the legs."  And so I just -- downward pressure
 9    until they were finished doing the maximum
10    restraints up top.
11             And then once they finished up there, I
12    helped just connect the -- the bottom portion of the
13    max restraints to the -- to the upper portion.
14        Q    All right.  So you did not apply the
15    maximum restraints to the ankles?
16        A    I was there, and I believe someone else did
17    them.  But I was -- I may have, like, helped with a
18    loop or so.  But I was more on the downward pressure
19    side until it was ready, and then I believe I did
20    the clip on the top so . . .
21        Q    All right.  So you did not apply the
22    maximum restraint to the waist?
23        A    To the waist?  No.
24        Q    But you do believe that you were the one
25    that connected the two?
```

Richard Fischer                                          February 23, 2017

```
 1      A    Yes.
 2      Q    Did you help bend Mr. Phounsy's legs to
 3  allow you to make the connection, or was somebody
 4  else doing that?
 5      A    No, I don't remember exactly bending the
 6  actual legs.  But I know for sure someone else did
 7  help assist.  But I would assume I did because I'm
 8  the one with the -- connecting them so . . .
 9      Q    So how far back did you guys have to bend
10  Mr. Phounsy's legs to make the connection?  And, for
11  example, were his heels touching his buttocks?
12      A    No.
13      Q    No?  Something less than that?
14      A    Yes.
15      Q    How far back were they bent, then, when you
16  actually connected?
17      A    I couldn't give an exact inch amount or
18  foot.  But it's our practice that we give them at
19  least I would say six inches at the very least just
20  to make sure there's some breathing room in there
21  so . . .
22      Q    I see.  So it's your practice to make that
23  cord that connects the two about six inches in
24  length?
25      A    Well -- I'm sorry.  I'm not understanding.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 35

Richard Fischer                                    February 23, 2017

```
 1        Q     Less than two minutes?
 2        A     I'd rather err on the safe side.  But less
 3   than five minutes.  Because time was kind of goin'
 4   fast or slow during that time but . . .
 5        Q     So who was in charge there inside the
 6   hallway once you got there?
 7        A     To tell you the truth, I don't remember who
 8   the sergeant on duty was.  But there was a sergeant
 9   there, I remember.  But I honestly don't remember
10   who.
11        Q     Do you recall any of the deputies kind of
12   taking the lead role there in the hallway when you
13   were applying the maximum restraints?
14        A     I don't know, no.
15        Q     What was Mr. Phounsy doing as you applied
16   or help apply the maximum restraints?
17        A     He was constantly struggling with us.
18        Q     When you say "struggling," can you describe
19   specifically what he was doing?
20        A     I think he was just trying to roll over on
21   his side.  Just trying to not let us control him.  I
22   guess that's what you'd say.  But just side to side
23   moving.  Wouldn't -- wouldn't stay still.
24        Q     At any point did Mr. Phounsy strike you?
25        A     No.
```

Exhibit 2   Page 36

Richard Fischer                                          February 23, 2017

```
 1        Q    Did you have any conversations with any of
 2   the family members about anything?
 3        A    No.
 4        Q    Do you recall hearing the family members
 5   say anything at any point?
 6        A    I know -- I think I heard conversations,
 7   but I don't remember anything like that, specifics.
 8        Q    Did you write down any notes about anything
 9   any of the family members had said?
10        A    No.
11        Q    So in your report in the third paragraph
12   about halfway through you say,
13             "I felt if I did not apply downward
14             pressure, Phounsy could have escaped our
15             control and continue to fight and injure
16             additional deputies."
17             What specifically -- what information did
18   you have to lead you to believe that Mr. Phounsy
19   would injure any deputies at that point?
20        A    I -- well -- backing up to just the cover
21   call itself, when Deputy Collins first put out code
22   cover, it was clear, concise, just like normal,
23   "Hey, code cover.  Get units here now."
24             And then shortly after hearing Deputy Krull
25   and Collins get back on the radio screaming -- you
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 37

Richard Fischer                                          February 23, 2017

```
 1    could tell it was a fight, and it was -- when I got

 2    there, there was blood everywhere.

 3            And so I think I overheard -- I can't say

 4    for sure, but I just knew Deputy Collins and Krull

 5    were going to the hospital so . . .

 6      Q    All right.  So you did not see Deputy

 7    Collins or Krull when you first arrived there?

 8      A    I don't recall seeing them, no.

 9      Q    So you didn't have any conversations with

10    Deputy Collins or Krull when you first arrived

11    there?

12      A    When I first arrived, no.

13      Q    When you in that hallway after arriving,

14    did any of the other deputies tell you that Deputy

15    Collins and Krull were injured?

16      A    It must have been, but I can't say for

17    sure.  I just remember hearing that from somewhere.

18      Q    Okay.  Is it possible that in writing your

19    report after the fact you had learned that they were

20    injured and then maybe included that information a

21    little too early chronologically in your report?

22      A    No.  I remember -- I don't know -- I

23    honestly don't remember when or where.  But I just

24    remember knowing that they were both going to the

25    hospital.
```

Richard Fischer                                    February 23, 2017

```
 1    treatment?

 2        A    I can't say specifics because I don't know

 3    what they do.  But they were doing stuff constantly.

