# Exhibit 4

Exhibit 4   Page 125



## ORIGINAL TRANSCRIPT

Transcript of the Testimony of:

# Jenny Martinson

K.J.P.

v.

County of San Diego

February 21, 2017

Volume I

LITIVATE REPORTING + TRIAL SERVICES
P: 877.771.3312 | F: 877.561.5538
www.litivate.com

Exhibit 4   Page 126

Jenny Martinson                                    February 21, 2017

```
1        A    I believe it was 51 Tom 4.  I was the only Tom
2   unit on that night.  It's -- I mean, if I were to look
3   at the CAD, I would be the only Tom unit that was on at
4   that time.
5        Q    All right.
6             MR. DEAN:  Does Tom mean traffic?
7             THE WITNESS:  It does.
8             MR. DEAN:  Thank you.
9   BY MR. McBRIDE:
10       Q    So at some point did you hear a call for cover
11  go out?
12       A    Yes.
13       Q    And that was regarding the 8385 Holden Road
14  address?
15       A    Yes.
16       Q    And were you still at the station drafting your
17  traffic report?
18       A    I was typing my report when the code cover call
19  came out over the radio.
20       Q    And what did you do at that point?
21       A    Well, I immediately got up and left the
22  station.
23       Q    And you -- did your FTO go with you?
24       A    He did.
25       Q    How long did it take you guys to get to the
```

Jenny Martinson                                         February 21, 2017

1    belt.

2        Q    So were you driving that night or was your FTO?

3        A    I drove.

4        Q    While you were responding to the scene, did

5    either you or your FTO look up the comments to the call

6    to get any more -- any additional information about the

7    previous call?

8        A    No.

9        Q    What did you do when you got there?

10       A    I ran up the hill to get to the -- and entered

11   the residence through the garage.

12       Q    When you pulled up were there any other -- how

13   many units did you see already there?

14       A    I don't recall how many units were already

15   there at scene.  I saw deputies running into the house,

16   and I followed.

17       Q    So you and your FTO were not the first backup

18   units to arrive?

19       A    We were not the first, no.

20       Q    You ran in through the garage?

21       A    Correct.

22       Q    And you entered into the house?

23       A    Correct.

24       Q    What did you see when you got inside?

25       A    As soon as I got inside, I saw deputies

Jenny Martinson                                                    February 21, 2017

1   attempting to take down a male subject.  He was still

2   standing, and he was in the process of going down to the

3   floor.

4           And as I entered, it was almost simultaneously

5   that he went down -- that the deputies took the male

6   subject down to the floor.

7       Q    All right.  So, basically, as you walked in,

8   you saw them taking Mr. Phounsy to the ground?

9       A    Correct.

10      Q    How many deputies were taking Mr. Phounsy to

11  the ground?

12      A    I don't recall.  There was -- I could give you

13  estimates.  There was maybe between four and six.

14      Q    All right.

15          So in your report -- this is on page 2.  This

16  is the second sentence under "Deputy's Observations and

17  Actions."  It says,

18          "There were approximately two

19          deputies holding onto Lucky's head and

20          shoulders, two deputies on his torso, and

21          two deputies holding onto his legs."

22          Was that after he was taken down to the ground

23  or was that how he was taken down to the ground?

24      A    That was after he was taken to the ground.

25      Q    I see.

Jenny Martinson                                      February 21, 2017

1          Do you recall who the deputies were who took

2     Lucky to the ground?

3     A     Not all of them.  At the time I was on

4     training.  I didn't know all the other deputies' names.

5     Q     Did you see -- did you know Deputy Collins or

6     Deputy Krull?

7     A     Prior to the incident?

8     Q     Yes.

9     A     I knew that they were deputies at the Santee

10    station, yes.

11    Q     Did you recognize them in the hallway when you

12    got inside?

13    A     Absolutely.  In their uniform.

14    Q     Were they two of the deputies that took

15    Mr. Phounsy to the ground?

16    A     I don't recall.  I don't recall.  I wasn't

17    necessarily staring at their -- at their faces and

18    seeing who.  I was more watching the commotion to figure

19    out where I was needed.

