# Exhibit 5

Exhibit 5   Page 147



Transcript of the Testimony of:

# Sandra Janet Carbajal

K.J.P.

v.

County of San Diego

February 22, 2017

Volume I

P: 877.771.3312 | F: 877.561.5538 | litivate.com

Exhibit 5   Page 148

Sandra Janet Carbajal                                    February 22, 2017

1      Q      From when to when?

2      A      2011 to 2012.

3      Q      Were you still working for National City PD

4   at the same time?

5      A      Yes.

6      Q      Were you like a contract employee, like a

7   1099 employee, or were you salaried for both?

8      A      For which one?

9      Q      For either/or.

10     A      I was full time with the District

11  Attorney's and part time with National City.

12     Q      I see.  All right.

13          So did you reapply with the Sheriff's

14  Department, then, sometime around 2012?

15     A      Yes.  I believe it was 2011 that I

16  reapplied.

17     Q      All right.  And you were hired at that

18  point as a corrections deputy, or did they hire you

19  as a law enforcement deputy?

20     A      As a corrections.

21     Q      Okay.  So you were assigned to Las Colinas

22  you said for about a year?

23     A      Yes.

24     Q      And where was your next assignment with the

25  Sheriff's Department after Las Colinas?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 149

Sandra Janet Carbajal                          February 22, 2017

1        A     I got sworn as a Deputy Sheriff for law

2   enforcement, and I was relocated to Santee patrol

3   station.

4        Q     All right.  Did you actually recertify?

5        A     Yes, I did.

6        Q     When was that?

7        A     2013.  About a year later.  Towards the end

8   of 2013 I recertified at Southwestern College.

9        Q     All right.  Okay.  Where was your first

10  assignment -- well, did you have any other

11  assignments with the Sheriff's Department prior to

12  recertifying, other than at Las Colinas?

13       A     No.

14       Q     Where was your first assignment with the

15  Sheriff's Department after recertifying?

16       A     Santee station.

17       Q     And are you still at Santee station?

18       A     I'm in the Lakeside station with the Santee

19  command.

20       Q     How long were you in Santee before you were

21  reassigned to the Lakeside station?

22       A     When they opened their new station in May

23  of 2016.  But I've always worked in the city of --

24  I'm sorry -- the county, which is Lakeside.

25       Q     And when you were in Santee did you work

Sandra Janet Carbajal                                    February 22, 2017

```
 1    patrol?
 2        A     Yes.
 3        Q     Did you have any other assignments there --
 4    special assignments other than patrol?
 5        A     No.
 6        Q     What about at Lakeside?
 7        A     No.
 8        Q     Just patrol?
 9        A     Yes.
10        Q     Do you have any other law enforcement
11    experience besides what you've just described?
12        A     No.
13        Q     Any military experience?
14        A     No.
15        Q     All right.  Exhibit 2 and 3, your reports,
16    when did you create these?
17        A     I believe it's the same day of the incident
18    when I created it.
19        Q     All right.
20              They both have timestamps down on the
21    bottom left-hand side.  It gives a date April 14,
22    2015.  Exhibit 2 says 12:15 in the morning.
23    Exhibit 3 says 2:57 in the morning.
24              Are those time -- do these time stamps
25    accurately reflect --
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 151

Sandra Janet Carbajal                                    February 22, 2017

1        A     Yes.

2        Q     -- the time you created these?

3        A     Yes.

4        Q     Do you remember who you submitted these

5   reports to?

6        A     I don't recall.

7        Q     Do you recall if anybody recommended any

8   changes or additions to your report?

9        A     I don't recall.

10       Q     You had a chance to review both Exhibit 2

11  and Exhibit 3 before arriving here today?

12       A     Yes.

13       Q     Is there anything in either of these that

14  you would change, anything that's inaccurate?

15       A     Just after reviewing the recording off of

16  the one that I spoke to about the radio call --

17       Q     Yes.

18       A     -- on my report when I wrote it I believe

19  that on page 7 --

20       Q     This is Exhibit 2?

21       A     Yes.

22       Q     Okay.

23       A     Page 7.  Under the investigation section.

24       Q     All right.

25       A     In the first paragraph I stated that,

LITIGATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 152

Sandra Janet Carbajal                                    February 22, 2017

