# Exhibit 10

Exhibit 10   Page 263



Transcript of the Testimony of:

# Aaron Bagley

K.J.P.

v.

County of San Diego

November 17, 2016

Volume I

LITIVATE REPORTING + TRIAL SERVICES
P: 877.771.3312 | F: 877.561.5538
www.litivate.com

Exhibit 10   Page 264

Aaron Bagley                                    November 17, 2016

1   equipment we'd bring.

2   BY MR. MCBRIDE:

3       Q.   And there would be a set of that on both the

4   ambulance and the engine?

5       A.   Yes.

6       Q.   Do you recall on this incident whether you

7   grabbed equipment for -- one set of equipment, or did

8   you bring equipment from both the ambulance and the

9   engine?

10      A.   I don't recall.

11      Q.   Okay.  So do you walk up as a group, the

12  five of you, or what happens after you guys parked and

13  grabbed your gear?

14      A.   Yeah.  We would -- we would -- we all walked

15  up.  And I can't remember about the ambulance, if they

16  came up exactly with us or a little behind us.  But I

17  do recall that I was the first person to walk up on

18  scene with my crew.

19      Q.   All right.  So what did you see when you

20  arrived at the house?

21      A.   We walked up the driveway.  Two deputies

22  were sitting up against the fence, kind of like in the

23  front of the house.  One deputy was -- had blood

24  covering his face and on his uniform, couldn't really

25  see exactly where the injury was from but -- and the

Aaron Bagley                                November 17, 2016

1   other deputy had some swelling to her face.  And so

2   that's what we saw.

3       Q.  All right.  Did you find your patient, the

4   individual who had been Tased?

5           MR. DEAN:  Assumes facts that he was the

6   patient.

7           Go ahead.

8           THE WITNESS:  No.  He was not -- he was

9   initially not visible when we walked up on scene.

10  BY MR. MCBRIDE:

11      Q.  Okay.  So when you got on scene, did you ask

12  anybody where your patient was -- where the individual

13  who had been Tased was?

14      A.  Yes, I did.

15      Q.  Who did you ask?

16      A.  One of the deputies.

17      Q.  Okay.  And what was the response?

18      A.  What I asked was, are there -- is the

19  suspect also a patient?

20      Q.  Okay.  So when you saw the injured deputies

21  you figured that they would be patients as well?

22      A.  Yes.

23      Q.  Okay.  So I guess describe to me, then,

24  what -- well -- so you see the two deputies: the one's

25  bleeding, the other with a swollen face.

Aaron Bagley                                    November 17, 2016

1          What do you do at that point?  Do you direct

2     any of the first responders to start treating them or

3     they just kind of do their own thing?

4          A.    No.  At that point, I want to determine

5     what's going on on the entire scene.  So I need to

6     figure out how many patients I have.  And so that's why

7     I ask the deputy is the suspect also a patient.

8          And -- so I'm trying to determine -- we

9     triage -- when there's multiple patients, we need to

10    triage them and determine who we're going to -- who

11    we're going to treat and how we're going to get

12    everybody to the hospital.  So that's what I'm trying

13    to do when I'm asking him about the patient.

14          And so at that point, he said he wasn't sure

15    if he was a patient, but he had been fighting -- you

16    know, they -- had been a struggle, so we should

17    probably err on the side of caution and make him a

18    patient, and that's when I requested additional

19    ambulance.

20          Q.    All right.  And let me just -- I'll just

21    tell you so we don't have to pull the computer out and

22    play it.  I'll represent to you that your statement

23    was -- you asked an unknown deputy if the suspect was

24    going to be a patient, too, because you only had one

25    ambulance.  And the deputy said yes, so you requested a

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 10   Page 267

Aaron Bagley                                    November 17, 2016

```
 1    second ambulance?

 2          A.   Um-hum.  That's --

 3          Q.   Is that what you remember?

 4          A.   Yes, that sounds -- sounds correct.  I don't

 5    remember what I specifically said, but that sounds --

 6          Q.   Something to that effect?

 7          A.   Yes.  Yes.

 8          Q.   All right.  And so generally, when you show

 9    up as the captain, are you directly involved in patient

10    care?

11          A.   I am not.  I mean, I -- I should say

12    sometimes I am and sometimes I'm not.  I'm a

13    paramedic --

14          Q.   If the situation -- go ahead.

15          A.   I'm a paramedic so I can.  But generally,

16    the paramedic -- the firefighter/paramedic, he's in

17    charge of patient care.

18          Q.   All right.  Is it fair to say as the

19    captain, you are generally with response -- you're

20    generally responsible for, I guess, deploying the

21    first-responder resources, making sure that the right

22    people are doing the right things on scene?

23          A.   Yes.

24          Q.   Okay.  So who start -- did -- at any point

25    did the deputies direct you or the other first
```

Aaron Bagley                                          November 17, 2016

1    responders to treat the two injured deputies?

