# Exhibit 11

Exhibit 11   Page 293



Transcript of the Testimony of:

# Aaron Do

K.J.P.

v.

County of San Diego

December 12, 2016

Volume I

LITIVATE REPORTING + TRIAL SERVICES
P: 877.771.3312 | F: 877.561.5538
www.litivate.com

Exhibit 11   Page 294

Aaron Do                                              December 12, 2016

1    responsibility to go to the proper radio channel for the

2    incident.  As you can see on this one, it says,

3    "Three-Charlie-Delta."  It's the captain's

4    responsibility to do that.  It would be unsafe for me to

5    operate the radio while driving.

6        Q.   All right.

7        A.   And the radio's in the captain's seat, so the

8    firefighters don't do that.

9        Q.   So as you are responding to and from calls as

10   the engineer, your sole responsibility is getting the

11   engine there safely?

12       A.   Correct.

13       Q.   All right.  So you arrive on scene?

14       A.   (Witness nods head.)

15       Q.   There at 8358 Holden Road?

16       A.   Yes.

17       Q.   What did you see when you got there?

18       A.   A large number of sheriff vehicles, and we -- I

19   do remember having to park a number of houses away from

20   the actual address because of the number of sheriffs'

21   vehicles.

22       Q.   In your recorded statement you gave to the

23   sheriffs deputies, you estimated there were about 15

24   sheriffs' vehicles there with the lights on.  Is that

25   accurate?

Exhibit 11   Page 295

Aaron Do                                                December 12, 2016

```
 1          MR. RACINE:  If you remember.
 2          THE WITNESS:  I don't recall.  Like I said,
 3   there were a large number of sheriff vehicles.  I don't
 4   recall exactly how many there were.
 5   BY MR. McBRIDE:
 6     Q.   All right.  What did you guys do when you got
 7   there?
 8          MR. RACINE:  Vague as to "you guys."
 9          Can you maybe ask a more clear question?  Maybe
10   what he did.
11   BY MR. McBRIDE:
12     Q.   What did you and the others on your engine do
13   when you got there?
14     A.   So I don't know exactly what the other
15   individuals were doing right when we got there.  When I
16   got there, I parked the vehicle, I set my wheel chocks,
17   and then I proceeded up to the scene.
18          And I don't recall whether or not I was with
19   the other two employees, or if they were ahead of me,
20   but I do remember securing my vehicle, walking up to the
21   address, and continuing with the call.
22     Q.   In your recorded statement, you said that
23   Captain Bagley and Mr. Hackett went up ahead of you
24   while you stayed to do some things around the engine.
25     A.   Okay.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 11   Page 296

Aaron Do                                          December 12, 2016

1     Q.   Is that what you remember happening?

2     A.   Like I said, I secured my rig and -- like I

3  said, I don't recall, since it's been so long, whether

4  or not they were in front of me or next to me, but --

5     Q.   So when you get there on scene, you have

6  responsibilities particular to the engine that the

7  firefighter/paramedics don't have?

8     A.   Correct.

9     Q.   How long does it usually take you to get the

10 rig secured once you show up on scene like this?

11    A.   It all depends on the scene.

12    Q.   All right.  So once you do get the rig secured,

13 do you remember if you walked up to the house with the

14 other paramedics, or do you remember if you walked up by

15 yourself?

16    A.   I don't recall.

17    Q.   Do you carry anything from the rig up to the

18 house?

19         MR. RACINE:  In general or at this call?

20         MR. McBRIDE:  This call.

21         THE WITNESS:  I don't recall.

22 BY MR. McBRIDE:

23    Q.   Okay.  Do you, at some point, walk up to the

24 house?

25    A.   Yes.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 11   Page 297

Aaron Do                                                    December 12, 2016

1        Q.   What do you see when you get up there?

2        A.   The first thing I see as I walk up to the house

3   at the end of the driveway where it meets the -- Holden

4   Road, I saw two sheriff deputies that were injured.  And

5   then I turned towards the house, and I could see the

6   garage door was open, and I saw numerous sheriffs with

7   what appeared to be them trying to secure the patient.

8        Q.   All right.  When you show up on scene for a

9   medical call like this, once you've secured the rig,

10  assuming there are other paramedics there, what are your

11  responsibilities on scene?

12        MR. RACINE:  Assumes facts.  Compound.  Go

13  ahead.

14        THE WITNESS:  My responsibility, as I stated

15  earlier, is to assist them with whatever their needs

16  are.

17  BY MR. McBRIDE:

18        Q.   All right.  So it could range from one of the

19  medics asking you to go interview a family member to

20  actually jumping in and providing assessment or

21  treatment to a patient?

22        MR. RACINE:  Incomplete hypothetical.

23        THE WITNESS:  Yeah, that sounds correct.

24  Generally, I don't just go in and start treating the

25  patient, but I will -- I check vital signs is generally

Aaron Do                                      December 12, 2016

1       Q.    And what do you recall seeing?

2       A.    I recall them walking up to the deputies and

3    starting to assess them.  And the only thing I remember

4    next was assisting them down to the ambulance.

5       Q.    Do you know why Mr. Nenow and the other

6    paramedics treated those deputies?  For instance, were

7    they asked to by the other sheriff's deputies there on

8    scene?

9            MR. RACINE:  Calls for speculation.

10           THE WITNESS:  I don't recall a sheriff asking

11   them to assess them.

12   BY MR. McBRIDE:

13      Q.    Were they already assessing and treating those

14   sheriff's deputies when you showed up at the house?

15      A.    I don't recall.

16      Q.    The female deputy, she was able to walk down to

17   the ambulance?

18      A.    Yes.

19      Q.    Did you assist in wheeling the male deputy down

20   on a gurney?

21      A.    I don't recall.

22      Q.    How long were you down at the ambulance with

23   these two deputies before you returned to the house?

24           MR. RACINE:  Lacks foundation.  Assumes facts.

25           THE WITNESS:  I don't recall the exact amount

Exhibit 11    Page 299

Aaron Do                                                December 12, 2016

