# Exhibit 17

Exhibit 17   Page 421



Transcript of the Testimony of:

# Marc Poynter

K.J.P.

v.

County of San Diego

February 16, 2017

Volume I

LITIVATE REPORTING + TRIAL SERVICES
P: 877.771.3312 | F: 877.561.5538
www.litivate.com

Exhibit 17   Page 422

Marc Poynter                                         February 16, 2017

 1    when the medications that the family knew of that

 2    were taken, I was informed of that.  And I don't

 3    recall anything else being -- anything else specific

 4    that he gave me that I didn't already know, or

 5    something that was contradicting.

 6         Q.   Okay.  When you say "he," are you talking

 7    about Mr. Csik or Captain Bagley?

 8         A.   Correct.  David Csik.

 9         Q.   Okay.  And do you recall specifically what

10    Captain Bagley told you?

11         A.   No, I do not recall specifically.

12         Q.   All right.  Okay.  So when you first saw

13    Lucky there, were there any deputies around him, or

14    was it just Mr. Hackett at Lucky's side?

15         A.   Oh, when I first arrived at scene?

16         Q.   Yes.

17         A.   There were deputies present.

18         Q.   How many?

19         A.   I could not give you an accurate count.

20    There was more than three.

21         Q.   And they were right there with Lucky?

22         A.   I recall three right at the side of Lucky,

23    yes.

24         Q.   Did they have their hand on Lucky?

25         A.   Yes.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 423

Marc Poynter                                           February 16, 2017

1        Q.    How so?

2        A.    So there were three deputies that were

3    holding Lucky in place.  One of them was towards the

4    lower extremities or the legs and the hip area.

5    Another deputy was hip and shoulder area.  And

6    another deputy was shoulder, head.

7        Q.    And how was Lucky laying on the ground?

8        A.    I recall Lucky being on the left side when

9    I arrived.

10       Q.    Did you at any point ever see Lucky in a

11   prone position?

12       A.    I did not.

13       Q.    At no point?

14       A.    No point.

15       Q.    Was Lucky restrained when you arrived?

16       A.    Yes, he was.

17       Q.    How was he restrained?

18       A.    He was restrained with handcuffs, as well

19   as restraints to his lower extremities.  And those

20   were connected with a rope strap that law enforcement

21   uses.

22       Q.    All right.  Were his handcuffs -- so he

23   was handcuffed behind his back?

24       A.    Yes, he was.

25       Q.    And were the handcuffs then attached to

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 424

Marc Poynter                                    February 16, 2017

```
 1    demonstrated with his fingers.
 2           MR. GAZZO:  Asked and answered.
 3           MR. OSTERBERG:  Asked and answered numerous
 4    times.
 5           Go ahead one more time and this is it.
 6           THE WITNESS:  (The witness indicates.)
 7    BY MR. McBRIDE:
 8           Q.   That's as far as you ever saw his legs
 9    bend?
10           A.   To my knowledge, yes.
11           Q.   Okay.  When you showed up there and first
12    contacted Mr. Phounsy, you said that a deputy was at
13    his legs.  There was a deputy at his waist.  And
14    there was a deputy at his shoulders and head area.
15    Did you see a deputy holding his head down at that
16    point, actually holding his head to the ground in the
17    driveway?
18           A.   There was a deputy holding Lucky's head in
19    place on the ground, yes.
20           Q.   And where did the deputy have his hands on
21    Lucky's head?
22           A.   The side of his face that was not on the
23    ground.  So it would be on his right side, right ear,
24    forehead side of his head.
25           Q.   Okay.  So he was pressing his -- the left
```

Marc Poynter                                    February 16, 2017

1    side of Lucky's head into the ground?

2         A.    He was holding it in place.

3         Q.    Okay.  Did Lucky have any visible signs of

4    trauma when you first contacted him?

5         A.    At the time, since it was dark, it was

6    difficult to see.  So at the scene, I was unable to

7    see any signs of trauma due to the darkness.  In the

8    ambulance is when we noticed that he had signs of

9    trauma.

10        Q.    All right.  At any point did you ask

11   either Mr. Hackett or any of the other deputies how

12   many times Lucky had been Tased?

13        A.    I recall -- I recall multiple, I don't

14   recall an exact amount, attempts.

15        Q.    Is that information important to you as

16   the paramedic treating him?

17        A.    The important would be that if it was

18   successful, and they had to cut them off and they

19   were still in place, that was not the impression I

20   got, that they were attempted in the sense of they

21   didn't strike Lucky, or they weren't -- they did not

22   attach.  Or the attached to his clothes only.  But I

23   do not recall removing any Taser bars or seeing them

24   either, so --

25        Q.    Okay.  So as far as you're assessing

Marc Poynter                                    February 16, 2017

```
 1    whether or not Lucky was stable -- assessing Lucky's
 2    condition, the fact that he had been Tasered, and how
 3    many times, and the type of Taser that was deployed
 4    is not information that you as the paramedic needed
 5    to know?
 6            MR. OSTERBERG:  Objection.  It misstates his
 7    testimony.
 8            THE WITNESS:  It is information that we need to
 9    know, if it worked, and if they are still in place to
10    see if we need to remove them or not remove them.  So
11    it is information that we -- we need to know.
12    BY MR. McBRIDE:
13        Q.   All right.  Did you in any way assess or
14    treat either Deputy Collins or Deputy Krull?
15        A.   No.
16            MR. McBRIDE:  All right.  Do you guys want to
17    do a three-minute break at this point?
18            MR. OSTERBERG:  Sure.
19            MR. GAZZO:  Good idea.
20            THE VIDEOGRAPHER:  We are off record at 11:09.
21            (A recess was taken.)
22            THE VIDEOGRAPHER:  And we are back on record at
23    11:20.
24    BY MR. McBRIDE:
25        Q.   All right.  Mr. Poynter, when we left off,
```

Marc Poynter                                           February 16, 2017

1   we were talking about the time at which you arrived

2   at Lucky's side.  So you did not see the deputies

3   carry Lucky out of the house?

4          A.    Correct, I did not.

5          Q.    When you first contacted Lucky, describe

6   what he was doing.  Was he saying anything?  Was he

7   doing anything?

8          A.    No.  He was nonverbal.  And I remember

9   him -- I remember the deputies moving quite a bit,

10  struggling to keep him in place.  So he was still

11  agitated or combative.  And there were people

12  talking.  And I remember getting the turnover from

13  there.  But that's what I remember the patient, what

14  he was doing was moving around excessively.

15         Q.    Did you recall at any point hearing Lucky

16  say anything?

17         A.    I do not remember any words, no.

18         Q.    Was anybody saying anything to Lucky when

19  you first arrived?

20         A.    Yeah.  There were a number of people

21  attempting to calm him quite calmly, actually, due to

22  the circumstances.  Everyone was trying to just hold

23  him in place and have him stop moving.

24         Q.    So you said that he was combative.

25  Describe what you mean.  Given the restraints that he

Marc Poynter                                                      February 16, 2017

1   was in, how was he being combative?

2          A.   Well, that's what -- that's what we saw

3   when we got there.  I mean, he was in restraints, but

4   he was still aggressive towards the deputies, and was

5   still moving around excessively with the restraints

6   in place.

7          Q.   What do you mean by -- so you've now said

8   he was combative and aggressive.  But the way you

9   described him being restrained, he couldn't move his

10  hands, right?

11         MR. OSTERBERG:  Objection.  Argumentative.

12  BY MR. McBRIDE:

13         Q.   Describe what you mean by him being

14  combative.  How was he being combative?

15         A.   He was still resisting being held in

16  place.

17         Q.   Okay.  And how was he resisting?  How was

18  he moving his body?

19         A.   Because he was -- because he was.  I mean,

20  he was -- he was moving excessively on the ground

21  with the restraints still in place, and the deputies

22  attempting to hold him in place.

23         Q.   What parts of his body was he moving?

24         A.   His entire body was moving.

25         Q.   Was he rocking side to side; or was he --

Marc Poynter                                            February 16, 2017

1    how was he moving?

2          A.    All over the place.   They were -- they

3    were actively trying to hold him down the entire time

4    I was getting the turnover from Aaron.

5          Q.    But can you specifically describe which

6    limbs he was moving and how?

7          A.    All of his extremities were moving.   His

8    arms, his shoulder, his body, his legs, like he

9    was -- he was moving around a lot is what I recall.

10         Q.    So if his had hands are cuffed behind his

11   back, and his legs are cuffed together, and those two

12   are attached, how was he moving his hands and legs?

