# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| K.J.P., a minor, and K.P.P., a minor, individually, by and through their mother, LOAN THI MINH NGUYEN, who also sues individually and as successor in interest to her now deceased husband, Lucky Phounsy, and KIMBERLY NANG CHANTHAPHANH, individually,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, San Diego Sheriff WILLIAM GORE, Sheriff's Department Deputy RICHARD FISCHER, CITY OF SANTEE, Santee Fire Department Fire Captain AARON BAGLEY, LAKESIDE FIRE PROTECTION DISTRICT, Lakeside Fire Protection District Firefighter/Paramedic MARC POYNTER, Santee Fire Department Firefighter/Paramedic AARON HACKETT, Lakeside Fire Protection District Firefighter/Paramedic DAVID CSIK, Sheriff's Department Sergeant KEVIN RALPH, Sheriff's Department Corporal MARCOS COLLINS, Sheriff's | Case No.: 3:15-cv-02692-H-MDD<br><br>**ORDER:**<br><br>**(1) GRANTING MOTION FOR SUMMARY JUDGMENT BY AARON BAGLEY, AARON HACKETT, AND THE CITY OF SANTEE**<br>**[Doc. No. 159]**<br><br>**(2) GRANTING MOTION FOR SUMMARY JUDGMENT BY DAVID CSIK, LAKESIDE FIRE PROTECTION DISTRICT, AND MARC POYNTER**<br>**[Doc. No. 160]**<br><br>**(3) GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT BY DEAN ALLEN, AARON BROOKE, SANDRA CARBAJAL, MARCOS COLLINS, RICHARD FISCHER, JANAE KRULL, MICHAEL LEE, JENNY MARTINSON, TAMANI PUGH, KEVIN RALPH, SAN DIEGO COUNTY SHERIFF'S** |

Department Deputy JANAE KRULL,
Sheriff's Department Deputy SANDRA
CARBAJAL, Sheriff's Department
Deputy BILLY TENNISON, III, Sheriff's
Department Deputy DEAN ALLEN,
Sheriff's Department Deputy MICHAEL
LEE, Sheriff's Department Deputy,
JENNY MARTINSON, Sheriff's
Department Deputy TAMANI PUGH,
Sheriff's Department Corporal AARON
BROOKE, and Sheriff's Department
Deputy JOVONNI SILVA,

                                    Defendants.

DEPARTMENT, COUNTY OF SAN
DIEGO, JOVONNI SILVA, AND
BILLY TENNISON
[Doc. No. 161]

On March 11, 2019, Defendants filed three renewed motions for summary judgment. (Doc. Nos. 159, 160, 161.) First, Defendants City of Santee, Aaron Bagley, and Aaron Hackett ("Santee Defendants") filed a motion for summary judgement. (Doc. No. 159.) Second, Defendants Lakeside Fire Protection District, Marc Poynter, and David Csik ("Lakeside Defendants") filed a motion summary judgment. (Doc. No. 160.) Third, Defendants County of San Diego, San Diego County Sheriff's Department, William Gore, Dean Allen, Aaron Brooke, Sandra Carbajal, Marcos Collins, Richard Fischer, Janae Krull, Michael Lee, Jenny Martinson, Tamani Pugh, Kevin Ralph, Jovonni Silva, and Billy Tennison ("San Diego Defendants") filed a motion for summary judgment. (Doc. No. 161.)

On March 26, 2019, Plaintiffs filed their oppositions to the three motions. (Doc. Nos. 163, 164, 165.) On April 2, 2019, Defendants filed their replies in support of their motions. (Doc. Nos. 166, 167, 168.) On April 8, 2019, the Court held a hearing on the motions. Brody A. McBride and Trenton G. Lamere appeared for Plaintiffs. Morris G. Hill appeared for San Diego Defendants. Kevin M. Osterberg appeared for Lakeside Defendants. Mitchell D. Dean and Lee H. Roistacher appeared for Santee Defendants.

For the following reasons, the Court grants the motion by Santee Defendants and grants the motion by Lakeside Defendants. The Court grants in part and denies in part the motion by San Diego Defendants.

# BACKGROUND

## I.  Factual History

On April 13, 2015, San Diego Sheriff's Department Officers responded to a 9-1-1 call from the residence of Kimberly Nang Chanthaphanh and Greg Kelley. (Doc. No. 161-4, Exh. A, Kelley Depo. at 38, 66.) Lucky Phounsy placed the 9-1-1 call and claimed on the call that people were trying to kill him. (Id. at 66; Doc. No. 161-4, Exh. C, Collins Depo. at 30; Doc. No. 161-5, Exh. D, Krull Depo. at 35.) Phounsy's family subsequently wrestled the phone from him and informed the 9-1-1 operator that Phounsy was acting delusional and paranoid, thinking someone was there to kill him. (Kelley Depo. at 66.)

Officers Marcos Collins and Janae Krull initially responded to the 9-1-1 call. (Collins Depo. at 34.) Officers Collins and Krull were met in the driveway by Kelley, who informed the officers that Phounsy had recently returned from a music festival, was possibly under the influence of drugs, and was paranoid that people were trying to kill him. (Collins Depo. at 35; Kelley Depo. at 68; Krull Depo. at 43–44.) Kelley escorted the officers inside and told Phounsy that they were there to help him. (Kelley Depo. at 69.) Upon entering the home, the officers asked Phounsy if he had any weapons, to which he replied no. (Collins Depo. at 50.) Officer Collins told Phounsy that he needed to pat him down to ensure that Phounsy did not have any weapons. (Id. at 52.) Phounsy initially refused, but then agreed after several requests by Officer Collins. (Id. at 53.)

Phounsy then told the officers that he did not want them to hold his hands during the pat down. (Id. at 53–54.) Officer Collins told Phounsy that he would need to hold his hands for the pat down. (Id. at 54–55.) The officers each grabbed one of Phounsy's arms to put them behind Phounsy's back. (Id.; Krull Depo. at 67–68.) Phounsy said that he did not want to be put in handcuffs. (Krull Depo. at 68.) The officers then leaned Phounsy into the wall and attempted to place him in handcuffs. (Id. at 69; Collins Depo. at 63.) Before the handcuffs were secured, a fight broke out between Phounsy and the officers. (Collins Depo. at 69; Krull Depo. at 76–77, 82–83.) During the fight, Officer Collins tasered Phounsy multiple times and Officer Krull tasered Phounsy once. (Collins Depo. at 76–79, 91–92,

96–97; Krull Depo. at 85, 90, 113–114.) Officer Krull also used her baton on Phounsy multiple times. (Collins Depo. at 110–112; Krull Depo. at 117, 125.)

A number of officers then arrived in response to the call for backup. (Collins Depo. at 115; Krull Depo. at 107, 127–129; Doc. No. 161-5, Exh. F, Allen Depo. at 35.) Officers Dean Allen, Michael Lee, Billy Tennison, and Tamani Pugh assisted Officer Collins in Krull in restraining Phounsy. (Allen Depo. at 39–41; Doc. No. 161-7, Exh. K, Pugh Depo. at 31–35.) Officers Aaron Brooke, Kevin Ralph, Richard Fischer, Jenny Martinson, Sandra Carbajal, Jovonni Silva then arrived on the scene. (Allen Depo. at 42, 63, 67; Doc. No. 161-6, Exh. G, Martinson Depo. at 28; Doc. No. 161-6, Exh, I, Carbajal Depo. at 30; Doc. No. 161-7, Exh. L, Silva Depo. at 19.) The officers collectively continued to struggle with Phounsy, first handcuffing Phounsy and then using maximum restraints. (Allen Depo. at 50–57.) During the struggle, Officer Brooke tasered Phounsy. (Doc. No. 161-6, Exh. H, Brooke Depo. at 36.) Once Phounsy was placed in maximum restraints, he was carried outside, laid on the ground, and held in place. (Id. at 65, 67.) At some point during the altercation, Officer Collins was injured and bleeding. (Collins Depo. at 126–129.)

Paramedics Marc Poynter, David Csik, and Aaron Hackett, and Fire Captain Aaron Bagley were on the scene. (Id. at 71–72; Doc. No. 160-21, Exh. 17-5, Poynter Depo. at 40; Doc. No. 160-14, Exh. 10, Bagley Depo. at 33.) Phounsy was given two doses of a sedative. (Poynter Depo. at 87–88.) After his initial assessment by paramedics, Phounsy was transported to Grossmont Hospital in an ambulance along with Poynter, Hackett, Csik, and Officer Fischer. (Id. at 138.) During the trip, Phounsy suffered cardiac arrest. (Doc. No. 163-2 at 533–38, Sperry Expert Report.) Later, doctors determined he had suffered a serious brain injury and was unlikely to recover. (Id.) His family elected to allow him to die. (Id.)

## II. **Procedural History**

On November 2, 2016, Plaintiffs filed the operative second amended complaint against three sets of Defendants. (Doc. No. 50.) First, the County of San Diego ("the County"), Sheriff William Gore, and "Sheriff's Department Defendants," San Diego

Sheriff's Department Officers Ralph, Fischer, Collins, Krull, Carbajal, Tennison, Allen, Lee, Martinson, Pugh, Brooke, and Silva. (Id. ¶¶ 11–24.) Second, the City of Santee ("the City") and "Santee Fire Defendants," Santee Fire Department Captain Bagley and firefighter/paramedic Hackett.[1] (Id. ¶¶ 26–28.) Third, Lakeside Fire Protection District ("the District") and "Lakeside Fire Defendants," Lakeside Fire Protection District firefighters/paramedics Poynter and Csik. (Id. ¶¶ 33–35.)

