# EXHIBIT C

*Gary M. Vilke, M.D., FACEP, FAAEM*
*11582 Normanton Way*
*San Diego, California 92131*
*(619) 666-8643*

May 22, 2017

Kevin Osterberg
Haight Brown & Bonesteel LLP
3750 University Ave
Suite 560
Riverside, CA 92501

Samuel C. Gazzo
Daley & Heft, LLP
462 Stevens Avenue, Suite 201
Solana Beach, CA 92075

James M. Chapin, Senior Deputy
San Diego County Counsel
1600 Pacific Highway, Room 355
San Diego, California 92101-2469

RE :   KJP, et. al. v County of San Diego, et. al.
Case No.: 3:15-cv-02692-H-MDD

### Introduction

I am a board-certified emergency department physician with substantial experience in

emergency medicine as well as Emergency Medical Services (EMS). My qualifications are

delineated at the end of my report.

I have been retained as an expert to review relevant materials and provide expert opinion on

whether the use of the TASER Electronic Control Device (ECD) by the San Diego Sherriff's

Deputies who arrested Mr. Lucky Phounsy or if any actions or inactions by the Lakeside and Santee

EMS personnel who transported Mr. Lucky Phounsy on April 13, 2015 caused or contributed to his

death. After careful review, it is my opinion to a reasonable degree of medical probability that



EXHIBIT 5
Vilke 7/14/17
Kathleen McLaughlin, CSR No. 5845
LITIVATE
REPORTING + TRIAL SERVICES

neither the use of the TASER ECD by the deputies nor any actions or inactions of the EMS personnel caused or contributed to the death of Mr. Phounsy.  He died of a cardiac arrest due to severe hyperkalemia resulting from acute kidney failure related to drug use and associated with acute drug induced agitation and underlying cardiac disease.  These opinions and related opinions are set forth in the expert report.

### Materials Reviewed

I have reviewed extensive materials pertaining to the above referenced case.  This includes, but is not limited to:

**Case-Specific Materials.**

1.  Complaint
2.  Expert Witness Disclosures by Plaintiffs, City of Santee, and Lakeside Fire Protection District
3.  San Diego County Sheriff's Crime/Incident Report # 15118678 for the incident of April 13, 2015, with Lucky Phounsy.
4.  Santee Fire and Lakeside FPD EMS Reports for the incident of April 13, 2015, with Lucky Phounsy.
5.  Grossmont Hospital Medical Records
6.  Medical Records from Dr. Jeffrey Dysart
7.  Scene photographs and of officers' injuries
8.  County of San Diego Medical Examiner's Investigative Report, Autopsy Report, and Toxicology Report for Case No. 15-00926 regarding Lucky Phounsy.
9.  Deposition of David Csik
10. Deposition of Aaron Hackett
11. Deposition of Adam Daniels
12. Deposition of Aaron Do
13. Deposition of Aaron Bagley
14. Deposition of Daniel Nenow
15. Deposition of Marc Poynter
16. Deposition of Dean Allen

17. Deposition of Jenny Martinson

18. Deposition of TamaniPugh

19. Deposition of Aaron Brooke

20. Deposition of Billy Tennison III

21. Deposition of Sandra Carbajal

22. Deposition of Richard Fisher

23. Deposition of Janae Krull

24. Deposition of Marcos Collins

25. Deposition of Michael Lee

26. Deposition of Steven Charles Chapman, M.D.


**Medical and Scientific Literature**

Vilke GM, Payne-James J, Karsch SB.  Excited Delirium Syndrome (ExDS):  Redefining an Old Diagnosis.  J Forens Legal Med. 2012;19:7-11.

Vilke, GM, Bozeman WP, Dawes DM, DeMers, G, Wilson MP.  Excited delirium syndrome (ExDS): Treatment options and considerations.  J Forens Legal Med. [Epub 2012 Jan 24]

Vilke GM, DeBard ML, Chan TC, Ho JD, Dawes DM, Hall C, Curtis MD, Costello MW, Mash DC, Coffman SR, McMullen MJ, Metzger JC, Roberts JR, Sztajnkrcer MD, Henderson SO, Adler J, Czarnecki F, Heck J, Bozeman WP. Excited Delirium Syndrome (ExDS): Defining Based on a Review of the Literature. J Emerg Med. [Epub 2011 Mar 24]

Bell, L. On a form of disease resembling some advanced stages of mania and fever, but so contradistinguished from any ordinary observed or described combination of symptoms as to render it probable that it may be overlooked and hitherto unrecorded malady. American Journal of Insanity. 1849; 6:97-127.

