THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By RONALD LENERT, Senior Deputy (State Bar No. 277434)
    FERNANDO KISH, Senior Deputy (State Bar No. 236961)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244;  Fax: (619) 531-6005
E-mail: ronald.lenert@sdcounty.ca.gov; fernando.kish@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, San Diego County Sheriff's Department,
Dean Allen, Aaron Brooke, Sandra Carbajal, Marcos Collins, Janae Krull, Michael Lee,
Jenny Martinson, Tamani Pugh, Jovonni Silva, and Billy Tennison

Mildred K. O'Linn (State Bar No. 159055)
Tori L.N. Bakken (State Bar No. 329069)
**MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900; Fax (213) 624-6999

Attorneys for Defendant Richard Fischer

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| K.J.P., a minor, and K.P.P., a minor, individually, by and through their mother, LOAN THI MINH NGUYEN, who also sues individually and as successor in interest to her now deceased husband, Lucky Phounsy, and KIMBERLY NANG CHANTHAPHANH, individually,<br><br>                Plaintiffs,<br>         v.<br><br>COUNTY OF SAN DIEGO; San Diego Sheriff WILLIAM GORE; RICHARD FISCHER; KEVIN RALPH; MARCOS COLLINS; JANAE KRULL; SANDRA (JANET) CARBAJAL; BILLY TENNISION, III; DEAN ALLEN; MICHAEL LEE; JENNY MARTINSON; TAMANI PUGH; AARON BROOKE; JOVONNI SILVA; CITY OF SANTEE; AARON BAGLEY; AARON HACKETT; AARON DO; ADAM DANIELS; DANIEL NEOW; LAKESIDE FIRE PROTECTION DISTRICT; MARC POYNTER; DAVID CSIK,<br><br>                Defendants. | No. 15cv2692-H(MDD)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE TO PRECLUDE OPINIONS THAT MR. PHOUNSY WAS MENTALLY ILL OR DISABLED**<br><br>**[DEFENDANTS' MOTION 2 OF 5]**<br><br>Date:    February 8, 2021<br>Time:   10:30 a.m.<br>Dep.t.:  15A - Courtroom of the Honorable Judge Marilyn L. Huff<br><br>Trial Date:  February 23, 2021 |

15cv2692-H(MDD)

# I.   INTRODUCTION

Decedent Phounsy was never diagnosed as mentally ill or disabled, and Plaintiffs have conceded they have no knowledge he ever even visited a mental health professional. Plaintiffs have no evidence that he had any actual mental illness or disability at the time of these events.  And this Court has dismissed Plaintiffs' ADA and Unruh Act claims for Plaintiffs' failure to raise triable issues as to mental health.  However, many of Plaintiffs experts, none of which are mental health professionals, are prepared to opine that he was in the midst of a mental health crisis.  It would be improper and prejudicial to Defendants to allow Plaintiffs to solicit either lay or unqualified expert testimony at trial that Phounsy was mentally ill on the day of these events.

# II.   SUMMARY OF FACTS

Lucky Phounsy had no history of mental health illness.  In April 2015, Phounsy spent several days at a music festival, where he ingested an unknown amount of drugs. When he returned, his family could not calm him down, and began arranging to transport him to the hospital.  At approximately 10 p.m. on April 13, 2015, he called 9-1-1 in a delusional state, stating he believed people were trying to kill him.  Deputies Collins and Krull arrived and found Phounsy paranoid, nervous, and with a crazed look in his eyes. He was breathing heavily and tensed when they approached him.   After a short interaction, they moved to handcuff him for safety as they investigated his condition. Phounsy violently resisted.  It took several additional deputies to finally restrain him in maximum restraints.   He suffered cardiac arrest while in an ambulance, and though doctors were able to regain a pulse, Phounsy was later declared brain dead.

# III.   ARGUMENT

This is not a case of an individual in the midst of a mental health crisis.  However, this factually unsupported assertion was integral to Plaintiffs' complaint and repeated by several of their experts.

Plaintiffs assert in their Complaint:   "On April 13, 2015, Lucky began experiencing symptoms of a mental health crisis…" and "Lucky suffered from a mental

15cv2692-H(MDD)

disability as defined by [California Codes]."  (Doc. No. 50, Second Amended Complaint, ¶ ¶ 2, 97).  They relied on this assertion in three of their causes of action.  This Court dismissed two of these through summary judgement, dismissing claims under the Americans with Disabilities Act and California Unruh Civil Rights Act after finding Plaintiffs failed their burden of raising triable issues of fact on such claims.  (Doc. No. 171, Order, p. 36:1-6.)  In addition, Plaintiffs continue to pursue a *Monell* allegation against Defendant County of San Diego, and one theory of their claim is still based on this assertion.  Specifically, Plaintiffs claim that the County had "a practice or custom of using excessive and unreasonable force on individuals in the midst of a mental health crisis." (Doc. No. 50, ¶ 72).

Plaintiffs have no evidence that Phounsy was in the midst of a mental health crisis. Plaintiffs have never been able to provide any documentation of a mental illness, and the failure to produce such evidence was the basis of the Court's summary judgment ruling. (Doc. No. 171, Order, p. 36:1-6.)  Plaintiffs conceded they had no knowledge of Mr. Phounsy receiving diagnosis or treatment for any mental or emotional conditions. (Exhibit A, Plaintiffs' Response to Special Interrogatories, No. 7.)  His wife, Plaintiff Loan Nguyen, testified she had no knowledge of Mr. Phounsy ever being evaluated for a psychiatric condition.  (Exhibit B, Deposition of Loan Nguyen, p. 24:23-25.)  Nor did she know of him ever being prescribed any psychiatric medications.  (*Id*. p. 26:12-13.)

However, three of Plaintiffs' retained experts, none of whom are held out to be qualified as mental health professionals, have offered opinions which suggest or assert that Mr. Phounsy was experiencing mental illness or disability.  An expert must have knowledge or experience regarding a specialized area of knowledge and testify only to proper subjects within that field of expertise.  *See United States v. Castaneda*, 94 F.3d 592, 595 (9th Cir. 1996).  An expert witness may only provide testimony in the form of opinion on matters to which his testimony is "both relevant and reliable."  Fed. R. Evid. 702; *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001).  It is the Court's prerogative to determine the threshold issue of expert qualifications prior to trial.  *United*

15cv2692-H(MDD)

*States v. Jawara*, 474 F.3d 565, 582 (9th Cir. 2007) (District courts have a general "gatekeeping" duty to ensure that proffered expert testimony "both rests on a reliable foundation and is relevant to the task at hand.")

Dr. Thrush, designated as an expert in internal medicine and having no qualifications in mental health, has offered opinions on mental illness that all parties have jointly moved to exclude (Doc. No. 257, Joint Motion.)  Mr. DeFoe, designated as an expert in police practices and having no qualifications as a mental health professional, has opined: "…[Defendants] failed to initially appreciate that Mr. Phounsy was mentally ill or experiencing a mental crisis…" (Exhibit C, DeFoe Rule 26 Report, p.11.)  While Mr. DeFoe can opine on things he believes Defendants should have considered, he has neither the qualifications nor any basis to assert that Mr. Phounsy *was* mentally ill or *was* experiencing a crisis caused by a mental or emotional disability.  Mr. DeFoe is simply not qualified to diagnose Mr. Phounsy, and cannot relay this factually unsupported allegation to the jury.  And Dr. Sperry, designated as an expert in forensic pathology, again having no qualifications in mental health, has opined:  "Mr. Phounsy's behavior and expressions… are most probably hallucinatory or delusional in nature, to the point of psychosis."  (Exhibit D Sperry Rule 26 Report, p. 4.)  He later concedes in his report:  "I am informed by their attorneys that he had no such history." (*Id.* p. 4.)  Psychosis is considered a mental illness in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (*DSM-5*).  Dr. Sperry has no qualifications to assert that Mr. Phounsy *was* mentally ill.

Defendants acknowledge that one of their defenses in this case is that they had the authority to detain Mr. Phounsy so that his mental health could be assessed by a medical provider.  Their concerns for Mr. Phounsy's erratic behavior are not tantamount to, and do not justify, any witness at trial asserting as a fact that Mr. Phounsy was mentally ill, disabled, or in the midst of a mental health crisis.

/ / /

/ / /

15cv2692-H(MDD)

# IV.    CONCLUSION

Based on the foregoing, Defendants request that Plaintiffs, their counsel, and their witnesses be instructed not to assert or imply that Mr. Phounsy was mentally ill, disabled, or in the midst of a mental health crisis.

Respectfully submitted,

DATED:  January 11, 2021          THOMAS E. MONTGOMERY, County Counsel

By: s/ RONALD LENERT, Senior Deputy
Attorneys for Defendants County of San Diego,
San Diego County Sheriff's Department, Dean
Allen, Aaron Brooke, Sandra Carbajal, Marcos
Collins, Janae Krull, Michael Lee, Jenny
Martinson, Tamani Pugh, Jovonni Silva, and Billy
Tennison

DATED:  January 11, 2021          **MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

By: s/ MILDRED O'LINN
Attorney for Defendant Richard Fischer

# EXHIBIT "A"

GERALD SINGLETON (SBN 208783)
BRODY A. McBRIDE (SBN 270852)
SINGLETON LAW FIRM, APC
115 West Plaza Street
Solana Beach, CA 92075
Tel:   (760) 697-1330
Fax:   (760) 697-1329
Email:   gerald@geraldsingleton.com
             brody@geraldsingleton.com

JOHN BURTON (SBN 86029)
THE LAW OFFICES OF JOHN BURTON
The Marine Building
128 North Fair Oaks Avenue
Pasadena, California 91103
Tel:   (626) 449-8300
Fax:   (626) 449-4417
Email:   jb@johnburtonlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

K.J.P., a minor, and K.P.P., a minor,
individually, by and through their mother,
LOAN THI MINH NGUYEN, who also
sues individually and as successor in
interest to her now deceased husband,
Lucky Phounsy, and KIMBERLY NANG
CHANTHAPHANH, individually,

Plaintiffs,

v.

COUNTY OF SAN DIEGO et al.,

Defendants.

Case No. 15-cv-02692-H-MDD

**PLAINTIFF LOAN THI MINH
NGUYEN'S RESPONSE TO
DEFENDANT COUNTY OF SAN
DIEGO'S FIRST SET OF
INTERROGATORIES**

By and through her attorneys, and pursuant to Federal Rules of Civil Procedure 33, plaintiff Loan Thi Minh Nguyen ("Plaintiff") responds and objects to defendant County of San Diego's ("County") First Set of Interrogatories as follows.

///

///

**PRELIMINARY STATEMENT**

Plaintiff's investigation and development of all facts and circumstances relating to this action is ongoing. These responses and objections are made without prejudice to, and are not a waiver of, Plaintiff's right to rely on other facts or documents at trial.

