THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By RONALD LENERT, Senior Deputy (State Bar No. 277434)
    FERNANDO KISH, Senior Deputy (State Bar No. 236961)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244; Fax: (619) 531-6005
E-mail: ronald.lenert@sdcounty.ca.gov; fernando.kish@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, San Diego County Sheriff's Department,
Dean Allen, Aaron Brooke, Sandra Carbajal, Marcos Collins, Janae Krull, Michael Lee,
Jenny Martinson, Tamani Pugh, Jovonni Silva, and Billy Tennison

Mildred K. O'Linn (State Bar No. 159055)
Tori L.N. Bakken (State Bar No. 329069)
**MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900; Fax (213) 624-6999

Attorneys for Defendant Richard Fischer

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| K.J.P., a minor, and K.P.P., a minor, individually, by and through their mother, LOAN THI MINH NGUYEN, who also sues individually and as successor in interest to her now deceased husband, Lucky Phounsy, and KIMBERLY NANG CHANTHAPHANH, individually,<br><br>          Plaintiffs,<br><br>     v.<br><br>COUNTY OF SAN DIEGO; San Diego Sheriff WILLIAM GORE; RICHARD FISCHER; KEVIN RALPH; MARCOS COLLINS; JANAE KRULL; SANDRA (JANET) CARBAJAL; BILLY TENNISION, III; DEAN ALLEN; MICHAEL LEE; JENNY MARTINSON; TAMANI PUGH; AARON BROOKE; JOVONNI SILVA; CITY OF SANTEE; AARON BAGLEY; AARON HACKETT; AARON DO; ADAM DANIELS; DANIEL NEOW; LAKESIDE FIRE PROTECTION DISTRICT; MARC POYNTER; DAVID CSIK,<br><br>          Defendants. | No. 15cv2692-H(MDD)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE TO EXCLUDE ALL EVIDENCE OF, AND REFERENCE TO, CERTAIN IMPROPER OPINIONS OF PLAINTIFFS' EXPERT WITNESSES**<br><br>**[DEFENDANTS' MOTION 3 OF 5]**<br><br>Date:    February 8, 2021<br>Time:   10:30 a.m.<br>Dep.t.:  15A - Courtroom of the Honorable Judge Marilyn L. Huff<br><br>Trial Date:   February 23, 2021 |

15cv2692-H(MDD)

# I.    INTRODUCTION

Defendants seek to exclude at trial certain improper opinions of Plaintiffs' experts which (1) concern subjects on which they are not qualified to testify, (2) are improper conclusions of law, (3) are speculative because they are not fact-based, and (4) irrelevant to the issues in this action.

# II.    SUMMARY OF FACTS

In April 2015, Lucky Phounsy ("Phounsy") spent several days at a music festival, where he ingested an unknown amount of drugs.  When he returned, his family was unable to get him settled down.  At approximately 10 p.m. on April 13, 2015, he called 9-1-1 in a delusional state, stating he believed people were trying to kill him.  Two deputies arrived, and attempted to take him into detention, but he violently resisted.  Several additional deputies arrived and finally secured him in maximum restraints.  One of those deputies was Defendant Fischer, who assisted other deputies by holding Phounsy's legs in place while maximum restraints were applied, and who connected the waist restraint to the leg restraint while other deputies pushed Phounsy's legs up.  The deputies requested medical support, and by 10:30 p.m. paramedics from Lakeside Fire Protection District and the City of Santee arrived. Phounsy was placed on a gurney, and transferred to the paramedic's care.  Defendant Fischer rode in the ambulance with Phounsy and two paramedics in order to stabilize and control Phounsy, who continued to resist.  As Phounsy continued to resist and struggle with deputies and paramedics while restrained, the paramedics chose to keep him in his restraints.  The paramedics departed with Phounsy before 11:10 p.m.  Phounsy went into cardiac arrest as the ambulance approached Sharp Grossmont Hospital.  Doctors were able to regain a pulse, but Phounsy was later declared brain dead.

# III.    ARGUMENT

## A.    The Court Should Exclude Opinions Of Plaintiffs' Experts To Which They Are Not Qualified To Testify

Fed. R. Evid. 702 states: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise

15cv2692-H(MDD)

if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

### 1. DeFoe

DeFoe's Opinion No. 25 refers to "the physiology of a struggle" (Exhibit A, DeFoe depo., 79:8-25, 83:17-84:10) which DeFoe explains as "[a] vicious cycle of more resistance, more force, and they're trying to breathe, the officers are taking that as resistance to the force, when in reality the resistance is to they're trying to breathe and then more force is applied, and it's that – very similar to what Mr. Meyer wrote in his report -- it's that effect that ultimately can lead to positional asphyxiation." (Ex. A, DeFoe depo., 98:21-99:14.) This is based on a scientific and medical theory that is beyond his expertise and should be excluded. *See*: *Rascon v. Brookins*, 2018 U.S. Dist. LEXIS 20088, 2018 WL 739696, at *3 (D. Ariz. 2018) (finding an expert witness was not qualified to opine about medical causation, the physiological effects of a Taser, the progression of asphyxiation, the medical effects of a carotid hold, and cause of death); *Dirks v. Cty. of Los Angeles*, 2008 U.S. Dist. LEXIS 129460, 2008 WL 11355528, at *3 (C.D. Cal. 2008) (finding that an expert witness's report "purports to characterize facts that have nothing to do with his area of expertise" and "many of its opinions are beyond the scope of his expertise"); *LeBlanc v. City of Los Angeles*, 2006 U.S. Dist. LEXIS 96768, 2006 WL 4752614, at *9 (C.D. Cal. 2006) (finding an expert witness was not qualified to opine on the effect of a Taser on the victim or otherwise make medical opinions).

### 2. Dr. Thrush

Dr. Thrush opined that it was "unusual" that paramedics discussed the case with law enforcement before writing their reports, and that an addendum prepared by paramedic Hackett was "created much later than is usual or customary, and this should be taken into consideration when interpreting them." (Exhibit B, Thrush deposition, 84:17-86:6, 266:21-

267:2, 269:13-20, 270:15-271:8.)  This is beyond the scope of Dr. Thrush's expertise and should be excluded.  "A witness must be qualified in the specific subject for which his testimony is offered.... [a] medical doctor is not presumed to have expert knowledge about every conceivable scientific principle or disease."  *Whiting v. Boston Edison Co.,* 891 F. Supp. 12, 24 (D. Mass. 1995).  Dr. Thrush testified that no Court has qualified him to testify as an expert witness in the area of paramedic practice and pre-hospital care (Ex. B, Thrush depo., 36:21-37:5), he has never been a licensed paramedic (Ex. B, Thrush depo., 51:13-15), he has never held a title of medical director for any fire agency paramedic program in California (Ex. B, Thrush depo., 53:25-54:7), and he has never worked as a medical doctor training paramedics in San Diego County.  (Ex. B, Thrush depo., 59:5-7.)  Further, since 1994, Dr. Thrush has not performed any quality assurance work for any paramedic programs in San Diego County (Ex. B, Thrush depo., 59:12-16), nor performed any protocol drafting, amending, or review for any paramedic programs in San Diego County.  (Ex. B, Thrush depo., 59:17-20.)  Dr. Thrush has never independently drafted policies or procedures for paramedics for pre-hospital care work.  (Ex. B, Thrush depo., 58:12-16.)

## B.    The Court Should Exclude The Opinions Of Plaintiffs' Experts Which Are Improper Conclusions Of Law

Experts may not offer legal opinions.  Legal opinions are unhelpful to the trier of fact, not within an expert's purview, and impermissibly invade the province of the judge.  *See* 29 Charles A. Wright et al., *Federal Practice and Procedure* (hereafter "Wright & Miller") § 6265.2 (2d ed., Apr. 2020 update). (stating that "courts often exclude expert opinions that involve legal conclusions"); *See also Frakes v. Masden*, 2015 U.S. Dist. LEXIS 159158, 2015 WL 7583051, at *4–5 (S.D. Tex. 2015) (excluding an expert witness's opinion that "no crime was in progress" when officer responded to a scene*); Carr v. Montgomery Cty.,* 2015 U.S. Dist. LEXIS 136560, 2015 WL 5838862, at *8–10 (S.D. Tex. 2015) (excluding an expert witness's opinions that officers had no "exigency or viable purpose," that a "reasonably trained" officer would have acted differently, and that a supervisor "unreasonably failed to properly supervise his officers").

15cv2692-H(MDD)

DeFoe's Opinion No. 24 that Defendants Corporal Collins and Deputy Krull did not have sufficient "legal justification" for conducting a pat-down search (Ex. A, DeFoe depo., 41:2-4) is an improper and inadmissible conclusion of law.

## C.   The Court Should Exclude The Opinions Of Plaintiffs' Experts Which Are Not Fact-Based

Experts may not offer conclusory opinions, even in areas where they are highly qualified.  Rather, experts must show their work.  This allows the court and jury to evaluate the basis of the expert's opinion and determine whether the opinion is truly helpful, fact-based, and reliable.  Otherwise an expert could offer his or her personal views as opinions, and the jury would have no way of knowing whether the opinions are trustworthy or representative of others in the field.

"The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.  The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded."  Fed. R. Evid. 702, adv. comm. notes to 2000 amendments.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).  As the Ninth Circuit explained on remand from the Supreme Court: "We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability.  Under *Daubert*, that's not enough."  *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1319 (9th Cir. 1995).

