RONALD LENERT, Senior Deputy (State Bar No. 277434)
FERNANDO KISH, Senior Deputy (State Bar No. 236961)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244; Fax: (619) 531-6005
E-mail: ronald.lenert@sdcounty.ca.gov; fernando.kish@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Dean Allen, Aaron Brooke, Sandra
Carbajal, Marcos Collins, Janae Krull, Michael Lee, Jenny Martinson, Tamani Pugh,
Jovonni Silva, and Billy Tennison


Mildred K. O'Linn (State Bar No. 159055)
Tori L.N. Bakken (State Bar No. 329069)
**MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900; Fax (213) 624-6999

Attorneys for Defendant Richard Fischer

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| K.J.P., a minor, and K.P.P., a minor, individually, by and through their mother, LOAN THI MINH NGUYEN, who also sues individually and as successor in interest to her now deceased husband, Lucky Phounsy, and KIMBERLY NANG CHANTHAPHANH, individually, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN DIEGO; San Diego Sheriff WILLIAM GORE; RICHARD FISCHER; KEVIN RALPH; MARCOS COLLINS; JANAE KRULL; SANDRA (JANET) CARBAJAL; BILLY TENNISION, III; DEAN ALLEN; MICHAEL LEE; JENNY MARTINSON; TAMANI PUGH; AARON BROOKE; JOVONNI SILVA; CITY OF SANTEE; AARON BAGLEY; AARON HACKETT; AARON DO; ADAM DANIELS; DANIEL NEOW; LAKESIDE FIRE PROTECTION DISTRICT; MARC POYNTER; DAVID CSIK, <br><br> Defendants. | No. 15cv2692-H(MDD) <br><br> **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE TESTIMONY OF DR. RICHARD GELLER [ECF NO. 260]** <br><br> Date:   February 8, 2021 <br> Time:   10:30 a.m. <br> Dep.t.:  15A - Courtroom of the Honorable Judge Marilyn L. Huff <br><br> Trial Date:   February 23, 2021 |

15cv2692-H(MDD)

# I.     INTRODUCTION

Plaintiffs do not want the jury to learn that Lucky Phounsy ("Phounsy") was suffering from excited delirium when he violently fought with the deputies.  They also want to keep the jury in the dark that Phounsy's use of synthetic drugs commonly known as "bath salts" was the cause of his excited delirium.  To that end, Plaintiffs' second motion in limine is a *Daubert* motion seeking to prevent defense toxicology expert Dr. Richard Geller from testifying that Phounsy used "bath salts" at any point in his life.  But Plaintiffs do not offer a valid basis to exclude Dr. Geller's testimony.  They do not challenge his qualifications or suggest his testimony is not the proper subject of expert testimony.  Rather, Plaintiffs simply disagree with Dr. Geller and accuse him of speculating about Phounsy's drug use.  In their desperate attempt to exclude Dr. Geller from testifying, Plaintiffs go so far as to make material misrepresentations that Phounsy's family was unaware of his drug use.[1]  Even if the court considered Plaintiffs' misrepresentations, exclusion is not the proper remedy because Plaintiffs' argument goes to weight of the evidence and not admissibility.  Because Plaintiffs' arguments are devoid of merit and predicated on false representations to this court, their motion to exclude Dr. Geller from testifying about Phounsy's use of "bath salts" should be denied.

# II.     STANDARD FOR MOTIONS IN LIMINE

To exclude evidence on a motion in limine, the evidence must be "clearly inadmissible on **all** potential grounds."  *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F.Supp.2d

---

[1] Plaintiffs tell the court that "Greg Kelley, Phounsy's stepfather, had no knowledge of Phounsy ever using any drug other than marijuana" (Doc. No. 260-1, p. 4, fn. 1).  However, Phounsy's wife told Kelley that Phounsy had taken cocaine and acid.  (Exhibit D, Loan Nguyen Depo 2, p. 59:1-12; Ex. E, Greg Kelley deposition, p.45:7-9).  Kelley himself reports that Phounsy used cocaine and acid to the 9-1-1 operator on the day of the incident.  (Ex. E, Kelley depo, p. 66:5-21).  Plaintiff Loan Nguyen, Phounsy's wife, suggests to the court that she was unaware of her husband's drug use.  (Doc. No. 260-1, p. 4:13-19).  However, Ms. Nguyen testified at deposition that her husband told her that he had taken "ecstasy and acid."  (Ex. D, Nguyen Depo 2, p. 62:15-16).  Out of concern for his health, Ms. Nguyen told paramedics that Phounsy had used LSD, ecstasy, marijuana, whippets, and cocaine.  (Ex. D, Nguyen Depo 2, p. 89:13-p. 90:20).  Despite Plaintiffs own admissions under oath, they inexplicably argue in their motion that "witnesses repeatedly testified that Phounsy did not have a history of using *any* illegal drugs."  Doc. No. 260-1, 8:2-3.

- 1 -

844, 846 (N.D. Ohio 2004) (emphasis added). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Hawthorne Partners v. AT & T Tech., Inc.,* 831 F. Supp. 1398, 1400 (N.D. Ill. 1993). This is because, although rulings on motions in limine may save "time, cost, effort and preparation, a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Wilkins v. Kmart Corp.,* 487 F.Supp.2d 1216, 1218 (D. Kan. 2007). *See Colton Crane Co., LLC v. Terex Cranes Wilmington, Inc*., 2010 U.S. Dist. LEXIS 141013, at * 3, 2010 WL 2035800 (C.D. Cal. May 19, 2010)("[M]otions in limine should rarely seek to exclude broad categories of evidence, as the court is almost always better situated to rule on evidentiary issues in their factual context during trial.").

Federal Rule of Evidence ("F.R.E.") 702 governs the admissibility of expert opinion testimony. It includes the prerequisite that, in order to testify as an expert on a particular subject, the witness must first be qualified to do so by their knowledge, skill, experience, training, and/or education. *See* F.R.E. 702; *see also Daubert v. Merrell Dow Pharm. Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995). If a witness is qualified as an expert, F.R.E. 702 sets forth four additional requirements for the testimony to be admitted:

(a) The expert's specialized knowledge must "help the trier of fact to understand the evidence or to determine a fact in issue";

(b) The testimony must be "based on sufficient facts or data";

(c) The testimony must be "the product of reliable principles and methods"; and

(d) The expert witness "reliably applied th[ose] principles and methods to the facts of the case."

F.R.E. 702 (a)-(d).

/ / /

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    ARGUMENT

**A.    Whether Or Not Lucky Phounsy Used Or Was Under the Influence of "Bath Salts" Is The Proper Subject of Dr. Geller's Medical Expert Opinion As A Board Certified Toxicologist.**

Dr. Geller is a physician, board certified in internal medicine, emergency medicine, and medical toxicology.  He has 27 years of clinical experience both as an internist and as an emergency room physician.  He also has 30 years serving as director of the Fresno/Madera Division of the California Poison Control System.  (Exhibit A., Dr. Richard J. Geller report, pg. 1.)  He is both a medical and forensic toxicologist.  (Exhibit J, Dr. Richard J. Geller deposition, p. 10:13-16.)

Dr. Geller's opinions about Phounsy's use of bath salts are based on his extensive experience and on medical science.  The National Institute on Drug Abuse[2], describes bath salts as "Synthetic cathinones, more commonly known as bath salts, are human-made stimulants chemically related to cathinone, a substance found in the khat plant."  Among other things, synthetic cathinones can cause paranoia, hallucinations, panic attacks, and excited delirium—extreme agitation and violent behavior.[3]  This is consistent with Dr. Geller's medical opinion, where he describes "bath salts" as a synthetic cathinone derived from substance found in the Khat tree of Africa.  (Ex. A., Dr. Geller report, pg. 9.)  According to Dr. Geller, based on his medical experience and relying on extensive scientific medical literature included in his report, "adverse psychiatric effects of synthetic cathinone [bath salts] use as including agitation, aggression, anxiety, paranoia, paranoid delusion, visual and auditory hallucinations (often in the form of threatening people) and psychosis.  (*Id*. at page 10 and page 15; *see also* Ex. K, medical journal excerpts).  Unfortunately, bath salts are not detected by routine toxicology testing because of their constantly evolving chemical makeup and the lack of widely available detection methods.  (Ex. A, Dr. Geller report, pg. 10.)

---

[2] The National Institute on Drug Abuse which is the lead federal agency supporting scientific research and drug use and its consequences.  *See* https://www.drugabuse.gov/
[3] https://www.drugabuse.gov/publications/drugfacts/synthetic-cathinones-bath-salts

15cv2692-H(MDD)

**B.      Dr. Geller's Opinion Properly Relies On Phounsy's Clinical Presentation And Admitted History of Drug Abuse.**

In his deposition, Dr. Geller summarized the basis for his opinion that Phounsy used bath salts, which was further detailed in his report.

> Q Okay. So we'll use that term. So you're saying that based on his behavior on the 13th the -- the evening of the 13th as well as the clinical findings on autopsy that to a high degree of medical probability Mr. Phounsy apparently, unbeknownst to his family and the people around him, consumed bath salts, and that's why he went into this altered state of consciousness.
>                    . . .
>
> THE WITNESS:· On the basis of the sum total of information that was presented to me in this case, his previous history, the pathology on his autopsy, going to a concert where drug use was rampant, and the opportunity to buy bath salts was there and, most importantly, his behavior on the evening of the 13th after a relatively lucid interval during the earlier part of the day on the 13th, I believe -- it is my opinion as a medical toxicologist to a reasonably high ·degree of medical probability, well exceeding 50 percent, that his -- that he was under the influence ·of a sympathomimetic drug not detectable by the San Diego County Medical Examiner.

(Ex. J, Dr. Geller depo., p. 75:19- p. 76:18.)

Dr. Geller is not alone in his opinion that Phounsy ingested a synthetic or stimulant drug (commonly referred to as "bath salts") that caused him to suffer excited delirium. Dr. Steven Campman—the medical examiner who performed Phounsy's autopsy before Plaintiffs filed this lawsuit or made any accusation—reached the same conclusion.

> "The decedent showed some of the major features of the **Excited Delirium Syndrome**, including psychosis, "super strength" and a sudden cardiorespiratory arrest after a struggle and restraint; however, he reportedly did not have a high body temperature, did not have an identified toxic concentration of stimulant drugs or a history of a naturally occurring psychosis, and his serum potassium concentration was not low when he got to the hospital. It remains possible, however, that he was still experiencing toxic effects of the MOMA or of a synthetic cathinone or other stimulant drug that was not detected or tested for (there are numerous such **"bath salts"** and other compounds, with new formulations being created, such that some are not detected by our methods).

(Exhibit B., Dr. Steven Campman's Autopsy Report, pg. 3 (emphasis added).)  Even Plaintiffs' own expert, Dr. Jerry Thrush, board certified in emergency medicine, agreed with the "excited delirium" diagnosis.  (Exhibit C, Dr. Jerry Thrush Report, pg. 27 "My

/ / /

opinion is that temperature *was* elevated and in this clinical context a part of muscular activity from struggle with superimposed finding consistent with excited delirium.")

Plaintiffs do not challenge Dr. Geller's qualifications and for good reason. They also do not contest the severe effects that bath salts have on a person. Plaintiffs also do not argue that bath salts are difficult to screen for. Instead, Plaintiffs contend that Dr. Geller's opinions that Phounsy ingested "bath salts" is "based on nothing but rank speculation." Doc. No. 260-1, 2:5-7. Summarily stated, Plaintiffs seem to suggest that Dr. Geller's opinion is speculative because none of the percipient witnesses (Phounsy's family and friends) ever used the words "bath salts" when describing Phounsy's drug use. Doc. No. 260-1, 4:3-11. But neither the agreed upon diagnosis of excited delirium nor the opinion that it was caused by Phounsy ingesting "bath salts" is pulled from thin air as Plaintiffs suggest. Instead, that diagnosis and opinion is rooted on facts that cannot be reasonably disputed, including admissions by Phounsy's own family that he used powerful illicit drugs. Many of these facts were recorded on the day of the incident, when memories were fresh and the influence of lawyers had yet to materialize. The uncontroverted evidence of Phounsy's drug use is extensive and includes the following:

- Phounsy explicitly told his wife, Plaintiff Nguyen, that he had used drugs the previous days while attending two days of a music festival. (Ex. D, Nguyen Depo 2, p. 62:15-16.)

- Nguyen, from this conversation and her observations of her husband, believed that the drug use was contributing to his problems on the day of the event. (Ex. D, Nguyen Depo 2, p. 59:19-24, p. 63:13-22.)

- Nguyen told Greg Kelley, Phounsy's step-father, that Phounsy had taken cocaine and acid. (Ex. D, Nguyen Depo 2, p. 59:1-12; Ex. E, Kelley depo., p.45:7-9.)

- Kelley believed Phounsy was acting and feeling unusual on the day of the event because of the drugs that he took. (Ex. E, Kelley depo., p. 54:20-p. 55:4)

- Kelley told the 9-1-1 dispatcher that Phounsy had taken cocaine and acid (Ex. E, Kelley depo, p. 66:5-21)

15cv2692-H(MDD)

- Sheriff's dispatch informed responding deputies the reports that Phounsy was under the influence of cocaine and acid. (Exhibit F, CAD, p. 1-2; Exhibit G, Collins deposition, p. 31:12-18; Exhibit H, Krull deposition, p. 35:1-7.)

- When deputies arrived, Kelley informed them that Phounsy was under the influence of drugs, specifically acid and cocaine. (Ex. G, Collins depo., p. 34:16-p. 35:7, p. 51:10-24; Ex. H, Krull depo., p. 35:1-7, p. 47:15-p. 48:14).

- Phounsy's wife told paramedics that Phounsy had used LSD, ecstasy, marijuana, whippets, and cocaine. (Ex. D, Nguyen depo 2, p. 89:13-p. 90:20).

- Sharp Grossmont Hospital Emergency Department records indicate that Phounsy had used cocaine, LSD, marijuana, sleeping aids, stimulants, and had a history of drug and alcohol abuse. Exhibit I, Sharp Intake Forms, pg. 3.

In short, there is no question that Phounsy was using drugs in the days leading up to the incident. Because some of the drugs mentioned by the percipients (cocaine, LSD, etc) did not show up in the toxicology report, a question arises as to what drugs Phounsy was in fact using and when. As a toxicologist, Dr. Geller is uniquely qualified to answer that question to assist the jury, which is precisely the purpose of expert testimony. *See In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 984 F.Supp.2d 1021, 1026 (C.D. Cal. 2013) ("The Rule 702 inquiry requires the Court to determine that the witness is qualified by special knowledge as an expert in the relevant area of expertise. . . . [and] determine if the proffered expert testimony is helpful to the trier of fact."). Without Dr. Geller, the jury would be left unassisted to answer medical questions that only an experienced toxicologist can explain. This is particularly important in this case because Plaintiffs have not designated a toxicologist and there is no other reasonably plausible explanation for Phounsy's erratic and violent behavior on the day of the incident.[4]

In their motion, Plaintiffs cite *Taylor v. Burlington Northern R. Co.*, 787 F.2d 1309, 1315 (9th Cir. 1986) arguing that it is analogous to the circumstances in this case.

---

[4] Plaintiffs have attempted to suggest that Phounsy was suffering from some type of mental health crisis. However, there is no evidence of any mental illness or disability and Plaintiffs has not designated any mental health professional qualified to provide such an opinion. *See* Defendants Motion in Limine No. 2, ECF Dkt. No. 266.

15cv2692-H(MDD)

1   Plaintiffs' reliance is misplaced.  Although the court in *Taylor* did exclude proffered
2   testimony of PCP use as speculative and unduly prejudicial under Rule 403 of the Federal
3   Rules of Evidence, there are important factual distinctions that make that holding
4   inapplicable here.

5          First, the plaintiff in *Taylor* was a former railroad employee suing under the
6   Federal Employers' Liability Act (FELA) alleging his foreman violently harassed him
7   causing him to suffer paranoid schizophrenia.  *Id* at 1312.  Unlike this case, it did not
8   involve a use of force case under section 1983 where the reasonableness of the force used
9   by the defendant was a necessary consideration.  Second, the plaintiff in *Taylor*, was
10  intellectually disabled.  *Id* at 1313.  He was also twice committed to a mental hospital,
11  diagnosed with paranoid schizophrenia, and received antipsychotic drugs on an outpatient
12  basis.  *Id* at 1314.  Here, there is no evidence that Phounsy suffered from any mental
13  illness or was intellectually disabled in any way.  *See* Defendants Motion in Limine No.
14  2, Doc. No. 266.  Third, *Taylor* did not involve a toxicology report nor any direct
15  evidence that plaintiff had indeed consumed hallucinogenic drugs.  By contrast here, the
16  record is replete, as detailed above, with evidence confirming Phounsy's drug use
17  including his toxicology report, his own statements made to his wife, his wife's
18  statements to Phounsy's medical providers, and his erratic and violent behavior.  In short,
19  the facts and circumstances in *Taylor* are inapposite and have no application in this case.

20         Carefully considered, Plaintiffs' motion attacks what they perceive as weakness in
21  Dr. Geller's analysis and conclusion.  However, the recourse for Plaintiffs is cross-
22  examination, not exclusion.  *See In re REMEC Inc. Sec. Litig.*, 702 F.Supp.2d 1202, 1219
23  (S.D. Cal. 2010) (perceived weaknesses in an expert's analysis may be explored through
24  cross- examination); *see In re NJOY Consumer Class Action Litig.*, 120 F.Supp.3d 1050,
25  1071 (C.D. Cal. 2015) ("All that [plaintiff] has shown is that, under its view of the facts,
26  Harris's testimony may not be convincing; that is not a valid basis for excluding Harris as
27  an expert.")  If Plaintiffs feel Dr. Geller's opinion is incorrect, they may "attack[] by
28  cross examination, contrary evidence, and attention to the burden of proof, not

15cv2692-H(MDD)

1   exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010); *In re REMEC Inc. Sec.*
2   *Litig.*, 702 F.Supp.2d 1202, 1219 (S.D. Cal. 2010) (perceived weaknesses are to be
3   explored through cross-examination, not exclusion).

4          The trial court is "a gatekeeper, not a fact finder." *United States v. Sandoval-*
5   *Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006).  If it is clear that an expert's testimony rests
6   on a reliable foundation and is relevant to the task at hand, the court's gatekeeping
7   function is satisfied.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 597
8   (1993).  While Plaintiffs disagree with Dr. Geller's conclusion, they fail to present any
9   valid reason why an expert toxicologist would not assist the jury in discussing the role
10  drugs played in Phounsy's death.  *See Alaska Rent-A-Car, Inc. v. Avis Budget Group,*
11  *Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013) ("The district court is not tasked with deciding
12  whether the expert is right or wrong, just whether his testimony has substance such that it
13  would be helpful to a jury.")

14  **C.   The Probative Value of Phounsy's Use of Bath Salts Is Not Outweighed By**
15  **Any Unfair Prejudice Because It is Central To Explaining His Conduct.**

16         "The exclusion of relevant evidence under Rule 403 is 'an extraordinary remedy to
17  be used sparingly'." *K-B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1155 (10th Cir.
18  1985).  The standard under Fed. R. Evid. 403 is not whether "'evidence is prejudicial,' . .
19  . but rather whether the evidence's 'probative value is *substantially outweighed* by the
20  danger of *unfair* prejudice.'" *Batiz v. Am. Commercial Sec. Servs.,* 776 F. Supp. 2d 1087,
21  1092 (C.D.Cal. 2011) (italics original).

22         Here, Plaintiffs are accusing the defendant deputies of using excessive force and
23  denying Phounsy medical care resulting in his death.  What illicit drugs Phounsy had in
24  his system at the time he violently fought with deputies is central to the evaluation of
25  whether the force was reasonable.  This is particularly true because bath salts are known
26  to cause erratic and violent behavior.  (Ex. A, Dr. Geller report, pg. 9.)  It is also central
27  to the question of Phounsy's cause of death.

