RONALD LENERT, Senior Deputy (State Bar No. 277434)
FERNANDO KISH, Senior Deputy (State Bar No. 236961)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244;  Fax: (619) 531-6005
E-mail: ronald.lenert@sdcounty.ca.gov; fernando.kish@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Dean Allen, Aaron Brooke, Sandra
Carbajal, Marcos Collins, Janae Krull, Michael Lee, Jenny Martinson, Tamani Pugh,
Jovonni Silva, and Billy Tennison


Mildred K. O'Linn (State Bar No. 159055)
Tori L.N. Bakken (State Bar No. 329069)
**MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900; Fax (213) 624-6999

Attorneys for Defendant Richard Fischer

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| K.J.P., a minor, and K.P.P., a minor, individually, by and through their mother, LOAN THI MINH NGUYEN, who also sues individually and as successor in interest to her now deceased husband, Lucky Phounsy, and KIMBERLY NANG CHANTHAPHANH, individually,<br><br>          Plaintiffs,<br><br>     v.<br><br>COUNTY OF SAN DIEGO; San Diego Sheriff WILLIAM GORE; RICHARD FISCHER; KEVIN RALPH; MARCOS COLLINS; JANAE KRULL; SANDRA (JANET) CARBAJAL; BILLY TENNISION, III; DEAN ALLEN; MICHAEL LEE; JENNY MARTINSON; TAMANI PUGH; AARON BROOKE; JOVONNI SILVA; CITY OF SANTEE; AARON BAGLEY; AARON HACKETT; AARON DO; ADAM DANIELS; DANIEL NEOW; LAKESIDE FIRE PROTECTION DISTRICT; MARC POYNTER; DAVID CSIK,<br><br>          Defendants. | No. 15cv2692-H(MDD)<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF EXCITED DELIRIUM [ECF NO. 261]**<br><br>Date:   February 8, 2021<br>Time:   10:30 a.m.<br>Dep.t.:  15A - Courtroom of the Honorable Judge Marilyn L. Huff<br><br>Trial Date:   February 23, 2021 |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................... 1

II.     ARGUMENT........................................................................................... 1

      A.     Evidence of Excited Delirium Syndrome Is Admissible Under Fed. R. Evid. 702 ........................................................................................................ 2

      B.     Excited Delirium Has Been Determined To Be The Product Of Reliable Principles And Methods. ................................................................... 2

      C.     Defendants' Experts Are Qualified To Render Opinions As To Excited Delirium Syndrome. ......................................................................... 4

      D.     The Opinions Of Defendants' Experts On Excited Delirium Syndrome Are Reliable Under Fed. R. Evid. 702 ................................................ 5

      E.     Testimony From Law Enforcement Officers And Paramedics About Excited Delirium May Be Admissible Under Fed. R. Evid. 701 And 702 .................. 9

      F.     Expert Opinions As To Excited Delirium Will Assist The Trier Of Fact. ... 10

      G.     Evidence Of Excited Delirium Is Admissible Under Fed. R. Evid 401 And 402. ......................................................................................................... 11

      H.     The Evidence Of Excited Delirium Is More Probative Than Unfairly Prejudicial And Should Not Be Excluded Under Fed. R. Evid. 403. ........... 12

III.    CONCLUSION..................................................................................... 13

15cv2692-H(MDD)

# TABLE OF AUTHORITIES

## <u>CASES</u>                                                                    Page(s)

*Affiliated FM Ins. Co. v. LTK Consulting Servs.*,
   2014 U.S. Dist. LEXIS 53211 (W.D. Wash. Apr. 16, 2014) .................................... 4-5

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
   738 F.3d 960 (9th Cir. 2013) ....................................................................... 2

*Boyd v. City & Cnty. of S.F.* ,
   576 F.3d 938 (9th Cir. 2009) ....................................................................... 2

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) .................................................................................. 10

*Ericson v. City of Phx.*,
   2016 U.S. Dist. LEXIS 152641 (D. Ariz. Nov. 2, 2016) .................................... 5

*Estate of Barnwell v. Roane Cnty.*,
   2016 U.S. Dist. LEXIS 48861 (E.D. Tenn. Apr. 12, 2016) .................................... 3, 8

*Gregory v. County of Maui*,
   523 F.3d 1103 (9th Cir. 2008) .................................................................. 3

*Hangarter v. Provident Life & Accident Ins. Co.* ,
   373 F.3d 998 (9th Cir. 2004) .................................................................. 4

*Kennedy v. Collagen Corp.*,
   161 F.3d 1226 (9th Cir. 1998) .................................................................. 11

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ................................................................................ 9

*Lass v. Cnty. of Orange*,
   2010 U.S. Dist. LEXIS 153044 (C.D. Cal. Sept. 17, 2010) .................................... 2, 10

*Mann v. Taser Int'l, Inc.*,
   588 F.3d 1291 (11th Cir. 2009) .................................................................. 4, 6

*Marquez v. City of Phx.*,
   693 F.3d 1167 (9th Cir. 2012) .................................................................. 3

*Scott v. Ross*,
   140 F.3d 1275 (9th Cir. 1998) .................................................................. 4

15cv2692-H(MDD)

*Silva v. Chung*,
  2019 U.S. Dist. LEXIS 85669 (D. Haw. May 21, 2019) ................................. 3, 4, 10

*Thomas v. Newton Int'l Enters.*,
  42 F.3d 1266 (9th Cir. 1994) ........................................................................ 4

*United States v. Garcia*,
  7 F.3d 885 (9th Cir. 1993) ............................................................................ 4

*United States v. Kenny*,
  645 F.2d 1323 (9th Cir. 1981) ..................................................................... 12

*Weigel v. Cox*,
  2010 U.S. Dist. LEXIS 161651 (D. Wyo. Mar. 18, 2010) .................................... 2-3, 6

## **RULES/STATUTES**

### **FEDERAL RULES OF EVIDENCE**

Rule 401 ....................................................................................................... 11

Rule 403 ....................................................................................................... 12

Rule 701 ....................................................................................................... 10

Rule 702 ................................................................................................. *passim*

15cv2692-H(MDD)

## I.     INTRODUCTION

The Court should deny Plaintiffs' motion in limine to exclude all evidence, testimony, and argument regarding excited delirium syndrome at the time of trial. Excited delirium syndrome is based on reliable principles and methods, and is widely accepted in the area of pathology.  Numerous federal courts have found expert testimony regarding excited delirium syndrome to be sufficiently reliable and admissible.  And Defendants' medical experts are qualified to render reliable and admissible opinions on excited delirium syndrome at trial.  Further, in addition to their observations, law enforcement officers and paramedics may also render reliable and admissible opinions on excited delirium syndrome at trial, based upon their training and experience.  Evidence of excited delirium syndrome is relevant and probative of the issues in this case- in particular Phounsy's cause of death- and is not unfairly prejudicial.

## II.     ARGUMENT

Plaintiffs not only fail to provide factual support for their arguments, they consistently mischaracterize deposition testimony.  While acknowledging that Dr. Geller is "defendants' main proposed expert on excited delirium syndrome" (Doc. No. 261, p. 2:20), nowhere do Plaintiffs ever cite to Dr. Geller's report or to his deposition testimony. Plaintiffs offer only broad mischaracterizations of the testimony of Dr. Geller (Doc. No. 261, p. 2:20-3:3, p. 4:20-21, p. 4:23-25) or of "defendants' experts".  (Doc. No. 261, p. 4:18-20, p. 4:26-27, p. 5:6-9, p. 5:18-24, p. 6:18-20).  Plaintiffs also mischaracterize this testimony of Dr. Vilke.  Plaintiffs cite to his testimony (Doc. No. 261, p. 3:3-5; p. 4:20-23) contending it constitutes Dr. Vilke's concession that Dr. Geller's opinions about Phounsy's alleged use of "bath salts" are speculative and unsupported by the evidence in this case, when the doctor's testimony does not.  (Doc. No. 261, p. 3:3-5, p. 4:20-23, citing Vilke dep. p. 148).  And Plaintiffs again mischaracterize testimony of Dr. Campman.  Plaintiffs cite to his testimony (Doc. No. 261, p. 4:6-23, p. 6:1-6, citing Campman dep. at p. 132) contending it shows that Dr. Campman never explicitly

/ / /

15cv2692-H(MDD)

concludes nor opines that Phounsy was affected by or died from excited delirium syndrome, and this is not accurate.

**A.**   **Evidence of Excited Delirium Syndrome Is Admissible Under Fed. R. Evid. 702**

"It is the trial judge's responsibility to ensure 'that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' [Citation].  In making this determination, the judge must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue.' [Citation]." *Boyd v. City and County of San Francisco*, 576 F.3d 938, 945 (9th Cir. 2009). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.,* 738 F.3d 960, 969-970 (9th Cir. 2013).

"Although '[m]any factors will bear on the inquiry,' some of the considerations considered relevant by the Supreme Court to such an assessment include: (a) whether the theory or technique can and has been tested; (b) whether the theory or technique has been subjected to peer review and publication; (c) the known or potential rate of error for the technique; and (d) the theory or technique's general degree of acceptance in the relevant scientific community. [Citation] [fn. omitted]." *Boyd, supra*, 576 F.3d at 945 (bracketed material added).

**B.**   **Excited Delirium Has Been Determined To Be The Product Of Reliable Principles And Methods.**

Contrary to Plaintiffs' assertions (Doc. No. 261, p. 5:25-6:10), "[e]xcited delirium is a 'widely accepted entity in forensic pathology.' [Citation]." *Lass v. County of Orange*, 2010 U.S. Dist. LEXIS 153044, *2 (C.D. Cal., Sept. 17, 2010).  "[E]xcited delirium is widely recognized in the area of pathology." *Weigel v Cox*, 2010 U.S. Dist. LEXIS

- 2 -

161651, *7 (D. Wyo., Mar. 18, 2010).  "The Eleventh Circuit Court of Appeals has explained that "excited delirium' is a widely accepted entity in forensic pathology and is cited by medical examiners to explain the sudden in-custody deaths of individuals who are combative and in a highly agitated state.' [Citations].  Numerous federal district courts have found expert testimony regarding Excited Delirium Syndrome to be sufficiently reliable and admissible despite *Daubert* challenges to its admissibility. [Citations]." *Silva v. Chung*, 2019 U.S. Dist. LEXIS 85669, *7 (D. Haw., May 21, 2019). "The Ninth Circuit Court of Appeals has permitted district courts to rely on expert testimony regarding Excited Delirium Syndrome in granting police officers qualified immunity in Section 1983 cases.  *Marquez v. City of Phoenix*, 693 F.3d 1167, 1171 (9th Cir. 2012); *Gregory v. Cnty. of Maui*, 523 F.3d 1103, (9th Cir. 2008)." *Silva, supra*, 2019 U.S. Dist. LEXIS 85669, *7.

