1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| K.J.P., a minor, and K.P.P., a minor, individually, by and through their mother, LOAN THI MINH NGUYEN, who also sues individually and as successor in interest to her now deceased husband, Lucky Phounsy, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN DIEGO and RICHARD FISCHER, <br><br> Defendants. | Case No.: 3:15-cv-02692-H-MDD <br><br> **ORDER:** <br><br> **(1) DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b)** <br><br> **(2) DENYING DEFENDANTS' RENEWED MOTION FOR QUALIFIED IMMUNITY** <br><br> **(3) CERTIFYING DEFENDANTS' CLAIM FOR QUALIFIED IMMUNITY AS FRIVOLOUS** <br><br> [Doc. No. 427.] |

On November 2, 2021, Defendants Richard Fischer and County of San Diego filed an updated motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). (Doc. No. 427.) On November 16, 2021, Plaintiffs filed a response in opposition to Defendants' motion. (Doc. No. 428.) On December 3, 2021, Defendants filed

a reply. (Doc. No. 429.) For the following reasons, the Court denies Defendants' motion for judgment as a matter of law, denies Defendants' renewed assertion of qualified immunity for Defendant Fischer, and certifies any third interlocutory appeal by Defendants of this Court's denial of qualified immunity as frivolous.

## **Background**

On April 13, 2015, the decedent, Lucky Phounsy, experienced a mental health crisis and called 9-1-1 for help. San Diego County Sheriff's Deputies responded to Mr. Phounsy's call. During the altercation between Mr. Phounsy and the deputies, Mr. Phounsy was tased multiple times, punched, handcuffed, put in maximum restraints, strapped to a gurney, and had pressure applied to his head and torso. Mr. Phounsy went into cardiac arrest, coded, and eventually was removed from life support at the hospital. He was 32 years old. This litigation by Mr. Phounsy's wife and young children follows.

On August 23, 2021, the Court held a trial in this case. During the trial, on August 30, 2021, Defendants filed a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). (Doc. No. 354.) On September 3, 2021, the trial ended when the jurors were unable to reach a verdict. (Doc. No. 363.) On September 12, 2021, Defendants filed a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). (Doc. No. 386.) On October 28, 2021, the Court denied Defendants' Rule 50(a) motion. (Doc. No. 388 at 2.)

On September 15, 2021, the Court granted Plaintiffs' motion to dismiss the remaining Deputy Defendants other than Defendant Fischer and all claims by Kimberly Nang Chanthaphanh. (Doc. No. 394.) On October 28, 2021, the Court ordered Defendants to file an updated version of their Rule 50(b) motion that took into consideration the dismissal of the defendants and claims. (Doc. No. 423.) On November 2, 2021, Defendants filed the present motion requesting judgment as a matter of law pursuant to Rule 50(b) for Plaintiffs' remaining claims of (1) § 1983 excessive force claim against Defendant Fischer; (2) Monell claim against the County for failure to train on the use of force; (3) Monell claim against the County for failure to train on addressing

serious medical needs; (4) California Bane Act claims against both Defendants; (5) negligence claims against both Defendants; and (6) wrongful death claims against both Defendants. (Doc. No. 427-1.) Defendants also reassert qualified immunity against Plaintiffs' § 1983 excessive force claim against Defendant Fischer. (Id. at 5–15.) On November 16, 2021, Plaintiffs filed a response in opposition to Defendants' motion. (Doc. No. 428.) On December 3, 2021, Defendants filed a reply. (Doc. No. 429.)

After rescheduling the retrial twice, the retrial in this case was set to begin on January 19, 2022. (Doc. No. 419.) On January 10, 2022, the Court held a telephonic status conference where it continued the final pretrial conference to February 14, 2022 and continued the retrial to March 2, 2022 due to the COVID-19 Omicron surge. (Doc. Nos. 438, 443.) At the January 10, 2022 telephonic status conference, the Court also indicated that it may rule on Defendants' Rule 50(b) motion at the February 14, 2022 final pretrial conference. (Doc. No. 441, Telephonic Status Conference Tr. 20, 25.)

On February 9, 2022, Plaintiffs filed a supplemental brief detailing alleged discovery violations by Defendants. (Doc. No. 448.) Plaintiffs allege that Defendants did not provide Plaintiffs with a maximum restraint training video[1] used by the San Diego County Sheriff's Department. (Id. at 3–4.) Plaintiffs represent that they made multiple requests for production of training materials related to maximum restraints used by the San Diego Sheriff's Department during discovery. (Doc. No. 448 at 3; Scott Decl. Ex. A at 5.) Plaintiffs included as an attachment to their brief the County's response to Plaintiffs' request for production dated September 7, 2016, in which Plaintiffs requested:

> Documents containing any training, protocol, policy, or procedure (in effect at the time of the incident through the present) that applies to or governs the use of restraints by SDSD personnel, including the use of "maximum restraints" and the "recovery position."

(Doc. No. 448, Scott Decl. Ex. A at 5.) The County responded, "San Diego County

---

[1] The maximum restraints training video can be viewed here: https://www.dropbox.com/s/9pi8149hg5t6c8p/COSD%203895%20MaxRestraintCordCuff_2007%20%281%29.wmv

3:15-cv-02692-H-MDD

Sheriff's Department Use of Force Addendum F will be produced." (Id.) In response to most of Plaintiffs' other requests for production, the County simply stated that, "Such records as exist will be produced." (Id.) Plaintiffs represent that the County did not provide the training video in response to the initial request for production, "gave no indication it possessed a video training, nor did the County later supplement its production to provide a video of the deputies' training." (Doc. No. 448 at 3; Scott Decl. Ex. A at 5.) Plaintiffs represent they instead were told about the training video by chance from counsel involved in another case against the County in this district. (Doc. No. 448 at 4; Bourassa Decl. ¶¶ 3–7.) Plaintiffs requested the Court issue sanctions against Defendants of "(1) preclude[ing] the County from replying on its cord cuff training to defend any claims at trial and (2) inform[ing] the jury that defendants impermissibly withheld their cord cuff training from plaintiffs when they were required to disclose it." (Doc. No. 448 at 11.) On February 10, 2022, the Court ordered Defendants to respond to Plaintiffs' supplemental brief. (Doc. No. 449.) On February 14, 2022, Defendants filed a response to Plaintiffs' supplement brief. (Doc. Nos. 454, 455.)

On February 14, 2022, the Court held the pretrial status conference. (Doc. No. 456.) At the pretrial status conference, the Court addressed the discovery violation and ordered a deposition to be taken by Friday, February 25, 2022, at the expense of the County, of the person most knowledgeable from the County and Plaintiffs as to whether the maximum restraint training video was provided during discovery.[2] (Doc. Nos. 460 at 2; 465.) At the pretrial status conference, the Court also indicated it would not rule on Defendants' Rule 50(b) motion until the discovery violation was further addressed. (Doc. No. 459, Telephonic Status Conference Tr. 25–27.) The Court continued the final pretrial conference to Monday, February 28, 2022 at 1:30 p.m. to allow the depositions to take place. (Doc. No. 456.)

_____

[2] The Court also ordered depositions to be taken of Defendants' expert Dr. Gary Vilke as to whether he saw, reviewed, or relied on the maximum restraint training video as part of his testimony and of Defendant Fischer related to the maximum restraint training video. (Doc. Nos. 456, 460.)

On February 22, 2022, the Court also ordered the County to produce its discovery production logs or show the Court how it supplemented Plaintiffs' request for production with the training video. (Doc. No. 456.) On February 23, 2022, Defendants filed an additional supplemental brief on the discovery violation. (Doc. No. 466.) In the supplemental brief, Defendants conceded that after seven years of litigation and the Plaintiffs' dismissal of all the individual deputy Defendants other than Defendant Fischer, they have no record they produced the maximum restraints training video to Plaintiffs. (Doc. No. 446 at 2–3.) Defendants stated that the person most knowledgeable as to whether the video was produced during discovery was deposed on February 22, 2022. (Id. at 2.) Defendants stated that "[a]s to the current issue of whether the County produced the video during the discovery period, the County's investigation thus far has not determined whether the video was produced while the discovery period was open." (Id. at 2.) Defendants stated that "[t]he County's records do not show whether the video was provided to County Counsel by the Sheriff's Department in response to Plaintiffs' Request for Production of Documents in 2016. The video was not specifically identified in the County's initial response, but subsequent discovery was provided, unfortunately without bates numbering or logging." (Id. at 3.) Defendants further stated that "[w]hile the Court has ordered the County to produce a discovery production log showing disclosure of this video, the County has no such documentation in its logs. Likewise, supplemental production was made informally on an ongoing basis, and records are incomplete." (Id. at 3 n.2.) The Court also notes that the training video was not listed on the parties' pretrial order and exhibit lists for any scheduled trial in this case, (Doc. Nos. 263-2, 291, 335, 365–66), nor is there any record of it being shown during depositions or the first trial. On February 27, 2022, Plaintiffs filed an additional supplemental brief on the discovery violation. (Doc. Nos. 474, 478.)

On November 23, 2022, Defendants also filed a petition for writ of mandate, prohibition, or other appropriate relief with the Ninth Circuit. Brief for the Petitioner, San Diego, et al. v. USDC-CASD, No. 22-70027. Defendants request the Ninth Circuit issue

a peremptory writ of mandate directing and compelling this Court to (1) rule on Defendants' pending Rule 50(b) motion prior to the commencement of the retrial of this matter, currently schedule to begin on March 2, 2022; (2) not consider any evidence that was not introduced during the first trial, and (3) stay the commencement of the retrial of this matter until this Court has resolved this pending petition, and thereafter further stay the retrial of this matter until after the Rule 50(b) motion has been decided. (Id. at 20.) In the alternative, Defendants request the Ninth Circuit direct and require this Court to show cause as to why the relief prayed for in this petition by the petitioners should not be granted. (Id.)