 4    They were never staying still just watching him.

 5    They were doing something.  But I can't say for sure

 6    what it was.

 7        Q    So talk to me about the shot that you saw.

 8    What did -- did you actually personally witness one

 9    of the paramedics give Mr. Phounsy a shot?

10        A    I remember the shot going in, and I think

11    someone else had said, "Oh, this should calm him

12    down"" or something.  Something along those lines.

13    But I don't -- that's pretty much it.

14        Q    And it was a paramedic that gave the shot?

15        A    Oh, yes.  It wasn't one of us.

16        Q    Where on Mr. Phounsy was the shot given?

17        A    To tell you the truth, I don't remember

18    exactly where.

19        Q    All right.

20             After the shot did you -- well, did the

21    shot have any effect on Mr. Phounsy?

22        A    It didn't seem to, no.

23        Q    No?  What did you do after you saw the

24    shot?  Did you stand there with Mr. Phounsy, or did

25    you go do other things?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 39

Richard Fischer                                    February 23, 2017

1    do use profanity so . . .

2        Q    Did you hear any other deputies use any

3    profanity towards Mr. Phounsy at any point during

4    this incident?

5        A    Again, I don't recall specifics.  It's

6    possible and probable, but I don't know for sure.

7        Q    But you're certain you didn't hear any

8    deputies laughing outside in the driveway?

9        A    I don't remember that, no.

10       Q    So what was Mr. Phounsy's demeanor outside

11   in the driveway when you saw him?

12       A    I believe he did -- he was constantly

13   moving.  It wasn't so violent as much, but he was

14   still going -- like just constant.

15            And then I remember them saying, "Okay, we

16   gotta -- let's go to the hospital."  But I don't

17   have like a whole lot of outside in the driveway

18   contact with him.

19       Q    Did he seem somewhat calmed down from the

20   way he was in the hallway?

21            MR. OSTERBERG:  Objection.  Vague and

22   ambiguous as to time and the meaning of "somewhat

23   calmed down."

24   BY MR. McBRIDE:

25       Q    Let me ask it a different way.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 40

Richard Fischer                                    February 23, 2017

```
 1              When you saw Mr. Phounsy in the driveway,
 2   did he seem more calm than he was when he was in the
 3   hallway?
 4              MR. OSTERBERG:  Same objections.
 5              THE WITNESS:  Still answer?
 6   BY MR. McBRIDE:
 7       Q    Yes.
 8       A    I would say no.  He was -- he was just
 9   going nonstop.  I couldn't -- I don't remember -- I
10   never like had my hands on him in the driveway.  So
11   I couldn't say for sure the tension he was giving.
12   But he was just constantly moving like the whole
13   contact.  So I couldn't give you a direct answer on
14   that.
15       Q    Okay.  So when you saw him, he was
16   constantly moving?
17       A    Yes.
18       Q    But would you describe him in the driveway
19   as violently resisting?
20       A    Violently resisting?  I guess based on
21   everything at that time, no.  Definitely resisting,
22   though, but . . .
23       Q    All right.  Would you describe Mr. Phounsy
24   when you saw him in the driveway as being combative?
25       A    Just -- for me it's hard to say combative
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 41

Richard Fischer                                    February 23, 2017

1    right then because, obviously, he was restrained so

2    he couldn't have.

3            Based on the totality of everything, I

4    believe he was trying to escape and would be

5    combative had he not been max restrained.  So -- I

6    know I kind of roundabout your question, sir.  I'm

7    sorry.

8            But at that time doing what he was doing, I

9    wouldn't call that -- I would still call it

10   combative, but I don't think on the level that

11   you're trying to get at, if that makes sense.

12       Q    So he was restrained, though?  So you would

13   agree that he could not have harmed any deputies

14   while he was restrained?

15       A    He could still harm but in a different

16   capacity.  His head is still loose.  You know, it's

17   not uncommon if they were able to escape the

18   restraints, you know, but I guess on a lower level

19   of combativeness.

20       Q    Have you ever -- in your experience prior

21   to this, the approximately five to 10 times you were

22   involved in placing maximum restraints on somebody,

23   of those times in which you correctly applied the

24   maximum restraints, have you ever had an individual

25   break out of them?

Richard Fischer                                    February 23, 2017

1        A     I didn't hear that, no.

2        Q     Were you personally concerned that

3   Mr. Phounsy could potentially go into cardiac

4   arrest?

5        A     Well, that's always a concern.  Anytime you

6   have anybody in custody, especially -- well, I guess

7   it's -- it's -- it's a concern of every contact.

8   So, yes.

9        Q     What specifically about Mr. Phounsy led you

10  to be concerned that he could go into cardiac

11  arrest?

12       A     Well, again, I believed him to be possibly

13  under the influence.  I know people who use any type

14  of drugs, it can affect your heart rate, your -- any

15  of your internal organs, really.

16             So to me it was just a concern that you

17  just have, I guess.  I don't know if it's ingrained

18  in us.  But specifically for him, I would just say

19  more so because he was probably under the influence

20  so . . .

21       Q     All right.

22             What did you -- what steps, if any, did you

23  take as a result of this concern for Mr. Phounsy

24  possibly going into cardiac arrest?

25       A     For me just constant monitoring.  Every

Richard Fischer                                    February 23, 2017