20    Q     Did you have any conversations with Deputy

21    Collins or Krull while you were there in the hallway?

22    A     Before or after the subject went down?  I mean,

23    I -- as soon -- as soon as the subject went down, I saw

24    Collins holding on the lower half of Phounsy, and I -- I

25    could see he was cut.  There was a visible cut on his

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 4   Page 130

Jenny Martinson                                February 21, 2017

1    forehead.

2           There was blood all the way down his face and

3    neck, and I knew that he needed to be taken out of that

4    situation, because that's not the type of person that

5    you need to -- to be securing a subject who has been

6    injured in that manner.  So I -- I told him I would take

7    over his position on the legs.

8           Q    All right.  So did you take over his position?

9           A    I did.

10          Q    All right.  And did you say anything to Deputy

11   Collins other than that, "I'll take over"?

12          A    I don't recall saying anything different, other

13   than, "Deputy" -- "Deputy Collins, I got this.  Get out

14   of here."

15          Q    Okay.  I guess the question I'm asking is:

16   While you were there in the hallway, at any point did

17   you have any conversations, other than what you've

18   described with Deputy Collins?

19          A    Not that I recall.

20          Q    And do you remember talking to Deputy Krull

21   there in the hallway at all?

22          A    No.

23          Q    So you were one of the two deputies holding on

24   to Mr. Phounsy's legs?

25          A    Correct.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 4   Page 131

Jenny Martinson                                    February 21, 2017

1        Q    So there were about six deputies total trying

2   to restrain Mr. Phounsy?

3        A    I'd say, like I said in my report, maybe six to

4   eight of us.  I don't know exactly how many.

5        Q    Did you see the deputies handcuff Mr. Phounsy?

6        A    I had -- I could not directly see, no.  I had a

7   deputy in -- blocking my -- my view.

8             So we did a lot of communication.  I held my

9   position, and they were calling out, "Let's get

10  handcuffs on him."  So I didn't physically see it.  I

11  just listened to them communicating on what they were

12  doing.

13       Q    How was Lucky situated?  Was he facing the door

14  that you had walked in through or was he facing down the

15  hallway?

16       A    His head was closest to the door that you enter

17  the hallway door to the garage.  So that's the direction

18  of his head.

19            And then his feet were facing the rest of the

20  house, I guess, that would open up to the living room

21  maybe.

22       Q    When you were holding his legs, how were you

23  faced?  Were you facing back down the hallway, or were

24  you facing towards the garage door that you had entered

25  through?

Jenny Martinson                                    February 21, 2017

1      A    I was facing towards neither.  I was face --

2  his legs -- he was laying parallel to the wall and the

3  hallway and, therefore, if I looked straight ahead where

4  I was facing, there was a wall immediately in front of

5  me.

6      Q    Did you hear any discussion among the deputies

7  that the handcuffs were broken or weren't working?

8      A    Not that I recall.

9      Q    All right.  So what did you do next?

10     A    I held his legs until they had gotten -- gotten

11 Phounsy secured in the handcuffs, and then we talked

12 that we would be putting him into maximum restraints.

13     Q    Were there any family members in the hallway

14 when you entered?

15     A    I do not recall.

16     Q    Do you recall seeing any family members in that

17 hallway at all?

18     A    At what point in time?  When I'm holding

19 down --

20     Q    Yes.

21     A    -- Phounsy?  I do not recall.

22     Q    You were focused on Mr. Phounsy, though?

23     A    Correct.

24     Q    Did you use any force on Mr. Phounsy at any

25 point in the hallway?

Exhibit 4   Page 133

Jenny Martinson                                    February 21, 2017

```
 1        A     Other than holding him down to the ground?
 2        Q     Yes.  So, for instance, any strikes,
 3   distraction blows, pressure points, anything like that.
 4        A     I -- I put my knee into his calf -- I mean,
 5   that's a good pressure point right there -- to help keep
 6   his legs straight -- straightened out while they were
 7   securing him so that he would stop kicking.
 8        Q     And when you put your knee into his calf, did
 9   you put your body weight on that?
10        A     I applied downward pressure with my body
11   weight, yes.
12        Q     How much, with 10 being as much pressure as you
13   can put on it?  One to --
14        A     My body weight.
15        Q     All of it?
16        A     I put my -- I put my whole body into it.
17        Q     All right.
18              Any other force you can think of that you used
19   against Mr. Phounsy there in the hallway?
20        A     As far as any strikes or blows or pressure
21   points?
22        Q     Yes.
23        A     I had a knee on one leg, and I was holding down
24   on the other, on his other leg.
25        Q     Did you see any of the other deputies use any
```

Jenny Martinson                                    February 21, 2017

1    amount of force on Mr. Phounsy?