```
 1              "Lucky was the original reporting
 2         party who told Sheriff's" Department "he
 3         was under the influence of Acid and
 4         Cocaine."
 5    Q    All right.
 6    A    That's what I believed at that time.
 7         When I reviewed the recording, it was
 8  actually the other reporting party who stated that
 9  he was under the influence of acid and cocaine.
10    Q    All right.  Anything else that you would
11  change?
12    A    That's all.
13    Q    Is there anything that you would add to
14  either Exhibit 2 or 3, any important fact that you
15  left out of these?
16    A    No.
17    Q    So do you believe that Exhibit 2 and 3
18  accurately reflect what you did, what you saw and
19  what you heard --
20    A    Yes.
21    Q    -- in connection with the incident?
22    A    Yes.
23    Q    It contains all the important facts?
24    A    Yes.
25    Q    Is there anything you remember about the
```

Sandra Janet Carbajal                                    February 22, 2017

```
 1   incident that's not contained in either Exhibit 2 or
 2   Exhibit 3?
 3           MR. CHAPIN:  Well, that's overbroad and
 4   vague.  Anything material, significant?
 5           MR. McBRIDE:  Anything important.  Thank
 6   you.
 7   BY MR. McBRIDE:
 8       Q    Is there anything important you remember
 9   about the incident, what you saw, what you heard,
10   what you did, that you did not include in Exhibit 2
11   or Exhibit 3?
12       A    No.
13       Q    Were you disciplined in any way as a result
14   of your involvement in this incident?
15       A    No.
16       Q    To your knowledge was anybody disciplined
17   in any way as a result of their involvement in this
18   incident?
19       A    No.
20       Q    Have you ever been the subject -- well,
21   have you ever been disciplined by the Sheriff's
22   Department for excessive force?
23       A    No.
24       Q    Have you ever been disciplined by the
25   Sheriff's Department for anything involving the
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 154

```
 1    application of maximum restraints?
 2         A    No.
 3         Q    Have you ever been the subject of any
 4    internal affair investigations for either of those
 5    subjects?
 6         A    No.
 7         Q    So you were interviewed by San Diego
 8    Sheriff's Homicide detectives in connection with
 9    this incident; correct?
10         A    Yes.
11         Q    And that was Detective Patterson on
12    June 11th, 2015?
13         A    Yes.
14         Q    Other than that interview, have you
15    given -- let me ask that again.
16              Have you given any other interviews besides
17    the one with Detective Patterson with San Diego
18    Sheriff's Homicide?
19         A    No.
20         Q    I'm going to play a little clip, an audio
21    clip, and then I'll ask you a couple of questions.
22    I'll start this at timestamp 10:20.
23                    (Audio played.)
24    BY MR. McBRIDE:
25         Q    Deputy Carbajal, did you recognize your
```

Exhibit 5   Page 155

Sandra Janet Carbajal                                    February 22, 2017

```
 1    voice in that clip?
 2        A    Yes.
 3        Q    And was that clip from the interview you
 4    gave to Detective Patterson?
 5        A    Yes.
 6             MR. McBRIDE:  I'll mark that as Exhibit 4.
 7             MR. CHAPIN:  Maybe 5.
 8             MR. McBRIDE:  Oh, yeah, you're right.
 9                  (Whereupon Exhibit 5 was marked for
10             identification, a copy of which is
11             attached hereto.)
12    BY MR. McBRIDE:
13        Q    Okay.  So you were working the evening of
14    April 13th, 2015; right?
15        A    Yes.
16        Q    Do you recall what shift you were working
17    that night?
18        A    Night shift.
19        Q    And from when to when?
20        A    From 6:00 p.m. to 6:30 a.m.
21        Q    And you were still working out of the
22    Santee station at this point?
23        A    Yes.
24        Q    Did you have a partner that night?
25        A    No.
```

Sandra Janet Carbajal                              February 22, 2017

```
 1      Q      So you were the only officer in your unit?

 2  Or the only deputy in your unit?

 3      A      We work in singles.

 4      Q      You don't have any team units --

 5      A      No.

 6      Q      -- K units?  What was your unit designator

 7  that night?

 8      A      50 Paul 9.

 9      Q      At some point did you hear a call go out

10  regarding the 8385 Holden Road address?

11      A      Yes.

12      Q      Do you recall where you were at at that

13  time?

14      A      I was in the City of El Cajon when the call

15  came out.

16      Q      Were you on another call or were you in

17  transit, returning from another call, something like

18  that?

19      A      I was probably driving around or something.

20      Q      You were not assigned to the original call?

21      A      From the incident?

22      Q      Yes.

23      A      No.

24      Q      Do you recall the nature of that original

25  call?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 157

Sandra Janet Carbajal                         February 22, 2017

```
 1        A     That I was on?