2         A.   They did not.

3         Q.   All right.  So that was a decision made by

4    you and the other first responders to treat these

5    deputies?

6         A.   It was made by me.

7         Q.   Okay.  So what happens at that point --

8    well, how soon after arriving at the house -- so

9    walking up and arriving at the house -- was it that you

10   had this conversation with the deputy about whether or

11   not the suspect was going to need treatment?

12        A.   It was almost immediately when I walked up.

13   It was -- the first thing on my mind was how many

14   patients do we have.

15        Q.   So what you did, though, have, including

16   yourself, five first responders/paramedics -- it's my

17   understanding that Mr. Do, the engineer, is also a

18   paramedic so he can provide treatment if necessary;

19   right?

20        A.   Yes.

21        Q.   Why call for the second medical unit?  Was

22   there not sufficient first responders there to treat

23   both the deputies and Mr. Phounsy?

24        A.   There was not.  So an ambulance -- we have

25   two patients already to take care of and the deputies.

Aaron Bagley                                          November 17, 2016

1    An ambulance -- one person drives the ambulance and one

2    person cares for the patients in the ambulance.  So for

3    them to take care of two people is a lot already for

4    them, plus the situation dictated they needed to be

5    transported separately.  So for that, we needed an

6    additional ambulance to transport the suspect.

7         Q.   All right.  And do you -- so did you, right

8    away, call for another unit?

9         A.   Yes.  Very close after arriving on scene and

10   determining, hey, we may have another patient.  Very --

11   and it's in our dispatch information.  So whatever time

12   is there --

13        Q.   Will you take a look at Exhibit 3, and tell

14   me if that's listed in there, the time that you called

15   for that second unit, medical unit?

16        A.   Okay.  So at 2237, it looks like Medic 2 was

17   dispatched.

18        Q.   So you would have called for Medic 2,

19   presumably, shortly before they were dispatched?

20        A.   Yes, probably seconds before they were

21   dispatched.

22        Q.   Typically, that happens -- there's no reason

23   to think that there was a five-minute delay between you

24   calling and them assigning a medic to the call?

25        A.   Yeah.  No.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 10   Page 270

Aaron Bagley                                         November 17, 2016

1       Q.   Okay.  So what do you do after you have that
2    conversation with the deputy?  What happens next?
3       A.   So we determine there's possibly another
4    patient.  I can see -- I can see the deputies inside
5    the house, and it looks like they are still struggling
6    or restraining -- I can't tell what they're doing, but
7    they are -- they are with the suspect at this time.
8       Q.   All right.  Well, let me actually close this
9    off.  Were you involved personally in providing any
10   assessment of or treatment to either of the two
11   deputies?
12      A.   Other than triaging their -- other than
13   triaging the call, no, I was not directly involved in
14   the patient care of the deputies.
15      Q.   So by "triaging," do you mean -- did you
16   have a quick conversation with them just to quickly
17   assess their condition?  What type -- what do you mean
18   by that?
19      A.   So we have -- so at this time we've
20   determined there's three patients, the two deputies and
21   the suspect.  The suspect is in the house.  We don't
22   have access to him.  He's not secured.  The deputies
23   are still -- we don't have access to him at all.  The
24   two deputies, the -- one of them -- I can't -- one of
25   them said -- they said they were complaining of some

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 10  Page 271

Aaron Bagley                                              November 17, 2016

1   dizziness.  And I can't remember who said that, whether

2   I heard the deputy say it or our paramedic said it.

3   There was blood.  They were, obviously, injured.  So we

4   have two patients, basically, ready to go.  They're

5   injured.  We know that.  The other patient, we don't

6   know what's going on.  He's still -- it's not safe for

7   us to go assess him, to go even determine his level of

8   injury.  We don't really know -- we don't know anything

9   about them at this time.

10          So the determination's made let's take the

11  two deputies.  We have another ambulance coming.  And

12  we have, you know, opportunity to get two people to the

13  hospital right now, and we got to take care of what we

14  have right in front of us.  So that was the

15  determination that was made.