```
 1   of time.
 2   BY MR. McBRIDE:
 3       Q.   What did you do when you were down at the
 4   ambulance with these deputies?
 5       A.   I believe I assisted the female deputy into the
 6   ambulance.  And I believe after that I went back up to
 7   the scene.
 8       Q.   Do you recall either of these two deputies
 9   saying anything, either while you were walking down to
10   the ambulance or once you got down to the ambulance?
11       A.   I don't recall.
12       Q.   Do you recall these deputies saying anything
13   when you were up at the house in the driveway?
14       A.   I don't recall.
15       Q.   So you returned to the house after assisting
16   the female deputy into the ambulance.  What's going on
17   when you get there?  What do you see?
18       A.   I believe the sheriffs were still trying to
19   secure the patient.
20       Q.   Inside the house?
21       A.   Yeah.  I believe it was the -- like a -- almost
22   like the hallway between the garage into the house.
23       Q.   All right.  What's going on in front of the
24   house that you see or hear?
25       A.   I don't recall anything in front of the house.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 11   Page 300

Aaron Do                                                    December 12, 2016

1      Q.   All right.  Do you know who asked you to go to

2   the engine to retrieve these narcotics?

3      A.   I can't say for sure, but if it was on the

4   engine, it would have been Aaron Hackett.

5      Q.   All right.  Do you recall actually specifically

6   going down to the engine and retrieving the narcotics?

7      A.   I don't -- I mean, I don't remember step by

8   step going down there, but that is one of my

9   responsibilities I will do on scene.

10     Q.   All right.  And did you go down and get the

11  narcotics before or after the deputies brought

12  Mr. Phounsy out to the driveway?

13     A.   I don't --

14          MR. RACINE:  Assumes facts.  Lacks foundation.

15          THE WITNESS:  I don't recall exactly.

16  BY MR. McBRIDE:

17     Q.   You were present and did observe the deputies

18  bring Mr. Phounsy out to the driveway, correct?

19     A.   Yes.

20     Q.   How long after you very first arrived at the

21  house was it before the deputies brought Mr. Phounsy out

22  to the driveway?

23          MR. RACINE:  Vague as to "arrived at the

24  house."  He's been there twice.

25          THE WITNESS:  I can't recall exactly how long

Aaron Do                                          December 12, 2016

```
 1    it was.
 2    BY MR. McBRIDE:
 3        Q.    A second ambulance unit arrived on scene at
 4    some point?
 5        A.    Yes.
 6        Q.    Do you know which unit?
 7        A.    I believe it was Medic 2.
 8        Q.    Do you recall who was on Medic 2 that night?
 9        A.    Yes.
10        Q.    Who?
11        A.    Derek -- last name is Csik, C-S-I-K, and Marc
12    Poynter.
13        Q.    Now, were you --
14        A.    Excuse me.  I said Derek.  It was David.
15        Q.    Were you down at the ambulance, M5, when M5
16    departed for the hospital?
17        A.    I don't believe so.
18        Q.    So describe to me what you saw when the
19    deputies brought Mr. Phounsy out to the driveway?
20        A.    So as I said, they were in that hallway or that
21    breezeway.  And like I said, they were attempting to
22    secure the patient, because he was combative.  I do
23    remember there was a handful of deputies in there.
24    Maybe half a dozen.  And once they got him in
25    restraints, they all picked him up and then brought him
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 11   Page 302

Aaron Do                                                    December 12, 2016