13         MR. OSTERBERG:   Objection.   Argumentative.

14   Asked and answered.

15         MR. GAZZO:   Argumentative.   Join.

16         MR. OSTERBERG:   Go ahead, sir.

17   BY MR. McBRIDE:

18         Q.    Can you demonstrate?   If you stood up, are

19   you able to demonstrate how Lucky was moving his

20   arms?

21         A.    I think I could --

22         MR. OSTERBERG:   No.   No.   No.   We're not here

23   to do any physical demonstrations.   He's here for

24   oral testimony.   So go ahead and ask a question.

25         THE WITNESS:   I can describe to you how he was

Marc Poynter                                          February 16, 2017

1    moving.

2    BY MR. McBRIDE:

3         Q.   Okay.

4         A.   He was moving around excessively on the

5    ground with the restraints in place.

6         Q.   Okay.  And what I'm getting out is how was

7    he moving?  Because if he is restrained the way

8    you've testified he was restrained, I'm having a hard

9    time picturing that in my mind.  So if you could

10   stand up and show --

11        MR. OSTERBERG:  We're not here for physical

12   demonstrations.  We're here for oral testimony.  But

13   he's already explained it to you, Counsel.

14        But go ahead one more time.

15   BY MR. McBRIDE:

16        Q.   Well, no.  You've said that he was moving.

17   And how was he moving?

18        A.   His entire body what moving with the

19   restraints in place.  I do not know how he was

20   moving.  I don't know why he was moving.  But he was

21   moving around on the ground excessively with the

22   restraints in place.

23        Q.   How were his arms specifically moving?

24        A.   From side to side, back and forth.

25        Q.   And how far side to side?

Marc Poynter                                    February 16, 2017

1        A.   I couldn't tell you.  It was pretty dark.

2        Q.   Okay.  How were his legs moving?

3        A.   Again, the same.

4        Q.   Side to side?

5        A.   Up and down, side to side.  The deputies

6    were having a difficult time holing him in place.

7        Q.   Was he straightening his legs, and then

8    bending them back again?

9        A.   I couldn't tell you exactly how it was.  I

10   was -- I was focused on the turnover, as well as was

11   watching what was going on, so there was --

12       Q.   At any point there in the driveway --

13   well, let me ask it this way:  Were the deputies

14   restraining Lucky in the driveway -- that is the

15   three deputies:  One holding his feet, the other at

16   his hips, the other at his shoulders and head -- were

17   they restraining him that way the entire time in the

18   driveway until you placed Lucky on the gurney?

19       A.   Yes.

20       Q.   So can you be any more specific about the

21   way in which Lucky was being combative or aggressive;

22   or is what you testified as specific as you can be?

23       A.   That's as specific as I could be.

24       Q.   Towards whom was Lucky being aggressive

25   and combative?  Or do you mean when you use those

Marc Poynter                                        February 16, 2017

1   words it was just him struggling?

2           MR. OSTERBERG:   Objection.   It calls for

3   speculation on the part of the witness.

4   Argumentative.

5           But go ahead.

6           MR. CHAPIN:   Compound.   Vague.

7           THE WITNESS:   He was moving around excessively

8   on the ground, thrashing, and trying to get the

9   deputies off of him that were trying to hold him in

10  place.

11  BY MR. McBRIDE:

12          Q.   All right.   Did you see any of the

13  deputies hit Lucky with a fist at any point?

14          A.   No.   No.

15          Q.   Did you see any of the deputies kick Lucky

16  at any point?

17          A.   No.

18          Q.   Did you ever see or hear Lucky's head hit

19  the ground?

20          A.   No.

21          Q.   Was Lucky conscious when you first

22  arrived?

23          A.   Yes.

24          Q.   So after the transfer -- it's my

25  understanding the first thing you did when you

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 433

Marc Poynter                                          February 16, 2017

```
 1    arrived is you received the transfer from
 2    Mr. Hackett, correct?
 3         MR. GAZZO:  It misstates testimony.
 4         MR. OSTERBERG:  It does, and it's already been
 5    asked and answered several times.
 6         But go ahead.
 7         THE WITNESS:  I did receive a turnover from
 8    Aaron.  Is that what you're referring to?
 9    BY MR. McBRIDE:
10         Q.   Yes.  Okay.  What did you do after that?
11         MR. GAZZO:  Asked and answered.
12         THE WITNESS:  So --
13         Am I okay to --
14         MR. OSTERBERG:  Yeah.  Go ahead.
15         THE WITNESS:  So I -- after getting the
16    turnover from Aaron, what happened was we had a
17    discussion regarding how to place Lucky on the
18    gurney, which brought up the point of attempting to
19    switch the restraints out.
20         And then we decided with his current behavior,
21    with still being agitated and combative, we elected
22    to use another 5 milligrams of Versed.  And as Aaron
23    was drawing the medication up, I remember discussing
24    with the deputies how to switch the restraints out.
25         They were -- they said that it was likely not
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 434

Marc Poynter                                                    February 16, 2017

1    going to be possible.  They -- we attempted, and that

2    wasn't -- it did not work.  That's what occurred just

3    briefly after the turnover.

4    BY MR. McBRIDE:

5        Q.   Okay.  We'll get to the Versed, and we'll

6    get to the restraints.

7            But my question for you specifically is, after

8    the turnover, did you do anything to assess or treat

9    Lucky?  Did you do a BRIM assessment, for instance?

10   Anything like that?

11       A.   Yeah, I --

12           MR. OSTERBERG:  I'll object as it misstates his

13   prior testimony when you say, "Did you do anything?"

14   He answered that.

15           But go ahead on a more specific question.

16           THE WITNESS:  Yeah, I'll be specific with what

17   I was actually looking at after the turnover was I

18   was watching Lucky's behavior on the ground, and

19   interpreting that another medication --

20   BY MR. McBRIDE:

21       Q.   All right.

22       A.   -- another dose of Versed would be

23   indicated; as well as looking at his breathing,

24   his -- and Aaron reported that he had a radial pulse

25   still present.  So with those three things, his ABCs

Marc Poynter                                      February 16, 2017