Plaintiffs first allege an excessive force claim under 42 U.S.C. § 1983 against Sheriff's Department Defendants. (Id. ¶¶ 59–63.) Second, Plaintiffs allege a § 1983 denial of medical care claim against Sheriff's Department Defendants, Santee Fire Defendants, and Lakeside Fire Defendants. (Id. ¶¶ 64–68.) Third, Plaintiffs allege a § 1983 Monell claim against the County, the City, and the District. (Id. ¶¶ 69–73.) Fourth, against the County and Sheriff's Department Defendants, Plaintiffs allege claims for battery; violation of the Bane Act, Cal. Civ. Code § 52.1; violation of the Americans with Disabilities Act, 42 U.S.C. § 12132, et seq. ("ADA"); violation of the Unruh Civil Rights Act, Cal. Civ. Code §§ 51, 51.7 ("Unruh Act"); and negligence. (Id. ¶¶ 74–107.) Fifth, Plaintiffs allege a claim for negligent hiring, retention, and supervision against Sheriff Gore. (Id. ¶¶ 108–116.) Sixth, against all Defendants, Plaintiffs assert claims for wrongful death and violation of substantive due process under § 1983. (Id. ¶¶ 117–126.) Finally, Plaintiff Loan Thi Minh Nguyen asserts a claim for intentional infliction of emotional distress against the County and Officers Collins and Krull. (Id. ¶¶ 127–132.)

On June 22, 2017, the County of San Diego, Sheriff Gore, and the Sheriff's Department Defendants filed a motion for summary judgment. (Doc No. 97.) On June 23, 2017, the City, the Santee Fire Defendants, the District, and the Lakeside Fire Defendants also filed a motion for summary judgment. (Doc. No. 98.) After briefing concluded, the Court issued an order granting summary judgment as to the claims against Sheriff Gore,

---

[1] City of Santee firefighter/paramedics Aaron Do, Adam Daniels, and Daniel Neow were initially named as Defendants, but have since been dismissed with prejudice. (Doc. No. 90.)

but denying summary judgment on the remaining claims on the basis that genuine issues of material fact remained. (Doc. No. 115.) Defendants then filed interlocutory appeals of the Court's denial of qualified immunity. (Doc. Nos. 116, 118, 124.) On appeal, the Ninth Circuit remanded the case back to this Court for "an individualized determination of whether summary judgment based on qualified immunity may be proper as to each defendant." (Doc. No. 157.) Accordingly, the Court set forth a renewed briefing schedule for the motions for summary judgment. (Doc. No. 156.)

## DISCUSSION

### I.   Legal Standard for Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1031 (9th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Fortune Dynamic, 618 F.3d at 1031 (internal quotation marks and citations omitted); accord Anderson, 477 U.S. at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case that the nonmoving party bears the burden of proving at trial. Id. at 322–23; Jones v. Williams, 791 F.3d 1023, 1030 (9th Cir. 2015). Once the moving party establishes the absence of a genuine issue of

material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting former Fed. R. Civ. P. 56(e)); accord Horphag Research Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007). To carry this burden, the non-moving party "may not rest upon mere allegation or denials of his pleadings." Anderson, 477 U.S. at 256; see also Behrens v. Pelletier, 516 U.S. 299, 309 (1996) ("On summary judgment, . . . the plaintiff can no longer rest on the pleadings."). Rather, the nonmoving party "must present affirmative evidence . . . from which a jury might return a verdict in his favor." Anderson, 477 U.S. at 256. Questions of law are well-suited to disposition via summary judgment. See, e.g., Pulte Home Corp. v. Am. Safety Indem. Co., 264 F. Supp. 3d 1073, 1077 (S.D. Cal. 2017).

When ruling on a summary judgment motion, the Court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). A court should not weigh the evidence or make credibility determinations. See Anderson, 477 U.S. at 255. "The evidence of the non-movant is to be believed." Id. Further, the Court may consider other materials in the record not cited to by the parties, but it is not required to do so. See Fed. R. Civ. P. 56(c)(3); Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010).

## II. Section 1983 Claims for Excessive Force and Denial of Medical Care

Plaintiffs assert claims under § 1983 for excessive force against Sheriff's Department Defendants, and for denial of medical care against Sheriff's Department Defendants, Santee Fire Defendants, and Lakeside Fire Defendants. (Doc. No. 50 ¶¶ 59–68.) Sheriff's Department Defendants, Santee Fire Defendants, and Lakeside Fire Defendants all argue that they are shielded from liability on these claims by qualified immunity. (Doc. Nos. 159-1, 160-1, 161-1.)

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution

and laws, shall be liable to the party injured in an action at law . . . ." 42 U.S.C. § 1983. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Kisela v. Hughes, 138 S.Ct. 1148, 1152 (2018) (quoting White v. Pauly, 137 S.Ct. 548, 551 (2017)). Qualified immunity protects a governmental official from suit "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004)). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." Avina v. United States, 681 F.3d 1127, 1130 (9th Cir. 2012) (quoting Glenn v. Washington Cty., 673 F.3d 864, 871 (9th Cir. 2011)).

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." Tolan v. Cotton, 134 S.Ct. 1861, 1865 (2014) (internal quotation marks and alteration notations omitted). "The second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation." Id. at 1866 (internal quotation marks omitted). Under the second prong of the test for qualified immunity, the Court must determine whether the plaintiff's right "was clearly established at the time of the officer's alleged misconduct." S.B. v. Cty. of San Diego, 864 F.3d 1010, 1015 (9th Cir. 2017) (quoting C.V. v. City of Anaheim, 823 F.3d 1252, 1255 (9th Cir. 2016)). "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Kisela, 138 S.Ct. at 1153 (quoting Plumhoff v. Rickard, 134 S.Ct. 2012, 2023 (2014)). To find that the law is clearly established, the Ninth Circuit does "not require a case directly on point, but existing precedent must have placed

the statutory or constitutional question beyond debate." <u>S.B.</u>, 864 F.3d at 1015 (quoting <u>Mullenix v. Luna</u>, 136 S.Ct. 305, 308 (2015)) (internal quotation marks omitted). "The Supreme Court has explained that, 'officials can still be on notice that their conduct violates established law even in novel factual circumstances,' and has rejected, 'a requirement that previous cases be fundamentally similar' to the facts at issue in a suit." <u>Young v. Cty. of Los Angeles</u>, 655 F.3d 1156, 1167 (9th Cir. 2011) (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002)).

When a court analyzes the two prongs of the qualified immunity doctrine, "if the answer to either is 'no,' then the officers cannot be held liable for damages." <u>Glenn</u>, 673 F.3d at 870 (citing <u>Pearson</u>, 555 U.S. at 236). When considering these two prongs, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." <u>Tolan</u>, 134 S.Ct. at 1866.

### A. Excessive Force Claim

Plaintiffs allege an excessive force claim under § 1983 against Sheriff's Department Defendants. (Doc. No. 50 at 11–12.) Sheriff's Department Defendants argue that they are protected from liability from qualified immunity. (Doc. No. 161-1.) The Court will assess the availability of qualified immunity to each Sheriff's Department Defendant individually.

### 1. <u>Officers Marcos Collins and Janae Krull</u>

Defendants argue that the use of force exerted by Officers Marcos Collins and Janae Krull was objectively reasonable and Phounsy's right was not clearly established. (Doc. No. 161-1 at 15–20.) The Court concludes viewing the facts in a light most favorable to Plaintiffs, genuine issues of material fact remain with regards to whether their use of force was excessive and whether Phounsy's right to be free from excessive force was clearly established.

Officers Collins and Krull were the initial responders to Phounsy's 9-1-1 call. (Collins Depo. at 34.) Although Phounsy asked the officers not to hold his hands during their pat down, each officer grabbed one of his arms. (<u>Id.</u> at 54–55; Krull Depo. at 67–68.) Officer Krull then attempted to handcuff Phounsy, despite his protests. (Krull Depo. at 69.)

A fight then broke out during which Officer Collins tasered Phounsy twice, and Officer Krull tasered Phounsy once and used her baton on Phounsy multiple times. (Collins Depo. at 76–7, 91–92 96–97, 110–112; Krull Depo. at 85, 90, 113–114, 117, 125.)

The first prong of qualified immunity asks whether the facts, taken in the light most favorable to the party asserting the injury, "show the officer's conduct violated a federal right." Tolan, 134 S.Ct. at 1865 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). "Objectively unreasonable uses of force violate the Fourth Amendment's guarantee against unreasonable seizures." Lowry v. City of San Diego, 818 F.3d 840, 847 (9th Cir. 2016). The reasonableness of a use of force is determined based on whether the defendant's actions were "objectively reasonable" in light of all facts and circumstances. Graham, 490 U.S. at 397. "The operative question in excessive force cases is whether the totality of the circumstances justifies a particular sort of search or seizure." Cty. of Los Angeles, Calif. v. Mendez, 137 S.Ct. 1539, 1546 (2017) (quoting Tennessee v. Garner, 471 U.S. 1, 8–9 (1985)). The reasonableness of a use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001) (quoting Graham, 490 U.S. at 396). "Determining whether the force used is reasonable requires a balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" Bryan v. MacPherson, 630 F.3d 805, 817 (9th Cir. 2010) (quoting Graham, 490 U.S. at 396). "[T]he gravity of the particular intrusion on Fourth Amendment interests" is evaluated by assessing "the type and amount of force inflicted." Miller v. Clark Cty., 340 F.3d 959, 964 (9th Cir. 2003). "[T]he importance of the government interests at stake" is evaluated according to "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." Id. (citing Graham, 490 U.S. at 396). The Ninth Circuit has "held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury." Liston v. Cty. of Riverside, 120 F.3d 965, 976 n.10 (9th Cir. 1997).

After reviewing the parties' arguments, the Court concludes that Plaintiffs have raised genuine issues of material fact as to whether Officers Collins and Krull's actions were objectively reasonable. Based on the evidence, a jury could find that when Officers Collins and Krull arrived on scene, there was no need to immediately subdue Phounsy. (See Collins Depo. at 35 (no report of Phounsy being armed), 40 (no specific reason to think Phounsy was a threat).) This is particularly the case because Phounsy was not a criminal suspect, but rather initiated the call to 9-1-1 asking for help. (Kelley Depo. at 38, 66.) Plaintiffs' expert opines that Officers Collins and Krull should have requested a Psychiatric Emergency Response Team prior to entering the home. (Doc. No. 164-2 at 451, DeFoe Expert Report.) Defendants dispute this, and the Court cannot weigh conflicting evidence. See Anderson, 477 U.S. at 255. Although the relative culpability of each party is considered in analyzing the reasonableness of force used, Bryan, 630 F.3d at 826, factual disputes remain as to whether Phounsy or Officers Collins and Krull created the situation that ultimately led to his death. Plaintiffs present evidence showing that Officer Collins used profanities when speaking to Phounsy, (Kelley Depo. at 75; Nguyen Depo. at 53), and expert testimony that "a reasonable officer acting consistent with standard police practices would not have directed profanity at an individual who was mentally ill or experiencing a mental crisis." (Doc. No. 164-2 at 452, DeFoe Expert Report.)