Chan TC, Vilke GM, Neuman T, Clausen JL:  Restraint position and positional asphyxia.  Ann Emerg Med 1997;30(5):578-586.

Chan TC, Vilke GM, Neuman T:  Reexamination of custody restraint position and positional asphyxia.  Am J Forensic Med Pathol 1998;19(3):201-205.

Vilke GM, Chan TC, Neuman T, Clausen JL:  Spirometry in normal subjects in sitting, prone, and supine positions.  Respir Care 2000;45(4):407-410.

Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T:  The impact of oleoresin capsicum spray on respiratory function in human subjects in the sitting and prone maximal restraint positions, final report.  NCJ 182433.  Washington, DC: United States Department of Justice, National Institute of Justice, 2000, 68 pages.

Chan TC, Vilke GM, Clausen J, Clark RF, Schmidt P, Snowden T, Neuman T: The effect of oleoresin capsicum "pepper" spray inhalation on respiratory function. J Forensic Sci 2002; 47(2):299-304.

Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM: Weight force during prone restraint and respiratory function. Am J Forensic Med Pathol 2004;25(3):185-189.

Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW. Ventilatory and metabolic demands during aggressive physical restraint in healthy adults. J Forensic Sci 2007;52(1):171-175.

Reay DT, Howard JD, Fligner CL, Ward RJ. Effects of positional restraint on oxygen saturation and heart rate following exercise. Am J Forensic Med Pathol. 1988 Mar;9(1):16-8.

Schmidt P, Snowden T. The effects of positional restraint on heart rate and oxygen saturation. J Emerg Med 1999;17:777-782.

Vilke GM, Sloane C, Castillo EM, Kolkhorst FW, Neuman TS, Chan TC. Evaluation of the Ventilatory Effects of a Restraint Chair on Human Subjects.. J Emerg Med. 2011;40(6):714-8. Epub 2010 Jan 13.

Savaser DJ, Campbell C, Castillo EM, Vilke GM, Sloane C, Neuman T, Hansen AV, Shah S, Chan TC. The effect of the prone maximal restrained position with and without weight force on cardiac output and other hemodynamic measures. J Forens Leg Med. 2013 Nov;20(8):991-5. Epub 2013 Aug 30.

Sloane C, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM. Evaluation of the Ventilatory Effects of the Prone Maximum Restraint Position (PMR) on Obese Human Subjects. Forens Sci Int 2014;237:86-9. Epub 2014;46(6):865-72. Epub 2014 Feb 14.

Cary NRB, et al: The effect of simulated restraint in the prone position on cardiorespiratory function following exercise in humans. J Physiol 1998;525:30.

Ho JD, Dawes DM, Moore JC, Caroon LV, Miner JR: Effect of position and weight force on inferior vena cava diameter--implications for arrest-related death. Forensic Sci Int. 2011 Oct 10;212(1-3):256-9.

Kroll MW, Still GK, Neuman TS, Graham MA, Griffin LV. Acute forces required for fatal compression asphyxia: A biomechanical model and historical comparisons. Med Sci and the Law. 2017 Jan 1:25802417695711. [Epub ahead of print]

Bozeman WP, Hauda WE 2nd, Heck JJ, Graham DD Jr, Martin BP, Winslow JE. Safety and injury profile of conducted electrical weapons used by law enforcement officers against criminal suspects. Ann Emerg Med. 2009 Apr;53(4):480-9. Epub 2009 Jan 21.

Eastman AL, et al. Conductive electrical devices: a prospective, population-based study of the medical safety of law enforcement use. J Trauma. 2008 Jun;64(6):1567-72.

Strote J, et al. Conducted Electrical Weapon Use by Law Enforcement: An Evaluation of Safety and Injury. J Trauma. 2009 Dec 22. [Epub ahead of print].

Vilke GM, Sloane CM, Suffecool A, Kolkhorst FW, Neuman TS, Castillo EM, Chan TC. Physiologic effects of the TASER after exercise. Acad Emerg Med. 2009 Aug;16(8):704-10.

Vilke GM, Sloane CM, Bouton KD, Kolkhorst FW, Levine SD, Neuman TS, Castillo EM, Chan TC. Physiological effects of a conducted electrical weapon on human subjects. Ann Emerg Med. 2007 Nov;50(5):569-75. Epub 2007 Aug 24.