By providing the following responses and objections to the County's interrogatories, Plaintiff does not waive, and hereby expressly reserves, her right to assert any and all objections as to the admissibility of such responses into evidence in this action, or in any other proceedings, on any and all grounds permitted by law.

**INTERROGATORIES**

**INTERROGATORY NO. 1:**

State Lucky Phounsy's residence addresses for the past ten years and the dates he lived at each address.

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff objects to this interrogatory on the grounds that it is overbroad and is not "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b). Without waiving these objections, Plaintiff will provide the requested information for the five years preceding Lucky Phounsy's death: 4765 Kleefield Ave., San Diego, CA 92117, approximately 3/2015-4/2015; 11369 Silver Oak Lane, San Diego, CA 92131, approximately 10/2012-2/2015; 11522 Cortina Place, San Diego, CA 92131, approximately 5/2009-10/2012.

**INTERROGATORY NO. 2:**

If Lucky Phounsy was ever in military service, state the service branch, dates of service, discharge rank, and type of discharge.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff objects to this interrogatory on the grounds that it is overbroad and is not "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b). Without waiving these objections, Plaintiff responds as follows: Lucky Phounsy did not serve in the military.

**INTERROGATORY NO. 3:**

State the name and address of Lucky Phounsy's most recent employer and the name, address, dates of employment, job title, and nature of work for each employer he had in the past ten years.

      **RESPONSE TO INTERROGATORY NO. 3:**

      Plaintiff objects to this interrogatory on the grounds that it is overbroad and seeks information not "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b). Without waiving these objections, Plaintiff will provide the requested information for the five years preceding Lucky Phounsy's death: MR Master Mechanics, 5820 Autoport Mall, San Diego, CA 92121, certified master technician, approximately 7/2014- 12/2014; Mission Hills Automotive, 308 W. Washington St., San Diego, CA 92103, certified master technician, approximately 9/2008-7/2012; Rosecrans Wellness Center, 1251 Rosecrans St., San Diego CA 92106, owner/operator, approximately 10/2012-8/2014; Mission Hills Automotive, 308 W. Washington St., San Diego, CA 92103, certified master technician, approximately 7/2007- 1/2008; Classic Volkswagen, 1695 Auto Parkway S., Escondido, CA 92025, certified master technician, approximately 4/2003-9/2006.

**INTERROGATORY NO. 4:**

State the names, ages and addresses of the children, parents, and siblings of Lucky Phounsy.

      **RESPONSE TO INTERROGATORY NO. 4:**

      Plaintiff objects to this interrogatory on the grounds that it is overbroad, seeks information that is not "relevant to any party's claim or defense," Fed. R. Civ. P. 26(b), and violates the privacy rights of any siblings Lucky Phounsy may have, as no sibling is a party to this action. Plaintiff further objects to this interrogatory on the ground that it seeks unfettered disclosure of the names of Lucky Phounsy's children, who are publicly identified only by their initials. Without waiving these objections, Plaintiff responds as follows: Plaintiff will provide the names, ages,

1 | and addresses of Lucky Phounsy's children upon entry of a suitable protective
2 | order and designation of this information as confidential thereunder.  The names,
3 | ages, and addresses of Lucky Phounsy's parents are: Kimberly Chanthaphanh, age
4 | 56, 8538 Holden Rd., Santee, CA 92071; Vilath Phounsy, age 61, 2430 Corinna
5 | Court, San Diego, CA 92105.

6 **INTERROGATORY NO. 5:**

7 Identify any drugs or medication Lucky Phounsy was taking prior to the incident.

8 | **RESPONSE TO INTERROGATORY NO. 5:**

9 | Plaintiff objects to this interrogatory on the grounds that it is vague as to time and
10 | lacks foundation, as Plaintiff does not have personal knowledge of (i.e., did not
11 | personally observe) each drug or medication Lucky Phounsy may or may not have
12 | taken "prior to the incident."  Plaintiff further objects to this interrogatory on the
13 | ground that the County is in possession of documents, which, if examined, will
14 | provide an answer to this interrogatory, namely, the toxicology reports issued by
15 | the County's Office of the Medical Examiner following Lucky Phounsy's death.
16 | Fed. R. Civ. P. 33(d)(1).  Without waiving these objections, Plaintiff responds as
17 | follows: Plaintiff observed Lucky Phounsy take diphenhydramine (a.k.a.
18 | "Benadryl") in the hour before the first County deputies arrived at the scene of the
19 | incident.

20 **INTERROGATORY NO. 6:**

21 State the name and address of each of Lucky Phounsy's health care providers and mental
22 health professionals, the complaints for which treatment was advised and the nature and
23 duration of the treatment.

24 | **RESPONSE TO INTERROGATORY NO. 6:**

25 | Plaintiff objects to this interrogatory on the grounds that it is overbroad and vague
26 | as to time, and lacks foundation, as Plaintiff does not have personal knowledge of
27 | Lucky Phounsy's health care providers and mental health professionals, and any
28 | subsequent treatment. Without waiving these objections, Plaintiff will provide the

1    names and addresses of any health care provider or mental health professional that

2    saw Lucky Phounsy within the year preceding his death, along with any complaints

3    or treatments involved during the same period: Dr. Jeffery Dysart, Lucky

4    Phounsy's primary care physician, 7830 Clairemont Mesa Blvd., San Diego, CA

5    92111. To Plaintiff's knowledge, Lucky Phounsy never saw Dr. Dysart for any

6    specific medical complaint. Rather, Plaintiff believes Lucky Phounsy would see

7    Dr. Dysart approximately once a year for a general wellness checkup. To

8    Plaintiff's knowledge, Lucky Phounsy never saw a mental health professional.

9    **INTERROGATORY NO. 7:**

10   List all physical, mental, and emotional conditions or disabilities Lucky Phounsy had

11   before the incident.

12   **RESPONSE TO INTERROGATORY NO. 7:**

13   Plaintiff objects to this interrogatory on the grounds that it is vague as to time, and

14   vague and ambiguous with regard to the term "conditions." In addition, this

15   interrogatory calls for expert opinion and lacks foundation, as Plaintiff is not

16   qualified to opine, nor does she have personal knowledge, regarding any physical,

17   mental, and emotional conditions or disabilities Lucky Phounsy may have had

18   before the incident. Without waiving these objections, Plaintiff will list any

19   physical, mental, or emotional diagnosis for which Lucky Phounsy was treated

20   during the year preceding his death: To Plaintiff's knowledge, Lucky Phounsy had

21   not been diagnosed with, nor had he received any treatment for, any physical,

22   mental, or emotional conditions during the year preceding his death.

23   **INTERROGATORY NO. 8:**

24   State the name and address of each school attended by Lucky Phounsy.

25   **RESPONSE TO INTERROGATORY NO. 8:**

26   Plaintiff objects to this interrogatory on the grounds that it is overbroad, vague as

27   to time, and seeks information that is not "relevant to any party's claim or

28   defense," Fed. R. Civ. P. 26(b). In addition, this interrogatory lacks foundation, as

1    Plaintiff does not have personal knowledge of the grade school, middle school, and

2    high school that Lucky Phounsy may have attended. Without waiving these

3    objections, Plaintiff responds as follows: Universal Technical Institute, 3121 West

4    Weldon Ave., Phoenix, AZ 85017.

5

6

7  Dated:  October 3, 2016            SINGLETON LAW FIRM, APC

8

9                       By:    *s/ Brody McBride*
                               Brody A. McBride, Esq.

10

11                       Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Re:   *K.J.P, et al. v. County of San Diego, et al. Case No.* 15-cv-02692

## VERIFICATION

I am the Plaintiff in the above-captioned matter.  I am familiar with the contents of **PLAINTIFF LOAN THI MINH NGUYEN'S RESPONSES TO DEFENDANT COUNTY OF SAN DIEGO'S INTERROGATORIES, SET ONE.** The information supplied there in is based on my own personal knowledge and/or has been supplied by my attorneys or other agents and is therefore provided as required by law.  The information contained in the foregoing document is true, except as to matters which were provided by my attorneys or other agents, and, as to those matters, I am informed and believe that they are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on September 30 , 2016, at San Diego, CA .

LOAN THI MINH NGUYEN

# EXHIBIT "B"



Transcript of the Testimony of:

# Loan Thi Minh Nguyen

K.J.P.

v.

County of San Diego

May 24, 2017

Volume I

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF CALIFORNIA

 3      _____
        K.J.P., a minor, and K.P.P., a   )
 4      minor, individually, by and through)
        their mother, LOAN THI MINH NGUYEN,)
 5      who also sues individually and as  )
        successor in interest to her now   )
 6      deceased husband, Lucky Phounsy,   )
        and KIMBERLY NANG CHANTHAPHANH,    )
 7      individually,                      )
                                           )
 8                  Plaintiffs,            ) Case No.
                                           ) 15-cv-02692-
 9                  -vs-                    ) H-MDD
                                           )
10      COUNTY OF SAN DIEGO; San Diego     )
        Sheriff WILLIAM GORE; RICHARD      )
11      FISCHER; KEVIN RALPH; MARCOS       )
        COLLINGS; JANAE KRULL; SANDRA      )
12      (JANET) CARBAJAL; BILLY TENNISION, )
        III; DEAN ALLEN; MICHAEL LEE;      )
13      JENNY MARTINSON; TAMANI PUGH;      )
        AARON BROOKE; JOVONNI SILVA; CITY  )
14      OF SANTEE; AARON BAGLEY; AARON     )
        HACKETT; AARON DO; ADAM DANIELS;   )
15      DANIEL NEOW; LAKESIDE FIRE         )
        PROTECTION DISTRICT; MARC POYNTER; )
16      DAVID CISIK,                       )
                                           )
17                  Defendants.            )
        _____)
18          DEPOSITION OF LOAN THI MINH NGUYEN

19              WEDNESDAY, MAY 24, 2017

20                  1:35 P.M.