### 1.   DeFoe

DeFoe offers the opinion that "if someone's mentally ill and they can't understand or can't process or someone under the influence who can't process or understand multiple commands at one time, you can't expect them to follow those commands." (Ex. A, DeFoe depo., 68:20-24).  However, DeFoe testified that he does not know what conflicting

/ / /

commands were given to Phounsy (Ex. A, DeFoe depo., 69:2-3) and is not aware of any specific conflicting command.  (Ex. A, DeFoe depo., 69:14-16.)

DeFoe offers the opinion that Defendant Fischer "did not check if the maximum restraints were properly placed on Mr. Phounsy."  (Ex. A, DeFoe depo., 75:14-16.)  But DeFoe testified that he does not know if the maximum restraints were improperly applied.  (Ex. A, DeFoe depo., 75:23-25.)

DeFoe offers the opinion that if Defendant Deputy Tennison's knee strikes to Phounsy were simply out of frustration, then this use of force was excessive.  (Ex. A, DeFoe depo., 85:11-15; 86:3-8.)  But DeFoe testified that he has no basis for an opinion that Defendant Deputy Tennison's knee strikes were done out of frustration.  (Ex. A, DeFoe depo., 86:13-18.)

All of these opinions of DeFoe should be excluded as improper conclusory opinions without evidentiary support.

### 2.   Dr. Sperry

Dr. Sperry offers the opinion that there was clearly cyanosis around Phounsy's lips, which indicates hypoxia (Exhibit C, Sperry deposition, 28:6-12, 29:1-3.)  However, Dr. Sperry testified that his opinion is based on two photographs.  (Ex. C, Sperry depo., 28:1-7 and depo. ex. 6.)  Dr. Sperry does not know who took these photographs.  (Ex. C, Sperry depo., 29:4-6.)  Dr. Sperry is not positive when these photos were taken.  (Ex. C, Sperry depo., 29:7-12.)  Dr. Sperry does not know what specific lighting conditions were there when these photos were taken.  (Ex. C, Sperry depo., 30:14-17.)  Dr. Sperry does not know what the f-stop was on the camera that took these photos.  (Ex. C, Sperry depo., 30:18-20.)  Dr. Sperry does not know how the photos were reproduced for his viewing other than they were digital capture.  (Ex. C, Sperry depo., 30:21-31:1.)  Dr. Sperry admitted that other than these two photos, there is no other measured, objective evidence that Phounsy was suffering from severe hypoxia at any time.  (Ex. C, Sperry depo., 34:21-35:25.)

Dr. Sperry offers the opinion that while the spit sock did not directly compromise Phounsy's breathing in a direct way, it interfered with the caregivers' ability to see

Phounsy's face and head (Ex. C, Sperry depo., 36:8-22) and impaired their ability to evaluate him.   (Ex. C, Sperry depo., 36:23-37:7; 37:22-38:5.)   However, Dr. Sperry testified that he did not recall ever seeing the actual spit sock that was used in this case. (Ex. C, Sperry depo., 38:6-9.)  Further, the evidence in this case is that paramedics could see through the spit sock (Exhibit D, Poynter deposition, 155:19-156:6), and that based on the lightweight mesh material of the spit sock, it was not a hindrance to Phounsy's ability to breathe.  (Exhibit E, Hackett deposition, 186:5-16.)

These opinions of Dr. Sperry should be excluded as improper conclusory opinions lacking evidentiary support.

**D.   The Court Should Exclude The Opinions Of Plaintiffs' Experts Which Are Irrelevant**

DeFoe's Opinion No. 16 (Ex. A, DeFoe depo., 82:23-83:16) only applied to Defendant Sergeant Kevin Ralph, who is no longer a party to this action.  This Court previously granted summary judgment in favor of Sergeant Ralph on all of Plaintiffs' claims.  (Doc. No. 171:21-22.)  The Court should exclude this opinion of DeFoe as irrelevant.

DeFoe's Opinion No. 23 pertains to the alleged failure of the San Diego Sheriff Department to conduct a comprehensive debrief after the incident.  (Ex. A, DeFoe depo. 96:25-98:19.)  The Court should exclude this opinion of DeFoe as irrelevant under Fed. R. Evid. 403, and also inadmissible as a subsequent remedial measure under Fed. R. Evid. 407.  *See Maddox v. City of Los Angeles,* 792 F.2d 1408, 1417 (9th Cir. 1986) ("The Internal Affairs investigation and measures taken by the defendant City were remedial measures taken after the incident.  Pursuant to Fed. R. Evid. § 403, evidence of these proceedings was therefore properly excluded with respect to the City's liability. [Citations]."); *Luera v. Snyder*, 599 F.Supp. 1459 (D. Col. 1984).

## IV.   CONCLUSION

Based on the foregoing, Defendants respectfully request that this Court make the following orders:

15cv2692-H(MDD)

1.    That Plaintiffs' expert witnesses, Plaintiffs' attorneys, Plaintiffs, and Plaintiffs' witnesses shall not, in the presence of the jury, testify, offer, or in any way refer to opinions which (1) concern subjects on which they are not qualified to testify, (2) are improper conclusions of law, (3) are speculative because they are not fact-based, and (4) irrelevant to the issues in this action.

Respectfully submitted,

DATED:  January 11, 2021         THOMAS E. MONTGOMERY, County Counsel

By: s/ RONALD LENERT, Senior Deputy
Attorneys for Defendants County of San Diego,
San Diego County Sheriff's Department, Dean
Allen, Aaron Brooke, Sandra Carbajal, Marcos
Collins, Janae Krull, Michael Lee, Jenny
Martinson, Tamani Pugh, Jovonni Silva, and Billy
Tennison

DATED:  January 11, 2021         **MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

By: s/ MILDRED O'LINN
Attorneys for Defendant Richard Fischer

- 7 -

15cv2692-H(MDD)

# EXHIBIT "A"

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Case No. 15CV2692-H-MDD

K.J.P., a minor, and K.P.P., a minor,          )
individually, by and through their              )
mother, LOAN THI MINH NGUYEN, who also          )
sues individually and as successor in           )
interest to her now deceased husband,           )
Lucky Phounsy, and KIMBERLY NANG                )
CHANTHAPHANH, individually,                     )
                                                )
                    Plaintiffs,                 )
vs.                                             )
                                                )
COUNTY OF SAN DIEGO; San Diego Sheriff          )
WILLIAM GORE; RICHARD FISCHER; KEVIN            )
RALPH; MARCOS COLLINS; JANAE KRULL;             )
SANDRA (JANET) CARBAJAL; BILLY TENNISION,)
III; DEAN ALLEN; MICHAEL LEE; JENNY             )
MARTINSON; TAMANI PUGH; AARON BROOKE;           )
JOVONNI SILVA; CITY OF SANTEE; AARON            )
BAGLEY; AARON HACKETT; AARON DO; ADAM           )
DANIELS; DANIEL NEOW; LAKESIDE FIRE             )
PROTECTION DISTRICT; MARC POYNTER;              )
DAVID CSIK,                                     )
                                                )
                    Defendants.                 )
_____)

DEPOSITION OF SCOTT A. DeFOE

June 30, 2017

Reported by:  Deborah M. DeSilva, CSR No. 7307, CRR

1  BY MR. CHAPIN:

2    Q. "Corporal Collins and Deputy Krull did not have

3  sufficient legal justification for conducting a 'Pat

4  Down' search."  Why not?

5    A. Well, there's no nexus that that person was

6  armed.

7    Q. So in conducting the investigation, they didn't

8  have any right to check him for weapons?

9    A. Well, based on the law, the person has to be

10  considered based on articulable facts that they're armed

11  and dangerous, and you have to have a reasonable

12  suspicion to detain before you do the search.  And part

13  of that is that there was criminal activity occurring.

14  And based on my review of the facts of the matter

15  initially, there wasn't any criminal activity.

16    Q. So would it be fair to say that this was either

17  an 11550 investigation or a 5150 investigation?

18    A. Well --

19      MR. McBRIDE:  Objection.  Assumes facts.

20  BY MR. CHAPIN:

21    Q. You know what I'm talking about, what 11550

22  means, right?

23    A. I'm a former DRE, so I understand the term.

24      The issue with 11550 in this matter is that you

25  have to form that based on your training and experience.

```
1            MR. McBRIDE:  Same objections.
2            THE WITNESS:  I believe the questions were
3  occurring prior to the force option, initial force.
4  BY MR. CHAPIN:
5      Q.  So they were giving simultaneous multiple
6  commands before anything happened?  Is that your
7  understanding?
8      A.  And during.  I don't know if it was actually
9  before, but it was during based on their testimony.
10     Q.  So they didn't have any right to yell at him
11 while he was beating them up?
12           MR. McBRIDE:  Objection.  Argumentative.
13           THE WITNESS:  The problem with even during
14 force giving different commands, multiple commands, if I
15 tell you -- if I'm telling you to put your hands up and
16 my partner's telling you to get on the ground, which one
17 are you going to do?  So that's the point of it.
18           If I'm asking you to do certain things, is
19 that -- if the commands conflict with one another or,
20 once again, if someone's mentally ill and they can't
21 understand or can't process or someone under the
22 influence who can't process or understand multiple
23 commands at one time, you can't expect them to follow
24 those commands.  That's where the criticism comes in.
25 ///
```

1   BY MR. CHAPIN:

2       Q.  What conflicting commands were they giving him?

3       A.  I don't know.  I just agree with Corporal

4   Collins when he stated on page 60 that giving multiple

5   commands would be confusing to someone who was mentally

6   ill.