28  / / /

Numerous courts in Section 1983 cases have held that the probative value of such evidence substantially outweighs any possible prejudicial effect. *See, e.g.*, *Boyd v. City & County of San Francisco*, 576 F.3d 938, 948-49 (9th Cir. 2009) (upheld ruling admitting evidence that decedent was intoxicated on drugs at time of shooting because it "was highly probative of the decedent's conduct, particularly in light of [the decedent's] alleged erratic behavior); *Saladino v. Winkler,* 609 F.2d 1211, 1214 (7th Cir.1979) (an excessive force action against police officer, evidence of plaintiff's intoxication held admissible because it was "relevant to the issue of the reasonableness of the plaintiff's conduct at that time" and "tends to make [it] more probable that the plaintiff acted as the defendant contended he did or that plaintiff otherwise conducted himself in such a manner as to place the defendant reasonably in fear of his life"); *Turner v. Cty. of Kern*, No. 1:11-CV-1366 AWI SKO, 2014 U.S. Dist. LEXIS 18573, at *5-6 (E.D. Cal. Feb. 12, 2014) ("[i]t is not uncommon for courts to permit evidence that a plaintiff/decedent was under the influence of drugs or alcohol in order to explain unusual behavior or to corroborate the officers' version of how a decedent acted"); *Davis v. Duran*, 276 F.R.D. 227, 232 (E.D. Ill. 2011) (noting "[e]vidence of alcohol or drug consumption is often admitted in excessive force cases on this theory [that plaintiff acted as the officer claimed] and notwithstanding the officer's lack of knowledge about that consumption," and citing cases). *See also Samples v. City of Atlanta*, 916 F.2d 1548, 1552 n.2 (11th Cir. 1990) (evidence of decedent's glue sniffing was relevant "to determining whether the officer acted reasonably" and "[t]he effects that glue sniffing have on behavior also tended to support the officer's description of David's actions").

Moreover, Phounsy's use of bath salts is probative to the wrongful death damages claimed in this case. *See e.g., Cobige v. City of Chicago,* 651 F.3d 780, 784-785 (7th Cir. 2011)(holding it was reversible error to preclude evidence of a decedent's record of arrests and convictions, imprisonment, and drug addiction because such evidence was relevant to the issue of damages in a wrongful death case to show the quality of the relationship between decedent and the plaintiff heirs). Courts have consistently permitted

15cv2692-H(MDD)

1  "wrongful death" defendants to introduce evidence of a decedent's health and criminal
2  history so as to permit the jury a fair opportunity to evaluate plaintiff's damages claims.
3  *Boyd v. City & Cty. of San Francisco*, 2006 WL 1390423, at *2 (N.D. Cal. 2006)("In
4  particular, California law allows a jury to consider the decedent's life expectancy, taking
5  into account his health habits and lifestyle as well as any... self-destructive impulses in
6  determining these amounts.").  *Chatham v. Davis*, 2014 WL 12659450, at *4 (S.D. Ill.
7  2014), aff'd, 839 F.3d 679 (7th Cir. 2016)("[E]vidence of [decedent]'s multiple prior
8  arrests were relevant to show how active [decedent] would have been in his son's life if
9  he had lived based on his prior record and drug usage."); *Chatham v. Parkhill*, 2013 WL
10  5912154 at *1 (S.D. Ill. 2013) (Proper for defendants to present "evidence of the
11  decedent's criminal history and daily drug use in order to rebut evidence regarding the
12  decedent's relationship with his son.").

13                              **III.   CONCLUSION**

14         Plaintiffs have not raised any valid basis to exclude Dr. Geller's opinion about
15  Phounsy's use of bath salts.  Plaintiffs' subjective disagreement should be pursued
16  through examination, not preclusion.  Plaintiffs' *Daubert* motion should be denied.

17                                    Respectfully submitted,

18  DATED:  January 25, 2021          Office of County Counsel

19                                    By: s/ RONALD LENERT, Senior Deputy
20                                    Attorneys for Defendants County of San Diego,
                                      Dean Allen, Aaron Brooke, Sandra Carbajal,
                                      Marcos Collins, Janae Krull, Michael Lee, Jenny
21                                    Martinson, Tamani Pugh, Jovonni Silva, and Billy
22                                    Tennison

23  DATED:  January 25, 2021          **MANNING & KASS**
                                      **ELLROD, RAMIREZ, TRESTER LLP**
24
25                                    By: s/ MILDRED O'LINN
                                      Attorney for Defendant Richard Fischer
26

27

28

15cv2692-H(MDD)

# EXHIBIT "A"

To:      Mr. James Chapin, Office of County Counsel, County of San Diego California

From:   Richard J. Geller, MD, MPH, MS

Re:      Report, Mr. Lucky Phounsy

Date:    May 22, 2017


Dear Mr. Chapin

I am writing, at your request, the following report regarding Mr. Lucky Phounsy

My qualifications are as follows.  My formal education includes having earned university degrees from Boston College (BS, chemistry), Tufts University (Doctor of Medicine), California State University Fresno (Master of Public Health) and the University of Florida (Master of Science, forensic toxicology).  I have been certified by the American Board of Internal Medicine and the American Board of Emergency Medicine.  I practiced clinical medicine, both as an internist and as an emergency physician, for a period of 27 years. During that time I treated in an emergency department setting the acute effects of stimulant exposure on many occasions.  In addition to being an internist and emergency physician, I am a very experienced medical toxicologist, having been certified by the American Board of Medical Toxicology and by the American Board of Emergency Medicine in the subspecialty of medical toxicology.  A medical toxicologist is an expert in the adverse clinical effects of xenobiotics, importantly including medications, on the human body, as well as being an expert in the diagnosis and treatment of poisoning from all poisons, including medications.  I have many years of experience in clinical pharmacology, and am employed by the Department of Clinical Pharmacy, University of California San Francisco School of Pharmacy.  In that role I am the director of the Fresno/Madera Division of the California Poison Control System, a position I have held since 1987.  In that role I also teach medical toxicology and advanced pharmacy practice to fourth year doctoral students.  In addition to being a Health Sciences Associate Professor, University of California San Francisco School of Pharmacy, I am also an Associate Clinical Professor, Medicine, University of California San Francisco School of Medicine, and an Adjunct Professor of Pharmacy Practice, University of the Pacific School of Pharmacy and Health Sciences, where I also teach fourth year doctoral pharmacy students.  In my 30 years of experience as a poison control medical director, I have observed and/or consulted on thousands of cases of exposure to drugs of abuse, including a number of fatal exposures.  I am a physician currently and consecutively licensed by the Medical Board of California since 1983, certificate number G49837.

As compensation for my time in reviewing records and in writing this report, we have agreed that I will be paid a fee of $200 per hour.  As of this date, I have not been paid for my work on this case.

Appended to this report is my most recent curriculum vitae.

1

I have expertise in the medical and forensic toxicological matters which follow, and am prepared to testify in court.  I have previously testified as an expert in medical and forensic toxicology in federal court and in superior courts in the State of California.  Specifically, I have testified in Federal Court in San Diego regarding the acute effects of methamphetamine intoxication.  While I do not keep a comprehensive record of my appearances in court, I have examined my billing records for the previous 5 years, and determined that I testified in court in the cases of Shaundra Brummett, et al., v. County of San Diego et al., in federal court in San Diego in 2014, CA Medical Board v. Dr. Pero (2016) and Lewis v. County of San Diego (2017).  I have been deposed in: Gallarzo v. Trinity Health Michigan (2014), Jackson v. Munson Medical Center (2014), Select Specialty Kalamazoo v. McLachlan (2013), Kaufman v Spectrum Health (2012), Varga v. Rady Children's Hospital (2012 or 2013), Antelma Soria v. CDCR (2016), Napier v. County of San Diego (2016) and Vianey Valdez v. State of California (2016).

You have asked me to comment on:

1.  The meaning of positive and negative toxicology findings as reported by the San Diego County Office of the Medical Examiner, following testing of Mr. Phounsy's antemortem blood drawn April 13, 2015, and also his urine, harvested at an unknown time.
2.  The possibility that Mr. Phounsy's altered mental status on April 13, 2015 could have been caused by consumption of methcathinone derivatives ("bath salts") or other stimulant drug that was not detected or tested for as suggested by the San Diego County Office of the Medical Examiner.
3.  Any possible causal relationship between Mr. Phounsy's reported history of drug abuse and his cardiopulmonary arrest on April 13, 2015.

The information provided to me by your office is as follows:

<u>Documents</u>

1.   County of San Diego, Office of the Medical Examiner, Investigative Report, Lucky Phounsy
2.   Selected medical records, Sharp Grossmont Hospital, Lucky Phounsy
3.   Lakeside/Santee Fire Department Pre-Hospital Care Report, 04/13/2015, Lucky Phounsy
4.   Documents related to organ donation, Lifesharing, Lucky Phounsy

<u>Depositions</u>

1.   David Csik
2.   Daniel Nenow
3.   Captain Aaron Bagley

4.   Aaron Do

5.   Adam Daniels

6.   Deputy Janae Krull

7.   Deputy Marcos Collins

8.   Deputy Richard Fisher

9.   Deputy Billy Joe Tennison III

10.  Deputy Sandra Janet Carajal

11.  Charles Campman, MD

Additional Documents

1.   Internet Brochure, 2015 Coachella Valley Music and Arts Festival

2.   Various references from peer-reviewed medical literature, as cited below and in bibliography

Information abstracted from documents cited above

On Friday, Saturday and Sunday, April 10, 11 and 12, 2015, the Coachella Valley Music and Arts Festival was held in Indio, California.  This is a yearly event widely known to be accompanied by illegal drug use.  In 2015, "A total of 93 arrests were made during the first weekend of the Coachella Valley Music & Arts Festival, 13 more last year, according to the Indio Police Department.  A majority of the arrests — 56 — were related to illegal narcotics, while 20 festivalgoers were arrested for alcohol violations, according to a police department statement released April 14."  ( Accessed May 16, 2017 at:

http://www.dailybulletin.com/events/20150414/coachella-2015-93-arrests-one-death-during-festivals-first-weekend )  Mr. Phounsy was an attendee at the concert.

On Monday, April 13, 2015, Mr. Phounsy was at home in Santee, California.  He apparently did not appear ill or of abnormal mental status for most of the day.  However, toward evening, he underwent a change in mental status.  Included with the transcript of deposition testimony of Deputy Billy Joe Tennison III provided to me is a section of the San Diego Sheriff's Department Follow-up Investigative Report, Case Number 15118678.

I quote from the report, which appears to be authored by Detective K. Brayman.  "*Statement of Greg Kelly.  Kelly is Phounsy's step father. Phounsy and his family came over to his house about 1200-1300 hours, today to celebrate Phounsy's child's first birthday.  Phounsy was fine most of the day, and had been playing outside with the kids.  About 18:00 hours, Phounsy started to hear things and was paranoid.  Phounsy believed someone was after him.*

3

  *Kelly was informed that Phounsy had recently used drugs and Phounsy's wife was calling a doctor to see what they need to do.  The doctor told them that Phounsy just needed to go to sleep. Kelly drive down Walgreens and purchased over the counter sleeping pills. Kelly went back to his house and gave Phounsy the medication.  Phounsy took the pills and started to go to sleep but then would wake up.  Phounsy was still paranoid:  Phounsy would look in closets and call his friends to see if they were coming to get him.*

  *About 2000 hours, Phounsy's wife called the doctor again and was informed that they needed to take Phounsy to the hospital.  Phounsy then called 911 on himself and gave Kelly the phone.  Kelly gave dispatch the information to this incident.  Kelly then waited in the garage for responding deputies. Once the duties arrived talked to them about what was going on prior to the making contact with Phounsy."*

  Included with the transcript of deposition testimony of Deputy Sandra Janet Carajal provided to me is a section of the San Diego County Sheriff's Department Crime/Incident Report, Case Number 15118678, report No. 15118678.1.

  I quote from the report, which appears to be authored by Deputy Carbajal.  "At 2221 hours, Deputy Krull and Deputy Collins arrived and contacted Lucky Phounsy inside the residence.  Lucky was the original reporting party who told Sheriff's Dispatch that he was under the influence of Acid and Cocaine."

  On April 13, 2015, David Csik was a firefighter/paramedic employed by the Lakeside Fire Protection District.  He related a conversation he had with a woman he believed to be a relative of Mr. Phounsy after he arrived at Mr. Phounsy's home.  The deposition states as follows.

  Q.  Off the top of your head, do you remember any of the drugs that she said that Mr. Phounsy had allegedly taken?

  A.  Off the top of my head, LSD, ecstasy, marijuana, whip-its and she thought possibly cocaine.

  The dictated History and Physical for Lucky Phounsy which is a part of the medical records from the Sharp Grossmont Hospital Emergency Department states as follows.  "Lucky Phounsy is 32 year old male who works as an auto mechanic, who has recently been to the Coachella concert, and patient has been using ecstasy, cocaine, acid and whip-its for the past 2 days, per his wife."  Under PERSONAL HISTORY, the record states "History of drug abuse and alcohol abuse."

Deputies Marcos Collins and Janae Krull were the first two deputies to respond to Mr. Phounsy's home following his call to 911

Deputy Collins relates in his deposition having had a conversation outside the home before entering with a male family member (presumably Mr. Kelly).  Deputy Collins stated in his deposition that he male said "Something to the effect that a family member of his had come back from a concert in the desert, Coachella, and that he was paranoid that people were out to kill him.  That wasn't the case.  And that he was high on acid and cocaine".

An exchange between Deputy Collins and an attorney at his deposition (p. 83) went as follows:

Q. "Okay.  So what information did you have to lead you to believe that he was under the influence, other than what you had heard had been told the people by other people?

A. When I walked in and he had a paranoid look on his face and was fidgety, couldn't stand still, wasn't complying with my commands.  I've arrested hundreds of people for being under the influence for, you know 5150 cases, and he was exhibiting some of the signs and symptomology of someone who is under the influence.

Q. Such as what?

A. Profuse sweating, trouble focusing on what I was telling him to do, looking around nervously.  All those things together made me believe he's possibly under the influence and not following commands".

Deputy Janae Krull was asked at her deposition (p. 20-21) : "are there any important facts, facts that you deem important, about what you did, what you saw, and what you heard during the incident that's not included in  this report that you think should be added?"  She replied: "other than the fact that I don't think it covers how animalistic he was acting and the full extent, no, nothing else needs to be added."

To the follow-up question "what do you mean by 'animalistic'?" Deputy Krull replied as follows.  "During the entire incident, he was constantly growling and talking in words that we couldn't even understand.  And I don't think that was added throughout the entire report."  Deputy Krull also described seeing a woman she believed was Mr. Phounsy's wife as follows.  "She was actually holding her child as if she was in fear.  It appeared she was shaking, and she was appearing to shield her child from what was going on."

Further on in her deposition, Deputy Krull was asked (p. 70) "prior to that point has Mr. Phounsy in any way acted aggressively towards you or Deputy Collins?"  She replied as follows.  "Based on his symptomology, his excessive sweating, his paranoia, his heavy breathing, his inability to focus, his loud, boisterous activity, we

believed there were drugs onboard, which can escalate to a violent situation very quickly through my training and experience."

Deputy Krull also described Mr. Phounsy as seemingly being impervious to pain. She found it unusual that, after being subjected to a TASER, he was able to stand up and throw punches. She describes (p. 209) striking him with a baton and "he didn't even turn toward me, didn't even acknowledge that I was hitting him."

Deputies Collins and Krull viewed Mr. Phounsy as a man with significantly altered mental status, by history having very recently used illegal drugs, and who was potentially dangerous. At the outset of their encounter with him, the deputies wanted to ensure that Mr. Phounsy was not in possession of a weapon. They thus attempted to do a manual "pat-down" of Mr. Phounsy in order to detect any potential weapons in his possession.

What ensued was a violent altercation. Mr. Phounsy resisted the attempt to pat him down. When the deputies attempted to handcuff Mr. Phounsy, he struggled with great strength against them. A number of punches were exchanged between Deputy Collins and Mr. Phounsy. At least one profusely bleeding wound was opened on Deputy Collins' head. Deputy Krull struck Mr. Phounsy with a baton. The deputies fired their TASER weapons at Mr. Phounsy multiple times. Writing in the County of San Diego, Office of the Medical Examiner, Investigative Report, Lucky Phounsy, the medical examiner investigator, Julio Estrada, stated that "the decedent was described as having 'super strength'." The same report references Sharp Grossmont Hospital as having provided information that the decedent had a history of drug and alcohol abuse.

Additional deputies responded to the scene, and eventually Mr. Phounsy was restrained with his hands bound together behind his back, his feet bound together, and then a further restraint applied attaching hand and foot restraints together.

Firefighter/paramedics responded to the scene to care for both Mr. Phounsy and the injured deputies (Collins and Krull). The firefighter/paramedics transported the deputies to a hospital.

In his deposition (p. 33), firefighter/paramedic David Csik stated that, shortly after arrival on scene, he spoke to a woman he believed to be a relative of Mr. Phounsy ("I don't know if it was a wife or ex-wife – she was speaking with a female deputy." During this conversation, Mr. Csik stated that "the family member had told me that the patient had been up, awake for several days with no sleep. He had taken a number of illicit drugs." When asked if he remembered any of the drugs that she said Mr. Phounsy had ingested, he replied "LSD, ecstasy, marijuana, whip-its and possibly cocaine."

A Pre-Hospital Care Report from the Lakeside/Santee Fire Department was included with documents attached to Mr. Csik's deposition.  The following is quoted from that report (page 2 of 4).  "The patient was carried by multiple Sheriff Deputies out of the residence, through the garage, and placed onto the driveway.  The patient was on his right side.  The patient was in four-point, 'hogtie' restraints with his arms and legs secured behind him.  The patient's positioning and restraints allowed the patient to straighten his abdomen and chest to take full tidal volume breaths.  The patient continued to violently jerk/thrash around, leading Sheriff Deputies on scene to request that the patient be medicated in order to ensure the safety of Law Enforcement and Fire Department personnel on scene."  5 mg Versed was administered IM at approximately 10:39 PM.  A second 5 mg dose of Versed was administered intramuscularly at approximately 10:50 PM.

Mr. Phounsy, after two doses of Versed, was placed on a gurney, on his side, and transported to Sharp Grossmont Hospital.  Initially, he continued to struggle against restraints.  On the way to the hospital, however, he suddenly became still.  He was found to be in cardiopulmonary arrest.  Advanced cardiac life support measures were successful in restoring a blood pressure, and Mr. Phounsy was admitted to the intensive care unit of the hospital.  However, it was determined that he had suffered a severe anoxic brain injury.  Following a hospitalization of approximately one week, during which he showed evidence of multi-organ failure and brain death, Mr. Phounsy succumbed.

The County of San Diego, Office of the Medical Examiner, performed a full autopsy on Lucky Phounsy.  Additionally, pre-mortem hospital blood, drawn on the night of his admission to Sharp Grossmont Hospital, was used for forensic toxicology testing.

The autopsy summary for Mr. Phounsy included (related to his cardiorespiratory arrest with anoxic encephalopathy) cerebral swelling with herniation and microscopic ischemic changes, resolving recent myocardial infarction (mitral papillary muscle) and renal tubular necrosis.  Unrelated to his cardiorespiratory arrest with anoxic encephalopathy was atherosclerotic cardiovascular disease in the form of left ventricular hypertrophy and focal marked cardiac arteriosclerosis.

The cause of death was ascribed to anoxic encephalopathy, due to, cardiopulmonary arrest with resuscitation following physical altercation and restraint, due to, stimulant drug-related psychotic state.  The manner of death was an accident.

An ELISA Drug of Abuse Screen was performed on Mr. Phounsy's antemortem blood.  This was presumptively positive for cannabinoids (marijuana), and was negative for benzodiazepines, cocaine metabolites and amphetamines.

A Base Screen utilizing GC/MS (Gas Chromatography/Mass Spectrometry) detected etomidate and diphenhydramine in small amounts in Mr. Phounsy's antemortem blood.

Benzodiazepines were searched for in Mr. Phounsy's antemortem blood using HPLC/DAD (High-Performance Liquid Chromatography with Diode-Array Detection) and were not detected.

Testing for amphetamines, utilizing LC/MS (Liquid Chromatography/Mass Spectrometry) detected MDMA (methylenedioxymethamphetamine), or ecstasy, in trace amounts in Mr. Phounsy's antemortem blood.

A Urine Screen, utilizing (Gas Chromatography/Mass Spectrometry), was performed on urine harvested from Mr. Phounsy (at a time not specified), and detected six pharmaceuticals plus laudanosine, a metabolite of atracurium, all of which could reasonably be attributed to medical care in an intensive care unit.