Further, excited delirium syndrome "[h]as been peer reviewed in a number of publications by the American Academy of Forensic Science and other various named journals and that it has been recognized as a syndrome in the National Association of Medical Examiners, the American Academy of Forensic Sciences, and the American College of Emergency Physicians." *Estate of Barnwell v. Roane County*, 2016 U.S. Dist. LEXIS 48861, *4-5 (D. E.D. Tenn., Apr. 12, 2016).  "[T]he Court notes that several professional publications recognize excited delirium as a real syndrome." *Estate of Barnwell, supra*, 2016 U.S. Dist. LEXIS 48861, *8.

Plaintiffs assert that there is no proper foundation under Fed. R. Evid. 702 for excited delirium syndrome because "EDS is not recognized as a disorder by the American Medical Association, the American Psychiatric Association, the World Health Organization, or the Diagnostic and Statistical Manual of Mental Disorders (DSM-5)." (Doc. No. 261, p. 5:25-6:3).  This is not a sufficient basis to exclude testimony as to excited delirium syndrome.  When ruling to admit the opinion an individual had died as a result of methamphetamine-induced Excited Delirium Syndrome, a district court should not exclude such an opinion on arguments it is not a recognized medical diagnosis by the

- 3 -

15cv2692-H(MDD)

American Medical Association, American Psychiatric Association, or the World Health Organization.  *Silva, supra*, 2019 U.S. Dist. LEXIS 85669, *5-6.  Such arguments go to weight, not admissibility.  *Id*.  Specifically regarding Excited Delirium Syndrome, "the district court is not tasked with deciding whether the expert is right or wrong, just whether the testimony has substance such that it would be helpful to the jury.  *Id*. at 969." *Id*, *5-6.  "Although not a validated diagnostic entity in either the International Classification of Diseases or the Diagnostic and Statistical Manual of Mental Disorders, 'excited delirium' is a widely accepted entity in forensic pathology and is cited by medical examiners to explain the sudden in-custody deaths of individuals who are combative and in a highly agitated state."  *Mann v. Taser Int'l, Inc.,* 588 F.3d 1291, 1299, n. 4 (11th Cir. 2009).

## C.   Defendants' Experts Are Qualified To Render Opinions As To Excited Delirium Syndrome.

Contrary to Plaintiffs' assertions (Doc. No. 261, p. 6:18-20), Defendants' experts are qualified to testify as to excited delirium syndrome.  Dr. Geller and Dr. Campman are qualified to testify as medical experts in this matter on the subject of excited delirium syndrome.

"Rule 702 'contemplates a *broad conception* of expert qualifications.' [citation]. Moreover, 'the advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert.' [citation]; *see also* Fed. R. Evid. 702 advisory committee's note ('In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.')."  *Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1015 (9th Cir. 2004) (emphasis in original), citing *Thomas v. Newton Int'l Enters.,* 42 F.3d 1266, 1269 (9th Cir. 1994).  "Lack of particularized expertise goes to the weight accorded her testimony, not to the admissibility of her opinion as an expert. [citation]."  *United States v. Garcia,* 7 F.3d 885, 890 (9th Cir. 1993).  *See also Scott v. Ross,* 140 F.3d 1275, 1286 (9th Cir. 1998) and *Affiliated FM Ins. Co. v. LTK Consulting Servs.,* 2014 U.S. Dist. LEXIS

53211, *10 (W.D. Wash. Apr. 16, 2014).  Further, "[w]hile differing areas of expertise are perhaps germane to the weight and allowed scope of [the expert's] testimony, they do not bar admissibility.  [citations]."  *Ericson v. City of Phoenix*, 2016 U.S. Dist. LEXIS 152641, *13 (D. Ariz., Nov. 3, 2016).

Dr. Geller is both a medical toxicologist and forensic toxicologist (Ex. A, Geller dep, 10:13-16), and is an internist and emergency room physician who is Board Certified in medical toxicology.  (Ex. A, Geller dep., 10:24-11:1).  He has testified as an expert witness in both federal and state court.  (Ex. B, Geller Report of May 22, 2017, p. 2).

Dr. Campman is a forensic pathologist and medical doctor who performed the autopsy and opined on the cause and manner of Phounsy's death.  (Ex. C, Campman dep., 7:25-8:4; 8:14-16).  He has been a medical examiner with the County of San Diego since about 2001.  (Ex. C, Campman dep., 8:14-16, 11:11-12, 12:16-24).  Dr. Campman has been Board Certified in forensic pathology since about 1999.  (Ex. C, Campman dep., 11:18-20).  He has testified in court around 250 times.  (Ex. C, Campman dep., 8:9-13).

**D.**   **The Opinions Of Defendants' Experts On Excited Delirium Syndrome Are Reliable Under Fed. R. Evid. 702**

Contrary to Plaintiffs' assertions (Doc. No. 261, p. 6:20-23), Defendants' experts' opinions on excited delirium syndrome are reliable.

Dr. Geller testified that excited delirium is a "syndrome" (Ex. A, Geller dep., 77:4-25), a series of signs and symptoms that are reliably present from episode to episode in certain people.  (Ex. A, Geller dep., 79:18-20).  According to Dr. Geller, it has been observed time and time again by emergency physicians, by EMS personnel, and by law enforcement personnel, is almost always occurring in the context of sympathomimetic drug abuse individuals who have grossly altered mental status, confusional state, imperviousness to pain, incredible strength, sweating, sympathetic nervous system that's revved up, and often have unintelligible speech.  (Ex. A, Geller dep., 80:5-13).

Dr. Geller's testimony is entirely consistent with the definition of excited delirium syndrome.  "'Excited delirium' is broadly defined as a state of agitation, excitability,

- 5 -

paranoia, aggression, and apparent immunity to pain, often associated with stimulant use and certain psychiatric disorders.  The signs and symptoms typically ascribed to 'excited delirium' include bizarre or violent behavior, hyperactivity, hyperthermia, confusion, great strength, sweating and removal of clothing, and imperviousness to pain. Speculation about triggering factors include sudden and intense activation of the sympathetic nervous system, with hyperthermia, and/or acidosis, which could trigger life-threatening arrhythmia in susceptible individuals. Carolyn B. Robinowitz, MD, Report of the Counsel on Science and Public Health 453 (American Medical Association, Annual Meeting 2009)." *Mann, supra,* 588 F.3d at 1299, n. 4.  "The development of this diagnosis, according to the exhibits submitted to the Court, is based on observation of subjects who generally display a particular suite of symptoms including erratic behavior, hyperthermia, and great strength.  The condition has been observed in connection with various presumed causes, most frequently cocaine use, but also including several mental illnesses.  The precise mechanism has been largely unknown, but researchers have recently observed a correlation between excited delirium and several biological markers. Ex. A (Mash et al. study)." *Weigel, supra*, 2010 U.S. Dist. LEXIS 161651, at *7.  "As Plaintiffs point out, none of the supporting science involves a controlled experiment, that is, testing one variable against a control group in order to disprove a hypothesis.  This is not surprising, given the potentially great risk of harm to experimental subjects. Accordingly, the current understanding of excited delirium derives almost exclusively from a process of inductive reasoning.  Although this process may, arguably, be less reliable than a controlled experiment, it is clear to the Court that no experimental alternative is realistically available." *Weigel, supra*, 2010 U.S. Dist. LEXIS 161651 at *7-8.

Phounsy exhibited many of the symptoms associated with excited delirium syndrome, even if he did not exhibit them all.  (Contrast Doc No. 261, p. 6:18-20).  As Dr. Geller testified, there exists in excited delirium a constellation of signs and symptoms that occur in some people after use of sympathomimetic drugs, which is remarkably

15cv2692-H(MDD)

1  similar from person to person; but "[n]ot everything in that basket of signs and symptoms

2  is present." (Ex. A, Geller dep., 81:1-17). Dr. Geller testified that on the evening of

3  April 13, 2015, at around 8 or 9 p.m., Phounsy was definitely in an "altered state of

4  consciousness"[1] and agitated. (Ex. A, Geller dep., p. 45:1-4, p. 93:10-15). According to

5  Dr. Geller, this altered state of consciousness looked exactly like drug-induced delirium,

6  an agitated state caused by an sympathomimetic. (Ex. A, Geller dep., p. 46:4-21). Dr.

7  Geller testified that Phounsy had an excited delirium, a grossly altered mental status with

8  features similar to psychotic behavior. (Ex. A, Geller dep., p. 43:22- p. 44:5).

9       According to Dr. Geller, based on the toxicology results alone, it is a reasonable

10  inference from the available data that Phounsy took some ecstasy when he was at

11  Coachella, and had consumed some marijuana in the recent past. (Ex. A, Geller dep., p.

12  66:16-67:5). While the toxicology data is confined to these drugs, to go to any other drug

13  in Phounsy's system, or any other cause of his either psychotic break, altered

14  consciousness, or excited delirium, Dr. Geller would also look to other data and other

15  history. (Ex. A, Geller dep., p. 67:13-23). Dr. Geller testified that *under the standards of*

16  *his profession as a medical toxicologist*, he can attribute an altered state of consciousness

17  or a psychotic state to acute drug intoxication without any form of positive toxicology

18  results, because the testing is only a part of it. History and the particular behavior are

19  also an important part of it. (Ex. A, Geller dep., p. 52:4- p. 53:6).