After the first trial in this case, additional information has come to light that implicates Defendants' failure to produce highly material discovery among other issues. It would be highly prejudicial for the Court to limit its evidentiary rulings, instructions to the jury, potential sanctions for failure to produce evidentiary discovery, and other current action in light of the additional information. Further it would be prejudicial to continue or stay this retrial. The Court has already prescreened jurors and reserved courtrooms. The Court has also already secured a block of time for this trial that works with the schedules of the Court, counsel, and the many expert witnesses and fact witnesses in this case. In light of the entire record, there is not good cause to stay or continue the retrial.

## Discussion

### I. Legal Standard for Federal Rule of Civil Procedure 50(b)

Under Federal Rule of Civil Procedure 50(b), "[n]o later than 28 days after the entry of judgment – or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged – the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b)(1)-(3).

1    "The standard for judgment as a matter of law… 'mirrors' the summary judgment
2    standard." Reed v. Lieurance, 863 F.3d 1196, 1204 (9th Cir. 2017) (citing Reeves v.
3    Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). "Judgment as a matter of law is
4    proper if the evidence, construed in the light most favorable to the non-moving party,
5    allows only one reasonable conclusion…[I]f conflicting inferences may be drawn from
6    the facts the case must go to the jury." Headwaters Forest Def. v. Cnty. of Humboldt, 240
7    F.3d 1185, 1197 (9th Cir. 2000) (citations omitted) (vacated on other grounds); see also
8    Jorgensen v. Cassiday, 320 F.3d 906, 917 (9th Cir. 2003).

9    "[I]n entertaining a motion for judgment as a matter of law, the court should
10   review all the evidence in the record." Reeves, 530 U.S. at 150. The court "may not make
11   credibility determinations or weigh the evidence" but instead "must draw all reasonable
12   inferences in favor of the nonmoving party." Id. "Thus, although the court should review
13   the record as a whole, it must disregard all evidence favorable to the moving party that
14   the jury is not required to believe." Id. at 151.

## II. Excessive Force as to Defendant Richard Fischer

16   Defendants argue Plaintiffs introduced insufficient evidence during trial to prove
17   Defendant Fischer used more force than was "'objectively reasonable' under all of the
18   circumstances" to support a § 1983 excessive force claim. (Doc. No. 427-1 at 2–4.)
19   Plaintiffs argue they introduced sufficient evidence at trial to support an excessive force
20   claim against Defendant Fischer. (Doc. No. 428 at 5–6.)

21   "Under the Fourth Amendment, police may use only such force as is objectively
22   reasonable under the circumstances." LaLonde v. Cnty. of Riverside, 204 F.3d 947, 959
23   (9th Cir. 2000) (citing Graham v. Connor, 490 U.S. 386, 397 (1989)). "For excessive
24   force claims, we evaluate: (1) 'the type and amount of force inflicted, (2) the
25   government's interest in the use of force, and (3) the balance between the gravity of the
26   intrusion…and the government's need.'" Valenzuela v. City of Anaheim, No. 20-55372,
27   2012 WL 3362847, at *3 (9th Cir. 2021) (quoting Rice v. Morehouse, 989 F.3d 1112,
28   1121 (9th Cir. 2021)); see also Graham, 490 U.S. at 396. In evaluating the type and

3:15-cv-02692-H-MDD

amount of force inflicted, "the nature and degree of physical contact are relevant…as are the risk of harm and the actual harm experience." Williamson v. City of Nat'l City, 23 F.4th 1146, 1152 (9th Cir. 2022) (citations omitted). In evaluating the government's interest, a district court must consider "(1) how severe the crime at issue was, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." Id. at 1153 (quoting Rice, 989 F.3d at 1121).

Other factors relevant in evaluating if the use of force is objectively reasonable include "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." Glenn v. Washington Cnty., 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted); see also Deorle v. Rutherford, 272 F.3d 1272, 1283 (9th Cir. 2001) ("Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.").

Taking the evidence presented at trial in the light most favorable to Plaintiffs, a reasonable jury could find Defendant Fischer used excessive force against Mr. Phounsy when he assisted in carrying Mr. Phounsy to the driveway and, according to a paramedic witness, dropped Mr. Phounsy one to two feet while Mr. Phounsy was in handcuffs and maximum restraints. A reasonable jury could also find Defendant Fischer used excessive force against Mr. Phounsy when he applied 9 out of 10 force to Mr. Phounsy's head and torso for approximately 10 minutes in the ambulance while Mr. Phounsy was handcuffed, in maximum restraints, and strapped to a gurney.

By way of background, on April 13, 2015, Mr. Phounsy called 9-1-1 and asked for help. (Trial Tr. II-82–84.) San Diego Sheriff's Deputies responded to Mr. Phounsy's 9-1-1 call at the home of Mr. Phounsy's mother, Kimberly Nang Chanthaphanh, and

3:15-cv-02692-H-MDD

stepfather, Greg Kelley. (Trial Tr. II-77.) That day, Mr. Phounsy, his wife, Loan Nyguen, their two minor children, K.J.P. and K.P.P., and Mr. Phounsy's sister's family were at Ms. Chanthaphanh's and Mr. Kelley's home celebrating Mr. Phounsy's son's birthday. (Trial Tr. II-77–78.) At trial, Mr. Kelley testified that as the day progressed, Mr. Phounsy began acting "afraid," "anxious," and "paranoid." (Trial Tr. II-80–82, 84, 135.) Mr. Kelley testified that Mr. Phounsy was checking under the beds and in closets, and "thought someone was after him." (Trial Tr. II-82, 84.) Mr. Kelley testified that Mr. Phounsy attended Coachella a few days prior, took drugs while he was there, and had not slept in multiple days. (Trial Tr. II-81-82.) Mr. Kelley testified that Mr. Phounsy did not take any drugs on April 13, 2015.[3] (Trial Tr. 84, 136.) Mr. Kelley testified that he was going to bring Mr. Phounsy to the hospital, but before he could, Mr. Phounsy called 9-1-1. (Trial Tr. II-83–84.) Mr. Phounsy told the 9-1-1 operator that people were trying to kill him. (Trial Tr. VII-228–29.) Mr. Kelley testified that he took the phone from Mr. Phounsy and told the 9-1-1 operator that Mr. Phounsy was acting paranoid, wanted help, had possibly taken drugs a few days earlier, and that there were no weapons at the house. (Trial Tr. II-84–85.) After speaking with the 9-1-1 operator, Mr. Kelley told Mr. Phounsy the police were on their way, and Mr. Phounsy "was relieved. He wanted help. He was scared, and he was relieved." (Trial Tr. II-87.)

Instead of sending the San Diego County Psychiatric Emergency Response Team (PERT), San Diego County Sheriff's Deputies Marcos Collins and Janae Krull responded. (Trial Tr. II-94; VII-205–06.) Deputies Collins and Krull were met in the driveway by Mr. Kelley, who "explained [to the deputies] what was going on" and "introduced them to Lucky, and they followed [Mr. Kelley] into the house." (Trial Tr. II-88; VI-206–07.) At trial, Plaintiffs' use of force expert, Mr. Scott DeFoe, was critical of

---

[3] The only drugs detected in the toxicology report conducted the blood sample taken from Mr. Phounsy at the time he passed away were cannabis, trace amounts of MDMA, and Benadryl. (Trial Tr. III-207, 212.) Dr. Sperry, Plaintiffs' forensic pathology expert, testified at trial that the amount of MDMA detected in Mr. Phounsy's blood was consistent with Mr. Phounsy ingested the MDMA several days prior to April 13, 2015. (Trial Tr. III-208–10.)

Deputies Collins's and Krull's actions and testified that:

> [I]t would have been prudent for Corporal Collins and Deputy Krull not to enter the residence initially. Even though Mr. Kelley allowed them to come in, you know, gave them access to come in, I would want Mr. Phounsy to step out of the residence, and there's a number of reasons for that. One, I don't know what's in his residence. I don't know who's in his residence. We all know we have kitchens, and there's access to knives in kitchens. So I've got all those concerns right away.

> I don't know if he's mentally ill, experiencing a mental crisis and/or under the influence of controlled substances. I don't know if he's on or off psycho tropic medication. I'm going to want to find out some of those important factors before I walk in. And once against, we can slow down. There's not a crime in progress. It's not like it's a domestic violence call where someone's being harmed. We can have Mr. Kelley come out, who was the best source of the information I believe at the time, and ask him what's going on and get a good detail and then formulate a plan with that information, and I believe that plan should have been obviously summoning a supervisor at that point. We know that San Diego Sheriff's Department has a very robust PERT unit, the Psychiatric Emergency Response Team. In fact, some of the deputies are trained in that, to come out to see, once again, the best information we can find out, is it psychosis, is it related to drugs, is it a compilation of both, because there's really no rush at this time.

> I'm going to want a supervisor. I had been a supervisor my last 14 years. This would be a typical call that I would want to go out on, once again, because there's no rush to make entry into the house.

> At that point I want to see if Mr. Phounsy will come out once I have maybe a couple extra deputies with me and a supervisor, we've formulated a plan. But prior to him coming out, I'm going to establish a cover and contact officer, and why that's critically importance is that, once, again, you don't know his level or his mental state at that time. So why that's important in a lot of these events is that I'm going to be the – if I'm designated as the contact officer, I'm going to have that conversation with Lucky at that time. We're not going to all have a conversation with Lucky. We're not going to tell him multiple commands like get on the ground, don't move, put your hands up, anything that may confuse him. We want to slow things down and use our actions and use our words to de-escalate the situation, and that's what officers are trained to do, especially PERT trained officers, or should be trained in that.