```
 1    time I was the guy next to him, I just made sure he
 2    was good, breathing, whatnot.
 3         Q    All right.
 4              But you already testified when you were out
 5    in the driveway you weren't really paying attention
 6    to him.
 7         A    Oh, out there I didn't.  Right.  That's
 8    correct.  I'm sorry.  I was speaking of later.
 9         Q    All right.  You were talking about later in
10    the ambulance?
11         A    Yes.
12         Q    Okay.
13              So your report says on one, two, three,
14    four, five, page five -- or page one, paragraph
15    five, you assisted medics in escorting Mr. Phounsy
16    to the ambulance?
17         A    Yes.
18         Q    What did you do to help escort Mr. Phounsy
19    to the ambulance?
20         A    I believe I was just walking next to him.
21         Q    Was Mr. Phounsy handcuffed to the gurney?
22         A    To the gurney?
23         Q    Yes.
24         A    I believe he was just handcuffed behind his
25    back still.
```

Richard Fischer                                    February 23, 2017

1      Q    All right.  How was Mr. Phounsy on the
2   gurney?
3      A    To tell you the truth, I don't remember
4   exactly.
5      Q    Was he on his back?
6      A    I don't remember.  I couldn't tell you.
7      Q    So you can't say if he was in a prone
8   position?
9      A    Yeah, I couldn't say for sure.
10     Q    Can you say if he was in the recovery
11  position?
12     A    No, I couldn't say for sure.
13     Q    Do you recall anybody -- any of the medics
14  saying to you or any of the other deputies that he
15  needs to be in a recovery position while on the
16  gurney?
17     A    I don't remember that, no.
18     Q    Before Mr. Phounsy was placed in the
19  ambulance, did you check his restraints to make sure
20  that they were still on him correctly?
21     A    I don't think I did, no.
22     Q    Before you got into the ambulance did you
23  check the restraints to make sure Mr. Phounsy could
24  breathe?
25     A    Well, yes.  I was -- I -- can I back that

LITIGATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 45

Richard Fischer                                          February 23, 2017

1    up?  I'm sorry.

2        Q    Yes.

3        A    I don't think -- I didn't check the

4    restraints to see if he can breathe.  I was just

5    checking to see if he could breathe.  Make sure he

6    was breathing still.

7        Q    Okay.

8             So before we get to the ambulance part, is

9    this anything else you did there on scene that you

10   remember, other than what you've described?

11       A    No.

12       Q    Did you have any conversations with any

13   deputies, other than what you've described?

14       A    I don't believe so.

15       Q    All right.  So when you were in the

16   ambulance, how were you guys situated?

17       A    Mr. Phounsy was -- so going to the back --

18   we were in the back of the ambulance.  If you go all

19   the way to the back, I was on -- I'm just speaking

20   in terms of we're facing the ambulance now.  I was

21   on the right side.

22            Mr. Phounsy was on his recovery position --

23   in the recovery position on his left side.  And

24   there was a medic next to me and another medic next

25   to him.

Richard Fischer                                      February 23, 2017

```
 1    around here too so . . .
 2        Q    Okay.  And then can you just draw just
 3    generally a rectangle where you remember Mr. Phounsy
 4    and then put a P in the middle?
 5        A    (Witness complies.)
 6        Q    You said Mr. Phounsy was on -- in the
 7    recovery position on his left side?
 8        A    Left side, yes.
 9        Q    So he was facing you?
10        A    He was facing me, yes.
11        Q    All right.
12             So, when you got into the ambulance, did
13    you see the medics provide any assessment or
14    treatment to Mr. Phounsy?
15        A    Yes.  They -- well, treatment, I don't know
16    for sure.  But I just know they were constantly
17    doing stuff, and I can't -- I can't say for sure
18    what it was.
19             But they are touching him, checking his
20    vitals.  They were doing stuff -- medical stuff that
21    I'm just not familiar with.  But they were -- I just
22    remember constant they were doing something.
23        Q    All right.
24             So in the ambulance Mr. Phounsy had calmed
25    down to the point where these paramedics were at
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 47