2        A    I could not see anything that they were doing

3    on the -- on his upper half because I was blocked by a

4    deputy just to my -- to my left.

5        Q    Did you see any deputies strike Mr. Phounsy?

6        A    I did not.

7        Q    Did you see any deputies drive stun Mr. Phounsy

8    with their taser?

9        A    I did not.

10       Q    Did you hear a taser cycle at all while you

11   were there in the hallway?

12       A    No.

13       Q    Did you hear any discussion of a taser while

14   you were there?

15       A    No.

16       Q    What was Mr. Phounsy -- what was his demeanor

17   when you got there in the hallway?  What was he doing?

18       A    He kept grunting.  He was -- while we were --

19   we got down to the ground with the commotion.  And then

20   as we're holding, I can remember -- I can recall him

21   grunting.

22            He would let out like a scream or a cry.  I

23   don't want to say it was a cry.  It was a -- it was --

24   it wasn't like a -- when I say scream, it was just like

25   a rage.  It was like out of a rage.  You could just hear

Jenny Martinson                                    February 21, 2017

1    like this agonizing (indicating noise) and then he would

2    grunt.  And it was just odd.

3        Q    Okay.  Did you ever hear Mr. Phounsy say

4    anything?

5        A    I never heard any audible words come out of his

6    mouth.

7        Q    It was just grunts and --

8        A    Whatever this kind of a scream that he was

9    doing, yes.

10       Q    Sure.

11            Okay.  How long did it take to get handcuffs on

12   Mr. Phounsy?

13       A    I don't recall.

14       Q    What happened after you got the handcuffs on

15   Mr. Phounsy?

16       A    We put him into maximum restraints.

17       Q    Who was in charge -- I don't want to say

18   supervising.  But who was in charge there in that scene

19   in that hallway?  Was there a ranking deputy there that

20   was kind of taking command?

21       A    I don't recall.  We were all working together.

22       Q    Who made the decision to place Mr. Phounsy in

23   the maximum restraints?

24       A    I don't recall.  I believe it was probably a

25   collective thought amongst us all.

Exhibit 4   Page 136

Jenny Martinson                                    February 21, 2017

1        Q     Was there a discussion as to whether you should

2    put Mr. Phounsy in the maximum restraints?

3        A     I don't recall.

4        Q     Was there a discussion as to how best to place

5    Mr. Phounsy in the maximum restraints?

6        A     I don't recall.

7        Q     What do you recall about the discussion

8    regarding maximum restraints?

9        A     That they were putting maximum restraints on

10   him.

11       Q     Didn't you say that there was a discussion?

12       A     I'm sorry.

13       Q     I'm sorry.  I must have misunderstood your

14   testimony.

15             After you placed Mr. Phounsy in handcuffs, I

16   thought you said there was a discussion about maximum

17   restraints.

18       A     That we were going to put him into maximum

19   restraints.

20       Q     Okay.

21       A     Somebody said -- I mean, I don't -- I don't

22   remember exactly.  It was -- you know, they were trying

23   to put the -- the cord around his -- around his abdomen

24   where the one cord goes.  You know, "Let's put him in

25   maximum restraints."

Jenny Martinson                                   February 21, 2017

1              I guess if you want to call that a discussion,

2      it was collectively as I'm holding down the legs here,

3      there was a decision to put the maximum restraints on.

4      I don't know who said it or where it came from or who

5      was in charge of that or if it was discussed on how to

6      do it.  It was a collective thought, "Let's put him in

7      maximum restraints."  Therefore, some -- they were

8      trying to put the hand -- the waist cord around him.

9          Q     So, when it was decided that Mr. Phounsy be

10     placed in maximum restraints, you were still on his

11     legs?

12         A     Correct.

13         Q     Did you participate in placing the maximum

14     restraints on Mr. Phounsy?

15         A     I did.

16         Q     What was your role?

17         A     I held down the legs as Deputy Pugh put the

18     restraint around his ankles.

19               After she had put it around his ankles, I

20     assisted to bend Phounsy at his knees so that we could

21     secure the ankle cord cuff to the waist cord cuff.