 2        Q     No, no, no.  When the original call went

 3   out to 8385 Holden.

 4        A     I just remember hearing that Deputy Krull

 5   and Corporal Collins received the radio call of a

 6   subject that believed someone was after him.

 7        Q     All right.  Do you remember anything else

 8   about the original comments to that call?

 9        A     I don't remember every detail to the call.

10        Q     All right.

11              At some point did you hear an additional

12   call regarding the 8385 Holden Road address?

13        A     I don't recall.

14        Q     You recall a cover call come out?

15        A     A cover call?

16        Q     Yes.

17        A     Yes.

18        Q     And what did you do at that point?

19        A     When I heard a cover call?

20        Q     Yes.

21        A     I responded in code cover to my partner.

22        Q     What does that mean?

23        A     That means that my partner is in serious --

24   there's a serious incident going on, and he needs

25   all the deputies to respond.  Unknown what the
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 158

Sandra Janet Carbajal                                        February 22, 2017

```
 1    nature is, but something is going on with the deputy
 2    that he needs all of us to go and cover him for an
 3    incident.
 4         Q    So you did respond?
 5         A    Yes.
 6         Q    And what was your -- how old were you at
 7    the time?
 8         A    About 26 years old.
 9         Q    How tall are you?
10         A    I'm five foot.
11         Q    How much did you weigh at the time?
12         A    About 95, 96 pounds.
13         Q    All right.  How long did it take you to get
14    there?
15         A    About maybe six minutes or so.
16         Q    Okay.  In your report you say you arrived
17    with Deputy Fischer?
18         A    Yes.
19         Q    Does that mean that -- because you were
20    alone in your car, I assume that means that you
21    arrived at the same time?
22         A    At the same time.  We both saw our vehicles
23    next to each other.
24         Q    All right.  So, when you got there, you and
25    Deputy Fischer were not the first backup units to
```

Sandra Janet Carbajal                                February 22, 2017

```
 1   arrive on scene?

 2        A    No.

 3        Q    How many patrol cars were there when you

 4   got there?

 5        A    I don't recall.

 6        Q    What did you see when you pulled up at the

 7   house?

 8        A    I saw several patrol cars there.

 9        Q    With their lights on?

10        A    I don't recall.

11        Q    Did you see any other deputies outside that

12   were going to the house?

13        A    I don't recall.  Just Deputy Fischer and I

14   were running inside the house.

15        Q    Okay.  Did you enter the house?

16        A    Yes.

17        Q    How did you enter the house?

18        A    I walked in through the garage.  Actually,

19   ran in through the garage.

20        Q    All right.

21             Prior to showing up on scene did you have

22   an MDC in your car?

23        A    Yes.

24        Q    Did you look up any information about the

25   original call while you were en route?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 160

Sandra Janet Carbajal                                    February 22, 2017

```
1        A     No.  I didn't have time.

2        Q     Okay.  When you -- did you walk in before

3   or after Deputy Fischer?

4        A     I don't recall.

5        Q     When you walked into the hallway, what did

6   you see?

7        A     I saw several deputies trying to prevent a

8   subject from leaving on the ground.

9        Q     All right.  So Mr. Phounsy was the subject?

10       A     Yes.

11       Q     He was -- was he on his stomach on the

12  ground?

13       A     Yes.

14       Q     Was his head facing towards the door you

15  just entered through or was it down the hallway?

16       A     I don't recall.

17       Q     How many deputies were on top of

18  Mr. Phounsy?

19       A     I don't recall the number.  I can just give

20  you an estimate that I believe was probably around

21  there.