16      Q.   Okay.  And so did you have any conversation

17  with these two deputies?

18      A.   I did not have a conversation with the

19  deputies.

20      Q.   And did you actually do any sort of -- you

21  know, a BRIM assessment or any evaluations of them at

22  all?

23      A.   I did not.

24      Q.   That was all handled by the other first

25  responders?

Aaron Bagley                                                    November 17, 2016

1        A.    Yes.

2        Q.    How did you know he was inside?  Did a

3   deputy tell you, or is this just what you're seeing?

4        A.    We walked up on the driveway.  The fence

5   where the deputies were sitting is here, the garage is

6   here -- the garage is open, and you can see all the way

7   into the house through the open door in the garage.  I

8   could see all the deputies gather around somebody in

9   there, and I assume that's him in there.

10        Q.    All right.  Okay.  So you made the

11   assumption that they're dealing with your suspect right

12   there?

13        A.    Yes.

14        Q.    Okay.  So how long after arriving -- so

15   ultimately, they did bring Mr. Phounsy out to you?

16        A.    Yes.

17        Q.    How long after arriving was it before the

18   deputies brought Mr. Phounsy out?

19        A.    I don't recall.

20        Q.    Can you give any sort of an estimate?  I

21   mean, was it 10 minutes?  5 minutes?

22        A.    I couldn't without guessing.

23        Q.    Was it -- well, at some point, did medic --

24   the Medic 5 paramedics, did they take the two deputies

25   to their ambulance and transport them to Grossmont?

1    of drugs he was taking, yes.

2          Q.    Okay.  And have you learned that there were

3    a number of toxicology exams done on his blood after

4    the incident that showed he was negative for everything

5    except for trace amounts of marijuana?

6          A.    Yeah, and including the Versed.  He was

7    negative for the Versed as well.

8          Q.    Right.

9          A.    So how accurate are those toxicology

10   reports?

11         Q.    Okay.  So what drugs were you told that

12   Mr. Phounsy had allegedly taken?

13         A.    It was such a list.  I -- I remember

14   cocaine, Ecstasy.  The family said they gave him

15   Benadryl to try and calm him down, but I can't remember

16   the other -- the other list of -- or the full list of

17   drugs.

18         Q.    Now, is this -- as you're getting this

19   information, are you writing it down at all, the

20   important items of information you get?

21         A.    This is -- as far as the medical stuff?

22         Q.    Yeah.

23         A.    No, I'm not writing this down.  The

24   paramedics are recording -- they've got a clipboard.

25   They're writing down his medical information, the list

Exhibit 10   Page 274

Aaron Bagley                                    November 17, 2016

1    him prior to him being brought out.

2         Q.    Okay.  So what --

3         A.    Other than the deputies telling us he was

4    Tased and he was on a laundry list of drugs.

5         Q.    Okay.  So in the meantime between you

6    getting that information and them bringing Lucky out,

7    do you remember anything else you did there on scene?

8         A.    Yes.  We -- I spoke with one of the

9    deputies.  I said, we have chemical sedation if -- if

10   he's still struggling and fighting, we are able to

11   chemically sedate him.  Do you -- we discussed whether

12   that would be prudent.  And the deputy said, yes, he is

13   still struggling, he is still fighting.  So for his own

14   safety and our own safety, we decided -- you know, I

15   talked to our paramedic, Aaron Hackett.  Do you want to

16   get the Versed, and we can sedate him.  And then the

17   determination was made to get the Versed and sedate

18   him.

19        Q.    Okay.  I'll ask you more about that in a

20   little bit.  But just -- you had that discussion before

21   Lucky was brought out?

22        A.    I don't recall if it was before or while he

23   was being brought out.  It was close to those -- it was

24   within a short window of time.

25        Q.    All right.  All right.  So talk to me about

Aaron Bagley                                          November 17, 2016

1    when Lucky was brought out.  Did you actually see the

2    deputies carrying Lucky out?

3         A.   Yes.

4         Q.   And where were you as Lucky was being

5    carried out?

6         A.   I was in the driveway.

7         Q.   All right.  And let's just do this for

8    clarity's sake.  We'll use one of these aerials.

9              MR. MCBRIDE:  Counsel, it's the same one we

10   used last time.  Do you want to see it?

11             MR. DEAN:  Perfect.  What exhibit number are

12   we on by this time?