```
 1    out to the driveway.
 2         Q.    So they carried him through the garage?
 3         A.    Yes.
 4         Q.    How were they carrying him?
 5               Let me ask you this.  Was he -- as Mr. Phounsy
 6    was carried, was he in a prone position?
 7         A.    I believe so.
 8         Q.    And were you able to tell how Mr. Phounsy was
 9    restrained at that time?
10         A.    Not exactly.
11         Q.    Were his hands bound behind his back?
12         A.    In the restraints, yes.
13         Q.    Were his legs bound behind his back?
14         A.    I believe so.
15         Q.    Could you tell if his hands were secured to his
16    legs?
17         A.    I can't recall exactly.
18         Q.    How were the deputies carrying him?  Did they
19    have ahold of the restraints behind his back, or were
20    they carrying him holding onto body parts, like limbs?
21         A.    I can't recall exactly.
22         Q.    Did you see the deputies set Mr. Phounsy down?
23         A.    Yes.
24         Q.    How did they set him down?
25         A.    What do you mean?
```

LITIVATE REPORTING + TRIAL SERVICES I 877.771.3312 I www.litivate.com

Exhibit 11   Page 303

Aaron Do                                                December 12, 2016

1      Q.   Did they set him down in a prone position?

2      A.   I believe so.

3      Q.   Did they drop him?

4      A.   They were holding onto him.  I don't know what

5  you mean by "drop him."

6      Q.   Did they set him down forcefully?

7      A.   I -- I don't know what you consider forcefully.

8  I don't know.  I can't say for sure.

9      Q.   Let me ask it this way.  When Mr. Phounsy was

10  set down, did he hit the ground with force?

11          MR. RACINE:  It's vague as to force.

12          THE WITNESS:  They set him down, which would

13  appear to me would be as safely as possible for them.

14  They didn't, like, just let him go, if that's what you

15  mean.  I am not sure what you mean by that, but --

16  BY MR. McBRIDE:

17      Q.   All right.

18      A.   I mean, he was still, like, fighting with them.

19  So, like I said, they set him down as safely as I would

20  think would be possible.

21      Q.   How far away from Mr. Phounsy were you when the

22  deputies set him down?

23      A.   I don't recall exactly.

24      Q.   Ten feet?

25      A.   I was in the front driveway.  I can't tell you

Aaron Do                                                December 12, 2016

1    truthful with these detectives?

2        A.   As truthful as I can remember, yes.

3        Q.   Did you lie to them about anything?

4        A.   No.

5        Q.   So when you talked to those detectives, the

6    account of the incident that you gave them at that time

7    was the truth, to the best of your ability?

8        A.   Yes.

9        Q.   Do you recall seeing Mr. Phounsy calm down

10   after the first Versed injection?

11           MR. RACINE:   Lacks foundation.

12           THE WITNESS:   I would say no.

13   BY MR. McBRIDE:

14       Q.   What about after the second dose?

15           MR. RACINE:   Assumes facts not in evidence.

16   Lacks foundation.

17           THE WITNESS:   I don't recall when the second

18   dose was given, but I would say that depending on when

19   it was, I remember having the patient on the gurney and

20   loading him into the ambulance, Medic 2, and I remember

21   him trying to strike me with his head as we were loading

22   him in.  So I don't recall exactly where in relationship

23   that was to the second dose of Versed.

24   BY MR. McBRIDE:

25       Q.   Well, in your recorded statement, you said that

1  you believed a Lakeside paramedic gave the second dose?

2      A.   I can't recall.

3      Q.   All right.  You also said that after the second

4  dose, Mr. Phounsy started to calm down.  You then put

5  him on the gurney and loaded him up.  Is that --

6      A.   I don't -- if that's what I said, then -- I

7  don't recall exactly.

8      Q.   All right.  Do you recall anything else that

9  happened there in the driveway, after the deputies

10 brought Mr. Phounsy out, but before you loaded him up on

11 the gurney?

12     A.   Just what I said about the head thing, as we

13 were loading him in.

14     Q.   Was there any discussion about taking

15 Mr. Phounsy out of the law enforcement maximum

16 restraints and putting him in your medic soft

17 restraints?

18          MR. RACINE:  Assumes facts not in evidence.

19          THE WITNESS:  I don't recall.

20 BY MR. McBRIDE:

21     Q.   You don't recall participating in any such

22 discussions?

23     A.   Not to my knowledge.  Not that I can remember,

24 no.

25     Q.   Do you recall anybody trying to take

Aaron Do                                    December 12, 2016

1   Mr. Phounsy out of the law enforcement restraints and

2   putting him in the medic soft restraints?

3       A.   Not that I recall.

4       Q.   After you returned to the house from the

5   ambulance, when you had walked the female deputy down

6   and helped her into the ambulance, did you go anywhere

7   else, other than the driveway area, before you left the

8   residence?

9       A.   Not that I recall.

10      Q.   So after returning to the house from Medic 5,

11  you stayed there in the front driveway area until you

12  eventually left the scene for good?

13      A.   Yes.  I believe so.

14      Q.   Did you ever go inside the house?

15      A.   No.

16      Q.   Did you ever go into the backyard?

17      A.   No.

18      Q.   Do you recall walking to either of the

19  neighbors' houses at any point?

20      A.   Walking to the neighbors' houses?

21      Q.   Yes.

22      A.   I walked in front of the neighbors' houses

23  coming from the engine and the ambulance, but I don't

24  remember going to a neighbors' house, no.

25      Q.   Do you recall returning to your rig, other than

Aaron Do                                        December 12, 2016

1   the one time you went to get the narcotics?

2       A.    Not that I can recall.

3       Q.    So as far as you remember today, after you

4   originally arrived on scene and walked up to the house,

5   you went back down the hill to go to Medic 5 --

6       A.    Uh-huh.

7       Q.    -- and then you went back down the hill to the

8   rig to grab the narcotics?

9       A.    Yes.

10      Q.    Other than that, you were up at the house in

11  the driveway area?

12      A.    Yes.

13      Q.    Okay.  How was Mr. Phounsy -- well, eventually

14  Mr. Phounsy was placed on a gurney?

15      A.    Yes.

16      Q.    Do you recall who placed him on a gurney?

17      A.    I believe I assisted with lifting him onto the

18  gurney.  I don't recall exactly who else was present,

19  with -- actually, handling the patient.

20      Q.    How was he placed on the gurney?  Was he in the

21  prone position?

22      A.    I can't say for sure, but I believe he was on

23  his side.

24      Q.    Did you ever see Mr. Phounsy on the gurney in a

25  supine position?

Aaron Do                                                December 12, 2016