```
 1    were intact; his air was open; he was breathing; and
 2    he still had circulation to his radial site.  But we
 3    were unable to get a blood pressure due to the amount
 4    of movement that was occur.  And so that would be the
 5    specifics that we assessed -- or I assessed at the
 6    scene after the turnover.
 7         Q.    So right away when you showed up, had you
 8    formed the impression that Lucky needed to be taken
 9    to the hospital, or when was that decided?
10         A.    Yeah, as we -- as I arrived on scene, he
11    definitely met the criteria of a transport patient, a
12    patient that needed to be transported.
13         Q.    What is that criteria?
14         A.    Well, there's a number of criteria that
15    patients need to meet, and they change from call to
16    call.  But on this scenario, he needed a medical
17    evaluation for the circumstances that he was -- or
18    the state that he was in.  I'm sorry.
19         Q.    What criteria was present in this case
20    that led you to believe that Lucky needed to be
21    transported to a hospital?
22         A.    He had an altered mental status.
23         Q.    Okay.  What else?
24         A.    He was under influence of drugs and
25    alcohol -- or I'm sorry, drugs for sure.  The alcohol
```

Marc Poynter                                        February 16, 2017

1          A.    I -- I think it's fair it say that on this

2     incident with my prior experience of law enforcement

3     encounters with patients transported, that any

4     patient that's in restraints and is this combative is

5     not -- is going to be transported by a paramedic

6     ambulance to the hospital.

7          Q.    All right.  So is it fair to say once you

8     got there on scene and received the patient transfer,

9     your -- your focus was getting Mr. Phounsy on the

10    gurney, into the ambulance, and to the nearest

11    hospital?

12         A.    Absolutely.

13         Q.    Okay.  So you -- you and Mr. Hackett after

14    the transfer, you -- or the turnover, you discussed

15    needing an additional dose of Versed?

16         A.    That's correct.

17         Q.    Talk to me about that discussion.

18         A.    Okay.

19         MR. OSTERBERG:  Well, hold on.

20         MR. McBRIDE:  Well, if you wait.

21    BY MR. McBRIDE:

22         Q.    Did you raise the issue of the Versed; or

23    did Mr. Hackett raise the issue of the second dose of

24    Versed?

25         A.    The first was Aaron.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 437

Marc Poynter                                          February 16, 2017

1          Q.    Okay.   What did he say?

2          A.    The specifics of what he said I cannot

3     recall.   But he did say, "I think he -- I think he

4     meets the criteria for a second dose of Versed."

5          Q.    All right.   And then what was your

6     response?

7          A.    I said, "I agree."

8          Q.    Okay.   And what does the -- well, under

9     which protocol were you treating Mr. Phounsy?

10         A.    This scenario would be under the excited

11    delirium protocol, which is -- I believe it's under

12    the poisoning overdose.   I don't recall the numbers.

13         Q.    Okay.   And so what does it say about

14    administering Versed?

15         MR. OSTERBERG:   Objection.   Overly broad.

16    Vague and ambiguous with regard to "what does it

17    say?"

18         Do you want him to -- I don't know if he can

19    quote it verbatim.   But are you looking for a general

20    answer?

21         MR. McBRIDE:   Sure.

22    BY MR. McBRIDE:

23         Q.    What's your working -- what was your

24    working understanding at the time of this incident as

25    of when you as paramedics could administer Versed in

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 438

Marc Poynter                                    February 16, 2017

1   the field pursuant to that standing protocol?

2        A.   With his -- with his state of excited

3   delirium, Versed of 5 milligrams can be given a few

4   different routes, which this one was given IM.  And

5   it may be repeated one time in ten minutes.

6        Q.   All right.  How long does it take for

7   Versed to kick in when it's given IM?

8        MR. OSTERBERG:  Objection.  Vague and

9   ambiguous.  Incomplete hypothetical.  It calls for

10  speculation on a case-by-case basis.

11       But go ahead.

12       THE WITNESS:  It would --

13       MR. GAZZO:  And it may call for expert medical

14  opinion as well.

15       MR. OSTERBERG:  Join.

16       Go ahead.

17       THE WITNESS:  In my experience, its -- its

18  onset has been -- it's varied from patient to

19  patient.

20  BY MR. McBRIDE:

21       Q.   Okay.  What's the shortest you've seen it

22  kick in in your experience?

23       A.   I've seen it work very fast; and I've seen

24  it work very slow.  But in reference to this call,

25  which was an IM injection, I've seen it not work at

Marc Poynter                                        February 16, 2017

1          (The last question was read by the reporter.)
2          MR. OSTERBERG:   Objection.   Vague and
3      ambiguous.   Overbroad.   Incomplete hypothetical.   It
4      may call for expert medical testimony.
5          MR. GAZZO:   Join.
6          MR. CHAPIN:   Join.
7          MR. OSTERBERG:   It assumes facts not in
8      evidence.
9      BY MR. McBRIDE:
10         Q.   Do you know the difference?   Can you tell
11     the difference between somebody who is, say, under
12     the influence of a stimulant and somebody who is
13     having a psychotic episode?
14         A.   In my experience, they can mimic each
15     other.
16         Q.   Okay.   Did you consider that in this case
17     that night?
18         A.   It was a possibility.   But the first thing
19     that was reported that he was under the influence of
20     drugs.
21         Q.   Okay.   So it was decided that you would
22     give Mr. Phounsy as additional 5 milligrams of
23     Versed?
24         A.   Yes.   That's correct.
25         Q.   Who made that decision?

Exhibit 17   Page 440

Marc Poynter                                              February 16, 2017

1          A.   It was both myself and Aaron.

2          Q.   Was a second dose administered?

3          A.   It was.

4          Q.   How?  What was the -- how was it

5     administered?

6          A.   What was the route?

7          Q.   Yes.

8          A.   Intramuscular.

9          Q.   Where?

10         A.   I do not recall specifically where.  I do

11    believe it was in the lower extremity.

12         Q.   All right.  An intramuscular.  So there's

13    three ways you can administer Versed, correct?

14         A.   Yes.

15         Q.   And intramuscular is the one that takes

16    the longest to kick in, would you agree?

17         MR. OSTERBERG:  Objection.  It calls for

18    speculation.  Incomplete hypothetical.

19         THE WITNESS:  It can.

20    BY MR. McBRIDE:

21         Q.   So were you present when Mr. Hackett

22    administered the second dose of Versed?

23         A.   Yes, I was.

24         Q.   Did you watch him do it?

25         A.   I remember Aaron drawing up the

Marc Poynter                                        February 16, 2017

1   potential that Versed can cause apnea.  And that

2   would be what I would be assessing the entire way to

3   the hospital.

4        Q.   Does it say anything about providing the

5   patient with oxygen?

6        A.   I believe it does say in there that oxygen

7   would -- is in the protocol.

8        Q.   Does it -- does it suggest oxygen, or does

9   it say you need to give the oxygen?

10       A.   Those protocols are guidelines to follow.

11       Q.   Okay.  It actually says, "high-flow

12  oxygen, right?

13       A.   Yes.

14       Q.   And what does that mean, "high-flow

15  oxygen, O2, SO"?

16       A.   High-flow oxygen would be interpreted as a

17  nonrebreather mask at a higher rate than what would

18  be given through a nasal cannula between the range of

19  10 to 15 liters per minute.

20       Q.   All right.

21       A.   The standing order is not having to

22  contact the hospital for it.

23       Q.   And did you do that for Mr. Phounsy

24  after -- or in connection with treating him?

25       A.   That was not performed.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 442

Marc Poynter                                    February 16, 2017

1        Q.   Why not?

2        A.   It did not appear to be indicated at the

3   time.

4        Q.   You didn't think that he needed the

5   high-flow oxygen?

6        A.   We were assessing his skin signs and

7   breathing status.  And he was showing signs of

8   adequate profusion at the scene with the skin signs

9   and capillary refill.  So that was the reason why it

10  was not administered.

11       Q.   What about, "Monitor EKG, capnography"?

12       A.   Those are two different things.  But the

13  EKG is the electrocardiogram, the heart monitor.  The

14  capnography is a CO2 detection device and waveform

15  ability.  But the EKG monitor was not used due to the

16  patient's behavior for the amount of movement.  The

17  leads would not have stayed on the patient.  And it

18  would have been a false reading.

19       Q.   Okay.  So let's talk about the EKG

20  monitoring, then.  You did have like a life monitor,

21  or just an EKG monitor there with you in the

22  ambulance?

23       A.   Yes, we do have an EKG monitor in the

24  ambulance.

25       Q.   How many leads?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 443

Marc Poynter                                            February 16, 2017

1          A.    We have two different monitors.  We have a

2    four-lead monitor, and then we have a 12-lead

3    monitor, which is for a different scenario.

4          Q.    And why was it that you couldn't use the

5    four-lead monitor on Mr. Phounsy?

6          A.    The -- I'm sorry.  The four-lead monitor

7    was not used due to the -- the movement of the

8    patient.  And my in my experience, they do not stay

9    on the patient.  As well as the movement will give

10   you a false reading, or too much artifact (phonetic)

11   to see the underlying rhythm.

12         Q.    Did you try it on Mr. Phounsy?

13         A.    It was not tried.

14         Q.    Why not?  Why not at least try it?

15         A.    In my experience, it has not been

16   successful.  So that was the determination of not --

17   to not put the monitor on at the time.

18         Q.    Did you discuss it with Mr. Hackett?

19         A.    Yeah.  We discussed the vital signs of

20   what to do in the back of the ambulance.  Oftentimes

21   we talk out loud.  So it's in my realm of things to

22   do to delegate to people in the back of the ambulance

23   of tasks.  And I do remember attempting a blood

24   pressure, which was one.  And I remember getting a

25   blood sugar, which I was able to perform.  And the

Marc Poynter                                    February 16, 2017

1    that when you're treating somebody under the

2    excited-delirium protocol, it suggests ventilating?

3         MR. GAZZO:  Well, he doesn't have it in front

4    of him.

5    BY MR. McBRIDE:

6         Q.   Do you know what I'm talking about?

7         A.   It's okay.  I know exactly what you're --

8    what you're referring to.  That's why I mentioned it

9    was a guideline.  Because in this scenario, Lucky was

10   ventilating himself with his current breathing

11   status.  So we did not need to ventilate.  That's

12   what I mean by those are our guidelines to follow.

13        Q.   Okay.  So are you talking he was

14   ventilating there on scene; or are you talking now in

15   the ambulance?

16        A.   He had his own respiratory drive from on

17   scene to the ambulance until we were exiting or about

18   to exit the freeway.

19        Q.   All right.  So just so we're clear, you

20   were treating Lucky pursuant to the excited-delirium

21   protocol, that's S-134, right?

22        A.   He also falls into the psychiatric or

23   combative protocol as well.

24        Q.   Okay.  And what did they suggest you do in

25   that standing protocol?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 445

Marc Poynter                                           February 16, 2017

1           MR. OSTERBERG:  Objection.  Argumentative.  It

2      misstates his testimony.

3           THE WITNESS:  No.  The restraints that were in

4      place were law-enforcement applied.  So we were safe

5      to operate with them in place with the understanding

6      that -- or not understanding, that the patient does

7      have the ability to take full, tidal volume breaths.

8           And the decision to change the restraints out

9      were based on -- that's what we typically use are the

10     Velcro-like restraints and -- but it's a case-by-case

11     scenario.  In this case we tried, and it just

12     wasn't -- we weren't able to do it, so --

13           Q.   All right.  Let me just back up a little.

14     So you as paramedics, you have your own restraints?

15           A.   We do.

16           Q.   And they are soft restraints, right?

17           A.   They are softer than handcuffs.

18           Q.   All right.  And it's basically a

19     four-point restraint?

20           A.   Four?  By four point, you mean to restrain

21     each extremity?

22           Q.   Yes.

23           A.   Yes.  We do have -- we have four of them

24     that we would use to restrain all four extremities.

25           Q.   Okay.  And do you use Velcro?

Exhibit 17   Page 446

Marc Poynter                                        February 16, 2017

1    remember ever receiving a formal training or a formal
2    training that addressed the issue of how to transfer
3    patients from law enforcement maximum restraints to
4    your soft paramedic restraints?
5         MR. OSTERBERG:  Objection.  Asked and answered.
6    Vague and ambiguous.
7         But go ahead.
8         THE WITNESS:  I cannot recall.
9    BY MR. McBRIDE:
10        Q.   Okay.  So you discussed transferring
11   Mr. Phounsy from the law enforcement restraints to
12   your soft medical restrains with both the deputies
13   and Mr. Hackett?
14        A.   Yes.
15        Q.   And what did you say?
16        A.   "We need to try to put him in our
17   restraints before moving him."
18        Q.   And why did you believe Mr. Phounsy needed
19   to be put into your soft restraints before being
20   transported?
21        A.   It's easier to take vital signs when
22   someone is not handcuffed.  And that's pretty much
23   the basis -- the basis behind wanting to switch them
24   out.  It's because it's easier to assess if the
25   incident necessitate it.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 447

Marc Poynter                                    February 16, 2017

1          Q.    Were you worried at all at that point

2     about Mr. Phounsy's ability to breathe in those

3     restraints?

4          A.    No.

5          Q.    Why not?

6          A.    Because he had adequate tidal volume.   I

7     could hear him breathing, see him breathing rapidly.

8     And his skin signs showed adequate profusion.

9          Q.    And how were you monitoring the volume of

10    his breaths?

11         A.    Visually.

12         Q.    And how were you monitoring his airway,

13    the sound of his breathing?

14         MR. OSTERBERG:   Objection.   Vague and

15    ambiguous.

16         THE WITNESS:   How were we monitoring the sound

17    of his breathing?

18    BY MR. McBRIDE:

19         Q.    Yes.

20         A.    By listening.

21         Q.    Just standing and listening to his

22    breathing; or did you use a -- the name slips me --

23    the orthoscope?

24         A.    Stethoscope.

25         Q.    Stethoscope.   Thank you.

Marc Poynter                                          February 16, 2017