Further, both use of a taser and baton are considered intermediate uses of force, which "present a significant intrusion upon an individual's liberty interests." Young, 655 F.3d at 1161–62 (citing Smith v. City of Hemet, 394 F.3d 689, 701–02 (9th Cir. 2005); United States v. Mohr, 318 F.3d 613, 623 (4th Cir. 2003)); see Bryan, 630 F.3d at 826. Factual disputes remain as to whether such a significant intrusion on Phounsy's liberty interests was justified by the governmental interests at stake given the circumstances. The Ninth Circuit has instructed that "summary judgment should be granted sparingly in excessive force cases." Gonzalez, 747 F.3d at 795 (citing Glenn, 673 F.3d at 871). "This principle applies with particular force where the only witness other than the officers was killed during the encounter." Id. This is precisely the situation presented here. Phounsy

ultimately died after a prolonged struggle with a group of 12 officers, which was initiated by Phounsy's encounter with Officers Collins and Krull. Thus, on the first prong of qualified immunity, disputed facts remain on the issue of whether the actions of Officers Collins and Krull were objectively reasonable.

The second prong of qualified immunity asks whether "the right in question was clearly established at the time of the violation." Tolan, 134 S.Ct. 1866. The Court concludes that genuine issues of material fact precluding summary judgment remain on this prong as well. In Alexander v. City and County of San Francisco, 29 F.3d 1355 (9th Cir. 1994), the Ninth Circuit held that it could constitute excessive force when the police "storm[ed] the house of a man whom they knew to be mentally ill." Id. at 1366. In reversing summary judgment for defendants, the Ninth Circuit agreed with the plaintiff that her claim that "defendants used excessive force in creating the situation" that ultimately lead to the need to use force. Id. In so holding, the Ninth Circuit noted that officer's use of force must be commensurate with the need presented by the situation. Id. at 1367.

Subsequently, in Doerle v. Rutherford, 272 F.3d 1272, 1282–83 (9th Cir. 2001), the Ninth Circuit further explained that "tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal." Id. "In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable." Id. (citing Alexander, 29 F.3d at 1366). "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." Id. at 1281. As such, the Doerle court held that using nonlethal force, in that case a beanbag projectile, against a mentally ill individual where there was no need to immediately subdue him constituted excessive force. Id.; see also Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1093 (9th Cir. 2013) (summarizing Doerle holding).

Genuine issues of material fact remain on the issue of whether Phounsy's right was clearly established. Plaintiffs argue that Phounsy was mentally ill at the time of the

incident, as a result of being unable to sleep for multiple days. (Nguyen Depo. at 43.) Phounsy was the one who called 9-1-1 asking for help, and Kelley explained to the officers that Phounsy was acting delusional. (Kelley Depo. at 66, 68.) Again, based on the evidence presented thus far, a jury could conclude that when Officers Krull and Collins arrived on scene, there was no need to immediately subdue Phounsy, particularly in a manner that could exacerbate the situation. (See Collins Depo. at 35 (no report of Phounsy being armed), 40 (no specific reason to think Phounsy was a threat).) Factual issues remain on the question of whether the force exerted by Officers Collins and Krull was excessive. Given the disputed facts, the Court declines to grant Officers Collins and Krull qualified immunity on Plaintiffs' excessive force claim at this time.

### 2.  <u>Officer Dean Allen</u>

Next, the Court concludes that Officer Dean Allen is not entitled to qualified immunity on Plaintiffs' excessive force claim at this time. Officer Allen was one of the first backup officers to arrive on the scene. (Allen Depo. at 35.) Upon seeing Phounsy struggling with Officers Collins and Krull, Officer Allen grabbed Phounsy's right arm and pulled Phounsy to the ground along with the assistance of other officers who arrived after Officer Allen. (<u>Id.</u> at 39.) Officer Allen continued to pin Phounsy's arm to his back. (<u>Id.</u> at 40.) As Officer Allen laid on Phounsy's right shoulder and held on to his right arm, he applied force with his right knee to Phounsy's left shoulder and then placed all of his bodyweight on Phounsy. (<u>Id.</u> at 44–46.) Officer Allen elbowed Phounsy twice in the forehead. (<u>Id.</u> at 45–46.) Officer Allen continued to control Phounsy while other officers placed him in maximum restraints. (<u>Id.</u> at 52–57.) Sergeant Ralph tasked Officer Allen with monitoring Phounsy while he was in the restraints. (Id. at 63.) Officer Allen then assisted in carrying Phounsy outside and continued to monitor Phounsy. (<u>Id.</u> at 65–67.)

On the first prong of qualified immunity, genuine issues of material fact remain as to whether Officer Allen's use of force was objectively reasonable and thus not in violation of Phounsy's rights. In regards to the nature and quality of intrusion on Phounsy's rights, Officer Allen used significant force on Phounsy in the form of pinning his arm, force using

his knee to Phounsy's shoulder, placing his full bodyweight on Phounsy, and elbowing Phounsy's head. (Id. at 40–46.) Plaintiffs have raised an issue of fact as to whether at some point during the altercation, Phounsy was no longer actively resisting, but instead was struggling due to an inability to breathe. (Doc. No. 164-2 at 456, DeFoe Expert Report.) Therefore, viewing the facts in a light most favorable to Phounsy, genuine issues of material fact remain on whether Officer Allen's use of force was warranted based on the circumstances.

Proceeding to the second prong of qualified immunity, genuine issues of material fact also remain, as to whether Phounsy's right was clearly established. As the Ninth Circuit has explained in Doerle, "tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal." 272 F.3d 1282–83; see also Gravelet-Blondin, 728 F.3d at 1093. At the time of this incident, "the law was clearly established that, as a general matter, police use of force must be carefully calibrated to respond to the particulars of a case, including the wrongdoing at issue, the safety threat posed by the suspect, and the risk of flight." C.B. v. City of Sonora, 769 F.3d 1005, 1030 (9th Cir. 2014) (citing Graham, 490 U.S. at 396). In Blankenhorn, the Ninth Circuit stated that the Court "need look no further than Graham's holding that force is only justified when there is a need for force." Blankenhorn, 485 F.3d at 481. Genuine issues of fact remain on the issue of whether Officer Allen's uses of force were excessive or was justified given the circumstances. Accordingly, the Court concludes that Officer Allen is not entitled to qualified immunity on Plaintiffs' excessive force claim at this time.

### 3.  **Officer Aaron Brooke**

The Court concludes that viewing the facts in a light most favorable to Plaintiffs, genuine issues of material fact remain at this time as to qualified immunity of Officer Brooke. When Officer Brooke arrived on the scene, Phounsy was already on his stomach on the ground, and several officers were attempting to control him. (Brooke Depo. at 33.)

Officer Brooke then used his taser in drive stun mode on Phounsy's back. (Id. at 36.)

Genuine issues of material fact remain on the issue of whether Officer Brooke's use of force was objectively reasonable. Generally, use of a taser is considered intermediate force, which presents a significant intrusion on an individual's rights. See Bryan, 630 F.3d at 826. Factual disputes remain as to whether such an intrusion on Phounsy's rights was warranted by the governmental interests at stake. Phounsy was already being restrained by numerous officers at that point and was on his stomach on the ground. Plaintiffs have raised an issue of fact as to whether at some point during the altercation, Phounsy was no longer actively resisting, but instead was struggling due to an inability to breathe. (Doc. No. 164-2 at 456, DeFoe Expert Report.) Further, Plaintiffs' expert opines that Officer Brooke should have communicated with the other officers and that Officer Brooke's use of the taser exacerbated the situation. (Id. at 453.) Defendants dispute this, and the Court cannot weigh conflicting evidence. See Anderson, 477 U.S. at 255. Given the factual disputes, it is unclear whether such an intrusion on Phounsy's rights is outweighed by the government's interest. Therefore, questions of fact remain as to whether Officer Brooke's actions were objectively reasonable under the circumstances.

Genuine issues of material fact also remain on the issue of whether Phounsy's right was clearly established. As the Ninth Circuit has explained in Doerle, "tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal." 272 F.3d 1282–83; see also Gravelet-Blondin, 728 F.3d at 1093. At the time of this incident, "the law was clearly established that, as a general matter, police use of force must be carefully calibrated to respond to the particulars of a case, including the wrongdoing at issue, the safety threat posed by the suspect, and the risk of flight." C.B., 769 F.3d at 1030 (citing Graham, 490 U.S. at 396). In Blankenhorn, the Ninth Circuit stated that the Court "need look no further than Graham's holding that force is only justified when there is a need for force." Blankenhorn, 485 F.3d at 481. Genuine issues of fact remain on the issue of whether

Officer Brooke's use of force was excessive or was justified given the circumstances. Therefore, at this time, the Court declines to grants qualified immunity to Officer Brooke on Plaintiffs' excessive force claim.

### 4. <u>Officer Billy Tennison</u>

The Court also declines to extend qualified immunity to Officer Billy Tennison at this time on Plaintiffs' excessive force claim because genuine issues of material fact remain. When Officer Tennison entered the residence, he saw Officers Collins and Krull attempting to restrain Phounsy, who was standing. (Doc. No. 161-7, Exh. M, Tennison Depo. at 49–52.) Officer Tennison then struck Phounsy with his knee in Phounsy's midsection. (<u>Id.</u> at 54.) A group of officers then took Phounsy to the ground. (<u>Id.</u> at 58.) Officer Tennison assisted in holding Phounsy down by applying his body weight to Phounsy's head and shoulders. (<u>Id.</u> at 58–59.) Officer Tennison attempted to put Phounsy in a carotid restraint. (<u>Id.</u> at 59.) He then applied pressure to the mandibular angle pressure point behind Phounsy's ear. (<u>Id.</u> at 61.) Officer Tennison continued to use his body weight on Phounsy's left shoulder and brought Phounsy's left arm to his back. (<u>Id.</u> at 62–63.) After Phounsy was secured in handcuffs, Officer Tennison assisted in applying maximum restraints by applying the cord cuff to Phounsy's waist. (<u>Id.</u> at 65.) At this time, Officer Tennison punched Phounsy with a closed fist "a couple times" in the thigh. (<u>Id.</u> at 66.) Officer Tennison then assisted with carrying Phounsy outside, setting him down, and rolling him into a recovery position. (<u>Id.</u> at 68, 80.)