Vilke GM, Bozeman WP, Chan TC.   Emergency Department Evaluation after Conducted Energy Weapon Use:  Review of the Literature for the Clinician.  J Emerg Med 2011;40(5):598-604. Epub 2011 Jan 4.

## Overview of Opinions
**(all opinions within this report are to a reasonable degree of medical or scientific probability)**

An overview of my opinions is as follows with more description of each below:

1. **The care provided to Mr. Phounsy by the prehospital EMS providers was appropriate and consistent with the applicable standard of care for prehospital providers including both paramedics and EMTs.**

2. **The paramedics treating Mr. Phounsy with two doses of midazolam was appropriate and did not breach standard of care and did not cause or contribute to Mr. Phounsy going into cardiac arrest.**

3. **The paramedics not using supplemental oxygen, not starting an IV and not using the cardiac monitor in the back of the ambulance prior to the cardiac arrest of Mr. Phounsy was reasonable, did not breach standard of care and did not cause or contribute to Mr. Phounsy going into cardiac arrest.**

4. **The use of the spit sock on Mr. Phounsy did not cause or contribute to his cardiac arrest or death.**

5. **The use of police maximal restraints, including the hogtie restraint, and weight force on Mr. Phounsy in the back of the ambulance did not cause or contribute to his cardiac arrest or death.**

6. The significant hyperkalemia (elevated potassium levels) that Mr. Phounsy developed due to acute renal failure, in combination with his underlying cardiac disease, drug use and agitation was the probable cause of his sudden cardiac arrest that ultimately resulted in his death.

7. The use of the TASER Electronic Control Device (ECD) on Mr. Phounsy did not cause or contribute to his cardiac arrest or death.

## Analysis

After reviewing the above listed materials, it appears that on April 13, 2015, at around 2200, 911 was called in order to gain assistance for Mr. Lucky Phounsy who was acting paranoid and thinking somebody was trying to kill him. Mr. Phounsy was 32 years old, 5'7" and weighed 185 lbs at the time of autopsy. Family reported that Mr. Phounsy had gone to Coachella and tried different illicit drugs while there, which may have included ecstasy, LSD, whippets, and cocaine. Sheriffs Deputy's arrived and found Mr. Phounsy acting very paranoid. When they attempted to assess him for weapons, an altercation ensued. Santee EMS had been summoned and were awaiting until the scene was clear to come in and evaluate.

Additional deputies were called to assist and gain control of Mr. Phounsy. A TASER electronic control device was used on Mr. Phounsy in both probe and drive stun mode. Deputies were injured during the restraining process, but ultimately Mr. Phounsy was able to be handcuffed, and due to his degree of resistance and combativeness, his legs were hobbled and then clipped to his handcuffs in a hogtie position.

After the Santee EMS personnel were cleared to enter the scene, an additional EMS unit was dispatched from Lakeside to assist with multiple patients. Mr. Phounsy was evaluated by paramedic Hackett and treated with 5 mg of midazolam intramuscularly to treat to his combativeness. Lakeside paramedic Poynter arrived on scene and also assisted in taking care of Mr. Phounsy. Mr. Phounsy was still extremely combative and struggling, and due to this extreme

nature, the paramedics opted to give a second 5 mg of midazolam intramuscularly. Mr. Phounsy was then placed onto a paramedic gurney on his left side, and taken to the ambulance for transport.

Due to his degree of combativeness, EKG probes were determined to not be placed as they would be either dislodged, or not offering accurate readings due to motion artifacts. Cardiovascular status was monitored by using capillary refill and assessments of radial pulse as well as physical evaluation of the patient. An oxygen saturation probe was attempted to be placed at least two times, but again due to Mr. Phounsy's combativeness it kept falling off and would not give an accurate read. Similarly, the blood pressure cuff would not give a reading due to the degree of agitation and struggle of Mr. Phounsy. Evaluation of his ventilatory status was maintained clinically, based on breathing pattern, rate and depth. A spit mask was applied in the ambulance on Mr. Phounsy to protect the personnel from exposure to spitting.

During the transport as the ambulance was approaching the hospital, there was a sudden change in status of Mr. Phounsy. He stopped resisting and struggling, and the deputy that was maintaining control of Mr. Phounsy's head noted that he was doing some grinding with his teeth. The paramedics reassessed at this time and noted that he was not breathing nor did he have a pulse. CPR was initiated and Mr. Phounsy was taken into the emergency room for further resuscitation.