21          462 STEVENS AVENUE, SUITE 201

22          SOLANA BEACH, CALIFORNIA

23  REPORTED BY:

24  DEBERA ANNE DORAN

25  CSR NO. 7821
```

```
 1    APPEARANCES:

 2   For Plaintiffs:

 3                    SINGLETON LAW FIRM, APC
                      BRODY McBRIDE, ESQ.
 4                    115 West Plaza Street
                      Solana Beach, California  92075
 5                    760-697-1330
                      brody@geraldsingleton.com
 6

 7

 8   For Defendants:

 9                    OFFICE OF COUNTY COUNSEL
                      JAMES M. CHAPIN, ESQ.
10                    1600 Pacific Highway, Room 355
                      San Diego, California  92101
11                    619-531-4860
                      james.chapin@sdcounty.ca.gov
12
                      HAIGHT BROWN & BONESTEEL, LLP
13                    KEVIN M. OSTERBERG, ESQ.
                      3880 Lemon Street, Suite 410
14                    Riverside, California 92501
                      951-341-8300
15                    kosterberg@hbblaw.com

16                    DALEY & HEFT, LLP
                      SAMUEL C. GAZZO, ESQ.
17                    462 Stevens Avenue, Suite 201
                      Solana Beach, California 92075
18                    858-755-5666
                      sgazzo@daleyheft.com
19

20

21

22

23

24

25
```

Loan Thi Minh Nguyen                                     May 24, 2017

```
 1                    I N D E X

 2   WITNESS:  LOAN THI MINH NGUYEN

 3   EXAMINATION                                    Page

 4   By:  Mr. Chapin ................................. 4

 5   By:  Mr. Osterberg ............................. 63

 6   By:  Mr. Gazzo ................................. 86

 7   By:  Mr. Chapin ............................... 114

 8   By:  Mr. Osterberg ............................ 115

 9

10   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER   Page   Line

11    ......................................... 38     22

12    ......................................... 71     13

13

14   Transcript Marked                          Page   Line

15   Marital/spousal privilege objection ........ 38     24

16   Marital/spousal privilege objection ........ 41     13

17   Marital/spousal privilege objection ........ 65     13

18   Marital/spousal privilege objection ........ 69     17

19   Marital/spousal privilege objection ........ 70     6

20   Marital/spousal privilege objection ........ 71     2

21   Marital/spousal privilege objection ........ 71     15

22

23                     EXHIBITS

24                  (None marked)

25
```

Loan Thi Minh Nguyen                                    May 24, 2017

```
 1            A    I think it was public intoxication.

 2            Q    And do you have to -- I'm sorry?

 3            A    I was just --

 4            Q    Did you have to bail him out?

 5            A    Yes, I did bail him out.

 6            Q    And were there charges pressed after that?

 7            A    There was no charges pressed.

 8            Q    And was he living with you at the time?

 9            A    Yes.

10            Q    Did he call you from the jail?

11            A    Yes.

12            Q    And that's the only other time he was

13     arrested during the marriage?

14            A    That's correct.

15            Q    Do you know if he was ever treated for drug

16     use or alcoholism?

17            A    No.

18            Q    Not at all?

19            A    No.

20            Q    Did he go to the doctor ever because he had

21     problems with alcohol?

22            A    No.

23            Q    Do you know if he was ever taken to a

24     hospital and evaluated for a psychiatric condition?

25            A    No.
```

```
 1                          DECLARATION

 2

 3         I hereby declare I am the deponent in the

 4    within matter; that I have read the foregoing

 5    deposition and know the contents thereof, and I

 6    declare that the same is true of my knowledge except

 7    as to the matters which are therein stated upon my

 8    information or belief, and as to those matters, I

 9    believe it to be true; and that I have made any

10    corrections as noted herein, in ink, initialed by

11    me, or attached hereto.

12         I declare under the penalties of perjury of

13    the State of California that the foregoing is true

14    and correct.

15         Executed on the _____ day of _____,

16    2017 at _____, California.

17

18

19

20            _____

21            LOAN THI MINH NGUYEN

22

23

24

25
```

```
 1                    REPORTER'S CERTIFICATE

 2           I, Debera Anne Doran, a Certified Shorthand

 3     Reporter, No. 7821 for the State of California, do

 4     hereby certify:  That prior to being examined, the

 5     witness in the foregoing deposition,

 6     LOAN THI MINH NGUYEN, was duly sworn to testify the

 7     truth, the whole truth, and nothing but the truth;

 8     that said deposition was taken down by me in

 9     stenographic shorthand at the time and place therein

10     named and thereafter transcribed into typewritten

11     form under my direction and supervision; and that

12     the same is a true, correct, and complete transcript

13     of said deposition.  Before completion of the

14     deposition, review of the transcript [x] was [ ] was

15     not requested.  If requested, any changes made by

16     the deponent (and provided to the reporter) during

17     the period allowed, are appended hereto.

18           I further certify that I am not interested in

19     the outcome of the action.  In witness whereof, I

20     have hereunto subscribed my name.