7           And Deputy Krull said they were both asking him

8   questions at the same time, and that they both admitted

9   that they did not outline who was the cover and contact

10  person.

11          So just based on their own testimony, it made

12  me believe that they were asking questions

13  simultaneously.

14      Q.  Do you have any specific conflicting commands

15  that you're aware of?

16      A.  I do not.

17          MR. McBRIDE:  Do you want to give him the

18  opportunity to review the material he has?

19          MR. CHAPIN:  He can do whatever he wants.  I'm

20  not going to try to do what you did with the last

21  witness.

22          MR. McBRIDE:  If you want the deposition

23  transcripts, I've got them.

24  BY MR. CHAPIN:

25      Q.  I am going to make it really easy for you.  I

```
 1   Carbajal's testimony.
 2            THE WITNESS:  It's in her deposition testimony.
 3   She was asked -- she admitted she did not put him on his
 4   side.
 5   BY MR. CHAPIN:
 6        Q.  Do you know if anybody put him on his side?
 7        A.  At what point?
 8        Q.  At any point.
 9        A.  In the -- someone put him on his side in the
10   driveway after he was taken outside.
11        Q.  Right.  So No. 10, same thing, it looks like,
12   with Deputy Fischer, correct?
13        A.  In addition, with Fischer he didn't check --
14   according to his testimony on page 60, he did not check
15   if the maximum restraints were properly placed on
16   Mr. Phounsy.  And in addition, he did not see any other
17   deputies check to see if Mr. Phounsy could breathe.
18   That was on his deposition on page 60 as well.
19        Q.  Do you know if any other deputies were
20   monitoring his breathing?
21        A.  Not according to a review of the facts in this
22   matter.
23        Q.  Do you know if the maximum restraints were not
24   properly applied?
25        A.  I don't know.
```

1    the -- where the ambulance was and assisted cutting them

2    off, which, you know, may have delayed the medical

3    treatment.

4            But I can tell you from applying them, as well

5    as observing people -- the use of restraints,

6    especially -- specifically court cuffs -- is that they

7    shouldn't be so tight that you have to cut them off.

8        Q.  And No. 13 sounds like a repeat of No. 1.  Am I

9    correct about that?

10       A.  Yes.  It's because of the time it took.  It

11   took 10 to 15 minutes to get the restraints on based on

12   my review of the testimony.  So that's a very prolonged

13   struggle.

14           There was no -- no one was coordinating, based

15   on my review of the testimony.  No one was really having

16   any discussions of what to do.  It was just kind of

17   everyone was using force trying to get them on, and it

18   took 10 to 15 minutes, which prolonged that struggle.

19           And during that physiology of the struggle,

20   he's trying to push.  Obviously, with that comes weight,

21   weight pushes on the back, the person tries to breathe,

22   they try to create space to get air into the lungs,

23   additional thrashing by that person because they're

24   trying to breathe, more weight, and subsequently, you

25   know, the end result is typically bad.

1   and came back 10 minutes later, and Mr. Phounsy was

2   still on his chest.

3       Q.  And whose testimony was that?

4       A.  I will find that.  Do you have my notes that

5   you put in?

6       Q.  These, I think.  You can go ahead and keep

7   those for now.

8       A.  I don't recall, but I will -- before the end of

9   the depo, I will hand you that.

10      Q.  Okay.  All right.  And as you testified

11  earlier, you're not aware of anybody checking his

12  breathing based on your review of the materials; is that

13  correct?

14      A.  That's correct.

15      Q.  So No. 15 is the same opinion with respect to

16  Deputy Martinson, correct?

17      A.  Yes.

18      Q.  And that he was not immediately rolled onto his

19  side.  Is that your complaint?

20      A.  Yeah.  According to their policy, as soon as

21  possible, when a subject is maximally restrained, he

22  will be rolled onto his side or in a seated position.

23      Q.  Okay.  And No. 16, with respect to Kevin

24  Ralph -- let me ask you, first of all, after reviewing

25  his deposition, is there anything you would add to

1    Opinion 16 with respect to Sergeant Ralph?

2         A.   I mentioned earlier, but I'll re-mention it

3    again, that he never asked any deputy on scene to

4    monitor Lucky's breathing, that was page 35; never made

5    sure himself that Lucky was breathing and had a pulse,

6    that was page 36.

7              I know he spent about 10 minutes on the phone

8    making -- while at least two minutes of that time

9    Mr. Phounsy was on his stomach -- calling, making

10   notifications during that time; does not remember seeing

11   Lucky actively resisting after Deputy Allen rolled him

12   onto his recovery position; did not see Lucky -- did not

13   check Lucky to see if he had any injuries; did not check

14   the restraints to see if they were applied properly; and

15   lastly, that he believed that Lucky's death was probably

16   preventable.

17        Q.   And what opinion do you have about whether the

18   restraints were applied properly or improperly?

19        A.   As I mentioned earlier, they were on tight

20   enough that they needed to cut them off.  They were on,

21   I believe, at a point when they shouldn't have been;

22   that's during the transport.  I think that was critical.

23   They should have been removed.

24             I also believe that he should have -- with the

25   restraints on, as basic policy, based on Mr. Meyer's

1   report, based on their department policy, once they are

2   placed on, there's certain procedures that you must do

3   that they failed to do, and that being put him in a

4   seated position or rolled onto his side, that that

5   didn't happen for some period of time, especially after

6   a prolonged struggle, 15 to 20 minutes, knowing that

7   there's a likelihood that -- based on the physiology of

8   the struggle, there's a strong likelihood he couldn't

9   breathe and not knowing if there were any medical

10  issues, medical conditions or whatnot.

11      Q.  But the only basis for your opinion that

12  they -- the restraints were improperly applied is the

13  fact that they were cut off in the ambulance; is that

14  right?

15      A.  Well, not just that.  The fact -- based on the

16  testimony that -- where the legs were.  The legs were,

17  you know, according to certain -- I mean, according

18  to -- I mentioned earlier with Jovonni Silva that the

19  legs were -- his legs were a few inches from his butt.

20  So the fact of the positioning, they pressed his feet

21  virtually all the way up to his butt, and they were tied

22  in such a manner that, once again, puts more pressure

23  onto the diaphragm area, more pressure onto your chest.

24          If you can envision lying on your stomach right

25  now with your legs tied to the back of your -- your legs

1   bound, your feet behind your back, and then force being

2   put on there, with your legs pushed all the way up to

3   your butt, and then people putting pressure on that

4   area, a lot of pressure, maybe on the buttocks area,

5   like in Silva's testimony, putting pressure on that area

6   as well is obviously going to restrict someone's

7   breathing, or could restrict someone's breathing.

8        Q.  But you don't know if it did or not?

9        A.  Well, I'm not providing medical opinion in this

10  matter, right.

11       Q.  Okay.  And I'm looking at No. 17 now with

12  respect to Deputy Tennison, and tell me about that

13  opinion.

14       A.  As I mentioned, I thought it was

15  counterproductive and excessive.  There's no reason for

16  knee strikes.  What we're trying to do is eventually

17  to -- to place a person in handcuffs.

18          And Deputy Tennison, I thought his behavior,

19  him being a PERT deputy, he never used any of those

20  skill sets that he had learned, to come in, you know, to

21  try to influence behavior.  He came in and right away,

22  you know, a couple knee strike -- the knee strike that

23  he did, I thought was counterproductive.

24          And to go back to my opinions -- but I believe

25  it was just counterproductive.  I believe it did not

1   assist in the -- actually, in the -- in the handcuffing

2   of Mr. Phounsy.

3        Q.  It may have been counterproductive in your

4   view, but it's not improper to do that, is it?

5        A.  Well, it depends.  It depends on what -- what's

6   the -- if the end result -- if the knee strike is simply

7   out of frustration because you can't get something done

8   then, it's excessive.

9             If it's done to, like, transition to a

10  handcuffing technique, such as a distraction strike or

11  something like that, no, then it's not.  But if it's

12  done solely out of frustration, then it's excessive.

13       Q.  And where did you derive your opinion it was

14  done out of frustration?

15       A.  If it wasn't done to effect -- I think it was

16  counterproductive.  I know -- I said if it was done out

17  of frustration.  I didn't say it was done out of

18  frustration.

19       Q.  No. 18 looks like the same thing with respect

20  to Deputy Tennison, who used punches to the right thigh.

21  And those are counterproductive, correct?

22       A.  Yes.

23       Q.  And what do you base that on?

24       A.  Once again, they're not used to effect the

25  handcuffing techniques.  So other than that, there's

1    BY MR. CHAPIN:

2        Q.  But you don't have any evidence to indicate

3    this was a respiratory arrest?

4            MR. McBRIDE:  Same objections.

5            THE WITNESS:  I don't, other than he went into

6    cardiac arrest in the ambulance and stopped breathing.

7    So I don't know if that was attributed to the prolonged

8    struggle; I don't know if it was attributed to the

9    pressure on the head for 10 minutes; I don't know if

10   it's attributed to the force, to the maximum restraints,

11   to the way in which the restraints were put on.  All of

12   those are medical opinions.