Finally, testing for LSD (commonly called "acid"), utilizing HPLC/MS/MS (High Performance Liquid Chromatography/Tandem Mass Spectrometry) was performed at NMS laboratories.  This detected no LSD in Mr. Phounsy's antemortem blood.

<u>Discussion</u>

The first topic I was asked to comment upon is the <u>meaning of positive and negative toxicology findings as reported by the San Diego County Office of the Medical Examiner</u>, following testing of Mr. Phounsy's antemortem blood drawn April 13, 2015, and also his urine, harvested at an unknown time.

The etomidate and diphenhydramine in small amounts in Mr. Phounsy's antemortem blood are consistent with hospital administration of etomidate (a short-acting intravenous anesthetic agent), and his history of ingesting a therapeutic amount of diphenhydramine, respectively.

The detected MDMA (methylenedioxymethamphetamine), or ecstasy, in trace amounts in Mr. Phounsy's antemortem blood, was almost surely due to use of ecstasy.  The terminal elimination half-life for ecstasy is estimated to lie in a range of 5-9 hours (Ref. 1,2).  Thus, a significant amount of the drug could have been ingested by Mr. Phounsy on April 10 and/or 11, and result in only a trace of the drug remaining in plasma by almost midnight on April 13.  Thus, this test result is not inconsistent with MDMA use during the time Mr. Phounsy was at Coachella.

LSD was not detected at a concentration above the reporting limit for this drug at NMS Labs.  This means either that LSD was not present in Mr. Phounsy's plasma, or that it was present, but at a concentration below which the lab does not report it.  The terminal elimination half-life for LSD is estimated to lie in a range of 3-5 hours (Ref. 1, 2) .  Thus, a significant amount of the drug could have been ingested by Mr. Phounsy on April 10

and/or 11, and result in a concentration below the reporting limit on April 13.  The result of this test does not exclude the use of LSD during the time Mr. Phounsy was at Coachella.

"Whip-its" refer to small (3-3.5 inches tall) cylinders of the anesthetic gas, nitrous oxide.  These are sold in food stores, and are intended to be mixed with cream, under pressure in a larger cylinder, to make whipped cream.  Nitrous oxide is a gas, and would leave the body quickly.  It was not tested for by the Medical Examiner as a part of the postmortem investigation of Mr. Phounsy's death.  The use of nitrous oxide is associated with an increased risk of cardiovascular complications, including myocardial infarction, for several days after use.

Cocaine has an extremely short terminal elimination half-life, 0.5-1.5 hours (Ref. 1, 2).  For this reason, the forensic detection of cocaine use focuses on cocaine metabolites, such as ecgonine methyl ester and benzoylecgonine.  Recreational use of cocaine should be detectable as cocaine metabolites in urine or blood for at least 24-48 hours.  No cocaine metabolites were found in the blood of Mr. Phounsy.  Deputy Carbajal stated, with regard to the 911 call placed by Mr. Phounsy on April 13, that Lucky was the original reporting party who told Sheriff's Dispatch that he was under the influence of acid and cocaine.  Given the subsequent negative toxicology testing for LSD and cocaine, it was extremely unlikely that this was correct.  What is not excluded, however, is cocaine use on April 10.  What is also not excluded is the use of another sympathomimetic drug on April 13 which may have been believed by Mr. Phounsy to be cocaine or LSD.

The second aspect of this case which I was asked to comment on is <u>the possibility that Mr. Phounsy's altered mental status on April 13, 2015 could have been caused by consumption of methcathinone derivatives ("bath salts") or other stimulant drugs</u> that were not detected or tested for as suggested by the San Diego County Office of the Medical Examiner.

In his autopsy report of Mr. Phounsy, Dr. Steven Campman stated that "it remains possible, however, that he was still experiencing toxic effects of the MDMA, or of a synthetic cathinone or other stimulant drug that was not detected or tested for.  (There are numerous such "bath salts" and other compounds, with new formulations being created, such that some are not detected by our methods)."

At the present time, and in April of 2015, the United States is awash in a flood of ever changing sympathomimetic (stimulant) drugs of abuse.  The worst of these (in terms of causing drug-induced delirium and extremely violent behavior) are the synthetic cathinone derivatives, or "bath salts".

Cathinone is a natural amphetamine-like substance found in the Khat tree of Africa, and is used there similarly to the mastication of coca leaves in South America.  When cathinone is exposed to a methylating agent, methcathinone results.  This substance has been a drug of abuse in Eastern Europe for a long time, but was seldom seen in the United States until recently.

9

Synthetic cathinones, derivatives of methcathinone, hereafter referred to as "bath salts", were first seen in the Unites States in 2010.  The early medical literature detailing clinical experience with bath salt drug abuse (Ref. 3, 4, 5, 6) was limited to 3 compounds – methylone, mephedrone and MDPV.  By 2015, the universe of bath salts included at least 14 compounds (Ref, 7) which had been identified, and probably many more.

Bath salts are not detected by routine toxicology testing.  Commercial analytic methods to detect bath salts in urine or blood lag, by years, the introduction of new drugs of abuse to the market place.  In 2015, it was highly unlikely that a county medical examiner's laboratory, or even a national reference laboratory, would detect many of the bath salts.  Yet bath salt use was, and still is, exploding in terms of prevalence. While many assays have been developed to detect older drugs of abuse such as amphetamines, MDMA and cocaine, bath salt use even in 2017 goes largely undetected due to the lack of widely available detection methods.

Bath salts are extremely troublesome drugs of abuse in terms of their adverse drug effects.  Karila and colleagues (Ref.7) describe the adverse psychiatric effects of synthetic cathinone use as including agitation, aggression, anxiety, paranoia, paranoid delusion, visual and auditory hallucinations (often in the form of threatening people) and psychosis.  Commonly reported emergency department presentations of bath salt users are tachycardia, diaphoresis, hypertension, agitation, paranoia, psychosis and serotonin syndrome. (Ref. 8)  Other physical effects of bath salts include cerebral edema and myocardial infarction, and common neuropsychiatric effects include aggression, combative behavior, hallucinations, paranoia and insomnia. (Ref. 8)

There is a large cross-over between the population of Americans using methamphetamine and/or MDMA, and those using bath salts.  Bath salts have been hailed by some as a "safe alternative" to MDMA, but are not.  A problem for the purchaser/user of illegal drugs is misidentification.  Because the chain of supply is inherently a criminal enterprise, and occurs completely outside of the protection of FDA regulation, the purchaser never really knows what he/she is buying.  A recent example of this was the numbers of deaths among California users of hydrocodone/acetaminophen in 2016.  Purchasers believing they were buying Norco actually ended up with fentanyl, and extremely potent opioid, and died of opioid overdoses.  It is entirely possible that Mr. Phounsy believed that he was purchasing MDMA, methamphetamine or cocaine, and ended up with bath salts.

The syndrome of excited delirium has been reported following the use of bath salts. (Ref. 6)  Dr. Campman raised the issue of Excited Delirium Syndrome in his autopsy report on Mr. Phounsy.  He states that "the decedent showed some of the major features of the Excited Delirium Syndrome, including psychosis, 'super strength' and a sudden cardiorespiratory arrest after struggle and restraint; however, he reportedly did not

have a high body temperature, did not have an identified toxic concentration of stimulant drugs or a history of naturally occurring psychosis, and his serum potassium was not low when he got to the hospital." He then allowed that it was possible that Mr. Phounsy was experiencing the toxic effects of a stimulant drug not detected by the methods used by the County of San Diego Medical Examiner.

Notwithstanding the reservations of Dr. Campman in making a diagnosis of Excited Delirium Syndrome (ExDS), I believe that there is a very high probability that this is what he experienced. Not all cases of Excited Delirium Syndrome have hyperthermia. In a series of sixty-cases believed by law enforcement to have had ExDS, 43 had a subsequent emergency department evaluation. (Ref. 9) Of those, only 3 (7%) were hyperthermic. The absence of hyperthermia does not exclude the diagnosis of ExDS. I believe that Mr. Phounsy did not have an "identified toxic concentration of stimulant drugs", as Dr. Campman put it, because he ingested something unidentifiable, either bath salts or another drug in the rapidly expanding vast universe of sympathomimetic (stimulant) drugs. The absence of an identified toxic concentration of stimulant drugs does not exclude the presence of stimulant drugs, and does not exclude the diagnosis of ExDS. Finally, Mr. Phounsy's potassium was measured following a prolonged period of cardiac arrest and shock, with ensuing profound metabolic acidosis. Metabolic acidosis causes hyperkalemia. Thus, the absence of hypokalemia does not exclude the diagnosis of ExDS.

The author of a review article on the Excited Delirium Syndrome (Ref, 10) states that "the excited delirium syndrome (EDS) is a life- threatening condition caused by a variety of factors including drug intoxication and psychiatric illness." "Excited delirium may include paranoid, aggressive and incoherent behavior which may lead to an encounter with law enforcement." In another review on the Excited Delirium Syndrome (Ref. 11), the authors state "excited (or agitated) delirium is characterized by agitation, aggression, acute distress and sudden death, often in the pre-hospital care setting." "It is typically associated with the use of drugs that alter dopamine processing, hyperthermia, and most notably, sometimes with death of the affected person in the custody of law enforcement." Further, "all accounts describe almost the exact same sequence of events: delirium with agitation (fear, panic, shouting, violence and hyperactivity), sudden cessation of struggle, respiratory arrest and death." "The presentation of excited delirium occurs with a sudden onset, with symptoms of bizarre and/or aggressive behavior, shouting, paranoia, panic violence toward others, unexpected physical strength and hyperthermia." Absent only hyperthermia, this is exactly the clinical picture surrounding Mr. Phounsy's cardiac arrest, with death delayed only by advanced medical care.

The authors of this study address two further circumstances of Mr. Phounsy's fatal evening. "Since the victims dies in police custody, the most widely publicized proposed causes of death in EXD are taser use and positional asphyxia." The authors go on to express their doubts regarding the validity of these *proposed*

11

causes of death.  "No study thus far has been able to demonstrate a causal relationship between Taser use and subsequent individual's deaths."  And, "the positional asphyxia theory has been refuted by a series of articles by Chan et al exploring the effect of PRMP (prone maximal restraint position) on ventilatory capacity and arterial blood gases."  In other words, in experimental conditions aiming to replicate the effect of prone restraint, no significant impact on ventilation has been demonstrated.

The third aspect of this case which you asked me to comment on is any <u>possible causal relationship between Mr. Phounsy's reported history of drug abuse and his cardiopulmonary arrest on April 13, 2015.</u>

The use of stimulant drugs, whether with amphetamine, methamphetamine, ecstasy, bath salts, cocaine, or the many other illegal stimulant drugs available in the marketplace of 2015 or today, is highly deleterious to the heart.  The neurotransmitters norepinephrine, dopamine, epinephrine and serotonin all have as their natural "off-signal" the transport of the transmitters back into cells.  There are specific transporters which move these agents back into cells, thus ending their effect.  The stimulant drugs referred to above block the transporters, resulting in profound and prolonged exaggerated effect of the transmitters.  Among the adverse consequences of this protracted catecholamine neurotransmitter state are increased vascular resistance, making it harder for the heart to push blood forward, increased oxygen demand on the heart muscle, decreased oxygen supply to the heart and acute injury to heart muscle.

In an article examining the pathogenesis of drug induced excited delirium, restraints and unexpected death, the authors state the following. (Ref. 12)  "Patients with excited delirium have significant sympathetic stress related to physical exertion, the use of restraints, drug intoxication and possibly underlying psychiatric disease.  Some of these patients die unexpectedly, and the autopsy is relatively uninformative.  We speculate that these patients have stress cardiomyopathy similar to tako-tsubo cardiomyopathy, secondary to pronounced catecholamine effect on cardiomyocytes or on the coronary microvasculature.  These patients have profound left ventricular dysfunction and experience either cardiac arrest or sustained cardiac dysfunction with hypotension."

<u>Concluding discussion.</u>

While some of the events which occurred in the final days of the life of Mr. Lucky Phounsy remain unknown, the many facts which are known allow reasonable conclusions as to what conspired to cause his death.  I believe the cause and manner of death reached by the County of San Diego, Office of the Medical Examiner are correct, as far as they go.  The ultimate cause of Mr. Phounsy's cardiorespiratory arrest and subsequent fatal anoxic brain injury is actually the ultimate cause of his death.  I believe that this lies in his stimulant drug use, possibly contributed to by use of nitrous oxide (whit-its).

It is known that Mr. Phounsy attended the 2015 Coachella Valley Music and Arts Festival, where his wife believed that he abused drugs, and where drug abuse was rampant.  Mr. Phounsy had a history of drug abuse.  His antemortem blood, drawn very shortly after his cardiopulmonary arrest, documented the presence of ecstasy, or MDMA, and marijuana.  Per the account of Mr. Kelly, Mr. Phounsy had a relatively normal day Monday, April 13, while at home the day after the festival ended.  But then something changed abruptly in Mr. Phounsy's mental status.  He became agitated, confused, combative, paranoid, and ultimately, violent.  He called 911 believing that someone was trying to kill him, and reported using what he believed was cocaine and acid.   The sudden change in his mental status was dramatic, and occurred in the same period that he admitted being under the influence of a drug.  Almost surely, his altered state was due to drug use, but not the cocaine and acid which he believed that he took.  This drug use appears to have occurred in the afternoon of April 13, 2015.

Conclusions

1. I agree with the San Diego County Office of Medical Examiner that Mr. Phounsy died an accidental death caused by an anoxic brain injury secondary to cardio-pulmonary arrest.

2. I believe that, to a high degree of medical probability, Mr. Phounsy's condition on the night of April 13, 2015, and the cause of his cardio-pulmonary arrest, was Excited Delirium Syndrome, itself caused by stimulant drug use, both at Coachella, and at home on the afternoon of April 13, 2015.

3. The combination of an Excited Delirium Syndrome in the absence of specific toxicologic confirmation by the medical examiner is not an uncommon event in the era of bath salts and a myriad of other stimulant drugs of abuse.  I believe that, to a high degree of medical probability, Mr. Phounsy ingested either a bath salt, or another of the stimulant drugs of abuse which are often not detected in modern forensic toxicologic analysis, on the afternoon of April 13, 2017.

4. The person going through an Excited Delirium Syndrome secondary to stimulant drug abuse represents not only a true medical emergency, but an individual who is a great danger to themselves, family members, and EMS and law enforcement personnel.

5. Virtually all authorities writing on the treatment of acute stimulant drug abuse, and Excited Delirium Syndrome, advocate the use of benzodiazepine therapy, and its use by the firefighter/paramedics who treated Mr. Phounsy was entirely appropriate.

6. I believe that, to a high degree of medical probability, had Mr. Phounsy not abused stimulant drugs up to, and including, the evening of his cardio-pulmonary arrest, the catastrophic event would not have occurred, and Mr. Phounsy would not have died.

I declare under penalty of perjury that the foregoing is true.

Signed this day in Fresno, California._____.

_____.

Richard J. Geller, MD, MPH, MS

14

References.

1) Baselt R.  Disposition of Toxic Drugs and Chemicals in Man, Ninth Edition.   Biomedical Publications. Seal Beach, California, 2011.

2) Molina D, Handbook of Forensic Toxicology for Medical Examiners, CRC Press, Boca Raton, 2010.

3) Spiller HA, Ryan ML, Weston RG, Jansen J.  Clinical experience with and analytical confirmation of "bath salts" and "legal highs" (synthetic cathinones) in the United States. Clin Toxicol (Phila). 2011 Jul;49(6):499-505.

4) Karch SB.  Cathinone neurotoxicity ("The "3Ms").  Curr Neuropharmacol. 2015 Jan;13(1):21-5.

5) German CL, Fleckenstein AE, Hanson GR.  Bath salts and synthetic cathinones: an emerging designer drug phenomenon.  Life Sci. 2014 Feb 27;97(1):2-8.

6) Penders TM.  The syndrome of excited delirium following use of "bath salts".  J Clin Psychiatry. 2013 May;74(5):518.

7) Karila L, Megarbane B, Cottencin O, Lejoyeux M.  Synthetic cathinones: a new public health problem. Curr Neuropharmacol. 2015 Jan;13(1):12-20.

8) Karen Miotto, Joan Striebel, Arthur K. Cho, Christine Wang.  Clinical and pharmacological aspects of bath salt use: A review of the literature and case reports.  Drug and Alcohol Depend 132(2013) 1-12.

9) Strote J, Walsh M, Auerbach D, Burns T, Maher P.  Medical conditions and restraint in patients experiencing excited delirium.  Am J Emerg Med. 2014 Sep;32(9):1093-6.

10) Gill JR.  The syndrome of excited delirium.  Forensic Sci Med Pathol. 2014 Jun;10(2):223-8.

11) Takeuchi A, Ahern TL, Henderson SO.  Excited delirium.  West J Emerg Med. 2011 Feb;12(1):77-83.

12) Otahbachi M, Cevik C, Bagdure S, Nugent K.  Excited delirium, restraints, and unexpected death: a review of pathogenesis.  Am J Forensic Med Pathol. 2010 Jun;31(2):107-12.

Conclusions

1. I agree with the San Diego County Office of Medical Examiner that Mr. Phounsy died an accidental death caused by an anoxic brain injury secondary to cardio-pulmonary arrest.

2. I believe that, to a high degree of medical probability, Mr. Phounsy's condition on the night of April 13, 2015, and the cause of his cardio-pulmonary arrest, was Excited Delirium Syndrome, itself caused by stimulant drug use, both at Coachella, and at home on the afternoon of April 13, 2015.

3. The combination of an Excited Delirium Syndrome in the absence of specific toxicologic confirmation by the medical examiner is not an uncommon event in the era of bath salts and a myriad of other stimulant drugs of abuse. I believe that, to a high degree of medical probability, Mr. Phounsy ingested either a bath salt, or another of the stimulant drugs of abuse which are often not detected in modern forensic toxicologic analysis, on the afternoon of April 13, 2017.

4. The person going through an Excited Delirium Syndrome secondary to stimulant drug abuse represents not only a true medical emergency, but an individual who is a great danger to themselves, family members, and EMS and law enforcement personnel.

5. Virtually all authorities writing on the treatment of acute stimulant drug abuse, and Excited Delirium Syndrome, advocate the use of benzodiazepine therapy, and its use by the firefighter/paramedics who treated Mr. Phounsy was entirely appropriate.

6. I believe that, to a high degree of medical probability, had Mr. Phounsy not abused stimulant drugs up to, and including, the evening of his cardio-pulmonary arrest, the catastrophic event would not have occurred, and Mr. Phounsy would not have died.

I declare under penalty of perjury that the foregoing is true.

Signed this day in Fresno, California. _May 22, 2017_.

_Richard J. Geller_, MD, MPH, MS.

Richard J. Geller, MD, MPH, MS

14

EXHIBIT "B"



# County of San Diego

**GLENN N. WAGNER, D.O.**
CHIEF MEDICAL EXAMINER

**JONATHAN R. LUCAS, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER

**OFFICE OF THE MEDICAL EXAMINER**

5570 OVERLAND AVE., SUITE 101, SAN DIEGO, CALIFORNIA 92123-1206

TEL: (858) 694-2895   FAX: (858) 495-5956

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | LUCKY PHOUNSY | **ME#:** | 15-0926 |
| **Place of death:** | Sharp Grossmont Hospital La Mesa, CA 91942 | **Age:** | 32 Years |
| | | **Sex:** | Male |
| **Date of death:** | April 20, 2015; 1932 Hours | | |
| **Date of autopsy:** | April 23, 2015; 0931 Hours | | |

CAUSE OF DEATH:      ANOXIC ENCEPHALOPATHY

Due To:      CARDIOPULMONARY ARREST WITH RESUSCITATION FOLLOWING PHYSICAL ALTERCATION AND RESTRAINT

Due To:      STIMULANT DRUG-RELATED PSYCHOTIC STATE

Contributing:      CARDIAC ARTERIOLOSCLEROSIS

MANNER OF DEATH:      ACCIDENT

AUTOPSY SUMMARY:

I.      History of cardiorespiratory arrest with anoxic encephalopathy.
     A.      Cerebral swelling with herniation and microscopic ischemic changes.
     B.      Resolving, recent myocardial infarct, mitral papillary muscle.
     C.      Renal tubular necrosis.