20       According to Dr. Geller, Phounsy's pattern of behavior that evening in the context

21  of previous and probably substantial sympathomimetic drug abuse is so strikingly similar

22  to so many other patients that Dr. Geller has seen acutely under the influence of

23  sympathomimetic drugs; that Dr. Geller does not see another hypothesis being in stature

24  against that hypothesis. (Ex. A, Geller dep., p. 72:19-73:6). But Dr. Geller's opinion is

25  not simply based on Phounsy's behavior that night. (Ex. A, Geller dep., 75:1-8). Dr.

26  Geller also pointed to Phounsy's history of previous drug use, the pathology at autopsy

27

28       [1] At the request of plaintiffs' counsel at the deposition, it was agreed that Dr. Geller would use the term "altered state of consciousness" instead of "excited delirium". [Geller dep., 44:6-24].

- 7 -

which showed that Phounsy was a significant sympathomimetic drug abuser over a significant period of time, and that Phounsy was at Coachella where sympathomimetic or bath salt use is rampant, as all going into his opinion.  (Ex. A, Geller dep., p. 73:12- p. 74:11).  *See Estate of Barnwell, supra*, 2016 U.S. Dist. LEXIS 48861 at *10 ("[T]he Court finds that the Plaintiffs' concern regarding Dr. Cogswell's sources of information can be adequately addressed during cross-examination, and it is not a reason to exclude Dr. Cogswell's opinion. [Citation].").

Dr. Geller testified that on the basis of the sum total of the information that was presented to him in this case—Phounsy's previous history, the pathology on his autopsy, going to a concert where drug use was rampant, and where the opportunity to buy bath salts was there and, most importantly, his behavior on the evening of the 13th after a relatively lucid interval during the earlier part of the day on the 13th—that it is his opinion as a medical toxicologist "*to a reasonably high degree of medical probability, well exceeding 50 percent*, that [Phounsy] was under the influence of a sympathomimetic drug not detectable by the San Diego County Medical Examiner."  (emphasis added) (Ex. A, Geller dep., p. 75:20- p. 76:18).  Dr. Geller attributes Phounsy's cardiac arrest/death specifically to sympathomimetic drug abuse, similar to excited delirium and drug-induced delirium.  (Geller dep., p. 100:6-12).

Dr. Campman's opinion is that excited delirium exists and that people die experiencing it.  (Ex. C, Campman dep., p. 89:16-23).  According to Dr. Campman, Phounsy was exhibiting symptoms of excited delirium syndrome, and ecstasy (or MDMA) is one to the drugs associated with causing it.  (Ex. C, Campman dep., p. 45:11-20).  Phounsy had a trace amount of ecstasy in his system.  Ecstasy is a stimulant drug like cocaine and methamphetamine.  It is one of the drugs that people have experienced effects from well after they take it.  (Ex. C, Campman dep., p. 45:21-23).  That it was present shows that Phounsy at least took that drug.  (Ex. C, Campman dep., p. 45:4-13).

/ / /

/ / /

15cv2692-H(MDD)

Dr. Campman relied on Phounsy's medical records to determine that his medical history was significant for drug and alcohol abuse, and daily marijuana use. (Ex. C, Campman dep., p. 37:10-13).

Dr. Campman's opinion was that Phounsy's cause of death was an anoxic encephalopathy due to cardiopulmonary arrest. (Ex. C, Campman dep., p. 134:23- p. 135:11). Dr. Campman testified that he used a descriptive cause of death that could include excited delirium syndrome. (Ex. C, Campman dep., p. 132:2-8). Phounsy had behaviors and a death consistent with those caused by ecstasy and other stimulant drugs. (Ex. C, Campman dep., p. 45:14-16).

The opinions of Dr. Geller and Dr. Campman on excited delirium syndrome are reliable under Fed. R. Evid. 702.

**E.** **Testimony From Law Enforcement Officers And Paramedics About Excited Delirium May Be Admissible Under Fed. R. Evid. 701 And 702**

Contrary to Plaintiffs' assertions (Doc. No. 261, p. 3:24-4:10), police officers and paramedics may qualify as experts under Fed. R. Evid. 702 to testify about excited delirium syndrome based on their "knowledge, skill, experience, training, or education". Fed. R. Evid. 702. The Notes of Advisory Committee on 2000 Amendments to Fed. R. Evid. 702 state in part: "Nothing in this amendment is intended to suggest that experience alone- or experience in conjunction with other knowledge, skill, training, or education— may not provide sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."

"[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). Relevant experience as a law enforcement officer or paramedic, in conjunction with proper training on municipal policies and standards to recognize and reasonably accommodate individuals exhibiting signs of excited delirium, can give non-/ / /

15cv2692-H(MDD)

medically trained laypersons the knowledge necessary to conclude that the symptoms being exhibited by a person are consistent with excited delirium.

In addition, under Fed. R. Evid. 701, law enforcement officers and paramedics can testify as to their personal observations of behaviors in individuals consistent with excited delirium syndrome, e.g. agitation, excitability, paranoia, aggression, bizarre or violent behavior, hyperactivity, hyperthermia, confusion, great strength, sweating and removal of clothing, and imperviousness to pain.

**F.    Expert Opinions As To Excited Delirium Will Assist The Trier Of Fact.**

Defendants' experts, as well as law enforcement officers and paramedics, are sufficiently qualified to testify as to excited delirium.  Excited delirium has been recognized as being based on reliable principles and methods.  And Defendants' medical experts have reasonably applied the principles and methods of excited delirium to the facts of this case.  Their opinions will assist the jury.  *See Lass, supra*, 2010 U.S. Dist. LEXIS 153044, *3-4 ("The Court finds that Dr. Wetli's opinion meets the required minimum level of reliability to be received.  There can be little doubt that expert medical opinion will be of assistance to the jury on a complicated central issue to the case. [Citation].  To be sure there is grist for a vigorous cross-examination of Dr. Wetli, but that is not the test. [Citations]."), and *Silva, supra*, 2019 U.S. Dist. LEXIS 85669, *9 ["Plaintiff is permitted to cross-examine Dr. Hail on her conclusions, the reliability of the principles and methods she utilized, any conflicting expert testimony, and any contrary evidence in the record.  [Citation].  It is the job of the jury to determine whether to credit Dr. Hail's opinion. [Citations]."].

"The Daubert opinions emphasize that causation need not be established to a high degree of certainty for expert testimony to be admissible under Rule 702.  The Supreme Court stressed that, 'it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science.' *Daubert*, 509 U.S. at 590.  On remand, we stated: 'Not knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim.

Causation can be proved even when we don't know precisely *how* the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage *somehow*.' [citation]."  *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1230 (9th Cir. 1998) (emphasis in original).

**G.    Evidence Of Excited Delirium Is Admissible Under Fed. R. Evid 401 And 402.**

The opinions of Defendants' experts are relevant under Fed. R. Evid. 401 and 402.

Dr. Geller has testified that it is his opinion as a medical toxicologist "*to a reasonably high degree of medical probability, well exceeding 50 percent*, that [Phounsy] was under the influence of a sympathomimetic drug not detectable by the San Diego County Medical Examiner." (emphasis added) and attributes Phounsy's cardiac arrest/death specifically to sympathomimetic drug abuse, similar to excited delirium and drug-induced delirium.  (Ex. A, Geller dep., p. 75:20-76:18; p. 100:6-12). Dr. Campman testified that he used a descriptive cause of death that could include excited delirium syndrome.  (Ex. C, Campman dep., p. 132:2-8).  Dr. Campman's opinion was that Phounsy had behaviors and a death consistent with those caused by ecstasy and other stimulant drugs.  (Ex. C, Campman dep., p. 45:14-16).

Plaintiffs misstate the testimony of Dr. Vilke.  Dr. Vilke actually testified that he had no "objective data" that Phounsy was on anything other than the MDMA, and based on the evidence and documents he reviewed that it would be speculative to say that Phounsy was on bath salts at the time of the incident.  (Ex. D, Vilke dep., p. 148:1-17). Dr. Vilke did not specifically refer to Dr. Geller's opinion in this testimony. Further, there is no mention of Dr. Geller's opinions in Dr. Vilke's report dated May 22, 2017, nor in Dr. Vilke's rebuttal report dated June 3, 2017.  Nor is there any mention of Dr. Geller in Dr. Vilke's deposition transcript of July 14, 2017.  Finally, there is no evidence that the term "bath salts" was defined for Dr. Vilke as broadly as the term was defined in Dr. Geller's deposition. Dr. Geller's testimony was that Phounsy had consumed "bath salts or other sympathomimetic drugs"; it was not limited to "bath salts".  It was Plaintiffs' counsel at Dr. Geller's deposition who asked Dr. Geller to use the term "bath salts", with

the understanding that this term would be "a broad category" that would also include "sympathomimetic drugs".  (Ex. A, Geller dep., p. 72:5-18; p. 73:9-10).

Even assuming arguendo that Dr. Vilke had testified as Plaintiffs claim, it would not be a basis for the exclusion of Dr. Geller's testimony as to excited delirium. (See also Defendants' Opposition to Plaintiff MiL 4).  Essentially, Plaintiffs request that this Court choose Dr. Vilke's opinion over Dr. Geller's opinion, demonstrating their misunderstanding of this Court's gate-keeping function under Fed. R. Evid. 702.

## H. The Evidence Of Excited Delirium Is More Probative Than Unfairly Prejudicial And Should Not Be Excluded Under Fed. R. Evid. 403.

Contrary to Plaintiffs' assertions (Doc. No. 261, p. 5:11-24), the fact that Phounsy did not exhibit every possible symptom of excited delirium goes to the weight of the opinions of Defendants' experts, not their admissibility.

Fed. R. Evid. 403 "[s]ets a fairly stringent standard. In determining whether to exclude evidence under Rule 403, the District Court must look not merely for prejudice, but unfair prejudice, defined in the Advisory Committee's Note to Rule 403 as 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.' Weinstein's Evidence P 403(03) at 403-15 (1979) suggests that 'evidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action' may fall within this disfavored category of evidence." *United States v. Kenny*, 645 F.2d 1323, 1342 (9th Cir. 1981). Plaintiffs have not demonstrated that there is any unfair prejudice from the admission of evidence of excited delirium.  Nor will the evidence of excited delirium result in a confusion of the issues, misleading the jury, wasting time, nor needlessly presenting cumulative evidence under Fed. R. Evid. 403.  The central legal issues in this case are not only whether Defendants' use of force was reasonable, but also whether any force used by Defendants was a cause or contributing factor to Phounsy's death.  The evidence of excited delirium goes directly to the cause of death.