> So, in that respect, I would have requested a supervisor. I would have requested additional deputies or two and slow things down and find out what's really transpiring inside of the house because, once again, there's no rush at this juncture.

(Trial Tr. IV-229–31.)

1    Upon entry of the home, Deputies Collins and Krull attempted to place handcuffs
2  on Mr. Phounsy and pat him down. (Trial Tr. II-92–93; VII-210–12.) Mr. Kelley testified
3  Mr. Phounsy "was confused of why he was being asked to put his hands up" and "why
4  they were putting the handcuff up on him," especially since Mr. Phounsy had himself
5  called 9-1-1 for help and was not a suspect of any crime at that point. (Trial Tr. II-157.)
6  During the encounter, the deputies tased Mr. Phounsy multiple times and Deputy Krull
7  used her baton on Mr. Phounsy. (Trial Tr. II-93–96, 98, 100-01, 153; VII-213–16.) In
8  resisting being handcuffed, Mr. Phounsy swung the open handcuff at Deputies Collins,
9  injuring Deputy Collins's nose, and was combative with Deputy Krull. (Trial Tr. VII-215,
10  22–23.)

11    Deputies Collins and Krull called for backup and a number of deputies arrived,
12  including Defendant Fischer, Deputies Dean Allen, Michael Lee, Billy Tennison, Tamani
13  Pugh, Aaron Brooke, Jenny Martinson, Sandra Hoxie (Carbajal), Jovonni Silva, and
14  Sergeant Kevin Ralph. (Trial Tr. II-102, 160, 181–83, 210, 214; III-3–4, 294–96; IV-3–4,
15  51–52, 193.) The deputies brought Mr. Phounsy to the ground face down in the prone
16  position. (Trial Tr. II-103.) Several deputies placed downward pressure on Mr. Phounsy
17  while he was prone. (Trial Tr. II-213, III-10, 51–52, III-50, 305; IV-4.) Deputy Tennison
18  delivered two to three closed fist strikes to Mr. Phounsy and attempted to place Mr.
19  Phounsy in a carotid restraint. (Trial Tr. II-51.) Deputy Brookes tased Mr. Phounsy in the
20  lower right shoulder for three seconds for pain compliance. (Trial Tr. III-298–302.)
21  Deputy Brookes testified that pain compliance is "intentionally causing a person pain to
22  seek specific cooperative behavior," not because someone is "presenting a say immediate
23  threat to your life or life of anybody else." (Trial Tr. III-300–01.) Deputy Brookes further
24  testified that pain compliance was taught to him and approved by the San Diego County
25  Sheriff's Department. (Trial Tr. III-301–02.)

26    Eventually, the deputies placed Mr. Phounsy in handcuffs and maximum restraints.
27  (Trial Tr. II-104.) Deputy Martinson testified that to place the maximum restraints on Mr.
28  Phounsy, the deputies put Mr. Phounsy "on the ground in a prone position," several

deputies held "[Mr. Phounsy's] legs down, while Deputy Pugh was able to put an ankle restraint onto Lucky's ankles," Deputy Martinson "ben[t] Mr. Phounsy's knees and his ankles to be where it needed to be attached, at the waist restraint cuff cord." (Trial Tr. IV-25–27.) Deputy Tennison testified that he and other officers also secured and bound Mr. Phounsy's hands behind his back. (Trial Tr. II-250.) Deputy Martinson testified that an additional ankle restraint was placed on Mr. Phounsy in the driveway and attached to the waist restraint. (Trial Tr. IV-28–29.) Plaintiffs' use of force expert, Mr. DeFoe, testified that in his professional opinion, the use of maximum restraints on Mr. Phounsy was an unnecessary and inappropriate use of force. (Trial Tr. IV-252.)

At trial, Defendants introduced Addendum F of the San Diego County Sheriff's Department manual, which addresses the County's maximum restraint policy. (Trial Tr. III-66.) Addendum F provides that "[a]s soon as possible a subject is maximally restrained, he will be rolled onto his side or into a seated position. The arresting deputy must continuously monitor the subject for consciences and breathing." (Trial Tr. III-67, 110.) At trial, several deputies testified that no one officer was designated as the arresting deputy in charge of monitoring Mr. Phounsy. (See, e.g., Trial Tr. III-111; IV-89.). Several deputies also testified that they did not check Mr. Phounsy's breathing or consciousness and did not see anyone else do so. (See, e.g., Trial Tr. II-215; III-63; IV-63.) Plaintiffs' use of force expert, Mr. DeFoe, testified that it was the County's policy that "[t]he arresting deputy must continually monitor the subject for consciousness and breathing, and none of the happened – either of those things happened at any time in the hallway." (Trial Tr. IV-249) (typo in original).

After Mr. Phounsy was placed in maximum restraints, Mr. Phounsy was carried outside the home to the driveway by multiple deputies, including Defendant Fischer. (Trial Tr. II-103–05, 159–60; IV-192.) Firefighter paramedic Aaron Hackett testified that the deputies dropped Mr. Phounsy onto the driveway when "[Mr. Phounsy] was one to two feet off the floor." (Trial Tr. II-18.) Mr. Phounsy was held in place in the driveway by three or four deputies. (Trial Tr. I-184, 240–41.) Sergeant Ralph testified that while

Mr. Phounsy was in the driveway with maximum restraints, he "did not see [Mr. Phounsy] physically resisting at that point." (Trial Tr. II-185.) Deputy Allen also testified that while Mr. Phounsy was in the driveway with maximum restraints, he was not concerned Mr. Phounsy would assault any deputies and did not see Mr. Phounsy fight with the deputies, try to kick the deputies, flail, or get out of the maximum restraints. (Trial Tr. II-216–19.)

Paramedics then arrived on scene, including firefighter paramedics Marc Poynter, David Csik, and Hackett. (Trial Tr. I-154–55; 239–40; II-14.) The paramedics performed an initial assessment of Mr. Phounsy while he was in the driveway in maximum restraints. (Trial Tr. II-21–27.)  Paramedic Poynter testified that when Mr. Phounsy was in the driveway, Paramedic Poynter estimated Mr. Phounsy was breathing at an abnormally rapid rate and had an abnormally high pulse rate. (Trial Tr. I-194–98.) Paramedic Hackett testified he gave Mr. Phounsy a 5 milligram dose of Versed, a sedative, through injection. (Trial Tr. I-162, 192; II-19, 30–31.) Paramedic Poynter testified that the paramedics waited 10 minutes to see if the first dose of Versed had any effect on Mr. Phounsy, and when it did not, Mr. Phounsy was given a second dose of Versed. (Trial Tr. I-162–63, 192–93.) Paramedic Poynter testified that the paramedics waited between 3 and 4 minutes for the second dose to work, but the second dose did not appear to be effective. (Trial Tr. I-163, 249; II-33.) After his initial assessment with the paramedics, Mr. Phounsy was placed on a gurney with handcuffs, maximum restraints, and strapped to the gurney with seatbelt straps. (Trial Tr. I-166–67; IV-141-45.) Mr. Phounsy was then loaded into an ambulance to be transported to Grossmont Hospital along with Paramedics Poynter, Hackett, Csik, and Defendant Fischer. (Trial Tr. I-250, 253.)

Defendant Fischer arrived on scene as Mr. Phounsy was being placed in maximum restraints, and Defendant Fischer was one of the deputies who assisted in carrying Mr. Phounsy outside the home to the driveway. (Trial Tr. II-103–05, 159–60; IV-192.) After carrying Mr. Phounsy to the driveway, Defendant Fischer testified that he accompanied

Deputy Pugh while she took pictures of the scene, including inside the house, and collected Deputy Collins's equipment. (Trial Tr. IV-194.) Defendant Fischer testified he returned to the driveway as Mr. Phounsy was being placed in the ambulance. (Trial Tr. IV-196–97.) At trial, Plaintiffs introduced photographs taken by Deputy Pugh, the deputy photographer on scene, of Mr. Phounsy in the driveway and on the gurney shortly before he was placed in the ambulance with Defendant Fischer. (Trial Tr. III-120–21.) The photographs, Plaintiffs' Exhibits 69–73, are attached to this order as Exhibit A. At the time, San Diego Sheriff's Deputies did not have body cameras. (Trial Tr. III-130.)

Defendant Fischer testified he was next to Mr. Phounsy while he was being loaded in the ambulance. (Trial Tr. IV-197.) Defendant Fischer further testified he was directed by either Deputy Brooke or Sergeant Ralph go in the ambulance with Mr. Phounsy. (Trial Tr. 198.) Defendant Fischer testified that he "knew [Deputy Collins and Krull] were injured" as a result of the struggle with Mr. Phounsy before he got into the ambulance with Mr. Phounsy. (Trial Tr. IV-141–42.) Defendant Fischer also testified that Mr. Phounsy looked like the photo labeled Plaintiffs' Exhibit 72 as Mr. Phounsy was loaded in the ambulance with him. (Trial Tr. IV-144-45.) Plaintiffs' Exhibit 72 is included in Exhibit A attached to this order. Plaintiffs' Exhibit 72 does not appear to demonstrate any active resistance by Mr. Phounsy.