Richard Fischer                                    February 23, 2017

```
 1    least able to check his vitals?
 2        A    I remember them checking it.  So -- but --
 3    as soon as we got in there, I was placing downward
 4    pressure on his head, and I was able to control him
 5    enough to where I know they were doing stuff.
 6    So . . .
 7        Q    All right.
 8        A    So in that sense he was calm enough to be
 9    monitored.
10        Q    Describe to me how Mr. Phounsy was
11    restrained while you were in the ambulance.
12        A    Well, he was max restrained still.
13        Q    So he had handcuffs on?
14        A    Yes.
15        Q    Behind his back?
16        A    I believe, yes.
17        Q    He still had the max restraints on?
18        A    Still had the max restraints on.
19        Q    And you don't remember whether or not he
20    was handcuffed to the gurney?
21        A    I -- I can safely assume he probably was
22    also, but I don't remember for sure.  But I'm pretty
23    sure he would have been, though.
24        Q    Handcuffed to the gurney?
25        A    Yes.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 48

Richard Fischer                                    February 23, 2017

1      Q    Is that your practice at the Sheriff's
2    Department?
3      A    It's just you take the totality of the
4    circumstances.  Him still constantly not going with
5    the program to keep him as secure as possible.  So
6    in this situation, yes.
7      Q    And typically where would you apply the
8    handcuffs on him to attach it to the gurney?  Is it
9    something that would be attached to his wrist?
10     A    Just kind of wherever you can.  Even the
11   forearm or something.  But just to the gurney, one
12   of the poles going up.
13     Q    Okay.  And there were also seatbelts that
14   attached Mr. Phounsy to the gurney?
15     A    Yes.  I believe there was.
16     Q    How many?  Do you remember?
17     A    I know most gurneys have three, I believe,
18   but I couldn't say -- I can't say for sure.
19     Q    And do you recall where the straps -- what
20   portion of Mr. Phounsy's body the straps crossed?
21     A    I don't know.
22     Q    Do you know if -- based on you being right
23   there with Mr. Phounsy, do you know if those
24   seatbelts were restricting his ability to breathe at
25   all?

Richard Fischer                                    February 23, 2017

```
 1        A     No.  He was breathing while I was there
 2   still.
 3        Q     How do you know?
 4        A     Because I can feel his -- well, him
 5   constantly moving.  I know he was.  And then I was
 6   just looking at his -- the rise and fall of his
 7   chest as well.
 8        Q     All right.  So, in addition to the
 9   handcuffs, the cuffs to the gurney potentially, the
10   maximum restraints, and the seatbelt, you were
11   applying downward pressure to Mr. Phounsy's head?
12        A     Yes.
13        Q     With one hand or two hands?
14        A     Both hands.
15        Q     So you would have had your hands on the
16   right side of his head?
17        A     That's correct, yes.
18        Q     Can you demonstrate to me how you were
19   holding down on his head?
20        A     Just like that with my palms (indicating).
21        Q     Okay.  On his forehead or on his ear?
22        A     So just kind of both hands like this
23   (indicating).  Forehead, the temple, the side of his
24   head.
25        Q     All right.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 50

Richard Fischer                                February 23, 2017

```
 1              On a scale of 1 to 10, with 10 being as
 2   hard as you could push down, how hard were you
 3   holding Mr. Phounsy's head down?
 4        A    I was holding it a good 9 to 10.  He was
 5   moving that -- that strong so . . .
 6        Q    So you were holding him essentially as hard
 7   as you could hold someone down?
 8        A    Yeah.
 9        Q    All right.
10              So, given all of those ways in which
11   Mr. Phounsy was being restrained at that time, you
12   said he was still moving?
13        A    Mm-hmm.  Yes.
14        Q    How was he still moving?
15        A    Just head going back and forth.  His body,
16   he was trying to move his body.  His body was pretty
17   secured, but he was still able to move it, and it
18   was just constant, just tensing and just going -- I
19   don't want to say -- just going side to side hard.
20        Q    Okay.
21              While Mr. Phounsy was on the gurney, were
22   his legs -- his legs were, obviously, still bent
23   back if he was in the maximum restraints.
24        A    Yes.
25        Q    Were his legs hanging off the gurney at
```

Richard Fischer                                    February 23, 2017

```
 1    there's not a lot of ways in which his body could
 2    move or at least move very far.
 3            MR. DEAN:  Lacks foundation.  Assumes
 4    facts.
 5            MR. OSTERBERG:  Join.
 6            THE WITNESS:  Well, you're still able to
 7    move.  It's not like you're perfectly just
 8    absolutely restricted.  And your head is actually
 9    very still agile.
10            So -- and, yeah, his body -- that's --
11    that's kind of why I was -- it was surprising for
12    me, because after a long physical altercation that
13    he was just involved in to still constantly, even
14    after given a shot, and constantly just not letting
15    go.  That's why it was just -- it would surprise me
16    being there so . . .
17    BY MR. McBRIDE:
18        Q    Did you see one shot or two?
19        A    I'm sorry?
20        Q    Did you see one injection or two
21    injections?
22        A    I believe I just saw one.
23        Q    Okay.
24            So what happened after you guys left in the
25    ambulance?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 52

Richard Fischer                                        February 23, 2017

1          A    I believe we were going to Grossmont

2    Hospital.  And -- well, that just -- his demeanor

3    continued the whole time.  So I just kept the

4    downward pressure.

5          Q    Do you know whose decision it was to

6    transport Mr. Phounsy in the max restraints?

7          A    I do not know.

8          Q    Did you guys -- while you were in the

9    ambulance were you lights and sirens or were you --

10         A    We were lights and sirens, I believe.

11         Q    Do you specifically remember the lights or

12   sirens being on?

13         A    You know what?  To be honest, I don't.  I

14   just know it's common practice.  Every time I have

15   ridden in the back of an ambulance, they've gone

16   lights and sirens so -- but I can't -- I honesty

17   don't remember.

18         Q    I'll take that marker.

19         A    I'm sorry.

20         Q    You're about to get it on your shirt.

21         A    Thank you.

22         Q    That would be a travesty.

23              Was there anything -- at the point you got

24   in the ambulance, did you believe Mr. Phounsy was in

25   critical condition?

Exhibit 2   Page 53

Richard Fischer                                    February 23, 2017