22         Q     How did -- did you see how Deputy Pugh attached

23     the restraint to Mr. Phounsy's ankles?

24         A     I did.

25         Q     How did she do it?

Jenny Martinson                                    February 21, 2017

 1      A    She put it on and wrapped it around his
 2  ankles.
 3      Q    Just wrapped it around the outside?   Just bound
 4  both ankles together?
 5      A    Correct.
 6      Q    That's it?
 7      A    I'm sorry?
 8      Q    So she just wrapped it around both ankles
 9  twice?
10      A    I don't recall how many times.   I don't know
11  how many times it went around.   She secured both ankles
12  together with a cord cuff.
13      Q    Okay.   And then did you see who connected the
14  ankles to the waist?
15      A    I did.
16      Q    You connected them?
17      A    I did.
18      Q    So you said that you bent Mr. Phounsy's legs
19  back so you could connect the two?
20      A    With the natural curvature of his knee.
21      Q    Okay.
22      A    So we bend at the knee, and then you have to
23  bend at his -- at his hips as well to get enough space
24  to clip the waist cuff and the ankle cuff together.
25      Q    I see.

Jenny Martinson                                    February 21, 2017

1          So if you just bend his knees backwards, that's

2    not enough to get the two together?  You have to kind of

3    bend the hips back as well?

4        A     Bend the hips forward.  Hips don't bend

5    backwards.  But, yes.  You -- it's not folding him into

6    a ball, because your body doesn't do that.  You have to

7    go like the accordion style.  So you bend at the waist

8    and you bend at the knees.

9        Q     Got it.

10         So when you attached this ankle -- the ankle

11   portion to the waist portion, was Mr. Phounsy's heels,

12   the heels of his feet, basically resting on his

13   buttocks?

14       A     They don't reach -- his feet do not reach his

15   buttocks based on the position he was in.

16       Q     Okay.  How far away from his buttocks was his

17   feet when you attached it?

18       A     I don't recall.  There's a -- there's a space

19   gap there.  I don't recall.  Maybe -- maybe -- maybe six

20   to eight inches.

21       Q     All right.

22       A     And that's a guesstimate.  An estimation.

23       Q     Do you recall how much slack was between the

24   ankle portion and the waist portion?  How much was that

25   portion of the restraint?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 4   Page 140

Jenny Martinson                                February 21, 2017

1   pulling them away.  He has the handcuffs.  It secured

2   him into -- per our policy for maximum restraint.

3       Q    How long did it take you and the other deputies

4   to get the maximum restraints on Mr. Phounsy?

5       A    We struggled to get the -- I don't know the

6   amount of time.  But we -- there was a delay and a

7   struggle to put the -- to get them connected.

8       Q    How much time passed from the moment you walked

9   in the hallway until you guys got Mr. Phounsy completely

10  in the maximum restraints?

11      A    I don't know.

12      Q    After you got Lucky in the maximum restraints,

13  did you check to make sure they were placed correctly?

14      A    Yes.  We checked to make sure they were placed

15  correctly.

16           During the whole time, Phounsy was attempting

17  to pull his legs underneath him.  He was trying to push

18  back.

19           So we -- he was still fighting.  Even with the

20  amounts of deputies that were holding him down, he was

21  still attempting to release himself from our grasp.

22  So . . .

23      Q    All right.  Did you ever see Mr. Phounsy strike

24  another deputy, hit or kick?

25      A    Other than attempting to pull away, I did not

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 4   Page 141

Jenny Martinson                                    February 21, 2017

1    see him strike anybody.

2        Q     So the way you understood it is Mr. Phounsy was

3    trying to pull away from you guys?

4        A     Yes.

5        Q     You didn't believe he was being combative

6    towards you deputies.  He was trying to get away?

7        A     Based on arriving on scene and seeing my

8    partner covered in blood with a cut on his face and

9    watching several deputies having to take the subject to

10   the ground, I knew we had a combative subject.  And, on

11   top of that, a Code 3 cover call was requested.

12       Q     Okay.  I appreciate that.

13             But my question was based on what you actually

14   saw.  Your personal observation of Mr. Phounsy.  Did you

15   see him acting combatively towards either you or any of

16   the other deputies --

17       A     I did not see him strike anybody.  I saw him

18   constant -- continuously resisting us.  Resisting, not

19   going with the program, pulling away.