22       Q     Around six?

23       A     Maybe six or so.

24       Q     Were you wearing a vest at the time?

25       A     Yes.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 161

Sandra Janet Carbajal                          February 22, 2017

```
 1        Q     Did you have both panels in?

 2        A     Yes.

 3        Q     Was anybody saying anything when you

 4   entered the hallway?

 5        A     Yes.

 6        Q     Who?

 7        A     I don't recall.  I just heard several

 8   deputies saying stuff.  I don't recall what they

 9   were exactly saying or who was saying stuff.

10        Q     Were they giving Mr. Phounsy commands?

11        A     Yes.

12        Q     So you heard several deputies giving

13   Mr. Phounsy commands?

14        A     Yes.

15        Q     What commands?

16        A     Like I said, I don't recall what they were

17   saying at this point.

18        Q     Did you -- what was Mr. Phounsy doing when

19   you first entered?

20        A     He was resisting and screaming and yelling

21   and kicking the deputies.  They were attempting to

22   restrain him.

23        Q     All right.  Let's unpack that.  You said he

24   was resisting.  What do you mean by that?  How

25   specifically was he resisting?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 162

Sandra Janet Carbajal                                    February 22, 2017

1          A      He was moving side to side attempting to

2     take the deputies off of him.

3          Q      Okay.  He was yelling and screaming?

4          A      Yes.

5          Q      What?

6          A      He was just making noise.  I don't recall

7     what he was saying.

8          Q      Okay.  You said that he was attempting to

9     kick the deputies.

10         A      Yes.  With his feet.

11         Q      And what led you to believe that he was

12    trying to actually kick the deputies and not just

13    kick his feet back?

14         A      Because the deputies were attempting to

15    hold his feet down.  He kept kicking them.

16         Q      All right.  And you -- based on what you

17    saw, you believed he was trying to kick the

18    deputies?

19         A      Yes.

20         Q      Did you actually see Mr. Phounsy ever kick

21    a deputy?

22         A      No.

23         Q      Did you at any point see Mr. Phounsy

24    otherwise strike a deputy?

25         A      No.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 163

Sandra Janet Carbajal                                February 22, 2017

1      Q     Did you see Mr. Phounsy bite a deputy?

2      A     No.

3      Q     At any point during the incident did you

4   hear Mr. Phounsy say anything audible, say anything

5   that made sense to you, other than a yell or a --

6      A     No.

7      Q     When you walked in was Mr. Phounsy already

8   in handcuffs?

9      A     He had handcuffs, but they weren't

10  completely attached.

11     Q     So you saw a cuff on one hand?

12     A     Yes.

13     Q     But the other hand was not applied?

14     A     No.

15     Q     So Exhibit 2, your report, page 8, fourth

16  paragraph, about halfway down you say,

17              "The unsecure strand of the cuff was

18          open as if" it "could have been used as

19          an impact weapon."

20          Did somebody suggest you put that in your

21  report?

22     A     No.  That's what I believed.

23     Q     So you -- what about a -- just an open cuff

24  on his hand led you to believe it could be used as

25  an impact weapon?

Sandra Janet Carbajal                                      February 22, 2017

```
 1        A      Because he's resisting and that can hurt a
 2   deputy if he moves his hand across, injuring a
 3   deputy with an open strand.
 4        Q      Did you ever see Mr. Phounsy swing his hand
 5   with that cuff attached to it?
 6        A      Several deputies were holding his hand down
 7   so he wasn't able to do that.
 8        Q      But did you see him even try?
 9        A      No.
10        Q      So why put that in your report?
11        A      Because that can be a -- it can be -- it's
12   a type of object that hurts a deputy.
13        Q      All right.
14               Are you as deputies trained to actually
15   make sure if you're going to put cuffs on somebody
16   you get both on so these kind of situations don't
17   arise?
18        A      Yes.
19        Q      Now, what do they tell you to do regarding
20   getting the cuffs completely on?
21        A      Attach them to the wrist.
22        Q      Anything else?
23        A      No.
24        Q      Do they tell you to avoid situations where
25   you only get one cuff on?
```

Sandra Janet Carbajal                                    February 22, 2017

1      A      What exactly are you asking me?

2      Q      Is this something you're taught to avoid as

3    a deputy?

4      A      Well, we are always trained to attempt to

5    put both cuffs on a subject.

6      Q      Okay.  All right.

7             So did you actually see other deputies

8    place handcuffs on Mr. Phounsy?

9      A      I don't recall.

10     Q      What did you do, then, when you first got

11   in the hallway?

12     A      I immediately assisted by holding Phoun --

13   or Lucky's shoulder down to prevent him from moving.

14     Q      Right or left shoulder?

15     A      It was his left shoulder.

16     Q      Did you yourself personally use any force

17   on Mr. Phounsy there in the hallway?

18     A      No.

19     Q      You didn't hit him or knee him or anything

20   like that?

21     A      No.

22     Q      All you did is place downward pressure on

23   his shoulder?

24     A      Yes.

25     Q      Did you see any other deputies use any

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 166

Sandra Janet Carbajal                                    February 22, 2017

```
 1    amount of force on Mr. Phounsy?