13             MR. MCBRIDE:  I believe 4.

14             I'll mark this as Exhibit 4.

15             (Exhibit 4 was marked for identification.)

16   BY MR. MCBRIDE:

17        Q.   All right.  Captain, take a look at

18   Exhibit 4.  And I know you've probably never seen this

19   residence from that vantage point.  But does that

20   generally depict the scene as you remember it that

21   night?

22        A.   It was dark, you know, so -- there's a house

23   and a driveway, yeah.  So yes, I would say.

24        Q.   If I represent to you that Exhibit 4 is a

25   Google image of 8538 Holden Road, do you see anything

Aaron Bagley                                    November 17, 2016

1        Q.    Why don't you just close off that circle?

2        A.    Right here?

3        Q.    Yeah, just close it off.  There you go.

4        A.    Okay.

5        Q.    And for the record, the captain has drawn an

6    orange circle in the driveway.

7              Why don't you go ahead and draw a little

8    line out of that and put a number 1 just so we know for

9    the record.

10       A.    (Witness complies.)

11       Q.    Perfect.  Okay.  So how were the deputies

12   carrying Lucky out?

13       A.    There was probably six of them carrying him,

14   and they were carrying him facedown.

15       Q.    All right.  How so?  Did they -- were they

16   carrying him underneath him?  Were they holding his

17   feet?

18       A.    I don't -- I don't recall specifically how

19   they were carrying him.

20       Q.    Was Lucky restrained when he was carried

21   out?

22       A.    He was.

23       Q.    How was he restrained?

24       A.    He had his hands -- I believe they were

25   cuffed, and then he had a -- feet were wrapped with

Aaron Bagley                                          November 17, 2016

1    a -- some sort of leather restraint, and that was tied

2    to his hands, basically.  So there's a cord connecting

3    his hands and his feet.

4          Q.   All right.  So I think you described it as a

5    hogtie before?

6          A.   Yes.  That's the way I describe it.  But a

7    hogtie is your hands and feet tied together.

8          Q.   Okay.

9          A.   And, you know, the deputies explained this

10   is called "max restraints," and it's not a true hogtie.

11         Q.   I know.  I listened to the audio and the

12   deputy really tried to talk you out of what you had

13   said.  But I think you said he was hogtied.  His hands

14   and feet were hooked together?

15         MR. DEAN:  The question is compound.  It

16   assumes your editorial and your narrative.  Can you

17   just ask him a question?

18         MR. MCBRIDE:  Sure.

19         MR. CHAPIN:  Also inconsistent with the

20   audio.

21   BY MR. MCBRIDE:

22         Q.   Did you see -- was he hogtied as you saw it?

23         A.   No, he was not.

24         Q.   So was his -- were -- his hands were cuffed

25   behind his back; right?

Aaron Bagley                                             November 17, 2016

 1          A.   Yes.
 2          Q.   His legs were fastened together.  His legs
 3    were bent backwards?
 4          A.   Um-hum.
 5          Q.   Is that a yes, his legs were fastened
 6    together?
 7          A.   His legs were fastened together.
 8          Q.   His legs were bent backwards?
 9          A.   Yes.
10          Q.   And his legs were connected to his hands?
11          A.   They were.
12          Q.   Okay.  And so where -- you saw the deputies
13    set Mr. Phounsy down?
14          A.   Um-hum.
15               MR. DEAN:  Is that a yes?
16               THE WITNESS:  Oh, I'm sorry.  Yes, they did.
17    BY MR. MCBRIDE:
18          Q.   How did they set him?
19          A.   They counted him to three, and then set him
20    down.  They said, we're going to lower him on three.
21    One, two, three, and they set him down.
22          Q.   All right.  Did they drop him at all?
23          A.   They did not drop him.
24          Q.   Did he strike the ground -- I mean, did they
25    gently set him down, or did they let him down and he

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 10   Page 279

Aaron Bagley                                November 17, 2016

```
1    struck the ground with some force?

2         A.   They fairly gently set him down.  It was a

3    steady -- they lowered him steadily to the -- or slowly

4    to the ground.

5         Q.   So they were carrying him prone?

6         A.   Yes.

7         Q.   And did they set him down prone?

8         A.   They did, yes.

9         Q.   Were you concerned by them setting him down

10   prone?

11        A.   He was immediately rolled on his side, so

12   there's really not a -- no.  As far as set -- just

13   laying him down prone, no, I was not concerned with

14   that because he was immediately rolled on his side.

15        Q.   So you saw the deputies set him down,

16   continued to observe Lucky and continued to observe the

17   deputy roll him over onto his side?

18        A.   Either -- and I can't recall if the deputies

19   or Aaron Hackett said it, but he was immediately put on

20   his side.  And that's part of -- and that's part of our

21   protocols.

22        Q.   So you saw them actually roll him onto his

23   side?

24        A.   Yes.

25        Q.   And how long after bringing him out did you
```

1    see the deputies, or whoever it was, roll Lucky onto

2    his side?