```
 1        A.    I don't recall.
 2        Q.    Was Mr. Phounsy restrained to the gurney in any
 3   way?
 4        A.    I don't -- I don't recall.  I don't remember.
 5   I have no idea.
 6        Q.    Do you recall putting seat belts on
 7   Mr. Phounsy?
 8        A.    I don't specifically remember doing that.  That
 9   is something that I generally do assist with on all
10   patients when we put them onto a gurney, but I can't
11   specifically remember doing that for him.
12        Q.    Do you recall any discussion about any concern
13   over Mr. Phounsy going into cardiac arrest?
14        A.    I remember hearing a comment from a Lakeside
15   medic.
16        Q.    Which one?
17        A.    David Csik.
18        Q.    Okay.  At what point did Mr. Csik comment about
19   being concerned over Mr. Phounsy going into cardiac
20   arrest?
21        A.    I believe it was as we were loading him into
22   the ambulance.
23        Q.    Do you recall what Mr. Csik said?
24        A.    I can't quote him verbatim, but it was
25   something along the lines of these are the type of
```

Aaron Do                                        December 12, 2016

1    patients that go into cardiac arrest.

2        Q.   After Mr. -- well, did you share Mr. Csik's

3    concern over Mr. Phounsy?

4             MR. OSTERBERG:  Objection.  Assumes facts not

5    in evidence.  Misstates his testimony.

6    BY MR. McBRIDE:

7        Q.   Let me ask it this way.  Were you also

8    concerned about Mr. Phounsy going into cardiac arrest?

9        A.   Absolutely.  I mean, for every patient that's

10   excited delirium, that's always a concern.  For all the

11   training that we've had, it's one of the things that you

12   have to look out for in that situation, especially if

13   somebody is under the influence of a stimulant.

14       Q.   All right.  And so you believed Mr. Phounsy was

15   exhibiting signs and symptoms of excited delirium?

16       A.   Yes.

17       Q.   And what is the criteria that you are looking

18   for, as a medic, before diagnosing somebody with excited

19   delirium?

20       A.   What symptoms are you looking for?

21       Q.   Sure.

22       A.   So if you have a suspicion that they are under

23   some sort of stimulant, altered level of consciousness,

24   abnormal behavior, aggressiveness, sweating, elevated

25   heart rate.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 11   Page 310

Aaron Do                                          December 12, 2016

```
 1        Q.    Was Mr. Phounsy sweating?