```
 1   patient then --

 2          MR. OSTERBERG:   Objection --

 3   BY MR. McBRIDE:

 4          Q.   -- with regard to the restraints?

 5          MR. OSTERBERG:   Objection.   Incomplete

 6   hypothetical.   Vague and ambiguous as phrased.

 7          MR. GAZZO:   It lacks foundation; and it calls

 8   for speculation.

 9          MR. OSTERBERG:   Join.

10          THE WITNESS:   The protocol states that that

11   specific policy is not to negate the use of law

12   enforcement restraints.

13   BY MR. McBRIDE:

14          Q.   But does it recommend using your soft

15   restraints when practicable?

16          A.   I would like to use my restraints that we

17   have on the ambulance when possible.

18          MR. McBRIDE:   All right.   We can just mark as

19   Exhibit 7, we'll do protocol 422.

20          (Exhibit Number 7 was marked for

21          identification.)

22   BY MR. McBRIDE:

23          Q.   All right.   What did the law enforcement

24   deputy say about your concern when you raised it?

25          A.   Specifically, I don't recall what or who
```

Exhibit 17   Page 449

Marc Poynter                                        February 16, 2017

1   said what.  I remember them saying, "It's going to be
2   difficult."
3          They did not think it was going to be possible,
4   but proceeded to -- I remember this conversation went
5   on for about 15 to 20 seconds.  It was a back and
6   forth how to change the restraints out.
7          And I remember -- I don't remember what
8   extremity, or how they were taking them off.  That's
9   on the law enforcement side.  But some attempt to
10  remove what they had, the patient became aggressive
11  with them doing that and agitated again.  That's when
12  the decision was this was not going to be safe for
13  the patient or us.  So we left them in place.
14         Q.   So law enforcement actually took a
15  handcuff off?
16         A.   I do not remember what restraint was
17  removed, or the attempt of what restraint was
18  removed.
19         Q.   So it was -- I'm sorry.  Go ahead.
20         A.   That was it.
21         Q.   So as you sit here today, you don't
22  remember if law enforcement actually removed a
23  restraint?
24         A.   I don't remember a restraint coming off.
25  I do remember the attempt to remove a -- one of the

Marc Poynter                                    February 16, 2017

```
 1   restraints.
 2        Q.   Okay.  And what did they do to attempt to
 3   remove a restraint?
 4        A.   I cannot tell you.
 5        Q.   Did you -- were you paying attention to
 6   something else; or you saw it and you just don't
 7   remember?
 8        A.   I believe my focus was elsewhere, not with
 9   how or what restraints they were attempting to
10   remove.
11        Q.   Okay.  So you don't actually know if they
12   tried to remove a restraint?  You didn't see it or
13   hear it yourself?
14        A.   I remember seeing them moving around the
15   restraint area with the strap and the handcuffs.  And
16   they did not feel comfortable.  And at that time,
17   with their experience and my experience, I used what
18   they said, with the best case scenario is to just put
19   the patient on the gurney in the restraints they were
20   in.
21        Q.   How long were they moving around at the
22   restraint area doing what you perceived to be them
23   attempting to remove the restraints?  How long did
24   they do that for?
25        A.   Roughly 30 seconds or so.
```

Exhibit 17   Page 451

Marc Poynter                                     February 16, 2017

1          Q.    And what did they say after they finished

2     doing that?

3          A.    "This isn't -- it's not going to happen."

4          Q.    Okay.  Were you still concerned about

5     getting Mr. Phounsy into those soft restraints?

6          A.    At that point, no.

7          Q.    If you had been, could you have overridden

8     the sheriff's deputies and said, "Hey, we still need

9     to move him"?

10         A.    Yes, I could have.

11         Q.    But you chose not to?

12         A.    Yes.

13         Q.    So do you think it would have been

14    possible to have transported or to have transferred

15    Mr. Phounsy from those law enforcement restrains to

16    the soft restraints?

17         MR. CHAPIN:  It calls for speculation.

18         MR. GAZZO:  Argumentative.  It calls for

19    speculation.

20         MR. OSTERBERG:  Join.

21         Go ahead.

22         THE WITNESS:  No.

23    BY MR. McBRIDE:

24         Q.    And you are basing that on what the

25    sheriff's deputies told you after they were moving

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 452

Marc Poynter                                           February 16, 2017

1    around the restrained area?

2         THE WITNESS:  And my experience.

3    BY MR. McBRIDE:

4         Q.   Okay.  What was it specifically about

5    Mr. Phounsy that led you to believe it would not have

6    been possible to transfer him?

7         MR. GAZZO:  Asked and answered.

8         MR. OSTERBERG:  Join.

9         One more time.  Go ahead.

10        THE WITNESS:  His agitation level, and his

11   resisting with the law enforcement in conjunction

12   with law enforcement who are holding Lucky in place

13   saying they do not feel comfortable, and it's not

14   going to happen.  With the patient still having the

15   ability to breathe, it was not a concern at that

16   point to me to take them off and risk everyone's

17   safety to put them in our restraints.

18   BY MR. McBRIDE:

19        Q.   Okay.  So what did you do after the

20   sheriff's deputies told you it wasn't going to

21   happen?

22        A.   We came up with a plan to move the patient

23   onto the gurney.

24        Q.   Okay.  And what was your plan?

25        A.   We were all going to grab a portion of his

Exhibit 17   Page 453

1   body, and lift him onto the gurney.

2          Q.   Okay.  And did you do that?

3          A.   Yes.  We refer to it as a body lift.

4          Q.   All right.  And how many individuals

5   assisted in lifting Lucky onto the gurney?

6          A.   A minimum of four-plus.

7          Q.   Who was involved in that?

8          A.   Myself, Aaron, and deputies that were at

9   the site of the scene -- or at the site of Lucky.

10          Q.   All right.  And how was Lucky placed onto

11   the gurney?

12          A.   On his left side.

13          Q.   All right.  Was he ever placed on his

14   back?

15          A.   He was placed on his back at some point.

16          Q.   At what point?  Once he was in the

17   ambulance, or while he was on the gurney still out

18   front?

19          A.   Once he arrested in the ambulance.

20          Q.   Okay.  But prior to that, it's your

21   testimony he was on his side?

22          A.   Correct.

23          Q.   Okay.  And then how was -- was Lucky

24   further restrained to the gurney?

25          A.   Seat belts were used that we have on the

Exhibit 17   Page 454

Marc Poynter                                    February 16, 2017

1          MR. GAZZO:  Relax.

2          MR. CHAPIN:  It was a joke.

3          MR. OSTERBERG:  We've been going about another

4    hour.  Would this be a good spot to take a minute?

5          MR. McBRIDE:  Sure.  How long do you need?

6          MR. OSTERBERG:  Just a couple of minutes.

7          MR. McBRIDE:  No problem.

8          THE VIDEOGRAPHER:  All right.  We are off

9    record at 12:28.

10         (A recess was taken.)

11         (Mr. Chapin exits the deposition.)

12         THE VIDEOGRAPHER:  And we are back on the

13   record at 12:37.

14   BY MR. McBRIDE:

15         Q.   All right.  Mr. Poynter, so who applied

16   the seat belt to Mr. Phounsy?

17         A.   I do not recall who applied them.

18         Q.   Did you apply them?

19         A.   I could have.  I just -- I cannot be

20   specific as to who did.

21         Q.   All right.  So when Mr. Phounsy was on the

22   gurney and the seat belts were fastened, was he

23   still -- was he on his side?

24         A.   Yes, he was.

25         Q.   Do you recall which side?

Marc Poynter                                        February 16, 2017

1          A.    Left side.

2          Q.    And was he still able to attain full tidal

3    volume breaths?

4          A.    Yes.

5          Q.    Did you check that?

6          A.    Constantly.

7          Q.    How did you check that?

8          A.    Visually, and I guess you would say

9    auditory, listening and -- looking and listening.

10         Q.    And where were the Velcro seat belts

11   attached to?  Did it go around his legs? around his

12   torso? around his shoulders?

13         A.    Well, they are attached to the gurney for

14   the lower extremities.  And then waist to chest area,

15   depending on where the gurney is.  Because it does go

16   into a seated position.  So it depends on the

17   position of the gurney.  But it's in the waist to

18   torso region and lower extremities.

19         Q.    So it actually goes around his chest area?

20         MR. OSTERBERG:  Objection.  It misstates his

21   testimony.

22         THE WITNESS:  The waist to the lower torso

23   portion.

24   BY MR. McBRIDE:

25         Q.    So did these seat belts inhibit his

Marc Poynter                                          February 16, 2017