As to the first prong of qualified immunity, the Court concludes that genuine issues of material fact remain as to whether Officer Tennison violated Phounsy's rights. Officer Tennison used significant force on Phounsy in the form of knee strikes to Phounsy's midsection, using his body weight on Phounsy's shoulders and head, a carotid restraint, pressure on Phounsy's mandibular angle pressure point, and closed fist punches. Plaintiffs have raised an issue of fact as to whether at some point during the altercation, Phounsy was no longer actively resisting, but instead was struggling due to an inability to breathe. (Doc. No. 164-2 at 456, DeFoe Expert Report.) Viewing the facts in a light most favorable to

Phounsy, genuine issues of material fact remain on whether Officer Tennison's intrusion on Phounsy's rights was justified by the governmental interests at stake. Therefore, the Court cannot at this time conclude that Officer Tennison's uses of forces were objectively reasonable.

Genuine issues of material fact also remain as to whether Phounsy's right was clearly established with regards to Officer Tennison. As the Ninth Circuit has explained in <u>Doerle</u>, "tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal." 272 F.3d 1282–83; <u>see also</u> <u>Gravelet-Blondin</u>, 728 F.3d at 1093. At the time of this incident, "the law was clearly established that, as a general matter, police use of force must be carefully calibrated to respond to the particulars of a case, including the wrongdoing at issue, the safety threat posed by the suspect, and the risk of flight." <u>C.B.</u>, 769 F.3d at 1030 (citing <u>Graham</u>, 490 U.S. at 396). In <u>Blankenhorn</u>, the Ninth Circuit stated that the Court "need look no further than <u>Graham</u>'s holding that force is only justified when there is a need for force." <u>Blankenhorn</u>, 485 F.3d at 481. Genuine issues of fact remain on the issue of whether Officer Tennison's use of force was excessive or was justified given the circumstances. Thus, the Court concludes that Officer Tennison is not entitled to qualified immunity at this time on Plaintiffs' excessive force claim.

### 5. <u>Officer Richard Fischer</u>

The Court concludes that Officer Richard Fischer is not entitled to qualified immunity at this time. When Officer Fischer arrived on the scene, he saw Phounsy on the ground in handcuffs, struggling with other officers as they attempted to apply maximum restraints. (Doc. No. 161-7, Exh, O, Fischer Depo. at 45–48.) Officer Fischer assisted by applying pressure to Phounsy's legs. (<u>Id.</u> at 50.) Later, Fischer walked with Phounsy to the ambulance and then rode with Phounsy in the ambulance to the hospital. (<u>Id.</u> at 88, 90.) While in the ambulance, Officer Fischer applied downward pressure to Phounsy's head with both hands to secure him while paramedics were assessing him. (<u>Id.</u> at 93, 95.) When

asked, "On a scale of 1 to 10, with 10 being as hard as you could push down, how hard were you holding Mr. Phounsy's head down?" Officer Fischer responded under oath that "a good 9 to 10." (Id. at 96.)

On the first prong of qualified immunity, the Court concludes that genuine issues of material fact remain as to whether Officer Fischer violated Phounsy's rights in the ambulance. Officer Fischer himself describes that he was pushing down on Phounsy's head in the ambulance with nearly full force. This poses a significant intrusion on Phounsy's rights. Factual disputes remain as to whether such a use of force was warranted and justified based on the governmental interests given the circumstances. Phounsy still had maximum restraints on and was handcuffed to the gurney. (Id. at 93.) Phounsy had already been given two doses of a sedative. (Poynter Depo. at 87–88.) Plaintiffs' expert opines that a reasonable officer would not have applied such downward pressure to Phounsy's head. (Doc. No. 164-2 at 453, DeFoe Expert Report.) Defendants dispute this, and the Court cannot weight conflicting evidence. See Anderson, 477 U.S. at 255. Therefore, due to remaining factual disputes, the Court cannot conclude at this time that Officer Fischer's act of using full force to hold down Phounsy's head under these circumstances was objectively reasonable.

The Court also concludes that genuine issues of material fact remain on the second prong of qualified immunity, as to whether Phounsy's right was clearly established. As the Ninth Circuit has explained in Doerle, "tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal." 272 F.3d 1282–83; see also Gravelet-Blondin, 728 F.3d at 1093. There are factual disputes as to whether "any safety concerns had long since abated" when the use of force occurred. See Hope, 536 U.S. at 738. Further, at the time of this incident, "the law was clearly established that, as a general matter, police use of force must be carefully calibrated to respond to the particulars of a case, including the wrongdoing at issue, the safety threat posed by the suspect, and the risk of flight." C.B., 769 F.3d 1005,

1030 (9th Cir. 2014) (citing <u>Graham</u>, 490 U.S. at 396). In <u>Blankenhorn</u>, the Ninth Circuit stated that the Court "need look no further than Graham's holding that force is only justified when there is a need for force." <u>Blankenhorn</u>, 485 F.3d at 481. Genuine issues of fact remain on the issue of whether Officer Fischer's use of force was excessive or was justified given the circumstances. Because genuine disputes of material fact remain on both prongs of qualified immunity with regards to Plaintiffs' excessive force claim against Officer Fischer, the Court declines to grant Officer Fischer qualified immunity at this time.

### 6. <u>Officers Jenny Martinson, Sandra Carbajal, Michael Lee, Tamani Pugh, Jovonni Silva, and Kevin Ralph</u>

As for the remaining Sheriff's Department Defendants, Officers Jenny Martinson, Sandra Carbajal, Michael Lee, Tamani Pugh, Jovonni Silva, and Kevin Ralph, the Court grants summary judgment because Plaintiffs have failed to meet their burden under <u>Celotex</u> as to the first prong of qualified immunity. Under the first prong of qualified immunity, the question for purposes of an excessive force claim is whether the officers engaged in any objectively unreasonable use of force prohibited by the Fourth Amendment. <u>See</u> <u>Lowry</u>, 818 F.3d at 847. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." <u>Graham</u>, 490 U.S. at 396 (internal quotation marks omitted).

These officers arrived on the scene in response to calls for cover from Officers Collins and Krull. (Martinson Depo. at 24; Carbajal Depo. at 29–30; Doc. Nos. 161-6, Exh. G, Lee Depo. at 31; 161-7, Exh. N, Ralph Depo. at 20.) At some point during the altercation, Officer Collins was injured and bleeding. (Collins Depo. at 126–129; Martinson Depo. at 31.) When Sergeant Ralph arrived, he checked on the safety of the other occupants of the residence. (Ralph Depo. at 22.) Sergeant Ralph then observed that the other officers had placed Phounsy in restraints and were preparing to move him. (<u>Id.</u> at 25.) Sergeant Ralph did not interact directly with Phounsy at any point.

3:15-cv-02692-H-MDD

Upon entering the house and observing the struggle between Phounsy and the other officers, Officer Carbajal held Phounsy's left shoulder down. (Carbajal Depo. at 33–37.) Officer Carbajal later held Phounsy's head to prevent him from hurting himself once he was placed outside in maximum restraints. (Id. at 48.) She had no further role in restraining Phounsy. (Id. at 37, 41.)

Officer Pugh, on seeing other officers struggle on the ground with Phounsy, attempted to place his right arm behind his back until someone took over her position. (Pugh Depo. at 36.) Officer Pugh then applied pressure to Phounsy's legs to keep him from kicking. (Id. at 39.) She was then handed a cord cuff, which she applied to Phounsy's ankles. (Id. at 40–41.) She helped push his feet towards his midsection in order for other officers to attach the leg restraints to the waist restrains. (Id. at 42.)

Officer Silva arrived in the residence when Phounsy was being placed in maximum restraints. (Silva Depo. at 21.) Officer Silva grabbed Phounsy's legs and then placed his body weight on Phounsy's legs to assist the officers who were applying the maximum restraints. (Id. at 21–23.) Officer Silva sat on Phounsy's legs while paramedics administered the first shot. (Id. at 34–35.) Officer Silva helped lift Phounsy into the ambulance medical gurney. (Id. at 42.)

Officer Martinson entered the home and saw other officers forcing Phounsy to the floor. (Martinson Depo. at 28–29.) Upon seeing blood on Officer Collins's face and neck, Martinson took over his position on Phounsy's legs, applying pressure to keep him from kicking. (Id. at 31.) Officer Martinson applied her body weight to Phounsy's legs and put her knee into his calf to straighten his leg. (Id. at 34.) She then assisted with applying maximum restraints to Phounsy and checking that they were placed correctly. (Id. at 38, 47.) She assisted with carrying Phounsy to the driveway. (Id. at 49.)

Officer Lee was one of the first backup officers on the scene and saw other officers take Phounsy to the ground. (Lee Depo. at 39–40.) Officer Lee then took the handcuffs from Officer Krull that were secured on Phounsy's right wrist and told Officer Krull to leave. (Id. at 42.) Another officer had placed another set of handcuffs on Phounsy's left

wrist. (<u>Id.</u> at 46.) Officer Lee then used one set of the handcuffs to secure Phounsy. (<u>Id.</u>) Officer Lee provided cord cuffs, but did not assist in placing Phounsy in the cuffs. (<u>Id.</u> at 48.) Officer Lee assisted with carrying Phounsy outside and placing Phounsy on the ambulance medical gurney. (<u>Id.</u> at 60, 90.)