Mr. Phounsy had a return of spontaneous circulation in the emergency department after using advanced cardiac medications. During the course of the emergency department evaluation, a serum potassium level was noted to be elevated at 6.6. Mr. Phounsy was treated with medications to emergently lower this very high level. He was stabilized, but in critical condition and was admitted to the hospital. He was found to be in renal failure and ultimately ended up dying on April 21, 2015.

The medical examiner performed an autopsy and reported the cause of death to be anoxic encephalopathy due to cardiopulmonary arrest with resuscitation following a physical altercation

and restraint, due to a stimulant drug-related psychotic state along with cardiac atherosclerosis as a contributing factor.

Given this history, there are a number of issues that need to be addressed in more detail below. All opinions given are to a reasonable, or higher, degree of medical probability based on the information currently available.

## Detailed discussion and basis of opinions

1. ***The care provided to Mr. Phounsy by the prehospital EMS providers was appropriate and consistent with the applicable standard of care for prehospital providers including both paramedics and EMTs.***

In reviewing the care provided to Mr. Phounsy by the paramedics, I did not see any deviations from standard of care. He received an assessment, evaluation and treatment. He was repeatedly reassessed and monitored. Protocols were followed within reason with the paramedics utilizing critical thinking which was reasonable based on the presentation and circumstances involved in this case.

2. ***The paramedics treating Mr. Phounsy with two doses of midazolam was appropriate and did not breach standard of care and did not cause or contribute to Mr. Phounsy going into cardiac arrest.***

Mr. Phounsy was suffering from an acute behavioral emergency, reported to the paramedics from the family at the time of the event to be associated with illicit drug usage. He was exhibiting signs and symptoms consistent with a stimulant induced sympathetic crisis. The paramedics utilized midazolam intramuscularly, which is part of their treatment protocols for both psychiatric/behavioral emergencies as well as for excited delirium. If the 5-mg dose of midazolam

does not improve symptoms, a second dose of midazolam 5 mg is recommended. This is what the paramedics did to treat Mr. Phounsy.  This utilizing of two doses of midazolam is what Mr. Phounsy needed to try to help calm him down and reduce his level of agitation. This dosage of midazolam is standard practice and in a severely agitated individual such as Mr. Phounsy, would not cause any respiratory issues or lead to ventilatory failure or cardiac arrest. The use of this medication by the paramedics was appropriate, met standard of care, and did not cause or contribute to Mr. Phounsy going into cardiac arrest.

   3. *The paramedics not using supplemental oxygen, not starting an IV and not using the cardiac monitor in the back of the ambulance prior to the cardiac arrest of Mr. Phounsy was reasonable, did not breach standard of care and did not cause or contribute to Mr. Phounsy going into cardiac arrest.*

   There was no clinical indication for the paramedics to utilize oxygen on Mr. Phounsy in the back of the ambulance prior to him going into cardiac arrest. There was no evidence that he was in respiratory distress, or showing symptoms of hypoxia. There was no cyanosis and there was no slowing of his heart rate.  Though the excited delirium protocol notes to start high flow O2 as soon as able, this is open to the judgement of the paramedics.  If there is no evidence of respiratory distress or hypoxia and the risks of trying to place the mask would be outweighing the unlikely benefits, the paramedics exercised sound judgement and were appropriate in not trying to place the oxygen mask. Under the same excited delirium protocol is written to ventilate the patient as soon as able.  As Mr. Phounsy was spontaneously breathing and moving air in and out, there was no indication to ventilate Mr. Phounsy.  Once again, the paramedics exercised appropriate judgment in weighing the risks of trying to ventilate Mr. Phounsy which would clearly outweigh any unlikely benefits, not to mention putting him at increased risk for inducing vomiting and aspiration into his lungs.

Patients who are breathing faster than normal due to drug intoxication or exertion or struggle typically have levels of oxygen in the blood that are above normal, and the addition of supplemental oxygen or ventilating would not have any clinical impact physiologically. Supplemental oxygen does not neutralize or have any clinical effects to improve metabolic acidosis. Not using supplemental oxygen did not lead to or cause the cardiac arrest of Mr. Phounsy.