21     Dated:  6/4/17

22     _____DeberaAnneDoran_____

23     Debera Anne Doran, CSR No. 7821
       (The foregoing certification of this transcript does
24     not apply to any reproduction of the same by any means,
       unless under the direct control and/or supervision of
25     the certifying reporter.)
```

# EXHIBIT "C"

# On-Scene Consulting

May 17, 2017
Mr. Brody A. McBride, Esq.
Singleton Law Firm, APC
115 West Plaza Street
Solana Beach, California 92075

**Regarding: K.J.P., a minor, and K.P.P., a minor, individually, by and through their mother, LOAN THI MINH NGUYEN, who also sues individually and as successor in interest to her now deceased husband, Lucky Phounsy, and KIMBERLY NANG CHANTHAPHANH, individually, Plaintiffs,**

vs.

**COUNTY OF SAN DIEGO; et al., Defendants.**
**(Case No. 15-cv-02692-H-MDD).**

Dear Mr. McBride,

Thank you for retaining me to analyze and render opinions regarding the April 13, 2015 use of force incident involving the following San Diego County Sheriff's Department Sergeant Kevin Ralph, No. 3519, and the following Deputy Sheriff's: Corporal Marcos Collins (No. 7127), Janae Krull (No. 0072), Richard Fischer (No. 3003), Sandra (Janet) Carbajal (No. 3141), Billy Tennison III (No. 4986), Jovonni Silva (No. 2586), Michael Lee (No. 6227), Dean Allen (No. 4591), Jenny Martinson (No. 0601), Tamani Pugh (No. 7231), and Corporal Aaron Brooke (No. 2820). Pursuant to the requirements of Rule 26, I have studied reports, photographs, San Diego County Sheriff's Department Documents, Transcriptions of Digitally Recorded Depositions, and other material (as listed under Materials Reviewed) provided to me thus far regarding this case.

It is my understanding that the deposition of Sergeant Kevin Ralph and Deputy Jovani Silva were recently taken. However, as of today's date, the transcripts of those depositions have not yet been completed and made available to me for my review. Additionally, it is my understanding that the deposition of Plaintiffs and other percipient witnesses (including Greg Kelly) are scheduled for later this month. Please be advised that if these deposition transcripts, and any additional documents related to this matter, are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions. It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

> Scott A. DeFoe
> Principal
> On-Scene Consulting, LLC

## On-Scene Consulting

**Materials Reviewed:**

1. United States District Court Southern District of California, Second Amended Complaint, Jury Trial Demand, Case No. 15-cv-02692-H-MDD).
2. San Diego County Sheriff's Department Audio 911-Dispatch (E24455) (1:38:45).
3. San Diego County Sheriff's Department Audio 911-Original Call (3:25).
4. County of San Diego, Office of the Medical Examiner, Toxicology Report, No. 15-00926 for Lucky Phounsy.
5. San Diego County Sheriff's Department-Addendum Section F, Use of Force Guidelines (CSD00321-340), dated 3/21/12.
6. San Diego County Sheriff's Department, Policy No. 23, Psychiatric Emergency Response Team (PERT) (CSD00341-43).
7. San Diego County Sheriff's Department-Procedure 6.32, Mentally Ill Persons (CSD00344-45).
8. San Diego County Sheriff's Department Detention Services Bureau, Manual of Policies and Procedures, 1.93, Use of Restraint Equipment.
9. San Diego County Sheriff's Department Procedure Section 2.1, Rules of Conduct for members of the San Diego County Sheriff's Department.
10. Photographs depicting Corporal Marcos Collin's injuries.
11. Photographs depicting Deputy Janae Krull's injuries.
12. Photographs depicting Mr. Lucky Phounsy's injuries.
13. Photographs of the scene and other evidence to include Corporal Collin's equipment (Taser X26, Sam Browne (equipment belt), Expended Taser X26 cartridges, and ASP (collapsible baton).
14. San Diego County Sheriff's Department, Follow-up Investigation Report, Case No. 15118678, Statement of Corporal Brooke, No. 2820 (CSD00020-25).
15. San Diego County Sheriff's Department Officer Report, Aaron Brooke, No. 2820 (CSD00017-19).
16. San Diego County Sheriff's Department, Follow-up Investigative Report, Case No. 15118678, Statement by Deputy Janet Carbajal, No. 3141 (CSD00026-30).
17. San Diego County Sheriff's Department Officer Report, Case No. 15118678 by Deputy Damon Chandler, No. 7721 (CSD00052-52).
18. San Diego County Sheriff's Department, Follow-up Investigative Report, Case No. 15118678, Statement by Corporal Marcos D. Collins, No. 7127 (CSD00054-59).
19. San Diego County Sheriff's Department Officer Report, Case No. 15118678, by Deputy Claudia Delgado, No. 5533, (CSD00070-74).
20. San Diego County Sheriff's Department, Officer Report, Case No. 15118678, Statement of Witness Greg Kelly (CSD00075-78).
21. San Diego County Sheriff's Department, Follow-up Investigative Report, Case No. 15118678, Statement of Deputy Richard Fischer (CSD00081-86).
22. San Diego County Sheriff's Department Officer Report, Case No. 15118678, No. 3003 (CSD00079-80).
23. San Diego County Sheriff's Department, Follow-up Investigative Report, Case No. 15118678, Statement of Deputy Janae Krull (CSD00088-100).
24. San Diego County Sheriff's Department, Follow-up Investigative Report, Case No. 15118678, Statement of Deputy Michael Lee (CSD00103-108).
25. San Diego County Sheriff's Department Officer Report, Case No. 15118678, Statement of Deputy Michael Lee, No. 6227 (CSD00101-102).

## On-Scene Consulting

26. San Diego County Sheriff's Department, Follow-up Investigative Report, Case No. 15118678, Statement of Deputy Jenny Martinson, No. 0601 (CSD00112-115).
27. San Diego County Sheriff's Department Officer Report, Case No. 15118678, Statement of Deputy Jenny Martinson, No. 0601 (CSD00109-111).
28. San Diego County Sheriff's Department, Follow-up Investigative Report, Case No. 15118678, Statement of Deputy Tamani Pugh (CSD00131-34).
29. San Diego County Sheriff's Department Officer Report, Case No. 15118678, Statement of Deputy Tamani Pugh (CSD00135).
30. San Diego County Sheriff's Department, Follow-up Investigative Report, Case No. 15118678, Statement of Sergeant Kevin Ralph, No. 3519 (CSD00136-40).
31. San Diego County Sheriff's Department Officer Report, Case No. 15118678, Statement of Deputy Krull, No. 0072, (CSD00141-42).
32. San Diego County Sheriff's Department, Follow-up Investigative Report, Case No. 1511868, Statement of Deputy Billy Joe Tennison III, No. 4986 (CSD00154-59).
33. San Diego County Sheriff's Department Officer Report, Case No. 15118678, Statement by Deputy Billy Joe Tennison III, No. 4986 (CDS00160-162).
34. San Diego County Sheriff's Department Taser Download (Deputy Brooke) (CSD00176-281).
35. San Diego County Sheriff's Department Taser Download (Deputy Collins) (CSD00175).
36. San Diego County Sheriff's Department Taser Download (Deputy Krull) (CSD00282-96).
37. Deposition Transcript and Exhibits of Aaron Bagley taken on 11-17-16.
38. Deposition Transcript and Exhibits of Aaron Do taken on 12-12-16.
39. Deposition Transcript and Exhibits of Aaron Hackett taken on 12-8-16.
40. Deposition Transcript and Exhibits of Adam Daniels taken on 12-12-16.
41. Deposition Transcript and Exhibits of Daniel Nenow taken on 11-17-16.
42. Deposition Transcript and Exhibits of David Csik taken on 12-8-16.
43. Deposition Transcript and Exhibits of Marc Poytner taken on 2-16-17.
44. Deposition Transcript and Exhibits of Steven Charles Campman, M.D. taken on 3-17-17.
45. Deposition Transcript and Exhibits of Billy Joe Tennison III taken on 2-22-17.
46. Deposition Transcript and Exhibits of Dean Allen taken on 2-21-17.
47. Deposition Transcript and Exhibits of Jenny Martinson taken on 2-21-17.
48. Deposition Transcript and Exhibits of Sandra "Janet" Carbajal taken on 2-22-17.
49. Deposition Transcript and Exhibits of Tamani Pugh taken on 2-21-17.
50. Deposition Transcript and Exhibits of Michael Lee on 2-24-17.
51. Deposition Transcript and Exhibits of Richard Fischer taken on 2-23-17.
52. Deposition Transcript and Exhibits of Janae Krull taken on 2-23-17.
53. Deposition Transcript and Exhibits of Marcos Collins taken on 2-24-17.
54. County of San Diego, Officer of the Medical Examiner, Investigative Report No. 15-00926.
55. National Law Enforcement Technology Center, Positional Asphyxia-Sudden Death (June 1995).
56. One-Breath: The Importance of Recognizing Agonal & Other Breathing Problems User-Level Study Guide, Version, 1.0e, Institute for the Prevention of In-Custody Deaths, Inc, 2015.

## On-Scene Consulting

### California POST Basic Learning Domains as Follows:
1. #1: "Leadership, Professionalism and Ethics."
2. #2: "Criminal Justice System."
3. #3: "Policing in the Community."
4. #20: "Use of Force."
5. #21: "Patrol Techniques."
6. #23: "Crimes in Progress."
7. #33: "Arrest and Control."
8. #35: "Firearms/Chemical Agents."
9. #19: "Vehicle Operations."
10. #37: "People with Disabilities."

### Overview of the Events that Transpired and Commentary:
According to Corporal Marcos Collins on April 13, 2015, he was dispatched a call at 8538 Holden Road that indicated a person had called 911 asking for assistance because "people were trying to kill him." According to Corporal Collins, another person either got on the phone or called, and said that no one was trying to kill him and that he was "freaking out." According to Corporal Collins, he believed that the caller was possibly under the influence. According to Corporal Collins he responded to the location from the Sheriff's Storefront located at the Target Shopping Center without activating his lights and siren on his marked police vehicle. According to Corporal Collins that upon his arrival at 8538 Holden Road, he waited for Deputy Janae Krull to arrive.

According to Corporal Collins that when Deputy Krull arrived, they parked their vehicles and walked to 8538 Holden Road. According to Corporal Collins, they were met by a male (Greg Kelly) who was standing at the end of the driveway of 8538 Holden Avenue. According to Corporal Collins, the male stated that his stepson was inside of the house (Lucky Phounsy DOB 07/31/82) "freaking out" and thought people were trying to kill him. According to Corporal Collins Mr. Kelly told him that Mr. Phounsy had just returned from Coachella and might have ingested drugs. Mr. Kelly advised Corporal Collins that Mr. Phounsy did not have any weapons. According to Corporal Collins, he estimated that he spoke to Mr. Kelly in the driveway for less than (2) minutes (Collins Deposition, Page 36). According to Corporal Collins, Mr. Kelly said, "Let me go in first" and he and Deputy Krull followed him into the house via the front door or the garage door
*(See Opinions 1-5).*

According to Corporal Collins, they entered the house and were in the hallway when Mr. Kelly yelled out, "The cops are here." According to Corporal Collins, he observed Mr. Phounsy in the hallway and he described him as "paranoid and nervous" with a "crazy look in his eyes." According to Corporal Collins, he told Mr. Phounsy that Mr. Phounsy was making him nervous and that he needed to pat him down for weapons so they could talk. According to Corporal Collins, he believed that Mr. Phounsy appeared "Very Defensive." According to Corporal Collins, he told Mr. Phounsy that he needed to hold onto his hands while patting him down. According to Corporal Collins, he asked Mr. Phounsy to step left of the doorway and was able to get Mr. Phounsy's right arm behind his back *(See Opinions 6-7).*

## On-Scene Consulting

According to Corporal Collins, he could feel Mr. Phounsy's arms tense up and Collins signaled Deputy Krull to handcuff him. According to Corporal Collins, Deputy Krull was able to place the handcuffs on one of Mr. Phounsy's wrists. According to Corporal Collins a lengthy altercation ensued between Mr. Phounsy and Corporal Collins and Deputy Krull, during which Corporal Collins sustained a lacerated and fractured nose, and Deputy Krull sustained a bruise near her right eye. During the altercation, Mr. Phounsy also sustained a number of cuts, bruises, and abrasions. According to Corporal Collins he used the following force during the altercation with Mr. Phounsy until additional San Diego County Deputy Sheriffs arrived and he was subsequently relieved and left the home: multiple applications of the Electronic Control Device (Taser X-26-Probe Activations/Drive Stun Mode), punches, possible strikes with Taser X-26, ground fighting, and body weight. Lastly, according to Corporal Collins, when he left the home, Deputies were pinning Mr. Phounsy to the floor in the hallway of the home.

According to Deputy Krull, she used the following force during the altercation with Mr. Phounsy until additional San Diego County Deputy Sheriff's arrived and she was relieved and left the home: wrist lock, body weight, Electronic Control Device (Taser X-2-Probe Activations), punches, grabbing and twisting of genitals, baton strikes (thighs), twist lock (left arm), ground fighting and body weight. Lastly, according to Deputy Krull, when she left the home, Deputies were pinning Mr. Phounsy to the ground in the hallway of the home.

According to Corporal Aaron Brooke, No. 2820, when he entered the home, he observed several Deputies on top of Mr. Phounsy restraining him. According to Corporal Brooke, he approached and subsequently removed his Taser X2 Electronic Control Device and deployed the Taser X-2 in Drive Stun Mode for an estimated (3) second activation to Mr. Phounsy's back *(See Opinion No. 8)*.

According to Corporal Brooke, he grabbed Mr. Phounsy's left wrist and held it down with both of his hands. According to Corporal Brooke, he handcuffed Mr. Phounsy's left wrist and pushed his left hand behind his back while leaning his bodyweight towards his feet. According to Corporal Brooke, he held Mr. Phounsy's left arm behind his back until he was handcuffed.

According to Corporal Brooke, he had no further contact with Mr. Phounsy for close to half an hour. While following the ambulance to Grossmont Hospital he heard Deputy Fischer broadcast that Mr. Phounsy was no longer breathing and that he had no. According to Corporal Brooke, when the ambulance arrived at Sharp Grossmont Hospital located at 5555 Grossmont Center Drive, La Mesa, he assisted Deputy Fischer by removing the handcuffs from Mr. Phounsy's wrists and cutting the Maximum Restraints from his feet.