13   BY MR. CHAPIN:

14       Q.  Have you read the medical examiner's report?

15       A.  I have.

16       Q.  Are you aware of the preexisting condition,

17   cardiac condition, Mr. Phounsy had?

18       A.  I believe --

19           MR. McBRIDE:  Objection.  Assumes facts.

20   Misstates the record.

21           THE WITNESS:  I believe I've read it.  In fact,

22   I know I've read it, but I don't know what the

23   conclusions were.

24   BY MR. CHAPIN:

25       Q.  Okay.  No. 22 is a criticism of the County

1   Sheriff's Department.  Why did you put that in there?

2        A.  No. 23, you mean?

3        Q.  I'm sorry, 23.

4        A.  Debrief.  I think that's -- I think incidents

5   such as this -- when you have an in-custody death, I

6   think it's critical that they do a comprehensive debrief

7   to learn best practices about what everyone did or

8   didn't do and things we can do better.

9            I think it's critical for lessons learned,

10  officer safety, what officer safety can glean out of

11  this or what's better for the department, and obviously

12  the standard of care for the community.  I think it's

13  critical to look at this thing comprehensively and find

14  out what we did right and what we did wrong.

15       Q.  And you don't know what the Sheriff's

16  Department did as far as debriefing, do you?

17       A.  I was never provided a debrief.  And it's my

18  understanding, based on my review, that there wasn't a

19  debrief.

20       Q.  But you don't know?

21       A.  If it occurred, I have not seen it, nor did

22  anyone testify that they attended one.

23       Q.  And this wouldn't really have anything to do

24  with the conduct of the deputies on this particular

25  occasion?

1      A.  Well, it could, because the purpose of any

2   debrief is to, you know, talk about what I did or what

3   you did or what Mr. McBride did or whatever it may be

4   because we're looking at what your actions were that

5   day, could they have been different; were they

6   reasonable based on this set of circumstances; what

7   parts were maybe unreasonable; was there lack of

8   communication; were there deescalation issues; was there

9   lack of supervisory oversight; was there -- you know,

10  was the force excessive.

11         There's a bunch of reasons why we debrief, and

12  so it does speak to each individual's actions that are

13  present.

14      Q.  I mean, it would relate to corrective action

15  rather than something that would affect the conduct of

16  the deputies on this particular day?

17      A.  Well, if the contact was such that they -- if

18  it was beyond what was reasonable, it could result in

19  discipline.

20      Q.  I think we covered No. 24 already.

21         And what is the "basic physiology of a

22  struggle"?

23      A.  I talked about that earlier.  It just basically

24  is, you know, the suspect is restrained in a face-down

25  position and breathing may become labored, weight is

1   applied to the person's back, the more weight, the more

2   severe the degree of compression, the individual

3   experiences increased difficulty breathing, and natural

4   reaction to oxygen deficiency occurs, and the person

5   struggles more violently, the officer applies more

6   compression to subdue the individual.

7           This is a vicious cycle of more resistance,

8   more force, and they're trying to breathe, the officers

9   are taking that as resistance to the force, when in

10  reality the resistance is to they're trying to breathe,

11  and then more force is applied, and it's that -- very

12  similar to what Mr. Meyer wrote in his report -- it's

13  that effect that ultimately can lead to positional

14  asphyxiation.

15      Q.  And finally, I believe --

16      A.  We have one more after this, a couple pages

17  away.

18          MR. OSTERBERG:  27 is on page 17.

19  BY MR. CHAPIN:

20      Q.  Oh, I'm sorry.  You're right.

21          No. 26, what's your criticism about the

22  deputies and the soft restraints?

23      A.  It is the fact that they should have

24  transitioned.  Obviously, when they accompanied

25  Mr. Phounsy in the ambulance, if they needed more than

Deposition of Scott A. DeFoe                                    K.J.P., et al. vs. COUNTY OF SAN DIEGO, et al.

1              I, Deborah M. DeSilva, Certified Shorthand

2       Reporter licensed in the State of California, License

3       No. 7307, hereby certify that the deponent was by me

4       duly sworn and the foregoing testimony was reported by

5       me and was thereafter transcribed with computer-aided

6       transcription; that the foregoing is a full, complete,

7       and true record of said proceeding.

8              I further certify that I am not of counsel or

9       attorney for either or any of the parties in the

10      foregoing proceeding and caption named or in any way

11      interested in the outcome of the cause in said caption.

12             The dismantling, unsealing, or unbinding of the

13      original transcript will render the reporter's

14      certificate null and void.

15              In witness whereof, I have hereunto set my

16      hand this day:  July 12, 2017.

17             XX   Reading and Signing was requested.

18             ____ Reading and Signing was waived.

19             ____ Reading and Signing was not requested.

20

21

22                    _____
                      Deborah M. DeSilva, RPR, CRR
23                    CSR No. 7307

24

25

# EXHIBIT "B"

Case 3:15-cv-02692-H-MDD   Document 268   Filed 01/11/21   PageID.8266   Page 27 of 67

Deposition of Jerry Thrush, M.D.                    K.J.P., et al. vs. COUNTY OF SAN DIEGO, et al.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| K.J.P., a minor, and K.P.P., a minor, individually, by and through their mother, LOAN THI MINH NGUYEN, et al., | ) ) ) ) |
| Plaintiffs, | ) Case No.: |
| v. | ) 15-CV-02692-H-MDD |
| COUNTY OF SAN DIEGO; San Diego Sheriff WILLIAM GORE; et al., | ) ) |
| Defendants. | ) |
| _____ | ) |

DEPOSITION OF JERRY THRUSH, M.D.

JULY 12, 2017

VOLUME I, PAGES 1 THROUGH 286, INCLUSIVE

SOLANA BEACH, CALIFORNIA

Reported by:  Lauren Ramseyer, CSR No. 14004

1  schedule.  I believe it's in the thumb drive, but just

2  in case, I brought it.

3              MR. OSTERBERG:  Let's attach that as

4  Exhibit P.

5              (Exhibit P was marked for identification.)

6  BY MR. OSTERBERG:

7      Q    And what do you charge for deposition

8  testimony, sir?

9      A    I believe it's $800 per hour.

10      Q    Okay.  Have you ever qualified as an expert

11  witness in any court of law as a police procedures and

12  tactics expert?

13      A    No.

14      Q    Have you ever qualified as an expert witness

15  in any court of law with regard to paramedic practice in

16  pre-hospital care?

17      A    When you say "qualified," I'm a specialist in

18  emergency medicine with emergency medical services

19  experience, and I'm not certain what you mean by

20  "qualified."

21      Q    Let me ask you this.  Has any court of law

22  said, "Yes, Dr. Thrush, you can go ahead and testify as

23  an expert witness in the area of paramedic practice and

24  pre-hospital care"?

25      A    I don't believe I've had such an accolade from

```
 1   a court of law.  But no court of law has said that I
 2   can't testify in such a case as a specialist in
 3   emergency medicine with EMS experience.
 4        Q     So the answer is no?
 5        A     Correct.
 6        Q     Okay.  Have you ever qualified as an expert
 7   witness in the area of photography and lighting?
 8        A     No.
 9        Q     Have you ever qualified as an expert in the
10   area of cause of death?
11        A     No.
12        Q     Have you ever qualified as an expert witness
13   in quantifying pain and suffering?
14        A     No.
15        Q     Are you personally familiar with any of the
16   named defendants in this lawsuit, whether they be
17   sheriffs' deputies, fire personnel, paramedics,
18   captains?
19        A     When you say "personally," I don't have any
20   personal relationship with any of them.  Have I met some
21   of them?  It's quite likely in the course of my practice
22   I have met some of the people in this case.
23        Q     And that's what I'm getting at.  Do you have
24   any recollection, as you sit here today, for example,
25   meeting or working with Captain Bagley?
```

1        Q     Can you tell me what your understanding is as

2    to the differences in training and scope and practice in

3    California between an EMT and a paramedic?

4        A     Yes.

5        Q     Or an EMTP.  Do you understand what that

6    acronym is?

7        A     Yes.

8              MR. MCBRIDE:  Objection.  Overbroad.

9    BY MR. OSTERBERG:

10       Q     Go ahead.

11       A     To give you a narrative answer, EMTs, in the

12   State of California, can place oxygen, provide spinal

13   embolization, bandage, splints, transport.

14             EMTs in the State of California do not place

15   IVs.  They do not administer medications, with the

16   exception of oxygen.  Does that answer your question?

17       Q     Yes.  Would it be simply stated EMTs provide

18   BLS, or basic life support, and EMTPs, or paramedics,

19   can provide ALS, advance life support?

20       A     That is correct.

21       Q     In the field?

22       A     Yes.  Although I think California has a

23   provision now that in some rural areas paramedics can

24   actually work in some emergency departments.

25       Q     As a medical doctor, have you ever held a

1    title of a medical director for any fire agency

2    paramedic program in California?

3          A    Paramedic program, yes.  Fire agency, no.

4          Q    So with regard to any paramedic program

5    provided by any fire agency in the State of California,

6    you never acted as a medical director?

7          A    That is correct.

8          Q    Now, in reviewing your materials, I saw that,

9    I think it was in 1994 into 1996, you had a position

10   with Life Care Medical Transport; is that correct?

11         A    Yes.

12         Q    And what was your title at Life Care?

13         A    My title was medical director.

14         Q    And at that point in time, were you working as

15   a doctor somewhere else?