II.      Arteriosclerotic cardiovascular disease.
     A.      Left ventricular myocardial hypertrophy.
     B.      Focal marked cardiac arteriolosclerosis.

III.      Multiple healing abrasions and contusions of the face, scalp, torso, and upper and lower extremities (including wrist, ankle and lower torso injuries consistent with restraint).

IV.      Cutaneous injuries of the back consistent with conducted energy weapon

**EXHIBIT** _4_

Campman 3/17/17

Kathleen McLaughlin, CSR No. 5845



AUTOPSY REPORT                      -3-                    LUCKY PHOUNSY 15-0926

decreased significantly" and he became pulseless and apneic and at 11:09 p.m. CPR was started and his restraints loosened or removed. Resuscitation continued upon arrival at the hospital at 11:15 p.m. until a pulse was obtained at 11:23 p.m.. Medics described his body as being "warm", but the first reported temperature in the hospital was 36.6°C (he was also described as being "afebrile" on initial evaluation in the emergency room). His serum potassium concentration was 6.6 mmol/L, and he was treated for that high potassium concentration, as well as ventilated, and his body temperature was lowered (not for fever but to improve potential neurologic outcome after his cardiac arrest). His toxicology screen at the hospital was positive only for cannabis, and negative for cocaine, amphetamine, and benzodiazepines (including midazolam), barbiturates, oxycodone, opiates, PCP, and alcohol. He was found to have experienced anoxic brain injury and he developed rhabdomyolysis, acute kidney failure, and "shock liver". He was declared brain dead on April 20 and 21, and later underwent organ/tissue donation.

An autopsy was performed and documented multiple body surface injuries of his head, torso, and extremities, including marks of his wrists consistent with handcuffs, and ankles, and waist areas consistent with the hobble restraint. He also had skin injuries of his back consistent with application of a conducted energy weapon, infarct of the anterior papillary muscle of his heart (dating several days before death, and consistent with the day of his cardiac arrest and closer to his death), and had brain swelling, and ischemic changes of his kidneys, but no fatal injuries were present. Pre-existing the time of the incident, he had focally marked cardiac arteriolosclerosis, and left ventricular myocardial hypertrophy. Toxicology studies performed on blood collected from him at the hospital at 11:36 p.m. on April 13 were positive for diphenhydramine (<0.20 mg/L), and MDMA ("ecstasy", trace), and etomidate was also detected; but other base drugs and LSD were not detected, and a screening panel of some synthetic cathinones ("bath salts") was negative. A screening test performed on blood collected from him at 11:20 p.m., the same date, was presumptive positive for cannabinoids, but no other common drugs of abuse were detected. Another toxicology screen performed on urine collected from his urinary catheter receptacle at autopsy detected levetiracetam, acetaminophen, lidocaine, metoprolol, fluconazole, metoclopramide and laudanosine (likely administered during his hospitalization or before organ procurement).

The decedent showed some of the major features of the Excited Delirium Syndrome, including psychosis, "super strength" and a sudden cardiorespiratory arrest after a struggle and restraint; however, he reportedly did not have a high body temperature, did not have an identified toxic concentration of stimulant drugs or a history of a naturally occurring psychosis, and his serum potassium concentration was not low when he got to the hospital. It remains possible, however, that he was still experiencing toxic effects of the MDMA or of a synthetic cathinone or other stimulant drug that was not detected or tested for (there are numerous such "bath salts" and other compounds, with new formulations being created, such that some are not detected by our methods). It does not appear that injuries from the altercation with police or the restraint itself were the cause of his arrest

EXHIBIT "C"

K.J.P., *et al.*, v. COUNTY OF SAN DIEGO, *et al.*,
Case No. 15-cv-2692-H-MDD

**Expert Witness Report**
**of**
**Jerry Thrush, MD, FAAEM**

May 12, 2017

## I. Introduction

### a. Purpose of Report

I have been retained by the Singleton Law Firm for purposes of evaluating the records
and formulating expert opinions regarding the events surrounding Lucky Phounsy's
cardiorespiratory arrest on 4/13/2015 and ultimate declaration of brain death on
4/20/2015.

### b. Qualifications of Expert

I am a Doctor of Medicine licensed to practice medicine in the State of California and a
board certified specialist in emergency medicine by the American Board of Emergency
Medicine. I am a graduate of Stanford University School of Medicine and residency
trained in the specialty of emergency medicine. I have been board certified in emergency
medicine for approximately twenty-four years. I am in active practice at an acute care
facility that is a Level 2 Trauma Center in California. Before medical school I was trained
and certified as an EMT here in San Diego at Miramar College, and I have served as the
Director of EMS (Emergency Medical Services) at Loma Linda University Medical
Center, a level I Trauma Center, and have served as the medical director of LifeCare
Medical Transportation. A true and correct copy of my Curriculum Vitae is attached
hereto as **Exhibit 1**.

As a specialist in emergency medicine I am familiar with the clinical management of
agitated patients, psychiatric emergencies, use of restraints, airway and respiratory
management in emergency situations, management of patients with drug and alcohol
intoxication, overdose, and cardiac arrest and resuscitation, as well as of standard of care
as it applies to prehospital providers and emergency physicians. I am qualified to render
opinions in this regard.

infarct may have been underlying heart disease. If this would have been a primary cause of death, medically I would have expected fulminant heart failure with fluid build up in the lung because of heart valve failure. That did not occur. To summarize, in all reasonable medical probability this small focal infarct did not cause the cardiorespiratory arrest in this case.

**My opinion on renal tubular necrosis:** This is evidence under the microscope of the acute kidney injury sustained by Mr. Phounsy. In layman's terms – this is evidence seen under the microscope, that kidneys were severely hurt because of being without oxygen for a prolonged period.

**My opinion on atherosclerotic cardiovascular disease, left ventricular myocardial hypertrophy and focal marked cardiac arteriosclerosis:** This is evidence of blood vessel disease and heart dysfunction caused by build up of plaque inside the heart arteries, which is not unusual even in someone of Mr. Phounsy's age. In layman's terms, Mr. Phounsy had some buildup of deposits inside his heart arteries that likely caused the left side to become enlarged. This could have been related to factors such as his heredity, high blood pressure, diet or drug use, but was definitely present before this event, and likely was a contributor to his death but not a primary cause.

**My opinion on multiple healing abrasions and contusions:** This finding of abrasions and contusions was extensively chronicled from page 7 – 10 of the autopsy report. In layman's terms there was significant evidence of traumatic injury (scrapes, cuts, bruises etc.) that took more than two pages of a thirteen-page autopsy report to describe. My opinion is that this is consistent with a detailed report of the traumatic injuries that Mr. Phounsy sustained.

**My opinion on cutaneous injuries of the back consistent with conducted energy weapon:** This shows findings consistent with being tased. My opinion is that this demonstrates proof that Mr. Phounsy was shot with a Taser weapon in probe mode.

**My opinion on temperature on arrival:** Dr. Campman also indicates that the patient was "afebrile on arrival." While this is technically correct, shortly after arrival hospital records page1296/1848 at 23:51 on 4/13/2015 Mr. Phounsy's temperature is recorded at 38.1. My opinion is that temperature *was* elevated and in this clinical context a part of muscular activity from struggle with superimposed finding consistent with excited delirium.

**My opinion on midazolam (Versed) intoxication:** Dr. Campman indicates that Mr. Phounsy "did not have signs of benzodiazepine toxicity, and did not have toxic concentrations of midazolam [Versed] in his blood collected shortly after his sudden arrest." My opinion is that in all reasonable medical probability Mr. Phounsy did not die because of the injection of Versed. See my previous statements on Versed elsewhere in this document.

EXHIBIT "D"



Transcript of **Loan Nguyen**

Thursday, January 14, 2021

*K.J.P., a minor v. County of San Diego*

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 98084

1                    IN THE UNITED STATES DISTRICT

2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4

5   K.J.P., a minor, et al.,        )
                                    )
6                  Plaintiff,       )
                                    )
7      vs.                          )Case No. 15-cv-2692-H-MDD
                                    )
8   COUNTY OF SAN DIEGO, et al.,    )
                                    )
9                  Defendants.      )
                                    )
10

11

12

13

14                    COMPLETELY VIDEO

15              DEPOSITION OF LOAN NGUYEN

16                       CALIFORNIA

17              THURSDAY, JANUARY 14, 2021

18

19

20

21

22

23

24   Reported by:
     LAURA A. RUTHERFORD, RPR
25   CSR No. 9266
     Job No. 98084

1          Q.    BY MR. LENERT:   But part of your conversation

2    was that Lucky had use drugs at the concert.   Isn't that

3    was you said?

4          A.    Yes.   Yes.

5                THE REPORTER:   I'm sorry.   What was the

6    objection?

7                MR. MC BRIDE:   Lacks foundation.   Calls for

8    speculation.   Argumentative.

9                THE REPORTER:   Thank you.

10               Answer?

11               THE WITNESS:   I told Greg the two drugs that

12   Lucky told me that he did at Coachella.

13         Q.    BY MR. LENERT:   Were you telling Greg about

14   this drug use because you thought that could be one of the

15   reasons that Lucky couldn't sleep?

16               MR. MC BRIDE:   Objection.   Calls for

17   speculation.   Lacks foundation.   Calls for expert opinion.

18   Argumentative.   And vague and ambiguous.

19         Q.    BY MR. LENERT:   Given those objections, were

20   you telling Greg about Lucky's drug use because you

21   believed it could be contributing to Lucky's inability to

22   sleep?

23               MR. MC BRIDE:   Same objections.

24               THE WITNESS:   Yes.

25         Q.    BY MR. LENERT:   And I want to understand.   In

```
 1   paramedics was next.  And then what else?  I think at the

 2   hospital.  And I can't think -- I can't remember off the

 3   top of my head who else.

 4              Q.   So in any of these interactions when you were

 5   discussing Lucky's possible drug use, you may have given a

 6   list of drugs?

 7              A.   Yes.  I named every drug that I could think

 8   of just to be safe.

 9              Q.   Because you knew Lucky had taken some drugs?

10              MR. MC BRIDE:  Argumentative.  Lacks

11   foundation.  Calls for speculation.

12              Q.   BY MR. LENERT:  Is that because you knew that

13   Lucky had taken some drugs?

14              MR. MC BRIDE:  Same objections.

15              THE WITNESS:  Lucky had told me that he took

16   ecstasy and acid.

17              Q.   BY MR. LENERT:  But you had a concern that he

18   had taken different drugs?

19              MR. MC BRIDE:  Objection.  Argumentative,

20   misstates testimony.

21              Go ahead.

22              THE WITNESS:  I just listed everything I can

23   think of just because I wanted to protect him just in

24   case.

25              Q.   BY MR. LENERT:  When Lucky told you he had
```

1   used marijuana and ecstasy, did you believe him?

2                   MR. MC BRIDE:  Objection.  Misstates

3   testimony.

4                   Go ahead.

5                   And asked and answered.

6                   THE WITNESS:  When you -- can you word -- can

7   you repeat that question, because you said marijuana and

8   ecstasy.  Lucky told me he took -- he did marijuana -- I

9   mean, he did ecstasy and acid.

10                  Q.   BY MR. LENERT:  I apologize.  I do not want

11  to say your testimony differently when I repeat it.  I

12  appreciate that.

13                  When Lucky told you he had taken ecstasy and

14  acid, did you believe him that he had taken ecstasy and

15  acid?

16                  MR. MC BRIDE:  Objection.  Calls for

17  speculation.  Lacks foundation.  Argumentative.

18                  Go ahead.

19                  THE WITNESS:  I didn't go to Coachella with

20  almost him.  I didn't see him take it.  And what he told

21  me is what he told me is that.  So I just took it for

22  that.

23                  Q.   BY MR. LENERT:  From all of your interactions

24  with Lucky, did you have a concern that he had taken other

25  drugs other than ecstasy and acid?

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

 1   to whether this was communicated in person, on the phone,

 2   or in a text message?

 3                   MR. MC BRIDE:  Objection.  Confusing.

 4                   THE WITNESS:  It's been almost six years.  I

 5   can't think -- I can't remember off the top of my head.  I

 6   can't remember.

 7                   Q.   BY MR. LENERT:  Do you remember why Sikone

 8   left of the house with her kids on Monday?

 9                   MR. MC BRIDE:  Objection.  Assumes facts.

10   Argumentative.  Calls for speculation.  Beyond the scope

11   of this deposition.

12                   Don't answer.

13                   Q.   BY MR. LENERT:  One of the paramedics that

14   arrived to take care of Lucky on Monday night was

15   paramedic Sisk (phonetic).  Do you remember talking to

16   him?

17                   A.   I remember talking to paramedics, but I don't

18   remember his name.

19                   Q.   To a paramedic that had responded, you

20   conveyed that Lucky had taken LSD, ecstasy, marijuana,

21   whippets and possibly cocaine.

22                   Does that sound like what you told him?

23                   MR. MC BRIDE:  Objection.  Assumes facts.

24   Argumentative.  Misstates testimony.  Asked and answered.

25                   Go ahead.

1          THE WITNESS:  I listed every drug that I

2    could think of just, because I did not want them to give

3    Lucky something, and it's just to be safe.  That was the

4    only reason why I listed all of that.

5          Q.  BY MR. LENERT:  At that time, did you feel it

6    was a possibility that he could have had any of those

7    drugs in his system?

8          MR. MC BRIDE:  Objection.  Argumentative.

9    Calls for speculation.  Calls for expert opinion.  Lacks

10   foundation.  Vague and ambiguous as to "possibility."

11          MR. LENERT:  Ms. Court Reporter, can you

12   reread the question?

13          THE REPORTER:  "At that time, did you feel it

14   was a possibility that he could have had any of those

15   drugs in his system?"

16          THE WITNESS:  I listed every drugs that I can

17   think of just, because I don't -- did not want them to

18   give him something else that would give him a reverse

19   reaction.  And that was the only reason why I listed

20   everything.

21          Q.  BY MR. LENERT:  I don't know that that

22   answers the question that I asked, though, Ms. Nguyen.

23   Let me ask have the Court Reporter ask it one more time.

24          Can you please restate that again?

25          THE REPORTER:  Question was, "At that time,

# EXHIBIT "E"



Transcript of the Testimony of:

# Greg Kelley

K.J.P.

v.

County of San Diego

May 25, 2017

Volume I

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF CALIFORNIA

 3     _____
       K.J.P., a minor, and K.P.P., a      )
 4     minor, individually, by and through)
       their mother, LOAN THI MINH NGUYEN,)
 5     who also sues individually and as   )
       successor in interest to her now    )
 6     deceased husband, Lucky Phounsy,     )
       and KIMBERLY NANG CHANTHAPHANH,      )
 7     individually,                        )
                                            )
 8                    Plaintiffs,           ) Case No.
                                            ) 15-cv-02692-
 9                    -vs-                   ) H-MDD
                                            )
10     COUNTY OF SAN DIEGO; San Diego       )
       Sheriff WILLIAM GORE; RICHARD        )
11     FISCHER; KEVIN RALPH; MARCOS         )
       COLLINGS; JANAE KRULL; SANDRA        )
12     (JANET) CARBAJAL; BILLY TENNISION,  )
       III; DEAN ALLEN; MICHAEL LEE;        )
13     JENNY MARTINSON; TAMANI PUGH;        )
       AARON BROOKE; JOVONNI SILVA; CITY    )
14     OF SANTEE; AARON BAGLEY; AARON       )
       HACKETT; AARON DO; ADAM DANIELS;     )
15     DANIEL NEOW; LAKESIDE FIRE           )
       PROTECTION DISTRICT; MARC POYNTER;  )
16     DAVID CISIK,                         )
                                            )
17                    Defendants.           )
       _____)
18              DEPOSITION OF GREG KELLEY

19              THURSDAY, MAY 25, 2017

20                    9:14 A.M.

21           462 STEVENS AVENUE, SUITE 201

22             SOLANA BEACH, CALIFORNIA

23     REPORTED BY:

24     DEBERA ANNE DORAN

25     CSR NO. 7821
```

Greg Kelley                                          May 25, 2017

```
 1              A    There may have been someone standing there,
 2      but she was talking directly to me to tell me what's
 3      going on.
 4              Q    And what did Loan say?
 5              A    She said that Lucky's having paranoid
 6      thoughts, that he's getting paranoid.
 7              Q    What else did she say?
 8              A    She told me that when he was at Coachella,
 9      that she had heard that he had taken cocaine and acid.
10              Q    Did she say where she heard that from?
11              A    No, she didn't say.
12              Q    She said Lucky told her.  Right?
13              MR. McBRIDE:  Objection.
14              THE WITNESS:  At that time I don't know if
15      she -- at that time she was bringing me up to speed.  I
16      don't think she got into details like where she heard
17      things.  She was just telling me what was going on.
18              MR. McBRIDE:  Can I put that objection on?
19              MR. OSTERBERG:  Oh, sure, go ahead.
20              MR. McBRIDE:  Argumentative and assumes
21      facts.
22      BY MR. OSTERBERG:
23              Q    So if I heard you correctly, Loan told you
24      during this conversation in the kitchen that Lucky was
25      showing signs of paranoia and that he had done cocaine
```

Greg Kelley                                                May 25, 2017

 1          Q     Did you talk to him when you saw this

 2   happen?

 3          A     Yeah.  I asked him:  Lucky, what's going on?

 4          Q     Did he respond?

 5          A     He might have responded like he thought he

 6   heard something or -- I don't remember what his response

 7   was.  But he responded, but I don't remember what he

 8   said.

 9          Q     Okay.  And what period of time did you

10   notice this conduct over?

11          A     Shortly after I got back, I would say over a

12   half hour, maybe an hour.

13          Q     Did he appear more animated?

14          A     Yes.

15          Q     Did he appear agitated?

16          A     What do you mean by "agitated"?

17          Q     Did he appear to be upset?

18          A     Yeah, he was like nervous, I would say.  He

19   appeared to be nervous.

20          Q     Did you ever tell Lucky that he was acting

21   and feeling this way because of the drugs that he took?

22          A     I don't remember.

23          Q     Do you remember telling anybody that you

24   said that?

25          A     I do remember telling somebody that I said

Greg Kelley                                    May 25, 2017

1    that.

2         Q     Who did you tell?

3         A     I believe I had told someone, the detective

4    came over or something.

5         Q     Did you review anything in preparation for

6    your deposition today?

7         A     Yes.

8         Q     What did you review?

9         A     I reviewed the --

10             MR. McBRIDE:   Wait.  Hold on.  Objection.

11             Other than anything that is protected by

12   attorney/client privilege and attorney work product, so

13   other than anything I had you create, you can go ahead

14   and answer.

15             THE WITNESS:   Okay.  I reviewed police

16   reports, the 911 call, and the detective that came the

17   following day and took our statements, took our -- talked

18   to us, and the recording that we didn't know about during

19   that time, for Loan and myself.  And very briefly a

20   medical exam report.  And pictures that we had that Brody

21   gave us for the hallway, not outside.

22   BY MR. OSTERBERG:

23        Q     Okay.  You reviewed all those things to

24   prepare for your deposition?

25        A     I wouldn't say I read them.  I scanned them.

Greg Kelley                                                  May 25, 2017