/ / /

- 12 -

# III.   CONCLUSION

Plaintiffs' motion should be denied in full.  Excited delirium syndrome is based on reliable principles and methods, and is widely accepted in the area of pathology. Defendants' medical experts are qualified to render reliable and admissible opinions on excited delirium syndrome.  In addition, law enforcement officers and paramedics may also render reliable and admissible opinions on excited delirium syndrome.  Evidence of excited delirium syndrome is relevant and probative of the issues in this case and not unfairly prejudicial.

Respectfully submitted,

DATED:  January 25, 2021          Office of County Counsel

By: s/ RONALD LENERT, Senior Deputy
Attorneys for Defendants County of San Diego,
Dean Allen, Aaron Brooke, Sandra Carbajal,
Marcos Collins, Janae Krull, Michael Lee, Jenny
Martinson, Tamani Pugh, Jovonni Silva, and Billy
Tennison

DATED:  January 25, 2021          **MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP**

By: s/ MILDRED O'LINN
Attorney for Defendant Richard Fischer

15cv2692-H(MDD)

# EXHIBIT "A"



Transcript of the Testimony of:

# Richard Joseph Geller, M.D.

K.J.P.

v.

County of San Diego

July 20, 2017

Volume I

Richard Joseph Geller, M.D.                                July 20, 2017

```
 1                UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF CALIFORNIA

 3

 4                Case No. 15-cv-02692-H-MDD

 5

 6  K.J.P., a minor, and K.P.P., a   )
    minor, individually, by and      )
 7  through their mother, LOAN THI    )
    MINH NGUYEN, who also sues        )
 8  individually and as successor     )
    in interest to her now deceased   )
 9  husband, Lucky Phounsy, and       )
    KIMBERLY NANG CHANTHAPHANH,       )
10  individually,                     )
                                      )
11                  Plaintiffs,       )
                                      )
12          vs.                       )
                                      )
13  COUNTY OF SAN DIEGO; et al.,      )
                                      )
14                  Defendants.       )
    ──────────────────────────────────)

15

16

17    VIDEOTAPED DEPOSITION OF RICHARD JOSEPH GELLER, M.D.

18                 San Diego, California

19                   July 20, 2017

20

21

22

23

24  REPORTED BY:  KATHLEEN S. McLAUGHLIN, CSR NO. 5845
                  Certified Shorthand Reporter
25                License No. 5845
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

```
 1   Lakeside defendants.
 2           MR. CHAPIN:  Can you hear us okay, Kevin?
 3           THE REPORTER:  I can't hear him very well.
 4           MR. OSTERBERG:  Yeah, I can hear John.
 5   Hopefully I can hear the deponent.
 6           MR. CHAPIN:  Okay.
 7               (Discussion held off the record.)
 8           THE VIDEOGRAPHER:  Please note that audio and
 9   video recording will take place unless all parties agree
10   to go off the record.
11           I am not related to any party in this action
12   nor am I an employee of Singleton Law Firm.  I have no
13   direct financial interest in the outcome in any way.
14           The reporter today is Kathy McLaughlin.  Would
15   the reporter please swear in the witness and we can
16   proceed.
17
18               RICHARD JOSEPH GELLER, M.D.,
19           Called as a witness by and on behalf of the
20   Plaintiffs, and having been first duly sworn by the
21   Deposition Officer, was examined and testified as
22   follows:
23
24                       EXAMINATION
25
```

Richard Joseph Geller, M.D.                          July 20, 2017

```
 1   belong.
 2          If I ask a question and you don't agree with
 3   the premise of the question or it's just not formulated
 4   in a way that you think you can give an accurate answer,
 5   please let me know and I'll back up, I'll try to correct
 6   it, because our objective here today is to get a clean
 7   record of your testimony and what you mean to say.
 8          When were you first retained on this case, do
 9   you recall?
10      A   Approximately July of 2016.
11      Q   So it's been just about a full year?
12      A   Approximately, yes.
13      Q   Okay.  And are you testifying, in your mind, as
14   an expert in toxicology?
15      A   I'm -- yes, I'm both a medical toxicologist and
16   a forensic toxicologist.
17      Q   And can you just explain what a toxicologist
18   is?
19      A   A toxicologist is a very, very broad term which
20   denotes someone with expertise somewhere along the line
21   in poisoning, either clinical expertise or laboratory
22   expertise.
23          A medical toxicologist is an expert in the
24   diagnosis and treatment of poisoned patients.  I am an
25   internist and emergency physician, and I'm board
```

1   certified in medical toxicology.  So that's my clinical

2   expertise.

3          A forensic toxicologist is an expert in the

4   interpretation of laboratory data arising from toxic

5   substances as it pertains to the law.

6      Q    So, if we take forensic toxicologists, for

7   example, would it be fair to say that some of them are

8   not medical doctors?

9      A    Yes.

10     Q    And if we take medical toxicologists, would

11  they invariably be medical doctors?

12     A    A medical toxicologist has to be a physician.

13     Q    Okay.

14         So did you actually personally perform any

15  forensic testing in this case?

16     A    No.

17     Q    So you're relying on results that have been

18  provided to you that were derived by other, I guess,

19  forensic toxicologists?

20     A    Well, they would be derived in a laboratory

21  that does forensic testing.  But, yes, I'm relying on

22  the laboratory results performed by others.

23     Q    And do you have any -- personally have any -- I

24  don't know if the right word is criticism.  But

25  questions about -- setting aside the fact that there may

Richard Joseph Geller, M.D.                              July 20, 2017

1      Q     Okay.

2            I mean, I understand you're drawing inferences,

3     and we'll get to that.  But in terms of a witness saying

4     he took something or him saying he took something or any

5     objective toxicological result that he took something,

6     you don't have any of that evidence; correct?

7      A     The only thing that would fit into that

8     category possibly is the narrative that was given during

9     the 9-1-1 call that Mr. Phounsy was quote, unquote, high

10     on cocaine and LSD.

11           It seemed to me that whether it was Mr. Phounsy

12     or Mr. Kelly who relayed that information to the 9-1-1

13     operator believed that he was under the influence of

14     those two drugs at that time.

15     Q     And does the fact that his toxicology screens

16     were negative for both of those substances indicate that

17     he was not, in fact, at that time high on cocaine or

18     LSD?

19     A     I think that's pretty strong evidence that

20     that's correct.

21     Q     Okay.

22           So Mr. Phounsy tried to go to sleep.  Maybe he

23     slept a little.  He then woke up and became -- would it

24     be fair to say psychotic?  Correct?

25     A     He experienced grossly altered mental status.

1    And the features of that altered mental status appeared

2   to have similarities to psychotic behavior.

3      Q    So what would you like to call it since we keep

4   discussing it?  What term --

5      A    I think he had an excited delirium.

6      Q    Okay.  I'm not so happy with that expression.

7   We'll talk more about it.  You're not comfortable with

8   psychotic episode?

9      A    It depends how you define the word psychotic.

10  To me the distinction between organic illness and

11  psychiatric illness is a distinction.

12          And I think that Mr. Phounsy's behavior really

13  didn't lie in the psychiatric realm, unless you want to

14  consider drug abuse psychiatric.  It lied -- lay in the

15  organic realm as a result of his chronic subacute and

16  acute drug use.

17     Q    I'm just trying to get our terminology before

18  we go deeper into that, which is where I'm obviously

19  headed.

20          Did -- can we call it an altered state of

21  consciousness?

22     A    That would be fine.

23     Q    Okay.  Comprise on that --

24     A    We agree.

25     Q    -- our negotiations here.  Okay.

Richard Joseph Geller, M.D.                                    July 20, 2017

 1           So in the evening of April 13th, 2015,

 2    Mister -- at around 8:00, 9:00 p.m., Mr. Phounsy had an

 3    altered state of consciousness; correct?

 4       A   Yes.

 5       Q   And his family was with him, and they were very

 6    concerned.  In fact, they were discussing taking him to

 7    an emergency room where somebody like you could have

 8    treated him; correct?

 9       A   I don't remember reading that there was a

10    discussion about an emergency department.

11       Q   Well, they were talking about taking him to get

12    medical attention.

13       A   I know that they twice called a physician on

14    his behalf.

15       Q   All right.

16           They were informed they needed to take him to

17    the hospital.  That's what I was referring to.  It's in

18    your report.  Okay.

19           Then Mr. Phounsy called 9-1-1 himself because

20    of his altered state of consciousness; correct?

21       A   Yes.

22       Q   And the Sheriff's Department came out; correct?

23       A   Yes.

24       Q   And then there was the altercation, and he was

25    taken to the hospital.  At some point before he got to

Richard Joseph Geller, M.D.                                July 20, 2017

1   the hospital, he was in full cardiopulmonary arrest;

2   correct?

3       A    Yes.

4       Q    So what different possibilities -- let's just

5   talk about possibilities -- are there that could explain

6   Mr. Phounsy's altered state of consciousness during the

7   evening of April 13th?  I know one is drug use.

8           But are there other possibilities that would

9   explain the altered state of consciousness?

10          MR. OSTERBERG:  Objection.  Overly broad.

11  Vague and ambiguous.

12          MS. PARADIS:  Join.

13          THE WITNESS:  Well, there are other

14  possibilities but nothing -- at least to my mind as an

15  experienced clinical physician and medical toxicologist,

16  there are none that rise to serious consideration to me

17  as an experienced emergency physician and medical

18  toxicologist.

19          This really looks exactly like drug-induced

20  delirium.  An agitated state caused by a

21  sympathomimetic.

22          Now, if you want a differential diagnosis, we

23  can go through that.  But --

24  BY MR. BURTON:

25      Q    Yeah, I do.

Richard Joseph Geller, M.D.                                      July 20, 2017

1    in only if you really understand the test and you've

2    considered the causes of a false positive test.  They're

3    really not all that useful.

4        Q    So, Doctor, is it really correct under the

5    standards of your profession as a medical toxicologist

6    to attribute an altered state of consciousness or a

7    psychotic state to acute drug intoxication without any

8    form of positive toxicology results?

9        A    It can be, because the testing is a part of it.

10   But history is an important part.  The particular

11   behavior is an important part of it.

12            If you ask the question in 2015 in the state of

13   California in someone who has just come back from a rock

14   and roll concert in the desert where drug abuse was

15   rampart, whose family says that he's been on drugs and

16   who's behaving the way Mr. Phounsy behaved and ask the

17   question what's going to do this, there's almost nothing

18   else that's going to do this but sympathomimetic drug

19   abuse.

20            Now, I know that he used sympathomimetic drugs

21   to the extent that they found MDMA.  I know that he used

22   marijuana at some point in the days to weeks before,

23   because he had a positive screen for it.

24            He seems to have thought that he had access to

25   LSD and cocaine because his family said that that's what

1    he was on.

2         But his clinical picture and his history

3    together are so strikingly consistent with

4    sympathomimetic drug abuse that I don't see much

5    likelihood that anything else could have accounted for

6    it.

7         MR. BURTON:  Could we go off the record and

8    have our sort of mid-deposition recess about halfway

9    through?

10         MR. CHAPIN:  Sure.

11         MS. PARADIS:  Sure.

12         THE VIDEOGRAPHER:  We are off record at

13    2:21 p.m.

14         (Recess.)

15         THE VIDEOGRAPHER:  Please stand by.  We are

16    back on record at 2:32 p.m.

17    BY MR. BURTON:

18    Q    Okay.  I thank everybody for promptly returning

19    from the break.

20         I just want to turn to the objective results we

21    have from the different screens.  And we know from the

22    paramedic records that Mr. Phounsy was given two

23    injections of -- if I could call it Versed.  Is that

24    okay?

25    A    That's fine.