Defendant Fischer sat in the back of the ambulance with Mr. Phounsy right next to Mr. Phounsy's head. (Trial Tr. IV-145.) Defendant Fischer requested a spit sock be placed on Mr. Phounsy's head (Trial Tr. I-28; II-40, 65–66; IV-149–52, 199.) During the ambulance ride, Mr. Phounsy was not hooked up to an EKG machine or pressure cuff. (Trial Tr. I-169, 211.) Mr. Phounsy's blood pressure was not taken. (Trial Tr. I-170; II-36.) Mr. Phounsy was not given an IV to receive fluids. (Trial Tr. I-212; II-37.) Mr. Phounsy was not hooked up to an oxygen saturation monitor, and Mr. Phounsy was not initially given oxygen. (Trial. Tr. I-169; II-52–53; III-190.)

In the ambulance, Defendant Fischer testified he only put his hands on Mr. Phounsy's head. (Trial Tr. IV-145.) But Paramedic Hackett testified that Defendant

Fischer had "one hand on the patient's shoulder and one on his head" and "used his hands to apply force." (Trial Tr. II-68.) Paramedic Hackett further testified that he saw Defendant Fischer stand up as he applied pressure to Mr. Phounsy's head. (Trial Tr. II-68.) Defendant Fischer testified at trial:

> Q: And, as the ambulance drove away, you took your hands, both of them, and you put those hands on Mr. Lucky's head and his torso, and you pushed down on him, didn't you?
> A: Not on his torso, but his head, yes.
> Q: And you did so with all the strength you had, right?
> A: Based on his level of resistance, yes.
> Q: Yes, you did. All the strength you had, you pressed down on his head, right?
> A: Yes, sir.
> Q: And you maintained that pressure for upward of 10 minutes, right?
> A: That was my approximation, yes."

(Id. at IV-145.) At trial, Defendant Fischer further testified:

> Q: And yet for 10 minutes, you pushed down with the strength that you described as between 9 and 10, 10 being as hard as you could possibly press down, right?
> A: Yes, sir.

(Id. at IV-146.) Defendant Fischer testified that on April 13, 2015, he weighed approximately 225 pounds. (Trial Tr. IV-141.)

Paramedic Hackett testified that he and Paramedic Poynter repeatedly asked Defendant Fischer throughout the ambulance ride if Mr. Phounsy was resisting. (Trial Tr. II-41, 70; IV-154.) Defendant Fischer repeatedly replied that Mr. Phounsy was still resisting. (Id.) But Paramedic Hackett testified that he thought "it looked like [Mr. Phounsy] was no longer actively resisting." (Trial Tr. II-41.) Paramedic Hackett further testified:

> Q: Now, Deputy Fischer never alerted you that Mr. Phounsy had stopped moving. Do I have that right?
> A: Based on my deposition and my recollection of the events, yes, sir.
> Q: An when you specifically asked Defendant Fischer, "is still resisting?," Defendant Fischer said, "Yes, he is"?
> A: Yes, sir.
> Q: Okay. And then, at some point, you stepped in because you grew alarmed, because Mr. Phounsy was completely motionless, right?

1    A: We felt like there was a status change in the patient.

2  (Trial Tr. II-70.) Paramedic Hackett testified that he heard the audible grinding of Mr.

3  Phounsy's teeth, which can indicate a person is coding. (Trial Tr. I-220–21.) Paramedic

4  Hackett testified that Defendant Fischer held Mr. Phounsy's torso until the point where

5  Paramedic Hackett realized Mr. Phounsy coded. (Trial Tr. II-70.)  Paramedics Hackett

6  and Poynter instructed Defendant Fischer to step away from Mr. Phounsy. (Trial Tr. II-

7  71.) Defendant Fischer stopped applying pressure. (Trial Tr. I-173; II-42–43, 52–53; IV-

8  203–05) Shortly before reaching Grossmont Hospital, Mr. Phounsy stopped breathing,

9  was pulseless, and had gone into cardiac arrest. (Trial Tr. I-222–23; II-41.) Paramedic

10  Hackett testified that Mr. Phounsy "was found to be pulseless and apneic, and so [the

11  paramedics] immediately started CPR." (Trial Tr. I-173, II-41–43, 52–53, IV-203–05.)

12  Mr. Phounsy was not given oxygen until he coded. (Trial Tr. I-277; II-52–53; III-190.)

13  Mr. Phounsy was eventually taken off life support at the hospital. (Trial Tr. II-109–10.)

14    At trial, Dr. Sperry, Plaintiffs' expert in forensic pathology, testified that in his

15  opinion:

16    Mr. Phounsy's death was caused by the effects of restricted breathing, that is, his
17    ability to breathe in and out and take oxygen in his body and expel carbon dioxide
     were impaired to such a degree that he eventually suffered cardiorespiratory arrest,
18    meaning his heart stopped and he stopped breathing. This caused ultimately
     irreversible brain damage. The technical term we use is anoxic encephalopathy,
19    which is a fancy way of saying no oxygen is getting to the brain and the brain then
     deteriorates and dies because it needs oxygen. He also had organ system failure of
20    other organs of his body, the kidney and the liver, specifically the kidneys and the
     liver that also were related to lack of oxygen and his cardiorespiratory arrest. So,
21    ultimately, restricted breathing that caused the development of cardiac respiratory
     arrest.
22

23  (Trial Tr. III-178.)

24    Dr. Sperry testified at trial that Mr. Phounsy's "lips have this bluish coloration to

25  them, and that is characteristic – that's what cyanosis looks like of the lips." (Trial Tr. III-

26  195; see Exhibit 70.) Dr. Sperry was asked, "So you see cyanosis on Mr. Phounsy's lips

27  in this photo?" and he replied, "Yes, I do." (Trial Tr. III-195.) Dr. Sperry testified that

28

cyanosis "is the visual appearance that…the patient manifests that they're not getting enough oxygen, and typically that is bluish discoloration on the lips and even around the mouth, bluish discoloration of the fingernails. That is – that is exactly what cyanosis means, is that there's not enough oxygen in the person's bloodstream." (Trial Tr. III-194; see also II-11.) Dr. Sperry further testified that Mr. Phounsy was diagnosed and treated by the ER physicians at Grossmont Hospital with acidosis. (Trial Tr. III-199.)

Dr. Sperry testified that the only drugs detected in the toxicology report done on Mr. Phounsy's blood sample taken at the time Mr. Phounsy passed away was cannabis, trace amounts of MDMA, and Benadryl. (Trial Tr. III-207, 212.) Dr. Sperry testified that the amount of MDMA detected in Mr. Phounsy's blood was "consistent really with Mr. Phounsy having ingested some MDMA perhaps as long as approximately 65 hours or so prior to the time that this blood was taken and would have been consistent then with him being at Coachella." (Trial Tr. III-208–09.) Dr. Sperry testified that by the time Mr. Phounsy's blood was drawn, the MDMA "was almost completely eliminated by that time." (Trial Tr. III-209.)  Dr. Sperry testified that it was his opinion, that Mr. Phounsy "was not under the influence of MDMA or Molly or Ecstasy at the time when his drawn. The effect that would have caused him to be under the influence or feeling the psychologic feelings of the drug, that was probably two, maybe three days earlier. That had long passed." (Trial Tr. III-210.)

At trial, Dr. Sperry further testified that Versed was not detected in Mr. Phounsy's system after the toxicology tests were performed. (Trial Tr. III-197.) Dr. Sperry testified that the Versed injections "were given into the muscle" and it usually takes between 5 to 10 minutes approximately for 5 milligrams of Versed to get into a person's blood. (Trial Tr. III-197–98.) Dr. Sperry testified that there was "no evidence of Versed in" the blood specimens taken of Mr. Phounsy at the time he passed away, which indicates Mr. Phounsy's "circulation, that is, his --- the blood flowing, being pumped around his body, was not working properly, that the – his heart was not working properly." (Trial Tr. III-198.)

Taking the evidence presented at trial in the light most favorable to Plaintiffs, a reasonable jury could choose not to accept Defendant Fischer's report of his actions or inactions. Defendant Fischer has been convicted of four felonies from his actions while on duty as a San Diego County Sheriff's Deputy.[4],[5] (Doc. No. 265 at 1; Trial Tr. IV-103–05.)[6] (Trial Tr. IV-103–05.) At trial, Defendant Fischer testified:

> Q: Defendant Fischer, you were once a deputy employed by the San Diego Sheriff's Department?
> A: Yes, sir.
> Q: You are no longer employed by the San Diego Sheriff's Department?
> A: That is correct.
> Q: And that is because, on September of 2019, you pled guilty to four felonies, correct?
> A: That is correct, sir.
> Q: And those felonies, those four felonies, occurred while you were on duty?
> A: Yes, sir.
> Q: In you uniform?
> A: Yes, sir.
> Q: I'm going to go through the four felonies. On September the 9th of 2019, did you make an appearance before Judge Daniel Goldstein here in San Diego?
> A: Yes, sir.
> Q: And during that court appearance, did you admit to the following felonies? Felony number one: On October 20, 2016, you, Richard Fischer, did unlawfully, under color of authority and without lawful necessity, assault initials D.N., a human being, while you were a public officer, to wit, a deputy sheriff with the San Diego County Sheriff's Department, in violation of PCS 149, a felony. Did you admit that conduct?
> A: Yes, I did.

---

[4] When deciding a motion for judgment as a matter of law, the court "may not make credibility determinations." Reeves, 530 U.S. at 150.

[5] Defendant Fischer also pled guilty to two misdemeanor counts of assault and battery under color of authority in violation of California Penal Code § 149 and one misdemeanor count of false imprisonment in violation of California Penal Code § 236. (Doc. No. 265 at 1.) Under Fed. Rule of Evid. 403 and 609(a)(1) & (2), the misdemeanor counts were not admissible at the trial and cannot be used for purposes of credibility.