```
 1            I just -- I -- with my experience with
 2    ambulances, suspects or deputies or anybody, they
 3    constantly go fast if -- they usually go Code 3.  I
 4    mean, just -- I would say the majority of the time
 5    anyways.
 6        Q    But there are times in which they do not go
 7    lights and sirens?
 8            MR. OSTERBERG:  Objection.  Vague and
 9    ambiguous.
10            THE WITNESS:  Oh, I can't say for sure.
11            MR. OSTERBERG:  Objection.  Vague and
12    ambiguous.
13            THE WITNESS:  And I can't say for sure.
14    BY MR. McBRIDE:
15        Q    Have you ever been in an ambulance with
16    either a suspect or a deputy going to the hospital
17    where the ambulance did not go lights and sirens?
18        A    I have not.
19        Q    Never?
20        A    No.
21        Q    All right.
22            At that point in the ambulance who was in
23    charge of Mr. Phounsy?
24        A    I guess myself as far as -- well, I
25    guess -- yeah, he was in custody.
```

Richard Fischer                                    February 23, 2017

1          MR. DEAN:  Let me interject.  Vague and
2     ambiguous with respect to "in charge."  For what
3     purpose?  Medical care or law enforcement care?  "In
4     charge" is vague and ambiguous.
5          MR. McBRIDE:  Okay.
6     BY MR. McBRIDE:
7          Q    Go ahead.  You were saying?
8          A    Well, yeah, I guess -- he was in custody so
9     he was in my custody.  So I was in charge of him as
10    far as him and medical personnel was -- whoever was
11    back there was in charge of -- kind of like we both
12    had a job to do.  So we both -- I guess both of us.
13    But as far as law enforcement, I was the only one
14    back there.
15         Q    So if the medics had wanted to get
16    Mr. Phounsy out of the maximum restraints, whose
17    decision would that have been?
18         A    That's a good question.  Honestly, it
19    would -- ultimately it would be up to me.
20         Q    Did the medics ever ask you to get -- well,
21    prior to Mr. Phounsy going into cardiac arrest, did
22    the paramedics ever ask you to get him out of the
23    maximum restraints?
24         A    I don't believe so.
25         Q    Did you hear the paramedics ask any law

Richard Fischer                                    February 23, 2017

1   enforcement deputy to remove the maximum restraints

2   from Mr. Phounsy?

3       A    No.

4       Q    Okay.  So what happened, then, on the ride?

5       A    Then eventually he just stopped moving his

6   head around and stopped struggling, I guess you

7   could say.  And when he stopped struggling, that's

8   when I released my pressure, my downward pressure.

9   And I just kind of left my hands over his head in

10  case he picked it up again, started again.  And he

11  just -- he was still breathing.  I remember

12  specifically seeing his -- the rise and fall of his

13  chest and --

14      Q    Let me stop you there.

15           At any point did you see any of the

16  paramedics attempt to place a blood pressure cuff on

17  Mr. Phounsy?

18      A    I am not -- I can't say for sure.  I don't

19  know.

20      Q    What about an oxygen mask?

21      A    At that point in time, I don't -- I don't

22  believe -- I can't say for sure.  So I don't know.

23      Q    Okay.  At some point in the ambulance did

24  you ask the paramedics to place a spit sock on

25  Mr. Phounsy?

Exhibit 2   Page 56

Richard Fischer                                February 23, 2017

1       Q    So was this -- one to two minutes after you

2    released the pressure and were kind of holding your

3    hands over his head, is that when one of the

4    paramedics said, "Is he finally calmed down"?

5       A    Yes.

6       Q    And what did you say?

7       A    And I said, "Yeah, finally," or something

8    like.

9       Q    And then what happened?

10      A    And then again a short time later he was --

11   I mean, he was constantly monitoring.  But finally

12   he was just like, "Oh," and he checked him again.

13   And then he's like, "Hey, he's not breathing."

14   And -- or he said, "He coded."  I'm sorry.  And then

15   so they started doing stuff and working on him some

16   more so . . .

17      Q    All right.

18           So do you recall which paramedic it was,

19   the one that you indicated M1 or M2, that finally

20   checked Mr. Phounsy and said that he coded?

21           MR. DEAN:  Argumentative with respect to

22   the word "finally."  And vague and ambiguous.

23           MR. OSTERBERG:  Misstates testimony as

24   well.

25           THE WITNESS:  I believe it was M1.

Richard Fischer                                    February 23, 2017

```
 1    BY MR. McBRIDE:
 2       Q    All right.
 3            Did you see -- the paramedic that's in the
 4    M1 position, did you see him get up and move from
 5    that seat at any point during the ride?
 6       A    I honestly don't remember.
 7       Q    All right.
 8            So what happened as soon as the paramedic
 9    announced that Mr. Phounsy had coded?
10       A    Both of them were -- again, more medical
11    stuff.  They were like, "Okay.  We gotta do this, we
12    gotta do that."  And then they were just working on
13    him medically.
14       Q    All right.  What did you see them do to
15    work on Mr. Phounsy medically?
16       A    Again, I -- they were -- I know they
17    were -- I believe they gave him like this thing over
18    the -- I don't know what it's called.  Just stuff to
19    like help him breathe.  And -- and, honestly, I
20    don't know.  Just medical stuff that I . . .
21       Q    Okay.  Did you see them at any point start
22    CPR?
23       A    Yes.
24       Q    How long after the medic said he coded was
25    it before they started doing CPR?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 58

Richard Fischer                                    February 23, 2017

1       A     I believe it was almost instantly.  It was

2   just -- again, I don't know what tools they have or

3   whatnot.  But they were just constantly just over

4   him and doing -- working on him medically.