20       Q     All right.  Did Mr. Phounsy at any point try to

21   bite you?

22       A     I was nowhere near his head.  So, no.

23       Q     Did you see Mr. Phounsy try to bite anybody?

24       A     I had no view of his upper body.

25       Q     Did you hear any of the other deputies say

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 4   Page 142

Jenny Martinson                                    February 21, 2017

1    anything about Mr. Phounsy trying to bite them?

2        A    I don't recall.

3        Q    What happened after you got Mr. Phounsy in the

4    maximum restraint?

5        A    After he was in maximum restraints, we all made

6    a plan to carry him outside.  So we assisted lifting

7    Phounsy off the ground and walking back out the hallway

8    through the garage onto the driveway where we placed him

9    on the ground so that he could be seen by paramedics and

10   fire department.

11       Q    How much time transpired between you guys

12   getting Mr. Phounsy in the maximum restraints and then

13   you guys carrying him out?

14       A    I don't recall.

15       Q    More than a minute?

16       A    I don't recall.  I don't know how long it

17   took.

18       Q    Did you roll Mr. Phounsy into the recovery

19   position after you got him into maximum restraints?

20       A    We did not.

21       Q    Did you ever see Mr. Phounsy in the recovery

22   position in that hallway?

23       A    No.

24       Q    Did you actually assist in carrying Mr. Phounsy

25   out?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 4   Page 143

Jenny Martinson                                                    February 21, 2017

```
1    there.
2            Where physically the paramedics were, the
3    persons themselves, I don't recall.  I do know that the
4    engine was there and that the -- their presence was
5    there.
6        Q    Did you ever see any paramedics treating
7    Mr. Phounsy?
8        A    No.  I finished securing him and then I moved
9    on.
10       Q    At any point did you check Mr. Phounsy -- well,
11   at any point after you applied the maximum restraints,
12   did you check Mr. Phounsy to make sure that he was
13   breathing, fully able to breathe?
14       A    I was on his legs.  I wouldn't even know.
15       Q    Did you see any deputies at any point check
16   Mr. Phounsy to make sure he was able to fully breathe?
17       A    I don't recall.
18       Q    Had Mr. Phounsy calmed down by the time you got
19   him out to the driveway?
20       A    He was still grunting.  He was still -- his
21   body was very rigid and tense.  He had not relaxed in
22   any way.  So, as far as resisting or calming down, he
23   was still actively pulling and tense.
24       Q    But at that point he was in the maximum
25   restraints; right?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 4   Page 144

Jenny Martinson                                          February 21, 2017

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3          I, JENNY MARTINSON, do hereby certify under

 4     penalty of perjury that I have read the foregoing

 5     transcript of my deposition taken on February 21, 2017;

 6     that I have made such corrections as appear noted herein

 7     in ink, initialed by me; that my testimony as contained

 8     herein, as corrected, is true and correct.

 9          DATED THIS   10   day of   MAY            ,

10     20 17 , at   SANTEE            ,      CA           .
                           (City)               (State)

11

12                                    JENNY MARTINSON

13

14

15

16

17

18

19

20

21

22

23

24

25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 4   Page 145

Jenny Martinson                                           February 21, 2017

```
 1                      CERTIFICATE OF

 2          CALIFORNIA CERTIFIED SHORTHAND REPORTER

 3              I, the undersigned, a Certified Shorthand

 4     Reporter of the State of California, do hereby certify:

 5              That the foregoing proceedings were taken

 6     before me at the time and place herein set forth; that

 7     any witnesses in the foregoing proceedings, prior to

 8     testifying, were placed under oath; that a verbatim

 9     record of the proceedings was made by me using machine

10     shorthand which was thereafter transcribed under my

11     direction; further, that the foregoing is an accurate

12     transcription thereof.

13              The dismantling of this transcript will render

14     the reporter's certificate null and void.

15              I further certify that I am neither financially

16     interested in the action nor a relative or employee of

17     any attorney of any of the parties.

18              Reading and signing was requested.

19              IN WITNESS WHEREOF, I have this date subscribed

20     my name.

21

22     Dated:  March 1, 2017

23                                 KATHLEEN S. McLAUGHLIN
                                   CSR No. 5845
24

25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 4   Page 146