 2        A    No.

 3        Q    Did you see any deputies tase Mr. Phounsy?

 4        A    No.

 5        Q    Did you ever hear a taser cycle at all --

 6        A    No.

 7        Q    -- while you were there in the hallway?

 8        A    No.

 9        Q    So how long after walking in was it before

10    deputies got Mr. Phounsy handcuffed?

11        A    It was probably about a minute or two.

12        Q    All right.  Did you see who actually

13    handcuffed him?

14        A    No.

15        Q    What happened after deputies got

16    Mr. Phounsy handcuffed?

17        A    He was carried out of the house.

18        Q    All right.

19             Just looking at your report, this is page

20    8, fourth paragraph, it says you -- you arrived on

21    scene, you ran into the residence, and there was

22    blood splattered all over.

23             "I saw several deputies were still

24             struggling with Lucky . . ."

25             "I observed Lucky had two sets of
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 167

Sandra Janet Carbajal                                    February 22, 2017

```
 1            handcuffs on."
 2       A    Yes.
 3       Q    So when I read this, it leads me to believe
 4  when you walked in he was already handcuffed.
 5       A    He had two separate handcuffs.
 6       Q    Okay.  So he had one pair on his right
 7  hand?
 8       A    Yes.
 9       Q    And one pair on his left hand?
10       A    Yes.
11       Q    All right.  When you saw Lucky handcuffed,
12  was one set of cuffs used, or were the two cuffs
13  hooked together?
14       A    They were not hooked together.
15       Q    So did Lucky have two sets of handcuffs on
16  at all times?
17       A    Yes.
18       Q    Were they both secured?  Eventually.
19       A    On his wrists they were secured.
20       Q    Okay.  So when deputies eventually got
21  Mr. Phounsy handcuffed, it was with two sets of
22  cuffs?
23       A    I don't recall.
24       Q    You don't remember that?
25       A    No.
```

Sandra Janet Carbajal                                February 22, 2017

1      Q    Do you remember seeing a deputy take that

2   cuff that was only halfway on, take that off?

3      A    No.

4      Q    All right.  So at least one set of cuffs

5   was completely on Mr. Phounsy when you walked in?

6      A    There was two sets of handcuffs, and they

7   were both on his wrist, but they weren't attached.

8      Q    Okay.  So he intentionally -- then why does

9   it say only one -- the unsecured strand of the cuff

10  was open if it could have been used?  So he really

11  had two cuffs that could have been used as an impact

12  weapon?

13     A    He had two cuffs, and one of the cuffs that

14  had a single strand not applied to the wrist was

15  open.

16     Q    All right.  Are you sure nobody suggested

17  that you put this language in here about the

18  handcuff being used as an impact weapon?

19     A    No.  I don't recall.

20     Q    If he had two sets of cuffs, neither of

21  which were completely strapped, I just -- personally

22  I think it's strange you would only say one cuff

23  could have been used as an impact weapon.  Do you

24  see?

25     A    That's what I believe.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 169

Sandra Janet Carbajal                                February 22, 2017

1        Q     Okay.  All right.

2              Did you participate in placing Mr. Phounsy

3    in the maximum restraints?

4        A     No.

5        Q     Were you present when the maximum

6    restraints were applied on Mr. Phounsy?

7        A     Yes.

8        Q     Did you continue to hold Mr. Phounsy's

9    right shoulder down as maximum restraints were

10   applied?

11       A     His left shoulder.

12       Q     Left shoulder.  Thank you.

13             Did you see who applied the restraints to

14   Mr. Phounsy's legs?

15       A     No.

16       Q     Did you see who applied it to his waist?

17       A     No.

18       Q     Did you see who connected the two?

19       A     No.

20       Q     Did you participate at all in bending

21   Mr. Phounsy's legs back so they could be connected?

22       A     No.

23       Q     After -- how long did it take for deputies

24   to apply the maximum restraints to Mr. Phounsy after

25   they got the cuffs on him?