3        A.    Immediately.  So as soon as he was on the

4    ground, he was rolled on his side.

5        Q.    So he would have spent less than five

6    seconds on the ground in the prone position?

7        A.    Yes.

8        Q.    And why, as a paramedic on scene, were you

9    concerned about him being set down in a prone position?

10   Why is that concerning to you, medically speaking?

11       A.    If you're laying on your stomach, it makes

12   it difficult to -- in prone position, it makes it

13   difficult to breathe.  It makes it difficult to assess

14   a patient.  So there's a whole -- there's a whole list

15   of reasons to not set somebody down -- or leave

16   somebody on their stomach prone.

17       Q.    In any of your -- are you trained as

18   paramedics about positional asphyxiation?

19       A.    Yes.

20       Q.    And is that a concern with somebody who's

21   restrained in that manner to be set on their stomach in

22   the prone position?

23       A.    Is it a -- in the manner that it was done,

24   it was not a concern.

25       Q.    But is that why you would be concerned if he

Exhibit 10   Page 281

Aaron Bagley                                    November 17, 2016

1   were left in that position?

2        A.   Yes.

3        Q.   Did you see, at any other point during the

4   incident, Lucky again on his stomach in the prone

5   position?

6        A.   I did not.

7        Q.   After Lucky was brought out, did you

8   generally stay in this area that you've indicated --

9   circled as the area 1?

10       A.   Yes, I did.  At some point, I walked over

11  with one of the paramedics off Medic 2, and we spoke to

12  the wife --

13       Q.   All right.

14       A.   -- at that point to gather the medical

15  information.

16       Q.   Was Lucky still in the driveway when you

17  went and talked to Lucky's wife?

18       A.   I don't recall.

19       Q.   Okay.  So they bring Lucky out.  What do you

20  do at that point?

21       A.   They bring Lucky out.  We had -- we

22  discussed giving him the Versed to assist with his

23  sedation.  And so Aaron Hackett was treating and

24  assessing Lucky at this point.

25       Q.   So he's one of your paramedics?

Aaron Bagley                                           November 17, 2016

1          A.    He's the one on the fire engine with me.

2          Q.    Okay.  So --

3          A.    Aaron Do had gone to get the Versed off -- I

4     don't know where he got it off -- but to get the Versed

5     so we could administer it to Lucky.

6          Q.    All right.  So let me ask this.  I should

7     have asked this question before.  Once Lucky's brought

8     out, do either you or one of your paramedics

9     immediately start treating him, or is there a lull

10    before you can go in and start treating him?

11         A.    There's no lull.  He's -- once he's brought

12    out, Aaron Hackett immediately went over to him and

13    started assessing him.

14         Q.    Okay.  Do you know what Mr. Hackett started

15    doing at that point?

16         A.    I can't say specifically about that,

17    medically.  He was trying -- I remember him trying to

18    get a blood pressure on -- on Mr. Phounsy, and he

19    was -- he was having -- he was still struggling, and he

20    was having trouble getting -- but he was having trouble

21    assessing him because he was thrashing around so much.

22              As far as the medical -- specific medical

23    care, you'd have to defer to what he did.  I don't

24    want -- I can't really speculate on the exact care he

25    gave to Lucky.

Exhibit 10   Page 283

Aaron Bagley                                        November 17, 2016

1        Q.   All right.  Were you personally involved in

2   assessing or treating Lucky in any way?

3        A.   I was not.

4        Q.   So once Lucky is brought out, Mr. Hackett

5   starts assessing and treating him.  And at this point

6   you're dealing with the issue of the Versed and whether

7   or not it will be administrated [sic]?

8        A.   I'm not dealing with whether it's going to

9   be administrated -- administered, but Aaron is --

10   Aaron Hackett is the one that's going to be

11   administering it.  Aaron Do went and got it.  And then

12   Aaron Hackett is the one that is -- I don't remember

13   who's drawing it up or getting it ready specifically,

14   but they're getting ready to administer the Versed.