 2        A.    I don't recall.

 3        Q.    Did he have an elevated heart rate?

 4        A.    I don't recall.

 5        Q.    Was he exhibiting symptoms of hypothermia?

 6        A.    I don't recall.

 7        Q.    What about excessive heat?

 8        A.    I don't recall.

 9        Q.    But you believed that he was in a state of

10   excited delirium?

11        A.    Yes.

12        Q.    Other -- your basis for that belief, is there

13   anything that supported your basis for that belief other

14   than what you just testified to?

15        A.    There -- I did remember hearing on scene that

16   he had taken -- he had been at Coachella and taken a

17   large amount of drugs.  I don't recall who exactly said

18   that, but when you hear that and you hear the actions

19   that he had exhibited, yes, I would believe it was

20   excited delirium.

21        Q.    What do you recall, if anything, about how

22   Mr. Phounsy was secured to the gurney?

23              MR. RACINE:  Asked and answered.

24              THE WITNESS:  I can't say for sure.  Like I

25   said, I believe he was on his side.  And I do remember,
```

Aaron Do                                                December 12, 2016

1   as we were loading him in, he did headbutt me, or lunge
2   at me, I guess you could say.  So he couldn't have been
3   prone.
4   BY MR. McBRIDE:
5       Q.    Describe how Mr. Phounsy lunged at you?
6       A.    So he was on the gurney.  Generally, when we
7   load the gurney into the ambulance, one person stands to
8   the side of the gurney so that it doesn't roll back out
9   from the ambulance.  And, generally, that's what I do.
10  I'll stand on the side and help guide it in.  And as I
11  was standing on the side, he basically kind of lunged
12  forward like that.
13      Q.    So you saw his torso actually lunge towards
14  you?
15      A.    I believe it was his torso and his head.
16          MR. McBRIDE:  We'll mark this as Exhibit 3.
17  It's --
18          MR. RACINE:  Do you need a break or anything?
19          THE WITNESS:  I am fine.
20  BY MR. McBRIDE:
21      Q.    I didn't tell you this, because I assumed we
22  would be so fast with you, but if you do need a break at
23  any point, just let us know.
24          So -- oh, this is Exhibit 3.  We'll mark this
25  as Exhibit 3.  It's two photographs.  We'll do 3A and

Aaron Do                                                December 12, 2016

1            DECLARATION UNDER PENALTY OF PERJURY

2                 *        *        *        *        *

3           I declare under the penalty of perjury

4      under the laws of the State of California,

5      United States of America, that the foregoing

6      testimony is true and correct; that I have read

7      my deposition and have made the necessary

8      corrections, additions or changes to my answers

9      that I deem necessary.

10

11           Dated: 1/4/17

12

13

14           _____

15                 AARON DO

16

17

18

19

20

21

22

23

24

25

Aaron Do                                              December 12, 2016

```
 1                    REPORTER'S CERTIFICATION

 2            I, Lorraine E. Mesker, a Certified Shorthand

 3    Reporter in the State of California, do hereby certify:

 4            That the witness in the foregoing deposition

 5    was by me duly sworn; that the deposition was then taken

 6    before me at the time and place herein set forth; that

 7    the testimony and proceedings were reported by me

 8    stenographically and were transcribed through

 9    computerized transcription under my direction; and the

10    foregoing is a true and correct record of the testimony

11    and proceedings taken at that time.

12            I further certify that I am not of counsel or

13    attorney for either or any of the parties in the

14    foregoing proceeding and caption named or in any way

15    interested in the outcome of the cause in said caption.

16            The dismantling, unsealing, or unbinding of the

17    original transcript will render the reporter's

18    certificates null and void.

19            IN WITNESS WHEREOF, I have subscribed my name

20    this 22nd day of December, 2016.

21            __X__  Reading and Signing was requested.
22            _____  Reading and Signing was waived.
              _____  Reading and Signing was not requested
23

24            _____
                    Lorraine E. Mesker
25            LORRAINE E. MESKER, CSR NO. 6499, RPR
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 11   Page 314