```
1    ability to breathe at all?

2         A.   No.

3         Q.   And what are you basing that on?

4         A.   The observation, looking and listening to

5    his breathing, and signs of profusion.

6         MR. McBRIDE:  We'll mark this as Exhibit 8.

7         (Exhibit Number 8 was marked for

8         identification.)

9    BY MR. McBRIDE:

10        Q.   Take a look at Exhibit 8, if you would.

11   Do you recognize what's depicted in this picture?

12        A.   I would say it's a patient on the gurney.

13        Q.   And do you recognize that patient to be

14   Mr. Phounsy?

15        A.   I could not say specifically if it is.

16   But since we're in the -- talking about this

17   incident, I would say that that is him.

18        Q.   Does that appear to be the way you

19   remember Mr. Phounsy being restrained to the gurney

20   that night?

21        MR. OSTERBERG:  Objection.  Vague and ambiguous

22   as to time.

23        THE WITNESS:  It appears that this is the way

24   he was restrained.

25   BY MR. McBRIDE:
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 457

Marc Poynter                                          February 16, 2017

1  ambulance?  Did you take him immediately to the

2  ambulance, or did you guys need to --

3       A.   No.  No.  Once he's placed on the gurney,

4  it's lifted up off the ground.  We proceed to the

5  ambulance one -- one to two minutes most.

6       Q.   Okay.  And what did you do when you got to

7  the ambulance?

8       A.   I remember it was a steep driveway, so we

9  had a couple of extra people on the gurney.  And once

10  we got down towards the rear of the ambulance, that

11  is when -- as we're walking down, that is when I

12  remember talking to my partner, David Csik, about the

13  things that he was able to receive from the captain

14  and the family.  And the decision was made to take an

15  extra person in the back, as well as the deputy, due

16  to the law enforcement restraints.  And that's when

17  we loaded the patient into the ambulance.

18       Q.   All right.  So after loading Mr. Phounsy

19  into the ambulance, did you check the restraints, so

20  including the law enforcement restraints and the seat

21  belts, to make sure that they weren't too tight, and

22  that Lucky could still breathe?

23       MR. OSTERBERG:  Objection.  Vague and

24  ambiguous.  Overbroad.

25       THE WITNESS:  I think there's two parts to

Marc Poynter                                          February 16, 2017

1    that.   The --

2          MR. OSTERBERG:   Compound.

3          THE WITNESS:   So there's the component of them

4    being applied to the extremities; and then there's

5    the component of breathing.   The component of them

6    being applied, it did not appear that they were too

7    tight.   He did have circulation.   I was able to feel

8    a pulse.

9          And visually, looking at his feet, they did not

10   appear to be too tight, as he did -- he still had

11   adequate circulation, normal color.   The ability to

12   breathe was never impeded with these restraints.

13   That's why we continued using these restraints.

14   BY MR. McBRIDE:

15         Q.   Well, it was eventually at some point,

16   right?

17         MR. GAZZO:   Argumentative.

18         MR. OSTERBERG:   Hold on.   Hold on a second.

19         Is that the end of your question?

20         MR. McBRIDE:   Yes.

21         MR. OSTERBERG:   Could I have that question read

22   back, please.

23         (The last question was read by the reporter.)

24         MR. OSTERBERG:   Overly broad.   Vague and

25   ambiguous.   It lacks foundation.   I don't even know

Marc Poynter                                          February 16, 2017

1    restraints face regarding positional asphyxia?

2         MR. OSTERBERG:  Objection.  Argumentative.

3    Vague and ambiguous.  Incomplete hypothetical.

4         MR. GAZZO:  Asked and answered.

5         MR. OSTERBERG:  It calls for speculation.  And

6    asked and answered a few times.

7         THE WITNESS:  I think I answered, right?  Can

8    you answer -- can you give me the question again

9    because --

10        MR. McBRIDE:  Sure.

11        Would you mind reading it back?

12        (The last question was read by the reporter.)

13        MR. OSTERBERG:  The same objection.  It's

14   argumentative.  Vague and ambiguous.  Asked and

15   answered.  Incomplete hypothetical.

16        THE WITNESS:  So there are risks associated

17   with these restraints being applied in this fashion

18   to where it can impede a patient's ability to take a

19   full tidal volume breath.  So I am aware of -- I am

20   aware of it.  That's why I determine that it was not

21   an issue.  That's why we continued with these

22   restraints.

23   BY MR. McBRIDE:

24        Q.  Okay.  And beyond listening and hearing to

25   his breathing, what else did you do to determine that

Marc Poynter                                                    February 16, 2017

1    these restraints were not inhibiting his breathing?

2         MR. OSTERBERG:  Objection.  Asked and answered

3    several times.  Vague and ambiguous.

4         Counsel, he's already talked about the skin

5    signs, and the profusion, and everything else.  He's

6    answered it several times.

7         THE WITNESS:  Yeah, that's what I would refer

8    to is his signs of adequate profusion.  Now, in the

9    ambulance he was definitely showing signs of adequate

10   profusion with more light that was visible; the skin

11   color was to be normal and not cyanotic; and his

12   respiratory status.

13   BY MR. McBRIDE:

14        Q.    Okay.  Who all was in the ambulance with

15   you?

16        A.    Myself, Aaron Hackett, Deputy Fisher, as

17   well as David Csik who was driving.

18        Q.    Okay.  And you guys left for where?

19        A.    Our hospital was Grossmont that we

20   transferred him to.