Plaintiffs have failed to meet their burden of showing genuine issues of material fact as to whether Officers Martinson, Carbajal, Lee, Pugh, Silva, and Ralph used excessive force. <u>See</u> <u>Celotex</u>, 477 U.S. at 322. Sergeant Ralph did not interact with Phounsy in any way. Officers Martinson, Carbajal, and Pugh held Phounsy's limbs until he was handcuffed. Officer Lee secured the handcuffs. Officers Martinson, Pugh, and Silva then assisted with placing Phounsy in maximum restraints. Officers Martinson, Lee, and Silva assisted in carrying Phounsy. The force exerted by each of these officers is not comparable to that used by Officers Collins, Krull, Allen, Brooke, Tennison, and Fischer. These officers did not independently exert any significant force. Further, these officers were not an integral part of any violation by the other officers. "An officer's liability under section 1983 is predicated on his 'integral participation' in the alleged violation." <u>Blankenhorn</u>, 485 F.3d at 481 n.12 (citing <u>Chuman v. Wright</u>, 76 F.3d 292, 294–95 (9th Cir.1996)). "Integral participation" does not require that each officer's conduct rise to a level of a constitutional violation, instead requiring "some fundamental involvement in the conduct that allegedly caused the violation." <u>Blankenhorn</u>, 485 F.3d at 481 n.12. Here, although these officers played a role in restraining Phounsy, they did not play an integral role in the any excessive use of force by any other officer. These officers were not present on scene during the initial altercation between Phounsy and Officers Collins and Krull. They did not have fundamental involvement in the use of force exerted by Officers Allen, Brooke, and Tennison. They also were not present during Officer Fischer's use of force in the ambulance.

Officers Martinson, Carbajal, Lee, Pugh, and Silva entered the residence to find that Phounsy was kicking while officers attempted to handcuff him. (Ralph Depo. at 21; Lee Depo. at 51–52; Pugh Depo. at 38.) These officers arrived on scene responding to a call by

Officers Collins and Krull for backup. Unlike Officers Collins and Krull, these officers had relatively little information about the situation. Each of these officers played a small role in subduing Phounsy and did not play an integral role in any excessive use of force by any other officer. While the balancing of the intrusion on Phounsy's rights against the governmental interests with regards to Officers Collins, Krull, Allen, Brooke, Tennison, and Fischer is not clear at this time due to remaining factual issues and the extent of force used by those officers, that is not the case for these officers. When weighing the force used by Officers Martinson, Carbajal, Lee, Pugh, Silva, and Ralph against the governmental interest involved, the Court concludes that Plaintiffs have failed to meet their burden of establishing that genuine issues of material fact exist as to whether such officers' actions were objectively reasonable. See Bennett v. Gow, 345 F. App'x 286, 287 (9th Cir. 2009) (concluding that take-down was not objectively unreasonable where "Officer Gow then pushed Bennett to the ground using relatively minor force and finished handcuffing him.").

With regards to Sergeant Ralph, Plaintiffs' argument is premised on supervisory liability because he was the highest-ranking officer on the scene. (Doc. No. 163 at 21.) However, "[l]iability under section 1983 arises only upon a showing of personal participation by the defendant. . . . A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under section 1983." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (citations omitted). Nothing in the record suggests that Sergeant Ralph directed violations, participated in violations, or failed to prevent any knowing violations of law.[2]

When a court analyzes the two prongs of the qualified immunity doctrine, "if the answer to either is 'no,' then the officers cannot be held liable for damages." Glenn, 673 F.3d at 870 (citing Pearson, 555 U.S. at 236). Here, the Court concludes that Officers

_____

[2] Undisputed evidence shows that Sergeant Ralph was not in a position to observed any of the officers tasering Phounsy. (Ralph Depo. 22–25.)

Martinson, Carbajal, Lee, Pugh, Silva, Ralph, and Fischer are entitled to qualified immunity as to Plaintiffs' excessive force claim under the first prong because Plaintiffs have failed to meet their burden of producing affirmative evidence creating genuine issues of material fact. See Celotex, 477 U.S. at 322. Therefore, the Court grants summary judgment based on the first prong of qualified immunity as to Plaintiffs' excessive force claim in favor of Officers Martinson, Carbajal, Lee, Pugh, Silva, and Ralph.

## B.    Denial of Medical Care Claim

Plaintiffs allege a § 1983 denial of medical care claim against Sheriff's Department Defendants, Santee Fire Defendants, and Lakeside Fire Defendants, alleging that the officers and paramedics compromised Phounsy's ability to breathe freely while restrained and failed to take reasonable steps to ensure he could breathe. (Doc. No. 50 ¶¶ 64–68.) All three groups of Defendants argue that they are protected from liability by qualified immunity. (Doc. Nos. 159-1, 160-1, 161-1.) The Court will assess the availability of qualified immunity to each of the Sheriff's Department Defendants, Santee Fire Defendants, and Lakeside Fire Defendants individually.

"Claims of failure to provide care for serious medical needs, when brought by a detainee [] who has been neither charged nor convicted of a crime, are analyzed under the substantive due process clause of the Fourteenth Amendment." Lolli v. County of Orange, 351 F.3d 410 (9th Cir. 2003); see also Gibson v. Cty. of Washoe, Nev., 290 F.3d 1175, 1187 (9th Cir. 2002) (reversed on other grounds) ("persons in custody ha[ve] the established right to not have officials remain deliberately indifferent to their serious medical needs"). To establish a denial of medical care claims, Plaintiffs must show that Defendants were deliberately indifferent. Gibson, 290 F.3d at 1187. Deliberate indifference requires that an official know of and disregarded an excessive risk to a detainee's health and safety. Id. It has long been settled that deliberate indifference is shown where an official "purposefully ignore[s] or fail[s] to respond to a prisoner's pain or possible medical need." McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) (reversed on other grounds).

1.  **Officers Dean Allen, Jenny Martinson, Sandra Carbajal, Michael Lee, Tamani Pugh, Jovonni Silva, Billy Tennison, and Richard Fischer**

After reviewing the arguments of the parties, the Court declines to grant qualified immunity to Officers Allen, Martinson, Carbajal, Lee, Pugh, Silva, Tennison, and Fischer on Plaintiffs' claim for denial of medical care because genuine issues of material fact remain on both prongs of qualified immunity. Plaintiffs make a § 1983 claim for denial of medical care claim against the Sheriff's Department Defendants on the basis that the officers failed to apply the maximum restraints in a manner that would not impede Phounsy's breathing; properly place Phounsy in the recovery position after placing him in maximum restraints; sufficiently monitor Phounsy's breathing; carry Phounsy in a proper manner; and address signs of Phounsy's struggling to breathe. (Doc. No. 163 at 14–17.) Accordingly, the relevant period of time for the denial of medical care claim begins after Phounsy was placed in handcuffs.

Officer Allen assisted with holding Phounsy still while the restraints were applied but did not apply the restraints himself. (Allen Depo. at 56.) Officer Allen was one of the officers who assisted with moving Phounsy from the hallway to the driveway. (Id. at 65.) Sergeant Ralph tasked Officer Allen with being the officer in charge of monitoring Phounsy while he was in restraints. (Id. at 63.) Officer Allen therefore sat next to Phounsy and observed him grunting, growling breathing heavily, and sweating, and his carotid artery pulsating. (Id. at 63–64.)

Officer Martinson assisted in applying the maximum restraints by holding down Phounsy's legs while Officer Pugh put the restraints on Phounsy's ankles. (Martinson Depo. at 38.) She also assisted in bending Phounsy's knees, and she then secured the ankle cord cuff to the waist cord cuff. (Id. at 38–39.) She checked the restraints to ensure that they were placed correctly. (Id. at 47.) She then assisted with carrying Phounsy outside to the driveway. (Id. at 49–50.) After placing Phounsy in the driveway, Officer Martinson proceeded to take witness statements. (Id. at 53.)

Officer Carbajal held down Phounsy's left shoulder while other officers applied maximum restraints. (Carbajal Depo. at 41.) Once Phounsy was placed outside, Officer Carbajal monitored Phounsy's breathing and held Phounsy's head to prevent him from hurting himself. (Id. at 45, 48.) She remained with Phounsy until he was loaded into the ambulance. (Id. at 49.)

After Phounsy was handcuffed, Officer Lee provided cord cuffs to the other officers, but did not assist in placing Phounsy in the cord cuffs. (Lee Depo. at 48.) Officer Lee assisted with carrying Phounsy outside once Phounsy was placed in maximum restraints. (Id. at 60.) In the driveway, Officer Lee applied downward pressure to Phounsy's arms and shoulders to keep him still. (Id. at 77.) Officer Lee then assisted with placing Phounsy on the ambulance gurney. (Id. at 76; 90.)

Officer Pugh wrapped the cord cuffs of the maximum restraints around Phounsy's legs. (Pugh Depo. at 41–42.) She then helped push his feet up so that the ankle cord cuffs could be attached to the waist cord cuffs. (Id. at 42–43.) Once Phounsy was carried outside, Officer Pugh took photographs of the scene. (Id. at 49.)

Officer Silva assisted the officers who were applying the maximum restraints by holding Phounsy's legs. (Id. at 21–23.) Officer Silva then sat on Phounsy's legs while paramedics administered the first shot. (Id. at 34–35.) Officer Silva helped place Phounsy into the ambulance medical gurney and into the ambulance. (Id. at 42.)

Officer Tennison applied the cord cuff of the maximum restraint to Phounsy's waist. (Tennison Depo. at 65.) He then assisted with carrying Phounsy outside. (Id. at 68.) Once Phounsy was placed outside, the maximum restraints came off him, and Officer Tennison assisted in reapplying the restraints with Officer Martinson. (Id. at 78.) Officer Tennison rolled Phounsy into the recovery position and then began taking witness statements. (Id. at 80.)

Officer Fischer assisted with holding Phounsy's legs in place while maximum restraints were applied. (Fischer Depo. at 51.) Officer Fischer connected the waist restraints to the leg restraints while other officers pushed Phounsy's legs up. (Id. at 51–52.) Once

Phounsy was restrained, Officer Fischer assisted with taking photographs and collected evidence. (Id. at 64.) While the paramedics treated Phounsy, Officer Fischer was nearby monitoring Phounsy's breathing. (Id. at 87.) Fischer escorted Phounsy to the ambulance and then rode with Phounsy in the ambulance to the hospital. (Id. at 88, 90.) In the ambulance, Officer Fischer applied downward pressure on Phounsy's head to control him. (Id. at 93.)