The paramedics did not place an IV into Mr. Phounsy because he was being so aggressive and struggling so much that trying to place an IV was a hazard to both Mr. Phounsy and the paramedics.   The protocol notes to give an IV bolus of fluid as soon as able, but with Mr. Phounsy struggling and moving around, the paramedics were unable to safely start an IV.  This decision to hold off on starting the IV until Mr. Phounsy was calmer was sound and appropriate and did not breach standard of care.  Even if the paramedics had started an IV, the fluid that would have gotten into Mr. Phounsy's system would not have prevented the subsequent cardiac arrest.

The paramedics did not place the cardiac monitor on Mr. Phounsy while he was aggressively struggling and resisting because they knew that all of the movement would lead to motion artifact on the monitor and would not be useful or accurate data.  Waiting until Mr. Phounsy was calmer before attempting to place the leads was reasonable and did not breach the standard of care.

The paramedics decisions to not initiate the use of high flow oxygen, starting an IV, not ventilating and not using a cardiac monitor due to the degree of agitation and movement was sound reasoning, appropriate, meeting standard of care, and did not cause or contribute to Mr. Phounsy going into cardiac arrest.

4. ***The use of the spit sock on Mr. Phounsy did not cause or contribute to his cardiac arrest or death.***

Mr. Phounsy had a spit mask placed on him for the personal protection of the deputy working with him in the back of the ambulance.  This is reasonable and prudent given his agitation

and lack of compliance coupled with the close proximity of the deputy near the face of Mr. Phounsy and the blood noted on Mr. Phounsy's face. The mask is made of a thin mesh material that covers the entire head. This material allows for air to pass through and does not impede one's ability to breathe. Even if pulled tightly over the nose and mouth, air passes through and allows for respirations. The material of the spit mask is much more permeable compared with masks covering the noses and mouths of physicians and nurses in the operating room or construction workers who breath for hours at a time without problems. There was no clinical evidence that Mr. Phounsy was unable to breathe through the spit mask, as demonstrated by no reported labored breathing, no cyanosis, coughing or gagging. He was active and moving as well until he became suddenly unresponsive, which is more consistent with a sudden cardiac arrest, not an asphyxiation. And to date, there are no reports in the medical literature that identify spit masks as a cause of asphyxiation. The use of the spit mask was certainly within the standard of care and was not a causal factor in Mr. Phounsy's sudden cardiac arrest or death.

5. **The use of police maximal restraints, including the hogtie restraint, and weight force on Mr. Phounsy in the back of the ambulance did not cause or contribute to his cardiac arrest or death.**

During the period that Mr. Phounsy was being handcuffed, he was restrained in a prone position with a certain amount of weight placed on him initially to gain control over him. He was handcuffed and because he was still struggling vigorously, a hobble was placed around his ankles and then attached to his handcuffs to complete a hogtie position. He was attempted to be maintained on his side, but kept struggling and wiggling back and forth.

After Mr. Phounsy was evaluated and initially treated by the EMS providers, there was discussion and consideration to change the police maximal restraints for the paramedic restraints. However, after observing the aggressive behavior of Mr. Phounsy and learning of the difficult struggle that the deputies had to try to get him handcuffed initially, the decision was made not to

remove the police maximal restraints and transport him with the handcuffs in place, with him lying on his side. Given the circumstances, this decision was sound and appropriate. He was not reported to complain of shortness of breath or difficulty breathing after being restrained and being tended to by the paramedics. He was reported to have shallow but effective unlabored breathing at a rate of 30 breaths/minute and a strong pulse of 120 beats/minute.

Once Mr. Phounsy was placed on the ambulance gurney, he was maintained in the hobble position on his side as best as could be maintained with all of his wiggling and struggling. He had seatbelts from the gurney placed across him to hold him in position but were reported to be loose enough to allow him to breathe and even move his position. In the back of the ambulance, Deputy Fisher, who weighed approximately 220 lbs at the time, was reportedly holding Mr. Phounsy's head and torso on the gurney to keep him from sitting up and moving. Throughout this period, the paramedics assessed his breathing and noted it to be appropriate. There was no cyanosis, and no signs of any respiratory distress. His heart rate was not reported to slow down, and Mr. Phounsy continued to struggle as he had been all the while.

The amount of weight being placed on the torso by the deputy is not enough to limit ventilations or cause asphyxiation by compression. Research using up to 220 lbs. of weight on a subject's back has not shown to cause physiologic changes that would imply asphyxiation is even possible with that amount of weight. The cardiac arrest of Mr. Phounsy was caused by his heart stopping, not due to asphyxia or other ventilatory issues.