According to Deputy Janet Carbajal, No. 3141, when she arrived at the home, Mr. Phounsy was being restrained by approximately (6) Deputies while Mr. Phounsy was on his stomach (Carbajal Deposition). According to Deputy Carbajal, she was present when the cord cuffs were placed on Mr. Phounsy though she did not place the cord cuffs on him. According to Deputy Carbajal, she assisted by applying bodyweight to Mr. Phounsy's right or left shoulder while the cord cuffs were being placed on him. According to Deputy Carbajal, she did not see how the cord cuffs were placed on Mr. Phounsy nor did she help carry Mr. Phounsy out of the house. According to Deputy Carbajal, while Mr. Phounsy was lying in the driveway, she held his head down.

## On-Scene Consulting

According to Deputy Carbajal, she did not feel that Mr. Phounsy was attempting to assault her (Carbajal Deposition, Page 43). According to Deputy Carbajal, she did not roll Mr. Phounsy in the recovery position and does not recall if she saw any other Deputies place Mr. Phounsy in the recovery position (Carbajal Deposition, Pages 45-46) *(See Opinion No. 9)*.

According to Deputy Carbajal, she believes Mr. Phounsy's legs were up to his buttocks while he was in maximum restraints (Carbajal Deposition, Page 51).

According to Deputy Richard Fischer, No. 3003, upon his arrival, he observed approximately eight deputies holding Mr. Phounsy down in the prone position on his stomach in the hallway. According to Deputy Fischer, Mr. Phounsy attempted to roll onto his back. According to Deputy Fischer, he applied downward pressure to both of Mr. Phounsy's feet for 20-30 seconds. *(See Opinion No. 10)*.

According to Deputy Fischer, he assisted the Deputies with putting on the Maximum Restraints. According to Deputy Fischer, he wrapped the cord cuffs around the feet and clipping them together. According to Deputy Fischer, he does not recall who was taking the lead role in the hallway while the maximum restraints were being put on Mr. Phounsy.

According to Deputy Fischer, he rode in the Lakeside Ambulance No. 2 and that he applied downward pressure to the forehead/temple/right side of head of Mr. Phounsy with both hands for approximately (10) minutes. According to Deputy Fischer, approximately 1-2 minutes later, he first noticed that Mr. Phounsy was not breathing *(See Opinion No. 11)*.

According to Deputy Fischer, he and Corporal Brooke cut the cord cuffs off when the ambulance arrived at the hospital *(See Opinion No. 12)*.

According to Deputy Michael Lee, No. 6227, he arrived at the same time as Deputies Allen and Tennison. According to Deputy Lee, he was the first or second deputy to reach Corporal Collins and Deputy Krull. According to Deputy Lee, he along with Deputies Martinson, Fischer and Pugh were positioned at Mr. Phounsy's legs. According to Deputy Lee, there was no discussion among the deputies as to how the cord cuffs were going to be applied (Lee Deposition, Page 53) *(See Opinion No. 13)*.

According to Deputy Lee, after Mr. Phounsy was completely placed in the Maximum Restraints, Deputy Lee did not check to see if the restraints were applied properly and that Mr. Phounsy could breathe *(See Opinion No. 14)*.

According to Deputy Lee, he assisted with carrying Mr. Phounsy from inside of the home to outside. According to Deputy Lee, the only force he used was to apply his body weight onto Mr. Phounsy's shoulder while Mr. Phounsy was lying in the driveway up until the time that he was placed on the gurney.

According to Deputy Jenny Martinson, No. 0601, upon her arrival, she observed deputies take Mr. Phounsy to the ground. According to Deputy Martinson, there were (2) Deputies were holding Mr. Phounsy's head and shoulders, (2) Deputies on Mr. Phounsy's torso and (2) Deputies on Mr. Phounsy's legs. According to Deputy Martinson, Mr. Phounsy was face down on the floor. According to Deputy Martinson, she relieved Deputy Collins at his position and

## On-Scene Consulting

grabbed Mr. Phounsy's right lower leg and placed her knee on his right calf. According to Deputy Martinson, she used her body weight (185 pounds) to apply downward pressure. According to Deputy Martinson, she held onto Mr. Phounsy's ankles while Deputy Pugh wrapped the cord cuff around Mr. Phounsy's ankles. According to Deputy Martinson, she connected the ankles to the waist. According to Deputy Martinson, she assisted moving Mr. Phounsy out of the hallway and outside the home by picking up his right lower limb.

According to Deputy Martinson, she never placed Mr. Phounsy in the recovery position after he was placed on the driveway. According to Deputy Martinson, when she went back inside of the home, Mr. Phounsy was still on his stomach *(See Opinion No. 15).*

According to Deputy Tamani Pugh, No. 7231, upon her arrival, she ran through the garage and into the hallway and observed several deputies fighting with Mr. Phounsy. According to Deputy Pugh, she put her feet on Mr. Phounsy's right calf and applied downward pressure. According to Deputy Pugh, she assisted with the application of the Maximum Restraints. According to Deputy Pugh, she wrapped one cord around Mr. Phounsy's right ankle and secured the left ankle by wrapping the cord around both ankles at the same time.

According to Sergeant Kevin Ralph, No. 3519, upon his arrival, he observed several deputies on the ground trying to gain control over Mr. Phounsy. According to Sergeant Ralph he heard Mr. Phounsy making grunting, groaning or animal sounds *(See Opinion No. 16).*

According to Deputy Billy Joe Tennison III, No. 4986, he was assigned to the Psychiatric Emergency Response Team (PERT) and was working with Clinician Miranda Bowersox. According to Deputy Tennison, he arrived at scene with Deputies Lee and Allen. According to Deputy Tennison, he kicked open the front door. According to Deputy Tennison, he moved around Deputy Krull and delivered one knee strike to Mr. Phounsy's mid-section and pushed down on Mr. Phounsy's head and left shoulder area *(See Opinion No. 17).* According to Deputy Tennison, he attempted to get Mr. Phounsy in a Carotid Restraint Technique. According to Deputy Tennison, he used a pressure point behind Mr. Phounsy's left ear and that he used his body weight to keep Mr. Phounsy on the ground. According to Deputy Tennison he struck Mr. Phounsy 2-3 times in the right thigh with a closed fist *(See Opinion No. 18).* According to Deputy Tennison, he placed a cord cuff under Mr. Phounsy's body and around his waist. According to Deputy Tennison, he pulled the cord cuff so Deputy Lee could attach the cord cuff. According to Deputy Tennison, he was one of the Deputies that carried out Mr. Phounsy to the driveway.

According to Deputy Tennison, he never saw Mr. Phounsy on his side in the recovery position after he was placed in maximum restraints and he never rolled Mr. Phounsy into the recovery position in the hall. In addition, according to Deputy Tennison, he never checked to see if Mr. Phounsy could breathe while they were in the hallway. Lastly, according to Deputy Tennison, he did not check the Maximum Restraints to see if they were applied correctly and does not recall seeing another deputy check Mr. Phounsy to make sure that he was breathing after the restraints were applied (Tennison Deposition, Pages 69-75) *(See Opinion No. 19).*

According to Deputy Dean Allen, No. 4591, he was the first back up officer to arrive. According to Deputy Allen, he entered the home and took control of Mr. Phounsy's right wrist and subsequently pulled him to the ground. According to Deputy Allen, he maintained Mr.

## On-Scene Consulting

Phounsy's right arm and pulled it behind his back. According to Deputy Allen, he struck Mr. Phounsy with two knee strikes to the left shoulder (Allen Deposition, Page 42).

According to Deputy Allen, he used his body weight (230 pounds) to hold Mr. Phounsy down. According to Deputy Allen, he struck Mr. Phounsy two times on the right side of his forehead with his elbow (Allen Deposition, Page 42) *(See Opinion No. 20)*.

According to Deputy Allen, he used his expandable baton and put the tip under Mr. Phounsy's arm and placed it in the back of his right rotator for approximately 45 seconds. According to Deputy Allen, he believes that it took between (15-20) minutes to get on the Maximum Restraints (Allen Deposition, Pages 56-57).

According to Deputy Allen, he assisted carrying Mr. Phounsy out to the driveway. According to Deputy Allen, he washed his hands and had a (10) minute conversation and when he returned Mr. Phounsy was still on the ground in the driveway (Allen Deposition, Page 95).

### Opinions:
1. It is my opinion that a reasonable officer acting consistent with standard police practices would have formulated a tactical plan and not entered the home without one. I base my opinion on the **California Police Officer Standards and Training (POST), Learning Domain No. 21-Basic Concepts of Law Enforcement Patrol, Officer Safety While on Patrol.**

### 1-21 Poor or No Planning:
It is my opinion that Corporal Collins and Deputy Krull should have formulated a tactical plan upon their arrival. The plan should have included who was designated Cover Officer and who was Designated as Contact Officer. The designation of Cover and Contact Officer is critical as it typically ensures that Deputies do not give conflicting commands or overwhelm an individual with multiple commands that can be confusing. Law Enforcement Officers are taught during their initial Police Officer Standards and Training (POST) Basic Academy as well as throughout their career at both in-service and perishable skills training that no two incidents are the same and not to be complacent. I base my opinion my review of the testimony in this matter:

- Deputy Krull failed to inquire via the Mobile Digital Computer (MDC) in her police vehicle or request additional information from the San Diego County Sheriff's Dispatch if there were any reports of prior calls for service or any weapons registered at the home during her estimated (7) minute commute to the call (Krull Deposition, Page 43).
- Deputy Krull stated that they typically do not have the discussion as to who would be the Contact Officer and who would be the Cover Officer (Krull Deposition, Page 75).
- Deputy Krull stated that both she and Corporal Collins were asking Mr. Phounsy questions, indicating disregard for one of the most basic POST tactical concepts (Krull Deposition, Page 75).
- Deputy Krull stated that she and Corporal Collins did not formulate a tactical plan before going into the home (Krull Deposition, Page 180).
- Deputy Krull stated that she did not receive training that when speaking to individuals who are potentially psychotic, there is (1) point of contact (Krull Deposition, Page 181).

## On-Scene Consulting

- Corporal Collins did not ask Mr. Kelly in the driveway if Mr. Phounsy had weapons (Collins Deposition, Page 36).
- Corporal Collins did not ask Mr. Kelly in the driveway if Mr. Phounsy had a history of naturally occurring psychosis or any mental illnesses (Collins Deposition, Pages 59-60).
- Corporal Collins stated that he believes it would only have taken a minute to find out if there were guns registered to the house or if Mr. Phounsy was mentally ill, but he chose not to do that (Collins Deposition, Page 150).
- Corporal Collins stated that he and Deputy Krull did not have a verbal plan (Collins Deposition, Page 155).
- Corporal Collins did not covey a contingency plan to Deputy Krull what they would do if they needed to use force (Collins Deposition, Page 159).
- Corporal Collins and Deputy Krull could have stayed outside for one to two minutes to talk about a plan prior to entering the home, but they chose not to (Collins Deposition, Page 160).
- Deputy Krull stated that before entering the home, she and Corporal Collins did not have any sort of conversation (Krull Deposition, Page 50).
- Deputy Krull stated that she and Corporal Collins had (1) minute of conversation with Mr. Kelly in the driveway before walking towards the door (Krull Deposition, Page 43).

Lastly, it is my opinion that Corporal Collins failure to formulate a tactical plan was even more egregious based on the fact that he is considered a quasi-supervisor. Corporals function as quasi supervisors in the field to less tenured Deputies by providing mentoring, leadership and sound decision making.

As explained below, one option the deputies could have considered, but evidently did not, is waiting outside and asking Mr. Phounsy, through his family members, to come outside to speak to them. This tactic would have been much less confrontational and also put the deputies in a much better tactical position. Any tactical situation that can result in fighting in the close quarters of a home, full of objects that can be used as weapons should always be avoided. Because Mr. Phounsy had called for law enforcement, there was every indication that he would come out of the house.

2. It is my opinion that a reasonable officer acting consistent with standard police practices would have requested an additional Deputies and a Supervisor to the location prior to making contact with Mr. Phounsy. Based on my review of the facts in this matter, Deputy Krull and Corporal Collins responded to the call for service without activating their emergency lights and siren. It is my opinion that there was no urgency to enter the home and it would have allowed a tactical plan to be formulated as well as supervisory oversight. I base my opinion on my review of the facts in this matter:

- Corporal Collins stated that he and Deputy Krull did not request additional Deputies to respond prior to entering the Phounsy home (Collins Deposition, Page 146).