16         A    Yes.

17         Q    Where?

18         A    I was working at Redlands Community Hospital,

19   Redlands, California, and Loma Linda University Medical

20   Center, in Loma Linda, California.

21              I believe at the same time I did some shifts

22   at the former Sharp Murrieta, in Murrieta, California.

23         Q    All right.  So with Life Care, was that a

24   full-time position?

25         A    No.

Deposition of Jerry Thrush, M.D.                              K.J.P., et al. vs. COUNTY OF SAN DIEGO, et al.

1    moved out of the area.

2         Q    Yeah, I didn't notice a time period.  Can you

3    generally give me a time period?

4         A    I don't recall.  I expect it was, to the best

5    of my recollection, early to mid '90s.

6         Q    Okay.  When did you leave the Inland Empire to

7    head to San Diego for nicer weather?

8         A    1994, although I continued to work some

9    shifts, when I first moved down here, at Redlands

10   Community Hospital and Loma Linda University.  And then

11   I decided I would just rather stay here.

12        Q    Have you ever participated or actually done

13   yourself or drafted yourself policies and procedures for

14   paramedics for use in pre-hospital care work?

15        A    I don't recall specifically authoring them

16   independently.  Now, I was a member of the Emergency

17   Medical Care Committee of San Bernardino County, and we

18   were a group that make recommendations regarding policy

19   and procedure for paramedics for the entire Inland

20   counties.

21        Q    Did that group author or edit policies and

22   procedures or protocols for paramedics' scope of

23   practice in San Bernardino County?

24        A    I know we made recommendations.  In terms of

25   whether we authored them, I think they were ultimately

1   authored at the time by the medical director in the

2   Inland counties, who was Conrad Salinas.

3         But I think we made recommendations in terms

4   of policy and procedure.

5     Q    Have you ever worked in any role as a medical

6   doctor in training paramedics in San Diego County?

7     A    I don't believe in San Diego County, although,

8   I certainly have in the Inland Empire, Riverside, and

9   San Bernardino counties.

10    Q    In the '90s?

11    A    Yes.

12    Q    Since 1994, since leaving the Inland Empire,

13  understanding that you went back sometimes and worked at

14  Loma Linda, have you performed any quality assurance

15  work for any paramedic programs in San Diego County?

16    A    No.

17    Q    Since 1994, have you ever performed any

18  protocol, drafting, protocol amending, or protocol

19  review for paramedic programs in San Diego County?

20    A    Not to my recollection.

21    Q    Since you've been in San Diego County, have

22  you ever performed any work in implementing policies or

23  procedures, things of that nature, for any paramedic

24  life flight programs in San Diego County?

25    A    No.

```
 1   BY MR. OSTERBERG:

 2        Q    Same answer?

 3        A    My belief is in any situation.

 4        Q    Okay.  Would you agree with me from the

 5   materials you reviewed and the testimony you reviewed

 6   that Paramedic Hackett and Paramedic Poynter, after the

 7   second dose of Versed was administered, they attempted

 8   to have a conversation with some deputies on scene about

 9   potentially removing the law enforcement restraints and

10   placing Mr. Phounsy in the restraints that were in the

11   gurney?

12             MR. MCBRIDE:  Objection.  Argumentative.

13   Assumes facts and misstates testimony.

14             THE WITNESS:  Per the documentation provided,

15   it seems there's documentation of such discussion.

16   BY MR. OSTERBERG:

17        Q    And you would agree from the materials

18   reviewed that after that discussion, that a joint

19   decision was made amongst the first responders that it

20   would be better for Mr. Phounsy's safety and the first

21   responders' safety and for anyone involved that they

22   leave Mr. Phounsy in the law enforcement restraints to

23   safely transport him to the hospital?

24             MR. MCBRIDE:  Objection.  Vague and ambiguous

25   as to which deputy and which paramedics you're talking
```

```
 1   about.   Argumentative.   Assumes facts.   Compound.
 2           THE WITNESS:   According to the documentation
 3   provided, that would be correct.   However, it is with a
 4   caveat that the paramedics indicated in their deposition
 5   that they discussed the case with law enforcement before
 6   doing the report.
 7   BY MR. OSTERBERG:
 8       Q    When you say discussed the case with
 9   law enforcement before their report, what are you
10   suggesting?
11       A    I'm just indicating what I reviewed.
12       Q    Who said that?
13       A    I believe it was Hackett in his deposition
14   mentioned that.
15       Q    Are you suggesting anything by stating that?
16       A    I'm just making a statement of what I
17   reviewed.
18       Q    Okay.   Then are you suggesting there's some
19   sort of a grand conspiracy here?
20       A    I'm simply reiterating what I reviewed, that
21   the -- there was some discussion among the providers and
22   law enforcement before records were indicated, were
23   written, I should say.   And furthermore, there is an
24   additional addendum written by Hackett sometime after
25   the events.   It is rather unusual according to his
```

Deposition of Jerry Thrush, M.D.                    K.J.P., et al. vs. COUNTY OF SAN DIEGO, et al.

```
 1   deposition transcript.

 2        Q    Are you talking about Paramedic Hackett?

 3        A    Correct.

 4        Q    Are you talking about any other paramedics?

 5        A    No, I believe he's the only one that made the

 6   addendum that was sometime after the events.

 7        Q    But you agree with me that after the

 8   discussion occurred with law enforcement about the

 9   potential for removing the law enforcement restraints

10   from Mr. Phounsy and placing him in the restraints on

11   the gurney, that a joint decision was made in the field

12   to leave Mr. Phounsy in the law enforcement restraints

13   in order to transport him to the hospital?

14             MR. MCBRIDE:  Objection.  Argumentative.

15   Assumes facts and misstates evidence.

16             THE WITNESS:  I agree there was such a

17   discussion documented and such a decision documented.

18   BY MR. OSTERBERG:

19        Q    Okay.  And after that discussion and decision

20   that we just talked about, you would agree that

21   Mr. Phounsy was then lifted off of the driveway by

22   multiple parties in the driveway, both paramedics and

23   sheriff deputies, and placed on the Medic 2 gurney,

24   correct?

25        A    Yes, I was --
```

Deposition of Jerry Thrush, M.D.                    K.J.P., et al. vs. COUNTY OF SAN DIEGO, et al.

1              MR. LENERT:  Okay.  Those are my question for

2    now, Doctor.  Thank you.

3              THE WITNESS:  Thank you.

4                         EXAMINATION

5    BY MR. GAZZO:

6         Q    Doctor, would you kindly pull out Exhibit R.

7    When you have that, let me know, please.

8         A    Is that the journal articles?

9         Q    I believe it's the patient care report.

10        A    Got it, yes.

11        Q    You have that?

12        A    I have it.

13        Q    And if you would also kindly turn to page 21

14   of your report.

15             While you're doing that, I want to direct your

16   attention to the opinion that you have regarding a

17   delayed notation.

18        A    Yes.

19        Q    You see that?

20        A    I see it.

21        Q    On page 21, you state, "My opinion regarding

22   delayed notation by Paramedic Hackett is that these were

23   created much later than is usual and customary, and this

24   should be taken into consideration when interpreting

25   them."

1              Did I read that correctly?

2       A     Yes.

3       Q     Then you write, "According to

4    Paramedic Hackett's addenda, deposition of Hackett,

5    Exhibit 2, the event occurred on 4/13/2015, and the

6    addenda were created on 4/30/2015."

7              Did you get that information, Doctor, from

8    Paramedic Hackett's deposition transcript?

9       A     Yes, as well as the time notations, I believe,

10   on the report itself, as some indicate a time and date

11   notation that's 4/30 instead of 4/13.

12      Q     Very good.  If I could, I'd like to mark this

13   next in line.  Where are we?

14             THE REPORTER:  Exhibit S.

15             MR. GAZZO:  Exhibit S.  Thank you.

16             (Exhibit S was marked for identification.)

17   BY MR. GAZZO:

18      Q     I'm going to mark what -- I'm handing you what

19   we're going to mark as Exhibit S.  And if you -- this is

20   an excerpt from the deposition of Paramedic Hackett.  If

21   you'd be kind enough to turn to page 29.

22      A     Okay.

23      Q     Line 7:

24             "Question:  So I understand according --

25   looking at Exhibit 2, page 2, it looks like your first

 1   addendum is 2:50 -- or, yeah, 2:56 a.m. on April 30th."

 2          Do you see that?

 3     A    Yes.

 4     Q    Okay.  From line 7 to 9.  You see that?

 5     A    Yes.

 6     Q    Okay.  And if you follow with me on line 11,

 7   the next question is, "Is that when you drafted this

 8   portion, or is that when you uploaded it into the

 9   system?

10          "Answer:  That's when I uploaded it into the

11   system."

12          Going to line 25, "So when did you draft

13   this?"

14          Continuing on to page 30, "Answer:  As far as

15   what I ended up doing after the call is we used a

16   patient -- we used to use patient assessment sheets.  I

17   jotted down some of the details of the call as best I

18   could, and then from there, I would say within that

19   night or the next day, I worked on my actual documenting

20   in a Word document.

21          "And then, like I said earlier, we didn't

22   really have a place to put it, so until I got kind of

23   word from my superiors on where to put it, I didn't put

24   it anywhere.

25          "Question:  All right.  So if I understand

1    your testimony correct, within, say, 24 hours of the

2    incident, you had completed drafting your account of

3    what happened?

4              "Answer:  Yes, sir.