```
 1                  I was walking back through the garage, and I
 2     heard something where they were -- I came to
 3     understand -- I don't know exactly what I heard -- that
 4     he had called 911 while I was getting the car seat.
 5            Q     What did you do when you heard Lucky had
 6     called 911?
 7            A     I set the car seat down on the treadmill,
 8     the base.  And they were in there -- I could hear the
 9     person on the phone asking, you know, what's going on?
10     And I asked:  Give me the phone.
11                  And so I was handed the phone.  And I talked
12     to the 911 lady.
13            Q     Okay.  Do you remember anything you told the
14     911 operator?
15            A     I remember I wanted to tell everything.  I
16     told her that -- that Lucky had done drugs.  I told her
17     that I think that he is not -- hasn't done drugs
18     recently, but that he had -- had done them while he was
19     at Coachella, and that he was acting paranoid and we were
20     trying to get him to a hospital, and that he had called
21     911.  He called them.  And then he wanted their help.
22            Q     Okay.  Do you remember anything the
23     dispatcher said to you?
24            A     Yes.  She asked me for names, address.  She
25     asked me if there was weapons.  I said no.  And I think
```

# EXHIBIT "F"

# Background Event Chronology

CSD00163

**Event Number:  E2445548**

| Date | Time | Term | Operator | Action |
|------|------|------|----------|--------|
| 04/13/15 | 22:13:25 | ph01 | 103027 | EVENT CREATED: [LOCATION] 8538 HOLDEN RD [AREA] SANT / PROSPECT AV [RP NAME] T-MOBILE |
| | | | | (877) 653-7911 [RP ADDRESS] S/A [SOURCE] ANI/ALI [RP PHONE] (619) 372-3522 , TBPAGE: |
| | | | | 1251 , TBGRID: A1 |
| | | | | Agency= SHERIFF   Dispatch Group: SNTD   Beat: 51P ,  Status= P   Priority: 4 0 ,   Hold |
| | | | | Type= 0 ,   Current= F ,   Open Current= F   Event:  11550 - UNDER THE INFLUENCE OF DRUGS [4] |
| 04/13/15 | 22:13:25 | if01 | 103027 | COMMENT ADDED: ** LOI search completed at 04/13/15 22:13:25 |
| 04/13/15 | 22:13:25 | ph01 | 103027 | W911 32.85446400 -116.993215 ....RP ADV SOMEONE TRYING TO KILL HIM ... NOW HAVE ANOTHER MALE SAYING ORIGINAL RP IS 115 ON DRUGS |
| 04/13/15 | 22:13:37 | ph01 | 103027 | EVENT UPDATED: [LOCATION] 8538 HOLDEN RD [AREA] SANT / PROSPECT AV [RP NAME] LUCKY [RP |
| | | | | ADDRESS] S/A [SOURCE] ANI/ALI [RP PHONE] (619) 372-3522 , TBPAGE: 1251 , TBGRID: A1 |
| | | | | Agency= SHERIFF   Dispatch Group: SNTD   Beat: 51P ,  Status= A   Priority: 4 0 ,   Hold |
| | | | | Type= 0 ,   Current= F ,   Open Current= F   Event:  11550 - UNDER THE INFLUENCE OF DRUGS [4] |
| 04/13/15 | 22:13:40 | ph01 | 103027 | COMMENT ADDED: . |
| 04/13/15 | 22:14:12 | sntd | 105103 | [UNIT]  51P7C  DP ,  Location= 8538 HOLDEN RD SANT ,   100072 |
| 04/13/15 | 22:14:17 | ph01 | 103027 | SUPP INFO CREATED: PERSO: Name: PHOUNFY,LUCKY  Race:  A  Sex:  M  Age: 33  Remarks: LAOS OR |
| | | | | THAI |
| 04/13/15 | 22:14:17 | if01 | 103027 | COMMENT ADDED: ** PER search completed at 04/13/15 22:14:17 |
| 04/13/15 | 22:14:23 | sntd | 105103 | [UNIT]  51P7C  ER ,  Location= 8538 HOLDEN RD SANT ,   100072 |
| 04/13/15 | 22:14:33 | ph01 | 103027 | COMMENT ADDED: MALE POSS HAS BEEN ON DRUGS FOR SEVERAL DAYS ..HAS NOT SLEPT FOR SEVERAL |
| | | | | DAYS |

CSD00164

| Date | Time | Term | Operator | Action |
|------|------|------|----------|--------|
| 04/13/15 | 22:14:34 | ph01 | 103027 | COMMENT ADDED: . |
| 04/13/15 | 22:14:48 | ph01 | 103027 | COMMENT ADDED: RP ADV HE IS ON COCAINE AND ACID |
| 04/13/15 | 22:15:04 | ph01 | 103027 | SUPP INFO UPDATED: PERSO: Name: PHOUNFY,LUCKY  Race: A  Sex: M  Age: 33  Remarks: LAOS OR |
| | | | | THAI, SHIRT, SHORTS |
| 04/13/15 | 22:15:04 | if01 | 103027 | COMMENT ADDED: ** PER search completed at 04/13/15 22:15:04 |
| 04/13/15 | 22:15:09 | sntd | 105103 | [UNIT] 51P3C  DP , Location= 8538 HOLDEN RD SANT ,   107127 |
| 04/13/15 | 22:15:13 | sntd | 105103 | [UNIT] 51P3C  ER , Location= 8538 HOLDEN RD SANT ,   107127 |
| 04/13/15 | 22:15:17 | sntd | 105103 | COMMENT ADDED: BC |
| 04/13/15 | 22:15:27 | ph01 | 103027 | COMMENT ADDED: 2ND RP IS GREG KELLY ADV GARAGE DOOR IS OPEN FOR DEPS ...NO WEAPONS |
| 04/13/15 | 22:15:29 | ph01 | 103027 | COMMENT ADDED: NFD |
| 04/13/15 | 22:17:33 | sntd | 105103 | COMMENT ADDED: BC |
| 04/13/15 | 22:20:51 | sntd | 105103 | [UNIT] 51P3C  ON , Location= 8538 HOLDEN RD SANT ,   107127 |
| 04/13/15 | 22:21:43 | sntd | 105103 | COMMENT ADDED: 51P3C -- 51X1 |
| 04/13/15 | 22:21:44 | sntd | 105103 | [UNIT] 51P3C  EC , 51P3C -- 51X1 , Location= 8538 HOLDEN RD SANT ,   107127 |
| 04/13/15 | 22:21:52 | $51P7C | 100072 | [UNIT] 51P7C  ON , Location= 8538 HOLDEN RD SANT ,   100072 |
| 04/13/15 | 22:24:51 | rurd | 109861 | [UNIT] A3  DP , Location= 8538 HOLDEN RD SANT ,   102303 ,   103841 |
| 04/13/15 | 22:24:51 | lead2 | 107873 | COMMENT ADDED: LEAD 10-4 |
| 04/13/15 | 22:24:53 | rurd | 109861 | [UNIT] A3  ER , Location= 8538 HOLDEN RD SANT ,   102303 ,   103841 |
| 04/13/15 | 22:24:56 | sntd | 105103 | [UNIT] 50P9C  DP , Location= 8538 HOLDEN RD SANT ,   103141 |
| 04/13/15 | 22:24:57 | srr | 100646 | [UNIT] A3  AK , Location= 8538 HOLDEN RD SANT ,   102303 ,   103841 |
| 04/13/15 | 22:25:01 | sntd | 105103 | [UNIT] 50P9C  ER , Location= 8538 HOLDEN RD SANT ,   103141 |
| 04/13/15 | 22:25:04 | sntd | 105103 | COMMENT ADDED: 51P3C -- CODE COVER |
| 04/13/15 | 22:25:05 | sntd | 105103 | [UNIT] 51P3C  EC , 51P3C -- CODE COVER , Location= 8538 HOLDEN RD SANT ,   107127 |
| 04/13/15 | 22:25:06 | lead2 | 107873 | COMMENT ADDED: CCLT ADVISED |
| 04/13/15 | 22:25:10 | supv1 | 102725 | COMMENT ADDED: CC SUP 10-4 |
| 04/13/15 | 22:25:11 | watchcommar | 101672 | COMMENT ADDED: CCLT 10-4 |
| 04/13/15 | 22:25:12 | sntd | 105103 | [UNIT] 50P5C  DP , Location= 8538 HOLDEN RD SANT ,   103003 |
| 04/13/15 | 22:25:15 | sntd | 105103 | [UNIT] 50P5C  ER , Location= 8538 HOLDEN RD SANT ,   103003 |
| 04/13/15 | 22:25:22 | srr | 100646 | COMMENT ADDED: A3 104 |
| 04/13/15 | 22:25:31 | sntd | 105103 | COMMENT ADDED: 50PSC 10-4 |
| 04/13/15 | 22:25:41 | sntd | 105103 | [UNIT] 50P7C  DP , Location= 8538 HOLDEN RD SANT ,   102820 |
| 04/13/15 | 22:25:44 | sntd | 105103 | [UNIT] 50P7C  ER , Location= 8538 HOLDEN RD SANT ,   102820 |
| 04/13/15 | 22:26:01 | sntd | 105103 | COMMENT ADDED: UNITS ER CODE ... 50PSC 10-4 |
| 04/13/15 | 22:26:24 | sntd | 105103 | [UNIT] 51P2B  DP , Location= 8538 HOLDEN RD SANT ,   107231 |
| 04/13/15 | 22:26:25 | sntd | 105103 | [UNIT] 51P2B  ER , Location= 8538 HOLDEN RD SANT ,   107231 |
| 04/13/15 | 22:26:33 | sntd | 105103 | COMMENT ADDED: 51P7C -- TASER DEPLOYMENT |

EXHIBIT "G"



## ORIGINAL TRANSCRIPT

Transcript of the Testimony of:

# Marcos Collins

K.J.P.

v.

County of San Diego

February 24, 2017

Volume I

P: 877.771.3312 | F: 877.561.5538 | litivate.com

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3

4          Case No. 15-cv-02692-H-MDD

5

6   K.J.P., a minor, and K.P.P., a      )
    minor, individually, by and        )
7   through their mother, LOAN THI      )
    MINH NGUYEN, who also sues          )
8   individually and as successor       )
    in interest to her now deceased     )
9   husband, Lucky Phounsy, and         )
    KIMBERLY NANG CHANTHAPHANH,          )
10  individually,                        )
                                         )
11                        Plaintiffs,    )
                                         )
12              vs.                       )
                                         )
13  COUNTY OF SAN DIEGO; et al.,         )
                                         )
14                        Defendants.    )
    _____)

15

16

17       VIDEOTAPED DEPOSITION OF MARCOS COLLINS

18            San Diego, California

19            February 24, 2017

20

21

22  REPORTED BY:  KATHLEEN S. McLAUGHLIN, CSR NO. 5845
                  Certified Shorthand Reporter
23                License No. 5845

24

25

Marcos Collins                                          February 24, 2017

```
 1        Q     Okay.  What did you -- so what type of

 2   priority are these calls typically?  This type of

 3   call.

 4        A     I don't know the priority number.  But it's

 5   a low to medium priority.

 6        Q     Do you recall what priority dispatch gave

 7   this specific call that night?

 8        A     No.

 9        Q     Is this the type of call that you would

10   respond lights and sirens to, though?

11        A     No.

12        Q     Did you have any specific concerns when you

13   heard this call go out?

14        A     Yeah.  I have concerns with every call we

15   get.  One of the concerns was is the male under the

16   influence.  So is it an under-the-influence call or

17   is it a 5150, possibly psychiatric call or a

18   combination thereof.

19        Q     So, when you heard this call go out, that

20   was something that was in your mind, is this a

21   controlled substance or is this a mental health

22   issue call?

23        A     Yes.

24        Q     Or potentially, I guess, it could be both;

25   right?
```

Marcos Collins                                    February 24, 2017

```
 1        Q     At any point when you were en route did you
 2   request any additional information like that from
 3   dispatch?
 4        A     No.  Typically, if there's flags like that,
 5   the dispatcher goes through, and she'll tell you on
 6   the way.  Like we've been here this many times or
 7   officer safety issues, she will tell you on the way
 8   there.
 9        Q     All right.
10              So you got there, and you parked.  Did you
11   get out of your car to wait for backup?
12        A     Yes.
13        Q     And where did you wait?
14        A     I think I waited by my car.  Maybe the
15   house over.
16        Q     Were you contacted by any of the family
17   members while you were waiting for your backup?
18        A     I don't remember if Deputy Krull was there
19   when we contacted a male or the male contacted me
20   before her arrival.  I'm not sure.
21        Q     Did you have a conversation with this male?
22        A     Yes.
23        Q     Did he start talking to you or did you
24   start asking questions of him?
25        A     I'm not sure who went first.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Marcos Collins                                              February 24, 2017

1        Q     What do you recall being discussed between
2    you and this male?
3        A     Something to the effect that a family
4    member of his had come back from a concert in the
5    desert, Coachella, and that he was paranoid that
6    people were out to kill him.  That wasn't the case.
7    And that he was high on acid and cocaine.
8        Q     Do you recall anything else?
9        A     No.
10       Q     Did you ask this man if Mr. Phounsy, the
11   individual you were there to contact, had any
12   weapons?
13       A     I don't recall that.
14       Q     Is that information that would be helpful
15   for you in -- to know before entering the residence
16   to contact him?
17       A     Definitely.
18       Q     Why?
19       A     Because if we're going into a place where
20   there's weapons, we're definitely gonna, you know,
21   be careful on our approach.  Maybe call the person
22   out to us.  Wait for more units.
23       Q     Did you hear Deputy Krull ask this male
24   whether or not Mr. Phounsy had any weapons?
25       A     I didn't hear that.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Marcos Collins                                    February 24, 2017

```
 1   remember what day of the week it was.  But I think
 2   it was -- he left from this concert and then went
 3   directly from there to this birthday party.
 4       Q    Is that what this individual told you, or
 5   that's just what your general -- in your mind's eye
 6   what happened?
 7       A    I don't remember if somebody told me that
 8   or I found that out after the fact.  I don't
 9   remember.
10       Q    Did you ask this individual any questions
11   regarding the controlled substances Lucky had
12   allegedly used, how much, when, et cetera?
13       A    No.  He volunteered that information to us.
14   He just said, "I think he took this stuff at this
15   concert, Coachella."  And I didn't ask him how much
16   he took.  Just . . .
17       Q    You didn't ask him specifically which day
18   he had taken these drugs?
19       A    No.
20       Q    Did Deputy Krull?
21       A    I'm not sure.
22       Q    Was that information that was important to
23   you in your role in responding to this?
24       A    Yes.
25       Q    How come you didn't ask him for it, then?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

# EXHIBIT "H"



## ORIGINAL TRANSCRIPT

Transcript of the Testimony of:

# Janae Krull

K.J.P.

v.

County of San Diego

February 23, 2017

Volume I

```
 1                UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF CALIFORNIA

 3

 4               Case No. 15-cv-02692-H-MDD

 5

 6   K.J.P., a minor, and K.P.P., a    )
     minor, individually, by and      )
 7   through their mother, LOAN THI    )
     MINH NGUYEN, who also sues        )
 8   individually and as successor     )
     in interest to her now deceased   )
 9   husband, Lucky Phounsy, and       )
     KIMBERLY NANG CHANTHAPHANH,       )
10   individually,                     )
                                       )
11                      Plaintiffs,    )
                                       )
12             vs.                     )
                                       )
13   COUNTY OF SAN DIEGO; et al.,      )
                                       )
14                      Defendants.    )
     _____)
15

16

17        VIDEOTAPED DEPOSITION OF JANAE KRULL

18             San Diego, California

19             February 23, 2017

20

21

22   REPORTED BY:  KATHLEEN S. McLAUGHLIN, CSR NO. 5845
                   Certified Shorthand Reporter
23                 License No. 5845

24

25
```

Page 1

Janae Krull                                      February 23, 2017

1      Q      All right.  Do you mind?  Thank you.

2             Do you recall the comments of the call, at

3      least as it came out over the radio?

4      A      Over the radio, to my recollection, an

5      individual had called 911 because he was having a

6      bad reaction to drugs taken, and he was paranoid,

7      felt someone was coming to get him.

8      Q      Okay.  So was it a -- like a mental health

9      evaluation call, or was it a crime in progress?  How

10     would you characterize a call like that?

11     A      It's very hard to tell.  Through my

12     training and experience, we receive many calls that

13     sound like it's going to be pertaining to one issue,

14     and we get there, it's completely different.

15            So it's -- on the way it could have -- it

16     went through my mind that it could be a medical

17     emergency, it could be something assaultive, it

18     could be a drug-induced.  There were multiple things

19     it could have been.

20     Q      Okay.  Of course, you never really know

21     until you get there.

22     A      Correct.

23     Q      I appreciate that.

24            But at the time you got the actual call,

25     what were you thinking regarding the nature of this

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Janae Krull                                    February 23, 2017

```
 1   was 97 or on scene.
 2      Q     And how soon before you arrived, based on
 3   your recollection, did Deputy Collins let you know
 4   he was 10-97?
 5      A     Based on my recollection at the moment, one
 6   to two minutes.
 7      Q     Before you arrived?
 8      A     To my knowledge, yes.
 9      Q     So for that approximate five minutes
10   before, is there any reason you couldn't have looked
11   up this additional information?
12      A     If we waited outside while there was
13   possibly a medical emergency going on inside, yes.
14      Q     Okay.
15      So how long did the conversation last with
16   this gentleman in the driveway, at least insofar as
17   you were present for it?
18      A     They were talking when I pulled up.  They
19   were talking while I walked to the driveway, and I
20   heard approximately a minute of the conversation as
21   we were walking to the door.
22      Q     All right.  So at this point you're walking
23   towards the house?
24      A     Correct.
25      Q     So at that point state every fact known to
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Janae Krull                                              February 23, 2017

1    you regarding Mr. Phounsy.

2         A    Asian male adult.  Paranoid.  Bad reaction

3    to drugs.  Believed somebody was there to harm him

4    and his family.

5              Wanted to go to the hospital but wouldn't

6    go.  Still inside the residence.  Unknown location

7    within the residence.  And that's what I knew going

8    in.

9         Q    Can you think of anything else?

10        A    Not right now, no.

11        Q    Did you later identify the individual that

12   you were talking to out in front of the house as

13   Greg Kelly?

14        A    Yes.

15        Q    Mr. Kelly, he didn't tell you that

16   Mr. Phounsy was standing in the hallway next to the

17   bedroom by his wife?

18        A    I did not hear that information.

19        Q    All right.  So, prior to walking into the

20   house, did you have any reason to believe that

21   Mr. Phounsy was armed with a weapon?

22        A    No.

23        Q    Not a single, specific and articulable fact

24   that he was armed with a weapon?

25        A    No.

EXHIBIT "I"

| Date/Time: 4/14/2015 2:00 pm | Date of Birth: 07/31/1982 | Information Source if not Patient: LOAN NGUYEN |
|---|---|---|

Patient Name: Lucky Phounsy    Preferred to be Called:

Any impairments to written/oral communication: ☑ None ☐ Vision ☐ Hearing ☐ Speech ☐ Cognition ☐ Other

Do You Speak and Understand English? ☐ No ☑ Yes    Do You Need an Interpreter? ☑ No ☐ Yes

Interpreter: ☐ Offered ☐ Refused ☐ Patient request family/friend as interpreter
☐ Unable to provide appropriate interpreter    Name of Interpreter, if needed

What is your preferred language for oral communication? ENGLISH
What is the preferred language for written communication? ENGLISH

Do you have a support person/care partner that could help you in the care-decision making? LOAN NGUYEN | Relationship: WIFE | Phone: 858 3424088

Do you wish to have a family member or representative notified of your admission?
☐ Family member/representative is already aware of admission    ☐ No
☐ Yes, notify the following    ☐ Unable to complete due to clinical condition

Name:    Relationship:    Number:

What is the preferred language for oral communication of your support person/care partner? ENGLISH
What is the preferred language for written communication of your support person/care partner? ENGLISH

Why are you in the hospital?

How can we provide "very good" care for you during your hospital visit?