```
 1   for speculation.

 2            MS. PARADIS:  Join.

 3            THE WITNESS:  Sympathomimetic drugs generally,

 4   of which MDMA is one, rev up the sympathetic nervous

 5   system and create, at least in non-overdose type

 6   recreational doses, as you said, a hypervigilance of the

 7   autonomic nervous system, keeping people awake.

 8            Methamphetamine, amphetamine have been used by

 9   college students for decades as speed to stay awake and

10   study all night.  So that's one of the known effects of

11   amphetamines, including methylenedioxymethamphetamine.

12            So that would be the acute mechanism for the

13   insomnia, not the triggering of some remote psychiatric

14   problem that nobody had ever heard about.

15   BY MR. BURTON:

16       Q    So, based on the toxicology results alone, the

17   one thing we can say for sure, at least reasonably sure

18   just based on the toxicology results alone, is that

19   Mr. Phounsy looks like he took some ecstasy when he was

20   at Coachella.

21       A    I think that's a reasonable inference from the

22   data that's available.

23       Q    And he smoked some marijuana -- and I know

24   marijuana stays around forever; right?  So at some time

25   in the past he had smoked some marijuana in the recent
```

Richard Joseph Geller, M.D.                    July 20, 2017

1    past.

2        A     Or ingested an edible.

3        Q     Okay.  Consumed marijuana.

4        A     Consumed marijuana.

5        Q     Okay.

6              Other than that, we can't say anything just

7    from the toxicology results alone; not even that he got

8    injected with benzodiazepine.  Correct?

9        A    There wouldn't be any data to categorically

10   state -- to identify the presence of other drugs.

11   You're right.

12       Q     Okay.

13             So to go to any other drug in his system or any

14   other cause of his either psychotic break or altered

15   consciousness or excited delirium, we would have to go

16   to other data and other history other than the

17   toxicology results; correct?

18       A     Well, we would use them in part.  They're a

19   part of my belief that there were -- that there were

20   other drugs involved.

21             But to say with 100 percent surety, the

22   toxicology data is confined to the drugs that you just

23   mentioned.

24       Q     Okay.

25             Now, let's go to page 9.  And there's a

Richard Joseph Geller, M.D.                                July 20, 2017

1    physically from levels of cocaine or LSD in his body on

2    the evening of April 13th; correct?

3         A    In terms of his mental status, that's correct.

4         Q    Okay.

5              Now, you have this hypothesis, I would call it,

6    that he had consumed bath salts that would not have

7    shown up on the drug screens.

8              Other than Mr. Phounsy's behavior as it's been

9    described to you, do you have any other evidence that

10   Mr. Phounsy consumed bath salts?

11        A    Well, I believe my statement was bath salts or

12   other sympathomimetic drugs.

13        Q    Right.  But I can't say that word.  So can we

14   just call them bath salts?

15        A    All right.

16        Q    Okay.  Understanding that it's a broad

17   category.

18        A    Okay.

19        Q    Okay.

20        A    All right.

21             The pattern of behavior on the evening of the

22   13th in the context of previous and probably substantial

23   sympathomimetic drug abuse is so strikingly similar to

24   so many other patients that I've seen acutely under the

25   influence of sympathomimetic drugs that I just don't see

Richard Joseph Geller, M.D.                                        July 20, 2017

1    another hypothesis being in stature against that

2    hypothesis.

3            I agree with you that it's a hypothesis.  I

4    can't prove that.  But the bar for me isn't proving

5    something to 100 degree of certainty.  It's giving you a

6    medical opinion to greater probability than 50 percent.

7        Q    Doctor, other than his behavior --

8        A    Yes.

9        Q    -- and can we please call these bath salts?

10       A    By all means.

11       Q    Thank you.

12            Other than his behavior and -- that would be

13   his behavior on the evening of April 13th, 2015;

14   correct?

15       A    Okay.

16       Q    Other than that behavior, do you have any other

17   evidence that this man ever in his life consumed bath

18   salts?  I think that's a "yes" or "no."

19       A    Well, it would be if -- if we're in agreement

20   on what the word "evidence" is.  Is evidence the same as

21   an indication?

22            Because I have -- there are other factors that

23   make me think that, but they're not -- you know, it

24   depends whether you want to call it evidence or not.

25            We know about his history of previous drug use.

Richard Joseph Geller, M.D.                                    July 20, 2017

1    I believe that his -- the pathology at autopsy showed

2    that he was a significant sympathomimetic drug abuser

3    over a significant period of time.

4            We know that he was at Coachella.  We know that

5    not only at Coachella but concerts similar to that

6    sympathomimetic or bath salt use is rampant.  So there

7    are a lot of circumstances that go into my opinion.

8            Now, whether or not that meets your definition

9    of evidence as -- in the question you asked me, I'm not

10   certain.  But that's a part of the basis for my

11   opinion.

12       Q    Well, my answer to your question, even though

13   I'm asking the questions, is that, no, it doesn't --

14       A    Okay.

15       Q    -- meet my -- I mean, if he's one of 100,000

16   people at a festival, to me that is not evidence that he

17   consumed bath salts, actually.

18            So I want to know did he say he took bath

19   salts?  Do you have some person who said he took bath

20   salts?  Do you have some toxicological test that shows

21   he took bath salts?  Do you have some evidence that he

22   went to a store and purchased bath salts?

23       A    In terms of the specific questions that you

24   just asked, no.

25       Q    Okay.

Richard Joseph Geller, M.D.                                July 20, 2017

```
 1          But you're saying that just based on his
 2   behavior -- and we know what his behavior was.  There
 3   was some dispute about it, but a lot of it's agreed --
 4   on Monday night that you attribute that behavior as
 5   virtually certain to be the result of his recent
 6   ingestion of bath salts?
 7      A    My opinion is not based simply on his behavior
 8   that night.
 9      Q    Well, your explanation for his behavior that
10   night, his cognitive break that we all agree happened,
11   is that it virtually certainly was due to the fact that,
12   unbeknownst to anybody, or anybody who will admit it, he
13   consumed bath salts on Monday, April 13th; correct?
14      A    I never use the phrase virtually certain.  I am
15   saying --
16      Q    Okay.  Your term.  Your term is -- it's here.
17   To a high degree of medical probability.
18      A    That's different than certainty.
19      Q    Okay.  So we'll use that term.
20          So you're saying that based on his behavior on
21   the 13th the -- the evening of the 13th as well as the
22   clinical findings on autopsy that to a high degree of
23   medical probability Mr. Phounsy apparently, unbeknownst
24   to his family and the people around him, consumed bath
25   salts, and that's why he went into this altered state of
```

Richard Joseph Geller, M.D.                                    July 20, 2017

1    consciousness.

2              MS. PARADIS:   Objection.   May misstate his

3    prior testimony.

4              MR. OSTERBERG:   Objection.   Misstates prior

5    testimony.   Overly broad.

6              THE WITNESS:   On the basis of the sum total of

7    information that was presented to me in this case, his

8    previous history, the pathology on his autopsy, going to

9    a concert where drug use was rampant, and the

10   opportunity to buy bath salts was there and, most

11   importantly, his behavior on the evening of the 13th

12   after a relatively lucid interval during the earlier

13   part of the day on the 13th, I believe -- it is my

14   opinion as a medical toxicologist to a reasonably high

15   degree of medical probability, well exceeding

16   50 percent, that his -- that he was under the influence

17   of a sympathomimetic drug not detectable by the San

18   Diego County Medical Examiner.

19   BY MR. BURTON:

20       Q    And is your -- is that an exhaustive list of

21   all the reasons you have?   I mean, you listed a bunch of

22   reasons.   I just want to make sure that you've listed

23   all your reasons.

24       A    I believe it is.   I was trying to give you the

25   whole picture in one answer.

Richard Joseph Geller, M.D.                                    July 20, 2017

```
 1        Q     Okay.
 2              And so what do you mean he had an opportunity
 3    to buy bath salts on Monday?
 4        A     We know that drugs were sold there.  They are
 5    sold every year at Coachella.  And bath salt use in
 6    April of 2015 was -- was really at a very high level in
 7    Southern California.  Almost certainly bath salts were
 8    available at Coachella.
 9        Q     You're not suggesting that he slipped out on
10    Monday, April 13th and bought bath salts somewhere, are
11    you?
12        A     No.
13        Q     Okay.  I thought that's what you were saying.
14        A     But I am suggesting that it's a very real
15    possibility that he purchased drugs at Coachella,
16    brought them home, and decided to reuse in late
17    afternoon, early evening of the 13th.
18        Q     He had a stash is what you're saying?
19        A     Colloquially?  Yes.
20        Q     Okay.
21              And do you have any -- any evidence of this --
22    him having a stash, other than what you've already
23    said?
24        A     No.
25        Q     Okay.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Richard Joseph Geller, M.D.                    July 20, 2017

1      Q     Does it explain death --

2      A     Yes.

3      Q     -- free standing?

4      A     Yes.

5      Q     Okay.  Does anybody who goes into excited

6   delirium always die?