[6] Defendant Fischer was represented by San Diego County Counsel until November 23, 2022, when conflict counsel was brought on due to Defendant Fischer's termination from the San Diego County Sheriff's Department and felony convictions. (Doc. No. 248 at 2.) On November 23, 2020, Mildred K. O'Linn, Esq., of Manning & Kass, Ellrod, Ramirez, Trester LLP was substituted as counsel of record for Defendant Fischer and continues to represent him. (Doc. No. 242.)

Q: Second felony: Between March 27 and April 4, 2017, you, Richard Fischer, did unlawfully, under color of authority and without lawful necessity, assault initials T.D., a human being, while you were a public officer, to wit, a deputy sheriff with the San Diego County Sheriff's Department, in violation of PCS 149, a felony. Did you admit that conduct?

A: Yes, sir.

Q: Felony number three: On September the 1st, 2016, did you, Richard Fischer, unlawfully, under color of authority and without lawful necessity, assault initials C.M., a human being, while you were a public officer, to wit, a deputy sheriff with the San Diego County Sheriff's Department, a violation of PCS 149, a felony? Did you admit that?

A: Yes, sir.

Q: Fourth felony: On October the 6th, 2017, did you, Richard Fischer, unlawfully, under color of authority and without lawful necessity, assault initials D.A., a human being, while you were a public officer, to wit, a deputy sheriff with the San Diego County Sheriff's Department, a violation of PCS 149, a felony? Did you admit that in front of Judge Goldstein?

A: Yes, sir.

Q: And then did you appear again for sentencing in front of Judge Goldstein on December the 10th of 2019?

A: Yes, sir.

Q: And was that for your sentencing?

A: Yes, sir.

Q: And were you then sentenced to five years in prison for having committed those four felonies?

A: Yes, sir.

Q: And because of those felonies, you are no longer employed by the San Diego Sheriff's Department, correct?

A: Correct.

(Id.) Defendant Fischer also testified at trial that he had two complaints filed against him for excessive use of force by individuals Defendant Fischer encountered while on duty.[7] (Trial Tr. IV-106.) These two complaints occurred prior to the present incident. (Trial Tr. IV-106, 125.) Defendant Fischer is currently incarcerated. (See Doc. Nos. 453, 457, 458.)

Taking the evidence presented at trial in the light most favorable to Plaintiffs, a reasonable jury could find Defendant Fischer dropped Mr. Phounsy one to two feet while

---

[7] The two complaints of excessive force were filed against Defendant Fischer by David Lyn William and Christopher Weaver. See infra pp. 29–31 for further discussion of the two complaints.

3:15-cv-02692-H-MDD

he was assisting in carrying Mr. Phounsy out of the house to driveway. A reasonable jury could find this constituted excessive force, considering Mr. Phounsy was handcuffed behind his back and in maximum restraints.

Taking the evidence presented at trial in the light most favorable to Plaintiffs, a reasonable jury could also find that prior to being placed in the ambulance with Defendant Fischer, Mr. Phounsy was in maximum restraints, handcuffed, strapped to the gurney, and in serious medical distress. (See Exhibit A.) A reasonable jury could find that while in the ambulance, any resistance by Mr. Phounsy was Mr. Phounsy struggling to breath. A reasonable jury could find that prior to the ambulance ride, Defendant Fischer heard Deputies Collins and Krull were injured by Mr. Phounsy, and a reasonable jury could infer that Defendant Fischer had an incentive to retaliate against Mr. Phounsy. A reasonable jury could find that while in the ambulance, Defendant Fischer had alternative means of avoiding being hit by Mr. Phounsy's head to the extent Mr. Phounsy was moving, such as by leaning back.  A reasonable jury could find that in the ambulance, Mr. Phounsy was "subdued" and "rendered helpless" by the handcuffs, maximum restraints, gurney straps, and spit sock. As a result, a reasonable jury could find that placing "9 out of 10 pressure" for approximately 10 minutes on Mr. Phounsy's head was excessive force. See, e.g., Valenzuela, 2012 WL 3362847, at *2 (finding excessive force when the defendant initially resisted officers but "by the time of the final hold, [the defendant] was subdued: He was lying on the ground with his arms pinned down by officers, and he was kept in the choke hold for at least one minute despite the arm restraints"); LaLonde, 204 F.3d at 961 ("[I]n a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of [force]…constitutes excessive force.").

The evidence presented at trial, construed in the light most favorable to Plaintiffs, could allow for a reasonable jury to find Defendant Fischer used excessive force against Mr. Phounsy. In fact, the jurors at the first trial in this case were unable to reach a consensus on any of the claims, further supporting this conclusion. As a result, the Court

denies Defendants' Rule 50(b) motion as to Plaintiffs' excessive force claim against Defendant Fischer.

## II. California's Bane Act

Defendants argue Plaintiffs introduced insufficient evidence at trial to make Bane Act claims. (Doc. No. 427-1 at 22.) Plaintiffs argue that they introduced sufficient evidence for a reasonable juror to find Defendant Fischer used excessive force against Mr. Phounsy to support their Bane Act claims. (Doc. No. 428 at 17–18.)

The Bane Act provides a private cause of action against anyone who "interferes by threats, intimidation, or coercion or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by an individual or individuals of rights secured by the Constitution of laws of the United States, or laws and rights secured by the constitution or laws of California." Cal. Civ. Code § 52.1(b). "[T]he elements of the excessive force claim under [The Bane Act] are the same as under § 1983[.]" Reese v. Cnty. of Sacramento, 888 F.3d 1030, 1044 (9th Cir. 2018) (quoting Chaudhry v. City of Los Angeles, 751 F.3d 1096, 1105 (9th Cir. 2014)). But in the context of an excessive force claim, "the Bane Act requires a 'specific intent to violate the arrestee's right to freedom from unreasonable seizure.'" Reese, 888 F.3d at 1043. To meet the specific intent standard, a defendant must have "intended not only the force, but its unreasonableness, its character as 'more than necessary under the circumstances.'" Id. at 1045 (quoting United States v. Reese, 2 F.3d 870, 885 (9th Cir. 1993)). Municipal defendants may be held vicariously liable for an officer's violation of the Bane Act. See Cal. Gov. Code § 815.2(a); see also Cameron v. Craig, 713 F.3d 1012, 1023 (9th Cir. 2013); Berns v. City of Redwood City, 737 F.Supp.2d 1047, 1065 (N.D. Cal. Aug. 25, 2010) ("[M]unicipal defendants may be held vicariously liable for an officer's violation of section 52.1. Cal. Gov't Code § 815.2(a).").

At trial, Plaintiffs introduced evidence that Mr. Phounsy was in maximum restraints, handcuffed, and strapped to a gurney when he was placed in the ambulance with Defendant Fischer. (Trial Tr. IV-141–45; Exhibit A.) Defendant Fischer testified

1   that while Mr. Phounsy was in maximum restraints and strapped to a gurney, he applied

2   "9 out of 10 pressure" on Mr. Phounsy's head for approximately 10 minutes. (Trial Tr.

3   IV-146.)  Defendant Fischer also testified that he "knew [Deputy Collins and Krull] were

4   injured" as a result of the struggle with Mr. Phounsy before he got into the ambulance

5   with Mr. Phounsy. (Trial Tr. IV-141–42.) Taking the evidence in the light most favorable

6   to the Plaintiffs, a reasonable jury could draw conflicting inferences as to whether

7   Defendant Fischer used excessive force in violation of Mr. Phounsy's Fourth Amendment

8   rights and whether Defendant Fischer intended the force to be "more than necessary

9   under the circumstances." See Reese, 888 F.3d at 1045. As such, the Court also denies

10  Defendants' Rule 50(b) motion as to Plaintiffs' Bane Act claims.

11  **III. Qualified Immunity**

12       Defendants argue that even if Plaintiffs' evidence at trial was sufficient to prove a

13  constitutional violation, Defendant Fischer would still be entitled to qualified immunity

14  because such a constitutional right was not clearly established in April 2015.[8] (Doc. No.

15  427-1 at 5.) Plaintiffs argue Defendant Fischer is not entitled to qualified immunity

16  because he violated clearly established law under Drummond ex rel. Drummond v. City

17  of Anaheim, 343 F.3d 1052 (9th Cir. 2003). (Doc. No. 428 at 7–9.)

18       "Qualified immunity shields a police officer from liability for civil damages under

19  section 1983 'unless the officer []violated a clearly established constitutional right.' Thus,

20  the qualified-immunity analysis involves two prongs: (1) whether the officer's conduct

21  violated a constitutional right, and (2) whether the right 'was clearly established at the

22  time of the events at issue.'" Williamson, 23 F.4th at 1151 (quoting Monzon v. City of

23  Murrieta, 978 F.3d 1150, 1156 (9th Cir. 2020)). Because a reasonable jury could find

24  Defendant Fischer used excessive force against Mr. Phounsy in violation of the Fourth

25  Amendment, the Court now turns to the second prong of qualified immunity analysis.

26

27  _____

28  [8] In analyzing whether Mr. Phounsy's right to be free from excessive force was "clearly established," the Court has only considered cases predating the date of the incident, April 13, 2015.

1    On the second prong, a district court must look to "'whether the right was clearly

2    established…in light of the specific context of the case' such that 'it would be clear to a

3    reasonable officer that his conduct was unlawful in the situation he confronted.'"