5       Q     So what do you do?  After they say he's

6   coded and they start doing the medical stuff, what

7   do you do?  Do you step back at that point?

8       A     Yes.  They're more experts at it than I am.

9   So I let them do what they need to do.  I just -- I

10  may have told them, "Hey, whatever you need from me,

11  let me know or whatnot."

12        But I just kind of wanted to get out of the

13  way to let them work so -- but I think I just

14  stayed -- I'm sorry.

15      Q     No.  Go ahead.

16      A     I think I just stayed in the same seating

17  position I was, or at least in that area.

18      Q     So you didn't walk to, say, the back of the

19  ambulance?

20      A     While they were still driving?

21      Q     Yes.

22      A     I don't -- I don't remember that.

23      Q     How many minutes did the drive last after

24  the medic said he coded before you guys actually

25  pulled in and the doors -- the back doors were

Richard Fischer                                    February 23, 2017

1       So how long after starting CPR was it

2   before the medics asked you to take the restraints

3   off?

4       MR. OSTERBERG:  Objection.  Misstates

5   testimony.  Lacks foundation.

6       THE WITNESS:  It was -- I don't know

7   exactly again.  But it was soon after.  I mean, it

8   was -- they were doing stuff.  Do this, do that.

9   And then it was like, "Hey we gotta get the

10  restraints" off so . . .

11  BY MR. McBRIDE:

12      Q    So did you start trying to get the

13  restraints off at that point?

14      A    Yes.

15      Q    So how long were you trying to get the

16  restraints off before you actually pulled into the

17  hospital?

18      The reason I'm asking is how close to the

19  hospital were you before you actually started trying

20  to get the restraints off?

21      A    I don't know exactly where we were.  But I

22  know as soon as he asked me to, I started -- I at

23  least unclipped -- I know -- I remember unclipping

24  the legs.  And then right then we pulled in.

25      And then I think -- well, Deputy Brooke, I

Exhibit 2   Page 60

Richard Fischer                                    February 23, 2017

1    think he heard me, obviously.  So as soon as those

2    doors opened, he was right there.  Then he jumped

3    up, and then we started taking the cord cuffs off.

4        Q    So just so I understand the sequence of

5    events, one of the medics says he coded.  They start

6    doing medical stuff.  They begin doing CPR.

7             At some point they ask you to take the

8    restraints off.  You believe you at least get the

9    cord attaching the ankles to the waist off.  And, as

10   soon as that happens, you're there, the door opens,

11   and Deputy Brooke is there?

12       A    That sounds about right, yes.

13       Q    Okay.  So, when Deputy Brooke opens the

14   door, what happens?

15       A    I just -- I think I may have told him,

16   "Hey, we gotta get the max restraints off."  So he

17   jumps up.  He had a knife or scissors or something.

18   And he's like, "Yeah, just cut it," so we started

19   cutting them.

20       Q    Were those restraints pretty tight?

21            MR. DEAN:  Vague and ambiguous.  On the

22   feet?  Overbroad with respect to restraints tight.

23   BY MR. McBRIDE:

24       Q    Were the restraints generally pretty tight?

25            MR. DEAN:  Same objection.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 61

Richard Fischer                                          February 23, 2017

```
1              THE WITNESS:  Yes.  They need to be secure
2    to where they can't -- it's made to restrict
3    movement, so they need to be somewhat tight.
4    BY MR. McBRIDE:
5        Q    Were they too tight for you to get them off
6    without cutting them off?
7              MR. DEAN:  Overbroad again.  Lacks
8    foundation.
9              THE WITNESS:  I honestly don't know.  I
10   know we cut 'em 'cuz it's faster.  So we just -- we
11   just cut 'em.
12   BY MR. McBRIDE:
13       Q    Was it Deputy Brooke that took
14   Mr. Phounsy's handcuffs off?
15       A    I believe I'm the one who took the
16   handcuffs off.
17       Q    Did you get the handcuffs off after you got
18   the restraints cut off?
19       A    Yes.
20       Q    Did you have a key with you in the
21   ambulance?
22       A    Yes.
23       Q    So what items did Deputy Brooke -- well,
24   let me ask it this way.
25              What portion of the restraints did Deputy
```

Richard Fischer                                      February 23, 2017

1   Brooke cut off?

2       A    Honestly, I don't -- I don't remember.  I

3   think he took off the majority, though, because he

4   had a good knife so -- if not all but . . .

5       Q    All right.  What were the paramedics doing

6   while you and Deputy Brooke were removing the

7   restraints?

8       A    They were continuing CPR.  They were --

9   again, more medical stuff that I couldn't tell you

10  for sure.  But they were doing stuff.