Sandra Janet Carbajal                                    February 22, 2017

```
1        A     Maybe a minute.  I don't recall the time.
2        Q     What was Mr. Phounsy doing as the deputies
3   were applying maximum restraints?
4        A     Continued doing the same thing.  He never
5   changed.
6        Q     And what's "the same thing"?
7        A     As I explained to you earlier, continued to
8   resist and yell.
9        Q     All right.  And by "resist," you mean move
10  around?
11       A     Yes.
12       Q     So in your report on page 8, fifth
13  paragraph, second sentence you say,
14                   "Lucky continued to display
15               aggressive and assaultive behavior
16               towards" the "deputies by attempting to
17               kick the deputies . . ."
18       A     Yes.
19       Q     So whenever -- did he do anything else that
20  led you to believe he was acting aggressively or
21  assaultive towards the deputies, other than the
22  kicking?
23       A     That's all.
24       Q     When you showed up in the hallway was
25  Deputy Collins or Deputy Krull still in the hallway?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 171

Sandra Janet Carbajal                                    February 22, 2017

1       Q     Did you see any deputy -- well, let me ask
2    you this:  Did you personally check the restraints
3    after they were applied to make sure they were
4    applied correctly?
5       A     No.
6       Q     At any point did you check to make sure
7    Mr. Phounsy could breathe after the restraints were
8    applied?
9       A     When we were outside.
10      Q     You checked them outside?
11      A     No, no, no.  The restraints, no.  You said
12   breathing.
13      Q     To make sure he could breathe --
14      A     Yes.
15      Q     -- you checked outside?
16      A     No.  I was visually watching his face to
17   make sure he's breathing.
18      Q     Outside?
19      A     Outside.
20      Q     Okay.  Did you see any other deputy check
21   Mr. Phounsy's breathing there in the hallway after
22   the restraints were applied?
23      A     No.
24      Q     Did you roll Mr. Phounsy into the recovery
25   position in the hallway?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 172

Sandra Janet Carbajal                              February 22, 2017

1      Q     Please.

2      A     I remember he was placed on a gurney in the

3   recovery position.

4      Q     All right.  You don't remember seeing

5   Mr. Phounsy laying on the driveway at any point?

6      A     No.

7      Q     So what did you do after you walked out,

8   then?  Did you stay there at Mr. Phounsy's side or

9   did you go --

10     A     No, no, no.

11     Q     -- back inside to do other things?

12     A     I stayed outside --

13     Q     Okay.

14     A     -- with the deputies -- I'm sorry.  With

15   Lucky.

16     Q     Did you have to go hands on with Lucky at

17  any other point while you were in the driveway?

18     A     Just held his head to prevent him from like

19  moving and stuff and hurting himself.

20     Q     All right.  How long were you there at

21  Lucky's side out in the driveway?

22     A     Until the paramedics took him.

23     Q     So after the deputies brought Mr. Phounsy

24  out, you followed them out?

25     A     Yes.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 173

Sandra Janet Carbajal                                    February 22, 2017

1      Q      And you stayed there with Mr. Phounsy until

2  Mr. Phounsy was loaded into the ambulance?

3      A      Yes.

4      Q      Okay.  So now do you remember seeing Lucky

5  Phounsy on the driveway?

6      A      He was in the driveway.  I don't recall a

7  lot of it, though.

8      Q      All right.  Do you recall Mr. Phounsy's

9  demeanor when he was outside in the driveway?

10     A      No.

11     Q      You do recall holding his head, though?

12     A      Yes.

13     Q      Were any other deputies there with you?

14     A      Yes.

15     Q      Who?

16     A      I don't recall who they were.

17     Q      Did you see -- did you use any additional

18  force -- well, I'm sorry.  You didn't use any force.

19     A      No.

20     Q      Did you use any force on Mr. Phounsy there

21  in the driveway?

22     A      No.

23     Q      Did you see any other deputies use any

24  force on --

25     A      No.

Sandra Janet Carbajal                          February 22, 2017

1    you saw and things that you did, were you relying on

2    your own senses as opposed to the reports of

3    others --

4            MR. McBRIDE:  Objection.  Vague and

5    ambiguous.

6    BY MR. DEAN:

7        Q    -- when you wrote your report for that

8    night?

9        A    Yes.

10       Q    For example, on page 8 of your report, if

11   you could review it.

12           MR. McBRIDE:  Overbroad as well.

13           MR. CHAPIN:  Overruled.  Join.

14   BY MR. DEAN:

15       Q    On page 8, bottom two-thirds of the report,

16   it says,

17               "Deputy Allen, Fischer and Lee

18           carried Lucky outside of the residence

19           and placed him in a recovery position."

20           Is that something you saw?

21           MR. McBRIDE:  Objection.  Lacks foundation.

22           THE WITNESS:  Yes.

23   BY MR. DEAN:

24       Q    All right.  It says,

25               "Lakeside paramedics evaluated Lucky

Sandra Janet Carbajal                                    February 22, 2017

1          and the Deputies on scene."

2          The deputies, is that Collins and Krull?

3     A    No.

4     Q    Who is that?

5     A    It was, I believe, Allen, Fischer and Lee,

6  the three people that carried him out.

7     Q    And why would the paramedics be evaluating

8  those deputies?

9          MR. McBRIDE:  Calls for speculation.

10          THE WITNESS:  Oh, I'm sorry.  I didn't

11  understand your question.

12  BY MR. DEAN:

13     Q    Bad question and I'll reask it.

14          When it says Lakeside paramedics evaluated

15  the deputies on the scene, would that be Collins and

16  Krull?

17     A    Yes.

18     Q    It says,

19          "Lucky was placed onto a gurney in

20          the recovery position"

21  in your report.  Is that what you saw?

22     A    Yes.

23          MR. McBRIDE:  Objection.  Lacks foundation.

24  BY MR. DEAN:

25     Q    It says,

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 176

Sandra Janet Carbajal                                    February 22, 2017