15        Q.   So are you the one that offered to deputies

16   to do that, or did deputies say, hey, do you guys have

17   any Versed or any benzo or anything we can give this

18   guy?

19        A.   I'm the one -- I'm the one that offered,

20   said, we do have -- we can sedate him if necessary.

21        Q.   Okay.  And what -- what types of

22   circumstances are you, as EMTs here in San Diego, able

23   to administer Versed?

24             MR. DEAN:  He's a paramedic, not an EMT.

25   BY MR. MCBRIDE:

Aaron Bagley                                    November 17, 2016

1        Q.   I'm sorry.  I know, as a layman, I use those

2   terms interchangeably, and I know they are not.

3        A.   Okay.

4        Q.   As a paramedic here in San Diego, what

5   circumstances are you able to administer Versed?

6             MR. DEAN:  That calls for a narrative,

7   because the question says when are you able to as

8   opposed to when are you not able to.  But it calls for

9   a narrative.  It's an incomplete hypothetical.  It

10  calls for speculation.

11            If you can, though, Captain, answer the

12  question based on the way he phrased it, please go

13  ahead and do so.

14            THE WITNESS:  Okay.  Well, in this scenario

15  is excited delirium, which is one of the indications

16  for giving Versed.

17  BY MR. MCBRIDE:

18       Q.   Okay.  Any other situation?

19       A.   Seizures, we can give it for.

20       Q.   Any other situation?

21            MR. DEAN:  Same objections.

22            Go ahead.

23            THE WITNESS:  Yeah.  There's -- we're

24  allowed to get variations of -- of orders as well.  So

25  there are some other situations we can get it for

Exhibit 10   Page 285

Aaron Bagley                                            November 17, 2016

1    for -- there are other situations we get medical
2    variations to give it.
3    BY MR. MCBRIDE:
4         Q.   But as far as the standing orders go --
5         A.   Yes.
6         Q.   -- seizures and excited delirium are the
7    only two situations where you can administer Versed
8    without getting hospital authorization?
9         A.   Yes.
10        Q.   All right.  So talk to me about excited
11   delirium.  Is that actually a condition that's listed
12   in your -- in the protocol here?
13        A.   It is.
14             MR. DEAN:  When you say "protocol here," do
15   you mean the county protocol?
16   BY MR. MCBRIDE:
17        Q.   Yes.
18        A.   San Diego County protocols, there's an
19   excited delirium protocol.
20        Q.   Okay.  And what does it say with relation --
21   well, what did it say with relation -- or with regard
22   to Versed and excited delirium in April of 2015?
23        A.   I don't recall exactly what it said.
24        Q.   All right.  Do you know what it says now?
25        A.   This -- do you want me to read you the

Aaron Bagley                                    November 17, 2016

1    specific protocol?  I can't recall exactly what it

2    says.

3         Q.   Okay.  So when you say excited delirium,

4    what criteria are you looking for?

5         A.   Combative patient, a patient that's a danger

6    to himself, a danger to us, someone that's basically --

7    yeah, it's a person that's a danger to himself or a

8    danger to us.

9         Q.   So if those two criteria are met, you, as a

10   paramedic in San Diego County, are able to administer

11   Versed?

12        A.   Yes.

13        Q.   So essentially, for any combative patient

14   you can give a Versed injection?

15        A.   I can't -- I would have to -- I can't know

16   if there's -- if it's --

17             MR. CHAPIN:  I'm going to object as vague,

18   then.

19             THE WITNESS:  It's kind of a vague question.

20             MR. CHAPIN:  It's too vague.

21   "Combativeness" is a variable term.

22   BY MR. MCBRIDE:

23        Q.   I'm asking you.  So you made the decision to

24   administer the Versed?

25        A.   Okay.  No, I did not make the decision --

Aaron Bagley                                          November 17, 2016

1  me or at who.  But there was some discussion about

2  getting him out of those restraints and into our soft

3  restraints.

4          Q.   Were you and the other paramedics concerned

5  about Lucky being in the hogtie or the four-point

6  restraints?

7          A.   We were.

8          Q.   Why were you concerned about that?

9          A.   There -- because they're not the -- they're

10  not the restraints we normally use in our -- in our

11  field.  That's not what we do.  So in order to get him

12  in a -- you know, as able to assess him a little bit

13  better, it would be better if he was in our soft

14  restraints.