21        Q.    And -- all right.  And you guys drove

22   Code 2 or Code 3?

23        A.    We drove Code 3.

24        Q.    Why does the Incident Detail Report say

25   you guys drove Code 2?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 461

Marc Poynter                                    February 16, 2017

```
 1        THE WITNESS:  I would assume that the deputy
 2   would have checked to make sure he had his key.
 3   BY MR. McBRIDE:
 4        Q.   Okay.  Well, doesn't your standing
 5   protocol 422 say that it's okay to transfer patients
 6   in law enforcement restraints so as long there's a
 7   key to get them out of the restraints, if necessary?
 8        MR. OSTERBERG:  Objection.  It may misstate the
 9   protocol.
10        Do you want to show it to him since you're
11   reading from it?
12   BY MR. McBRIDE:
13        Q.   What's your working understanding of
14   protocol 422 regarding restraints and transporting
15   patients in law enforcement restraints?
16        MR. OSTERBERG:  Well, as phrased, it's overly
17   broad.  It's vague and ambiguous as to have him
18   describe the entire protocol, but --
19        THE WITNESS:  So in this regards when we
20   transport patients that are in law enforcement
21   restraints, there's an attempt to have a deputy ride
22   in the ambulance with us, as they are their
23   restraints.  If that is not possible due to certain
24   circumstances, there's a -- a predetermined decision
25   of what to do if we needed to pull over to the side
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 462

Marc Poynter                                             February 16, 2017

1    of the road for law enforcement assistance.  So

2    that's a discussion that we have prior to leaving.

3         So the example would be that you have to

4    leave -- there's only one deputy assigned to a patrol

5    car; and as opposed to leaving the patrol car at the

6    scene, a case-by-case basis, they would follow us in

7    tandem.  And we would decide if something happens,

8    we're going to pull over.  That's telling us we need

9    your assistance.

10   BY MR. McBRIDE:

11        Q.   Okay.  Did you every check to make sure

12   once in the ambulance, Lucky could straighten his

13   abdomen?

14        A.   His abdomen would be with his torso.  So

15   he wasn't able to follow commands at any point.  But

16   he was able to take full tidal volume breaths still.

17   So with that, he was still able to move his abdomen.

18        Q.   But you never checked to make sure he

19   could straighten his abdomen?

20        MR. OSTERBERG:  Objection.  It misstates his

21   testimony.  Argumentative.

22        THE WITNESS:  I could not check to see if he

23   could move his abdomen, as I would need him to follow

24   commands for that.

25   BY MR. McBRIDE:

Exhibit 17   Page 463

Marc Poynter                                          February 16, 2017

1        Q.    All right.  So what time did you leave the

2    scene and head to Grossmont, do you remember?

3        A.    Could I refer?

4        Q.    Yeah.  If you don't remember, go ahead and

5    look at either Exhibit 2 or 3, whichever you need.

6        A.    I understand this one more since we've

7    used these.  The transport code -- I'm sorry.  The

8    transport time is once we are transporting to the

9    hospital, there's a button that we press on the MDC

10   that populates this time in.  We left the scene at

11   20:03 is what the PCR says.

12       Q.    All right.  And you are looking at

13   Exhibit 2?

14       A.    Yes.

15       Q.    Okay.  So what did you do once you guys

16   took off?

17             Well, let me ask it this way:  Did you do any

18   additional assessment of Mr. Phounsy once in the

19   ambulance?

20       A.    Yes.

21       Q.    What did you do?

22       A.    We monitored his -- I'm going to start off

23   with how I do every call.  I start with airway

24   breathing circulation.  So we look and listen to his

25   airway and -- to determine that it's maintainable and

Exhibit 17   Page 464

Marc Poynter                                          February 16, 2017

1   open; look the his tidal volume, and the ability to

2   take a breath.  Or at this point, we noted that he

3   still had a respiratory drive on his own.

4        We look at skin signs -- or I did look at skin

5   signs.  I checked the radial pulse; however, I wasn't

6   able to get a rate due to the amount of movement.  I

7   wasn't able to get a blood pressure, but attempted

8   because of the position that he was in with the

9   handcuffs.  And he was flexing, so I was unable to

10  get the blood pressure cuff around his arm.  But he

11  did have a present radial pulse that tells me he does

12  have an adequate blood pressure.

13       I attempted the oxygen saturation probe.  And

14  that fell off two-plus times.  So I was unable to get

15  an oxygen saturation, but he still had good capillary

16  refill.  I did -- I was able to get a blood sugar.

17  And that's what we did as soon as we got into the

18  ambulance.  And I believe that was before we were

19  transporting or as we were transporting that's what

20  occurred.

21       Q.   All right.  So who is in charge once you

22  are in -- who is in charge of the patient once you

23  are in the ambulance?  Is it the deputy there, or is

24  it you and the other paramedic?

25       A.   Well, this is a -- since this is a medical

Marc Poynter                                    February 16, 2017

1    call, it would be us, the paramedics, providing care.

2    I had mentioned that I would be the paramedic on

3    record, since I am the one officially transferring

4    care with my signature.   However, every paramedic in

5    the back of the ambulance has responsibility to treat

6    the patient.

7         Q.   Now, was Deputy Fisher further restraining

8    Mr. Phounsy while in the ambulance?

9         A.   Yes.

10        Q.   How was he restraining Mr. Phounsy?

11        A.   He was holding his shoulders and his head

12   on the gurney in place.

13        Q.   So how was he holding his head on the

14   gurney?

15        A.   He had one hand on the side of his head

16   holding it in place onto the gurney.

17        Q.   So pressing his head to the gurney?

18        A.   He had his hand on his head holding him on

19   the gurney.

20        Q.   All right.   And was his hands over his

21   face or --

22        A.   No.

23        Q.   -- what part of his hand?   Can you

24   demonstrate?

25        A.   Yeah, on the ear (indicating).   So the

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 466

Marc Poynter                                    February 16, 2017

1   side of his face; the side of his head.

2        Q.   All right.  Did Mr. Phounsy say anything

3   in the ambulance?

4        A.   No.  He was not verbal.

5        Q.   So how many times did you check -- while

6   in the ambulance did you check Mr. Phounsy's

7   capillary refill?

8        A.   Capillary refill was more than once.  I

9   could say to the best of my knowledge, two en route

10  to the hospital.

11       Q.   All right.  What about his radial pulse?

12  Did you just check it once you got in, or did you

13  check it again en route?

14       A.   No.  I checked it continuously en route to

15  the hospital.

16       Q.   How many times total would you say?

17       A.   On these status calls, we use a

18  five-minute parameter to reassess vital signs due to

19  the -- due to his acuity level.  And with the

20  transport of 10 to 15 minutes, I would -- it's a

21  pretty religious check.  That's what we're trained to

22  do from EMTs, so three-plus times.

23       Q.   All right.  You eventually put a spit sock

24  on Mr. Phounsy?

25       MR. OSTERBERG:  Objection.  Vague and ambiguous

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 467

Marc Poynter                                        February 16, 2017