Genuine issues of material fact remain on the first prong of qualified immunity as to whether Officers Allen, Martinson, Carbajal, Lee, Pugh, Silva, Tennison, and Fischer denied Phounsy of medical care by acting with deliberate indifference. Plaintiffs raise a factual dispute as to whether the restraints were placed properly and whether Phounsy was placed in the correct positions once in maximum restraints. (Doc. No. 163 at 13–14.) Sergeant Ralph testified that it is the duty of the deputies to ensure restraints are properly applied once the scene is secured. (Ralph Depo. at 38.) Officers Allen, Martinson, Carbajal, Lee, Pugh, Silva, Tennison, and Fischer all had some role in applying the restraints or holding Phounsy still for the application of the restraints. As such, they were present for the relevant time when Phounsy should have been placed in the recovery position. Plaintiffs' expert opines that the officers failed to verify whether the maximum restraints were properly placed and verify that Phounsy could breath. (Doc. No. 164-2 at 453, DeFoe Expert Report.) Plaintiffs' expert also opines that the officers should have formulated a plan as to how the maximum restraints would be applied so as to minimize the time Phounsy was held down by officers' bodyweight in the interests of his health and safety. (Id. at 454.) Defendants dispute such contentions, and the Court cannot weigh conflicting evidence. See Anderson, 477 U.S. at 255. Plaintiffs also raise a dispute as to whether Phounsy was carried correctly or in a manner that endangered him. (Doc. No. 163 at 15.) Officers Allen, Lee, Tennison, and Martinson all assisted in carrying Phounsy outside, setting him down, and positioning of his body in the driveway. Plaintiffs' expert opines that carrying Phounsy in the prone position and then continuing to hold him in the prone position in the driveway contributed to Phounsy's cardiorespiratory arrest. (Doc. No. 164-

2 at 482, Thrush Expert Report.) Defendants dispute this, and the Court cannot weigh conflicting evidence. See Anderson, 477 U.S. at 255. Further, there is a factual issue as to whether Phounsy was sufficiently and continually monitored while in restraints before the paramedics began to assess Phounsy's condition. (Id. at 14.) Officer Allen was tasked with monitoring Phounsy, and Officers Carbajal, Lee, and Fischer assisted with monitoring Phounsy in the driveway. Plaintiffs produce expert testimony showing that officers are instructed to continually monitor an individual for consciousness and breathing. (Doc. No. 164-2 at 453, DeFoe Expert Report.) Plaintiffs' expert opines that photographs taken of Phounsy at the scene before he was placed in the ambulance show "[t]here is clearly cyanosis visible around his lips, indicating severe hypoxia" and Phounsy was unconscious at the time. (Id. at 534, Sperry Expert Report.) Defendants dispute this, and the Court cannot weigh conflicting evidence. See Anderson, 477 U.S. at 255. There is a dispute as to whether any of these officers, who were all exposed to Phounsy during this time, saw signs exhibited by Phounsy, as identified by Plaintiffs' experts, and failed to respond. Accordingly, factual disputes remain on the question of whether Officers Allen, Martinson, Carbajal, Lee, Pugh, Silva, Tennison, and Fischer violated Phounsy's rights by acting with deliberate indifference to his serious medical needs.

Under the second prong of the qualified immunity doctrine, genuine issues of material fact remain as to whether Phounsy's right was clearly established. The Ninth Circuit has stated that "persons in custody ha[ve] the established right to not have officials remain deliberately indifferent to their serious medical needs." Gibson, 290 F.3d at 1187. It has long been settled that deliberate indifference is shown where an official "purposefully ignore[s] or fail[s] to respond to a prisoner's pain or possible medical need." McGuckin, 974 F.2d at 1060. Accordingly, the relevant inquiry on which genuine issues of material fact remain is whether Officers Allen, Martinson, Carbajal, Lee, Pugh, Silva, Tennison, and Fischer were deliberately indifferent to Phounsy's medical needs. Plaintiffs have raised issues of fact as to whether Phounsy faced an excessive risk to his health and safety, and whether these officers knew of such a risk and disregarded it. Therefore, viewing the facts

in a light most favorable to Plaintiffs, the Court declines to grant qualified immunity in favor of Officers Allen, Martinson, Carbajal, Lee, Pugh, Silva, Tennison, and Fischer on Plaintiffs' denial of medical care claim at this time due to remaining genuine disputes of material fact.

### 2. Officers Marcos Collins, Janae Krull, Aaron Brooke, and Kevin Ralph

The Court concludes that the remaining Officers Collins, Krull, Brooke, and Ralph are entitled to summary judgment on Plaintiffs' claim for denial of medical care. While the altercation with Phounsy was ongoing and after backup officers had arrived, Officer Brooke noticed Officers Collins's injuries and instructed Officer Collins get out. (Collins Depo. at 116.) Officer Martinson took over Officer Collins's position before handcuffs were secured on Phounsy. (Martinson Depo. at 31.) Similarly, Officer Lee took the unsecured handcuffs from Officer Krull and told her to leave. (Lee Depo. at 42; Krull Depo. at 130.) After assisting with securing Phounsy in handcuffs, Officer Brooke escorted Officers Collins and Krull outside to the front of the house. (Brooke Depo. at 44; Collins Depo. at 116; Krull Depo. at 130.)

When Sergeant Ralph arrived on scene, he checked on the safety of the other occupants of the home. (Ralph Depo. at 22.) He then saw that the other officers had placed Phounsy in restraints and were preparing to move him. (Id. at 25.) He was not involved in the decision to place Phounsy in maximum restraints and was not involved in supervision of the officers applying the maximum restraints. (Id. at 26.) At that point he began making phone calls in the driveway to command staff. (Id. at 27.) During the phone calls, Sergeant Ralph noticed that Phounsy had been placed in the driveway and was lying on his stomach. (Id. at 30.) Accordingly, Sergeant Ralph instructed Officer Allen to place Phounsy on his side, and to monitor his airways, his pulse, and for signs of excited delirium. (Id.) Sergeant Ralph also ensured that paramedics were on scene. (Id. at 38, 42–43.) Sergeant Ralph then verified that witnesses were being contacted and photographs were being taken. (Id. at 48.)

/ / /

Plaintiffs have failed to meet their burden under <u>Celotex</u> of producing affirmative evidence showing genuine issues of material fact as to whether Officers Collins, Krull, Brooke, and Ralph acted with deliberate indifference to any known excessive risk to Phounsy's health and safety. First, the record reflects that Officers Collins, Krull, and Brooke did not assist with placing Phounsy in maximum restraints, moving Phounsy, or monitoring Phounsy, and did not interact with Phounsy in anyway once they withdrew from the altercation. Second, Sergeant Ralph did not interact with Phounsy because he was engaged in other administrative duties on the scene at the time Phounsy was being restrained, carried outside, and treated by the paramedics. At one point, Sergeant Ralph noticed that Phounsy was in the prone position. (<u>Id.</u> at 29–30.) At that time, he knew of a risk to Phounsy's health and safety, but rather than disregard such risk, Sergeant Ralph acted appropriately by instructing Officer Allen to place Phounsy in the recovery position and putting Officer Allen in charge of monitoring Phounsy's breathing. (<u>Id.</u>; Allen Depo. at 63.) Therefore, Sergeant Ralph was not deliberately indifferent. Much of Plaintiffs' argument regarding Sergeant Ralph is premised on supervisory liability because he was the highest-ranking officer on the scene. (Doc. No. 163 at 21.) However, "[l]iability under section 1983 arises only upon a showing of personal participation by the defendant. . . . A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under section 1983." <u>Taylor</u>, 880 F.2d at 1045. Nothing in the record suggests that Sergeant Ralph directed violations, participated in violations, or failed to prevent any knowing violations of law. Accordingly, based on the first prong of qualified immunity, the Court grants summary judgment in favor of Officers Collins, Krull, Brooke, and Ralph on Plaintiffs' claim for denial of medical care.

///

///

///

### 3. **Paramedics Aaron Hackett, Marc Poynter, and David Csik, and Fire Captain Aaron Bagley**

Plaintiffs argue that the Paramedic Defendants were deliberately indifferent to Phounsy's medical needs by treating officers before treating Phounsy, failing to place Phounsy in soft restraints, treating Phounsy with a two doses of a sedative, and failing to sufficiently monitor Phounsy's vital signs. (Doc. No. 164 at 5–13.) Hackett, Poynter, Csik, and Captain Bagley argue that they are entitled to qualified immunity under both prongs of the qualified immunity test. (Doc. Nos. 159-1 at 21–27; 160-1 at 18–25.)

When Captain Bagley and Hackett arrived on scene with other paramedics, Officers Collins and Krull explained the situation. (Doc. No. 159-4, Hackett Decl. ¶¶ 7, 8.) Captain Bagley directed the paramedics to attend to Officers Collins and Krull, and requested a second ambulance. (Doc. No. 159-3, Bagley Decl. ¶¶ 7, 9.) Phounsy was then brought outside, and Captain Bagley instructed Hackett to attend to Phounsy. (Id. ¶ 11.) Hackett and Captain Bagley discussed Phounsy's treatment and giving a sedative, Versed, to Phounsy to calm him down. (Hackett Decl. ¶¶ 11–13.) Hackett then gave Phounsy an intramuscular injection of 5 milligrams of Versed, while Captain Bagley observed. (Id. ¶ 13; Bagley Decl. ¶ 12.) Hackett monitored Phounsy's condition. (Id. ¶¶ 15–20.) Hackett was unable to get oxygen saturation readings or check Phounsy's blood pressure because Phounsy was moving too much. (Id. ¶ 21.)

Lakeside paramedics Poynter and Csik then arrived on scene, and Captain Bagley briefed them on the situation. (Bagley Decl. ¶ 13.) Poynter, who was assigned to patient care, joined Hackett. (Poynter Depo. at 40.) Csik was assigned as the "radio person," a role involving no patient care, and proceeded to speak to Phounsy's family members. (Doc. No. 160-22, Exh. 18, Csik Depo. at 20, 29–35.) Hackett and Poynter together decided to give Phounsy an additional dose of Versed. (Poynter Depo. at 82, 87.) Hackett administered the second 5 milligram dose, also intramuscularly. (Id. at 88.) Hackett and Poynter continued to assess Phounsy's condition. (Id. at 92–93; Hackett Decl. ¶ 24.) Captain Bagley, Hackett, and Poynter discussed placing Phounsy in soft medical restraints but ultimately decided

not to because he continued to flail. (Bagley Decl. ¶ 14; Hackett Decl. ¶ 26.) Hackett, Poynter, and Csik, along with the assistance of officers, lifted Phounsy onto the ambulance gurney and into the ambulance. (Hackett Decl. ¶¶ 28–29.) Hackett, Poynter, and Officer Fischer rode with Phounsy in the back of the ambulance. (Id. ¶ 29.) Csik drove the ambulance. (Csik Depo. at 21, 91.) Hackett and Poynter monitored Phounsy's breathing and pulse. (Hackett Decl. ¶ 30.) A mesh hood was placed over Phounsy's head to prevent him from spitting. (Id. ¶ 31.) Before arriving at the hospital Hackett and Poynter detected that Phounsy stopped moving and had no pulse. (Id. ¶ 32.) They removed the mesh hood and maximum restraints, and the paramedics began administering CPR. (Id.)