The decision to transport Mr. Phounsy using the police maximal restraints with him on his side was appropriate and met standard of care. And since there were no physiologically significant amounts of weight being placed on him by Deputy Fisher during the transport, and given that the cardiac arrest was sudden, there is no evidence that position, restraint or body weight caused or contributed to Mr. Phounsy's sudden cardiac arrest and death.

6. *The significant hyperkalemia (elevated potassium levels) that Mr. Phounsy developed due to acute renal failure, in combination with his underlying cardiac disease, drug use and agitation was the probable cause of his sudden cardiac arrest that ultimately resulted in his death.*

Mr. Phounsy was found to have a potassium level of 6.6 at the time of his emergency department evaluation at 2320. The cause of this elevation is most likely due to acute kidney failure that often accompanies drug use like MDMA, especially after several days of repeated use as was reported in the case of Mr. Phounsy. This elevation was not caused by or worsened by the interaction with the deputies or EMS providers. Mr. Phounsy had an elevated creatinine of 2.0. This is consistent with renal failure and predated the arrival of the deputies and paramedics.

CPK is an enzyme released when muscle cells break down. When muscles are overworked or damaged, they release the enzyme into the blood stream that can be measured on laboratory evaluation. CPK is very non-specific in that many different activities can cause it to rise. One of the most common is recreational muscle activity. Athletes and non-athletes alike after even a moderate work out can see measurable elevations in CPK. In the emergency department, we see elevations in patients with seizures, who are on statin medications for cholesterol, or who have been involved in altercations or done repetitive muscle contraction activities. A mild rise to 841 like seen in Mr. Phounsy is typically not even a concern as is considered clinically insignificant. When we see elevations into the tens of thousands range, there is an increased risk for the complications of rhabdomyolysis including renal failure. Renal failure can occur in patients with severely elevated CPK levels. CPK damages the kidneys and causes the kidneys not to function correctly. When this occurs, creatinine levels start to rise and this is diagnostic of renal failure. If this goes on for a long enough period of time, potassium levels will elevate.

In the case of Mr. Phounsy, the CPK levels were not significantly elevated at the time of his arrival to the hospital. However, his creatinine was already elevated as was his potassium level, but this was not due to rhabdomyolysis from elevated CPK, because his CPK levels were not high

enough to cause this. The kidney dysfunction pre-dated the arrival of the deputies and EMS providers. If exertion and struggling and fighting were to cause kidney failure, first the CPK levels have to be elevated, and that takes many hours to occur. The timeframe from the deputies' and paramedics' interactions with Mr. Phounsy and his lab work done about an hour later is inconsistent with struggle or exertion induced rhabdomyolysis or renal failure.

The potassium level of Mr. Phounsy at the hospital was 6.6 which was noted after being given bicarbonate as part of his cardiac arrest resuscitation. Bicarbonate is one of the urgent therapies used to treat and lower hyperkalemia. This means that his initial level of potassium was even higher than 6.6 prior to the bicarbonate at the time of his cardiac arrest. By way of comparison, a normal potassium level is 3.5-5.0. Patients with chronic kidney failure on dialysis can get up to levels of 6.0 to 7.5 with little in the way of clinical findings, but other patients with acute elevations in potassium will have EKG changes at these levels and are already at significant risk to go into sudden cardiac arrest. Mr. Phounsy, with a potassium of greater than 6.6 was at increased risk to go into cardiac arrest at any moment, with or without any involvement by law enforcement or EMS providers. This severe hyperkalemia in combination with his severe agitation and continuing to struggle, and from his MDMA use is the probable cause of Mr. Phounsy's sudden cardiac arrest and ultimately his death a week later.

### 7. *The use of the TASER Electronic Control Device (ECD) on Mr. Phounsy did not cause or contribute to his cardiac arrest or death.*

There are no peer-reviewed published scientific or medical literature that concludes that TASER ECDs cause cardiac dysrhythmias or cardiac arrest in humans utilized in the probe mode or drive stun mode away from the chest transcardiac axis. There is theoretical modeling that describes how a TASER ECD could possibly cause cardiac arrest over the transcardiac axis, but the circumstances are not present with Mr. Phounsy. More than 1.5 million volunteer subjects have

undergone TASER ECD activations, and none have ever been reported to develop sudden cardiac arrest or die. Just because a TASER ECD was being used in proximity to his death, does not imply causation.