## On-Scene Consulting

3. It is my opinion that a reasonable officer acting consistent with standard police practices would have ascertained how many occupants were inside of the home prior to entering the home. It is my opinion once Deputy Krull and Corporal Collins ascertained the number of occupants that were inside of the home, and once additional Deputies and a Supervisor arrived, they should have requested Mr. Phounsy to exit the home to speak with them. In the event that Mr. Phounsy refused the request to exit, Corporal Collins and Deputy Krull should have requested all of the occupants to exit the home until they could adjust their tactical plan.

4. It is my opinion that a reasonable officer acting consistent with standard police practices would have requested the Psychiatric Emergency Response Team (PERT) to respond to the location prior to making entry into the home. PERT Units combine the resources of a uniformed Deputy and a licensed clinician in responding to the needs of the mentally ill. The PERT Unit advised patrol Deputies on psychiatric issues that arise in the course of their law enforcement duties, and assists in transportation and processing of individuals deemed to need impatient psychiatric treatment. I base my opinion on my review of the facts in this matter that Deputy Billy Joe Tennison III was assigned to PERT on the night of this incident and was accompanied by Clinician Miranda Bowersox (Tennison Deposition, Pages 30-31). In addition, I base my opinion on my law enforcement experience with the Los Angeles Police Department while assigned to: patrol, Detectives, and Special Weapons and Tactics. The utilization of a mental health professional at the onset of an incident such as this incident can be an invaluable tool. The Los Angeles Police Department Mental Evaluation Unit (MEU) responds to thousands of similar incidents on an annual basis and supports uniformed personnel by providing valuable insight and information. Lastly, it is my opinion that Deputy Krull and Corporal Collins failed to request PERT prior to making entry into the Phounsy home. I base my opinion on:

- Corporal Collins stated that he did not request a PERT Unit because they were not working that night (See Opinion No. 4), and that he is PERT trained and they would not do anything different than he would have done (Collins Deposition, Page 152).
- Corporal Collins stated that he did not request to see if a PERT Unit was available over the radio (Collins Deposition, Page 153).
- Deputy Krull stated that she overheard Corporal Collins speaking to the male in the driveway and heard, "there is something off" and that Mr. Phounsy needed help but that he did not want to go to the hospital and that they (Collins and Krull) needed to take him. In addition, Deputy Krull overheard that Mr. Phounsy believed somebody was after him and that his (Phounsy's) family was in danger. Lastly, Deputy Krull overheard that Mr. Phounsy was the one who called 911 and that he (Phounsy) was ready to go to the hospital (Krull Deposition, Page 43).

## On-Scene Consulting

5.  It is my opinion that Corporal Collins and Deputy Krull failed to initially determine that Mr. Phounsy was mentally ill or experiencing a mental crisis. Throughout the United States and in California, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Phounsy who are suffering from a mental illness or experiencing a mental crisis. Such contacts are extremely common in police work, and inappropriate tactics frequently lead to bad results, as they did here. The objective is to avoid unnecessary injury and or death. The underlying principle is reverence for human life. These correct and reasonable include methods such as: recognize cues and other indicators to make appropriate decisions regarding intervention strategies, time to assess the situation, calm the situation, request additional and equipment, provide reassurance that the officers are there to help, give the person time to calm down, move slowly, eliminate emergency lights and reduce environmental distractions. These correct and reasonable methods are well known and proven effective for the safety and welfare of both Peace Officers and the public.

6.  It is my opinion that Corporal Collins and Deputy Krull failed to initially appreciate that Mr. Phounsy was mentally ill or experiencing a mental crisis and then act accordingly. Corporal Collins and Deputy Krull clearly failed to respond as trained and delineated in the California Commission on Peace Officers Standards and Training, Basic Course Workbook Series Student Materials Learning Domain 37, "People with Disabilities" Volume 4. This learning domain states that one of the appropriate tactical actions officers should do is to assume a quiet nonthreatening manner when approaching or conversing with an individual. I base my opinion on my review of the facts in this matter:

- Deputy Krull stated that both she and Corporal Collins were asking Mr. Phounsy questions (Krull Deposition, Page 75).
- Deputy Krull stated that she agrees that how peace officers respond to a person with mental disorders can have a tremendous impact on how these encounters will be resolved (Krull Deposition, Page 157).
- Corporal Collins stated that giving multiple commands simultaneously would be confusing to someone who is mentally ill or experiencing a mental crisis (Collins Deposition, Page 160).

7.  It is my opinion that a reasonable officer acting consistent with standard police practices would not have directed profanity at an individual who was mentally ill or experiencing a mental crisis. According to Corporal Collins, he stated that it is possible that he told Mr. Phounsy to "put his fucking hands behind his back" (Collins Deposition, Pages 64-65). In addition, if it is determined that Corporal Collins directed profanity at Mr. Phounsy, he escalated the situation. Law Enforcement Officers are taught de-escalation techniques to minimize the use of force and to bring the incident to a successful resolution as soon as possible. Lastly, if it is determined that Corporal Collins directed profanity at Mr. Phounsy, he violated, San Diego County Sheriff's Department-Procedure Section, 2.1, Rules of Conduct for Members of the San Diego County Sheriff's Department, 2.22 Courtesy-Employees shall be courteous to the public and fellow

## On-Scene Consulting

employees. They shall be tactful in the performance of their duties, shall control their tempers, exercise patience and discretion even in the face of extreme provocation. Except when necessary to establish control during a violent or dangerous situation, no member shall use course, profane, or violent language, dated 4-2-14.

8. It is my opinion that a reasonable officer acting consistent with standard police practices would not have deployed his/her Taser X2 on Mr. Phounsy at that juncture. It is my opinion that Corporal Brooke should have assessed the situation and communicated with the other Deputies who were attempting to control Mr. Phounsy as to where and how he could assist. The use of the Taser X-2 detracted from the goal of handcuffing Mr. Phounsy with minimal force. It is my opinion that Mr. Phounsy reacted to pain caused by the activation of the Taser X-2 and most likely responded to the pain by moving his arms and legs and thus prolonging the force incident. Lastly, Corporal Brooke should have functioned as supervisor by coordinating the simultaneous effort by all involved Deputies.

9. It is my opinion that a reasonable officer acting consistent with standard police practices would have immediately placed Mr. Phounsy on his side once he was restrained so his breathing was not further impaired. In addition, it is my opinion that a reasonable officer acting consistent with standard police practices would have avoided applying weight to Mr. Phounsy's upper torso during the restraint process, restraining only the arms and legs. Lastly, it is my opinion that Deputy Carbajal violated San Diego County Sheriff's Department Use of Force Guidelines (3/21/12)-Addendum Section Force Section F that states, "As soon as possible after a subject is maximally restrained, he will be rolled onto his side or seated position. The arresting deputy must continually monitor the subject for consciousness and breathing.

10. It is my opinion that a reasonable officer acting consistent with standard police practices would have immediately placed Mr. Phounsy on his side once he was restrained so his breathing was not further impaired.  Lastly, it is my opinion that Deputy Fischer violated San Diego County Sheriff's Department Use of Force Guidelines (3/21/12)-Addendum Section Force Section F that states, "As soon as possible after a subject is maximally restrained, he will be rolled onto his side or seated position. The arresting deputy must continually monitor the subject for consciousness and breathing. Deputy Fischer stated that he did not check if the Maximum Restraints were properly placed on Mr. Phounsy (Fischer Deposition, Page 60). Deputy Fischer stated that he did not see any deputies check to see if Mr. Phounsy could breathe (Fischer Deposition, Page 60).

11. It is my opinion that a reasonable officer acting consistent with standard police practices would not have applied downward pressure to Mr. Phounsy's head while he was in the ambulance.  In addition, it is my opinion that a reasonable officer acting consistent with standard police practices would have avoided applying weight to Mr. Phounsy's head, restraining only the arms and legs. In addition, Deputy Fischer weighed 200-225 pounds on the day of the incident (Fischer Deposition, Page 32). Deputy Fischer stated that he estimates that that he was holding his head with a good 9 to 10 (10 being hard as possible), and that he held it until Mr. Phounsy

## On-Scene Consulting

stopped resisting (Fischer Deposition, Page 95). Deputy Fischer stated that he continued to apply pressure even though the "Spit Sock" was on (Fischer Deposition, Page 106). Lastly, it is my opinion that Deputy Fischer violated San Diego County Sheriff's Department Use of Force Guidelines (3/21/12)-Addendum Section Force Section F that states, "As soon as possible after a subject is maximally restrained, he will be rolled onto his side or seated position. The arresting deputy must continually monitor the subject for consciousness and breathing. In addition, it is my opinion that Deputy Fischer and the other Deputies on scene, including Sergeant Ralph (who was in overall command of the incident), should have ensured that Mr. Phounsy was taken out of the Maximum Restraints and placed into Soft Restraints prior to departing 8358 Holden Road. According to Captain Aaron Bagley, he was concerned that Mr. Phounsy was "Hog Tied" and placed in four-point restraints as it is not part of their protocol (Bagley Deposition, Pages 81-82). According to Captain Aaron Bagley, he cannot recall a time where a patient was able to get out of soft restraints (Bagley Deposition, Page 89).

12. It is my opinion that a reasonable officer acting consistent with standard police practices would not have placed the cord cuffs on Mr. Phounsy so tight that they needed to be cut off.

13. It is my opinion that a reasonable officer acting consistent with standard police practices would have formulated a tactical plan. I base my opinion on the
**California Police Officer Standards and Training (POST), Learning Domain No. 21-Basic Concepts of Law Enforcement Patrol, Officer Safety While on Patrol.**

**1-21 Poor or No Planning:**
It is my opinion the Deputies who were involved in applying the Maximum Restraints should have formulated a plan as to how the cord cuffs were going to be applied. In addition, it is my opinion that by formulating a plan would have greatly reduced the time it took to apply the Maximum Restraints in this matter as well as reduced the time that Mr. Phounsy was subjected to the bodyweight and force of the Deputies.

14. It is my opinion that a reasonable officer acting consistent with standard police practices would have immediately placed Mr. Phounsy on his side once he was restrained so his breathing was not further impaired. In addition, it is my opinion that Deputy Lee violated San Diego County Sheriff's Department Use of Force Guidelines (3/21/12)-Addendum Section Force Section F that states, "As soon as possible after a subject is maximally restrained, he will be rolled onto his side or seated position. The arresting deputy must continually monitor the subject for consciousness and breathing. Deputy Lee stated that he did not check if the Maximum Restraints were properly placed on Mr. Phounsy and that he could breathe. According to Deputy Lee, once Mr. Phounsy was placed on the gurney, he applied the orange straps and tightened the orange straps close to the body like a seat belt (Lee Deposition, Page 109). According to Deputy Lee, he did not make sure that Mr. Phounsy could still breathe nor did he see anyone else check to see if Mr. Phounsy could breathe after he attached the orange straps.

## On-Scene Consulting

15.  It is my opinion that a reasonable officer acting consistent with standard police practices would have immediately placed Mr. Phounsy on his side once he was restrained so his breathing wasn't impaired.  Lastly, it is my opinion that Deputy Martinson violated San Diego County Sheriff's Department Use of Force Guidelines (3/21/12)-Addendum Section Force Section F that states, "As soon as possible after a subject is maximally restrained, he will be rolled onto his side or seated position.  The arresting deputy must continually monitor the subject for consciousness and breathing.

16.  It is my opinion that a reasonable supervisor acting consistent with standard police practices would have immediately recognized that a person lying on his stomach will have trouble breathing when pressure is applied to his back.  It is my opinion that Sergeant Ralph should have monitored the force and ensured that Mr. Phounsy did not remain in a prone position on his stomach and was immediately placed in a seated or standing position as soon as possible.  In addition, it is my opinion that Sergeant Ralph should have recognized and immediately summoned medical assistance when he heard labored or exaggerated breathing; gurgling; guttural sounds; groaning, snorting; and or gasping.