5              "Question:  Did you make any changes to that

6    after you completed it within 24 hours of the incident?

7              "Answer:  No, sir."

8              Did you review that testimony in conjunction

9    with the opinion that you have written on page 21,

10   Doctor?

11        A    Yes.  Although, in my report, I did use the

12   word "create" instead of "upload."

13        Q    Correct.  So you would agree, after reading

14   that testimony, that the document, the patient care

15   report in Exhibit R, was created on the day of or

16   shortly after the April 13th, 2015, incident?

17        A    I did.  Although, it's still certainly

18   delayed.  And elsewhere in the deposition testimony, I

19   think that it's apparent that such a delayed addenda is

20   so unusual.

21        Q    Correct.  But the addenda was created on the

22   date of the incident, correct?

23             MR. MCBRIDE:  Objection.  Misstates the

24   deposition testimony.  I think it's within 24 hours.

25   ///

1   BY MR. GAZZO:

2        Q    Fair enough.  The document was created within

3   24 hours of the incident, correct?

4        A    According to the deposition of Aaron Hackett.

5   But we don't have the notes that he made or he alleges

6   that he made that he created the document from.

7        Q    Correct.  But he testified that he didn't make

8   any changes between the draft and the uploading of the

9   document on April 30th.

10       A    That's right.  I stand corrected.  Instead of

11  "created," I should have used the word "uploaded" in my

12  document.

13       Q    Okay.  And that's, frankly, just what I wanted

14  to clarify.

15            So does that change your opinion regarding

16  this document that it was in fact created within 24

17  hours of the date of the incident as opposed to what you

18  wrote here "created April 30th, 2015"?

19       A    It doesn't change my opinion that the document

20  was delayed and that it was unusual.  That's clear in

21  the reports that it was unusual that such an addenda

22  would be created later and put into the chart.

23       Q    Well, I'm confused.  Are you still saying that

24  the document was created on April 30th, 2015, after we

25  just reviewed this testimony?

1    A    No.  I'm saying it was uploaded, but it was

2    still created later than customary.  It was so late he

3    didn't know what to do with the extra -- and as I

4    understand in his deposition, he was asked to do it by

5    his superior.  He didn't come up with the idea, "Hey, I

6    have to do this addendum."

7         I understand he was asked by his superior to

8    do it, as I interpreted his deposition.

9    Q    Okay.  Your understanding is that he didn't

10   create the patient care report or his portion thereof in

11   the normal and usual course of his business?

12   A    My understanding is that this addendum was

13   created later than the initial report, and I stand

14   corrected that it was actually created within 24 hours

15   and then uploaded later.

16   Q    Okay.  I hope I didn't misunderstand you, I

17   was confounded just for a moment.  I thought I heard you

18   answer counsel's question that an additive factor to

19   Mr. Phounsy's cardiorespiratory arrest was a delay in

20   CPR.  Did I understand -- in response to counsel's

21   question, did I understand that correctly?

22   A    A delay in, at least, effective CPR.  My

23   concern is that there may have been a delay in CPR

24   altogether, as he wasn't monitored.  There was no

25   cardiac monitor.  So my overriding concern with the case

REPORTER'S CERTIFICATE


        I, Lauren Ramseyer, Certified Shorthand

Reporter licensed in the State of California, License

No. 14004, hereby certify that the deponent was by me

first duly sworn and the foregoing testimony was

reported by me and was thereafter transcribed with

Computer-Aided Transcription; that the foregoing is a

full, complete, and true record of said proceedings.

        I further certify that I am not of counsel or

attorney for either or any of the parties in the

foregoing proceeding and caption named or in any way

interested in the outcome of the cause in said caption.

        The dismantling, unsealing, or unbinding of

the original transcript will render the reporter's

certificates null and void.

        In witness whereof, I have hereunto set my

hand this day: July 24, 2017.

                ___X___Reading and Signing was requested.

                _____Reading and Signing was waived.

                _____Reading and Signing was not requested.


                *Lauren Ramseyer*
        _____

                Lauren Ramseyer, CSR No. 14004

EXHIBIT "C"

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 2

 3   K.J.P., a minor, and K.P.P.,
     a minor, individually, by and
 4   through their mother, LOAN THI
     MINH NGUYEN, who also sues
 5   individually and as successor
     in interest to her now deceased
 6   husband, Lucky Phounsy, and
     KIMBERLY NANG CHANTHAPHANH,
 7   Individually,

 8              Plaintiffs,

 9        vs.                        NO. 15cv2692-H(MDD)

10   COUNTY OF SAN DIEGO; San Diego
     Sheriff WILLIAM GORE; RICHARD
11   FISCHER; KEVIN RALPH; MARCOS
     COLLINS; JANAE KRULL; SANDRA
12   (JANET) CARBAJAL; BILLY
     TENNISION, III; DEAN ALLEN;
13   MICHAEL LEE; JENNY MARTINSON;
     TAMANI PUGH; AARON BROOKE;
14   JOVONNI SILVA; CITY OF SANTEE;
     AARON BAGLEY; AARON HACKETT;
15   AARON DO; ADAM DANIELS; DANIEL
     NEOW; LAKESIDE FIRE PROTECTION
16   DISTRICT; MARC POYNTER; DAVID
     CSIK,
17
                Defendants.
18   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

19
          EXPERT WITNESS VIDEOTAPED DEPOSITION OF
20
                KRIS LEE SPERRY, M.D.
21

22                  July 24, 2017

23                    1:09 p.m.

24

25
```



1

2

3

4    EXPERT WITNESS VIDEOTAPED DEPOSITION OF

5            KRIS LEE SPERRY, M.D.

6

7               July 24, 2017

8                1:09 p.m.

9

10          2700 Centennial Tower
        101 Marietta Street, N.W.
11           Atlanta, Georgia

12

13

14      Kelly S. Lawrence, CCR-B-1625

15

16

17

18

19

20

21

22

23

24

25



1    Q.    And if you have the photographs you're

2  referring to on Page 2, I'd like you to provide that

3  to the court reporter as the next exhibit.

4    A.    Yes.   There's, I think, two -- two

5  photographs.

6         (Defendant's Exhibit-6 was marked for

7  identification.)

8    Q.    (By Mr. Chapin)   Okay.   And in this -- in

9  your opinion you indicate that there was clearly

10  cyanosis visible around his lips, indicating severe

11  hypoxia; is that right?

12    A.    Yes.

13    Q.    Is that your opinion based on that

14  photograph?

15    A.    Yes.   His lips are distinctly different in

16  coloration from the remainder of his face, and that's

17  usually -- you know, looking at cyanosis or reaching

18  a conclusion of cyanosis, looking at the lips or the

19  fingernail beds are at least where it's -- at least

20  is initially visualized.

21    Q.    And is there a particular photograph

22  you're looking at or is it two photographs?

23    A.    I would say, really, both of them.

24  They're slightly different.   They're different views,

25  slightly.



1      Q.    Okay.  So both photographs indicate
2  cyanosis?
3      A.    I think so, yes.
4      Q.    And do you know who took those
5  photographs?
6      A.    I don't.
7      Q.    Do you know when the photographs were
8  taken?
9      A.    I think they were taken just before -- I
10 mean, he had been obviously placed on the gurney, but
11 my understanding is that these were before he was
12 placed in the back of the ambulance.
13     Q.    Did you look at any photographs of him in
14 the ambulance?
15     A.    I don't know.  I don't recall offhand.
16 There may be some.  I'm just not recalling.  I'd have
17 to look and see.  I've got several hundred
18 photographs.
19     Q.    Well, why did you pick out these two
20 photographs?
21     A.    Well, because they -- they showed him
22 after he was strapped onto the gurney, and they
23 showed what I believe to be cyanosis of his lips.
24     Q.    Did you pull those photographs out of the
25 hundreds of photographs you had or did somebody give



```
 1    them to you and tell you to look at these?

 2         A.    No, they -- I pulled them out of

 3    everything that I had been sent.

 4         Q.    Did you pull out any photographs after

 5    these were taken and render an opinion about cyanosis

 6    from those photographs?

 7              MR. McBRIDE:   Objection.  Vague and

 8         ambiguous.  Confusing.

 9              THE WITNESS:   Well, I would have to look

10         at -- you know, I'd have to look through all my

11         photographs again.  If you want me to look, I

12         certainly can.  I just don't recall right now

13         what -- you know, what else there was.

14         Q.    (By Mr. Chapin)  Do you know what lighting

15    conditions were there for this particular photograph,

16    these two photographs?

17         A.    What specific lighting?  No.

18         Q.    Do you know what the F-stop was on the

19    camera that took these photographs?

20         A.    No.

21         Q.    Do you know how they were reproduced for

22    your viewing?