Do you have any special requests regarding visitors? (Describe)

**REQUIRED**    Height: ~~5'5~~ 5'8    Stated Weight: 175    Weight:

**Infectious Disease Screening**

| ☑ No ☐ Yes | Have you, or anyone with whom you have close contact, traveled within the last 21 days? |
|---|---|
| ☑ No ☐ Yes | Did location of this recent travel include: Liberia, Guinea or Sierra Leone?  Describe: |
| ☐ No ☐ Yes | Do you have any of the following symptoms: ☐ Fever ☐ Adominal Pain ☐ Bleeding ☐ Chills ☐ Diarrhea ☐ Fatigue  Headache ☐ Muscle Pain ☐ Vomiting ☐ Weakness/Numbness |

**Allergies**

| ☑ No ☐ Yes | Are you ALLERGIC to ☐LATEX ☐RUBBER ☐IODINE ☐X-RAY DYE ☐SHELLFISH ☐TAPE? (Reaction) |
|---|---|
| ☑ No ☐ Yes | Do you have an Allergy/sensitivity to sulfites (food & drug preservatives) or any FOOD ALLERGY? (Type /Reaction) |
| ☑ No ☐ Yes | Do you have any MEDICATION ALLERGIES? (please list on Medication/Allergy form) |

**Personal Preferences/Needs Screening, if "yes", please describe**

| ☐ No ☐ Yes | Do you have religious/cultural preferences that will affect your care? |
|---|---|
| ☐ No ☐ Yes | Do you request a spiritual advisor? |

**SHARP.**    **ACUTE PATIENT INTAKE**

PATIENT IDENTIFICATION

(82664727) 04/14/2015
PHOUNSY,LUCKY  07/31/1982
00-93-04-24 IPE AGE: 32  M
ATT: POKALA,SATHYA P
PCP: UNKNOWN PCP
102-306-995

RN Signature

Date/Time

001900

Would you accept blood or blood products?
- ☑ Yes. I would accept blood or blood products.
- ☐ Yes. I would accept blood or blood products with conditions. Please Describe:

- ☐ No, I would not accept blood or blood products.

| ☑No ☐ Yes | Do you have an Advanced Directive (Living Will, POLST form, etc.)? If YES: Who will be bringing your form to place on the chart? If NO: Would you like information about this? |
|---|---|
| ☑No ☐ Yes | Would you like to participate in the Open Medical Record Program? (may not available at all facilities) |
| ☑No ☐ Yes | Do you use or are you interested in Integrative Therapies during this hospitalization? (Reiki, Acupuncture, Massage, etc). Integrative therapies may not be available at all facilities. |

**Nutrition/Speech Screening, if "yes", please describe**

| ☑ No ☐ Yes | Do you have any food preferences/special diet needs that need to be part of your care? |
|---|---|
| ☑ No ☐ Yes | Have you been eating less than half your usual meals during the last week? (other than a Doctor's order to not eat) |
| ☑No ☐ Yes | Do you have difficulty eating, or do you cough or choke while swallowing food or liquids? |
| ☑ No ☐ Yes | Do you have a new problem with understanding, communicating or talking? |

**Functional Screening, if "yes" please describe**

| ☑ No ☐ Yes | Have you had a recent change in your ability to walk, or get out of bed/chair? |
|---|---|
| ☑ No ☐ Yes | Have you had a recent decrease in your ability to do your self care activities? (washing, grooming, dressing, etc.) |
| ☑ No ☐ Yes | Do you follow a bowel program at home? ☐ Meds  ☐ Diet  ☐ Rehab  Date of last BM |
| ☑ No ☐ Yes | Do you have chronic pain? (Pain lasting 6 months or more) If yes, answer additional questions: |

| Origin/Cause of Pain: | Location: | Duration: |
|---|---|---|
| **Pain Intensity (Pain Scale 0-10)**  Acceptable Level=   Current=   At Worst=   At Best= | | |
| What makes the pain worse? | | |
| What makes the pain better? | | |
| What are the effects of the pain? | | |
| Is current pain regimen effective? | | |

**Personal Safety Screening, if "yes", please describe**

| ☑No ☐ Yes | Are you in a relationship in which you have been hurt, threatened or scared? |
|---|---|
| **Smoking Status:** | Are you a: ☐ Current every day smoker ☐ Current some day smoker ☐ Former smoker  ☑ Never smoked  ☐ Smoker, current status unknown  ☐ Unknown if ever smoked  ☐ Light tobacco smoker  ☐ Heavy tobacco smoker |
| ☑ No ☐ Yes | Have you smoked cigarettes within the last 12 months?  ☐ Unknown/unable to obtain  Began?          Last used? |
| ☑No ☐ Yes | Do you currently have an Intravenous Device (PICC line, Midline or Port) or any other implanted device or pump in your chest, neck, abdomen or arm? ( Insulin pump, Pain pump, etc ) |
| ☑No ☐ Yes | Do you currently have Home Health Services visiting you?  Agency Name: |

# SHARP.   ACUTE PATIENT INTAKE

PATIENT IDENTIFICATION
(82664727) 04/14/2015
PHOUNSY,LUCKY  07/31/1982
00-93-04-24 IPE AGE: 32  M
ATT: POKALA,SATHYA P
PCP: UNKNOWN PCP
102-306-995

001901

| Personal Safety Screening, if "yes", please describe (continued) | |
|---|---|
| ☑ No ☐ Yes | Do you live anywhere other than a private residence?<br>☐ Board & Care  ☐ Family & Friends  ☐ Homeless  ☐ Residential Treatment Center  ☐ Shelter<br>☐ Other: |

| Communicable Diseases Screening   if "yes" please describe | |
|---|---|
| ☑ No ☐ Yes | Do you have a history of communicable disease :<br>☐ None ☐ C-Difficile ☐ CMV ☐ ESBL ☐ HIV ☐ KPC ☐ MRSA ☐ VRE<br>☐ Chicken pox (in last 3 weeks) ☐ Whooping cough ☐ OTHER |
| ☑ No ☐ Yes | Have you had a cough greater than 3 weeks duration and do you currently have recent unexplained weight loss, bloody sputum, night sweats or fever? **If "yes", please specify below: Or if pregnant with no prenatal care please specify:** ☐ Bloody sputum  ☐ History of exposure to TB  ☐ Cough ☐ History of positive TB skin test ☐ History of positive chest x-ray for TB ☐ Treated for TB |

| Pregnant/Breastfeeding | |
|---|---|
| ☑ No ☐ Yes | Women: Are you currently/possibly pregnant? |
| ☑ No ☐ Yes | Women: Are you currently breastfeeding? |

| Historical Immunizations | |
|---|---|
| ☐ No ☑ Yes | Have you had the Influenza vaccine in this flu season?          Date: Jun 05 |
| ☐ No ☐ Yes | Have you had the Pneumonia vaccine in the last 5 years?          Date: |

| Psycho-Social Screening   if "yes" please describe | |
|---|---|
| ☑ No ☐ Yes | Have you been in counseling and/or taking medication for treatment of mental illness in the last 2 years? |
| ☑ No ☐ Yes | Have you had suicidal thoughts, and/or attempts, in the last 2 years? |
| ☐ No ☑ Yes | Have you abused or been in treatment for substance dependence (alcohol, street drugs, and prescriptions) in the last 3 years? |

| Describe Substance Abuse: | |
|---|---|
| Alcohol use history: | ☐ None ☑ Current ☐ Past  ☐ Other: |
| Alcohol type: | ☐ Beer ☑ Liquor  ☐ Wine  ☐ Other: |
| Alcohol use frequency: | ☑ Binge drinking  ☐ Daily  ☐ Weekly ☐ Monthly  ☐ Occasionally ☐ Other: |
| Alcohol use amount: | |
| Alcohol last used: | |
| Alcohol use notes: | |

| Describe Drug Use: | | | |
|---|---|---|---|
| Drug use history: | ☐ None ☑ Current  ☐ Past  ☐ Other: | | |
| Drug use type: | ☐ Amphetamines | ☐ Anti-Depressants | ☐ Anti Psychotics | ☐ Benzodiazepines |
| | ☑ Cocaine | ☐ Cough Syrups | ☐ Ecstasy | ☐ Hallucinogens |
| | ☐ Heroin | ☐ Inhalants (Glues/Solvents/Aerosols) | | ☐ Ketamine |
| | ☑ LSD | ☑ Marijuana  . | ☐ Methamphetamines | ☐ Muscle Relaxants |
| | ☐ Narcotics | ☐ Opiates | ☐ PCP | ☐ Sedatives |
| | ☑ Sleeping Aids | ☑ Stimulants | | |
| | ☐ Other: | | | |

**SHARP.**   **ACUTE PATIENT INTAKE**

PATIENT IDENTIFICATION<br>(82664727) 04/14/2015<br>PHOUNSY,LUCKY  07/31/1982<br>00-93-04-24 IPE AGE: 32  M<br>ATT: POKALA,SATHYA P<br>PCP: UNKNOWN PCP<br>102-306-995

001902

# EXHIBIT "J"



Transcript of the Testimony of:

# Richard Joseph Geller, M.D.

K.J.P.

v.

County of San Diego

July 20, 2017

Volume I

```
 1                   UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF CALIFORNIA

 3

 4                   Case No. 15-cv-02692-H-MDD

 5

 6   K.J.P., a minor, and K.P.P., a   )
     minor, individually, by and      )
 7   through their mother, LOAN THI   )
     MINH NGUYEN, who also sues       )
 8   individually and as successor    )
     in interest to her now deceased  )
 9   husband, Lucky Phounsy, and      )
     KIMBERLY NANG CHANTHAPHANH,      )
10   individually,                    )
                                      )
11                       Plaintiffs,  )
                                      )
12            vs.                     )
                                      )
13   COUNTY OF SAN DIEGO; et al.,     )
                                      )
14                       Defendants.  )
     _____ )
15

16

17      VIDEOTAPED DEPOSITION OF RICHARD JOSEPH GELLER, M.D.

18                    San Diego, California

19                       July 20, 2017

20

21

22

23

24   REPORTED BY:  KATHLEEN S. McLAUGHLIN, CSR NO. 5845
                   Certified Shorthand Reporter
25                 License No. 5845
```

1  belong.

2        If I ask a question and you don't agree with

3  the premise of the question or it's just not formulated

4  in a way that you think you can give an accurate answer,

5  please let me know and I'll back up, I'll try to correct

6  it, because our objective here today is to get a clean

7  record of your testimony and what you mean to say.

8        When were you first retained on this case, do

9  you recall?

10     A    Approximately July of 2016.

11     Q    So it's been just about a full year?

12     A    Approximately, yes.

13     Q    Okay.  And are you testifying, in your mind, as

14  an expert in toxicology?

15     A    I'm -- yes, I'm both a medical toxicologist and

16  a forensic toxicologist.

17     Q    And can you just explain what a toxicologist

18  is?

19     A    A toxicologist is a very, very broad term which

20  denotes someone with expertise somewhere along the line

21  in poisoning, either clinical expertise or laboratory

22  expertise.

23        A medical toxicologist is an expert in the

24  diagnosis and treatment of poisoned patients.  I am an

25  internist and emergency physician, and I'm board

1           But you're saying that just based on his

2     behavior -- and we know what his behavior was.  There

3     was some dispute about it, but a lot of it's agreed --

4     on Monday night that you attribute that behavior as

5     virtually certain to be the result of his recent

6     ingestion of bath salts?

7        A     My opinion is not based simply on his behavior

8     that night.

9        Q     Well, your explanation for his behavior that

10    night, his cognitive break that we all agree happened,

11    is that it virtually certainly was due to the fact that,

12    unbeknownst to anybody, or anybody who will admit it, he

13    consumed bath salts on Monday, April 13th; correct?

14       A     I never use the phrase virtually certain.  I am

15    saying --

16       Q     Okay.  Your term.  Your term is -- it's here.

17    To a high degree of medical probability.

18       A     That's different than certainty.

19       Q     Okay.  So we'll use that term.

20             So you're saying that based on his behavior on

21    the 13th the -- the evening of the 13th as well as the

22    clinical findings on autopsy that to a high degree of

23    medical probability Mr. Phounsy apparently, unbeknownst

24    to his family and the people around him, consumed bath

25    salts, and that's why he went into this altered state of

1  consciousness.

2        MS. PARADIS:  Objection.  May misstate his

3  prior testimony.

4        MR. OSTERBERG:  Objection.  Misstates prior

5  testimony.  Overly broad.

6        THE WITNESS:  On the basis of the sum total of

7  information that was presented to me in this case, his

8  previous history, the pathology on his autopsy, going to

9  a concert where drug use was rampant, and the

10 opportunity to buy bath salts was there and, most

11 importantly, his behavior on the evening of the 13th

12 after a relatively lucid interval during the earlier

13 part of the day on the 13th, I believe -- it is my

14 opinion as a medical toxicologist to a reasonably high

15 degree of medical probability, well exceeding

16 50 percent, that his -- that he was under the influence

17 of a sympathomimetic drug not detectable by the San

18 Diego County Medical Examiner.

19 BY MR. BURTON:

20    Q    And is your -- is that an exhaustive list of

21 all the reasons you have?  I mean, you listed a bunch of

22 reasons.  I just want to make sure that you've listed

23 all your reasons.

24    A    I believe it is.  I was trying to give you the

25 whole picture in one answer.

# EXHIBIT "K"

*Send Orders for Reprints to reprints@benthamscience.ae*

12                                                     *Current Neuropharmacology, 2015, 13,* 12-20

# Synthetic Cathinones: A New Public Health Problem

Laurent Karila[1,*], Bruno Megarbane[2-5], Olivier Cottencin[6] and Michel Lejoyeux[7]

[1]*Addiction Research and Treatment Center, Paul Brousse Hospital, Paris-Sud University, Villejuif 94800, France; CEA-INSERM, Orsay, France;* [2]*Inserm, U1144, Paris, F-75006, France;* [3]*Paris-Descartes University, UMR-S 1144, Paris, F-75006, France;* [4]*Paris-Diderot University, UMR-S 1144, Paris, F-75013, France;* [5]*Department of Medical and Toxicological Critical Care, Lariboisière Hospital, Paris-Diderot University, 75010 Paris, France;* [6]*Department of Psychiatry and Addictology, CHRU Lille, France;* [7]*Department of Psychiatry and Addictology, Bichat Hospital, Paris-Diderot University, Paris, France*



Laurent Karila

**Abstract:** New psychoactive substances (NPS) have completely modified the drug scene and the current landscape of addiction. Synthetic substances, such as substituted or synthetic cathinones, also known as « legal highs », are often produced and used to mimic the effects of controlled drugs such as cocaine, methylenedioxymethamphetamine (MDMA, ecstasy), and methamphetamine. The overwhelming majority of synthetic cathinones are produced in China and South East Asian countries. The *Internet* has emerged as the new marketplace for NPS, playing a major role in providing information on acquisition, synthesis, extraction, identification, and substance use. All these compounds are intentionally mislabeled and sold on-line under slang terms such as bath salts, plant food, plant feeders and research chemicals. They are sometimes labeled « not for human use » or « not tested for hazards or toxicity ». The rapid spread of NPS forces member countries of the European Union to adapt their response to the potential new dangers that may cause. To date, not only health actors but also the general public need to be clearly informed and aware of dangers resulting from NPS spread and use. Here, we review the major clinical effects of synthetic cathinones to highlight their impact on public health. A literature search was conducted from 2009 to 2014 based on PubMed, Google Scholar, Erowid, and governmental websites, using the following keywords alone or in combination: "new psychoactive substances", "synthetic cathinones", "substituted cathinones", "mephedrone", "methylone", "MDPV", "4-MEC", "addiction", and "substance use disorder".

**Keywords:** Addiction, MDPV, 4-MEC, mephedrone, methylone, new psychoactive substances, substance use disorder, substituted cathinones, synthetic cathinones,

## INTRODUCTION

New psychoactive substances (NPS) have completely modified the drug scene and the current landscape of addiction [1]. Synthetic substances, such as substituted or synthetic cathinones, also known as « legal highs », are a group of β-ketone amphetamine compounds derived from cathinone, the active stimulant in the khat plant. These drugs, still not controlled by international laws, are often produced and used to mimic the effects of controlled drugs such as cocaine, methylenedioxymethamphetamine (MDMA, ecstasy), and methamphetamine. NPS can appear on the market either under the guise of a controlled drug or as an alternative to a controlled drug [2]. In this way, 4-methylamphetamine was sold directly on the illicit drug market as amphetamine.

Synthetic cathinones and synthetic cannabinoids represent more than two thirds of the NPS available in this new drug market. The overwhelming majority of synthetic cathinones is produced in China and South East Asian countries (3). Mephedrone (4-methylmethcathinone), methylone (3,4-methylenedioxymethcathinone), 3,4-methylenedioxypyrovalerone (MDPV), methylethcathinone (4-MEC), 3-fluoromethcathinone (3-FMC), 4-fluoromethcathinone (4-FMC), buphedrone (alpha-methylamino-butyrophenone), butylone (beta-keto-N-methyl-3,4-benzodioxyolybutanamine), methedrone (4-methoxymethcathinone), pentedrone (α-methylaminovalerophenone) and naphyrone (naphthylpyrovalerone) are some of the most well-known synthetic cathinones (Table **1**) [4].

The Drug Enforcement Administration (DEA) has noted that the terminology of synthetic cathinones tends to have a glamorous aura including « Meow Meow », « Bliss », « Energy-1 », « Hurricane Charlie », « White rush », « Bloom », « Blue magic », « Blue silk », « Cloud 9 », « Cloud 10 », « Mind Candy », « Rocket Fuel », « Sextasy », and « Torpedo ». All these compounds are intentionally mislabeled and sold on-line under slang terms such as bath salts, plant food, plant feeders and research chemicals. They are sometimes labeled « not for human use » or « not tested for hazards or toxicity » [3]. Their street price in the US is approximately $25–35 per half gram package, while in Europe prices range between 18 and 25 € per gram [1].

Constant modification of the chemical structure by covert laboratories allows manufacturers to stay one step ahead of the legal process. The *Internet* has emerged as the new marketplace for NPS, playing a major role in providing

*Address correspondence to this author at the Addiction Research and Treatment Center, Paul Brousse Hospital, 12 avenue Paul Vaillant Couturier, Villejuif 94800, France; Tel: 33 1 45596513;
E-mail: Laurent.karila@pbr.aphp.fr

1570-159X/15 $58.00+.00                                                     ©2015 Bentham Science Publishers

**Table 2.**   Classification of the different cathinones according to their relative potential of monoamine reuptake inhibition and release, in comparison to methylenedioxymethamphetamine (MDMA), methamphetamine, and cocaine.

| | Monamine Reuptake Inhibition | | | Monoamine Release | | |
|---|---|---|---|---|---|---|
| | Dopamine | Norepinephrine | Serotonine | Dopamine | Norepinephrine | Serotonine |
| **MDMA-like cathinones** | | | | | | |
| Mephedrone | +++ | +++ | ++ | ++ | ++ | ++ |
| Methylone | +++ | +++ | ++ | ++ | ++ | ++ |
| **Methamphetamine-like cathinones** | | | | | | |
| Cathinone | ++ | +++ | + | +++ | +++ | - |
| Methcathinone | ++ | +++ | + | +++ | +++ | - |
| **Cocaine-like cathinones** | | | | | | |
| Pyrovalerone | ++ | +++ | ++ | - | - | - |
| MDPV | ++ | +++ | ++ | - | - | - |

Drug discriminative studies represent an effective model to investigate subjective drug effects in humans. Mice reliably discriminate MDPV from saline and cumulative doses of MDPV, MDMA and methamphetamine fully substituted for MDPV training stimulus [45]. In rats, MDPV, methylone, mephedrone, naphyrone, and butylone can fully substitute for the discriminative stimulus effects of cocaine and methamphetamine. Mephedrone effects are comparable to those of MDMA, cocaine and methamphetamine.

Acquisition of self-administration with MDPV is obtained with a greater potency and efficacy than with methamphetamine [46]. Escalation of intake is also observed at higher rather than lower MDPV doses [47]. These data highly suggest that MDPV may possess a unique reinforcing profile among psychostimulants.

## CLINICAL TOXICOLOGY

### General Data on Toxicity

Synthetic cathinone causes amphetamine-like psychoactive and sympathomimetic effects. They are mainly used for social and economic reasons in addition to their stimulant properties, often serving as replacement for others illicit stimulant drugs [37]. Psychotropic effects of substituted cathinones are individual-, dose- and route of administration-dependent [34]. The primary effects sought by users include increased alertness, empathy, euphoria, openness in communication, talkativeness, intensification of sensory experiences, music sensitivity, reduced appetite, insomnia, sexual performance, increased sociability and capacity to work [38].

Users report a number of negative physical and psychiatric effects associated with synthetic cathinones [3]. The main NPS adverse effects are summarized in Table 3. Cardiac, psychiatric, and neurological adverse effects are the most common reported ones requiring medical care. NPS use may lead to violence, homicidal combative behavior, self-mutilation, coma, and death [39]. Acute toxicity is the

leading cause of NPS-induced fatalities. However, concomitant synthetic cathinones and other drugs use have been reported in numerous fatalities, limiting any definitive conclusion regarding their implication in the onset of death.