7      A     No.

8      Q     Why do some people die and other people don't

9   die?

10     A     Well, that's true of any disease.  Almost any

11  disease.

12     Q     Well, why is it -- I don't know if that's true

13  of almost any disease.  But why is that true of excited

14  delirium?

15     A     Well, one of the things that's missing with the

16  excited delirium picture to call it a real disease as

17  opposed to a syndrome is the pathophysiology.

18          A syndrome is a series of signs and symptoms

19  that are reliably present from episode to episode in

20  certain people.

21          But it -- has what's missing is a poorly --

22  what's missing is a well-worked-out pathophysiology.  So

23  it's not called a disease.  It's called a syndrome.

24          When gay men in the early 1980's started having

25  immune compromise in Kaposi sarcoma, it was called a

1   syndrome, the immune deficiency syndrome, or AIDS.  But

2   it was a syndrome.  Nobody knew what the cause of it

3   was.  Now we know that HIV is a disease.  It's an

4   infection.  The pathophysiology is very well worked out.

5              What has been observed time and time again by

6   emergency physicians, by EMS personnel, by law

7   enforcement personnel is almost always occurring in the

8   context of sympathomimetic drug abuse individuals who

9   have grossly altered mental status, confusional state,

10  imperviousness to pain, incredible strength, sweating,

11  sympathetic nervous system that's revved up.  They often

12  have unintelligible speech.  They're dangerous to other

13  people in terms of their behavior.  And then after a

14  period --

15       Q    You forgot hyperthermia.

16       A    Hyperthermia, but not always.

17       Q    Not when it's inconvenient for a case.

18       A    I'm sorry?

19       Q    This man didn't have hyperthermia.

20       A    Not that was documented, no.

21       Q    Well, they documented his temperature.  It was

22  normal.

23       A    It was also said --

24            MR. OSTERBERG:  Would you let him finish his

25  answer?

Richard Joseph Geller, M.D.                                     July 20, 2017

1            THE WITNESS:   What I'm saying about excited

2    delirium is that there exists a constellation of signs

3    and symptoms that occur in some people after use of

4    sympathomimetic drugs, which is remarkably similar from

5    person to person.   Not everything in that basket of

6    signs and symptoms is present.

7            And at the end -- and sometimes people recover

8    from that delirium, and sometimes they suddenly just

9    stop and death occurs.

10            The pathophysiology of that probably involves

11    excess catecholamines.   It may involve a transitory

12    cardiomyopathy.

13            But there's no agreement as to the exact

14    pathophysiology that's behind this constellation of

15    signs and symptoms, and that's where the controversy is.

16    That's where the controversy is.   It's clearly a

17    syndrome.

18    BY MR. BURTON:

19        Q    Well, hang on.   I mean, I have to cut you off

20    and -- I understand what counsel is saying.   But, I

21    mean, I do have limited time.   I need to finish this

22    deposition.

23            The -- a couple things.   No. 1, you're

24    attributing it invariably to drug ingestion.   But you

25    know, don't you, that the history of this disease came

```
 1              MS. PARADIS:  Join.
 2              THE WITNESS:  That's kind of my reaction to the
 3      question.  I mean, it is -- it is a hypothetical, and
 4      it's difficult to answer.
 5              I think I agree with you that people who
 6      exercise are going to need increased minute ventilation.
 7      But what evidence is there that the ventilation is
 8      restricted?
 9      BY MR. BURTON:
10          Q    Well, let's just take it one step at a time.
11      Mr. Phounsy was in an altered state of consciousness for
12      whatever reason.  You have your reason, the bath salt
13      ingestion.  But he was definitely in an altered state of
14      consciousness and agitated; correct?
15          A    Yes.
16          Q    And he was in a pretty protracted significant
17      fight with at least initially two Deputy Sheriffs;
18      correct?
19          A    Yes.
20          Q    And then he was restrained by multiple Deputy
21      Sheriffs; correct?
22          A    It took -- it took multiple Deputy Sheriffs to
23      get him into restraints.
24          Q    And then there's testimony that he struggled
25      against those restraints; correct?
```

Richard Joseph Geller, M.D.                                July 20, 2017

```
 1   3:34 p.m.
 2              (Recess.)
 3              THE VIDEOGRAPHER:  Please stand by.  We are
 4   back on record at 3:36 p.m.
 5   BY MR. BURTON:
 6       Q    Doctor, are you attributing this cardiac
 7   arrest/death to excited delirium?
 8       A    I'm attributing it to sympathomimetic drug
 9   abuse.  And we could call it excited delirium, we could
10   call it drug-induced delirium.  They're all a very
11   similar series of situations.  But I'm attributing it
12   specifically to drug use.
13       Q    And have you ever done that in a civil case any
14   other occasion?
15       A    Not that I recall.
16       Q    Have you ever done it in any case on any other
17   occasion?
18       A    Attributing a death to specifically drug use?
19       Q    Yes.
20       A    Exclusive of homicide, I can't recall.
21       Q    You mean actually like poisoning someone?
22       A    No.  Someone -- someone who has a very, very
23   high level of, you know, methamphetamine and ended up
24   getting shot.  I mean, absent the methamphetamine, that
25   wouldn't have happened.  So . . .
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Richard Joseph Geller, M.D.                                July 20, 2017

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3          I, RICHARD JOSEPH GELLER, M.D., do hereby

 4   certify under penalty of perjury that I have read the

 5   foregoing transcript of my deposition taken on July 20,

 6   2017; that I have made such corrections as appear noted

 7   herein in ink, initialed by me; that my testimony as

 8   contained herein, as corrected, is true and correct.

 9          DATED THIS _____ day of _____,

10   20___, at _____, _____.
                        (City)               (State)

11

12                         _____

13                         RICHARD JOSEPH GELLER, M.D.

14

15

16

17

18

19

20

21

22

23

24

25
```

Richard Joseph Geller, M.D.                                    July 20, 2017

```
 1                      CERTIFICATE OF

 2          CALIFORNIA CERTIFIED SHORTHAND REPORTER

 3             I, the undersigned, a Certified Shorthand

 4    Reporter of the State of California, do hereby certify:

 5             That the foregoing proceedings were taken

 6    before me at the time and place herein set forth; that

 7    any witnesses in the foregoing proceedings, prior to

 8    testifying, were placed under oath; that a verbatim

 9    record of the proceedings was made by me using machine

10    shorthand which was thereafter transcribed under my

11    direction; further, that the foregoing is an accurate

12    transcription thereof.

13             The dismantling of this transcript will render

14    the reporter's certificate null and void.

15             I further certify that I am neither financially

16    interested in the action nor a relative or employee of

17    any attorney of any of the parties.

18             Reading and signing was requested.

19             IN WITNESS WHEREOF, I have this date subscribed

20    my name.

21

22    Dated:  August 3, 2017

23                              KATHLEEN S. McLAUGHLIN
                                CSR No. 5845
24

25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

# EXHIBIT "B"

To:  Mr. James Chapin, Office of County Counsel, County of San Diego California

From:  Richard J. Geller, MD, MPH, MS

Re:  Report, Mr. Lucky Phounsy

Date:  May 22, 2017


Dear Mr. Chapin

I am writing, at your request, the following report regarding Mr. Lucky Phounsy

My qualifications are as follows.  My formal education includes having earned university degrees from Boston College (BS, chemistry), Tufts University (Doctor of Medicine), California State University Fresno (Master of Public Health) and the University of Florida (Master of Science, forensic toxicology).  I have been certified by the American Board of Internal Medicine and the American Board of Emergency Medicine.  I practiced clinical medicine, both as an internist and as an emergency physician, for a period of 27 years.  During that time I treated in an emergency department setting the acute effects of stimulant exposure on many occasions.  In addition to being an internist and emergency physician, I am a very experienced medical toxicologist, having been certified by the American Board of Medical Toxicology and by the American Board of Emergency Medicine in the subspecialty of medical toxicology.  A medical toxicologist is an expert in the adverse clinical effects of xenobiotics, importantly including medications, on the human body, as well as being an expert in the diagnosis and treatment of poisoning from all poisons, including medications.  I have many years of experience in clinical pharmacology, and am employed by the Department of Clinical Pharmacy, University of California San Francisco School of Pharmacy.  In that role I am the director of the Fresno/Madera Division of the California Poison Control System, a position I have held since 1987.  In that role I also teach medical toxicology and advanced pharmacy practice to fourth year doctoral students.  In addition to being a Health Sciences Associate Professor, University of California San Francisco School of Pharmacy, I am also an Associate Clinical Professor, Medicine, University of California San Francisco School of Medicine, and an Adjunct Professor of Pharmacy Practice, University of the Pacific School of Pharmacy and Health Sciences, where I also teach fourth year doctoral pharmacy students.  In my 30 years of experience as a poison control medical director, I have observed and/or consulted on thousands of cases of exposure to drugs of abuse, including a number of fatal exposures.  I am a physician currently and consecutively licensed by the Medical Board of California since 1983, certificate number G49837.

As compensation for my time in reviewing records and in writing this report, we have agreed that I will be paid a fee of $200 per hour.  As of this date, I have not been paid for my work on this case.

Appended to this report is my most recent curriculum vitae.

1

I have expertise in the medical and forensic toxicological matters which follow, and am prepared to testify in court.  I have previously testified as an expert in medical and forensic toxicology in federal court and in superior courts in the State of California.  Specifically, I have testified in Federal Court in San Diego regarding the acute effects of methamphetamine intoxication.  While I do not keep a comprehensive record of my appearances in court, I have examined my billing records for the previous 5 years, and determined that I testified in court in the cases of Shaundra Brummett, et al., v. County of San Diego et al., in federal court in San Diego in 2014, CA Medical Board v. Dr. Pero (2016) and Lewis v. County of San Diego (2017).  I have been deposed in: Gallarzo v. Trinity Health Michigan (2014), Jackson v. Munson Medical Center (2014), Select Specialty Kalamazoo v. McLachlan (2013), Kaufman v Spectrum Health (2012), Varga v. Rady Children's Hospital (2012 or 2013), Antelma Soria v. CDCR (2016), Napier v. County of San Diego (2016) and Vianey Valdez v. State of California (2016).

You have asked me to comment on:

1. The meaning of positive and negative toxicology findings as reported by the San Diego County Office of the Medical Examiner, following testing of Mr. Phounsy's antemortem blood drawn April 13, 2015, and also his urine, harvested at an unknown time.

2. The possibility that Mr. Phounsy's altered mental status on April 13, 2015 could have been caused by consumption of methcathinone derivatives ("bath salts") or other stimulant drug that was not detected or tested for as suggested by the San Diego County Office of the Medical Examiner.

3. Any possible causal relationship between Mr. Phounsy's reported history of drug abuse and his cardiopulmonary arrest on April 13, 2015.

The information provided to me by your office is as follows:

<u>Documents</u>

1. County of San Diego, Office of the Medical Examiner, Investigative Report, Lucky Phounsy

2. Selected medical records, Sharp Grossmont Hospital, Lucky Phounsy

3. Lakeside/Santee Fire Department Pre-Hospital Care Report, 04/13/2015, Lucky Phounsy

4. Documents related to organ donation, Lifesharing, Lucky Phounsy

<u>Depositions</u>

1. David Csik

2. Daniel Nenow

3. Captain Aaron Bagley

Conclusions

1. I agree with the San Diego County Office of Medical Examiner that Mr. Phounsy died an accidental death caused by an anoxic brain injury secondary to cardio-pulmonary arrest.

2. I believe that, to a high degree of medical probability, Mr. Phounsy's condition on the night of April 13, 2015, and the cause of his cardio-pulmonary arrest, was Excited Delirium Syndrome, itself caused by stimulant drug use, both at Coachella, and at home on the afternoon of April 13, 2015.

3. The combination of an Excited Delirium Syndrome in the absence of specific toxicologic confirmation by the medical examiner is not an uncommon event in the era of bath salts and a myriad of other stimulant drugs of abuse. I believe that, to a high degree of medical probability, Mr. Phounsy ingested either a bath salt, or another of the stimulant drugs of abuse which are often not detected in modern forensic toxicologic analysis, on the afternoon of April 13, 2017.

4. The person going through an Excited Delirium Syndrome secondary to stimulant drug abuse represents not only a true medical emergency, but an individual who is a great danger to themselves, family members, and EMS and law enforcement personnel.

5. Virtually all authorities writing on the treatment of acute stimulant drug abuse, and Excited Delirium Syndrome, advocate the use of benzodiazepine therapy, and its use by the firefighter/paramedics who treated Mr. Phounsy was entirely appropriate.

6. I believe that, to a high degree of medical probability, had Mr. Phounsy not abused stimulant drugs up to, and including, the evening of his cardio-pulmonary arrest, the catastrophic event would not have occurred, and Mr. Phounsy would not have died.

I declare under penalty of perjury that the foregoing is true.

Signed this day in Fresno, California. _May 22, 2017_.

_Richard J. Geller_, MD, MPH, MS.

Richard J. Geller, MD, MPH, MS

14

# EXHIBIT "C"

Steven Charles Campman, M.D.                    March 17, 2017