4    Drummond, 343 F.3d at 1056 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). In

5    determining whether a right was clearly established, there does not need to be "a case

6    directly on point" but "existing precedent must have placed the statutory or constitutional

7    question beyond debate." Rivas-Villegas v. Cortesluna, 142 S.Ct. 4, 7–8 (2021) (quoting

8    White v. Pauly, 137 S.Ct. 548, 551 (2017)).

9    "[T]he reasonableness of force used is ordinarily a question of fact for the jury."

10   Avina v. United States, 681 F.3d 1127, 1130 (9th Cir. 2012) (quoting Liston v. Cnty. of

11   Riverside, 120 F.3d 965, 976 n.10 (9th Cir. 1997)). Thus, "[b]ecause the excessive force

12   inquiry nearly always requires a jury to sift through disputed factual contentions, and to

13   draw inferences therefrom, [the Ninth Circuit] held on many occasions that summary

14   judgment or judgment as a matter of law in excessive force cases should be granted

15   sparingly." Avina, 681 F.3d at 1130 (quoting Glenn, 673 F.3d at 871); see also Espinosa

16   v. City and Cnty. of San Francisco, 598 F.3d 528, 537 (9th Cir. 2010) ("[T]his court has

17   often held that in police misconduct cases, summary judgment should only be granted

18   'sparingly' because such cases often turn on credibility determinations by a jury."); Smith

19   v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005).

20   This Court and the Ninth Circuit have considered Defendants' claims of qualified

21   immunity for Defendant Fischer on multiple occasions. On April 12, 2019, on remand

22   from the Ninth Circuit, this Court denied in part Defendants' motions for summary

23   judgment. (Doc. No. 171.) The Court noted:

24       [G]enuine issues of material fact remain as to whether Office Fischer violated
         Phounsy's rights in the ambulance. Officer Fischer himself describes that he was
25       pushing down on Phounsy's head in the ambulance with nearly full force. This
         poses a significant intrusion on Phounsy's rights. Factual disputes remain as to
26       whether such a use of force was warranted and justified based on the governmental
         interests given the circumstances. Phounsy still had maximum restraints on and
27       was handcuffed to the gurney. Phounsy had already been given two doses of a

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

sedative. Plaintiffs' expert opines that a reasonable officer would not have applied such downward pressure on Phounsy's head.

(Id. at 18.) (citations omitted). The Court concluded that Defendant Fischer was not entitled to qualified immunity because genuine issues of material fact remain as to whether Defendant Fischer violated Mr. Phounsy's constitutional rights in the ambulance and whether such rights were clearly established at the time. (Id. at 17–19.) Defendants filed an interlocutory appeal of this Court's denial of their motion for summary judgment on the basis of qualified immunity, and, on March 31, 2020, the Ninth Circuit denied Defendants' appeal. See K.J.P et al. v. Cnty. of San Diego, Case No. 19-55527 (9th Cir. 2020). The Ninth Circuit held "Defendants failed to present all relevant acts in the light most favorable to Plaintiffs." Id. at 2–3.[9] Similarly, Defendants' present Rule 50(b) motion fails to present the relevant acts in the light most favorable to the Plaintiffs.

At the time of this incident in April 2015, "the law was clearly established that, as a general matter, police use of force must be carefully calibrated to respond to the particulars of the case, including the wrongdoing at issue, the safety threat posed by the suspect, and the risk of flight." C.B. v. City of Sonora, 769 F.3d 1005, 1030 (9th Cir. 2014) (citing Graham, 490 U.S. at 396). In Drummond, decided in 2003, the Ninth Circuit held that "squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a greater degree of force that is greater than reasonable." 343 F.3d at 1059. The facts in Drummond are similar to the facts in the present case. In Drummond, officers responded to a call from one of Drummond's neighbors who sought help for Drummond. Id. at 1054. Drummond was hallucinating, in an agitated state, and endangering himself. Id. Two responding officers brought Drummond to the ground, cuffed Drummond's arms behind his back as he lay on his stomach, and placed their knees and body weight onto Drummond's neck and upper

---

[9] The Ninth Circuit also held that "to the extent Defendants seek to challenge the district court's holding that clearly established law protected Phounsy's rights, Defendants waived those arguments by failing to advance an argument that the law was not clearly established that takes the facts in the light most favorable to Plaintiffs." K.J.P. et al., Case No. 19-55527 at 3.

3:15-cv-02692-H-MDD

torso. Id. at 1054–55. Drummond offered no resistance. Id. at 1054. Drummond told the officers he could not breath and eventually he fell into respiratory distress. Id. at 1054–55.

Similarly, in Abston v. City of Merced decided in 2013, the Ninth Circuit held that it was clearly established as of 2008 that "the use of body compression to restrain a prone and bound suspect who was in no position to offer any meaningful resistance, would violate the rule established by Drummond." 506 Fed. Appx. 650, 652–53 (9th Cir. 2013). The facts in Abston are also similar to the facts in the present case. In Abston, officers pulled over Abston, who was high on methamphetamine and driving the wrong way on the freeway. Id. at 651. Abston ignored the officers' orders to exit the vehicle, got into a "scuffle with the [] officer, during which Abston exhibited bizarre behavior," and then ran away down the highway. Id. Abston then climbed to the top of a tractor-trailer's sleeper cabin and refused to come down, even after officers "emptied a can of pepper spray on his face." Id. The officers forced Abston off the trailer, Abston took off running, and the officers tased Abston multiple times. Id. The officers got Abston to the ground and attempted to restrain him. Id. Abston struggled and kicked at officers, eventually kicking one officer "in the shoulder with such force as to require surgery." Id. One officer then applied body weight pressure to Abston for 1 minute and 7 seconds while Abston was "face-down, handcuffed and ankle-shackled." Id. at 652. The Ninth Circuit noted that it was not clear "whether Abston continued to resist during this period and, if so, whether his resistance was anything more than minimal, considering that he was handcuffed and ankle-shackled." Id. Abston eventually stopped breathing. Id.; see also Padilla v. City of Alhambra, No. CV 05-07609 MMM (CTx), 2007 U.S. Dist. LEXIS 104051, at *1 (C.D. Cal. May 30, 2007).

Additional case law predating April 2015 further established that that using force against an individual that is subdued and offers minimal resistance violates the individual's Fourth Amendment right to be free of excessive force. In Davis v. City of Las Vegas, the Ninth Circuit held that an officer violated the Fourth Amendment by

pushing an unarmed, handcuffed man into a wall multiple times and punching him in the face while the man lay face-down on the ground. 478 F.3d 1048, 1055–56 (9th Cir. 2007). In LaLonde, the Ninth Circuit held that where "an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon [e.g., pepper sprays; police dogs] or a refusal without cause to alleviate its harmful effects constitutes excessive force." 204 F.3d at 961.

Case law predating April 2015 also established that "when dealing with an emotionally disturbed individual who is creating a disturbance or resisting arrest, as opposed to a dangerous criminal, officers typically use less forceful tactics." Glenn, 673 F.3d at 877 (citing Deorle, 272 F.3d at 1282); see also Alexander v. City and Cnty. of San Francisco, 29 F.3d 1355 (9th Cir. 1994); Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1093 (9th Cir. 2013). In Doerle, the Ninth Circuit held that using nonlethal force, in that case a beanbag projectile, against a mentally ill individual where there was no need to immediately subdue him constituted excessive force. Id.; see also Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1093 (9th Cir. 2013).

As of April 2015, case law gave Defendant Fischer fair notice that the force he used on Mr. Phounsy in the ambulance–"9 out of 10 pressure" for approximately 10 minutes on Mr. Phounsy's head while Mr. Phounsy was handcuffed, in maximum restraints, and strapped to a gurney until Mr. Phounsy stopped breathing and went into cardiac arrest–was excessive in violation of Mr. Phounsy's Fourth Amendment rights. As a result, Defendant Fischer is not entitled to qualified immunity.

Finally, Plaintiffs request the Court find any renewed qualified immunity appeal as frivolous under Chuman v. Wright, 960 F.2d 104, 105 (9th Cir. 1992). (Doc. No. 428 at 10–11.) Defendants did not respond to this argument in their reply. (Doc. No. 429.) "Although a pretrial appeal of an order denying qualified immunity normally divests the district court of jurisdiction to proceed with trial, the district court may certify the appeal as frivolous and then proceed with trial." Padgett v. Wright, 587 F.3d 983, 985 (9th Cir. 2009) (citing Chuman, 960 F.2d at 105). "In the absence of such certification, the district

court is automatically divested" of its authority "to proceed with trial pending appeal." Chuman, F.2d at 105. Considering this case is nearly seven years old, the law was clearly established at the time of the incident that Defendant Fischer's actions constituted excessive force, and Defendants' similar prior appeal on qualified immunity was rejected by the Ninth Circuit, the Court also certifies as frivolous any third appeal by Defendants of the Court's denial of qualified immunity.

## IV. Monell Claims as to Defendant County of San Diego

Under certain circumstances, a municipality can be liable under § 1983 liability for constitutional violations. See Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 690 (1978). A municipality cannot be held liable under § 1983 under a respondent superior theory. Id. at 691. Instead, § 1983 liability may be imposed on a municipality when it has a "policy" or "custom" that is the "moving force" behind a violation of federally protected rights. Id. at 694.