11      Q    So, after the doors opened, how long did it

12  take you and Deputy Brooke to get the restraints

13  completely off and the handcuffs off?

14      A    Definitely I would say less than a minute.

15      Q    What were the demeanor of the medics in the

16  ambulance after the one medic said Mr. Phounsy had

17  coded?

18      A    They -- they just kind of -- the demeanor

19  was just -- they were like, "Okay.  Let's go.  Do

20  this.  Do that.  Okay, you go here."  They were kind

21  of just -- I'm sorry.  I kind of get in the zone of

22  like where I was at.

23           So, yeah, they were just -- they kind of

24  like jumped up a level of -- I don't know how to

25  explain it.  But they were just really -- "Okay,

Richard Fischer                                          February 23, 2017

```
1    he's coded.  So we gotta do this, we gotta do that."
2    They were just --
3                    (Whereupon the Deposition Officer
4             requested the witness to speak slower.)
5                    (Discussion held off the record.)
6             THE WITNESS:  So, as soon as he said he
7    coded, they took charge and began doing stuff a lot
8    more quickly -- quickly, yes.
9    BY MR. McBRIDE:
10        Q    Did they seem concerned?
11        A    Yes.
12        Q    Did either of the medics at any point, for
13   lack of a better word, yell at you that, "We need to
14   get these restraints off"?
15        A    Yeah.  I don't remember yelling.  But I
16   know they told them, "Hey, like" -- again, they kind
17   of took charge.  Said, "Hey, get these restraints
18   off like now."  So -- I don't remember yelling,
19   though.
20        Q    Did they stress the need to get the
21   restraints off?
22             MR. DEAN:  Vague and ambiguous.  Lacks
23   foundation with respect to the term "stress."
24             THE WITNESS:  I remember them saying they
25   need to get the restraints off.  So . . .
```

Richard Fischer                                    February 23, 2017

1    onto his back at any time before you and Deputy

2    Brooke cut the restraints off and got the handcuffs

3    off him?

4        A    I don't remember that, no.

5        Q    Do you recall seeing Mr. Phounsy rolled to

6    his back at that point on the gurney?

7        A    After the restraints were off?

8        Q    Yes.

9        A    I -- honestly, I don't remember.  I would

10   assume so, but I can't say for sure.

11       Q    All right.  So what happened at that point?

12   You get the restraints, the handcuffs off him.  What

13   happens at that point?

14       A    They're continuing doing their medical

15   stuff on him as they roll him to the emergency room,

16   and then me and Brooke are just there and just kind

17   of -- would just hang out outside the room as the

18   doctors started getting -- they started doing their

19   announcements.  So we got this, this is what

20   happened, and then they took over.

21       Q    How long in total were you there at the

22   hospital that night?

23       A    I don't remember.  I honestly don't

24   remember.  I wasn't there the whole night, though.

25       Q    Did you talk to any family members there at

Richard Fischer                                    February 23, 2017

1    wanted to if you hadn't used your hands in the

2    ambulance.

3           Is that correct?

4       A    That's correct.

5       Q    And he did so -- you could feel the

6    tension -- let me ask you this:  Did you testify

7    earlier that when your hands were on his head, you

8    could feel him trying to move his head in the

9    ambulance?

10      A    Yes.  That's correct.

11      Q    I'll ask you some specific questions about

12   him, whether or not he was actually cuffed to the

13   gurney.

14          Are you assuming that, or do you know that

15   because you saw him cuffed to the gurney?

16          MR. McBRIDE:  Objection.  Asked and

17   answered.

18          THE WITNESS:  Yeah, I would have to say

19   more I'm assuming that.

20   BY MR. DEAN:

21      Q    Do you have a specific recollection of

22   using your key to unlock the handcuffs and actually

23   removing any handcuffs from any structure of the

24   gurney itself?

25          MR. McBRIDE:  Objection.  Vague and

Richard Fischer                                          February 23, 2017

```
 1    you're not remembering at all is the application of
 2    the spit sock to his head?
 3        A    That's -- yes.
 4        Q    Okay.
 5             From the point the ambulance started moving
 6    from the driveway area to the point that a paramedic
 7    said -- to the point where you released your hands
 8    from his head -- do you have those two points in
 9    mind?
10        A    Yes.
11        Q    Okay.
12             In that time frame did it ever appear to
13    you that the paramedics didn't care what happened to
14    Mr. Phounsy?
15        A    No.
16             MR. McBRIDE:  Objection.  Argumentative.
17    BY MR. DEAN:
18        Q    That they were -- in that time frame did it
19    ever appear to you that the paramedics were doing
20    something other than monitoring or dealing with
21    Mr. Phounsy?
22             MR. McBRIDE:  Objection.  Vague and
23    ambiguous.  Argumentative.  And calls for
24    speculation.
25             THE WITNESS:  No.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 67

Richard Fischer                                          February 23, 2017