```
 1              "Several deputies and I were holding
 2         Lucky as he was still resisting on the
 3         Gurney."
 4         My question is:  Were you holding a portion
 5    of Lucky while he was on the gurney?
 6    A    Yes.
 7    Q    Okay.  The next sentence says,
 8              "I held Lucky's head down . . ."
 9         Does that refresh your recollection that
10    you were holding Lucky's head while he was on the
11    gurney?
12    A    Yes.
13         MR. McBRIDE:  Objection.  Lacks foundation.
14    BY MR. DEAN:
15    Q    It does refresh your recollection?
16    A    Yes.  It refreshes my recollection.
17    Q    Thank you.
18         And it says,
19              "I held Lucky's head down with both
20         my hands to prevent him from moving from
21         the recovery position."
22         My question is:  Do you recall what kinds
23    of movements Lucky was doing on the gurney while you
24    were holding his head?
25         MR. McBRIDE:  Objection.  Lacks foundation.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 177

Sandra Janet Carbajal                          February 22, 2017

```
 1          THE WITNESS:  You refreshed my
 2    recollection.  And seeing this, he was actually
 3    continuing to move prior to the injected shot.
 4    BY MR. DEAN:
 5      Q    You testified earlier that you saw the
 6    medics give him a shot.  You just don't recall where
 7    the shot was given.
 8          Is that your testimony?
 9      A    Yes.
10      Q    My question is:  Did you see a shot given
11    to Mr. Phounsy before he was placed on the gurney?
12      A    I don't recall when it was.
13      Q    So you don't know if the shot was given to
14    him while he was on the driveway or while he was on
15    the gurney.
16          Is that accurate?
17      A    Yes.
18      Q    Okay.  But you did see them give him a
19    shot?
20      A    Yes.
21      Q    In that same paragraph that I was reading
22    from before it says,
23              "Several deputies and I were holding
24              Lucky as he was still resisting on the
25              Gurney."
```

Sandra Janet Carbajal                                February 22, 2017

```
 1            My question is:  Do you remember the types
 2   of movements Lucky was doing that you characterized
 3   here as resisting?
 4            MR. McBRIDE:  Objection.  Assumes facts.
 5   Lacks foundation.  Asked and answered.
 6            THE WITNESS:  I don't recall the movements.
 7   But if I wrote it on my report, there was movements.
 8   I just don't recall what it was.
 9   BY MR. DEAN:
10      Q    All right.  You can see the word on the
11   report.  And what you're telling me is that today
12   you don't know what movements resulted you in
13   writing that word?
14      A    Yes.
15      Q    The next paragraph says,
16            "I observed Deputy Collins had blood
17            all over his face with blood dripping
18            onto his uniform."
19            Does that -- me reading that and you
20   looking at that in your report, does that refresh
21   your recollection that when you came out into the
22   driveway you saw Deputy Collins?
23      A    Yes.
24      Q    And that he had blood dripping from his
25   face?
```