15          So we had discussion about trying to get him

16  in those soft restraints.  But with the situation, him

17  thrashing about so violently, the injury to the two

18  sheriff's deputies, being Tased seven times

19  unresponsive, we take him out of those restraints,

20  we're putting everybody at huge risk, including Lucky.

21  So -- and this was the thought process going on while

22  we're having this discussion about taking him out of

23  the restraints.

24          Q.   In fact, you, as paramedics, are prohibited

25  from placing individuals in four-point restraints like

Aaron Bagley                                          November 17, 2016

1       A.   I don't believe they said -- they said that.

2   Actually, I don't know what they said.

3       Q.   Is that a situation where you could override

4   the deputies?  If you believed it was medically

5   necessary or advisable to remove Lucky from those --

6   the way he -- the deputies had him restrained and place

7   him in your restraints, is that something you could

8   override them on?

9       A.   That's a situation where if I had thought it

10  was -- we needed to get him out of those restraints,

11  the deputies would not have -- in my experience,

12  dealing with the deputies, they would not have -- there

13  would not have been -- as far as the medical care,

14  they're going to defer to us.  If we were to say, hey,

15  we need to get him out of these, they would have --

16  they would've helped us do that and made it happen.

17      Q.   So who, ultimately, made the decision that

18  Lucky remain restrained in the way that you said he was

19  by the deputies?

20      A.   I don't recall who made the ultimate

21  decision.

22      Q.   Did you make that decision?

23      A.   I don't recall us making a specific

24  decision.  I do recall that it was just unsafe to take

25  him out of those restraints at that time.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 10   Page 289

Aaron Bagley                                          November 17, 2016

1   was a significant risk or not that Lucky would go into

2   cardiac arrest?

3           MR. DEAN:   Assumes facts, vague and

4   ambiguous with respect to the term "mitigate" and the

5   causation that's implied.

6           But go ahead.

7           THE WITNESS:   Okay.   The one thing that the

8   paramedics want to do is take him out of those

9   restraints -- or there were discussion about taking him

10  out of the restraints.   So that was -- that was --

11  there -- that was what was said not to necessarily

12  avoid cardiac arrest, because I can't say that there's

13  something -- but just to be able to better assess him.

14          But with the condition of him and the danger

15  he represented to himself and the deputies, it just

16  wasn't safe to take him out of those restraints.

17  BY MR. MCBRIDE:

18      Q.   All right.   I just need a minute to go

19  through my notes.   I'm 99 percent done.   I'm sure there

20  will be a couple more questions.

21          MR. MCBRIDE:   But do you want to go ahead,

22  Jim, and I'll look at these while you go?

23          MR. DEAN:   I'm happy about that because I

24  have to be in National City by 1:30.

25

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 10   Page 290

Aaron Bagley                                          November 17, 2016

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2    Case Name: Phounsy  vs. County of San Diego

 3    Date of Deposition: 11-17-16

 4    Job No.: 25334

 5

 6         I, CAPTAIN AARON BAGLEY, hereby certify under

 7    penalty of perjury under the laws of the State of

 8    _____ that the foregoing is true and correct.

 9         Executed this _____ day of _____,

10    2016, at _____.

11

12

13

14

15                                    _____

16                        Captain Aaron Bagley

17

18

19

20

21

22

23

24

25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 10   Page 291

Aaron Bagley                                                    November 17, 2016

1           I, the undersigned, a Certified Shorthand

2      Reporter of the State of California, do hereby certify:

3           That the foregoing proceedings were taken

4      before me at the time and place herein set forth; that

5      any witnesses in the foregoing proceedings, prior to

6      testifying, were duly sworn; that a record of the

7      proceedings was made by me using machine shorthand,

8      which was thereafter transcribed under my direction;

9      that the foregoing transcript is a true record of the

10     testimony given.

11          Further, that if the foregoing pertains to the

12     original transcript of a deposition in a federal case,

13     before completion of the proceedings, review of the

14     transcript [x] was [ ] was not requested.

15          I further certify I am neither financially

16     interested in the action nor a relative or employee of

17     any attorney or party to this action.

18          IN WITNESS WHEREOF, I have this date

19     subscribed my name.

20

21     Dated:  December 1st, 2016

22                    *Lorie Rhyne*

23              _____

24              Lorie Rhyne

25              RPR, CRR, CSR No. 12905

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 10   Page 292