```
 1    as to "you."
 2         THE WITNESS:  I did not personally place the
 3    spit sock on.
 4    BY MR. McBRIDE:
 5         Q.   Who did?
 6         A.   I do not recall who put the spit sock on.
 7         Q.   Was it the deputy?
 8         A.   I do not recall.  I'm sorry.
 9         Q.   But you're certain it wasn't you?
10         A.   I'm certain I did not put it on.
11         Q.   Do you -- were you present for the spit
12    sock being applied?
13         A.   To the best of my knowledge, it was put on
14    in the ambulance.  So once the patient was put in,
15    we're required to stay with the patient.  So I -- it
16    would be under the assumption that yeah, I was
17    present.  I just don't recall it being put on.
18         Q.   All right.  So were you -- if you don't
19    mind, could you take a look at Exhibit 9.  So in
20    looking at Exhibit 9, Mr. Phounsy was on -- who was
21    he facing, you or Deputy Fisher?
22         A.   Deputy Fisher.
23         Q.   Okay.  So he was on his left side?
24         A.   He was on his left side, correct.
25         Q.   All right.  So you would have been sitting
```

Marc Poynter                                    February 16, 2017

1    right there when this spit sock was applied?

2         A.    Correct.

3         Q.    You just don't remember who it was that

4    applied it?

5         A.    Yes.

6         Q.    Why was this spit sock applied to

7    Mr. Phounsy?

8         A.    There was mention of him spitting.  And I

9    believe it was spitting at Deputy Fisher.  And that

10   was the determination to apply it.

11        Q.    What was the determination?

12        A.    That he was spitting.

13        Q.    Did you at any point see Mr. Phounsy spit?

14        A.    I personally did not.

15        Q.    According to the standing protocol, are

16   you as paramedics allowed to place a spit sock on a

17   patient?

18        A.    Yes.

19        Q.    Under what circumstances?

20        MR. OSTERBERG:  Well, objection.  Vague and

21   ambiguous.  Incomplete hypothetical.

22        THE WITNESS:  If the patient's actively

23   spitting, that's why we carry them, to decrease

24   exposure risks.

25   BY MR. McBRIDE:

Marc Poynter                                              February 16, 2017

1          Q.    Is there anything that you need to do as

2    paramedics prior to placing a spit sock on a patient?

3          MR. OSTERBERG:   Objection.   Vague and ambiguous

4    with regard to the meaning of "need to do."

5          THE WITNESS:   If a patient's actively spitting,

6    that's what we use them for.

7    BY MR. McBRIDE:

8          Q.    Are you required to first place an oxygen

9    mask on the patient prior to placing a spit sock?

10         A.    No.

11         Q.    Okay.   And that was your working

12   understanding of the standing protocol at the time of

13   this incident?

14         A.    Yes.

15         Q.    So I'll read from Exhibit 7.   This is

16   bullet point 3-B -- or I'm sorry, 3-C:   "Restraints

17   should be used only when less-restrictive techniques

18   are unsuccessful and practical or likely to endanger

19   the patient or others.   If the patient is actively

20   spitting, a surgical mask or oxygen mask with minimum

21   6 liter per O2 for simple oxygen masks, and 10 to 15

22   liter O2 for nonbreather masks may be placed over the

23   patient's mouth to protect the EMS personnel.   If

24   this method fails, a lightweight, sheer protective

25   mesh hood may be used."

Exhibit 17   Page 470

Marc Poynter                                    February 16, 2017

1          Do you recall that being in the standing

2    protocol?

3          A.   I do.

4          Q.   Okay.  But you guys did not first try an

5    oxygen mask?

6          MR. OSTERBERG:  Argumentative.  Asked and

7    answered.

8          THE WITNESS:  We did not use an oxygen mask

9    first, as it is a guideline and it says, "May need,

10   may use an oxygen mask."

11   BY MR. McBRIDE:

12         Q.   "If this method fails, a lightweight,

13   sheer protective mesh hood may be used."

14         Does that suggest to you that you need to try

15   the oxygen mask first, or no, you view this as an

16   advisory?

17         MR. OSTERBERG:  Objection.  Argumentative.

18   Asked and answered.  You left out the prior part of

19   the sentence, it said "may."

20         But go ahead.

21         MR. GAZZO:  Join.

22         THE WITNESS:  I interpret it as "may use,"

23   based on the current status of the patient.  It is a

24   generic guideline for all patient encounters and

25   incidents.  And it would not meet every scenario.

Marc Poynter                                    February 16, 2017

```
 1   BY MR. McBRIDE:
 2        Q.   All right.  Why did you not use an oxygen
 3   mask in the ambulance?
 4        A.   The reason is due to the patient's skin
 5   signs and adequate profusion, as well as the status
 6   of his breathing en route to the hospital at the time
 7   that we put the spit sock on.
 8        Q.   So based on your personal assessment of
 9   Mr. Phounsy, you did not think an oxygen mask was
10   necessary?
11        A.   That is correct.
12        Q.   Describe the spit sock.  What was it?
13   What was it made of?
14        A.   I'm not sure what it's made of.  It's a
15   mesh-like material.  It has a loose elastic band to
16   keep it in place.  And it's a fairly large, so it
17   doesn't restrict by any means.
18        Have you ever seen a bee hood before?
19        Q.   Yes.
20        A.   It's similar to that, but it's just a
21   beige color as opposed to black.
22        Q.   So when it was placed over Mr. Phounsy,
23   where did this loose elastic band go around?  Did it
24   go around his neck area?
25        A.   Yes, it does go around the neck area by
```

Marc Poynter                                    February 16, 2017

```
 1   the collarbone.
 2       Q.   All right.  I'm going to read farther down
 3   from that same section.  "The mesh hood may never be
 4   tightened in any manner to secure it around the
 5   patient's neck."
 6       Was that your understanding of standing
 7   protocol 422 at the time of this incident?
 8       A.   Yes.
 9       Q.   But you guys did secure it around his
10   neck?
11       MR. OSTERBERG:  Objection.  It misstates prior
12   testimony.  He stated he did not place the spit sock
13   on the patient.  He didn't say he put it around his
14   neck; he talked about the collarbone.
15   BY MR. McBRIDE:
16       Q.   The spit stock was secured around
17   Mr. Phounsy's neck, correct?
18       MR. OSTERBERG:  Objection.  Objection.
19   Argumentative.  It misstates prior testimony.  Asked
20   and answered.
21       Go ahead.
22       THE WITNESS:  The way these things are designed
23   and patented is that they do not restrict.  I believe
24   what this is referring to is an alternative method to
25   keep it in place by restricting it around a patient's
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 473

Marc Poynter                                      February 16, 2017

1   neck.  These things are very loose elastic bands that

2   hold it in place.

3   BY MR. McBRIDE:

4        Q.   Okay.  But the elastic band was around his

5   neck?

6        MR. OSTERBERG:  Objection.  It's argumentative.

7   Asked and answered.  It misstates his testimony.

8        MR. GAZZO:  Join.

9   BY MR. McBRIDE:

10       Q.   Correct?

11       A.   It was around the collarbone, lower neck

12   area.  These things do not restrict.  The verbiage in

13   that policy is that it's not to be restricted around

14   someone's neck.  These are approved by the County to

15   use.  The ones that we get are approved by the

16   County.  They are all patented in the same fashion.

17   And they are loose elastic bands that are used

18   commonly and routinely with no issues.

19       Q.   Okay.  Is it -- can you see through the

20   spit sock?

21       A.   Yes.

22       Q.   Is it sheer or is it -- you can see all

23   the way through it?

24       A.   It's just a mesh hood.  I don't know what

25   you mean by "sheer," like a -- like reflective kind

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 474

Marc Poynter                                    February 16, 2017

```
1    of?
2         Q.   Is it opaque?  Like your shirt, for
3    instance, is completely opaque.  I can't see through
4    your shirt.
5         A.   Oh, no.  You can see -- you can see
6    through the mesh hood.
7         Q.   Okay.  So after the spit -- how far into
8    the ride was the spit sock applied?
9         A.   I -- I could not -- I couldn't give you an
10   answer to that.  I don't know.
11        Q.   After the spit sock was applied, did
12   Deputy Fisher continue to hold Mr. Phounsy's head in
13   the manner you described earlier?
14        A.   To my knowledge, yes.
15        Q.   What was Mr. Phounsy's demeanor while in
16   the ambulance?
17        A.   He was still very combative or thrashing
18   around once we placed him in the ambulance and in
19   route to the ability that we couldn't get extra vital
20   signs.
21        Q.   So he now in addition to the maximum
22   restraints is -- has two seat belts over him, and a
23   deputy holding his head.  And your testimony is that
24   he's still thrashing around?
25        A.   Yes.
```

Exhibit 17   Page 475

Marc Poynter                                        February 16, 2017

1        Q.    What part of his body is able to thrash
2    given all of those restraints and Deputy Fisher
3    holding him down?
4        A.    His entire body was still moving en route
5    to the hospital.
6        Q.    How much movement?  I mean, was he moving
7    12 inches side to side?  How was he moving?
8        A.    He was still attempting to lift himself
9    off the gurney with his upper torso.  His legs
10   continued to move side to side, up and down en route
11   to the hospital.  And on top of the spitting that
12   occurred which with the spit sock, that was another
13   form of more or less a thrashing around.  But that's
14   how -- that's how I would describe it.
15       Q.    Okay.  Can you be any more specific about
16   the movement; or that's as specific as you can be?
17       A.    That's -- that's how specific I can be.
18       Q.    Did Mr. Phounsy say anything while in the
19   ambulance?
20       A.    He did not say anything.
21       Q.    Did Deputy Fisher say anything to
22   Mr. Phounsy?
23       A.    I do remember him on a couple of occasions
24   mentioning to calm down.  That's all I remember him
25   saying to the patient.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 476

Marc Poynter                                          February 16, 2017

1    hospital?
2         MR. OSTERBERG:  Yeah, that's what he's talking
3    about.
4         THE WITNESS:  Okay.  Okay.  So we're -- we
5    still monitor the patient on the way to the hospital,
6    airway breathing and circulation on the other -- on
7    the methods I've mentioned.
8    BY MR. McBRIDE:
9         Q.   Well, let me ask you this:  How are you
10   monitoring his airway and breathing after the spit
11   sock is applied and Mr. Fisher is still holding his
12   head down?
13        A.   Still the same methods.  We're listening
14   for any abnormal sounds from his airway.  We're
15   looking at his tidal volume, his rise and fall of his
16   chest.  We're still looking at his skin signs.  And
17   those are the techniques or methods that we're using
18   to monitor his airway and breathing.
19        Q.   Okay.  Then what happens?
20        A.   We're monitoring his circulation on the
21   way to the hospital.  And I don't remember exactly
22   what point, I believe it was at the point of exiting
23   or near exiting the freeway, it was either prompted
24   from the deputy or ourselves at our point of the
25   checks.  And we determined that we was making a noise

Marc Poynter                                      February 16, 2017

1    from his mouth in the sound of grinding teeth.