After considering Plaintiffs' arguments as to the paramedics, the Court concludes that Hackett, Poynter, Csik, and Captain Bagley are entitled to qualified immunity.[3] On the first prong, Plaintiffs have failed to meet their burden under Celotex of showing genuine issues of material fact as to these Defendants. "Mere negligence in diagnosing or treating a medical condition, without more" is insufficient to support a claim of deliberate indifference. Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting McGuckin, 974 F.2d at 1059). "Deliberate indifference is a higher standard than gross negligence because it requires a culpable mental state, meaning that the state actor must recognize an unreasonable risk and actually intend to expose the plaintiff to such risks without regard to the consequences to the plaintiff." Campbell v. State of Wash. Dep't of Soc. & Health Servs., 671 F.3d 837, 846 (9th Cir. 2011) (internal quotation marks, alterations, and citation

---

[3] With respect to the Santee and Lakeside Paramedic Defendants, Plaintiffs have failed to comply with the Ninth Circuit's mandate and this Court's order. The Ninth Circuit's mandate states that "an individualized determination of whether summary judgment based on qualified immunity may be proper as to each defendant" is required in this case. (Doc. No. 157 at 7.) Accordingly, the Court ordered the parties to structure their arguments to "address each Defendant separately." (Doc. No. 156.) Plaintiffs failed to do so as to these Defendants. Plaintiffs filed one combined opposition to both the motion for summary judgment by Santee Fire Defendants and the motion for summary judgment by Lakeside Fire Defendants. (Doc. Nos. 164, 165.) In the opposition, Plaintiffs refer to Hackett, Poynter, Csik, and Captain Bagley as the "Paramedic Defendants" throughout, rather than independently analyzing the applicability of qualified immunity to each Defendant individually, as instructed by the Court. Nonetheless, the Court has done an individualized assessment as to each of the Paramedic Defendants independently.

omitted). "While poor medical treatment will at a certain point rise to the level of constitutional violation, mere malpractice, or even gross negligence, does not suffice." Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990). "A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." Colwell v. Bannister, 763 F.3d 1060, 1068 (9th Cir. 2014).

Here, Csik, as the designated radio person and ambulance driver, was not involved with treating Phounsy or any other individual at the scene. (Csik Depo. at 20, 29–35.) Although Plaintiffs argue that Captain Bagley improperly prioritized treatment of the officers over treatment of Phounsy, the record reflects that Captain Bagley instructed Hackett to treat Phounsy once he had been secured and brought outside by officers. (Bagley Decl. ¶ 11; Bagley Depo. at 59–60.) Further, Captain Bagley, Hackett, and Poynter were not indifferent to Phounsy's medical needs, but rather, were proactive in providing Phounsy with medical treatment and assessment. Captain Bagley, Hackett, and Poynter made decisions regarding how to treat Phounsy under the circumstances, including consideration of risks to Phounsy. Such medical decisions on which medical professionals could differ, even if negligent, do not constitute deliberate indifference.

On the second prong of qualified immunity, Phounsy's right was not clearly established as to Csik, Hackett, Poynter, and Captain Bagley. Plaintiffs have failed to identify any case involving paramedics under similar circumstances. Although the Ninth Circuit does "not require a case directly on point," Plaintiffs also fail to identify a case that places "the statutory or constitutional question beyond debate." S.B., 864 F.3d at 1015. In order for the law to be clearly established, "the prior precedent must be 'controlling'— from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." Sharp v. Cty. of Orange, 871 F.3d 901, 911 (9th Cir. 2017). Plaintiffs provide a list of cases but fail to provide any analysis. (See Doc. No. 165 at 25.) Only two of the cases are from the Ninth Circuit, neither of which involved paramedics or in any way places the issues here beyond constitutional debate. See Lolli,

351 F.3d 410 (deliberate indifference claim against correctional officers regarding treatment of diabetic pretrial detainee); <u>Penilla v. City of Huntington Park</u>, 115 F.3d 707 (9th Cir. 1997) (deliberate indifference claim against police officers who cancelled a request for paramedics). Out-of-circuit cases cited by Plaintiffs similarly fail to clearly establish Phounsy's right because they do not present circumstances sufficiently similar to these and do not show any consensus of courts outside of the Ninth Circuit. <u>See, e.g.</u>, <u>Phillips v. Roane Cty., Tenn.</u>, 534 F.3d 531 (6th Cir. 2008); <u>Mata v. Saiz</u>, 427 F.3d at 745 (10th Cir. 2005); <u>Salazar v. City of Chicago</u>, 940 F.2d 233 (7th Cir. 1991).

In sum, Plaintiffs have failed to meet their burden under the second prong of qualified immunity by failing to show that Phounsy's rights were clearly established under these circumstances. <u>See</u> <u>Sharp</u>, 871 F.3d at 911. Further, the Court has been unable to find any case that would have put these paramedics on notice. Csik was only tangentially involved with Phounsy. Hackett, Poynter, and Captain Bagley were exercising medical judgment during their encounter with Phounsy. Thus, the Court grants qualified immunity and summary judgment to Hackett, Poynter, Csik, and Captain Bagley.

## III. **<u>Plaintiffs' Remaining Claims</u>**

Plaintiffs also assert additional claims under state and federal law. (Doc. No. 50.) Defendants move for summary judgment on these claims. (Doc. Nos. 159–161.) Plaintiffs do not address these claims in their oppositions.[4]

### A. **<u>Monell</u> Liability**

Plaintiffs allege a § 1983 <u>Monell</u> claim against the County, the City, and the District. (Doc. No. 50 ¶¶ 69–73.) Municipalities and local government units can be liable under § 1983. <u>Monell v. Dept. of Soc. Servs. of City of New York</u>, 436 U.S. 658, 690 (1978). To

_____

[4] Plaintiffs erroneously contend in their opposition that the renewed summary judgment motions were only intended to address qualified immunity. (Doc. No. 136 at 4–5.) Defendants argue that Ninth Circuit's mandate does not limit the scope of the renewed motions for summary judgment to only the qualified immunity analysis. (Doc. Nos. 166 at 4–5; 167 at 4–5; 168 at 2.) The analysis of many of the additional claims is linked with the applicability of qualified immunity on the § 1983 claims. Therefore, the Court addresses the additional claims.

recover, a plaintiff must show that a constitutional violation was caused by the municipalities' "policy, regulation, custom, or usage." <u>Chewy v. Gates</u>, 27 F.3d 1432, 1444 (9th Cir. 1994). Defendants argue that Plaintiffs' <u>Monell</u> claims fail because there is no underlying violation by the officers and paramedics. (Doc. Nos. 159-1 at 30; 160-1 at 30.) Because the Court grants summary judgment on the basis of qualified immunity in favor of Hackett, Poynter, Csik, and Captain Bagley, there is no underlying claim to support a <u>Monell</u> claim against the City and the District. Accordingly, the Court grants summary judgment in favor of the City of Santee and the Lakeside Fire Protection District on Plaintiffs' <u>Monell</u> claim.

However, because the Court has declined to grant summary judgment in favor of some San Diego Sheriff's Department Officers on the excessive force and denial of medical care claims, underlying claims that could support a basis for <u>Monell</u> liability against the County remain. Defendants further argue that Plaintiffs have failed to show any policy, custom, practice, or training was a moving force behind any underlying violation. (Doc. Nos. 159-1 at 31–32; 159-1 at 30–32; 161-1 at 22–23.) But, Plaintiffs allege that violations of Phounsy's constitutional rights arose from (1) "a practice or custom of using excessive and unreasonable force on individuals in the midst of a mental health crisis"; (2) "a failure to train deputies, EMTs, and paramedics to appropriately deal with such individuals"; and (3) "a policy and practice of giving priority to the medical needs of law enforcement officers over those of other people who might present with more serious, life-threatening conditions[.]" (Doc. No. 50 ¶ 72.) Plaintiffs have produced evidence in support of these assertions. (<u>See</u> Doc. No. 164-2 at 449–456, DeFoe Expert Report.) Therefore, at this time, triable questions of fact remain as to these issues with regards to the County, and the Court denies summary judgment in favor of the County of San Diego on Plaintiffs' <u>Monell</u> claim.

### B.    Battery and Bane Act Claims

Plaintiffs allege claims against the County and Sheriff's Department Defendants for battery and violation of the Bane Act, Cal. Civ. Code § 52.1. (Doc. No. 50 ¶¶ 74–86.) Under California law, the analysis of a battery claim against a law enforcement officer is

the same as that for a plaintiff's excessive force claim. See Saman v. Robbins, 173 F.3d 1150, 1156 n.6 (9th Cir. 1999) ("Alfaorr's battery claim must fail along with his § 1983 claim because we hold that no reasonable jury could have found that Officer Kimball's actions were objectively unreasonable under the circumstances."). The analysis of a Bane Act claim is also the same as that for a § 1983 excessive force claim. Cameron v. Craig, 713 F.3d 1012, 1022 (9th Cir. 2013).

The Court concludes that genuine issues of material fact remain on Plaintiffs' battery and Bane Act claims against Officers Collins, Krull, Allen, Brooke, Tennison, and Fischer. Therefore, the Court denies summary judgment as to those Defendants. However, because the Court concludes that Officers Martinson, Carbajal, Lee, Pugh, Silva, and Ralph acted in an objectively reasonable manner under the circumstances for the purposes of Plaintiffs' § 1983 excessive force claim, such officers are also entitled to summary judgment on the battery and Bane Act claims. Thus, the Court grants summary judgment in favor of Officers Martinson, Carbajal, Lee, Pugh, Silva, and Ralph on such claims.