The TASER X26 ECD data download from Deputy Collins's device shows six trigger pulls over two time periods. The first time-period was three trigger pulls for a total of 11 seconds of activation over 16 seconds, and the second was three trigger pulls for a total of 10 seconds of activation over 14 seconds. Both sets of activations were in probe mode into the torso. The time periods were approximately 3 minutes apart. The deputy reported that Mr. Phounsy pulled out the probes each time. The TASER X2 ECD data download from Deputy Brooke's device shows two trigger pull arcs for a total of 4 seconds of activation, a 3 second activation followed by a 1 second activation. He reported to use the TASER ECD in drive stun mode with the contact points located on the right side of Mr. Phounsy's back, under his shoulder. The TASER X2 ECD data download from Deputy Krull's device shows one trigger pull for a total of 5 seconds of activation. She reported to use the TASER ECD in probe mode with the laser location at the shoulder and thigh of Mr. Phounsy.

For an ECD to deliver a charge to the person, the electrical circuit must be completed and maintained. Thus, as a point of clarification, just because the TASER ECD downloads recorded 30 seconds of activation time from the three TASER ECDs, does not mean that the TASER ECD were indeed in contact with the subject and delivering the electrical stimulus for that amount of time. Often with moving, squirming, rolling and kicking, probes can become dislodged or wires broken. In this case, Mr. Phounsy was reported to pull out the probes as well as rolling around and at the end of the final TASER ECD activation, the wires were reported to no longer be attached. Even after the final TASER ECD activation, Mr. Phounsy was still struggling and fighting for quite some time before he went into cardiac arrest. If the TASER ECD had "electrocuted" Mr. Phounsy, his heart would have gone into a ventricular fibrillation (VF) at the time the electricity was being

delivered and he would have immediately lost consciousness at the time that the TASER ECD was firing or within 1-2 seconds after stopping.   Subjects in VF cannot fight or struggle, let alone remain conscious as the blood flow to the brain ceases immediately.

This time of struggle that Mr. Phounsy had after the last TASER ECD activation support that the TASER ECD did not cause his heart to go into cardiac arrest.  This conclusion is also supported in that the first rhythm reported by the defibrillator that was used to treat Mr. Phounsy after he went into cardiac arrest recorded the first rhythm as asystole, flatline.   Asystole is not a rhythm caused by electricity, VF is.

For one to possibly conclude that a TASER ECD could even be considered to cause cardiac arrest, basically all the following facts would need to be present:

1) The device probes would need to be penetrating deep into the chest wall for the tips to be close to the heart (a close dart to heart ratio);

2) The subject would need to have a thin chest wall;

3) The subject to be standing at the time of the TASER ECD activation and leaning forward so that the heart is closer to the anterior chest wall;

4) The subject would need to lose consciousness immediately during the TASER ECD activation or with 1-2 seconds after; and

5) The first cardiac rhythm would need to be ventricular fibrillation.

All of these would be needed to even consider the TASER ECD as the cause of death, but in this case with Mr. Phounsy, these facts are not present.  So again, the published scientific data as well as the objective evidence available in this case confirms that the use of the TASER ECD was non-contributory to the cardiac arrest and death of Mr. Phounsy.

## Background

My background is that I am a full-time faculty member in the department of emergency medicine at the University of California, San Diego Medical Center. I am residency trained and board certified in Emergency Medicine. I work full time as a practicing clinician in the Emergency Department of a busy urban hospital and serve and the clinical operations chief for our two emergency departments with a combined annual census of approximately 70,000 visits. I currently serve as the Medical Director for Risk Management for the UC San Diego Health System. I also serve as the UCSD Medical Center's Medical Risk Management Committee Chair and Allocation Committee Co-Chair, as well as previously having served as the Chair of the Patient Care and Peer Review Committee, each of which are charged with the task of reviewing medical records and making determinations of standard of care. I am also the former Chief of Staff for the UCSD Medical Center.