17.  It is my opinion that a reasonable officer acting consistent with standard police practices would not have struck Mr. Phounsy with his knee as it was counter-productive and excessive.  In addition, it is my opinion that the knee strike that Deputy Tennison delivered detracted from the goal to handcuff Mr. Phounsy.

18.  It is my opinion that a reasonable officer acting consistent with standard police practices would not have punched Mr. Phounsy 2-3 times in the right thigh as it was counter-productive and excessive.  In addition, it is my opinion that the punches Deputy Tennison delivered detracted from the goal to handcuff Mr. Phounsy.

19.  It is my opinion that a reasonable officer acting consistent with standard police practices would have immediately placed Mr. Phounsy on his side once he was restrained so his breathing wasn't impaired.  In addition, it is my opinion that Deputy Tennison violated San Diego County Sheriff's Department Use of Force Guidelines (3/21/12)-Addendum Section Force Section F that states, "As soon as possible after a subject is maximally restrained, he will be rolled onto his side or seated position.  The arresting deputy must continually monitor the subject for consciousness and breathing.

20.  It is my opinion that a reasonable officer acting consistent with standard police practices would not have conducted two knee strikes to the left shoulder of Mr. Phounsy and would not have conducted two elbow strikes to the right side of Mr. Phounsy's forehead as it was counter-productive and excessive.  In addition, it is my opinion that the knee and elbow strikes detracted from the goal to handcuff Mr. Phounsy.  In addition, I base my opinion on Deputy Allen's statement that he believes that Mr. Phounsy's actions were resistive and not assaultive (Allen Deposition, Page 52).

## On-Scene Consulting

21. It is my opinion that the failure to discuss and formulate a tactical plan clearly had a negative impact on the outcome of the incident and resulted in the use of lethal force causing death to Mr. Phounsy.

22. It is my opinion there was a gross lack of situational awareness and fundamental tactical errors in this incident. In this case, there was a departure of expected and required tactics as well as a deliberate departure from training.

23. It is my opinion based on my review of the facts in this matter, the San Diego County Sheriff's Department failed to conduct a comprehensive debrief of this incident to provide necessary and valuable feedback to ensure that use of force incidents are minimized.

24. Based on my review of the facts in this matter, Corporal Collins and Deputy Krull did not have a sufficient legal justification for conducting a "Pat Down" search of Mr. Phounsy against his will as there was no information that I reviewed to justify reasonable and articulable suspicion that Mr. Phounsy may be "armed with a weapon." At their depositions, both Corporal Collins and Deputy Krull testified that they did not have any specific and articulable facts that Mr. Phounsy was presently armed with a weapon. In fact, to the contrary, Mr. Kelly had informed them that Mr. Phounsy was not armed, which Mr. Phounsy reiterated shortly after being contacted by the deputies. Lastly, the officers were not legally justified in handcuffing Mr. Phounsy. Based on the Deputies' own testimony in this matter, their justification for doing so was to effectuate their illegal pat down of Mr. Phounsy and for officer safety, neither of which is a sufficient legal justification.

25. It is my opinion that the Basic Physiology of a Struggle is applicable in this matter. A person lying on his stomach has trouble breathing when pressure is applied to the back. The remedy seems relatively simple: get the pressure off his back. However, during a violent struggle between an officer or officers and a suspect, the solution is not as simple as it may sound. Often, the situation is compounded by a vicious cycle of suspect resistance and officer restraint:
- A suspect is restrained in a face-down position, and breathing may become labored.
- Weight is applied to the person's back-the more weight, the more sever the degree of compression.
- The individual experiences increased difficulty breathing.
- The natural reaction to oxygen deficiency occurs-the person struggles more violently.
- The officer applies more compression to subdue the individual.

26. It is my opinion that the Deputies in this matter failed to transition Mr. Phounsy from Maximum Restraints to Soft Restraints to allow medical personnel to perform necessary treatment to Mr. Phounsy. In addition, it is my opinion there were numerous Deputies at scene during this incident that could have made the transition without jeopardizing the safety of medical personnel or the Deputies. I base my opinion on my field experience during my employment with the Los Angeles Police Department.

## On-Scene Consulting

### Considerations Regarding the Use of Deadly Force

The use of force that can prove lethal is the most serious decision a peace officer may ever have to make. Such a decision should be guided by *the reverence for human life* and, used only when other means of control are unreasonable or have been exhausted. Reverence for life is the foundation on which the decision to use force rests. Deadly force, including the use of techniques that can kill, is always the last resort used in the direst of circumstances. The authority to use such force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously. In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained at the POST Basic academy that the use of force must meet an *"Objectively Reasonable"* standard. The following quotes from POST typifies the training (emphasis added): *"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner."
(Learning Domain #20; "Introduction to the Use of Force," pages 1-4).

Further, POST teaches in the basic curriculum regarding the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1. The power of arrest and
2. The power to use deadly force.

"The authority to do so does not come from the rule of an authoritarian dictator. Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost care and restraint.* This is why it is important to emphasize that peace officers do so only with the utmost care and restraint, *not confer "police powers" on themselves.* These powers come to the criminal justice system from the people they serve. (Learning Domain #2: "Criminal Justice System," page s 1-4, Emphasis added).

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."

**"Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate." Also POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of the circumstances." (Learning Domain #20 "Use of Force," Chapter 2).

POST training specifies that the use of force under the "totality of the circumstances" be only justified on the basis of an "objectively reasonable" standard. In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear. The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actually perceived circumstances.* POST defines "Unreasonable Fear" as: *Generated in the officer's mind with no direct correlation to*

## On-Scene Consulting

*facts and situations.* (Learning Domain #20, Chapter 5, Emphasis added).  Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." (Learning Domain #20, Chapter 3).

A great deal of emphasis is placed on tried and proved tactics at the POST Basic Academy with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

27.  It is my opinion that due the dangers of positional asphyxia, the Hobble Restraint Device shall not be used to bind an individual's hands to his/her feet in any manner.  The handcuffs must firmly grip the individual's wrists and the hobble must tightly secure the individual's ankles.  After being searched, the individual be immediately rolled into an upright seated position.  ***Secured individuals shall not be placed in recumbent position causing them to lie on their stomach or side.***

### My Qualifications for Reviewing this Case:

My opinions are based on my education, training and experience.  Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811.  Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC)-6-month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989.  While in the academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail).  I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds.  *I received the Purple* Heart in 2010.  Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

## On-Scene Consulting

I was promoted to the rank of Detective and attended Basis Detective School. Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division. Prior to my assignment, I attended mandated Basic Supervisor School. In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training. The training focused on team building, leadership, and decision making. While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include: Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training. I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents. I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance. While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group. I directly supervised (14) Police Officers and Detectives assigned to the Unit. Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division. I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives. As a Unit, we prepared and served numerous search warrants. I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the service. I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section. I investigated personnel complaints that were too large in scope for a geographical Division. At the conclusion of my loan, I was selected to Management Services Division, Special Projects, and Office of the Chief of Police. I completed numerous in depth staff projects for review by the Chief of Police. In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Also during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice. I directly supervised ten undercover officers and four uniformed officers. I provided all facets of training to the officers assigned to Vice at that time to include: Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer. I conducted audits, personnel investigations, administrative projects, Use of Force Investigations and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force. I conducted Use of Force audits on Specialized Units in Central and South Bureaus. I reported directly to the Office of the Chief of Police.

## On-Scene Consulting

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (18) K9 Handlers. Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units. I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School. While at K9, I investigated and completed K9 contacts, personnel complaints, Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents. *I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.*

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers. I conducted and facilitated all facets of SWAT training to include: Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis. In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting). I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation Team. I provided on-going crisis negotiation training, mental health training, de-briefs, 40-hour POST Certified CNT School, and suicide prevention training. I worked in conjunctional with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Training. In addition, I was assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counter-Terrorism following the terrorist attack in November 2008. I taught use of force, tactics and SWAT deployment to 250 Mumbai Special Tactical Police Officers. Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart and the Police Star.

Scott A. DeFoe

EXHIBIT "D"

Kris Sperry, M.D.
Forensic Pathologist

Certified by the American Board of Pathology in:
Anatomic Pathology
Clinical Pathology
Forensic Pathology

May 8, 2017

Re:  Lucky Phounsy

I have been provided with extensive documents and materials concerning Lucky Phounsy, including documents generated at and around his death, his hospitalization following the cardiac arrest he sustained prior to arrival at the hospital, and the autopsy examination.  These documents were provided to me on a flash drive; a complete delineation of these items is contained upon the drive itself.  However, these materials generally contain the following:  Deposition transcripts of Daniel Nenow, Aaron Bagley, David Csik, Adam Daniels, Aaron Do, and Aaron Hackett.  The non-deposition documents include:  San Diego Medical Examiner's file (including toxicology reports and toxicology testing performed at National Medical Services), photographs from the Medical Examiner's Office and photographs of Mr. Phounsy in the driveway and on the gurney, perhaps in the back of the ambulance in which he had been transported; EMS policies and procedures; 13 WAVE audio files; medical records from Sharp Grossman Hospital, regarding Mr. Phounsy's hospitalization there until he died; Taser downloads; multiple San Diego Sheriff's Department (SDSD) reports, interviews and supplemental reports; Santee Fire Rescue policies and procedures and other documents; and Lakeside/Santee Fire Department documents and reports.