23         A.    Other than being digital, no, I don't

24    know -- I don't know specific details about how they

25    were reproduced other than they're -- you know,
```



KRIS LEE SPERRY, M.D.                                    July 24, 2017
K.J.P. vs COUNTY OF SAN DIEGO                                        34

1       Q.    Yes.

2       A.    No.  I think these photographs help, but

3   they're not to me the straw that breaks the camel's

4   back.

5       Q.    Well, you relied heavily on them because

6   you're saying that he was suffering from hypoxia

7   because of these photographs.  There isn't any other

8   evidence of that, is there?

9           MR. McBRIDE:  Objection.  Argumentative.

10      Misstates testimony.

11          THE WITNESS:  Sorry.  I relied upon them

12      because I had them, and they're there to view

13      and for me to look at and to incorporate into my

14      interpretation.  If they weren't there, if I

15      didn't have the photographs, if the photographs

16      didn't exist, for instance, all the rest of

17      the -- the outcome still was the same with

18      Mr. Phounsy.  So they're just, you know, an

19      added piece of information, which fortuitously

20      exists.

21      Q.    (By Mr. Chapin)  Is there any other

22   evidence that he was suffering from severe hypoxia at

23   any time other than these two photographs?

24          MR. McBRIDE:  Objection.  Overbroad.

25      Vague and ambiguous.  Misstates prior testimony.




```
 1              THE WITNESS:  Okay.  There's no other --
 2       well, as I've said a couple of times, the
 3       objective evidence which would really
 4       physiologically establish hypoxia, that is,
 5       oxygen saturation, other vital signs, those were
 6       not taken and do not exist.  And so, you know,
 7       those can't -- I can't rely on those because
 8       they weren't done.
 9       Q.   (By Mr. Chapin)  So the answer is there's
10  no other evidence other than these photographs,
11  correct?
12              MR. McBRIDE:  Objection.  Argumentative.
13              THE WITNESS:  All right.  There's no other
14       measured, objective evidence because those
15       measurements and objective observations or
16       objective documentations weren't done.
17       Q.   (By Mr. Chapin)  There's no objective
18  evidence at all, right?
19              MR. McBRIDE:  Same objection.
20              THE WITNESS:  Correct.  Yes.  And I'm
21       not -- again, not trying to argue with you, but
22       it's -- you know, if you -- the absence of
23       something doesn't mean it doesn't exist; and
24       there's a double negative in there, but that's
25       purposeful.
```



1        Q.    (By Mr. Chapin)   Let's go on on Page 5 of

2   your report.

3        A.    Sure.

4        Q.    The one where you indicate -- I think you

5   can find it -- "A spit sock further compromised

6   breathing and also obscured the ability to visualize

7   his face."

8             How did a spit sock compromise his

9   breathing?

10       A.    I think the -- really, more from the -- I

11  don't know that the spit sock itself was something

12  that actually directly compromised his breathing in a

13  direct way, but the placement of a spit sock would

14  interfere with the caregivers' ability to look at him

15  and say evaluate his cyanosis, for instance, the

16  degree of cyanosis that he had or any progressions of

17  cyanosis, looking at his eyes, things like that.

18            So as far as a direct obstructive effect,

19  no, that's not what I was trying to, you know, to

20  say.  And if that came across that way, then that's

21  inartful on my part.  But it obscured the ability of

22  the caregivers to see his face and head.

23       Q.    Okay.  So I see that, but now I can strike

24  out that it further compromised his breathing; is

25  that right?



1      A.    Well, as far as -- yes, as far as, like I

2    said, my -- I was not trying to imply or trying to

3    say that the sock actually blocked his breathing

4    because those -- that's not how those things are

5    designed.  I mean, they're designed to avoid that,

6    but by their placement it impairs the caregivers'

7    ability to evaluate him.  So in that respect there's

8    a compromise that occurs.

9      Q.    But, technically speaking, your report is

10   inaccurate when it says, "It further compromised his

11   breathing," correct?

12            MR. McBRIDE:  Objection.  Argumentative.

13   Misstates prior testimony.

14     Q.    (By Mr. Chapin)  The spit sock did not

15   compromise his breathing, correct?

16     A.    Okay.  That's fine.  But this is the third

17   time I will have said this now.  As far as directly

18   obstructing his ability to breath, no, that's not how

19   those are designed.  And if they were designed -- you

20   know, if they -- if they had that physical

21   capability, I don't think they would ever be used.

22     Q.    And how does a spit sock obscure the

23   ability to visualize his face?

24     A.    By covering his face.  I mean, although

25   it's not completely opaque, nonetheless, this is



1  still a barrier between the caregivers and his face

2  and evaluating the color of his lips, which is where

3  cyanosis comes in, and, you know, any other, you

4  know, movements of his eyes, things like that.  It's

5  just you cannot see well.

6       Q.    Have you seen the spit sock that was used

7  in this case?

8       A.    No, I don't -- I don't recall seeing this

9  specific spit sock.  It's possible it might be in one

10 of the photographs.  I don't -- I don't recall it,

11 though.

12      Q.    And moving on down into your report, you

13 mention -- now I'm going down to looks like the

14 second full opinion.  "It is my opinion" -- it goes

15 on -- "the manner in which Lucky Phounsy was

16 restrained in the back -- within the back of the

17 ambulance is a direct contributing factor to his

18 death."

19           Why is that?

20      A.    Because he was still in the maximal

21 restraint position and, as a consequence, could not

22 really be placed supine.  He was -- his body was

23 laying on his left side, somewhat twisted still with

24 his -- again, his hands handcuffed behind his back

25 and his legs pulled up with the -- you know, as I



KRIS LEE SPERRY, M.D.                                    July 24, 2017
K.J.P. vs COUNTY OF SAN DIEGO                                    110

1

2                     C E R T I F I C A T E

3

4   STATE OF GEORGIA:

5   COUNTY OF FULTON:

6

7           I hereby certify that the foregoing

8       transcript was taken down, as stated in the

9       caption, and the questions and answers thereto

10      were reduced to typewriting under my direction;

11      that the foregoing pages 1 through 109 represent

12      a true, complete, and correct transcript of the

13      evidence given upon said hearing, and I further

14      certify that I am not of kin or counsel to the

15      parties in the case; am not in the regular

16      employ of counsel for any of said parties; nor

17      am I in anywise interested in the result of said

18      case.

19          This, the 4th day of August 2017.

20                          _Kelly S. Lawrence_

21

22                      KELLY S. LAWRENCE, CCR-B-1625

23

24

25



1          COURT REPORTER DISCLOSURE

2

    DEPOSITION OF:  KRIS LEE SPERRY, M.D.
3

         Pursuant to Article 10.B. of the Rules and
4  Regulations of the Board of Court Reporting of the
    Judicial Council of Georgia which states: "Each court
5  reporter shall tender a disclosure form at the time
    of the taking of the deposition stating the
6  arrangements made for the reporting services of the
    certified court reporter, by the certified court
7  reporter, the court reporter's employer, or the
    referral source for the deposition, with any party to
8  the litigation, counsel to the parties or other
    entity.  Such form shall be attached to the
9  deposition transcript," I make the following
    disclosure:
10      I am a Georgia Certified Court Reporter.  I am
    here as a representative of Esquire Deposition
11  Solutions. Esquire Deposition Solutions was contacted
    to provide court reporting services for the
12  deposition.  Esquire Deposition Solutions will not be
    taking this deposition under any contract that is
13  prohibited by O.C.G.A. 9-11-28(c).
         Esquire Deposition Solutions has no
14  contract/agreement to provide reporting services with
    any party to the case, any counsel in the case, or
15  any reporter or reporting agency from whom a referral
    might have been made to cover this deposition.
16  Esquire Deposition Solutions will charge its usual
    and customary rates to all parties in the case, and a
17  financial discount will not be given to any party to
    this litigation.

18                                              07/24/2017
19  Kelly S. Lawrence, CCR-B-1625

20  Signature of attorneys present:      Date:

21  /s/

22  /s/

23  /s/

24  Return this form after review and/or signatures to
    the court reporter for inclusion in the record.
25  Please use reverse side for additional signatures.



Defendant Exhibit

Exhibit No.: 6

Name:

Date: 07/24/2017

ESQUIRE



EXHIBIT "D"



Transcript of the Testimony of:

# Marc Poynter

K.J.P.

v.

County of San Diego

February 16, 2017

Volume I

LITIVATE REPORTING + TRIAL SERVICES
P: 877.771.3312 | F: 877.561.5538
www.litivate.com

1  neck.  These things are very loose elastic bands that

2  hold it in place.

3  BY MR. McBRIDE:

4       Q.   Okay.  But the elastic band was around his

5  neck?

6       MR. OSTERBERG:  Objection.  It's argumentative.

7  Asked and answered.  It misstates his testimony.

8       MR. GAZZO:  Join.

9  BY MR. McBRIDE:

10      Q.   Correct?

11      A.   It was around the collarbone, lower neck

12  area.  These things do not restrict.  The verbiage in

13  that policy is that it's not to be restricted around

14  someone's neck.  These are approved by the County to

15  use.  The ones that we get are approved by the

16  County.  They are all patented in the same fashion.

17  And they are loose elastic bands that are used

18  commonly and routinely with no issues.

19      Q.   Okay.  Is it -- can you see through the

20  spit sock?

21      A.   Yes.

22      Q.   Is it sheer or is it -- you can see all

23  the way through it?

24      A.   It's just a mesh hood.  I don't know what

25  you mean by "sheer," like a -- like reflective kind

1   of?

2        Q.   Is it opaque?  Like your shirt, for

3   instance, is completely opaque.  I can't see through

4   your shirt.

5        A.   Oh, no.  You can see -- you can see

6   through the mesh hood.

7        Q.   Okay.  So after the spit -- how far into

8   the ride was the spit sock applied?

9        A.   I -- I could not -- I couldn't give you an

10  answer to that.  I don't know.

11       Q.   After the spit sock was applied, did

12  Deputy Fisher continue to hold Mr. Phounsy's head in

13  the manner you described earlier?

14       A.   To my knowledge, yes.

15       Q.   What was Mr. Phounsy's demeanor while in

16  the ambulance?

17       A.   He was still very combative or thrashing

18  around once we placed him in the ambulance and in

19  route to the ability that we couldn't get extra vital

20  signs.

21       Q.   So he now in addition to the maximum

22  restraints is -- has two seat belts over him, and a

23  deputy holding his head.  And your testimony is that

24  he's still thrashing around?

25       A.   Yes.

Marc Poynter                                                    February 16, 2017

1          I, R. Jerrod Jones, CSR 11750, do hereby
        declare:
2

3          That prior to being examined, the witness named
    in the foregoing deposition was by me duly sworn
    pursuant to Section 30(f)(1) of the Federal Rules of
4   Civil Procedure and the deposition is a true record
    of the testimony given by the witness.
5

6          That said deposition was taken down by me in
    shorthand at the time and place therein named and
    thereafter reduced to text under my direction.
7

8          __X_ That the witness was requested to review
             the transcript and make any changes to the
             transcript as a result of that interview
9            pursuant to section 30(e) of the Federal
             Rules of Civil Procedure.
10

11         _____ No changes have been provided by the
             witness during the period allowed.
12
           _____ The changes made by the witness are
             appended to the transcript.
13
           _____ No request was made that the transcript be
14           reviewed pursuant to Section 30(e) of the
             Federal Rules of Civil Procedure.
15

16         I further declare that I have no interest in
    the event of this action.

17         I declare under penalty of perjury under the
    laws of the United States of America that the
18  foregoing is true and correct.

19         WITNESS my hand this 2nd day of March, 2017.

20

21  _____

22         R. Jerrod Jones, CSR No. 11750, RPR

23

24

25

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | www.litivate.com

EXHIBIT "E"

Aaron Hackett                                    December 08, 2016

1                    UNITED STATES DISTRICT COURT          Page 1

2                   SOUTHERN DISTRICT OF CALIFORNIA

3

4    K.J.P., a minor, and K.P.P., a minor,
     individually, by and through their
5    mother, LOAN THI MINH NGUYEN, who else
     sues individually and as successor in
6    interest to her now deceased husband,
     Lucky Phounsy, and KIMBERLY NANG
7    CHANTHAPHANH, individually,

8                              Plaintiffs,

9      vs.                              CASE NO.
                                        15-cv-02692-H-MDD
10   COUNTY OF SAN DIEGO; ET AL.,

11                             Defendants.
     _____

12

13

14

15          VIDEOTAPED DEPOSITION OF AARON HACKETT

16

17                    Santee, California

18                Thursday, December 8, 2016

19

20

21

22

23

24   Reported by: Lorraine E. Mesker, RPR

25              CSR License No. 6499

1  not be able to breath, as well?
2       MR. GAZZO: Calls for speculation.
3  Argumentative. Misstates testimony.
4  BY MR. McBRIDE:
5       Q.  Did you consider that placing the spit sock
6  over Mr. Phounsy's head would further restrict his
7  ability to breathe?
8       A.  Based on the lightweight, mesh material of the
9  spit sock, I don't see it as being any hindrance in his
10 ability to breath.
11      Q.  Have you ever had a spit sock on your head?
12      A.  I have not personally, no.
13      Q.  Then how would you know that it doesn't affect
14 your ability to breathe?
15      A.  Just based on the material, it doesn't look
16 like it would cause any sort of issue.
17      Q.  All right.  How far into the ride was it that
18 you put the spit sock on Mr. Phounsy's head?
19      A.  I'm not -- I am not entirely sure.  It would be
20 at sometime -- at some point on the freeway, perhaps.
21 That's my best guess.
22      Q.  Closer to when you left or closer to when you
23 arrived?
24      A.  I would say sometime in the middle.
25      Q.  What was Mr. Phounsy doing just prior to
                                              Page 186

1  putting the spit sock on his head?
2       A.  He was still continuing to kind of thrash
3  around.  The deputy said that he was -- felt like
4  Mr. Phounsy was trying to spit at him.  He made the
5  request for the spit sock.
6       Q.  All right.  What happened after you placed the
7  spit sock on Mr. Phounsy's head?
8       A.  We continued to drive.  We continued to monitor
9  the patient.  Continued to ask Deputy Ficher about the
10 patient's movements and his force against him.
11      Q.  Was Mr. Poynter doing anything to assess or
12 monitor Mr. Phounsy?
13      A.  We were all visually watching Mr. Phounsy, as
14 well as questioning the deputy.
15      Q.  What were you questioning the deputy?
16      MR. GAZZO: Asked and answered.
17      THE WITNESS:  We continued to ask him about
18 patient movement.  We continued to try to monitor the
19 rise and fall of the patient's chest, and we continued
20 to look for any sort of respiratory compromise or change
21 in patient behavior that would be indicative of some
22 sort of change in patient status.
23 BY MR. McBRIDE:
24      Q.  Okay.  So Lucky eventually coded?
25      A.  Yes, sir.  We noticed a change in patient
                                              Page 187

1  status.  Patient was no longer actively resisting
2  Deputy Ficher.  We requested that Deputy Ficher remove
3  his hands from forcibly restraining Lucky, and we
4  assessed his pulse and respiration.  We saw his pulse
5  was inactive at this point, and we started CPR measures
6  immediately.
7       Q.  Okay.  So according to Deputy Ficher, he held
8  Lucky's head down for about ten minutes until Lucky
9  stopped trying to break free from the restraint -- well,
10 actually, let me back up.
11      Prior to you discovering that Mr. Phounsy was
12 motionless, when was the last time that you had asked
13 Deputy Ficher whether Mr. Phounsy still resisted?  Do
14 you understand my question?  How long had it been since
15 you asked, "Hey, is he still --
16      A.  I do -- I do understand your question.  This is
17 a conversation that we continued to have, as I said,
18 throughout the ambulance.  And it was when myself and
19 Marc Poynter noticed that the patient was no longer
20 moving that we noticed that.
21      Q.  Okay.  So this wasn't something that Deputy
22 Ficher brought to your attention.
23      A.  No, sir.
24      Q.  You and Mr. Poynter noticed?
25      A.  Yes, sir.
                                              Page 188

1       Q.  All right.  According to Deputy Ficher, he says
2  that Lucky had stopped trying to break out of the
3  restraints for approximately two minutes before you and
4  Mr. Poynter asked is he still resisting.
5       A.  I can't remember --
6       MR. OSTERBERG:  Is that a question?
7       MR. McBRIDE:  I've got a question.  Give me one
8  second.
9       MR. OSTERBERG:  Okay.
10 BY MR. McBRIDE:
11      Q.  Could it have been two minutes that Mr. Phounsy
12 was not resisting before you and Mr. Poynter noticed?
13      A.  I can't tell you for sure.  It's been a long
14 time.  I can't tell you for sure.
15      Q.  But is it possible?
16      A.  I think it is highly unlikely.
17      Q.  So you think that -- assuming I am correctly
18 representing Mr. Ficher's testimony, you think he was
19 mistaken?
20      A.  I can't --
21      MR. OSTERBERG:  Argumentative.
22      THE WITNESS:  I can't speak towards his
23 testimony.  I can only speak to what I can remember from
24 the call.  I don't feel -- I don't feel like he had not
25 been resisting two minutes prior to that happening.
                                              Page 189

Aaron Hackett                                                    December 08, 2016