In 2012, 2.5% of telephone enquiries to the UK National Poisons Information Service and 2.4% of enquiries to US poisons centres are related to recreational drugs [50]. The retrospective telephone call data obtained from the UK Poisons information service showed that 28% of the presumed NPS-intoxicated persons presented agitation [29]. Interestingly, agitation is the most common symptom reported in the retrospective review of self-reported exposures in the Scottish emergency department (prevalence: 26%) [51], in the retrospective study from two US Poison centers (prevalence: 82%) [52], as well as in the prospective US series (prevalence: 66%) [53]. Detailed physical examination at the bedside allows recognizing the sympathomimetic toxidrome including psychosis, significant tachycardia, hypertension, and seizures. Signs attributed to serotonin toxicity are also not rare. Cardiovascular complications are commonly reported including chest pain, palpitation, and collapse. The majority of cathinon-exposed patients is tachycardic with increased systolic and diastolic blood pressure. Cases of cathinone-induced hyponatremia have been reported, questioning the possibility of over hydration in the setting of drug-induced secretion of vasopressin like with MDMA [54]. In a large series of 236 patients exposed to "bath salts" and "legal highs", bought under 37 separate "brand" names in the US and identified as MDPV by gas chromatography/mass spectrometry when performed, the following clinical consequences were described: agitation (82%), combative behavior (57%), tachycardia (56%), hallucinations (40%), paranoia (36%), confusion (35%), chest pain (17%), myoclonus (19%), hypertension (17%), mydriasis (13%), CPK elevations (9%), hypokalemia (4%), and blurred vision (3%) [52].

Management of synthetic cathinone-induced toxicity is primarily supportive and may necessitate admission to the

**Table 3.    Adverse and toxic effects of synthetic cathinones.**

| Somatic Adverse Effects | Psychiatric Adverse Effects |
|---|---|
| • Cardiovascular system: tachycardia, hypovolemia, hypertension, chest pain, ST segment alterations, myocarditis, cardiac arrest<br>• Central nervous system: headache, insomnia, dizziness, seizures, tremor, confusion altered mental status, collapse, confusion, dizziness, drowsiness, dystonia, headache, hyperreflexia, myoclonus, paraesthesias<br>• Hematologic system: disseminated intravascular coagulation, thrombocytopenia, anemia<br>• Gastrointestinal and hepatic system: emesis, nausea, abdominal pain, abnormal liver function tests, liver failure<br>• Pulmonary system: Shortness of breath, tachypnea, respiratory failure and arrest, respiratory acidosis<br>• Renal system: increased serum creatinine, kidney damage, acute renal failure, hyponatremia, hyperkalemia, hyperuricemia,<br>• Musculoskeletal system: elevated creatinine kinase, rhabdomyolysis, peripheral vasoconstriction,<br>• Ophthalmic system: mydriasis, blurred vision, nystagmus<br>• ENT: Epistaxis, oral and pharyngeal effects, tongue disorder, trismus, bruxism<br>• Consequences of IV route use: vein blockage, skin erosion, local infection, abscess, scab, lump, gangrenous tissue, blood clots and large holes at overused injecting sites<br>• Others: hyperthermia, skin rash, diaphoresis, bone pain, necrotizing fasciitis, serotonin syndrome | • Agitation, aggression<br>• Anxiety, depersonalization/derealization panic attacks<br>• Anorexia<br>• Paranoia, paranoid delusion, visual and auditory hallucinations (often in the form of threatening people), psychosis<br>• Anhedonia, depression, suicidal thoughts/actions, self-harm (gunshots, self-stabbings, repeated self-mutilations) and risk behavior without evidence of psychosis or depression comorbidity<br>• Cognitive disorders : long-term cognitive impairments, disorientation to names, place and time, loosening of association<br>• Addiction, tolerance, withdrawal |

intensive care unit. Intravenous fluids, seizure-prevention measures, close monitoring and restraints are generally recommended to prevent harm to self or others [37, 55, 56]. Other key-measures include benzodiazepines to treat agitation seizures, and sympathomimetic symptoms; aggressive cooling to treat hyperthermia; water restriction or hypertonic saline to treat hyponatremia; mechanical ventilation to protect airways and treat respiratory failure; fluids and catecholamine infusion to treat shock; and dialysis to treat severe metabolic disturbances and acute renal failure. In the series from the US poison centers, patients were treated and released from the emergency department (49%), admitted to the intensive care unit (21%), admitted to the psychiatry ward (12%) and lost to follow up (12%); additionally, one fatality was reported [52].

**Specific Considerations on the Most Popular Synthetic Cathinones**

*Mephedrone*-related psychoactive effects last from 1 to 4 h and resemble those of methamphetamine, including euphoria, elevated mood, alertness, increased concentration, talkativeness, empathy, an "urge to move", pleasurable rushing, sense of being sped up, enhanced music appreciation, elevated mood, and mild sexual stimulation [40]. The higher the dose or the more prolonged the mephedrone use is and, the more severe unwanted effects appear. The first reported death related solely to mephedrone was a Swedish decedent with hyponatremia and brain edema [61]. Several additional cases were attributed to mephedrone, at least as adjunctive causative agent [62, 63].

*MDPV*-related psychoactive effects resembling those of cocaine, which lasts from 3 to 4 hours [41]. Its short duration of action leads users to consume numerous doses in succession [15], to counteract the unpleasant comedown effects. MDPV use may result in tolerance and consequently in overdose (42). Recent findings indicated that MDPV has reinforcing properties and activates brain reward circuitry, suggesting a potential for abuse and addiction in humans [43]. Patients using MDPV are prone to development of bizarre behaviors, hallucinations suicidality, and excited delirium syndrome, a condition described with phencyclidine at considerable risk for serious medical morbidity like hyperthermia, rhabdomyolysis, kidney failure and even fatality [67-69]. MDPV has been detected in up to 107 non-fatal intoxications and 99 deaths, particularly in Finland and in the UK [34, 44].

*Methylone,* a close structural analogue of MDMA and the second most popular designer drug used in 2010 and combined to mephedrone [21], is responsible for psychoactive effects resembling those of MDMA [45]. At average doses of 100 to 200 mg, effects of methylone include calmer euphoria, alertness, restlessness, strong feeling of empathy, with milder stimulation. Antidepressant effects, number of significant adverse effects and even fatalities [74] were attributed to methylone use, mainly in association with other illicit drugs.

*4-MEC,* a synthetic stimulant chemically similar to methcathinone with empathogenic effects, is marketed alone and in mixtures containing other synthetic cathinones under the names NRG-1 or NRG-2 [15]. Users report that 4-MEC

**18**  *Current Neuropharmacology,* **2015***, Vol. 13, No. 1*                                                                  *Karila et al.*

involves multiple time redosing ("boosting", "bumping"), with difficulty not redosing after using a strong dose if more 4-MEC is available when they are starting to come down. Multidrug poisoning involving 4-MEC as well as acute tolerance to this synthetic cathinone were reported [46].

*Pentedrone,* identified in 2010 as one of the varieties of bath salts throughout the US and UK. Administered by a variety of different routes including intravenously, pentedrone has stimulant effects and a number of adverse effects.

*Naphyrone,* structurally similar to mephedrone and MDPV, is genrally found in mixtures of cathinones, called NRG-1 and NRG-3, mainly including 4-fluoromethcathinone, MDPV, 3',4'-methylenedioxy-α-pyrrolidinobutyrophenone (MDPBP), 4'-methyl-α-pyrrolidinopropiophenone (4-MePPP, MPPP or MαPPP), and β-keto-methylbenzodioxolylpentanamine (pentylone, bk-methyl-K, bk-MBDP). Naphyrone's psychoactive and side-effects are thus rather difficult to distinguish from those of the other NPS present in the mixture. However, one 27-year old male who ingested 1 g of naphyrone was reported to have developed a prolonged high associated with palpitations, sweating and insomnia [77].

## CONCLUSION

In the last 8 years, NPS, including synthetic cathinones, has extensively dominated the drug scene in Europe and the US. Many drug users have switched from their traditional drugs to NPS use. Several factors have contributed to their increasing popularity including their falsely legal image, their more reasonable costs, and their distribution based on the new technologies. However, major health issues have emerged in relation to the somatic, mental, and addictive consequences of their use with persistent unknowns for the future. It is mandatory to develop clinical research and improve the management of addiction and poisonings attributed to these NPS.

## CONFLICT OF INTEREST

Dr Laurent Karila receives consulting fees from Sanofi Aventis, BMS Otsuka, Lundbeck, Gillead, Shering Plough, Eutherapie, Merck/Serono, Astra Zeneca Pharmaceuticals, Bouchara-Recordati, Jansse-Cilag, DA Pharma Pharmaceuticals.

Prof Olivier Cottencin receives consulting fees from Bouchara-Recordati, Reckitt, Lundbeck, Janssen-cilag.

Prof Michel Lejoyeux receives consulting fees from Merck/Serono, Lundbeck.

## ACKNOWLEDGEMENTS

Declared none.

## REFERENCES

[1]    E.M.C.D.D.A. European Monitoring Centre for Drugs and Drug Addiction European Drug Report 2014: Trends and developments; Publications Office of the European Union: Luxembourg, **2014**, pp. 1-80.

[2]    Karila, L. Emergency of synthetic drugs in the general landscape of addiction. *Rev. Prat.,* **2012***, 62*, 661-663. PubMed ID 22730797

[3]    Valente, M.J.; Guedes de Pinho, P.; de Lourdes Bastos, M.; Carvalho, F.; Carvalho, M. Khat and synthetic cathinones: a review. *Arch. Toxicol.,* **2014***, 88*, 15-45. DOI 10.1007/s00204-013-1163-9

[4]    Cottencin, O.; Rolland, B.; Karila, L. New designer drugs (synthetic cannabinoids and synthetic cathinones): review of literature. *Curr. Pharm. Des*., **2014***, 20*, 4106-4111. DOI: 10.2174/13816128113199990622

[5]    Karila, L.; Mégarbane B.; Chevillard, L.; Benturquia, N.; Laplanche, J.L.; Lejoyeux, M. [Nov el Psychoactive Substances: A review]. Press. Med., **2015***,* pii: S0755-4982(15)00003-2. doi: 10.1016/j.lpm.2014.09.020 (Epub a head of print].

[6]    Karila, L.; Reynaud, M. GHB and synthetic cathinones: clinical effects and potential consequences. *Drug Test Anal.,* **2011***, 3*, 552-559. DOI: 10.1002/dta.210

[7]    Randolph, S.A. Synthetic drugs: bath salts and spice. Workplace Health Saf., **2014***, 62*, 88. DOI: 10.3928/21650799-20140121-06

[8]    Deluca, P.; Davey, Z.; Corazza, O.; Di Furia, L.; Farre, M.; Flesland, L.H.; Mannonen, M.; Majava, A.; Peltoniemi, T.; Pasinetti, M.; Pezzolesi, C.; Scherbaum, N.; Siemann, H.; Skutle, A.; Torrens, M.; van der Kreeft, P.; Iversen, E.; Schifano, F. Identifying emerging trends in recreational drug use; outcomes from the Psychonaut Web Mapping Project. *Prog. Neuropsychopharmacol. Biol. Psychiatr.,* **2012***, 39*, 221-226. doi: 10.1016/j.pnpbp.2012.07.011

[9]    Wood, D.M.; Heyerdahl, F.; Yates, C.B.; Dines, A.M.; Giraudon, I.; Hovda, K.E.; Dargan, P.I. The European Drug Emergencies Network (Euro-DEN). *Clin. Toxicol. (Phila.),* **2014***, 52*, 239-241. doi:10.3109/15563650.2014.898771

[10]   Drug Enforcement Administration, Department of Justice. Schedules of controlled substances: temporary placement of three synthetic cathinones in schedule I. Final order. *Fed. Regist.,* **2011***, 76*, 65371-65375. PMID: 22016903

[11]   U.S. Drug Enforcement Administration, Office of Diversion Control. National Forensic Laboratory Information System: Midyear Report 2012. U.S. Drug Enforcement Administration. http://www.deadiversion.usdoj.gov/nflis/2012midyear.pdf [Accessed on: 4th October, 2014].

[12]   American Association of Poison Control Centers. Bath salts data. http://www.aapcc.org/alerts/bath-salts/ [Accessed on: 4th October, **2014**].

[13]   Journal Officiel de la République Française. Arrêté du 27 juillet 2012 modifiant les arrêtés du 22 février 1990 fixant la liste des substances classées comme stupéfiants et la liste des substances psychotropes.http://www.legifrance.gouv.fr/affichTexte.do?cidTexte=JORFTEXT000026246525&dateTexte=&categorieLien=id [Accessed on: 4th October, **2014**].

[14]   Karila, L.; Petit, A.; Cottencin, O.; Coscas, S.; Reynaud, M. Synthetic drugs: the new low-cost landscape of drugs. *Rev. Prat.,* **2012***, 62*, 664-666. PubMed ID: 22730798

[15]   Krikorian, A.D. Kat and its use: an historical perspective. *J. Ethnopharmacol.,* **1984***, 12*, 115-178. DOI: 10.1016/0378-8741(84)90047-3

[16]   Griffiths, P.; Lopez, D.; Sedefov, R.; Gallegos, A.; Hughes, B.; Noor, A.; Royuela, L. Khat use and monitoring drug use in Europe: The current situation and issues for the future. *J. Ethnopharmacol.,* **2010***, 132*, 578-583. doi: 10.1016/j.jep.2010.04.046

[17]   Zawilska, J.B.; Wojcieszak, J. Designer cathinones--an emerging class of novel recreational drugs. *Forensic Sci. Int.,* **2013***, 231*, 42-53. doi: 10.1016/j.forsciint.2013.04.015.

[18]   King, L.A.; Kicman, A.T. A brief history of 'new psychoactive substances'. *Drug Test Anal.,* **2011***, 3*, 401-403. DOI: 10.1002/dta.319

[19]   Sanchez, S. Sur un homologue de l'éphédrine. *Bull. Soc. Chim. Fr.,* **1929***, 45*, 284-286.

[20]   Emerson, T.; Cisek, J. Methcathinone: a Russian designer amphetamine infiltrates the rural midwest. *Ann. Emerg. Med.,* **1993***, 22*, 1897-1903. DOI: 10.1016/S0196-0644(05)80419-6

[21]   German, C.L.; Fleckenstein, A.E.; Hanson, G.R. Bath salts and synthetic cathinones: an emerging designer drug phenomenon. *Life Sci.,* **2014***, 97*, 2-8. doi: 10.1016/j.lfs.2013.07.023

[22]   Morris, H. Mephedrone: the phantom menace. Vice Magazine, [Online] **2010***,* pp. 98-100. http://www.vice.com/en_ca/read/hamilton-s-pharmacopeia-455-v17n6 [Accessed on: 4th October, **2014**].

[23]   E.M.C.D.D.A. EMCDDA and Europol step up information collection on mephedrone. http://www.emcdda.europa.eu/publications/drugnet/online/2010/69/article3 [Accessed on: 4th October, **2014**].

[24]   E.M.C.D.D.A. European Monitoring Center for Drugs and Drug Abuse: Annual report 2011: The state of the drug problem in

Drug and Alcohol Dependence 132 (2013) 1–12



Contents lists available at SciVerse ScienceDirect

# Drug and Alcohol Dependence

journal homepage: www.elsevier.com/locate/drugalcdep



## Review

# Clinical and pharmacological aspects of bath salt use: A review of the literature and case reports



Karen Miotto [a,*], Joan Striebel [a], Arthur K. Cho [b], Christine Wang [a]

[a] David Geffen School of Medicine at UCLA, Semel Institute of Neuroscience and Human Behavior, 760 Westwood Plaza, Los Angeles, CA 90095, United States
[b] UCLA Molecular & Medical Pharmacology/Environmental Health Sciences, Box 951772, 21-297 CHS, Los Angeles, CA 90095, United States

## ARTICLE INFO

*Article history:*
Received 15 December 2012
Received in revised form 26 April 2013
Accepted 20 June 2013
Available online 1 August 2013

*Keywords:*
Bath salts
Cathinone
Hallucinations
Psychosis
Stimulant
Tachycardic

## ABSTRACT

Bath salts are designer drugs with stimulant properties that are a growing medical and psychiatric concern due to their widespread availability and use. Although the chemical compounds in the mixtures referred to as "bath salts" vary, many are derivatives of cathinone, a monoamine alkaloid. Cathinones have an affinity for dopamine, serotonin, and norepinephrine synapses in the brain. Because of the strong selection for these neurotransmitters, these drugs induce stimulating effects similar to those of methamphetamines, cocaine, and 3,4-methylenedioxy-N-methylamphetamine (MDMA). Much of the emerging information about bath salts is from emergency department evaluation and treatment of severe medical and neuropsychiatric adverse outcomes. This review consists of a compilation of case reports and describes the emergent literature that illustrates the chemical composition of bath salts, patterns of use, administration methods, medical and neuropsychiatric effects, and treatments of patients with bath salt toxicity.

© 2013 Elsevier Ireland Ltd. All rights reserved.

## Contents

1. Introduction ................................................................................................. 2
2. Methods ..................................................................................................... 2
3. Results ...................................................................................................... 2
   3.1. Packaging and sales of bath salts ..................................................................... 2
   3.2. Trends in use ...................................................................................... 2
   3.3. Patterns of use of bath salts ......................................................................... 3
   3.4. Effects of bath salt use .............................................................................. 3
      3.4.1. Common characteristics ....................................................................... 3
      3.4.2. Withdrawal ................................................................................. 3
   3.5. Regulation ......................................................................................... 3
   3.6. Neurochemistry and pharmacology ................................................................... 3
      3.6.1. Chemistry .................................................................................. 3
   3.7. Animal studies ..................................................................................... 4
   3.8. Pharmacokinetics .................................................................................. 4
   3.9. Human toxicity ..................................................................................... 4
   3.10. Mortality ......................................................................................... 7
   3.11. Evaluation and treatment ........................................................................... 10
4. Conclusion .................................................................................................. 11
   Role of funding source ....................................................................................... 11
   Contributors ................................................................................................ 11
   Conflict of interest .......................................................................................... 11
      Acknowledgement ....................................................................................... 11
      References ............................................................................................. 11

* Corresponding author at: David Geffen School of Medicine at UCLA, Semel Institute of Neuroscience and Human Behavior, 760 Westwood Plaza, Box 115919, Room B8-228, Los Angeles, CA 90095, United States. Tel.: +1 310 206 2782; fax: +1 310 206 2072.
   *E-mail address:* kmiotto@mednet.ucla.edu (K. Miotto).

0376-8716/$ – see front matter © 2013 Elsevier Ireland Ltd. All rights reserved.
http://dx.doi.org/10.1016/j.drugalcdep.2013.06.016

*K. Miotto et al. / Drug and Alcohol Dependence 132 (2013) 1–12*

## 1. Introduction

Bath salts are sympathomimetic stimulants with serotonergic actions and hallucinogenic properties. The term, bath salts, refers to a group of chemicals, generally derivatives of cathinone. Cathinone is a monoamine alkaloid found in khat (*Catha edulis*), a shrub whose leaves are chewed or dried and consumed as tea for their stimulant properties in East Africa and the Arabian Peninsula. Bath salts typically contain at least one of three major synthetic cathinones: mephedrone, methylone, or methylenedioxypyrovalerone (MDPV). Other non-cathinone derived compounds identified in bath salts preparations include piperazines (Forrester, 2012).

Despite efforts to regulate sales and distribution, bath salts are available for purchase at convenience stores, gas stations, and on the Internet. The initial rise in popularity of bath salts in Europe and the United States has been attributed to their convenient availability and marketing claims that they are safe to use, as well as an overall lack of understanding of their adverse effects (Prosser and Nelson, 2012). The increase in abuse and attraction to bath salts can be attributed to the ability of users to evade detection by standard urine toxicology testing. These compounds are seen as legal substitutes that produce desirable effects similar to methamphetamine, cocaine, and 3,4-methylenedioxy-N-methylamphetamine (MDMA).

The most common emergency department presentations of bath salt users are tachycardia, diaphoresis, and hypertension. Adverse neuropsychiatric effects reported include agitation, paranoia, psychosis, and serotonin syndrome. Undesirable psychotic effects associated with bath salts illustrate the importance of a greater awareness among clinicians. This review describes pertinent information on trends in sales and use, effects, withdrawal symptoms, chemical composition, animal research data, legal regulations, medical and psychiatric toxicity, and treatment considerations for bath salt use. The most recent published case reports are also compiled to provide a review of the existing medical literature.