```
 1                 UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF CALIFORNIA

 3

 4                 Case No. 15-cv-02692-H-MDD

 5

 6   K.J.P., a minor, and K.P.P., a    )
     minor, individually, by and       )
 7   through their mother, LOAN THI     )
     MINH NGUYEN, who also sues         )
 8   individually and as successor      )
     in interest to her now deceased    )
 9   husband, Lucky Phounsy, and        )
     KIMBERLY NANG CHANTHAPHANH,         )
10   individually,                       )
                                         )
11                       Plaintiffs,    )
                                         )
12            vs.                        )
                                         )
13   COUNTY OF SAN DIEGO; et al.,        )
                                         )
14                       Defendants.    )
     _____)
15

16

17      VIDEOTAPED DEPOSITION OF STEVEN CHARLES CAMPMAN, M.D.

18                    San Diego, California

19                       March 17, 2017

20

21

22

23

24   REPORTED BY:  KATHLEEN S. McLAUGHLIN, CSR NO. 5845
                    Certified Shorthand Reporter
25                  License No. 5845
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

 1   plaintiffs.

 2          MR. BURTON:   John Burton on behalf of

 3   plaintiffs.

 4          THE VIDEOGRAPHER:   Please note that audio and

 5   video recording will take place unless all parties agree

 6   to go off the record.

 7          I am not related to any party in this action

 8   nor am I an employee of Singleton Law Firm.  I have no

 9   direct financial interest in the outcome in any way.

10   The reporter today is Kathy McLaughlin.

11          Would the reporter please swear in the witness

12   and we can proceed.

13

14               STEVEN CHARLES CAMPMAN, M.D.,

15          Called as a witness by and on behalf of the

16   Plaintiffs, and having been first duly sworn by the

17   Deposition Officer, was examined and testified as

18   follows:

19

20                      EXAMINATION

21   BY MR. BURTON:

22      Q   Can you state your name for the record, please,

23   sir?

24      A   Yes.  Steven Charles Campman.

25      Q   And you're a medical doctor who performed the

Steven Charles Campman, M.D.                          March 17, 2017

1    autopsy and opined on the cause and the manner of death

2    of Lucky Phounsy.

3           Is that correct?

4    A    Yes.

5    Q    I imagine you've given depositions before?

6    A    Yes.

7    Q    And can you estimate how many?

8    A    Yes.  Around 25.

9    Q    And I imagine that you've testified in court

10   many, many times?

11   A    Yes.

12   Q    Could you estimate how many?

13   A    Yes.  250 or around there.

14   Q    And that's part of your profession as a

15   forensic pathologist and Medical Examiner; correct?

16   A    Yes.

17   Q    So I know you're familiar with this procedure.

18        Just let me know if you need me to rephrase a

19   question so that we get a nice, clear record for

20   subsequent review.

21        As a lay person who thinks he knows something

22   about medicine, I may very well say something that you

23   find to be imprecisely formulated.  Just let me know,

24   and we'll back up and make sure that the testimony

25   reflects what you mean to say and not my lay person's

Steven Charles Campman, M.D.                    March 17, 2017

1    pathology.

2            After that was one extra year of subspecialty

3    training, also an apprenticeship, and it was in forensic

4    pathology.

5            And after that was board certification in

6    forensic pathology.

7            As for experience, my first job after training

8    was with the Office of the Armed Forces Medical

9    Examiner in Washington, D.C., and I was there about

10   three years.

11           And then I came here to San Diego, and I've had

12   my current job for 16 years.

13      Q    Where did you go to medical school?

14      A    Creighton University in Omaha, Nebraska.

15      Q    Where did you do your residency?

16      A    University of California, Davis Medical Center

17   in Sacramento, California.

18      Q    And when did you get your board certification

19   in forensic pathology?

20      A    I think that was in 1999.

21      Q    Could you explain for a lay person who has no

22   idea exactly what forensic pathology is?

23      A    Yes.  I'll start first with what's pathology.

24           And pathology in its broadest sense is the

25   study of disease, and it has two main branches:

1    Anatomical and clinical.

2            Anatomical you can think of as anytime

3    something is taken off of someone or out of someone and

4    examined by a physician for a diagnosis, like if you

5    have a skin biopsy or a lung taken out or something

6    amputated or a Pap smear or an autopsy, that's all part

7    of anatomical pathology.

8            Clinical pathology you can think of as any of

9    the hospital laboratories, like chemistry or toxicology

10   or the blood bank or immunology lab, those are all part

11   of clinical pathology.

12           Forensic pathology is a subspecialty of

13   anatomical pathology that deals mostly with sudden and

14   unexpected deaths.  Injuries and illnesses that can

15   produce sudden and unexpected deaths.

16      Q    And what does a forensic pathologist employed

17   by the County of San Diego do?

18      A    I, and we -- there are seven of us --

19   participate in medical-legal investigations.  It is --

20   usually ends with determining a cause and manner of

21   death.  It often involves performing an autopsy, but

22   sometimes we do that, determining cause and manner of

23   death, just with medical records and history.  That's

24   the most of the work.

25           We occasionally will do consultations on live

Steven Charles Campman, M.D.                         March 17, 2017

1        A    I wrote it in this report.

2        Q    It would be contained in the opinion?

3        A    Yes.

4        Q    So I'd like to now go through these facts, if

5    you could follow along with me.  I'm just going to read

6    what it says, skipping what I think is irrelevant.  But

7    if you think something is relevant that I skipped, let

8    me know.

9        A    All right.

10       Q    It says his medical history was significant for

11   drug and alcohol abuse and daily marijuana use.  Do you

12   recall where you got that?

13       A    Medical records.

14       Q    And then it says cigarette smoking, and then it

15   says the records indicate he did not smoke variably.  So

16   there's some question as to whether or not he was a

17   cigarette smoker.

18       A    Correct.  In one place in the records it will

19   say, yes, he was a smoker, and another place it said,

20   no, he did not.

21       Q    Just based on your physical examination of his

22   lungs or any of his other organs, could you tell whether

23   he was a cigarette smoker?

24       A    I could check his lungs.  But I think he did

25   have what's called anthracotic pigmentation, or carbon

Steven Charles Campman, M.D.                                    March 17, 2017

1    April 13th, that would have shown in the toxicology

2    screen; correct?

3        A    Yes.

4        Q    Now, ecstasy is in a little different category

5    because he did have a trace amount of ecstasy?

6        A    Yes.

7        Q    Okay.  And can you offer any opinion as to what

8    that trace amount meant in this case?

9        A    Yes.

10       Q    What's that?

11       A    It is -- it's a stimulant drug like cocaine and

12   methamphetamine.  It -- that it was present just shows

13   at least he took that -- that drug.

14            And as far as the significance in this case, he

15   had behaviors and a death that are consistent with those

16   caused by ecstasy and other stimulant drugs.