"[A]n allegation of 'failure to train' can be the basis for liability under §1983." City of Canton v. Harris, 489 U.S. 378 (1989). "[T]he inadequacy of police training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. at 388. To show "deliberate indifferent," a plaintiff must prove that "in light of the duties assigned to specific officers or employees the need for different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." Id. at 390. "In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." Id. at 390.  It is not enough to "prove that an injury or accident could have been avoided if an officer had had better or more training." Id. at 391. A plaintiff can "succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where 'a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools

to handle recurring situations.'" <u>Long v. Cnty. of Los Angeles</u>, 442 F.3d 1178, 1186–87 (9th Cir. 2006) (quoting <u>Board of Cnty. Comms. v. Brown</u>, 520 U.S. 397, 409 (1997)).

### A. <u>Monell</u> Claim for Failure to Train on Use of Force

Defendants argue that Plaintiffs presented insufficient evidence that the County failed to train deputies on the proper use of force. (Doc. No. 429 at 6–8.) Plaintiffs argue they did provide adequate evidence at trial to suggest the County's deputies were not adequately trained on the use of force, specifically to recognize when perceived resistance from a person in the prone position may be an indication of the person struggling to breathe. (Doc. No. 428 at 13–14.)

On February 9, 2022, Plaintiffs alerted the Court that nearly seven years into litigation, Defendants did not produce the San Diego County Sheriff's Departments maximum restraints training video to them. (Doc. No. 448.) Defendants have conceded that they do not have any bates stamps, production log, or other records that the County ever provided the training video to Plaintiffs in response to Plaintiffs' initial request for production or in later supplemental discovery. (Doc. No. 466.) This is despite Defendant's duty to disclose and ongoing duty to supplement under Federal Rules of Civil Procedure 26(a) and (e)(1). <u>See</u> <u>R&R Sails, Inc. v. Ins. Co. of Pennsylvania</u>, 673 F.3d 1240, 1245–46 (9th Cir. 2012). The training video was not listed by the parties in the pretrial order or exhibit list for any scheduled trial in this case, or shown during the first trial. (Doc. Nos. 263-2, 291, 335, 365–66.)

From the Court's perspective of the totality of the evidence, the individual deputies did not testify consistently with the maximum restraints training video, and the training video is silent on the need for deputies to monitor breathing. From the Court's perspective, the training video also raises issues of excessive force. The video starts with a reenactment that depicts two deputies walking on either side of a suspect holding the suspect's arms. One of the officer's states, "Stop resisting. Calm down. Stop resisting. You're going to jail." In response, the suspect begins struggling. The deputies immediately proceed to put the suspect in maximum restraints. According to the training

3:15-cv-02692-H-MDD

video, minimal resistance from a suspect warrants maximum restraints.[10]  For example, the training video instructs deputies to attach the ankle restraint to the waist restraint near the suspect's stomach. But the deputies attached Mr. Phounsy's ankle restraint to the waist restraint near Mr. Phounsy's back. (See Doc. Nos. 454 at 8; 478 at 21.)

At trial, Plaintiffs also provided testimony from Mr. Scott Alan DeFoe, who the Court qualified as an expert on use of force. (Trial Tr. IV-223.) Mr. DeFoe testified regarding the proper practice of immediately putting a person who has been restrained in the prone position "in a recumbent position" or "on [the person's] side" to "allow them to breathe because, especially in a prolonged struggle, that persons on the ground, they're compressed, they're on the ground, there's weight." (Trial Tr. IV-241.) Mr. DeFoe testified that in this position, "they're trying to obviously breathe" and "the way that translates to officers is resistance" when in "reality, it's trying to breathe." (Id.) Mr. DeFoe further testified that "many training organizations throughout the country look and realize that once someone is on the ground in a prone position, even without the maximum restraints, if I just handcuff you, everyone is taught at that point to get him off or her off their stomach, get them in a recumbent, seated or standing position without delay." (Trial Tr. IV-243.)

Plaintiffs also presented testimony from several deputies on scene regarding their training in positional asphyxia and maximum restraints. For example, Deputy Allen testified at trial:

> Q: Again, we got to kind of transport ourselves back to April in 2015. And at that point in time, you had no training whatsoever from the San Diego Sheriff's Department on ways that individuals can positionally asphyxiate. Is that a true statement?
> A: That is a true statement.

(Trial Tr. II-219). Deputy Allen further testified at trial:

> Q: You weren't aware of any of the signs of someone who may be positionally

---

[10] The maximum restraints training video can be viewed here:
https://www.dropbox.com/s/9pi8149hg5t6c8p/COSD%203895%20MaxRestraintCordCuff_2007%20%281%29.wmv

asphyxiating in your presence in April of 2015. Is that a true statement?

A: Correct.

(Trial Tr. II-220).

Defendant Fischer also testified at trial that two complaints were filed against him for excessive use of force by individuals Defendant Fischer encountered while on duty. (Trial Tr. IV-106.) In the interaction with Christopher Weaver in July 2014, Defendant Fischer testified that Defendant Fischer "wrapped [his] arms around [Mr. Weaver's] head and shoulder area," "took [Mr. Weaver] to the floor," "applied downward pressure to Weaver's back," and when Mr. Weaver tensed, Defendant Fischer "immediately delivered two closed-fist strikes," and then continued "several seconds of further downward pressure." (Trial Tr. IV-107–16.) Mr. Weaver "filed a complaint against Defendant Fischer for excessive use of force." (Trial Tr. IV-116.) Defendant Fischer testified following the incident:

Q: And then the Sheriff's Department, in fact, did do an internal affairs investigation, right?
A: Yes, sir.
Q: And they cleared you of everything, right?
A: Yes, sir, they did.
Q: They said you didn't do anything wrong throughout that entire exchange with Mr. Weaver?
A: That is correct.
Q: And you received no discipline for that, right?
A: That is correct.
Q: You were never prosecuted for that?
A: No sir.
Q: Did they suggest to you that maybe you should review any type of training materials when you're encountering a person in a condition that was just described, like Mr. Weaver?
A: No, sir.
Q: Did they suggest maybe you should go back and review any of the use-of-force policies that are in writing and apply to the situation that I just described?
A: No, sir.

(Trial Tr. IV-116–17.)[11]

In the interaction with David Lyn Williams in February 2015, two months before the incident in the present case, Defendant Fischer testified that he handcuffed Mr. Williams, Mr. Williams tensed his body and struggled to pull away from Defendant Fischer, Defendant Fischer "applied downward pressure on his upper shoulder area, using [his] left forearm, for five to 10 seconds," and Mr. Williams received a laceration on his head. (Trial Tr. IV-125–30.) Mr. Williams "filed an excessive use of force against [Defendant Fischer.]" (Trial Tr. IV-130.) Defendant Fischer testified following the incident that:

> Q: Did you ever receive any type of disciplinary writeup for this conduct?
> A: No, sir.
> Q: Were you ever disciplined in any way for this conduct?
> A: No, sir.
> Q: Did they ever suggest to you, in combination with what we just discussed with Mr. Weaver, "Hey, Deputy Fischer. How about you take a look at this training manual on use of force in situations such as this?" Was that ever even recommended to you by county of San Diego?
> A: No, sir.
> Q: And were you eventually cleared of any wrongdoing whatsoever with respect to your interaction with Mr. Williams on that day?
> A: You're saying was I cleared of any wrongdoing?
> Q: Yes. Did they clear you, these people over here (indicating)? Did they clear you?
> A: Yes, sir.

(Trial Tr. IV-131.)

Taking the evidence presented at trial in the light most favorable to Plaintiffs, a

---

[11] The altercation between Defendant Fischer and Mr. Weaver occurred when Mr. Weaver was incarcerated at the San Diego Central Jail. (Trial Tr. IV-106.) On February 3, 2022, the Office of the California State Auditor published a report detailing an audit it conducted of the San Diego County Sheriff's Department and in-custody deaths of incarcerated individuals. See California State Auditor Report 2021-109, San Diego County Sheriff's Department, It Has Failed to Adequately Prevent and Respond to Deaths of Individuals in Custody (Feb. 3, 2022). In anticipation of the retrial, the Court ordered the parties to file a brief on whether any findings of the audit or testimony of the auditor should be admissible in their case in chief or rebuttal. (Doc. No. 447.) On February 16, 2022, Plaintiffs filed their brief. (Doc. No. 461.) On February 23, 2022, Defendants filed their opposition brief. (Doc. No. 468.) On February 28, 2022, Plaintiffs filed their reply brief. (Doc. No. 478.)

reasonable jury could find the County exhibited "deliberate indifference" by providing its officers with inadequate training on the use of force. As such, the Court denies Defendants' Rule 50(b) motion as to Plaintiffs' <u>Monell</u> claim on failure to train on use of force.

### B. <u>Monell</u> Claim for Failure to Train on Addressing Serious Medical Needs

Defendants also argue that Plaintiffs presented insufficient evidence that the County failed to train deputies on how to recognize an individual in medical distress. (Doc. No. 429 at 6–8.) Plaintiffs argue they provided adequate evidence at trial to suggest the County's deputies were not adequately trained to address serious medical needs. (Doc. No. 428 at 13–14.) Specifically, Plaintiffs argue that "at least eight deputies were present when Mr. Phounsy was exhibiting these signs of medical distress…yet no one did anything to address this medical need." (<u>Id.</u> at 15–16.)