```
1    BY MR. DEAN:
2        Q    Did it appear to you that they were always
3    in that time frame busy doing something medically
4    with respect to Mr. Phounsy?
5            MR. McBRIDE:  Same objections plus lacks
6    foundation.
7            THE WITNESS:  Yes.
8    BY MR. DEAN:
9        Q    Is that what it looked like to you?
10       A    Yes.
11           MR. McBRIDE:  Same objections.
12   BY MR. DEAN:
13       Q    Would it be also fair to say that your
14   memory in June of 2015 at the time you were
15   interviewed by the Homicide detectives your memory
16   was better about the details of the incident than it
17   is today?
18       A    Yes.  That's fair to say.
19       Q    All right.
20           Detective Patterson asked you -- I'm going
21   to read a section and ask you if it refreshes your
22   recollection.  Let me explain what I mean by that.
23           I'm going to read you words that I'm
24   telling you are your words.
25       A    Okay.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 68

Richard Fischer                                    February 23, 2017

```
 1        A     Yes.
 2        Q     And at that point a paramedic asked you,
 3   "Did he stop struggling"?
 4              MR. McBRIDE:  Objection.  Misstates prior
 5   testimony.
 6              THE WITNESS:  Something along those lines,
 7   yes.
 8   BY MR. DEAN:
 9        Q     And you said something like, "Yeah,
10   finally" or something like that?
11        A     That's correct.
12        Q     All right.
13              Then did some time go by until a
14   paramedic -- until a paramedic said he coded?
15        A     Yes.
16        Q     Between the time you lifted your hands off
17   of his head and the time a paramedic said he coded,
18   did you see that he was breathing?
19        A     Yes.
20        Q     And did you do that by looking at his head,
21   seeing his chest, hearing his breathing, what?
22        A     I saw the rise and fall of his chest, and
23   he was still moving.  He just wasn't struggling
24   really.
25        Q     Okay.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 69

Richard Fischer                                    February 23, 2017

```
 1            So between the time you were able to lift
 2    your hands from his head and you had that brief
 3    discussion with the paramedics about him stopping
 4    struggling and the time a paramedic said he coded,
 5    you were seeing and realizing that he was breathing?
 6        A    Yes.
 7        Q    In your statement it says,
 8             "They were like, 'We have to get
 9             this' -- 'these restraints off now.'  By
10             that time we just got to Grossmont."
11        My question is:  Does that refresh your
12    recollection that -- that when the paramedics asked
13    you to take the restraints off, you were already at
14    Grossmont?
15        A    Yes.
16        Q    I know you said earlier that you don't know
17    all the medical stuff.  But you also testified that
18    as soon as the paramedic said he coded, they started
19    CPR activities.
20             Is that true?
21        A    Yes.
22             MR. McBRIDE:  Objection.  Misstates prior
23    testimony.
24    BY MR. DEAN:
25        Q    Did they begin the CPR activities that you
```

Richard Fischer                                    February 23, 2017

1    recognized as CPR activities before all of the

2    restraints were removed?

3        A    Yes.

4        Q    And did they continue to do that until he

5    was wheeled into the hospital?

6        A    Yes.

7        Q    The first thing you did when the paramedic

8    said, "We need to remove these restraints" is unclip

9    the cord that connected his legs to the middle

10   section of the maximum restraints.

11            Is that correct?

12            MR. McBRIDE:  Objection.  Leading.

13   BY MR. DEAN:

14       Q    Is that correct?

15       A    Yes.

16       Q    So the very first thing that happened is

17   his legs were free.

18       A    Yes.

19            MR. McBRIDE:  Objection.  Leading.

20   Misstates prior testimony.  Vague as to time.

21   BY MR. DEAN:

22       Q    And by legs free, I mean instead of his

23   legs being fastened backwards towards his buttocks

24   area, they could now spread out, even though they

25   were still bound together by the other cords?

DECLARATION UNDER PENALTY OF PERJURY


     I, RICHARD FISCHER, do hereby certify under

penalty of perjury that I have read the foregoing

transcript of my deposition taken on February 23,

2017; that I have made such corrections as appear

noted herein in ink, initialed by me; that my

testimony as contained herein, as corrected, is true

and correct.

     DATED THIS _4/8/17_ day of _April_,

20_17_, at _SAN MARCOS_ , _California_ .
              (City)              (State)


                         _____
                         RICHARD FISCHER

Exhibit 2   Page 72

Richard Fischer                                                    February 23, 2017

```
 1                    CERTIFICATE OF

 2          CALIFORNIA CERTIFIED SHORTHAND REPORTER

 3             I, the undersigned, a Certified Shorthand

 4     Reporter of the State of California, do hereby

 5     certify:

 6             That the foregoing proceedings were taken

 7     before me at the time and place herein set forth;

 8     that any witnesses in the foregoing proceedings,

 9     prior to testifying, were placed under oath; that a

10     verbatim record of the proceedings was made by me

11     using machine shorthand which was thereafter

12     transcribed under my direction; further, that the

13     foregoing is an accurate transcription thereof.

14             The dismantling of this transcript will

15     render the reporter's certificate null and void.

16             I further certify that I am neither

17     financially interested in the action nor a relative

18     or employee of any attorney of any of the parties.

19             Reading and signing was requested.

20             IN WITNESS WHEREOF, I have this date

21     subscribed my name.

22

23     Dated:  March 4, 2017

24                                  KATHLEEN S. McLAUGHLIN
                                    CSR No. 5845
25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 2   Page 73