Sandra Janet Carbajal                                February 22, 2017

```
1        A    Yes.

2        Q    Okay.  The last sentence of that same

3   paragraph says,

4                   "Lakeside paramedics were treating

5             both deputies."

6             Do you see that?

7        A    Yes.

8        Q    Does that refresh your recollection that

9   you saw paramedics with Deputies Collins and Krull

10  in the driveway?

11       A    Yes.

12       Q    Do you remember how many medics --

13  paramedics were with the injured deputies?

14       A    I don't recall.

15       Q    And do you remember how many paramedics

16  were with Mr. Phounsy when you saw a shot given to

17  Mr. Phounsy?

18       A    I don't recall them now.

19       Q    Do you remember whether or not it was the

20  same medics that you saw with the injured deputies

21  that you saw also giving the shot, or were there two

22  different sets of paramedics?  Do you remember that?

23       A    I -- I don't remember which paramedics or

24  who.

25       Q    Okay.  When you were at Lucky's head, were
```

Sandra Janet Carbajal                                        February 22, 2017

```
1    your hands physically on his head?

2       A    I recall holding his head.

3       Q    And when you were holding his head, you

4    testified earlier, I think, that one of your things

5    that you did was observe whether or not he was

6    breathing.

7            Is that right?

8       A    Yes.

9       Q    And did you, in fact, observe that he was

10   breathing?

11      A    Yes.

12      Q    I have a photograph.

13           MR. DEAN:   Where are we at?

14           MR. CHAPIN:   7?

15           MR. McBRIDE:   7.

16           MR. DEAN:   All right.  So I'll just mark

17   this photograph as Exhibit 7.

18                (Whereupon Exhibit 7 was marked for

19           identification, a copy of which is

20           attached hereto.)

21   BY MR. DEAN:

22      Q    I'm going to first ask you just to look at

23   it and see -- I'm going to ultimately ask you if you

24   can see any parts of what you might think is your

25   body anywhere in the picture.  If you can, that's
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 181

Sandra Janet Carbajal                                    February 22, 2017

```
 1        Q    -- in the driveway?

 2        A    Yes.

 3             MR. McBRIDE:  Objection.  Vague as to time.

 4   BY MR. DEAN:

 5        Q    And when he was in the driveway looking

 6   like that, is that when you saw paramedics attending

 7   to him?

 8        A    Yes.

 9        Q    I was just curious.  Is code cover a common

10   thing for you to hear during your -- while you're

11   working?

12        A    No.

13        Q    It's a pretty extraordinary event?

14        A    Yes.

15        Q    Thanks.

16             MR. DEAN:  I don't have anything further.

17

18                  FURTHER EXAMINATION

19   BY MR. McBRIDE:

20        Q    So you said the reason you ordered a

21   phlebotomist to the hospital was because you

22   believed Mr. Phounsy was under the influence of a

23   drug?

24        A    Yes.

25        Q    Please state every fact known to you at the
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 182

Sandra Janet Carbajal                              February 22, 2017

1              DECLARATION UNDER PENALTY OF PERJURY

2

3         I, SANDRA JANET CARBAJAL, do hereby certify

4    under penalty of perjury that I have read the

5    foregoing transcript of my deposition taken on

6    February 22, 2017; that I have made such corrections

7    as appear noted herein in ink, initialed by me; that

8    my testimony as contained herein, as corrected, is

9    true and correct.

10        DATED THIS ___9___ day of __April_____,

11   20_1_7_, at __lakeside_____, ___cA_____.
                     (City)              (State)

12

13                            _____
                               SANDRA JANET CARBAJAL
14

15

16

17

18

19

20

21

22

23

24

25

Sandra Janet Carbajal                                    February 22, 2017

```
 1                      CERTIFICATE OF

 2          CALIFORNIA CERTIFIED SHORTHAND REPORTER

 3              I, the undersigned, a Certified Shorthand

 4     Reporter of the State of California, do hereby

 5     certify:

 6              That the foregoing proceedings were taken

 7     before me at the time and place herein set forth;

 8     that any witnesses in the foregoing proceedings,

 9     prior to testifying, were placed under oath; that a

10     verbatim record of the proceedings was made by me

11     using machine shorthand which was thereafter

12     transcribed under my direction; further, that the

13     foregoing is an accurate transcription thereof.

14              The dismantling of this transcript will

15     render the reporter's certificate null and void.

16              I further certify that I am neither

17     financially interested in the action nor a relative

18     or employee of any attorney of any of the parties.

19              Reading and signing was requested.

20              IN WITNESS WHEREOF, I have this date

21     subscribed my name.

22

23     Dated:  March 3, 2017          _____

24                                    KATHLEEN S. MCLAUGHLIN
                                      CSR No. 5845
25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Exhibit 5   Page 184