2          That prompted me to remove the spit sock,

3    because that is oftentimes associated with cardiac

4    arrest.  We refer to it as lockjaw or trismus.  And

5    at that point we noted that the patient was pulsus

6    apneic.  So we immediately rolled him back on -- or

7    rolled him onto his side, onto his back, and told the

8    deputy that we needed all of the restraints to be

9    removed immediately.  And that's when we began chest

10   compressions.

11         Q.   About how many minutes into the ride was

12   it that you first heard this grinding of the teeth,

13   the lockjaw?

14         A.   It was fairly -- it was pretty into the

15   transport that this -- that we noticed this.  I

16   couldn't give you an exact amount of time.  These

17   transports don't seem to be very long.  They are not

18   very long, but they seem to be longer than normal

19   sometimes with work that's being done in the

20   ambulance.  But I would say six -- six, seven minutes

21   en route, approximately, is when we noticed.

22         Q.   So what tipped you off to the fact that

23   Mr. Phounsy wasn't breathing was this grinding noise?

24         A.   Correct; that both the deputy felt and we

25   heard.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 478

Marc Poynter                                                February 16, 2017

1          Q.    So neither -- according to Mr. Hackett,

2     either you or he noticed that Mr. Phounsy wasn't

3     moving any more and asked the deputy, "Hey, is he

4     still struggling?"  Do you remember that happening?

5          A.    That occurred also.  They happened pretty

6     much simultaneously.  There was a -- the reason that

7     prompted "What's that noise?" I believe what

8     happened, to my recall, is that there was a cessation

9     of movement which was pretty subsequent.  I mean, it

10    was pretty -- not subsequent.  It was pretty

11    prominent.  And with the grinding teeth is what

12    prompted our check of -- the ABC check or check him

13    for a pulse and breathing status.

14         Q.    So were you watching Mr. Phounsy when he

15    stopped moving; or did you just look over and notice

16    he's not moving anymore, and then you hear the

17    grinding?

18         A.    I was positioned on the side of the bench

19    looking directly at the patient, as well as Deputy

20    Fisher.  And I noticed it simultaneously with Aaron,

21    I believe, which prompted us to, "Hey, did he stop

22    moving for you?  Are you holding him down more?" to

23    the deputy.

24              He said, "Oh, he's grinding his teeth."

25              We heard it.  That's what prompted everything.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

Exhibit 17   Page 479

Marc Poynter                                           February 16, 2017

1    The spit sock was removed.

2         I told the deputy that we needed the restraints

3    off right away.

4         Q.    So how much time elapse between

5    Mr. Phounsy stopped moving and you guys pulling the

6    spit sock off of him?

7         A.    Seconds.    It was -- it's almost a

8    knee-jerk reaction to be able to look more closely,

9    especially with the grinding and no movement, and our

10   knowledge of the scenario, and the potential for this

11   to happen.

12        Q.    So at the time you noticed -- or at the

13   time that Mr. Phounsy stopped moving and you noticed

14   the grinding, how was the deputy holding

15   Mr. Phounsy's head?

16        A.    It was -- it was the same in en route to

17   the hospital the entire time.    One in the area of the

18   shoulder, and one in the area that I mentioned by his

19   ear on the side of his head.    That's where he was.

20        Q.    Okay.    So you were able to flip

21   Mr. Phounsy on his back?

22        A.    Yes, that's correct.    The best we could

23   onto his back.

24        Q.    So given the restraints and the way that

25   his legs are, I don't -- would you agree he

Exhibit 17   Page 480

```
 1    couldn't -- you couldn't completely flip him on his

 2    back?

 3          MR. OSTERBERG:  Objection.  Argumentative.

 4          THE WITNESS:  So the -- I'm sorry.

 5          MR. OSTERBERG:  Go ahead.

 6          THE WITNESS:  So I'm sorry.  The way that we

 7    moved him on his back, our gurney has -- there's an

 8    opening where the handrail is.  It's completely open,

 9    as opposed to other gurneys are solid.  His hands

10    were able to be pushed through the side.  As opposed

11    to dropping the rails down initially, his hands were

12    pushed in the opening of the handrail on the driver's

13    side.  That gave him the best supine position to

14    where we could perform chest compressions while the

15    deputy was attempting to get the handcuffs off.

16    BY MR. McBRIDE:

17          Q.  Okay.  Because his legs were still bent

18    back behind him, correct?

19          MR. OSTERBERG:  Objection.  It misstates prior

20    testimony.  Vague and ambiguous as phrased.

21          MR. GAZZO:  Join.

22          THE WITNESS:  They weren't bent -- I'm sorry.

23          MR. GAZZO:  Go ahead.

24          THE WITNESS:  They weren't -- they weren't bent

25    behind him at any point.  They were just slightly
```

Exhibit 17   Page 481

Marc Poynter                                    February 16, 2017

1    bent, like I'd mentioned, from the vertical position

2    you mentioned.  At that point, his legs were semi-off

3    the gurney also to give him the most supine position

4    that we could given the circumstance.

5    BY MR. McBRIDE:

6         Q.    Okay.  And what did the deputy do to get

7    the handcuffs off?

8         A.    That I don't -- that I don't know

9    specifically.  I know that he was attempting -- he

10   was over the patient and using a key, what it seemed

11   to be, with the handcuffs, with my understanding of

12   that's how you take the handcuffs off.  But at the

13   time, both myself and Aaron were busy with the

14   medical aspect of this call.  And I wasn't really

15   focused on the handcuffs or the restraints.

16        Q.    Did you ever actually see the deputy

17   before you got to the hospital and parked with a key

18   in the back of the ambulance?

19        A.    I did not visually see a key.

20        Q.    Before you got to the hospital, did the

21   deputy get any of the handcuffs off?

22        A.    I believe the handcuffs around his -- on

23   his hands were removed.  The restraints at the legs

24   were still in place.  If I remember right, to the

25   best of my recollection, that's what happened.

Exhibit 17   Page 482

Marc Poynter                                                    February 16, 2017

1              DECLARATION UNDER PENALTY OF PERJURY

2

3

4        I, Marc Poynter, do hereby certify under

5    penalty of perjury that I have read the foregoing

6    transcript of my deposition taken on Thursday,

7    February 16, 2017; that I have made such corrections

8    as appear noted herein in ink, initialed by me; that

9    my testimony as contained herein, as corrected, is

10   true and correct.

11

12

13        Dated this  12   day of  APRIL   2017,

14   at     SAN DIEGO           , California.

15

16

17

18                                   _____

19                                        Marc Poynter

20

21

22

23

24

25

Page 185

Exhibit 17   Page 483

Marc Poynter                                                    February 16, 2017

1       I, R. Jerrod Jones, CSR 11750, do hereby
        declare:
2
        That prior to being examined, the witness named
3   in the foregoing deposition was by me duly sworn
    pursuant to Section 30(f)(1) of the Federal Rules of
4   Civil Procedure and the deposition is a true record
    of the testimony given by the witness.
5
        That said deposition was taken down by me in
6   shorthand at the time and place therein named and
    thereafter reduced to text under my direction.
7
        __X_ That the witness was requested to review
8            the transcript and make any changes to the
             transcript as a result of that interview
9            pursuant to section 30(e) of the Federal
             Rules of Civil Procedure.
10
        _____ No changes have been provided by the
11           witness during the period allowed.
12
        _____ The changes made by the witness are
13           appended to the transcript.
14      _____ No request was made that the transcript be
             reviewed pursuant to Section 30(e) of the
15           Federal Rules of Civil Procedure.
16      I further declare that I have no interest in
    the event of this action.
17
        I declare under penalty of perjury under the
18  laws of the United States of America that the
    foregoing is true and correct.
19
        WITNESS my hand this 2nd day of March, 2017.
20

21

22  R. Jerrod Jones, CSR No. 11750, RPR

23

24

25