## C. ADA and Unruh Act Claims

Plaintiffs also allege claims pursuant to the ADA and California's Unruh Act against the County and Sheriff's Department Defendants. (Doc. No. 50 ¶¶ 87–101). Defendants argue that Phounsy did not have a qualifying disability. (Doc. No. 161-1 at 27.) Plaintiffs do not address their ADA and Unruh Act claims in their opposition. Under the ADA, "disability" means: "(A) A physical or mental impairment that substantially limits one or more life activities of such individual; (B) A record of such an impairment; or (C) Being regarded as having such an impairment." 42 U.S.C. § 12102. The ADA provides that "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals." Id. § 12102(4)(A). "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." Id. § 12102(4)(D). Similarly, the Unruh Act lists qualifying disabilities and states that the term "mental disability" does not include "psychoactive substance use disorders resulting from the current unlawful use of controlled substances or other drugs." Cal. Gov't Code § 12926.

Defendants argue that Phounsy only suffered "[t]emporary irrationality" and therefore does not have a qualifying disability under the ADA. (Doc. No. 161-1 at 27.) Plaintiffs do not address these claims in their opposition and have failed to meet their burden of raising triable issues of fact on such claims. See Celotex, 477 U.S. at 322. Accordingly, the Court grants summary judgment in favor of Defendants on Plaintiffs' ADA and Unruh Act claims.

### D. Negligence

Plaintiffs allege a claim for negligence against the County and Sheriff's Department Defendants. (Doc. No. 50 ¶¶ 102–107). Defendants argue, relying on City of Simi Valley v. Superior Court, 111 Cal. App. 4th 1077 (2003), that a finding of objective reasonableness bars a state negligence action. The Court concludes above that genuine issues of material fact remain on the objective reasonableness of the uses of force by Officers Collins, Krull, Allen, Brooke, Tennison, and Fischer. The Court also concludes that genuine issues of material fact remain on whether Officers Allen, Martinson, Carbajal, Lee, Pugh, Silva, Tennison, and Fischer were deliberately indifference to Phounsy's medical needs. As discussed above, the Court concludes that Sergeant Ralph acted objectively reasonably and without deliberate indifference, and therefore, the Court grants him summary judgment on Plaintiffs' negligence claim. The Court denies summary judgment in favor of the County and the other officers due to remaining factual disputes.

### E. Negligent Hiring, Retention, and Supervision

Plaintiffs allege a claim for negligent hiring, retention, and supervision against Sheriff Gore. (Doc. No. 50 ¶¶ 108–116.) Defendants in their renewed motion for summary judgment argue that Sheriff Gore is not liable for act of his subordinates if he did not direct or cooperate in such acts. (Doc. No. 161-1 at 28–29.) The Court already granted summary judgment in favor of Sheriff Gore, (Doc. No. 115 at 12–13), and nothing in the Ninth Circuit's mandate affects the Court's ruling on claims against Sheriff Gore. (See Doc. No. 157.) Nonetheless, the Court again concludes that summary judgment in favor of Sheriff Gore is appropriate.

"A chief of police is not liable in damages for the unlawful acts and omissions of the subordinates of the department unless he has directed such acts or personally cooperated." Oppenheimer v. City of Los Angeles, 104 Cal. App. 2d 545, 549 (1951). Plaintiffs have not offered any facts showing that Sheriff Gore directed or personally cooperated in any acts towards Phounsy. Further, Plaintiffs have offered no facts showing that Sheriff Gore breached any other duty towards Phounsy. Accordingly, the Court grants summary judgment on the claims against Sheriff Gore.

### F. Wrongful Death

Plaintiffs assert a claim for wrongful death against all Defendants. (Doc. No. 50 ¶¶ 117–121.) Defendants argue that without viable underlying claims for excessive force and denial of medical care, the wrongful death claim fails. (Doc. Nos. 159-1 at 32; 160-1 at 32; 161-1 at 29.) Because the Court grants summary judgment in favor of Sergeant Ralph on Plaintiffs' excessive force and denial of medical care claims and in favor of Hackett, Poynter, Csik, and Captain Bagley on Plaintiffs' denial of medical care claim, the Court also grants summary judgment in favor of Sergeant Ralph, Hackett, Poynter, and Captain Bagley on Plaintiffs' wrongful death claim. The Court also grants summary judgment on this claim in favor of the City and the District because the Court grants summary judgment in favor of both entities' employees, leaving no underlying violation. The Court grants summary judgment in favor of Sheriff Gore on this claim because Plaintiffs show no evidence supporting such a claim.

The Court denies summary judgment on the wrongful death claim as to Officers Collins, Krull, Allen, Brooke, Tennison, Fischer, Martinson, Carbajal, Lee, Pugh, Silva, and the County of San Diego because genuine issues of material fact remain as to those Defendants on the excessive force or denial of medical care claims.

### G. Substantive Due Process

Plaintiffs assert against all Defendants a claim under § 1983 substantive due process for violation of their right to familial companionship. (Doc. No. 50 ¶¶ 122–126.) A claim for substantive due process liability requires that official conduct in depriving a person of

a familial relationship "shocks the conscience." <u>Porter v. Osborn</u>, 546 F.3d 1131, 1136 (9th Cir. 2008). Such a claim requires an underlying violation of the decedent's constitutional rights. <u>Gausik v. Perez</u>, 392 F.3d 1006, 1008 (9th Cir. 2004.) Sheriff's Department Defendants rely on <u>Wilkinson v. Torres</u>, 610 F.3d 546 (9th Cir. 2010) to argue that there is no liability here because the situation is not one where actual deliberation was practical and the officers did not have ulterior motives. (Doc. No. 161-1 at 29.) Lakeside and Santee Defendants argue that there is no underlying violation and any conduct does not "shock the conscience." (Doc. Nos. 159-1 at 18–29; 160-1 at 28–31.)

Because the Court grants summary judgment in favor of Sergeant Ralph on Plaintiffs' excessive force and denial of medical care claims and in favor of Hackett, Poynter, Csik, and Captain Bagley on Plaintiffs' denial of medical care claim, the Court also grants summary judgment in favor of Sergeant Ralph, Hackett, Poynter, Csik, and Captain Bagley on Plaintiffs' substantive due process claim. The Court also grants summary judgment on this claim in favor of the City and the District because the Court grants summary judgment in favor of both of those entities' employees, leaving no underlying violation. The Court grants summary judgment in favor of Sheriff Gore on this claim because Plaintiffs show no evidence supporting such a claim.

As for Officers Collins, Krull, Allen, Brooke, Tennison, Fischer, Martinson, Carbajal, Lee, Pugh, and Silva, and the County, genuine issues of material fact remain on the substantive due process claim. First, the Court concludes that for these Defendants, genuine issues of material fact remain as to whether they violated Phounsy's rights. Second, triable issues of fact remain as to whether there was time to deliberate. Collins testified that after he arrived at Chanthaphanh's home, he waited by his car for Deputy Krull. (Collins Depo. at 34.) After Deputy Krull arrived, they took time to speak to Mr. Kelley regarding the situation. (<u>Id.</u> at 34–35.) Further, many of the Defendants did in fact deliberate with each other during the relevant time period. There also is a genuine dispute of material fact as to whether these Defendants had any ulterior motives in their actions. Accordingly, the Court denies summary judgment on the substantive due process claim as

to Officers Collins, Krull, Allen, Brooke, Tennison, Fischer, Martinson, Carbajal, Lee, Pugh, and Silva, and the County.

### H.     Intentional Infliction of Emotional Distress

Finally, Plaintiff Loan Thi Minh Nguyen asserts a claim for intentional infliction of emotional distress against the County, Officer Collins, and Officer Krull. (Doc. No. 50 ¶¶ 127–132.) To prove a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct by the defendant with the intent of causing or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered extreme emotional distress; and (3) actual and proximate causation. Hughes v. Pair, 46 Cal. 4th 1035, 1051 (2009). Plaintiff Loan is the wife of Phounsy and was present during the altercation between the officers and Phounsy, which ultimately resulted in Phounsy's death. (Nguyen Depo. at 52.) Plaintiff Loan has raised genuine issues of material fact on the elements of her claim for intentional infliction of emotional distress against the County, Officer Collins, and Officer Krull.

## **CONCLUSION**

For the foregoing reasons, the Court grants the motion for summary judgment by the City of Santee, Bagley, and Hackett on all claims. The Court also grants the motion for summary judgment by the Lakeside Fire Protection District, Poynter, and Csik on all claims.

The Court grants in part and denies in part San Diego Defendants' motion for summary judgment. Specifically, the Court grants summary judgment in favor of Sheriff Gore and Sergeant Ralph on all claims. The Court grants summary judgment in favor of all Defendants on Plaintiffs' ADA and Unruh Act claims. On Plaintiffs' excessive force claim, the Court grants summary judgment to Officers Martinson, Carbajal, Lee, Pugh, and Silva; and denies summary judgment to Officers Collins, Krull, Allen, Brooke, Tennison, and Fischer. On Plaintiffs' denial of medical care claim, the Court grants summary judgment to Officers Collins, Krull, and Brooke; and denies summary judgment to Officers Allen, Martinson, Carbajal, Lee, Pugh, Silva, Tennison, and Fischer. The Court denies summary

judgment to the County of San Diego on Plaintiffs' <u>Monell</u> claim. As for Plaintiffs' battery and Bane Act claims, the Court grants summary judgment to Officers Martinson, Carbajal, Lee, Pugh, and Silva; and denies summary judgment to Officers Collins, Krull, Allen, Brooke, Tennison, and Fischer. The Court denies summary judgment to the County and all Sheriff's Department Defendants except Sergeant Ralph on Plaintiffs' negligence claim. As for Plaintiffs' wrongful death and substantive due process claims, the Court denies summary judgment as to all San Diego Defendants except Gore and Ralph. Finally, the Court denies summary judgment on Plaintiff Loan's intentional infliction of emotional distress claim.

**IT IS SO ORDERED.**

DATED: April 12, 2019

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

3:15-cv-02692-H-MDD