I have worked for almost 20 years as a faculty emergency physician at an urban-based emergency department that is contracted to receive patients who are in custody, both as field arrests and for on-going care while incarcerated. I served as the UCSD Director of Custody Services overseeing hospital services for the San Diego County Sheriff's Department Medical Services for 16 years. I also have worked in a jail setting for over 18 years, staffing weekly sick call clinics on site at the San Diego Sheriff's jails throughout San Diego County. I have also served as the on-site medical director for the San Diego Sheriff's medical clinics for 16 years where I have trained staff physicians, participated in quality assurance, resource utilization, policy and protocol development and peer review. I have also overseen the physician staffing for seven jails in San Diego County over that time. During my career, I have evaluated thousands of patients over the last 20 years who have been under the influence of drugs, were in cardiac arrest and/or had elevated potassium levels

My Emergency Medical Services (EMS)/prehospital background and experience includes having been a flight physician with Lifeflight of San Diego and with Mercy Air, taking care of

acutely injured patients at the scene.  My EMS administrative roles include having been the Base Station Medical Director for UCSD, the Medical Director for the Palomar and Southwestern Paramedic College Training Programs, and the former Medical Director for the County of San Diego Emergency Medical Services (EMS) one of the largest EMS systems in the nation. In this role, I was responsible for protocols and quality assurance of over 1000 paramedics and 4000 EMT's.  I started the UCSD EMS/Disaster Medicine Fellowship Training Program and was the first Fellowship Director and currently serve as the Assistant Director of the EMS/Disaster Medicine Division in the UCSD Department of Emergency Medicine and as the Medical Director for Carlsbad Fire Department and AirLinkUSA Air Ambulance Service.  I have been a paramedic base hospital physician in San Diego County for over 25 years.  Other previous roles include have been the Medical Director for the San Diego County Metropolitan Medical Strike Team (MMST) and serving as EMS medical back up for many SWAT operations. I was also the Principal Investigator for San Diego's Resuscitative Outcomes Consortium (ROC) site, a National Institute of Health (NIH) funded study consortium that evaluated treatment options for out of-hospital cardiac arrest and severe traumatic injury including gunshot injuries for over a decade.

I was the lead author on work requested by the American College of Emergency Physicians (ACEP) to review the totality of the body of literature on the topic of Excited Delirium Syndrome (ExDS) and wrote up the findings of the expert consensus panel's white paper.  I have published a number of papers on the topic, have been grant funded by the National Institute of Justice to study patients with ExDS and invited to write multiple text book chapters on the topic of ExDS.  I have also been invited to lecture nationally and internationally on the topics of Excited Delirium Syndrome.

I am knowledgeable of peer-reviewed medical and scientific research on the physiological effects of positional restraint and positional asphyxia conducted by others. I have also performed extensive clinical research on human subjects who have been restrained in various positions and

with various amounts of weight being placed (articles included in my curriculum vitae) which includes having directly been involved with hundreds of subjects being restrained and studied, hundreds of patients restrained during my work in the emergency department and have personally been restrained with weights placed on me as well.  I have been invited to lecture nationally and internationally on this subject.  Given my own interests in this area, I regularly perform a complete review of the literature regarding restraints and in custody death.

I am knowledgeable of peer-reviewed medical and scientific research on TASER electronic control devices (ECDs) conducted by others.  In fact, I was the lead author on work requested by the American Academy of Emergency Medicine (AAEM) to review the totality of the peer reviewed published medical literature on humans and come to conclusions regarding the necessary emergency department evaluation of patients being seen after receiving a TASER ECD activation.  I have received federal grant funding and performed extensive clinical research on human subjects who have received TASER ECD applications (articles included in my curriculum vitae) which includes having been involved with over 200 TASER ECD activations and have personally received multiple applications of the device.  I have written several book chapters on this topic and have lectured internationally about the physiologic effects of TASER ECDs.

As per Rule 26 formatting, Appendix A is a copy of my current Curriculum Vitae, which includes a list of all publications authored by me.  Appendix B is a list of all cases in which I have testified as an expert in trial or deposition within the preceding four years.  Appendix C is my fee schedule.   The knowledge base that I utilize has been developed over time from my years of clinical practice and experience, reading and training as well as research.  Under penalty of perjury, I hereby swear that the opinions stated above are true and correct within a reasonable degree of medical probability. I also reserve the right to review the Rule 26 Reports of other expert witnesses retained in this case by all parties, and review other materials as they become available in the case, and provide additional opinions as appropriate.

Respectfully submitted,

Gary M. Vilke, M.D., FACEP, FAAEM
Professor of Clinical Emergency Medicine
Emergency Medicine Clinical Service Chief and Co-Medical Director
Medical Director, Risk Management, UC San Diego Health System
Director, Clinical Research for Emergency Medicine