Lucky Phounsy was a 32 year old Southeast Asian male.  Family members report a history of recreational drug use including marijuana, cocaine, methamphetamine, LSD and nitrous oxide.  He is reported to have attended a music festival over a few days during which he apparently ingested marijuana, ecstasy, and perhaps other substances.  He returned home on Saturday April 11 or Sunday April 12.  Upon his return home, he was not acting normally.  He had serious insomnia and paranoid delusions.  The family became concerned, and reportedly administered 75 mg of diphenhydramine, an over-the-counter sleep medication; it was reported that he had not slept for a time period that could have been two days or more, and it is hypothesized that he became increasingly psychotic, paranoid and delusional as the result of sleep deprivation.  In any event, shortly after 10:00 pm on Monday, April 13, 2015, Mr. Phounsy called 911, relating that someone was threatening to kill him or his family members.  Initially two Sheriff's Deputies responded, and a complex struggle began during which both deployed their Tasers (dart mode) several times.  As many as eight backup deputies responded and may have been participating in this restraint, during which he was drive-stunned with a

Dr. Kris L. Sperry
5/11/2017
Page 2 of 6

Taser twice.  He was eventually placed in "maximum restraints", with his arms handcuffed behind his back, his legs shackled together, a cord wrapped around his waist, and a cord attaching the leg restraints passing over the chain between the handcuffs was affixed to the waist band.  This is a modified form of the restraint commonly referred to as a hogtie.  He is reported to have continued to struggle, which is somewhat difficult to imagine given the restraints.  He was carried out to the driveway and placed on his chest for some period of time before being placed on his side, still in the "maximum restraint" position.  Following the arrival of paramedics, he was reportedly administered 5 mg of Versed (midazolam) IM at around 10:45 pm.

Mr. Phounsy's face was photographed while he was on his side in maximum restraints on the driveway.  His neck is flaccid, his eyelids are heavy and he therefore appears unconscious.  There is clearly cyanosis visible around his lips, indicating severe hypoxia.

It is reported that deputies and paramedical personnel discussed removing the restraints so that Mr. Phounsy could be transported supine and flat to the hospital, restrained at each extremity with softer restraints.  He was reportedly given another 5 mg of Versed.  He was placed on his left side upon the ambulance gurney, still restrained with the "maximum restraints", and transport initiated.  The gurney straps passed over his body, and photographs that appear to have been taken in the ambulance show Mr. Phounsy to be somewhat on his left side, with a strap passing over and across his chest.  In the ambulance, no vital signs were obtained, no cardiac monitor was attached, and no pulse oximeter attached.  A "spit sock" was placed over his head.  No oxygen was administered, and a deputy in the back of the ambulance was holding down Mr. Phounsy's head, neck and torso.

At some point during the transfer personnel in the back of the ambulance related that Mr. Phounsy was noted to have stopped breathing, and no pulse could be found.  Close to the time of arrival at the Emergency Department the paramedics report initiating CPR.  These efforts included placement of a bag valve mask to deliver oxygen, and external chest compressions, although Mr. Phounsy remained restrained, predominantly on his left side.  After backing in to the ambulance bay, the gurney was removed, and another deputy is reported to have assisted in removing the handcuffs, leg restraints, and cutting off the various straps.

In the emergency room, Mr. Phounsy was in full cardiorespiratory arrest.  The initial blood gas at 0020 hours on April 14, 2015, did not register a pH or a PCO2 level.  However, the initial end tidal CO2 measurement was very markedly elevated at 86 mm Hg (normal 30-43 mm Hg), which indicates severe gas exchange inequity through

Dr. Kris L. Sperry
5/11/2017
Page 3 of 6

profound lack of effective respiration (breathing).  His serum lactic acid level was also found to be markedly elevated, reflecting the intense and prolonged struggle and restraint.  His serum potassium was also elevated, at 6.2 meq/L.  His body temperature was not elevated.  Mr. Phounsy was aggressively treated empirically for severe acidosis, with restoration of his heart beat and pulse, but he had sustained severe, irreversible brain damage and also multi-organ system damage from systemic hypoxic and inadequate perfusion.  He subsequently went in to acute kidney failure, liver failure, and died, after being disconnected from life support, on April 20, 2015.

The autopsy examination documented many superficial abrasion and contusions, which corresponded to the struggles he had been engaged in with law enforcement officers, the Taser deployments, and various restraints.  There were no specific injuries, alone or in combination, which would have been potentially life threatening, nor represented inflicted trauma that would have been serious.  The heart weight was 320 grams, which is essentially normal for a 186 pound male, although the left ventricle exhibited focal irregular thickening.  Microscopically, an area of myocardial (heart muscle) necrosis was found within one of the papillary muscles of the left ventricle, along with narrowing of microscopic arterioles in this tissue.  This most likely represents an area of acute infarction that developed as the consequence of Mr. Phounsy's prolonged hypoxia and inadequate blood perfusion.

Very extensive toxicologic testing was performed, both by the San Diego Medical Examiner's Office and by National Medical Services (a nationally known forensic toxicology laboratory of which I am aware and recognize).  The only substances which were detected in antemortem blood samples were cannabinoids, diphenhydramine, and an extremely small "trace" of MDMA (<0.01 mg/L).  Urine analysis disclosed a myriad of drugs, all of which were medications that had been administered to him as part of his medical treatment.  More extensive testing for synthetic cannabinoids and other esoteric abused drugs was negative.  It is notable that no Versed was detected in any testing; as this drug had been given in relatively small doses through an IM route, it is doubtful that any meaningful systemic absorption had taken place.  The lack of Versed in the blood is consistent with the cardiac arrest happening closer to the time the injections were administered.

The cause of death as listed in the autopsy report is, "ANOXIC ENCEPHALOPATHY [due to] CARDIOPULMONARY ARREST WITH RESUSCITATION FOLLOWING PHYSICAL ALTERCATION AND RESTRAINT [due to] STIMULANT DRUG-RELATED PSYCHOTIC STATE," with "CARDIAC ARTERIOLOSCLEROSIS" listed as a contributing factor in the death.  The Manner of Death was determined to be, "ACCIDENT."

---

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
5/11/2017
Page 4 of 6


Despite extensive and detailed toxicology analyses, the only potentially serious psychoactive drug that was detected in the blood when he initially arrived at the hospital was MDMA, and this level was so low that it was considered a "trace." The historical information related by Mr. Phounsy to his family members, who gave this information to law enforcement officers, included a myriad of illicit drugs. However, it is impossible to rely upon this information as given by Mr. Phounsy as being a true and accurate of what he truly ingested, as compared to what he *might* have ingested, during the music festival. Obviously, there is no quality control or certainty when it comes to illicitly manufactured and illicitly sold drugs, and the saying that "Let the Buyer Beware" is particularly apt for the illicit drug trade. The only objective scientific proof that exists is that Mr. Phounsy did, at some point, ingest some MDMA that was almost entirely eliminated from his system at the time of this restraint incident, as well as had smoked/consumed cannabinoids (marijuana, most probably) in some fashion. He self-reported to his family that he had not slept in several days, and was most probably sleep-deprived. Most true stimulant drugs, such as amphetamine, methamphetamine, and cocaine, remain detectable within the blood and/or urine as parent drug and/or metabolites for several days; none of these were found in his blood. It is impossible to state with any reasonable degree of medical certainty exactly *what* he consumed and *when* he consumed it, despite his relayed belief that he had possibly consumed several named illicit substances over the years.

Mr. Phounsy's behavior and expressions that he thought that someone was trying to kill him are most probably hallucinatory or delusional in nature, to the point of psychosis. It is not documented that any queries were made to his family members regarding any history of prior mental illness of any sort. I am informed by their attorneys that he had no such history.

The intense and prolonged struggles that Mr. Phounsy had with law enforcement officers, including the applications (both via barbs and drive-stun mechanisms) of the Tasers, all included intense physical activity, which initiates the development of metabolic acidosis through induced muscle contractions and other increased metabolic requirements, and generated lactic acid. Although it is reported that once he was in the "maximal restraint" position he appeared to be able to breathe adequately (and was eventually turned to his left side when on the ground), he was then placed on the ambulance gurney and strapped down with the gurney straps while still maximally restrained. One strap passed over his chest, holding him on the gurney, and his head, neck and torso were variably "restrained" during transport. He was given no oxygen, a spit sock was placed over his head so that he could only be visualized poorly, and no vital signs were obtained at any point. After his cardiopulmonary arrest and at the

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net

Dr. Kris L. Sperry
5/11/2017
Page 5 of 6

hospital, it was found that his end tidal $CO_2$ was twice the upper limits of normal, indicating prolonged severe breathing impairment. The blood pH was not obtained (possibly because it was below the detection limits of the instrumentation), but he was correctly diagnosed as being profoundly acidotic and treatment to counteract the acidosis successfully restored his heart beat. However, by this point, he had sustained irreversible hypoxic brain damage, and systemic hypoxic/ischemic injury to multiple organ systems.

It is my opinion, to a reasonable degree of medical certainty, that Lucky Phounsy died of irreversible brain and internal organ hypoxic injury, which occurred when he was placed in a physically restraining position which began in the house, and thereafter continued on the driveway and in the back of the ambulance within which he was being transported to the hospital. In the ambulance, he was maintained in a "maximum restraint" position, with his hands handcuffed behind his back and his shackled legs attached to the handcuff chain. Consequently, he was strapped to the gurney predominantly lying on his left side, with his arms pinned behind him. A "spit sock" further compromised breathing and also obscured the ability to visualize his face, and no vital signs were taken at any point. His ability to properly breathe was impaired, and the inadequate gas exchange produced progressive $CO_2$ retention, with progressive respiratory acidosis, and inadequate oxygenation. This hypoxia, along with the metabolic acidosis that had developed from his prolonged struggle with officers, initiated a cardiorespiratory arrest. Then, after this had occurred, he remained in this abnormal restrained position, and the belated attempts to ventilate him with a bag mask were ineffective, as evinced by the extremely high end tidal $CO_2$ at the hospital. Furthermore, being restrained on the gurney, turned towards his left side, would have dramatically impaired the ability to adequately perform external cardiac compressions and generate a systemic and central nervous system blood flow adequate to preserve his organs, especially his brain, until the return of spontaneous circulation.

It is my opinion, to a reasonable degree of medical certainty, that the manner in which Lucky Phounsy was restrained within the back of the ambulance during his transport to the hospital is a direct contributing factor to his death, exacerbating the underlying metabolic acidosis which had been evolving, and impairing his ability to breathe adequately, causing impaired oxygenation, carbon dioxide retention, and hypoxic with respiratory acidosis. These factors interacted to cause a cardiorespiratory arrest. Had he been administered oxygen by the paramedics these effects would have been mitigated and more likely than not would have survived. Furthermore, it is my opinion, to a reasonable degree of medical certainty, that maintaining him in the maximally restrained position while strapped to the gurney in the ambulance was a substantial contributing factor to the progression of his metabolic and respiratory acidosis, hypoxia,

Dr. Kris L. Sperry
5/8/2017
Page 6 of 6

and the inability to properly and adequately perform cardiopulmonary resuscitation and administer oxygen via the bag valve mask after the cardiac arrest was noted.

I disagree with the Manner of Death determination of the San Diego Medical Examiner's Office.  Mr. Phounsy's death, as with essentially all deaths that occur during or following law enforcement custody incidents which involve struggles with officers or other similar actions, are properly classified as "HOMICIDE," as the death is caused by or contributed to by the actions of another or others.  "Homicide" to a medical examiner is defined in these terms.  The wording of the Cause of Death in the San Diego Medical Examiner's Office autopsy report, stating that the cardiopulmonary arrest occurred "...FOLLOWING PHYSICAL ALTERCATION AND RESTRAINT," defines the Manner of Death as being "HOMICIDE."

All of the above opinions are rendered to a reasonable degree of medical certainty.

Kris Sperry, M. D.

Sperry Forensic Pathology Consultants, Inc.
302 Watermark Drive
Peachtree City, Georgia  30269
Telephone:  (770) 486-5380
e-mail Dr. Sperry:  stiffdoc@bellsouth.net