```
1              CORRECTION CERTIFICATE
2         I, AARON HACKETT, do hereby certify that I have
3    read the foregoing deposition transcript and that, to
4    the best of my knowledge, said transcript is true and
5    accurate (with the exception of the following changes
6    listed below):
7    PAGE  LINE   CHANGE TESTIMONY TO READ AS FOLLOWS:
8    ____  ____   _____
9    ____  ____   _____
10   ____  ____   _____
11   ____  ____   _____
12   ____  ____   _____
13   ____  ____   _____
14   ____  ____   _____
15   ____  ____   _____
16   ____  ____   _____
17   ____  ____   _____
18   ____  ____   _____
19   ____  ____   _____
20   ____  ____   _____
21   ____  ____   _____
22   ____  ____   _____
23   ____  ____   _____
24
            _____
25                AARON HACKETT
```

Page 210

```
1            REPORTER'S CERTIFICATION
2         I, Lorraine E. Mesker, a Certified Shorthand
3    Reporter in the State of California, do hereby certify:
4         That the witness in the foregoing deposition
5    was by me duly sworn; that the deposition was then taken
6    before me at the time and place herein set forth; that
7    the testimony and proceedings were reported by me
8    stenographically and were transcribed through
9    computerized transcription under my direction; and the
10   foregoing is a true and correct record of the testimony
11   and proceedings taken at that time.
12        I further certify that I am not of counsel or
13   attorney for either or any of the parties in the
14   foregoing proceeding and caption named or in any way
15   interested in the outcome of the cause in said caption.
16        The dismantling, unsealing, or unbinding of the
17   original transcript will render the reporter's
18   certificates null and void.
19        IN WITNESS WHEREOF, I have subscribed my name
20   this 21st day of December, 2016.
21
            __X__  Reading and Signing was requested.
22          _____  Reading and Signing was waived.
            _____  Reading and Signing was not requested
23
24
         _____
25        LORRAINE E. MESKER, CSR NO. 6499, RPR
```

Page 211