## 2. Methods

A systematic literature review of articles was conducted through PubMed, including articles published between January 1950 and January 2013. The search was done using the following terms: bath salt, cathinone, mephedrone, methylone, and methylenedioxypyrovalerone, in order to identify articles on patterns of use, physical and neuropsychiatric characteristics, chemical composition and pharmacology, and legal regulation of bath salts. Literature evaluated included English only retrospective studies, toxicology data, chemical analyses studies, and case reports. Case report studies regarding individual bath salt use were examined and compiled in a detailed table (Table 3). The GovTrack.us website was examined to identify any federal bills regarding chemicals in bath salts. The Drug Enforcement Administration and Federal Register websites were also searched to identify recent legislation on bath salts.

## 3. Results

The literature search resulted in a total of 428 published medical articles written in the English language relating to the key search terms (bath salt, cathinone, mephedrone, methylone, and methylenedioxypyrovalerone), with the oldest report published in 1981. 146 of these articles discussed non-human animal studies; 122 of these articles strictly pertained to the clinical characteristics of bath salts and these were tabulated for their experimental studies and study characteristics. Additionally, 11 surveys of user reports and 20 articles regarding the pharmacology and chemical composition of bath salts were included in the review. Case reports began to appear in literature in 2010; 29 case reports were identified and compiled into Table 3 with sections including patient population, administration methods, physical and neuropsychiatric characteristics, and disposition. The remaining 90 articles

were not relevant to the clinical aspects or the chemical composition of bath salts.

### 3.1. Packaging and sales of bath salts

Illicit bath salts are often sold in small appealing packages that vary in content and quantity to circumvent state and federal restrictions (El Paso Intelligence Center, 2011; National Drug Intelligence Center, 2011). The packages contain white, crystalline powder or ingestible tablets (Forrester, 2012). Unlike traditional bath salts sold as Epsom salts in large containers, illicit bath salts are often sold in small 200–500 mg quantities at elevated prices, typically 25–75 dollars per package. These drugs are sold under various trade names such as Cloud Nine, Drone, Ivory Wave, Ivory Coast, Vanilla Sky, and White Rush (McGraw, 2012). Manufacturers seeking to evade regulations label bath salts for use as an aromatic potpourri, not intended for ingestion or intranasal use. Alternative marketing strategies include bath salts sold as plant food or insect repellant, with labels stipulating "not for human consumption" (National Drug Intelligence Center, 2011). Advertisements also promote that bath salt products are safe, produce euphoria, and have sexual or energizing effects.

### 3.2. Trends in use

Bath salts data compiled by the American Association of Poison Control Centers indicated 304 human exposure calls across the country in 2010 and 6138 in 2011, representing a 2019% increase within a one-year span in the United States (American Association of Poison Control Centers, 2012). Drug Enforcement Administration (DEA) National Forensic Laboratory Information System also received an increase in reports of synthetic cathinone seizures, receiving 14 reports in 2009 from 8 states to 290 reports from 21 states in 2010 (National Drug Intelligence Center, 2011). Epidemiological data from national indicators, such as Monitoring the Future, Drug Abuse Warning Network, and Substance Abuse and Mental Health Services Administration is not yet available. However, patterns of use are being tracked on the state level by the National Institute of Drug Abuse Community Epidemiology Work Group (Forrester et al., 2011).

Similarly, in the European Union, data from the Early Warning System has reported a steady increase in the number of police and forensic cases related to synthetic cathinones (methylone and mephedrone) since 2009. Synthetic cathinone seizures analyzed by the United Kingdom (UK) Forensic Science Service increased from less than 10 reports in 2009 to 650 reports in 2010. Additionally, UK healthcare providers accessed the National Poisons Information Service's entry on mephedrone 1664 times and made 157 telephone inquiries from 2009 to 2010 (European Monitoring Centre for Drugs and Drug Addiction, 2012).

The available survey data identify users as predominantly young males (Dulaney, 2012; Forrester et al., 2011; Spiller et al., 2011; James et al., 2010; Pohjalainen and Hoppu, 2010). However, individual case reports identifies a diverse population with users ranging from teenagers to those in their 50s (National Drug Intelligence Center, 2011; Wood et al., 2010a, 2010b, 2011). The Michigan Morbidity and Mortality 2012 weekly report stated that 46% of bath salt users presenting to emergency rooms had co-morbid mental illness, and 69% had self-reported drug abuse (Center for Disease Control and Prevention, 2011). Prosser and Nelson's review (2012) demonstrated that bath salt users tended to use two or more drugs simultaneously, which was confirmed in post mortem toxicology samples with bath salts normally found in conjunction with alcohol, cocaine, tobacco, and cannabis (Prosser and Nelson, 2012; Forrester, 2012).

K. Miotto et al. / Drug and Alcohol Dependence 132 (2013) 1–12                    3

**Table 1**
Common physical and neuropsychiatric effects of bath salts.

|  | Desirable | Adverse |
|---|---|---|
| Physical | Alertness | Cerebral edema |
|  | Analgesic effects | Diaphoresis |
|  | Increased energy | Hyperreflexia |
|  | Stimulation | Hypertension |
|  |  | Hyperthermia |
|  |  | Jaw tension |
|  |  | Muscle spasms |
|  |  | Mydriasis |
|  |  | Myocardial infarction |
|  |  | Respiratory distress |
|  |  | Seizures |
|  |  | Tachycardic |
| Neuropsychiatric | Creativity | Aggression |
|  | Empathy | Agitation |
|  | Euphoria | Combative behavior |
|  | Sociability | Dysphoria |
|  | Productivity | Hallucinations |
|  | Mental clarity | Insomnia |
|  | Sexual arousal | Paranoia |
|  | Sharpened awareness | Psychosis |
|  |  | Suicidal thoughts |

References:
(1) Forrester (2012).
(2) Hadlock et al. (2011).
(3) Lusthof et al. (2011).
(4) Maskell et al. (2011).
(5) National Drug Intelligence Center (2011).
(6) Prosser and Nelson (2012).
(7) Spiller et al. (2011).
(8) Winstock et al. (2011).

### 3.3. Patterns of use of bath salts

Patterns of bath salt use vary from daily to episodic. Some users report increased tolerance or diminished euphoric response with daily usage, and others report adverse physical or psychological events that may also deter frequent use. Additional confounding factors are the varying content, concentrations, and potency of the compounds found in bath salt packages (McGraw, 2012). The most commonly reported methods of administration are intranasal and oral ingestion (Forrester, 2012). "Bombing" involves wrapping the bath salt compound in cigarette paper before ingesting the mixture. "Keying" involves insufflating powder that is applied onto a key. Other methods of administration include injection (either intravenous or intramuscular), gingival delivery, and rectal or vaginal insertion (Michigan Department of Corrections, 2012). Users will often switch between administration methods during a binge, particularly with mephedrone, due to reports of nasal irritation, nasal erosion, and dyspepsia.

The onset of psychoactive effects and duration of action differ with administration methods. Intravenous injection and nasal insufflation were reported to achieve the quickest "high" but with the shortest duration, while oral ingestion resulted in longer duration periods but required longer onset time (Prosser and Nelson, 2012). In a survey of 100 mephedrone users conducted by Winsock and colleagues, the typical pattern of use through insufflation was reported to be an average of 5.5 doses over a 10-h period with a median of 1 h between doses (Winstock et al., 2011), suggesting a shorter duration of action of mephedrone with intranasal use.

### 3.4. Effects of bath salt use

*3.4.1. Common characteristics.* Table 1 summarizes the desirable and adverse effects of bath salt use based on the medical literature and user self-reports. Some users describe an experience of intense euphoria followed by craving when the acute effects

diminish (McGraw, 2012). Table 1 identifies the characteristic physical and neuropsychiatric effects of bath salts.

*3.4.2. Withdrawal.* Bath salt binge users describe a "crash or comedown" after use that is reportedly similar to or more intense than the withdrawal from other stimulants. Winstock and colleagues (2011) surveyed mephedrone users who identified withdrawal symptoms similar to the Diagnostic and Statistical Manual of Mental Disorders (DSM) criteria for stimulant withdrawal, including insomnia, fatigue, increased appetite, and depression or dysphoria. Other commonly reported symptoms of post acute intoxication include craving, nausea, irritability, unusual sweat odor, paranoia, and fear (McGraw, 2012). Additional data is necessary in order to determine if the negative experiences described immediately post intoxication are part of the acute toxicity or more typical of a withdrawal syndrome.

### 3.5. Regulation

State, national, and international regulations are being developed to decrease sales distributions and use. Bath salts are marketed, sold, and shipped directly to distributors and users alike via the Internet, creating a challenge for international and national tracking and regulation. The first documented seizure of bath salts in the United States was in 2009. Since then, recent law enforcement data and U.S. Ports of Entry seizure data indicate that most of the synthetic cathinones are manufactured internationally in China, India, and Pakistan (National Drug Intelligence Center, 2011). In light of this growing public health concern, states began regulating bath salts beginning in early 2011. All 50 states had banned, restricted, or introduced legislation to ban the distribution, possession and/or consumption of some of the compounds by April 2011 (National Drug Intelligence Center, 2011). On October 21, 2011, mephedrone, MDPV, and methylone were temporarily placed onto Schedule I of the United States Controlled Substances Act (CSA; Drug Enforcement Administration, 2011). Through the Synthetic Drug Abuse Prevention Act of 2012, passed in June 2012, mephedrone and MDPV were added to Schedule I of the CSA (Food and Drug Administration, 2012). In October 2012, the temporary scheduling of methylone and its salts was extended until April 20, 2013 or until further decision was reached by officials (Drug Enforcement Administration, 2012). Currently, none of the synthetic cathinones are regulated by the UN Drug Control Conventions, but there are some cathinones including mephedrone and methylone, that are scheduled drugs in multiple European member states (European Monitoring Centre for Drugs and Drug Addiction, 2012).

Bath salts are still available in the US and Europe despite efforts to regulate their distribution and sales. Bath salt manufacturers evade federal regulations by frequently altering the chemical structure of their products (Schifano et al., 2011). In their analysis of stimulant products advertised as "legal highs," Shanks and colleagues have found that many of the f banned substances have been replaced by compounds that are yet to be regulated (Shanks et al., 2012).

### 3.6. Neurochemistry and pharmacology

*3.6.1. Chemistry.* Despite the popularity and extensive use of bath salts, pharmacology information on these compounds is limited. Studies have identified two general classes of chemical species in bath salt mixtures, compounds with stimulant activity related to the amphetamines, and compounds with serotonergic effects that appear to contribute to the hallucinogenic properties of these mixtures. The amphetamine related compounds are derivatives of cathinone that differ from amphetamine in the beta carbon, or the

Case 3:15-cv-02692-H-MDD   Document 281   Filed 01/25/21   PageID.8971   Page 84 of 84

service, including inpatient and outpatient psychiatric or addiction treatment units.

## 4. Conclusion

Bath salts are composed of a group of chemicals that are generally derivatives of cathinone. Cathinone is a monoamine alkaloid found in the leaves of the shrub, khat (*Catha edulis*) that is chewed for their stimulant properties. The desired effects from bath salts include euphoria, increased energy, and alertness. These chemicals are marketed as "legal" alternatives to illicit drugs like methamphetamine, cocaine, and MDMA. The popularity of bath salts has led to an increase in abuse due to widespread accessibility and ability of users to evade detection by standard urine toxicology testing.

The major chemical components found in bath salts are the three synthetic cathinone derivatives: mephedrone, methylone, and MPDV, in addition to piperazines. Mephedrone acts on dopamine and serotonin systems; its addictive properties are believed to be due to a massive spike in neurotransmitter activity coupled with a subsequent fall. Methylone and piperazines show strong selective affinity for the serotonin receptors, which produce the hallucinations that are experienced by bath salt users. MDPV also acts as a reuptake inhibitor on norepinephrine and dopamine neurotransmitters. The effects of cathinones and piperazines are expected to be shorter than those of methamphetamines due to their shorter half lives.

Despite drug labels touting safety, users suffer untoward effects from bath salt use including both physical and neuropsychiatric symptoms. In severe cases, multi-system organ failure and death can occur. More commonly, psychosis can occur with extended drug use in addition to agitation and paranoia. Data also suggests that there is a higher risk of psychosis in users with concurrent psychiatric disorders and it is not uncommon for users to develop psychotic symptoms in the intoxicated or withdrawal period. State and federal regulation of some of the compounds contained in bath salts have resulted in new analogs and a variety of chemical compositions. Manufacturers are aggressively creating and distributing replacement compounds for bath salts. The changing landscape of emerging drugs of abuse calls for further healthcare education and research.

### Role of funding source

Nothing declared.

### Contributors

Authors Miotto, Cho, Striebel, and Wang contributed to the manuscript design, writing, and editing of manuscript drafts. All authors contributed to and have approved the final manuscript.

### Conflict of interest

No conflict declared.

### Acknowledgement

We thank Lauren Fukumoto and Grace Jun who assisted with the research, preparation, and critical review of the manuscript.

## References

Adebamiro, A., Perazella, M.A., 2012. Recurrent acute kidney injury following bath salts intoxication. Am J Kidney Dis. 59, 273–275.
American Association of Poison Control Centers, Bath Salts Data. December 31, 2012, Available at https://aapcc.s3.amazonaws.com/files/library/Bath.Salts.Data.for.Website.1.09.2013.pdf, (accessed 07.22.13).
Angoa-Perez, M., Kane, M.J., Francescutti, D.M., Sykes, K.E., Shah, M.M., Mohammed, A.M., Thomas, D.M., Kuhn, D.M., 2012. Mephedrone, an abused psychoactive component of 'bath salts' and methamphetamine congener, does not cause neurotoxicity to dopamine nerve endings of the striatum. J. Neurochem. 120, 1097–1107.
Antia, U., Lee, H.S., Kydd, R.R., Tingle, M.D., Russell, B.R., 2009a. Pharmacokinetics of 'party pill' drug N-benzylpiperazine (BZP) in healthy human participants. Forensic Sci. Int. 186, 63–67.
Antia, U., Tingle, M.D., Russell, B.R., 2009b. In vivo interactions between BZP and TFMPP (party pill drugs). N. Z. Med. J. 122, 29–38.
Antonowicz, J.L., Metzger, A.K., Ramanujam, S.L., 2011. Paranoid psychosis induced by consumption of methylenedioxypyrovalerone: two cases. Gen. Hosp. Psychiatry 33, e5–e6.
Arbo, M.D., Bastos, M.L., Carmo, H.F., 2011. Piperazine compounds as drugs of abuse. Drug Alcohol Depend. 122, 174–185.
Baumann, M.H., Clark, R.D., Budzynski, A.G., Partilla, J.S., Blough, B.E., Rothman, R.B., 2005. N-substituted piperazines abused by humans mimic the molecular mechanism of 3,4-methylenedioxymethamphetamine (MDMA, or 'Ecstasy'). Neuropsychopharmacology 30, 550–560.
Benford, D.M., Goshgarian, A.M., Caplan, J.P., 2011. Bath salts abuse: neuropsychiatric effects of cathinone derivatives. Psychosomatics 52, 593–594.
Berger, M., Gray, J.A., Roth, B.L., 2009. The expanded biology of serotonin. Annu. Rev. Med. 60, 355–366.
Borek, H.A., Holstege, C.P., 2012. Hyperthermia and multiorgan failure after abuse of "bath salts" containing 3,4-methylenedioxypyrovalerone. Ann. Emerg. Med. 60, 103–105.
Boulanger-Gobeil, C., St-Onge, M., Laliberté, M., Auger, P.L., 2012. Seizures and hyponatremia related to ethcathinone and methylone poisoning. J. Med. Toxicol. 8, 59–61.
Boyer, E.W., Shannon, M., 2005. The serotonin syndrome. N. Engl. J. Med. 352, 1112–1120.
Brenneisen, R., Fisch, H.U., Koelbing, U., Geisshusler, S., Kalix, P., 1990. Amphetaminelike effects in humans of the khat alkaloid cathinone. Br. J. Clin. Pharmacol. 30, 825–828.
Center for Disease Control and Prevention, 2011. Emergency department visits after use of a drug sold as "bath salts" – Michigan, November 13, 2010–March 31, 2011. Morb. Mortal. Wkly. Rep. 60, 624–627.
Chiang, C.K., Chou, Y.H., Chen, Y.H., Sha, C.B., Liang, C.S., 2011. Aphthous ulcers associated with bupropion in a female adolescent: a case verified by rechallenge. Gen. Hosp. Psychiatry 4, 411.
Cook, C.E., Jeffcoat, A.R., Hill, J.M., Pugh, D.E., Patetta, P.K., Sadler, B.M., White, W.R., Perez-Reyes, M., 1993. Pharmacokinetics of methamphetamine self-administered to human subjects by smoking S-(+)-methamphetamine hydrochloride. Drug Metab. Dispos. 21, 717–723.
Derungs, A., Schietzel, S., Meyer, M.R., Maurer, H.H., Krähenbühl, S., Liechti, M.E., 2011. Sympathomimetic toxicity in a case of analytically confirmed recreational use of naphyrone (naphthylpyrovalerone). Clin. Toxicol. (Phila.) 691, 691–693.
Dickson, A.J., Vorce, S.P., Levine, B., Past, M.R., 2010. Multiple-drug toxicity caused by the coadministration of 4-methylmethcathinone (mephedrone) and heroin. J. Anal. Toxicol. 34, 162–168.
Drug Enforcement Administration, 2011. Schedules of controlled substances: temporary placement of three synthetic cathinones in Schedule I. Final Order. Fed. Regist. 76, 65371–65375.
Drug Enforcement Administration, 2012. Schedules of controlled substances: extension of temporary placement of methylone into schedule I of the controlled substances act. Final Order. Fed. Regist. 77, 64032–64033.
Dulaney, A.R., 2012. "Bath salts" and "plant food" products: the experience of one regional US poison center. J. Med. Toxicol. (Epub ahead of print).
Durham, M., 2011. Ivory wave: the next mephedrone? Emerg. Med. J. 28, 1059–1060.
El Paso Intelligence Center, 2011. Synthetic Stimulants Marketed as Bath Salts. March 8, 2011, Available at http://info.publicintelligence.net/EPIC-BathSalts.pdf (accessed 23.02.13).
European Monitoring Centre for Drugs and Drug Addiction, 2012. Synthetic Cathinones, Available at http://www.emcdda.europa.eu/publications/drug-profiles/synthetic-cathinones (accessed 07.03.13).
Falgiani, M., Desai, B., Ryan, M., 2012. "Bath salts" intoxication: a case report. Case Rep. Emerg. Med. 2012.
Feuchtl, A., Bagli, M., Stephan, R., Frahnert, C., Kolsch, H., Kuhn, K.U., Rao, M.L., 2004. Pharmacokinetics of m-chlorophenylpiperazine after intravenous and oral administration in healthy male volunteers: implication for the pharmacodynamic profile. Pharmacopsychiatry 37, 180–188.
Food and Drug Administration, 2012. S. 3187: Food and Drug Administration Safety and Innovation Act. US Bill HR S 112th Cong 2012. June 2012, Available at www.govtrack.us/congress/bills/112/s3187/text (accessed 23.02.13).
Forrester, M.B., 2012. Synthetic cathinone exposures reported to Texas poison centers. Am. J. Drug Alcohol Abuse 38, 609–615.
Forrester, M.B., Klenschid, K., Schwarz, E., Young, A., 2011. Synthetic cannabinoid exposures reported to Texas poison centers. J. Addict. Dis. 30, 351–358.
Gustavsson, D., Escher, C., 2009. Mephedrone – Internet drug which seems to have come and stay. Fatal cases in Sweden have drawn attention to previously unknown substance. Lakartidningen 106, 2769–2771.
Hadlock, G.C., Webb, K.M., McFadden, L.M., Chu, P.W., Ellis, J.D., Allen, S.C., Andrenyak, D.M., Vieira-Brock, P.L., German, C.L., Conrad, K.M., Hoonakker, A.J., Gibb, J.W., Wilkins, D.G., Hanson, G.R., Fleckenstein, A.E., 2011. 4-Methylmethcathinone (mephedrone): neuropharmacological effects of a designer stimulant of abuse. J. Pharmacol. Exp. Ther. 339, 530–536.