17            He was exhibiting something that some people

18   refer to as Excited Delirium Syndrome, and ecstasy, or

19   MDMA, is one of the drugs that is associated with that

20   or causes that.

21            And MDMA is also one of the drugs that people

22   have reported experiencing effects from well after

23   they've taken it.

24            So, again, it's -- it shows me that we're on

25   kind of the right path about the underlying diagnosis

Steven Charles Campman, M.D.                    March 17, 2017

1   ended up talking about excited delirium and telling the

2   police, you know, "Once you see someone like that, don't

3   touch them because they're going to die."

4          And then the police got mad and said, "Well, we

5   can't not touch them because then they'll hurt

6   themselves or someone else."

7          And then I got to follow directly after

8   lecturing -- I'm straying away from the question,

9   though -- but lecture on deaths in custody.

10         So it was kind of a -- kind of a rough setup

11  for my lecture.  But Steven Karch is one that I know for

12  sure says that.

13     Q     Okay.  I'm familiar with Dr. Karch.

14         Then I'd like to go to the next sentence.

15  Well, let me just ask this.

16         You don't believe that, do you, that once

17  somebody is in this so-called excited delirium that

18  there's no medical treatment that can make any

19  difference?

20     A     I don't know that that's not true or true.  I

21  do believe that the Excited Delirium Syndrome exists and

22  that people die experiencing it.  So I think it's

23  possible.

24     Q     Do you believe that people die from excited

25  delirium when they're not in restraints?

Steven Charles Campman, M.D.                    March 17, 2017

```
 1        A     Correct.
 2        Q     And then you have a paragraph on Excited
 3   Delirium Syndrome.  But you did not attribute his death
 4   to Excited Delirium Syndrome; correct?
 5        A     I didn't use that term.  I gave a descriptive
 6   cause of death that would -- that could include that.
 7        Q     But you chose not to; correct?
 8        A     Correct.
 9        Q     And you explain here, I think -- you say,
10                  ". . . his serum potassium
11               concentration was not low when he got to
12               the hospital."
13               Would you say low potassium concentration would
14   be an indicia of excited delirium?
15        A     It could be.  One of the descriptions --
16   actually, it's Doctor -- Mister Dr. DiMaio --
17        Q     Okay.
18        A     -- of the mechanism of why excited delirium
19   kills is that, with the agitation and exercise, there's
20   the rise in potassium, but then in the arrest period,
21   after the person has been restrained or is otherwise not
22   exercising anymore, then there's a rapid drop in the
23   potassium to even below normal.
24               And in that low period or in the dropping
25   period is -- what he proposes, anyway -- as when the
```

Steven Charles Campman, M.D.                    March 17, 2017

```
 1              a safe position with and being
 2              administered oxygen when he experienced
 3              his sudden arrest several minutes after
 4              the altercation . . . ."
 5              Do you see that?
 6      A    Yes.
 7      Q    So, if the facts were different than you
 8  thought they were when you wrote this, and he was, let's
 9  say, not in a safe position and not being administered
10  oxygen when he experienced his sudden arrest, would that
11  affect your opinion here?
12      A    Yes.  Depending on what that difference was,
13  yes.
14      Q    Okay.
15              So you assumed that he was in a safe position
16  and being administered oxygen when you ruled out the
17  police restraints as the cause of death; correct?
18      A    Yes.  Again, I described before that my main
19  consideration was that he wasn't prone with six or eight
20  heavy people on him at the time.  That's the main thing,
21  is he didn't have his arrest right when all those heavy
22  people were restraining him.
23      Q    Okay.  And then we've covered the midazolam
24  causation.
25              So then you get to your conclusion.  The cause
```

Steven Charles Campman, M.D.                    March 17, 2017

1    of death is anoxic encephalopathy.

2            And there's really -- no one could -- could

3    deny that he died because he had so much brain damage;

4    correct?  If we just look one step back from when he

5    died.

6        A    I hope that's true, yes.

7        Q    Okay.  And that the encephalopathy was due to

8    the cardiopulmonary arrest.

9        A    Correct.

10       Q    No question about that.

11       A    Not to me, no.

12       Q    Okay.  Now -- with resuscitation.

13            So there was a physical altercation and

14   restraint that you were given in the history; correct?

15       A    Yes.

16       Q    Okay.  So it followed that; right?

17       A    Yes.

18       Q    And then "due" to "stimulant drug-related

19   psychotic state . . ."

20       A    Yes.

21       Q    Besides the trace -- no.  Let's take the easy

22   part.

23            There's no doubt that he had a psychotic state;

24   correct?  Everybody agrees with that.

25       A    I certainly agree, yes.

```
 1   unsigned copy can be used.

 2           MR. CHAPIN:  Okay.

 3           MR. OSTERBERG:  So stipulated.

 4           THE REPORTER:  Copy, Mr. Osterberg?

 5           MR. OSTERBERG:  Yes.

 6           MR. GAZZO:  Yes.

 7           THE VIDEOGRAPHER:  This concludes today's

 8   deposition of Dr. Steven C. Campman, Volume I.  The

 9   total number of media was one, and we are off the record

10   at 1:35 p.m.

11           (The deposition concluded at 1:35 p.m.)

12           (END OF PROCEEDINGS.  DECLARATION UNDER PENALTY

13   OF PERJURY ON THE FOLLOWING PAGE HEREOF.)

14

15

16

17

18

19

20

21

22

23

24

25
```

Steven Charles Campman, M.D.                    March 17, 2017

```
 1                      CERTIFICATE OF

 2           CALIFORNIA CERTIFIED SHORTHAND REPORTER

 3                I, the undersigned, a Certified Shorthand

 4      Reporter of the State of California, do hereby certify:

 5                That the foregoing proceedings were taken

 6      before me at the time and place herein set forth; that

 7      any witnesses in the foregoing proceedings, prior to

 8      testifying, were placed under oath; that a verbatim

 9      record of the proceedings was made by me using machine

10      shorthand which was thereafter transcribed under my

11      direction; further, that the foregoing is an accurate

12      transcription thereof.

13                The dismantling of this transcript will render

14      the reporter's certificate null and void.

15                I further certify that I am neither financially

16      interested in the action nor a relative or employee of

17      any attorney of any of the parties.

18                Reading and signing was requested.

19                IN WITNESS WHEREOF, I have this date subscribed

20      my name.

21

22      Dated:  March 31, 2017

23                                     KATHLEEN S. McLAUGHLIN
                                       CSR No. 5845
24

25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

EXHIBIT "D"

Gary Michael Vilke, M.D.                                    July 14, 2017

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF CALIFORNIA

 3

 4            Case No. 15-cv-02692-H-MDD

 5

 6  K.J.P., a minor, and K.P.P., a   )
    minor, individually, by and      )
 7  through their mother, LOAN THI    )
    MINH NGUYEN, who also sues        )
 8  individually and as successor     )
    in interest to her now deceased   )
 9  husband, Lucky Phounsy, and       )
    KIMBERLY NANG CHANTHAPHANH,        )
10  individually,                     )
                                      )
11                      Plaintiffs,   )
                                      )
12            vs.                     )
                                      )
13  COUNTY OF SAN DIEGO; et al.,      )
                                      )
14                      Defendants.   )
    _____)

15

16

17     VIDEOTAPED DEPOSITION OF GARY MICHAEL VILKE, M.D.

18                 San Diego, California

19                    July 14, 2017

20

21

22

23

24  REPORTED BY:  KATHLEEN S. McLAUGHLIN, CSR NO. 5845
                  Certified Shorthand Reporter
25                License No. 5845
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Gary Michael Vilke, M.D.                                    July 14, 2017

1    BY MR. McBRIDE:

2        Q    All right.  Doctor, you mentioned bath salts or

3    cathinones.

4            Do you have any -- do you think Mr. Phounsy was

5    under the influence of bath salts at the time of the

6    incident?

7        A    I have no reason to believe he was -- had taken

8    anything.  Certainly, at Coachella lots of things happen

9    there.

10           But from the perspective of do I have any

11   objective data to say that he was on anything else than

12   the MDMA, I can't say, no.

13       Q    So would you agree that to say Mr. Phounsy was

14   on bath salts at the time of the incident based on the

15   evidence and document you've reviewed would be

16   speculative?

17       A    Correct.

18       Q    Okay.

19           Let's talk about your opinion regarding the

20   failure of Mr. Phounsy's kidneys.  So you believe

21   Mr. Phounsy's kidneys failed?

22       A    He was having renal insufficiency or renal --

23   renal dysfunction.

24       Q    Okay.  What was the level of Mr. Phounsy's

25   renal dysfunction?

Gary Michael Vilke, M.D.                                          July 14, 2017

```
1              DECLARATION UNDER PENALTY OF PERJURY

2

3         I, GARY MICHAEL VILKE, M.D., do hereby certify

4    under penalty of perjury that I have read the foregoing

5    transcript of my deposition taken on July 14, 2017; that

6    I have made such corrections as appear noted herein in

7    ink, initialed by me; that my testimony as contained

8    herein, as corrected, is true and correct.

9         DATED THIS _____ day of _____,

10   20____, at _____, _____.
                      (City)                  (State)

11

12                       _____

13                        GARY MICHAEL VILKE, M.D.

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF

 2         CALIFORNIA CERTIFIED SHORTHAND REPORTER

 3              I, the undersigned, a Certified Shorthand

 4    Reporter of the State of California, do hereby certify:

 5              That the foregoing proceedings were taken

 6    before me at the time and place herein set forth; that

 7    any witnesses in the foregoing proceedings, prior to

 8    testifying, were placed under oath; that a verbatim

 9    record of the proceedings was made by me using machine

10    shorthand which was thereafter transcribed under my

11    direction; further, that the foregoing is an accurate

12    transcription thereof.

13              The dismantling of this transcript will render

14    the reporter's certificate null and void.

15              I further certify that I am neither financially

16    interested in the action nor a relative or employee of

17    any attorney of any of the parties.

18              Reading and signing was requested.

19              IN WITNESS WHEREOF, I have this date subscribed

20    my name.

21

22    Dated:  July 28, 2017

23                              KATHLEEN S. McLAUGHLIN
                                CSR No. 5845
24

25
```