"Claims of failure to provide care for serious medical needs, when brought by a detainee [] who has been neither charged nor convicted of a crime, are analyzed under the substantive due process clause of the Fourteenth Amendment." <u>Lolli v. Cnty. of Orange</u>, 351 F.3d 410 (9th Cir. 2003); <u>see also</u> <u>Gibson v. Cnty. of Washoe, Nev.</u>, 290 F.3d 1175, 1187 (9th Cir. 2002) (reversed on other grounds) ("persons in custody ha[ve] the established right to not have officials remain deliberately indifferent to their serious medical needs"). To establish a denial of medical care claims, Plaintiffs must show that Defendants were deliberately indifferent. <u>Gibson</u>, 290 F.3d at 1187. Deliberate indifference requires that an official know of and disregarded an excessive risk to a detainee's health and safety. <u>Id.</u> It has long been settled that deliberate indifference is shown where an official "purposefully ignore[s] or fail[s] to respond to a prisoner's pain or possible medical need." <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1060 (9th Cir. 1992) (reversed on other grounds).[12]

---

[12] In <u>Tatum v. City & Cnty. of San Francisco</u>, the Ninth Circuit held that officers satisfied their Fourth Amendment obligations to provide medical care to an arrested suspect by calling an ambulance and monitoring the suspect's condition and breathing while waiting for the ambulance's arrival. 441 F.3d

3:15-cv-02692-H-MDD

On August 23, 2021, Plaintiffs dismissed their deliberate indifference to medical needs claim as to Defendant Fischer and Deputies Allen, Carbajal, Lee, Martinson, Silva, and Tennison. (Doc. No. 352.) This dismissal was "conditioned upon Plaintiffs still being permitted to continue to present evidence and argument that these defendants violated Lucky Phounsy's right for purposes of Monell liability against the County." (Id.) "[M]unicipal defendants may be liable under 1983 even in situations in which no individual officer is held liable for violating a plaintiff's constitutional rights." Horton by Horton v. City of Santa Maria, 915 F.3d 592, 604 (9th Cir. 2019); see also Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1143 (9th Cir. 2012); Sarmiento v. Cnty. of Orange, 496 Fed.Appx. 718, 720 n.2 (9th Cir. 2012); Fairley v. Luman, 281 F.3d 913, 917 (9th Cir. 2002). "If a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under 1983." Fairley, 281 F.3d at 917. "This is true whether the officers are exonerated on the basis of qualified immunity, because they were merely negligent, or for other failure of proof." Id. at 917 n.4 (citing Chew v. Gates, 27 F.3d 1432, 1438 (9th Cir. 1994)).

At trial, Defendants introduced Addendum F of the San Diego County Sheriff's Department manual that addresses the County's maximum restraint policy. (Trial Tr. III-66.) Addendum F provides that "[a]s soon as possible a subject is maximally restrained,

---

1090, 1099 (9th Cir. 2006). At the first trial, the Court instructed the jury under both the Fourth Amendment and Fourteenth Amendment standard for deliberate indifference. (Doc. No. 360.) However, the Court remains skeptical that Mr. Phounsy was an "arrestee" and not a "pretrial detainee" in the house, driveway, and ambulance, considering Mr. Phounsy was in maximum restraints, in the custody of the San Diego County Sheriff's Department, and not free to leave. Regardless, Tatum did not stand for the proposition that because deputies called the paramedics, they are absolved as a matter of law from any purported Fourth Amendment violation. The officers in Tatum also did not have a role in how the suspect was treated after the paramedics were summoned. In the present case, the deputies continued to exert influence over how Mr. Phounsy was treated after the paramedics arrived. It is well-established law that a government entity's "affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty" triggers an affirmative duty to protect. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989); see also Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1071 (9th Cir. 2016) (setting the standard for failure to protect claims under the Fourteenth Amendment). As such, Defendants were not relieved of this duty as a matter of law solely because they called the paramedics.

he will be rolled onto his side or into a seated position. The arresting deputy must continuously monitor the subject for consciences and breathing." (Trial Tr. III-67, 110.) At trial, Plaintiffs' use of force expert, Mr. DeFoe, testified that officers should be trained to "understand that there's something not right, and when you're hearing guttural sounds, someone's breathing compromised, you understand that there might be a problem and there may be a medical emergency that needs to be dealt with right away." (Trial Tr. IV-253–54.)  Mr. DeFoe testified that it was the County's policy that "[t]he arresting deputy must continually monitor the subject for consciousness and breathing, and none of the happened – either of those things happened at any time in the hallway." (Trial Tr. IV-249) (typo in original).

At trial, Deputy Silva testified that the arresting deputy "was going to be either Deputy Krull or Deputy Collins," but because Deputy Krull and Deputy Collins were receiving medical treatment, "another deputy would probably take their arrest on that case." (Trial Tr. IV-87–88.) Deputy Silva further testified that "it is encompassing on the deputies on scene to take that role, and to monitor the suspect or subject." (Trial Tri. IV-89.) Deputy Lee was asked, "who was the arresting deputy that night?" and Deputy Lee responded, "I don't know who." (Trial Tr. III-111.)

At trial, Deputy Allen testified:

Q: At no point in time did you see any of the other deputies check to see that Mr. Phounsy was breathing at that point in time?"
A: No.

(Trial Tr. II-215.) Deputy Allen further testified:

Q: You didn't [check if Mr. Phounsy was breathing], did you?
A: I didn't need to. He was growling at me.
Q: I'm sorry? You didn't need to check –
A: He was growling.
Q: He was growling?
A: He was growling.
Q: Oh, so then you interpreted his growling as his ability to breathe without any difficulty?
A: I did.

(Trial Tr. II-215–16.) Deputy Lee was asked at trial "[D]id you ever check to see whether he could still breathe when he was trapped to the gurney? Yes or no? Did you ever check?" Deputy Lee responded, "Physically check? No." (Trial Tr. III-63.) Deputy Pugh also testified at trial:

> Q: Now, you never checked personally – I'm asking about your actions – whether Lucky was having any trouble breathing in the hallway after the application of maximum restraints? And I'm limiting my question to you. You never did that, right?
> A: I did not check for breathing. He appeared to be breathing. His movements and noises that he was making ---

(Trial Tr. III-126–27.) Deputy Silva testified at trial:

> Q: Yet you don't ever recall any of the paramedics checking Lucky's pulse?
> A: No, sir.
> Q: And you yourself never checked Lucky's pulse, right?
> A: No, sir.
> Q: But you saw his stomach moving, so you assumed he was probably breathing okay?
> A: It was coupled with the grunts that he was making, so his stomach moving coupled with the grunts.
> Q: And you assumed based on that that he was probably okay?
> A: As well as him continuing to resist, and basically pull away from the max restraints, yes. With all those combined, I was fairly confident that he was still breathing.
> Q: "Fairly confident he was still breathing." Is that what you just said?
> A: Well, I was confident that he was breathing, because there's no other way that he could apply that much force, grunt, and his stomach move in the manner without breathing. So I apologize for the "fairly comment."

(Trial Tr. IV-58-59.) Deputy Silva was also asked at trial, "Did you consider – did you just consider the possibility that Lucky's movements may have been caused by his difficulty breathing at that point?" Deputy Silva answered, "No, sir." (Trial Tr. IV-59.) Deputy Silva also testified at trial:

> Q: Did you ever check Lucky's airway?
> A: I did not.
> Q: Did you ever see any other deputy check Lucky's airway in your presence?
> Q: I did not.

(Trial Tr. IV-63.) Deputy Billy Tennison III testified at trial:

> Q: Okay. You personally never checked to make sure that Mr. Phounsy was able to breathe properly in the hallway?
> A: True.
> Q: You never checked those restraints at any point in time, whether it be in the hallway or out in the driveway, to ensure that they were applied correctly. Is that a true statement?
> A: Sure.

(Trial Tr. II-251–52.)

Taking the evidence presented at trial in the light most favorable to Plaintiffs, a reasonable jury could find that the County's deputies are in a "recurring situation" of responding to individuals in distress, and the County failed to train officers on recognizing signs of medical distress. See Brown, 520 U.S. at 409 ("The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify finding that policymaker' decisions not to train the officer reflected 'deliberate indifference.'"). As a result, a reasonable jury could find the County exhibited "deliberate indifference" by providing its officers with inadequate training on addressing serious medical needs. The Court denies Defendants' Rule 50(b) motion as to Plaintiffs' Monell claim for failure to train on addressing serious medical needs.

**V. Negligence and Wrongful Death**

Defendants argue that Plaintiffs failed to introduce sufficient evidence to establish that Defendant Fischer acted negligently. (Doc. No. 427-1 at 23). Defendants further argue that because Plaintiffs fail as to their negligence claim, they also fail as to their wrongful death claim because "to prove their cause of action for wrongful death, they must prove that Defendants committed a tort." (Id. at 24.)

"In order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate legal cause of the resulting injury." Hayes v. Cnty. of San Diego, 57 Cal. 4th 622, 698 (2013) (citation omitted). Under California law, "peace officers

have a duty to act reasonably when using deadly force." Id. "The reasonableness of an officer's conduct is determined in light of the totality of circumstances." Id. Taking the evidence in the light most favorable to the Plaintiffs, a reasonable jury could find that Defendant Fischer and other deputies on scene did not act objectively reasonable when using force against Mr. Phounsy. As a result, the Court denies Defendants' Rule 50(b) motion as to Plaintiffs' negligence claims against Defendants.

California's wrongful death statute provides a cause of action "for the death of a person caused by the wrongful act of neglect of another." Cal. Civ. P. Code § 377.60 (a). Because the Court denies Defendants' Rule 50(b) motion as to Plaintiffs' negligence claims, the Court similarly denies Defendants' Rule 50(b) motion as to Plaintiffs' wrongful death claims.

### Conclusion

For the reasons above, the Court denies Defendants' motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), denies Defendants' renewed motion asserting qualified immunity against Plaintiffs' § 1983 excessive force claim against Defendant Fischer, and certifies as frivolous any third interlocutory appeal of this Court's denial of qualified immunity.

**IT IS SO ORDERED.**

DATED: February 28, 2022

_____

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT