1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

10

**SOUTHERN DISTRICT OF CALIFORNIA**

11
12

13  K.J.P., a minor; and K.P.P., a minor;
    individually, by and through their mother;
14  LOAN THI MINH NGUYEN, who also
    sues individually and as successor in
15  interest to her now deceased husband,
    Lucky Phounsy,
16

17                              Plaintiffs,

18  v.

19  COUNTY OF SAN DIEGO; and
    RICHARD FISCHER,
20
                            Defendants.
21

22

23

24

25

26

Case No.: 3:15-cv-02692-H-MDD

**ORDER:**

**(1) DENYING DEFENDANTS'
MOTION FOR JUDGMENT AS A
MATTER OF LAW PURSUANT TO
FEDERAL RULE OF CIVIL
PROCEDURE 50(b); AND**

[Doc. No. 552.]

**(2) GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR A NEW TRIAL
PURSUANT TO FEDERAL RULE
OF CIVIL PROCEDURE 59**

[Doc. No. 551.]

27
28

   On April 14, 2022, Defendants County of San Diego and Richard Fischer
(collectively, "Defendants") filed two post-trial motions: (1) a motion for judgment as a

matter of law pursuant to Federal Rule of Civil Procedure 50(b); and (2) a motion for a new trial pursuant to Federal Rule of Civil Procedure 59. (Doc. Nos. 551, 552.) On April 15, 2022, the Court issued a scheduling order setting a briefing schedule on Defendants' post-trial motions. (Doc. No. 554.) On May 9 and 11, 2022, Plaintiffs K.J.P., K.P.P., and Loan Thi Mihn Nguyen (collectively, "Plaintiffs") filed an opposition to Defendants' post-trial motions. (Doc. Nos. 563, 564.) On May 23, 2022, Defendants filed their replies. (Doc. Nos. 568, 569.) On June 13, 2022, the Court held a hearing on Defendants' post-trial motions. (Doc. No. 576.) Mildred K. O'Linn, Ronald Lenert, Sylvia Soliman Aceves, Jeffrey Patrick Michalowski, and Steven Jeff Renick appeared on behalf of Defendants. Mark F. Fleming, Timothy A. Scott, Kimberly Sue Trimble, and Marcus S. Bourassa appeared on behalf of Plaintiffs. For the reasons that follow, the Court denies Defendants' motion for judgment as a matter of law and grants in part and denies in part Defendants' motion for a new trial.

## Background

### I. Introduction

This case arises out of the death of Lucky Phounsy, a thirty-two-year-old husband, son, and father of two small children. On April 13, 2015, Mr. Phounsy experienced a mental health crisis. Mr. Phounsy called 9-1-1 for help, and San Diego County Sheriff's deputies responded. During the approximately forty-five-minute altercation that followed between Mr. Phounsy and the sheriff's deputies, Mr. Phounsy was tased multiple times, punched, handcuffed, put in maximum restraints, strapped to a gurney, and had prolonged pressure applied to his head and torso. (Doc. Nos. 499, Tr. I-198–99, 271; 535, II-67; 537, V-200–02, 249–55, 198–99, 221–25; 539, VII-177–78; 541, VIII-263–65, 268, 270.) While in the ambulance to the hospital, Mr. Phounsy went into cardiac arrest and coded. (Tr. II-151; Doc. No. 536, III-106.) Mr. Phounsy remained in a coma at the hospital for several days until his family made the decision to remove him from life support. (Tr. III-229.) Following Mr. Phounsy's death, Mr. Phounsy's wife, Loan Nguyen, and their two children, K.J.P. and K.P.P., filed the present action alleging, among other claims, that San

Diego County Sheriff deputy Defendant Fischer used excessive force against Mr. Phounsy resulting in his death and that the County failed to train its deputies under Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 691 (1978).

On March 2, 2022, almost seven years after Mr. Phounsy's death, a jury of eight individuals representing a cross section of the San Diego community were impaneled to try this case. Throughout the trial, each juror thoughtfully listened to the evidence and arguments presented by both sides. The jury eventually returned a unanimous verdict in favor of Plaintiffs on all claims, awarding $5 million for Mr. Phounsy's mental, physical, and emotional pain and suffering and $80 million to the family Mr. Phounsy left behind for their loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, and guidance. Ultimately, Mr. Phounsy's death was a tragedy that left two small children without a father and a young mother forced to raise them on her own. The jury's verdict reflected that loss.

## II. Procedural History[1]

On March 2, 2022, the case proceeded to a jury trial. (Doc. No. 495.) Pursuant to the pretrial order, the trial proceeded on the following claims: (1) 42 U.S.C. § 1983 excessive force claim by Mr. Phounsy's successor in interest against Defendant Fischer; (2) 42 U.S.C. § 1983 Monell claim by Mr. Phounsy's successor in interest against the County; (3) violation of California's Bane Act, Cal. Civ. Code § 52.1, by Mr. Phounsy's successor in interest against Defendant Fischer; (4) negligence by Mr. Phounsy's successor in interest against Defendant Fischer; and (5) wrongful death, Cal. Civ. Proc. Code § 337.60, by Plaintiffs Loan Nguyen, K.J.P., and K.P.P. against Defendant Fischer and the County. (Doc. No. 493 at 3–12.) The Court also bifurcated the determination of the amount of punitive damages if the jury were to make a finding that Defendants' conduct was malicious, oppressive, or in reckless disregard to Mr. Phounsy's rights. (Id. at 78–79.)

---

[1] See Doc. Nos. 171 and 488 for a detailed summary of this case's lengthy procedural history.

On March 8, 2022, Defendants made an oral Rule 50(a) motion for judgment as a matter of law, and on March 10, 2022, Defendants file a written Rule 50(a) motion. (Doc. Nos. 513, 517.) On March 14, 2020, the parties concluded closing arguments, and the jury began deliberations. (Doc. No. 524.)

On March 15, 2016, the jury returned the verdict, and the jurors were polled. (Doc. No. 525.) The jury unanimously found for Plaintiffs on all claims. (Id.; see also Doc. Nos. 532, 533.) Specifically, on Claim I § 1983 excessive force, the jury found by a preponderance of the evidence that Defendant Fischer used excessive force against Mr. Phounsy in violation of the Fourth Amendment; that Defendant Fischer's excessive force was the cause of Mr. Phounsy's death; and that Defendant Fischer's excessive force was malicious, oppressive, or done in reckless disregard for Mr. Phounsy's right to be free from excessive force. (Doc. No. 532 at 2.)

On Claim II § 1983 Monell failure to train, the jury found by a preponderance of the evidence that one or more San Diego County Sheriff's deputies violated Mr. Phounsy's right to be free from excessive force, that the violation of Mr. Phounsy's constitutional rights was a foreseeable result of a failure to train by the County to avoid violating a constitutional right to be free from excessive force, and that the County's failure to train caused injury to Mr. Phounsy. (Id. at 3.) The jury listed Defendant Fischer and dismissed Defendant Collins as the sheriff's deputies who violated Mr. Phounsy's constitutional rights. (Id.)

On Claim III Bane Act, the jury found by a preponderance of the evidence that Defendant Fischer acted violently against Mr. Phounsy, that Defendant Fischer intended to deprive Mr. Phounsy of his right to be free from excessive force or acted in reckless disregard of Mr. Phounsy's right to be free from excessive force, and that Defendant Fischer's conduct was a substantial factor in causing harm to Mr. Phounsy. (Id. at 4.) The jury also found by clear and convincing evidence that Defendant Fischer's conduct was malicious or oppressive. (Id.)

On Claim IV negligence, the jury found by a preponderance of the evidence that

one or more San Diego County Sheriff's deputies were negligent on April 13, 2015. (Id. at 5.) The jury listed Defendant Fischer and dismissed Defendants Collins, Ralph, and Allen as the Sheriff's deputies who were negligent. (Id. at 5.) The jury found by a preponderance of the evidence that the negligence of one or more San Diego County Sheriff's deputies on April 13, 2015 was a substantial factor in causing harm to Mr. Phounsy. (Id.) The jury also found by a preponderance of the evidence that Mr. Phounsy was not negligent. (Id.) Finally, the jury assigned the following percentage of responsibility for negligence:

> Richard Fischer: 20%
> Other Sheriff's deputies: 70% (Specify Names(s): Collins, Allen, Ralph)[2]
> Lucky Phounsy: 0%
> Other: 10% (Specify Name(s): Paramedic Firefighters Poynter, Hackett)

(Id.)

On Claim V wrongful death, the jury found by a preponderance of the evidence that Mr. Phounsy's death was caused by the violation of one or more of his constitutional rights, and that Mr. Phounsy's death was caused by the negligence of one or more San Diego County Sheriff's deputies. (Id. at 6.)

The jury awarded $2 million in damages for the mental, physical, and emotional pain and suffering experienced by Mr. Phounsy up until the time he was placed in the ambulance and $3 million in damages for the mental, physical, and emotional pain and suffering experience by Mr. Phounsy from the ambulance until the time of his death. (Id. at 7.) The jury also awarded K.J.P., K.P.P., and Loan Nguyen a total of $20 million in damages for the loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, and guidance from April 20, 2015 through the

---

[2] When the jury first returned the verdict on March 15, 2022, the jury also included dismissed Defendants Billy Tennison III and Aaron Brooke in the list of Sheriff's deputies responsible for 70% of the negligence in Subsection E but did not list them as deputies who were negligent on April 13, 2015 in Subsection A. (Doc. No. 544, Tr. XI-6.) On March 16, 2022, at Defendants' request, the Court requested the jury clarify this inconsistency. (Doc. No. 526.) The jury unanimously decided to remove deputies Tennison and Brooke from Subsection E. (Doc. No. 532 at 5.)

3:15-cv-02692-H-MDD

present and $60 million in damages for the loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, and guidance for the future. (Id.)

The jury found Defendant Fischer acted maliciously, oppressively, or in reckless disregard to Mr. Phounsy's rights for both Plaintiffs' excessive force and Bane Act claims. (Id. at 2, 4.) The Court directed the jury to return the following day to proceed to the punitive damages stage. (Doc. No. 525.) After the jurors were dismissed for the day, Plaintiffs and Defendant Fischer stipulated to $10,000 in punitive damages. (Doc. No. 543, Tr. X-27–29.) On March 16, 2022, the Court notified the jury that Plaintiffs and Defendant Fischer had reached a stipulation on punitive damages. (Doc. No. 526.) After consultation with the parties, the Court also asked the jury to reconcile an inconsistency in the verdict form.[3] (Id.) After the jury reconciled the inconsistency, the Court polled the jury again. (Doc. No. 526.)

On April 14, 2022, Defendants filed the present post-trial motions. (Doc. Nos. 551, 552.) On May 2, 2022, the Court granted Defendants' motion to waive the requirement for a supersedeas bond and stay enforcement of judgment until after the post-trial motions were resolved. (Doc. Nos. 547, 558, 560.) On May 9 and 11, 2022, Plaintiffs filed an opposition to the present motions. (Doc. Nos. 563, 564.) On May 23, 2022, Defendants replied. (Doc. Nos. 568, 569.) On June 13, 2022, the Court held a hearing on Defendants' post-trial motions. (Doc. No. 576.)

## Discussion

## I. Legal Standards

### A. Motion for Judgment as a Matter of Law Pursuant to Rule 50(b)

Under Federal Rule of Civil Procedure 50(b), "[n]o later than 28 days after the entry of judgment…the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In

---

[3] See supra note 2.

ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b)(1)–(3).

"The standard for judgment as a matter of law . . . 'mirrors' the summary judgment standard." Reed v. Lieurance, 863 F.3d 1196, 1204 (9th Cir. 2017) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). "Judgment as a matter of law is proper if the evidence, construed in the light most favorable to the non-moving party, allows only one reasonable conclusion." Headwaters Forest Def. v. Cnty. of Humboldt, 240 F.3d 1185, 1197 (9th Cir. 2000) (citations omitted) (vacated on other grounds); see also Jorgensen v. Cassiday, 320 F.3d 906, 917 (9th Cir. 2003). "[I]n entertaining a motion for judgment as a matter of law, the court should review all the evidence in the record." Reeves, 530 U.S. at 150. The court "may not make credibility determinations or weigh the evidence" but instead "must draw all reasonable inferences in favor of the nonmoving party." Velazquez v. City of Long Beach, 793 F.3d 1010, 1018 (9th Cir. 2015) (quoting Reeves, 530 U.S. at 150).

**B. Motion for a New Trial Pursuant to Rule 59**

Pursuant to Federal Rule of Civil Procedure 59, a district court "may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Rule 59 does not specify the grounds on which a motion for a new trial may be granted." Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) (quoting Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1035 (9th Cir. 2003)). Instead, district courts in the Ninth Circuit are "bound by the grounds that have been historically recognized." Id. "Historically recognized ground include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" Id. (quoting Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940)). A district court "may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is

based upon false or perjurious evidence, or to prevent a miscarriage of justice." <u>Id.</u> (quoting <u>Passantino v. Johnson & Johnson Consumer Prods.</u>, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). In considering a Rule 59 motion, courts are "not required to view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses." <u>Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.</u>, 762 F.3d 829, 842 (9th Cir. 2014). A district court's grant or denial of a motion for a new trial under Rule 59(a) is reviewed for an abuse of discretion. <u>See</u> <u>Claiborne v. Blauser</u>, 934 F.3d 885, 893 (9th Cir. 2019); <u>Molski</u>, 481 F.3d at 728.

## II. Defendants' Rule 50(b) Motion for Judgment as a Matter of Law

Defendants move for judgment as a matter of law pursuant to Rule 50(b) arguing that the jury's findings in favor of Plaintiffs on all claims was not supported by substantial evidence. (Doc. No. 552-1.) Plaintiffs oppose. (Doc. No. 563.) The Court concludes that substantial evidence supported the jury's findings.

### A. Plaintiffs' Excessive Force Claim Against Defendant Fischer

Defendants argue that there was not substantial evidence to support the jury's finding Defendant Fischer used excessive force in violation of Mr. Phounsy's Fourth Amendment rights. (Doc. No. 552-1 at 2.) The Court disagrees.

"Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances." <u>LaLonde v. Cnty. of Riverside</u>, 204 F.3d 947, 959 (9th Cir. 2000) (citing <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989)). "In assessing the objective reasonableness of a particular use of force, we consider: (1) 'the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted,' (2) 'the government's interest in the use of force,' and (3) the balance between 'the gravity of the intrusion on the individual' and 'the government's need for that intrusion.'" <u>Rice v. Morehouse</u>, 989 F.3d 1112, 1121 (9th Cir. 2021) (quoting <u>Lowry v. City of San Diego</u>, 858 F.3d 1248, 1256 (9th Cir. 2017)).

In evaluating the type and amount of force inflicted, "the nature and degree of physical contact are relevant . . . as are the risk of harm and the actual harm experience."

Williamson v. City of Nat'l City, 23 F.4th 1146, 1152 (9th Cir. 2022) (citations omitted). In evaluating the government's interest, a district court must consider "(1) how severe the crime at issue was, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." Id. at 1153 (quoting Rice, 989 F.3d at 1121) (internal quotation marks omitted). The most important factor is whether the suspect posed an immediate threat. See Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). Other factors relevant in evaluating if the use of force is objectively reasonable include "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." Glenn v. Washington Cnty., 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted); see also Deorle v. Rutherford, 272 F.3d 1272, 1283 (9th Cir. 2001). "Where an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would have or should have accurately perceived that fact." Torres v. City of Madera, 648 F.3d 1119, 1124 (9th Cir. 2011) (citing Jensen v. City of Oxnard, 145 F.3d 1078, 1086 (9th Cir. 1998)).

Viewing the facts in the light most favorable to Plaintiffs, and drawing all reasonable inferences in their favor, substantial evidence was presented at trial to support the jury's conclusion that Defendant Fischer used excessive force against Mr. Phounsy in the ambulance. See Shafer v. Cnty. of Santa Barbara, 868 F.3d 1110, 1115 (9th Cir. 2017) (internal quotation marks and citation omitted) ("Because this appeal comes after the jury's verdict, we must construe the facts in the light most favorable to the jury's verdict—in this case, in favor of the Plaintiffs."). First, Defendant Fischer's own testimony indicated that the amount of force he used on Mr. Phounsy in the ambulance was great. See Rice, 989 F.3d at 1121. Defendant Fischer testified that as soon as he got into the back of the ambulance with Mr. Phounsy and the firefighter paramedics, he put both of his hands on Mr. Phounsy's head and pushed down as hard as he could with "9 out of 10 pressure" for approximately six minutes. (Tr. I-271; II-67.) Defendant Fischer

testified that while his hands were on Mr. Phounsy's head, he learned Mr. Phounsy had coded. (Tr. I-286.) Defendant Fischer never attempted to have any verbal communication with Mr. Phounsy during the entire ambulance ride to check if Mr. Phounsy was okay. (Tr. I-280.) Defendant Fischer testified that he stood up while continuing to apply pressure on Mr. Phounsy. (Tr. I-271–72.) Defendant Fischer is over six feet tall and weighed 225 pounds at the time of the incident. (Tr. I-197, 274.) Both Plaintiffs' medical experts, Dr. Thrush and Dr. Sperry, provided opinions that the force used by Defendant Fischer in the ambulance contributed to Mr. Phounsy's death. (Tr. II-187; Tr. III-5.) As a result, substantial evidence was presented that the amount of force Defendant Fischer used on Mr. Phounsy in the ambulance was great.

Second, by the time Defendant Fischer applied force on Mr. Phounsy's head in the ambulance, the government's interest in the use of such force was low. See Rice, 989 F.3d at 1121. Mr. Phounsy called 9-1-1 for help. (Tr. III-206.) Although Mr. Phounsy had fought with the sheriff's deputies earlier that night, the most important factor is whether he posed an immediate threat to the officers or others at the time of the application of force. See Graham, 490 U.S. at 396; Mattos, 61 F.3d at 441; Alexander v. City & Cnty. of San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1995) ("[I]t is the need for force which is at the heart of the consideration of the Graham factors."). Substantial evidence was presented at trial that by the time Mr. Phounsy was placed in the ambulance with Defendant Fischer and the firefighter paramedics, "the need for more forced [had] waned as circumstances changed." Hyde v. City of Willcox, 32 F.4th 863, 871 (9th Cir. 2022). Defendant Fischer testified that Mr. Phounsy was strapped to a gurney with thick, secure straps around his chest, and was still in maximum restraints and handcuffs when he was placed in the back of the ambulance. (Tr. I-262–63, 276–77; II-61–62.) Photographic evidence of Mr. Phounsy's condition before he was placed in the ambulance also supported the conclusion that "the need for more forced [had] waned." (See Attachment A); Hyde, 32 F.4th at 871. Thus, a reasonable jury could conclude that Mr. Phounsy was fully restrained in the ambulance. See Hyde, 32 F.4th at 863 ("[W]e have never required

that a suspect's ever inch be immobilized before he is considered restrained for a reasonable force analysis. To the contrary, out cases routinely call suspects 'restrained' after they have been handcuffed…or simply pinned down by officers.").

Furthermore, by the time Mr. Phounsy was placed in the ambulance, Mr. Phounsy had been in handcuffs and maximum restraints for approximately thirty minutes and had been administered two doses of Versed, a sedative. (Tr. I-198–99; I-252.) As such, a reasonable jury could conclude "it was no longer a frantic and fast-evolving situation requiring officers to make split-second decisions." Hyde, 32 F.4th at 871. In fact, Defendant Fischer testified that he had never seen someone break out of maximum restraints during his entire time working for the San Diego County Sheriff's Department. (Tr. I-268.) Plaintiffs' use of force expert, Mr. DeFoe, also provided the opinion at trial that "[i]t was absolutely unnecessary to push down on his head with a 9 to 10 -- what he describes 9 out of 10 or 90 percent of the strength of 220 pounds when someone[]s hogtied in a partially supine position on his back . . . " (Doc. No. 546, Tr. IV-223–24.) In sum, substantial evidence was presented at trial that the government's interest in using force against Mr. Phounsy in the ambulance was low. Thus, when viewing the evidence presented in the light most favorable to Plaintiffs, a reasonable jury could "balance . . . the gravity of the intrusions . . . and the government's need" and conclude that the force Defendant Fischer used on Mr. Phounsy in the ambulance was excessive. Rice, 989 F.3d at 1121 (internal quotation marks omitted).

The Court rejects Defendants' argument that Plaintiffs did not offer evidence to refute Defendant Fischer's testimony that he only applied force to Mr. Phounsy in response to Mr. Phounsy's resistance. (Doc. No. 552-1 at 3–4.) Taking the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that Mr. Phounsy was severely battered and nearly unconscious prior to being placed in the ambulance and therefore not capable of meaningfully resisting Defendant Fischer. Both Plaintiffs' medical expert, Dr. Thrush, and use of force expert, Mr. DeFoe, provided testimony that could support the conclusion that any movement by Mr. Phounsy in the ambulance was

3:15-cv-02692-H-MDD

not resistance, but Mr. Phounsy's attempt to breathe. (Tr. II-187; IV-191.) During Mr. Phounsy's initial interaction with the Sheriff's deputies, Mr. Phounsy was punched, hit with a baton, and tased multiple times. (Tr. V-249–55, 198–99, 221–25; VII-177–78; VIII-263–65, 268, 270.) Mr. Phounsy was then placed in handcuffs and maximum restraints by several deputies, including Defendant Fischer. (Tr. I-199; V-200–02.) After being restrained, Mr. Phounsy was held down by several deputies inside the house and outside on the driveway for approximately thirty minutes. (Tr. I-198–99; I-252.) While restrained in the driveway, Mr. Phounsy was also given two doses of Versed. (Doc. No. 538, Tr. VI-71, VIII-61, 73.) At trial, Defendant Fischer admitted that Mr. Phounsy looked like he did in Exhibit 72 before Defendant Fischer used force on him. (Tr. I-263, 265; Attachment A.) A reasonable jury could conclude from the photographic evidence[4] and the record that Mr. Phounsy's demeanor prior to being placed in the ambulance was inconsistent with active resistance. (See Attachment A; Exs. 69–70, 72–73.)

Further, evidence presented at trial by both Plaintiffs' and Defendants' witnesses also supported the conclusion that Mr. Phounsy was not capable of offering meaningful resistance in the ambulance. Plaintiffs' medical expert, Dr. Sperry, testified there was evidence Mr. Phounsy had cyanosis prior to being placed in the ambulance. (Tr. III-16–17; Attachment A.) Dr. Sperry testified that:

> Cyanosis is the appearance on someone[]s skin and, notably, their fingernail beds and their lips especially, where there is a bluish discoloration which denotes a very -- a low oxygen level in the blood, and that is how visually, well, a doctor or a

---

[4] This case also illustrates the importance of policies requiring the use body-worn cameras by law enforcement. When the present incident occurred in 2015, San Diego County Sheriff's deputies did not have body-worn cameras. As a result, there was no video evidence of the altercation between Mr. Phounsy and the Sheriff's deputies. The only visual evidence from that night were still photographs taken by one of the Sheriff's deputies on scene, only a few of which were of Mr. Phounsy. Five of those photographs are attached to this order. (Attachment A.) The lack of video evidence in the present case created a challenge for the jurors to piece together what happened seven years ago between Mr. Phounsy and the Sheriff's deputies largely from the still photographs and the memories of individuals present. Since this incident occurred, the San Diego County Sheriff's Department has adopted the use of body-worn cameras. This policy change is an important step in both protecting officers who are often placed in the difficult position of making split-second decisions in dangerous situations and holding officers accountable who overstep their authority, like the jury concluded as to Defendant Fischer.

paramedic, anybody can see that and understand the relevance, but even anybody else can see blue lips or blue fingernail beds. That means there is inadequate level of oxygen in the blood.

(Tr. III-14.) Evidence was presented at trial that the firefighter paramedics gave Mr. Phounsy two doses of Versed before he was put in the ambulance. (Tr. VI-71; VIII-61, 73.) Dr. Sperry testified that the toxicology report indicated Mr. Phounsy did not have Versed in his system, which Dr. Sperry testified indicated that:

. . . at and around and shortly after the time the Versed was given to him, was injected to him, his circulation was impaired. That is, his heart was not beating and adequately and pumping blood throughout the body, which is what then would allow the Versed to get in the blood and carry it elsewhere. Most of really, if one could measure it, would still be in the area of muscle around where the injections were given. So, none of it -- none of the Versed made it into the blood because the heart was not working properly, and the blood then could not pick up the drug and carry it to other parts of the body and be measured.

(Tr. III-21). Dr. Sperry further testified that the cyanosis and lack of Versed in Mr. Phounsy's blood indicated Mr. Phounsy was "already suffering low oxygen levels before Fischer did what he did." (Tr. III-19.)

Plaintiffs' medical expert, Dr. Thrush, testified that when Mr. Phounsy "got into the ambulance, his mental status wasn't normal. His vital signs were not normal." (Tr. II-181.) Dr. Thrush also testified that there was evidence that Mr. Phounsy was suffering from cyanosis when he was placed in the ambulance. (Tr. II-181–82.) Specifically, Dr. Thrush testified:

His lips appear quite cyanotic to me. And if you see the -- the tip of his ear, his right ear, the downward ear is cyanotic or bluish as well. You see a little bit of his cheek you see the same coloration at the very top of the -- the screen just by the top of his left ear. And if you compare this in particular with either other people on scene with a similar skin tone or compare it with Mr. Phounsy himself as he's intubated on the ventilator where he has good oxygenation, the -- this is very different than that appears, and this appears to me consistent with cyanosis.

(Tr. II-181–82; Attachment A.) Dr. Thrush further testified that there was no trace of Versed in Mr. Phounsy's toxicology screening, (Doc. No. I-222–23), which Dr. Thrush stated indicated that Mr. Phounsy's:

3:15-cv-02692-H-MDD

…blood flow state was probably very very low. His blood pressure was not measured in the field. It was probably very very extremely low. He had a high catecholamine state or construction of his blood vessels so that they didn't pick up the -- the drug and transport it. If it was a urine test, I would say, well, maybe it didn't get excreted because blood flow to the kidney was very very low, but this was a blood test, you see. So, my impression, in the driveway, he was very very sick. He was, by this evidence, near death already before he got into the ambulance, and, you know, the trip in the ambulance unfortunately, it was not good, as we discussed.

(Tr. II-224.)

Firefighter paramedic Aaron Bagley, who was present on scene at the incident, was asked to examine a photograph of Mr. Phounsy taken shortly before he was placed in the ambulance, (Attachment A, Ex. 70), and testified:

Q: I want you now to look at his lips.
A: Okay.
Q: Knowing what you now know, wouldn't you agree that this picture shows evidence that this man was lacking oxygen when this picture was taken?
A: So his lips appear to be cyanotic, a little. They appear to be somewhat cyanotic. So, according to this picture, potentially, yes.
Q: All right. You admit now under oath that this man appears to be cyanotic in this picture?
A: In this picture, just based on his lips, yes, that the lips appear somewhat cyanotic. So there's a lot of tools we use to determine that, but just according to the way his lips look, I'd say they look blue to me.

(Tr. VII-118.) Evidence was also presented at trial that Mr. Phounsy was not given oxygen in the ambulance. (Tr. VI-42, VI-83.)

Finally, a reasonably jury could accept the admitted deposition testimony of Defendant Fischer at trial that Mr. Phounsy never actually struck or kicked or attempted to strike or kick Defendant Fischer or any of the other deputies. (Doc. No. 563 at 9.) A reasonable jury could also accept the admitted deposition testimony of Defendant Fischer at trial that he did not check whether Mr. Phounsy's restraints were correctly applied in the ambulance or whether Mr. Phounsy could breathe in the restraints. (Id. at 10.) Similarly, a reasonable jury could accept Defendant Fischer's admitted deposition testimony at trial that he applied downward pressure on the right side of Mr. Phounsy's

3:15-cv-02692-H-MDD

head with both hands and that he was holding Mr. Phounsy's head down with "a good 9 to 10" pressure. (Id. at 11.)

Defendants also argue that the firefighter paramedics present in the ambulance corroborated Defendant Fischer's testimony. (Doc. No. 552-1 at 3–4.) However, during the ambulance ride, the firefighter paramedics repeatedly asked Defendant Fischer whether Mr. Phounsy was resisting, (Tr. VI-87–88), and so a reasonable jury could conclude that the paramedics' accounts of Mr. Phounsy's resistance were based on misinformation Defendant Fischer told them. Further, the testimony of Defendant Fischer and the firefighter paramedics contradicted each other. Defendant Fischer testified that, "after approximately six minutes of downward pressure, [Mr. Phounsy] stopped resisting. So, I released the pressure, keeping my hands over his head in case he started up again. About a minute – one or two minutes later, we learned [Mr. Phounsy] had coded." (Tr. I-286.) However, firefighter paramedic Marc Poynter testified that Defendant Fischer "was holding [Mr. Phounsy's] shoulders and his head on the gurney in place" for the entire ambulance ride. (Tr. VIII-96, 106.) Firefighter paramedic Aaron Hackett testified that Defendant Fischer "was pressing down on both the torso and the head for the majority of the ride." (Tr. VI-86–87.) The firefighter paramedics also testified that Defendant Fischer continued to hold Mr. Phounsy down even after the firefighter paramedics could see Mr. Phounsy had "stopped moving" and started grinding his teeth, which indicated Mr. Phounsy was suffering from cardiac arrest. (Tr. VIII-106.) Finally, the jury heard testimony from the firefighter paramedics that they were previously defendants in this case, (Tr. VI-79–80, 94), and the record reflects that the firefighter paramedics settled their claims with Plaintiffs while on interlocutory appeal. (Doc. Nos. 208, 211–13, 215–16, 218–19, 221, 223, 225–26, 229, 233, 235, 244, 245.)

Finally, the Court disagrees with Defendants' argument that "[P]laintiffs offered no evidence that Fischer's actions in the ambulance were a substantial factor in causing injury or death." (Doc. No. 552-1 at 3.) At trial, Dr. Thrush provided the opinion that:

Mr. Phounsy died from complications of cardiopulmonary arrest, brain death, and

multi-organ failure. This was caused by him not being able to breathe enough moving oxygen into his body and CO2 or carbon dioxide out of his body. And this caused the arrest, and this also caused the brain death. That is when the [b]rain doesn't get enough oxygen, it basically dies, doesn't function. Same with organs like the kidneys and liver.

(Tr. II-154) (typo in original.) Dr. Thrush further testified:

Q: In your view, did Deputy Fischer pressing down on Mr. Phounsy contribute to Mr. Phounsy's death?
A: It did, and I think it did by -- by two main mechanisms. First was the restriction of breathing because Mr. Phounsy's starting point, again, wasn't to be a healthy individual by that point. He was very sick. The evidence shows that Deputy Fischer pushed down on the -- the head over the temple and the ear with a 9 out of 10 force. And, as I recall, Deputy Fischer was 220 to 225 pounds. And this would have twisted the neck. This may have and I believe likely did on an anatomic basis constrict the airway. In addition, evidence from the paramedics by their run sheet indicated that Deputy Fischer was also pushing on the torso of Mr. Phounsy.

(Tr. II-187.) Dr. Sperry also testified that:

In my opinion, [Mr. Phounsy] died as a consequence of restricted breathing. That is, during the course of the entire incident, he was unable to breathe adequately and get enough oxygen into his body and at the same time expel the carbon dioxide that had accumulated in his body, and these conditions really cause severe complications that really included his heart stopping and damage to other organs. But, ultimately, the basic cause of death was interference with his breathing or pressure on his body that caused him to be able to-- well, not be able to breathe adequately.

(Tr. III-5.) Dr. Thrush and Dr. Sperry both testified that the toxicology reports conducted on Mr. Phounsy's blood and urine indicated that there was marijuana, Benadryl, and trace amounts of MDMA (ecstasy) in Mr. Phounsy's system. (Tr. II-217–20; III-5–10, 12–14.) However, both Dr. Thrush and Dr. Sperry testified that, in their opinion, drug use did not contribute to Mr. Phounsy's death. (Tr. II-219; III-5–10, 12.) Accordingly, substantial evidence supported the jury's finding that Defendant Fischer used excessive force against Mr. Phounsy causing his death.

## B. Plaintiffs' Bane Act Claim

Defendants also argue that Plaintiffs' California Bane Act claim was not supported by substantial evidence. (Doc. No. 552-1 at 20–22.) The Court disagrees.

1    The Bane Act provides a private cause of action against anyone who "interferes by

2    threats, intimidation, or coercion or attempts to interfere by threats, intimidation, or

3    coercion, with the exercise or enjoyment by an individual or individuals of rights secured

4    by the Constitution of laws of the United States, or laws and rights secured by the

5    constitution or laws of California." Cal. Civ. Code § 52.1(b). "[T]he elements of the

6    excessive force claim under [The Bane Act] are the same as under § 1983[.]" Reese v.

7    Cnty. of Sacramento, 888 F.3d 1030, 1044 (9th Cir. 2018) (quoting Chaudhry v. City of

8    Los Angeles, 751 F.3d 1096, 1105 (9th Cir. 2014)). However, "the Bane Act [also]

9    requires a 'specific intent to violate the arrestee's right to freedom from unreasonable

10    seizure.'" Reese, 888 F.3d at 1043. To meet the specific intent standard, a defendant must

11    have "intended not only the force, but its unreasonableness, its character as 'more than

12    necessary under the circumstances.'" Id. at 1045 (quoting United States v. Reese, 2 F.3d

13    870, 885 (9th Cir. 1993)). Municipal defendants may be held vicariously liable for an

14    officer's violation of the Bane Act. See Cal. Gov. Code § 815.2(a); see also Cameron v.

15    Craig, 713 F.3d 1012, 1023 (9th Cir. 2013); Berns v. City of Redwood City, 737 F. Supp.

16    2d 1047, 1065 (N.D. Cal. 2010).

17    Substantial evidence was presented at trial that Defendant Fischer used excessive

18    force against Mr. Phounsy in the ambulance. Substantial evidence was also presented at

19    trial that Defendant Fischer intended his use of force to be "more than necessary under

20    the circumstances." Reese, 888 F.3d at 1045. Defendant Fischer testified that he helped

21    carry Mr. Phounsy out of the home to the driveway in the prone position along with other

22    deputies. (Tr. I-252.) Defendant Fischer and the other deputies then put Mr. Phounsy

23    down in the driveway in the prone position and did not immediately roll Mr. Phounsy

24    into the recovery position. (Tr. I-252–53.) Defendant Fischer testified that he left Mr.

25    Phounsy in the prone position with other deputies and accompanied another deputy to

26    take photographs of the inside of the house. (Tr. I-257; II-60–61.) While inside the home,

27    Defendant Fischer testified he saw another deputy's equipment on the floor. (Id.)

28    Defendant Fischer testified he knew that equipment had got there because the deputy

"was in a fight with Mr. Phounsy." (Tr. II-61.) Defendant Fischer further testified that when he accompanied Mr. Phounsy in the back of the ambulance, he knew two deputies had been taken to the hospital due to injuries they sustained from Mr. Phounsy. (Tr. I-269.) Defendant Fischer testified that he was "on extra high alert" in the ambulance "based on the circumstances of the initial fight" between Mr. Phounsy and deputies Collins and Krull. (Tr. I-269–70.) Defendant Fischer also testified that he directed one of the firefighter paramedics to put a spit sock on Mr. Phounsy's head in the ambulance even though Mr. Phounsy was not spitting on him. (Tr. I-295.) Defendant Fischer also testified that he continued to apply downward pressure on Mr. Phounsy's head with the spit sock on. (Id.) A reasonable jury could conclude from this evidence that Defendant Fischer acted in reckless disregard of Mr. Phounsy's rights in the ambulance in retaliation for Mr. Phounsy's actions against other deputies. As a result, substantial evidence supports the jury's finding of liability under the Bane Act.

### C. Qualified Immunity

Defendants argue that even if Plaintiffs' evidence at trial was sufficient to prove a constitutional violation, Defendant Fischer would be entitled to qualified immunity. (Doc. No. 552-1 at 5–8.) Plaintiffs argue Defendant Fischer is not entitled to qualified immunity because he violated clearly established law under Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052 (9th Cir. 2003). (Doc. No. 563 at 8–10.)

"Qualified immunity shields a police officer from liability for civil damages under section 1983 'unless the officer []violated a clearly established constitutional right.' Thus, the qualified-immunity analysis involves two prongs: (1) whether the officer's conduct violated a constitutional right, and (2) whether the right 'was clearly established at the time of the events at issue.'" Williamson, 23 F.4th at 1151 (quoting Monzon v. City of Murrieta, 978 F.3d 1150, 1156 (9th Cir. 2020)). Because a reasonable jury could find Defendant Fischer used excessive force against Mr. Phounsy in violation of the Fourth Amendment, the Court turns to the second prong of qualified immunity analysis.

"A Government official's conduct violates clearly established law when, at the

time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable officer would [have understood] that what he is doing violates that right.'" Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (alterations in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). In determining whether a right was clearly established, there does not need to be "a case directly on point" but "existing precedent must have placed the statutory or constitutional question beyond debate." Rivas-Villegas v. Cortesluna, 142 S. Ct. 4, 7–8 (2021) (per curiam) (quoting White v. Pauly, 137 S. Ct. 548, 551 (2017)).

This Court and the Ninth Circuit have considered Defendant Fischer's claims of qualified immunity on multiple occasions. On April 12, 2019, on remand from the Ninth Circuit, this Court denied in part Defendants' motions for summary judgment. (Doc. No. 171.) The Court noted:

> [G]enuine issues of material fact remain as to whether Office Fischer violated Phounsy's rights in the ambulance. Officer Fischer himself describes that he was pushing down on Phounsy's head in the ambulance with nearly full force. This poses a significant intrusion on Phounsy's rights. Factual disputes remain as to whether such a use of force was warranted and justified based on the governmental interests given the circumstances. Phounsy still had maximum restraints on and was handcuffed to the gurney. Phounsy had already been given two doses of a sedative. Plaintiffs' expert opines that a reasonable officer would not have applied such downward pressure on Phounsy's head.

(Id. at 18) (citations omitted). The Court concluded that Defendant Fischer was not entitled to qualified immunity because genuine issues of material fact remain as to whether Defendant Fischer violated Mr. Phounsy's constitutional rights in the ambulance and whether such rights were clearly established at the time. (Id. at 17–19.) Defendants filed an interlocutory appeal of this Court's denial of their motion for summary judgment on the basis of qualified immunity, and, on March 31, 2020, the Ninth Circuit denied Defendants' appeal. See K.J.P et al. v. Cnty. of San Diego, No. 19-55527, 800 Fed. Appx. 545, 546 (9th Cir. 2020). The Ninth Circuit held "Defendants failed to present all

relevant acts in the light most favorable to Plaintiffs."[5] Id. at 2–3. On February 28, 2022, the Court again held Defendant Fischer was not entitled to qualified immunity in its denial of Defendants' Rule 50(b) from the first trial in this case. (Doc. No. 428 at 26.)

In 1989, the Supreme Court established in Graham v. Connor that law enforcement use of force must be calibrated to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396; see also C.B. v. City of Sonora, 769 F.3d 1005, 1030 (9th Cir. 2014). As of 2011, it was clearly established that the "'most important' factor . . . is whether the suspect posed an immediate threat to officers." Anderson v. City of Henderson, 35 F.4th 710, 716 (9th Cir. 2022) (quoting Mattos, 661 F.3d at 441).

In Drummond, decided in 2003, the Ninth Circuit considered the Graham factors in the context of the application of force on a restrained individual. 343 F.3d at 1059. The facts in Drummond are similar to the facts in the present case. In Drummond, officers responded to a call from one of Drummond's neighbors who sought help for Drummond. Id. at 1054. Drummond was hallucinating, in an agitated state, and endangering himself. Id. Two responding officers brought Drummond to the ground, cuffed Drummond's arms behind his back as he lay on his stomach, and placed their knees and body weight on Drummond's neck and upper torso. Id. at 1054–55. Drummond offered no resistance. Id. at 1054. Drummond told the officers he could not breath and eventually he fell into respiratory distress. Id. at 1054–55. The Ninth Circuit held that "squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." Id. at 1059.

The Ninth Circuit reaffirmed Drummond recently in Hyde v. City of Willcox, 32

---

[5] The Ninth Circuit also held that "to the extent Defendants seek to challenge the district court's holding that clearly established law protected Phounsy's rights, Defendants waived those arguments by failing to advance an argument that the law was not clearly established that takes the facts in the light most favorable to Plaintiffs." K.J.P. et al., 800 Fed. Appx. at 546.

F.4th 863, 871 (9th Cir. 2022). In <u>Hyde</u>, the Ninth Circuit held officers were not entitled to qualified immunity for forced used after an individual was "subdued and restrained." <u>Id</u>. at 872. The decedent was arrested on suspicion of drunk driving and booked overnight. <u>Id</u>. at 868. The decedent suffered from mental health issues, and after not receiving his medication, sprinted out of his cell around the booking area. <u>Id</u>. In response, several officers tased, tackled, and struck the decedent with closed fists while other officers fasted leg irons on him. <u>Id</u>. The officers then handcuffed the decedent and placed him on a restraint chair. <u>Id</u>. While four of the officers fastened the decedent into the chair, one officer tased the decedent and another officer used her arms to place the decedent's head into a restraint hold. <u>Id</u>. Approximately twenty minutes later, the decedent stopped breathing and later passed away. <u>Id</u>.

The Ninth Circuit held that the officers in <u>Hyde</u> were entitled to qualified immunity for the force used before the decedent was "subdued and restrained" by having his "hands handcuffed behind his back and his legs shackled," but were not entitled to qualified immunity for force used after that point. <u>Id</u>. at 870–72. Specifically, the Ninth Circuit held that the force used before the decedent "was subdued and restrained" – tasing and closed-fist strikes – was reasonable because "(i) [the decedent] violently scuffled with the officers, (ii) the officers had not yet restrained [the decedent], and (iii) the officers were 'forced to make split-second judgments – in circumstances that [were] tense, uncertain, and rapidly evolving.'" <u>Id</u>. at 870 (citing <u>Graham</u> 490 U.S. at 397). However, once the decedent was "subdued and restrained," the Ninth Circuit acknowledged that "the need for more force waned as circumstances changed" and "it was no longer a frantic and fast-evolving situation requiring officer to make split second decision." <u>Id</u>. As such, the Ninth Circuit held that the force used by the officers after this point – tasing and a head restraint – was unreasonable because the officers had "two minutes to realize that [the decedent] – who was handcuffed, shackled, and exhausted – could no longer resist and did not pose a threat." <u>Id</u>. The Ninth Circuit further held that it was clearly established law under <u>Drummond</u> that "the use of a head restraint on [the

decedent] was unreasonable when he had both his hands and feet shackled for two minutes and no longer could resist." Id. at 872.

In addition, the Ninth Circuit has reaffirmed Drummond on several other occasions in cases where officers used force on a restrained or subdued individual. See, e.g., Valenzuela v. City of Anaheim, No. 20-55371, 2021 WL 3362847, at *2 (9th Cir. 2021) (holding officers were not entitled to qualified immunity under Drummond after the officers placed the decedent in a multiple choke holds while the decedent was lying on the ground with his arms pinned down); Tuumalemalo v. Greene, 946 F.3d 471, 477 (9th Cir. 2019) (holding officers were not entitled to qualified immunity under Drummond for using "a chokehold on a non-resisting, restrained person" and noting that "there was little chance [the plaintiff] could initiate resistance with five other officers fully restraining him and pinning him to the ground"); Zion v. Cnty. of Orange, 874 F.3d 1072, 1076 (9th Cir. 2017) (holding an officer was not entitled to qualified immunity for shooting and stomping on the decedent's head after the suspect had been brought to the ground because the law was clearly established that "use of deadly force against a non-threatening suspect is unreasonable" and "continued force against a suspect who has been brought to the ground can violate the Fourth Amendment" under Drummond); Abston v. City of Merced, 506 Fed. Appx. 650, 652–53 (9th Cir. 2013) (holding an officer was not entitled to qualified immunity for applying body weight pressure to the decedent for one minute and seven seconds while the decedent was "face-down, handcuffed and ankle-shackled," even though the decedent had actively resisted arrest and injured an officer); Davis v. City of Las Vegas, 478 F.3d 1048, 1053 (9th Cir. 2007) (holding an officer was not entitled to qualified immunity after pushing an unarmed, handcuffed man into a wall multiple times and punching him in the face while the man lay face-down on the ground); see also Andrews v. City of Henderson, 35 F.4th 710, 719 (9th Cir. 2022) (holding that it was clearly established in 2007 that "an officer violates the Fourth Amendment by tackling and piling on top of a 'relatively calm,' non-resisting suspect who poses little threat of safety" (citing Blackenhorn v. City of Orange, 485 F.3d 463, 478, 481 (9th Cir.

3:15-cv-02692-H-MDD

2007)); <u>Hughes v. Rodriguez</u>, 31 F.4th 1211, 1223 (9th Cir. 2022) (holding that it was clearly established in 1992 that "beating a handcuffed convict violates the Eighth Amendment" prohibition on excessive force (citing <u>Hudson v. McMillian</u>, 504 U.S. 1, 3 (1992)); <u>LaLonde v. Cnty. of Riverside</u>, 204 F.3d 947, 961 (9th Cir. 2000) (holding that where "an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon [e.g., pepper sprays; police dogs] or a refusal without cause to alleviate its harmful effects constitutes excessive force").

In the present case, Defendant Fischer was involved in the application of force on Mr. Phounsy on April 13, 2015 during three periods of the interaction: first, attaching the maximum restraint cords to Mr. Phounsy in the hallway; second, carrying Mr. Phounsy to the driveway; and third, applying pressure to Mr. Phounsy in the ambulance. The Court concludes Defendant Fischer is entitled to qualified immunity for his actions in the hallway and driveway. When Defendant Fischer arrived on scene, he entered into a "frantic and fast-evolving situation" requiring him to "make split second decisions." <u>Hyde</u>, 32 F.4th at 870 (citing <u>Graham</u> 490 U.S. at 397). Mr. Phounsy had just "violently scuffled with the officers" and was in the process of being restrained. <u>Id.</u>; (<u>see, e.g.</u>, Tr. III-218–27.) Defendant Fischer assisted other deputies in applying maximum restraints to Mr. Phounsy. (Tr. I-199.) Defendant Fischer then assisted with carrying Mr. Phounsy from inside the home to the driveway outside. (Tr. I-252; III-57–58.) Defendant Fischer then left Mr. Phounsy in the driveway with other deputies and accompanied Deputy Tamani Pugh as she took photographs inside the home. (Tr. I-257–58; II-59, 60; VI-125.) Taking the facts in the light most favorable to Plaintiffs, the case law as established in April 2015 did not give every reasonable officer in Defendant Fischer's position notice that his pre-ambulance conduct was unlawful. <u>See Ashcroft</u>, 563 U.S. at 741.

But by the time Mr. Phounsy was placed in the ambulance, it was no longer a "frantic and fast-evolving situation" requiring Defendant Fischer to "make split second decisions." <u>Hyde</u>, 32 F.4th at 870 (citing <u>Graham</u> 490 U.S. at 397). At that point, Mr. Phounsy had been in handcuffs and maximum restraints surrounded by officers for

approximately thirty minutes and was securely strapped to a gurney. In other words, Mr. Phounsy was "subdued and restrained" before Defendant Fischer used force on him and had been for a significant period of time. Id. at 870–72.

Not only was the force used by Defendant Fischer excessive, but it was clearly established in April 2015 by Drummond that Defendant Fischer's actions of pushing down "as hard as he could" on Mr. Phounsy's head and torso for approximately six minutes with "9 out of 10 pressure" while Mr. Phounsy was handcuffed, in maximum restraints, and strapped to a gurney until Mr. Phounsy stopped breathing and went into cardiac arrest was excessive force in violation of Mr. Phounsy's Fourth Amendment rights. Accordingly, Defendant Fischer is not entitled to qualified immunity for his actions in the ambulance.[6]

### D. Plaintiffs' Monell Failure to Train Claim

Defendants argue that the jury's verdict in favor of Plaintiffs on the Monell failure to train claim against the County was not supported by substantial evidence. (Doc. No.

---

[6] Defendants attempt to distinguish the present case from Drummond based on Mr. Phounsy's resistance. (Doc. No. 552-1 at 7–8.) Defendants' argument is not persuasive because the Defendants' assumption that Mr. Phounsy was actively resisting Defendant Fischer in the ambulance fails to take the facts in the light most favorable to Plaintiffs. See K.J.P. et al., 800 Fed. Appx. at 546. Further, Defendants' argument rests almost entirely on analogizing the present case to an unpublished memorandum disposition, A.B. v. San Diego, No. 20-56140, 2022 WL 1055558 (9th Cir. 2022), which is readily distinguishable from the present case. The district court in A.B. granted qualified immunity to officers at the summary judgment stage, which the Ninth Circuit affirmed on appeal. See A.B. v. Cnty. of San Diego, No. 18-cv-1541-MMA, 2020 WL 5847551, at *9 (S.D. Cal. Oct. 1, 2020); A.B., 2022 WL 1055558, at *2. In coming to this conclusion, the Ninth Circuit distinguished the degree of force used by the officers in Drummond as "much greater than the force" used by the officers in A.B. Id. at *2. In the present case, the degree of force employed by Defendant Fischer on Mr. Phounsy in the ambulance ("9 out of 10 pressure" on the head of a fully restrained individual) was much more equivalent to the force used in Drummond (kneeling on the defendant's neck) than in A.B. (varying degrees of force on parts of the decedent's body but never with the officer's full body weight). A.B., 2020 WL 5847551, at *20. Further, the amount of time Defendant Fischer applied pressure to Mr. Phounsy while Mr. Phounsy was subdued and restrained was much more equivalent to the time in Drummond (approximately twenty minutes) than in A.B. (approximately thirty seconds). At most, the force used in A.B. in analogous to the force used on Mr. Phounsy in the home and driveway or the force used before the decedent was "subdued and restrained" in Hyde. However, once Mr. Phounsy was fully restrained in the ambulance, A.B. is not analogous.

552-1 at 9–19.) Plaintiffs argue that the jury's <u>Monell</u> finding was supported by substantial evidence that the County failed to train its deputies, including Defendant Fischer, on preventing excessive force, "particularly as it relates to escalating force against a person in restraints causing them to asphyxiate." (Doc. No. 563 at 10–12.) The Court agrees with Plaintiffs.

A municipality cannot be held liable under § 1983 under a respondent superior theory. <u>Monell v. Dep't of Soc. Servs. of the City of New York</u>, 436 U.S. 658, 691 (1978). Instead, § 1983 liability may be imposed on a municipality only when "a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." <u>Dougherty v. City of Covina</u>, 654 F.3d 892, 900 (9th Cir. 2011) (citing <u>Monell</u>, 436 U.S. at 694). "In order to establish liability for governmental entities under <u>Monell</u>, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation.'" <u>Dougherty</u>, 654 F.3d at 900 (quoting <u>Plumeau v. Sch. Dist. No. 400 Cnty. of Yamhill</u>, 130 F.3d 432, 438 (9th Cir. 1997)); <u>see also</u> <u>City of Canton v. Harris</u>, 489 U.S. 388 (1989).

"A policy can be one of action or inaction." <u>Long v. City of Los Angeles</u>, 442 F.3d 1178, 1185 (9th Cir. 2006). "A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations." <u>Tsao v. Desert Palace, Inc.</u>, 698 F.3d 1128, 1143 (9th Cir. 2012) (citing <u>Oviatt v. Pearce</u>, 954 F.2d 1470, 1477 (9th Cir. 1992)); <u>J.K.J. v. City of San Diego</u>, No. 20-55622, __ F.4th __, 2021 WL 9194183, at *5 (9th Cir. Nov. 15, 2021, amended Aug. 2, 2022) ("[R]ecognizing that a failure to train can be a policy under <u>Monell</u>" (internal quotation marks and citation omitted).). For a <u>Monell</u> claim based on failure to train, "[a] plaintiff must show, in addition to a constitutional violation, that this policy amounts to deliberate indifference to the plaintiff's constitutional right and that the policy caused the violation, in the sense that the [municipality] could have prevented the violation with an appropriate policy."

*Tsao*, 698 F.3d at 1143 (internal quotation marks and citations omitted); see also *City of Canton*, 489 U.S. at 390 (holding that to show "deliberate indifference" for failure to train claims, a plaintiff must prove that "in light of the duties assigned to specific officers or employees the need for different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need"). It is not enough to "prove that an injury or accident could have been avoided if an officer had had better or more training." *City of Canton*, 489 U.S. at 391.

Failure to train can be the basis of municipal liability under several circumstances. See *Long*, 442 F.3d at 1188 (citing *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 530 U.S. 397, 407 (1997)). "The first is a deficient training program, 'intended to apply over time to multiple employees'" where "the continued adherence by policymakers 'to an approach that they know or should know has failed to prevent tortious conduct by employees may establish . . . 'deliberate indifference.'" Id. Second, "the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." Id. Finally, "[a] plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where 'a violation of federal rights may be a highly predictable consequence of failure to handle recurring situations.'" Id.

### 1. Constitutional Violation

Substantial evidence supported the jury's finding that Defendant Fischer's used excessive force on Mr. Phounsy in the ambulance in violation of Mr. Phounsy's Fourth Amendment rights.[7] See supra Part II.A.

---

[7] Defendants also argue that "the inclusion of Collins on the 'failure to train' verdict form demonstrates that the Monell finding was incurably infected with a misunderstanding of law." (Doc. No. 552-1 at 12–13.) In Section II of the special verdict form, the jury listed deputy Collins as an officer who used

## 2. Policy that Amounted to Deliberate Indifference

A reasonable jury could find based on the evidence presented at the trial that the County's training program was deficient on training its deputies on how to avoid using excessive force on a restrained individual, which "amount[ed] to deliberate indifference" to Mr. Phounsy's constitutional rights. Dougherty, 654 F.3d at 900. At trial, both Plaintiffs' use of force expert, Mr. DeFoe, and medical expert, Dr. Thrush, testified about signs of asphyxiation, including movements and sounds a person struggling to breath may make. Mr. DeFoe testified that when a person is in a prone position in maximum restraints, they "are going to try to create some space between the ground and [their] diaphragm so [they] can breathe," and "officers may perceive that [the person] is trying to get up . . . that you're resisting . . . which translates into more weight, which translates into more force . . . [a]n that continues on, and on so the end game is either someone asphyxiates based on compression and/or position." (Tr. IV-191.) Mr. DeFoe further testified that when compression is put on the back or neck of an individual in maximum restraints, "the end result is the person can't breathe. So when you're looking at the person's trying to draw in breath, they're trying to basically – so, we hear guttural gurgling, agonal breathing . . . ." (Id. at 192.) Dr. Thrush testified that "human beings, when we're in severe respiratory distress, we'll kind of grunt at the end of an expiration in order to get a little more pressure to get a little more oxygen in." (Tr. II-187.)

At trial, Defendant Fischer testified that he did not remember being trained on if placing pressure on a person in maximum restraints would increase the risk of asphyxiation:

---

excessive force against Mr. Phounsy in addition to Defendant Fischer. (Doc. No. 532 at 3.) On August 9, 2021, the Court dismissed deputy Collins as a defendant from this action with prejudice pursuant to the parties' joint motion to dismiss. (Doc. Nos. 315, 316.) "[A] stipulated dismissal of an action with prejudice in a federal district court generally constitutes a final judgment on the merits and precludes a party from reasserting the same claim in a subsequent action in the same court." Headwaters, 399 F.3d at 1052. As a matter of law, the jury could not find deputy Collins liable. However, the jury's finding of Monell liability for the County is independently supported by the jury's finding of excessive force by Defendant Fischer and so the jury's finding of Monell liability is not in error.

3:15-cv-02692-H-MDD

Q: Are -- are there additional concerns in terms of the safety of having somebody in the prone position while they're being maximally restrained when additional weight is placed on the individual's back? Is that -- is that part of your training, that that -- that could increase the danger of asphyxiation?

A: You're talking about downward pressure on someone's back in the process of applying max restraints?

Q: Yes.

A: For a prolonged period of time I would believe so, yes.

Q: What's a prolonged period of time in your view?

A: I don't know. I would just -- to put on max restraints, depending on the level of combativeness of the suspect, it just depends.

Q: But additional pressure, as you've been trained, while you're maximally restraining an individual, adding pressure on the back would increase the danger of positional asphyxiation, right? That's how you're trained, right?

A: As I sit here today, I honestly don't remember specifically that. I can only assume that. I would think there's training on that, but --

Q: But you don't remember?

A: I don't remember.

(Tr. I-227–28.)

Plaintiffs also elicited testimony from Defendant Fischer regarding two prior incidents of use of force. First, on July 9, 2014, Defendant Fischer testified that he was working as a correction officer for the County when he used force against an inmate, Mr. Christopher Weaver. (Tr. I-177–78.) Defendant Fischer testified that while he was escorting Mr. Weaver with four other deputies to a holding cell, Mr. Weaver "tensed" his forearm and turned around. (Tr. I-178–81.) Defendant Fischer testified he wrapped his arm around Mr. Weaver's head, drove Mr. Weaver into the floor, and delivered two closed fist punches to Mr. Weaver. (Tr. I-181.) Defendant Fischer testified that, in response to Mr. Weaver's alleged resistance, he then applied pressure on Mr. Weaver's back while Mr. Weaver was in a prone position on the floor. (Tr. I-182.) Defendant Fischer also testified that Mr. Weaver had not struck or kicked or attempted to strike or kick him or any of the other deputies present. (Tr. I-182–84.)

The second incident occurred on February 23, 2015, just a few months before the incident with Mr. Phounsy, while Defendant Fischer was working as a sheriff's deputy. (Tr. I-186.) Defendant Fischer testified that while on patrol, he recognized Mr. David

3:15-cv-02692-H-MDD

Williams as someone who was a "Fourth Waiver," or had a court order "in place that the Fourth Amendment would not apply to that individual because of some criminal conviction." (Tr. I-187.) Defendant Fischer testified that he knew he did not need probable cause to stop and detain Mr. Weaver. (Id.) Defendant Fischer testified that he searched Mr. Williams, handcuffed him, and brought Mr. Williams behind his patrol vehicle. (Tr. I-189.) Defendant Fischer testified that Mr. Williams, while handcuffed, took a step toward Defendant Fischer. (Tr. I-191.) In response, to Defendant Fischer "applied a head takedown" by wrapping his right arm around Mr. William's head and then driving Mr. Williams to the ground. (Id.) Defendant Fischer then applied downward pressure on Mr. Williams while he was in the prone position for approximately ten seconds. (Tr. I-191–92.) Defendant Fischer testified that the County jail would not let Defendant Fischer book Mr. Williams due to his injuries and instead directed Defendant Fischer to take Mr. Williams to the hospital. (Tr. I-193–94.) Mr. Williams did not want to go to the hospital with Defendant Fischer, and so Mr. Williams was booked and sent to a different station. (Tr. I-194.)

Both Mr. Weaver and Mr. Williams filed complaints against Defendant Fischer. (Tr. I-194–95.) As a result, the San Diego County Sheriff's Department conducted investigations into both incidents and cleared Defendant Fischer of any wrongdoing. (Tr. I-194–95.) Defendant Fischer testified that the County never suggested after either incident that he "should review any training materials that would relate to the appropriate use of force" or suggest how Defendant Fischer could have handled either situation differently. (Tr. I-195–96.) A reasonable jury could conclude from Defendant Fischer's testimony that he received deficient training on avoiding excessive use of force against restrained individuals and recognizing resistance.

Plaintiffs also elicited testimony from several other deputies from which a reasonable jury could conclude the deputies as a group had received deficient training in preventing excessive force on a restrained individual. Several deputies testified that Mr. Phounsy was making "grunting," "animalistic noises," "groaning," "moaning" while in

3:15-cv-02692-H-MDD

maximum restraints, but that the deputies interpreted those noises to be a sign Mr. Phounsy was breathing. (See, e.g., IV-158, 160, 164 (Sergeant Ralph: ("I heard grunting and animalistic noises;" "just grunting;" "it was grunting and animalistic noises"); V-230 ("he was growling, screaming"); VIII-25 (Deputy Silva: "he was also grunting").) Several deputies testified that they never checked Mr. Phounsy's breathing by any method other than visually observing him. (See Tr. V-230 (Deputy Allen); Tr. V-308 (Deputy Carbajal); Tr. VI-130, 142 (Deputy Pugh); Tr. VIII-37 (Deputy Silva).) Several deputies also testified that they were never trained by the County on "agonal breathing." (See Tr. V-203 (Deputy Allen); Tr. V-308 (Deputy Carbajal); Tr. VI-142, 144 (Deputy Pugh); Tr. VIII-302 (Deputy Krull).) At trial, Deputy Allen testified:

> Q: In terms of your training on positional asphyxiation, was it your testimony that you were unfamiliar with the term "positional asphyxiation" in 2015?
> A: Yes, sir.
> Q: Never heard the term before?
> A: I don't believe so, no.
> Q: And what about the signs of positional asphyxiation? Were you familiar with the signs of positional asphyxiation prior to this incident through the training that you received from the San Diego County Sheriff's Department?
> A: I was not.

(Tr. V-229-30.) Evidence was also presented at trial that the deputies did not immediately place Mr. Phounsy in the recovery position in both the hallway and driveway. (Tr. I-245, 252.)

Defendants' own use of force expert, Mr. Meyer, expressed concern with the deputies' application of maximum restraints on Mr. Phounsy, acknowledging that if Mr. Phounsy was kept in the position depicted in Exhibit 71 for more than "one or two seconds," "that's a problem" and it would "be close" to a hogtie. (Tr. VII-265; Attachment A.) Finally, Plaintiffs' use of force expert, Mr. DeFoe, testified the following regarding the San Diego County Sheriff's Department's training on agonal breathing as it relates to maximum restraints: "It was insufficient, although I've had seven deputies, based on their testimony that stated they heard guttural noises, animalistic noises, which is agonal breathing. It means the body's in the process of dying. That is ultimately what

you're hearing." (Tr. IV-194.)

Taking the evidence presented at trial in the light most favorable to Plaintiffs, a reasonable jury could conclude that the County failed to train its officers on how to prevent the use of excessive force on an individual in maximum restraints, which amounted to deliberate indifference to Mr. Phounsy's constitutional right.

### 3. Moving Force

Finally, substantial evidence was presented at trial that the deficiencies in the County's training program were "the moving force behind" the violation of Mr. Phounsy's constitutional right. <u>Dougherty</u>, 654 F.3d at 900. Defendant Fischer testified that he applied downward pressure on Mr. Phounsy's head for approximately six minutes during the ambulance ride because he perceived that Mr. Phounsy was resisting. (Tr. I-271–74, 286; II-43–44, 67.) When asked what resisting meant, Defendant Fischer testified that resisting was "moving, side to side, not staying still . . . ." (Tr. I-280.) Plaintiffs also introduced Defendant Fischer's testimony from a prior proceeding where Defendant Fischer described Mr. Phounsy's movement in the ambulance as his "head going back and forth, his body. He was trying to move his body. His body was secured, but he was still moving, and it was just constant, just tensing and going – like bouncing." (Tr. I-103.) Defendant Fischer was asked if he "ever consider[ed] the possibility that Lucky was moving around because he was struggling to breath," and Defendant Fischer responded, "[b]ased on what I saw, he did not appear[] to be struggling." (Tr. I-279.) Mr. Phounsy then coded in the ambulance while Defendant Fischer's hand were on him. (Tr. I-280.)  Dr. Thrush testified that in his opinion, Defendant Fischer's actions in the ambulance contributed to Mr. Phounsy's death because "[t]he evidence shows that Deputy Fischer pushed down on the - - the head over the temple and the ear with a 9 out of 10 force" and "[t]his may have and I believe likely did on an anatomic basis constrict the airway." (Tr. II-87.) Dr. Sperry also testified that Mr. Phounsy's "basic cause of death was interference with his breathing or pressure on his body that caused him to be able to– well, not be able to breathe adequately." (Tr. III-5.)

Based on this evidence, a reasonable jury could conclude that Defendant Fischer lacked training on how to avoid using excessive force on a restrained individual and this deficient training was the "moving force" behind Defendant Fischer's use of excessive force on Mr. Phounsy in the ambulance. As a result, viewing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, substantial evidence was presented at trial to support the jury's finding of liability against the County on the <u>Monell</u> claim.

### E. Plaintiffs' Negligence Claim

Defendants challenge the jury's finding of negligence by San Diego County Sheriff's deputies Fischer, Allen, Collins, and Ralph. (Doc. No. 552-1 at 22–25.) Defendants also challenge the jury's finding of liability by the County. (<u>Id.</u>)

### 1. Defendant Fischer and the County

First, Defendants argue that insufficient evidence was presented at trial to support the jury's finding that Defendant Fischer's actions were negligent and that "a claim of 'direct negligence' is not cognizable against a municipal defendant." (<u>Id.</u> at 22–23, 25.) "In order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate legal cause of the resulting injury." <u>Hayes v. Cnty. of San Diego</u>, 57 Cal. 4th 622, 629 (2013) (citation omitted). Under California law, public employees "are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons." <u>Id.</u> at 628–29 (citing Cal. Gov. Code § 820). "'Under California law, police officers have a duty not to use excessive force.'" <u>Lawrence v. City & Cnty. of San Francisco</u>, 258 F. Supp. 3d 977, 999 (N.D. Cal. 2017) (quoting <u>Warren v. Marcus</u>, 78 F. Supp. 3d 1228, 1251 (N.D. Cal. 2015)); <u>see</u> <u>Mann v. City of Chula Vista</u>, No. 18-CV-2525-WQH-MDD, 2020 WL 5759749, at *9 (S.D. Cal. Sept. 28, 2020) (Under California law, "[p]olice officers owe 'a duty to use reasonable care' in deciding whether to use and in fact using force"); <u>see also</u> <u>Hayes</u>, 57 Cal. 4th at 629 ("This court has long recognized that peace

3:15-cv-02692-H-MDD

officers have a duty to act reasonably when using deadly force."). "The reasonableness of an officer's conduct is determined in light of the totality of circumstances." <u>Hayes</u>, 57 Cal. 4th at 629. Further, "public entities are generally liable for injuries caused by the negligence of their employees acting within the scope of their employment." <u>Id.</u> (citing Cal. Gov. Code § 815.2). As such, governmental entities "can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct." <u>Mary M. v. City of Los Angeles</u>, 54 Cal. 3d 202, 215 (1991).

Taking the evidence presented in the light most favorable to Plaintiffs, a reasonable jury could find that Defendant Fischer did not act objectively reasonably when Defendant Fischer did not immediately place Mr. Phounsy on his side in the recovery position after placing him in maximum restraints in the hallway and after moving him to the driveway. (Tr. I-252–54.) A reasonable jury could further conclude that Defendant Fischer's failure to place Mr. Phounsy in the recovery position was in violation of the San Diego County Sheriff's Department, Addendum Section F, Use of Force Guidelines.[8] (Doc. No. 509 at 13; <u>see also</u> Tr. I-212, 220, 229); <u>see</u> <u>Peterson v. City of Long Beach</u>, 594 F.2d 477, 480 (1979) (holding that a police department manual constitutes a "regulation" and indicates a minimal standard of care); <u>Clemente v. State of California</u>, 707 P.2d 818, 824 (Cal. 1985) (holding that the trial court did not error in providing a jury instruction that if the jury found a highway patrol officer violated the California Highway Patrol Accident Manual and such violation was the legal cause of injury, the jury could find such violation was negligence). Further, taking the evidence in the light most favorable to Plaintiffs, a reasonable jury could also find that Defendant Fischer did not act objectively reasonably when he used force against Mr. Phounsy in the ambulance and that such force was the

---

[8] Even though Defendant Fischer is entitled to qualified immunity for his actions in the hallway and the driveway, Defendant Fischer can still be found negligent for these actions. <u>See</u> <u>Shen v. Albany Unified Sch. Dist.</u>, 436 F. Supp. 3d 1305, 1309 (N.D. Cal. 2020) ("Because qualified immunity is a federal doctrine, it does not bar potential state law liability.").

cause of Mr. Phounsy's death. Hayes, 57 Cal. 4th at 629. The parties stipulated that Defendant Fischer was acting in the scope of his employment during the incident. (See Doc. No. 531, Jury Instruction No. 6.) As a result, substantial evidence supported the jury's finding of negligence by Defendant Fischer and vicariously the County for Defendant Fischer's actions.

### 2. Dismissed Defendants

Next, Defendants argue that the jury's finding of negligence by deputies Collins and Allen and sergeant Ralph was procedurally barred because Plaintiffs voluntarily dismissed deputies Collins and Allen and the Court dismissed sergeant Ralph at summary judgment. (Doc. No. 552-1 at 23–24.) "[A] stipulated dismissal of an action with prejudice in a federal district court generally constitutes a final judgment on the merits and precludes a party from reasserting the same claim in a subsequent action in the same court." Headwaters, 399 F.3d at 1052. Federal Rule of Civil Procedure 54(b) "permits orders to be 'revised at any time before entry of a final order'" and so "[t]he trial court may revise non-final orders 'at any time' before entry of final judgment." In re Linton, 631 B.R. 882, 896 (B.A.P. 9th Cir. 2021) (citing Hyan v. Hummer, 825 F.3d 1043, 1046–47 (9th Cir. 2016)); see also Midmountain Contractors, Inc. v. Am. Safety Indem. Co., No. C10-1239 JLR, 2013 WL 5492952, at *4 (W.D. Wash. Oct. 1, 2013). However, "[o]nce a district judge issues a partial summary judgment order removing certain claims from a case, the parties have a right to rely on the ruling by forbearing from introducing any evidence or cross-examining witnesses in regard to those claims. If, as allowed by Rule 54(b), the judge subsequently changes the initial ruling and broadens the scope of the trial, the judge must inform the parties and give them an opportunity to present evidence relating to the newly revived issue. Failure to do so might in some circumstances cause substantial prejudice." Leddy v. Standard Drywall, Inc., 875 F.2d 383, 386 (2nd Cir. 1989); see also Alberty-Velez v. Corp. de Puerto Rico Para La Difusion Public, 242 F.3d 418,422 (1st Cir. 2001); see also Fed. R. Civ. P. 56(g).

1       The Court agrees with Defendants that the County cannot be vicariously liable for

2   the actions of dismissed defendants. On August 9, 2021, the Court granted the parties

3   joint motion to dismiss deputy Collins with prejudice, (Doc. Nos. 315, 316), and on

4   September 15, 2021, the Court granted the parties' joint motion to dismiss all claims

5   against deputy Allen with prejudice. (Doc. Nos. 391, 394.) The parties jointly agreed to

6   the dismissal for a waiver of costs. (Id.) Further, on April 12, 2019, the Court granted

7   summary judgment on all claims against sergeant Ralph and did not subsequently change

8   its ruling. (Doc. No. 171 at 19, 22, 28–29, 36–38); see Fed. R. Civ. P. 54(b); Leddy, 875

9   F.2d at 386. As a result, the County cannot be held vicariously liable for their actions. See

10  Freeman v. Churchill, 30 Cal. 2d 452, 461 (1947) ("It is the firmly-established rule that a

11  judgment on the merits favorable to the employee in an action by a third person for a tort

12  of the employee is a bar to an action by the third person against the employer where the

13  latter's asserted liability for the tort rests upon respondeat superior and not his

14  independent tort.").

15      Plaintiffs, citing Perez v. City of Huntington Park, 7 Cal. App. 4th 817 (1992),

16  argue "that judgment could be entered in favor of all the deputies without precluding

17  judgment against the County." (Doc. No. 563 at 20). The Court does not find Perez's

18  narrow holding applicable to the present case. In Perez, the California Court of Appeals

19  held that the City of Huntington Park could still be held vicariously liable for its officers'

20  unreasonable use of force even though the trial court could not determine which of the

21  four officers present was the officer that used the unreasonable force. 7 Cal. App. 4th at

22  819. The court reasoned that since "the judgment did not determine that no employee

23  committed a wrong," the City of Huntington Park "should not be relieved of liability." Id.

24  at 822. This is distinct from the facts in the present case where the defendants were

25  dismissed or received summary judgment. As a result, the general rule that a "verdict

26  which exonerates the employee necessarily exonerates the employer also" applies. Id. at

27  820 (citing Freeman, 30 Cal. 2d at 461).

28

3:15-cv-02692-H-MDD

Nonetheless, under California law, the Court was still required to ask the jury to apportion fault to nonparties because the fault of nonparties is relevant for comparative fault damages considerations. See Vollaro v. Lispi, 168 Cal. Rptr. 323, 329 n.5 (Ct. App. 2014) ("The proposition that a jury may apportion liability to a nonparty has been adopted by the Judicial Council of California Civil Jury Instructions (CACI) . . . 'Nonparties' include the universe of tortfeasors who are not present at trial, including defendants who settled before trial and nonjoined alleged tortfeasors."); Romine v. Johnson Controls, Inc., 224 Cal. App. 4th 990, 1011 (2014) ("[I]t is error for a trial court not to allow the jury to assess the comparative fault of defendants who settled before trial."); see also Cal. Civ. Code § 1431.2; Judicial Council of California Civil Jury Instructions (CACI) No. 406. Apportionment of Responsibility (2022). As a result, it was proper for the jury to apportion a percentage of fault to deputy Collins, deputy Allen, sergeant Ralph, and the firefighter paramedics, and such apportionment may still be relevant for reducing any damages award for negligence.

### F. Plaintiffs' Wrongful Death Claim

Finally, Defendants argue that because there was not substantial evidence to support Plaintiffs' excessive force or negligence causes of action, Plaintiffs' wrongful death cause of action also fails. (Doc. No. 552-1 at 25.) Under California Code of Civil Procedure § 377.60, "[a] cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by," among others, "[t]he decedent's surviving spouse" and "children." Cal. Civ. Code § 337.60(a). "The elements of a cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." Quiroz v. Seventh Ave. Cntr., 45 Cal. Rptr. 3d 222, 226 (Ct. App. 2006) (internal citation omitted). Because substantial evidence supports the jury's finding of negligence by Defendant Fischer and the County, substantial evidence also supported the jury's finding in Plaintiffs' favor on the wrongful death claim.

1  **II. Defendants' Motion for a New Trial**

2          In their second post-trial motion, Defendants move for a new trial pursuant to

3  Federal Rule of Civil Procedure 59. (Doc. No. 551-1.) Defendants argue a new trial is

4  warranted because (1) the jury's verdict was against the clear weight of the evidence; (2)

5  the jury instructions and special verdict form prejudiced Defendants; (3) evidentiary

6  rulings prejudiced Defendants; (4) Plaintiffs' counsel's conduct prejudiced Defendants;

7  and (5) the damages awarded by the jury were excessive. Id.

8          **A. Clear Weight of the Evidence**

9          Defendants argue that the jury's verdict was against the clear weight of the

10  evidence "for all the reasons explained in defendants Rule 50(b) motion" and request the

11  Court grant a new trial if the Court declines to grant Defendants' Rule 50(b) motion.

12  (Doc. No. 555-1 at 2.) A court may grant a motion for a new trial based on insufficiency

13  of the evidence "only if the verdict is against the great weight of the evidence, or it is

14  quite clear that the jury has reached a seriously erroneous result." EEOC v. Pape Lift,

15  Inc., 115 F.3d 676, 680 (9th Cir. 1997) (internal quotation marks omitted).

16          At trial, the jury heard Defendant Fischer testify that as soon as he got into the

17  ambulance with Mr. Phounsy, he put both of his hands on Mr. Phounsy's head and

18  pushed down as hard as he could with "9 out of 10 pressure" for six minutes. (Tr. I-271.)

19  The jury also heard from the paramedic firefighters present in the ambulance that

20  Defendant Fischer pressed down on Mr. Phounsy for "the majority of the ride" and

21  continued to hold down after the firefighter paramedics could see Mr. Phounsy had

22  "stopped moving." (Tr. VI-86–87; VIII-106.) Both of Plaintiffs' medical experts, Dr.

23  Thrush and Dr. Sperry, provided the opinion that Mr. Phounsy died because he was

24  unable to breathe and that Defendant Fischer's actions in the ambulance contributed to

25  Mr. Phounsy's death. (Tr. II-154, 187; III-5.) Defendant Fischer also testified that he

26  could not remember whether the County trained him on the danger of applying pressure

27  to an individual in maximum restraints. (Tr. I-227–28.) The jury also heard from

28  Plaintiffs' use of force expert, Mr. DeFoe, who provided the opinion that the County's

training for its deputies on detecting agonal breathing from an individual in maximum restraints "was insufficient." (Tr. IV-194.) Ultimately, the jury concluded that Defendant Fischer used excessive and unreasonable force against Mr. Phounsy, that Defendant Fischer had the specific intent under the Bane Act to use excessive force, and that the violation of Mr. Phounsy's constitutional right was the result of the County's failure to train its deputies to avoid using excessive force on individuals in maximum restraints. (Doc. No. 532.) This conclusion was neither against the clear weight of the evidence nor erroneous. See Pape Lift, 115 F.3d at 680. As a result, the Court denies Defendants' motion for a new trial on this ground.

## B. Jury Instructions and Special Verdict Form

Defendants also argue that a new trial is warranted based on instructional errors. (Doc. No. 551-1 at 7–15.) But Defendants did not timely raise these objections or demonstrate that a new trial is warranted.

### 1. Monell Standard and Jury Instruction

Defendants argue the Court provided the incorrect standard for Monell liability in Section II(B) of the special verdict form. (Doc. No. 551 at 10.) Defendants did not object to the language of Section II(B) at trial on this ground despite the Court providing Defendants numerous opportunities to do so.[9] "By waiting until post-trial motions to raise its specific contentions, [Defendants] prevented the Court from correcting any problems

---

[9] On Thursday, March 3, 2022, the second day of trial, the Court gave the parties a draft of the special verdict form to review and provide edits. (Tr. II-319.) On Wednesday, March 9, 2022, the Court stated to the parties "I've requested the comments for the verdict form and I'll ask them by 9:00 a.m. on Friday." (Tr. VI-328.) On Thursday, March 10, 2022, the Court provided the parties with an updated version of the special verdict form and requested that the parties "designate somebody to be able to address that tomorrow at noon." (Tr. VII-220, 310.) The morning of Friday, March 11, 2022, the Court provide the parties with an updated version of the special verdict form. (Tr. VIII-86.) After the jury was dismissed on Friday, March 11, 2022, the Court and parties went through the special verdict form together line by line. (Tr. VIII-311.) At this time, the Court asked the parties to provide edits or objections to the special verdict form. (Id.) The parties did not object or suggest edits to Section II(B). (Tr. VIII-318–33.) On Monday, March 14, 2022, the Court again provided the parties with an opportunity to discuss and object to the special verdict form before bringing the jury in. (Tr. IX-1–11.) The parties again did not object or suggest edits to Section II(B). (Tr. IX-11.)

ex ante." <u>Yeti by Molly, Ltd. v. Decker Outdoor Corp.</u>, 259 F.3d 1101, 1110 (9th Cir. 2001). Defendants cannot now assert the special verdict form was improper. <u>See id.</u> at 1109 (holding a party waived its objects to the verdict form by not objecting to an alleged error "until after the jury rendered its verdict and was discharged").[10]

Even if the objection had been timely, the <u>Monell</u> standard in the special verdict form, taken together with the jury instructions, was correct. For a <u>Monell</u> claim based on failure to train, "a plaintiff must show, in addition to a constitutional violation, that this policy amounts to deliberate indifference to the plaintiff's constitutional right and that the policy caused the violation, in the sense that the municipality could have prevented the violation with an appropriate policy." <u>Tsao</u>, 698 F.3d at 1143 (internal quotation marks and citations omitted); <u>see also</u> <u>City of Canton</u>, 489 U.S. at 390–92. Section II(A) of the special verdict form asked the jury:

> Do you find by a preponderance of the evidence that one or more San Diego County Sheriff's deputies violated Lucky Phounsy's constitutional rights to be free from excessive force?

(Doc. No 532 at 3.) This question addresses the first requirement for <u>Monell</u> failure to train liability: did a "constitutional violation" occur? <u>See</u> <u>Tsao</u>, 698 F.3d at 1143.

Section II(B) of the special verdict form asked the jury:

> Do you find by a preponderance of the evidence that the violation of Lucky Phounsy's constitutional rights was a foreseeable result of a failure to train by the County of San Diego to avoid violating a constitutional right to be free from excessive force?

(Doc. No 532 at 3.) This question addresses the second requirement for <u>Monell</u> liability: was the County "deliberately indifferent" to Mr. Phounsy's constitutional rights? <u>See</u> <u>Tsao</u>, 698 F.3d at 1143. To show "deliberate indifference," a plaintiff must prove that "in light of the duties assigned to specific officers or employees the need for different training is so obvious, and the inadequacy so likely to result in the violation of

---

[10] Defendants argue that they did not waive their objection because they objected during the first trial. (Doc. No. 568 at 8.) However, objecting to a completely different version of the special verdict form during a different trial is insufficient to give the Court notice of the objection.

constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." <u>City of Canton</u>, 489 U.S. at 390. In other words, was the constitutional violation a "highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations" or a foreseeable result of the County's deficient training program? <u>See</u> <u>Long</u>, 442 F.3d at 1186 (citing <u>Brown</u>, 520 U.S. at 409).

Finally, Section II(C) of the special verdict form asked the jury:

> Do you find by a preponderance of the evidence that the County's failure to train caused injury to Lucky Phounsy?

(Doc. No 532 at 3.) To meet the "moving force" requirement, "the plaintiff must show both causation-in-fact and proximate causation." <u>Gravelet-Blondin v. Shelton</u>, 728 F.3d 1086, 1096 (9th Cir. 2013). Section II(C) thus addresses the third and final requirement for <u>Monell</u> liability: was the County's failure to train the "moving force" behind Mr. Phounsy's constitutional violation? <u>See</u> <u>Tsao</u>, 698 F.3d at 1143.

The jury instructions provided both orally and in paper form also instructed the jury on the "moving force" standard twice. Jury Instruction No. 33 stated the following as one of the required elements of a <u>Monell</u> failure to train claim:

> The failure of the County to prevent violations of law by its deputies or to provide adequate training caused the deprivation of Mr. Phounsy's rights by the deputies; that is, the County's failure to prevent violations of law by its deputies or to train is so closely related to the deprivation of Mr. Phounsy's rights **as to be the moving force that caused his ultimate injuries**.

(Doc. No. 531 at 36, Jury Instruction No. 33; <u>see also</u> Doc. No. 542, Tr. IX-32) (emphasis added). Jury Instruction No. 34 also provided:

> In order to establish that either or both defendants deprived the plaintiff of particular rights under the United States Constitution, the plaintiff must prove by a preponderance of the evidence that the acts were so closely related to the deprivation of the particular constitutional right **as to be the moving force that caused the ultimate injury.**

(Doc. No. 531 at 38, Jury Instruction No. 34; <u>see also</u> Tr. IX-33) (emphasis added). Finally, the "moving force" standard provided in Section II(B) of the special verdict form

was substantially similar to the language used in the Ninth Circuit Model Jury Instructions:

> 5. the failure of the defendant [name of local governing body] [to prevent violations of law by its employees] [to provide adequate training] **caused the deprivation of the plaintiff's rights** by the [name of defendant's [police officer[s]] [employee[s]]]; that is, the defendant's failure [to prevent violations of law by its employees] [to train] **played a substantial part in bringing about or actually causing the injury or damage to the plaintiff**.

Ninth Circuit Model Civil Jury Instruction 9.8 (2017) (emphasis added). Accordingly, the Monell special verdict form, taken as a whole with the jury instructions, was proper.

Defendants also argue the Court misstated the Monell jury instruction during oral instructions. (Doc. No. 551-1 at 7–9.) Plaintiffs' Monell claim based on failure to train on serious medical needs was disposed of before jury deliberations and so the only Monell claim before the jury was on the theory of failure to train on use of force. (Doc. No. VIII-174–77.) When delivering its oral instructions on the Monell claim, the Court stated:

> [I]f you find that the plaintiffs have proved all elements they are required to prove under the instructions on excessive force and/or deliberate indifference to medical needs, your verdict should be for the Plaintiff.

(Tr. IX-33.) This instruction was from an earlier version of the proposed jury instructions and was a mistake. However, each counsel and juror was provided with a copy of the written instructions that included the correct Monell standard to follow along with as the Court orally instructed the jury. (Tr. IX-10–11.) Despite this, Defendants did not contemporaneously object to the oral instruction and instead raised this objection for the first time in its Rule 59 motion. (Tr. IX-33); Fed. R. Civ. Proc. 51(c)(2)(B). Had Defendants objected during trial, the Court could have reinstructed the jury to cure the misstatement.

Because Defendants did not timely object to the Court's oral instructions, Defendants' objection is reviewed on appeal for plain error. United States v. Walter-Eze, 869 F.3d 891, 911 (9th Cir. 2017). Plain error requires a showing that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the

error affected [defendant's] substantial rights, which in the ordinary case means it affected the outcome of the district-court proceedings; and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." Id. "In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." Id. Thus, "the adequacy of jury instructions is not determined by the giving of any one instruction, but by examining the instructions as a whole." United States v. Ancheta, 38 F.3d 1114, 1116 (9th Cir. 1994) (quoting United States v. Boekelman, 594 F.2d 1238, 1240 (9th Cir. 1979)).

The oral Monell jury instruction did not amount to plain error because the remainder of the oral instructions, the written instructions, and special verdict form repeatedly emphasized that the Monell claim was exclusively for failure to train on excessive force. The Court orally instructed the jury:

> Plaintiff claims a violation for failure to train the Sheriff's deputies on the use of force. Plaintiff claims that Defendant Richard Fischer used excessive force and the County failed to properly train Sheriff's deputies on the use of force.

(Tr. IX-32.) The printed version of Jury Instruction No. 32 provided to the jurors to use during deliberations correctly stated:

> Plaintiff claims a violation for failure to train the sheriff's deputies on the use of force. Plaintiff claims that Defendant Richard Fischer used excessive force and that the County failed to properly train sheriff's deputies on the use of force.

(Doc. No. 531 at 35, Jury Instruction No. 32.) Similarly, the printed version of Jury Instruction No. 33 given to the jury detailed the elements of a Monell failure to train on excessive force claim and provided:

> If you find that plaintiff has proved each of these elements, and if you find that the plaintiffs have proved all the elements they are required to prove under the instructions on excessive force, your verdict should be for the plaintiffs.

(Id. at 531–32, Jury Instruction No. 33.) Finally, the Monell section of the special verdict form only asked the jury about the County's liability for "failure to train . . . to avoid violating a constitutional right to be free from excessive force." (Doc. No. 532 at 3.) The instructions, taken as a whole, were clear that the Monell claim was only for failure to

train on excessive force, and so the "[C]ourt's slip of the tongue was unlikely to have misled the jury or affected the outcome of the proceedings." Walter-Eze, 869 F.3d at 912.

The Ninth Circuit has held under similar facts that the no plain error occurred. See, e.g., id. at 911 (holding the district court's misstatement of the burden of proof was not plain error "[w]hen considered as whole with the remainder of the district court's instructions and the fact that the jury was provided a copy of the correct written instructions"); Ancheta, 38 F.3d at 1117 (holding the district court's oral misinstruction of a criminal jury did not amount to plain error were the "remaining instructions repeatedly and exhaustively reminded the jury of the proper legal standard" and the jury was provided "with proper written instructions"); United States v. Brown, 552 F.2d 10, 11–12 (9th Cir. 1975) (per curiam) (holding that although the district court erred in omitted the reasonable doubt standard in one instruction, no plain error occurred since other instructions repeatedly reminded the jury of the reasonable doubt standard). Accordingly, Defendants have failed to show that the Monell instruction warrants a new trial.

### 2. Adverse Jury Instructions on the County's Discovery Violations

Defendants also challenge the adverse jury instructions given by the Court. (Doc. No. 551-1 at 12–15.) The adverse jury instructions were properly given as measured sanctions for the County's serious discovery violations.[11]

Federal Rule of Civil Procedure 26(e) imposes a duty on a party to supplement or correct prior discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A). This affirmative duty continues "even after the discovery cut-off date."

---

[11] At trial, the Court gave three adverse jury instructions: first, for the County's failure to supplement discovery with the Maximum Restraint Training Video; second, for the County's failure to supplement discovery and preserve Defendant Fischer's maximum restraints training test results; and third, for the County's failure to supplement discovery with the October 21, 2021 toxicology report of Mr. Phounsy's blood sample. In their Rule 59 motion, Defendants do not challenge the toxicology report adverse jury instruction. (Doc. No. 551-1 at 12–15.)

Hernandez v. Polanco Enters., Inc., 19 F. Supp. 3d 918, 933 (N.D. Cal. 2013); see also Sanders v. Univ. of Idaho, Coll. of Law, No. 3:19-cv-00225-BLW, 2022 WL 280875, at *3 (D. Idaho Jan. 31, 2022) (collecting cases). Federal Rule of Civil Procedure 37(c)(1) "authorizes a court to sanction a party for failing to produce information required by Rule 26(a) or (e)" by prohibiting that party from using "the withheld information at trial unless the failure was substantially justified or harmless." Fast v. GoDaddy.com LLC, 340 F.R.D. 326, 335–36 (D. Ariz. 2022) (citation omitted). However, "blocking the use of information at trial is, of course, no penalty when the withheld information is unfavorable to the party that failed to disclose it." Id. As a result, Rule 37(c)(1) also permits courts to impose other sanctions, including "inform[ing] the jury of the party's failure," "designating facts be taken as established for purposes of the action," or "other appropriate sanctions." Fed. R. Evid. 37(c)(1)(A)–(B); Fed. R. Evid. 37(b)(2)(A)(i)–(vi).

Under Federal Rule of Civil Procedure 37(e), potential litigants also "have a duty to preserve relevant information when litigation is reasonably foreseeable." Fed. R. Civ. P. 37(e) Committee Notes on Rules to the 2015 Amendment; see also Compass Bank v. Morris Cerullo World Evangelism, 104 F. Supp. 3d 1040, 1051 (S.D. Cal. 2015). "Once the duty to preserve attaches, a party must 'suspend any existing policies related to deleting or destroying files and preserve all relevant documents related to the litigation.'" Id. at 1052 (citing Lopez v. Santoyo, No. 09-cv-00108-W-RBB, 2021 WL 5427957, at *7 (S.D. Cal. Nov. 7, 2012)). "[T]he failure to preserve electronic or other records, once the duty to do so has been triggered, raises the issue of spoliation of evidence and its consequences." U.S. Legal Support, Inc. v. Hofioni, No. 2:13-cv-1770-LKK-AC, 2014 WL 172336, at *3 (E.D. Cal. Jan. 15, 2014) (citation omitted). "Sanctions that a federal court may impose for spoliation include assessing attorney's fees and costs, giving the jury an adverse inference instruction, precluding evidence, or imposing the harsh, case-dispositive sanctions of dismissal or judgment.'" Compass Bank, 104 F. Supp. 3d at 1052 (quoting U.S. v. Town of Colorado City, Ariz., No. 3:12-cv-8123-HRH, 2014 WL 3724232, at *7 (D. Ariz. July 28, 2014)). "Ultimately, the choice of appropriate

spoliation sanctions must be determined on a case-by-case basis, and should be commensurate to the spoliation party's motive or degree of fault in destroying the evidence." Apple Inc. v. Samsung Elecs. Co., 888 F. Supp. 2d 976, 992–93 (N.D. Cal. 2012). When a "sanction amount[s] to dismissal of a claim, the district court [is] required to consider whether the claimed noncompliance involved willfulness, fault, or bad faith, . . . and also to consider the availability of lesser sanctions." R & R Sails, Inc. v. Ins. Co. of Pa., 673 F.3d 1240, 1247 (9th Cir. 2012). Discovery sanctions are reviewed for "abuse of discretion." Yeti by Molly, 259 F.3d at 1105.

During discovery, Plaintiffs explicitly requested information from the County about the San Diego County Sheriff's Department's training on maximum restraints and excited delirium. On September 7, 2016, Plaintiffs sent the following request for production to the County:

> CATEGORY 8: Documents containing any training, protocol, policy, or procedure (in effect at the time of the incident through the present) that applies to or governs the use of restraints by SDSD personnel, including the use of "maximum restraints" and the "recovery position."
>
> CATEGORY 9: Documents showing whatever training each of the SDSD personnel who helped restrain Lucky Phounsy (at any point during the incident) had, at the time of the incident, in the use of restraints, including the use of "maximum restraints" and the "recovery position."
>
> CATEGORY NO. 17: Documents containing any SDSD policy or procedure (in effect at the time of the incident through the present) on how SDSD personnel should interact with mentally disturbed individuals (including those who may be suffering from "excited delirium").

(Doc. No. 448, Scott Decl. Ex. A at 5, 7.)[12] On September 17, 2016, the County provided the following responses:

---

[12] In response to other requests for production of "documents," the County produced video and audio discovery. For example, in response to Plaintiffs' request for "[a]ny documents related to the incident," the County produced "[a]udio recording of fire department witness statements," "[a]udio recording of civilian witnesses," "[r]adio communications recording (EMS)," and "[r]adio communications recording (sheriff)." (Doc. No. 448, Scott Decl. Ex. A at 2–3.) As a result, Plaintiffs' request for production of "documents" related to maximum restraints and excited delirium covered video and audio, including the maximum restraint and excited delirium training videos. See Fed. R. Civ. P. 34(a)(1).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONSE TO CATEGORY 8: San Diego County Sheriff's Department Use of Force Addendum F will be produced.

RESPONSE TO CATEGORY 9: Such documents as exist will be produced.

RESPONSE TO CATEGORY 17: Such documents as exist will be produced.

(Id.)

On February 9, 2022, after the conclusion of the first trial in this case, Plaintiffs filed a supplemental brief alleging the County did not provide Plaintiffs with a maximum restraint training video used by the San Diego County Sheriff's Department to train its deputies. (Doc. No. 448 at 3–4.) Plaintiffs represent they made multiple requests for production for maximum restraint training materials used by the County during discovery, including the September 7, 2016 request, but never received the video. (Id. at 3; Scott Decl. Ex. A at 5.) Plaintiffs represent they were instead informed of the training video after the first trial by chance from counsel in another case against the County. (Doc. No. 448 at 4; Bourassa Decl. ¶¶ 3–7.)

In response to Plaintiffs' allegations, the Court ordered briefing, targeted depositions, and a hearing on this matter. On February 14, 2022, Defendants filed a response to Plaintiffs' supplemental briefing. (Doc. Nos. 454, 455.) On February 14, 2022, the Court also held a pretrial status conference where the Court addressed the discovery violations and ordered a deposition to be taken of the person most knowledgeable from the County and Plaintiffs as to whether the maximum restraint training video was provided during discovery. (Doc. Nos. 460 at 2; 465.) The Court also ordered depositions to be taken of Defendants' medical expert, Dr. Vilke, as to whether he saw, reviewed, or relied on the maximum restraint training video as part of his testimony and of Defendant Fischer related to the maximum restraint training video. (Doc. Nos. 456, 460.) On February 22, 2022, the Court order the County to produce its discovery production logs to show how the County supplemented Plaintiffs' request for production with the training video. (Doc. No. 456.) On February 23, 2022, Defendants filed an additional supplemental brief on the discovery violation. (Doc. No. 466.) On

February 27, 2022, Plaintiffs also filed an additional supplemental brief. (Doc. No. 474, 478.)

The County conceded that after approximately seven years of litigation and Plaintiffs' voluntary dismissal of all of the individual deputy defendants other than Defendant Fischer, the County had no record that it produced the maximum restraint training video to Plaintiffs. (Doc. No. 466 at 2–3.) Specifically, the County stated that "[a]s to the current issue of whether the County produced the video during the discovery period, the County's investigation thus far has not determined whether the video was produced while the discovery period was open." (Id. at 2.) The County further provided that "[t]he County's records do not show whether the video was provided to County Counsel by the Sheriff's Department in response to Plaintiffs' Request for Production of Documents in 2016. The video was not specifically identified in the County's initial response, but subsequent discovery was provided, unfortunately without bates numbering or logging." (Id. at 3.) The County also stated that "[w]hile the Court has ordered the County to produce a discovery production log showing disclosure of this video, the County has no such documentation in its logs. Likewise, supplemental production was made informally on an ongoing basis, and records are incomplete." (Id. at 3 n.2.) The Court notes that the training video was not listed on the parties' pretrial order or exhibit lists for any prior scheduled trial in this case, (Doc. Nos. 263-2, 291, 335, 365–66), nor was it shown during depositions or used during the first trial.

After the County's maximum restraint training video discovery violation came to light, the Court learned of three additional serious discovery violations by the County. First, the County failed to provide Plaintiffs with the San Diego County Sheriff's Department's training video on excited delirium. (Doc. Nos. 448 at 4, Bourassa Decl. ¶ 6–7; 505 at 2.) The excited delirium training video was created in 2007 and narrated by Dr. Vilke, the County's medical expert who testified at the first trial in this case. (Id.) The County did not provide Plaintiffs with the excited delirium training video during discovery despite Dr. Vilke's role in this litigation and Plaintiffs' specific request for

production of "[d]ocuments containing any SDSD policy or procedure . . . on how SDSD personnel should interact with mentally disturbed individuals (including those who may be suffering from 'excited delirium')." (Doc. No. 448-1 at 7.) Instead, after the first trial, Plaintiffs received the excited delirium training video from the same third party who provided Plaintiffs with the maximum restraint training video. (Doc. No. 448 at 4.)

Second, the County failed to timely provide and preserve the individual Sheriff's deputies' test results from the San Diego County Sheriff's Department's "Maximum Restraint/Excited Delirium Comprehension Test." (Doc. No. 505, Bourassa Decl. ¶¶ 3–9.) At the February 14, 2022 pretrial conference, the Court asked the County whether it had produced the test results to Plaintiffs, and the County responded "I don't know if they can still be identified and generated. I would think that those should have been produced." (Doc. No. 459 at 40:9–12.) On February 24, 2022, less than a week before the retrial, the County provided Plaintiffs with some of the dismissed deputies' test results. (Doc. No. 505, Bourassa Decl. ¶¶ 4–7.) None of the results predated the incident with Mr. Phounsy. (Id. ¶ 7.) The County also did not provide Plaintiffs with any of Defendant Fischer's test results. (Id. ¶ 8; Tr. IV-132–34.)

This litigation has been ongoing since 2015. From 2015 through 2017, Defendant Fischer was accused by sixteen women of assaulting them while he was on-duty as a San Diego County Sheriff's deputy. (Doc. No. 510.) In 2018, criminal charges were filed against Defendant Fischer for his on-duty conduct. (Doc. No. 279 at 3.) In September 2019, Defendant Fischer plead guilty to four felonies and three misdemeanors arising from these allegations. (Doc. Nos. 265, 279, 511.) In December 2019, the San Diego County Sheriff's Department terminated Defendant Fischer. (Tr. IV-134.) The County also settled several related civil lawsuits arising out of Defendant Fischer's conduct. (Doc. No. 265.) The criminal convictions, civil settlements, and Defendant Fischer's termination from the San Diego County Sheriff's Department occurred during the pendency of this case. County Counsel continued to represent Defendant Fischer in this litigation until November 23, 2020, when conflict counsel was hired to represent

Defendant Fischer. (Doc. No. 242.) Considering the criminal and civil cases brought against Defendant Fischer arising from his on-duty conduct, the County should have had procedures in place to ensure evidence related to Defendant Fischer's training was preserved. See Hofioni, 2014 WL 172336, at *3.

Finally, on the third day of trial after Plaintiffs' experts testified and left, the County disclosed that it had not provided Plaintiffs with a new toxicology report the County conducted on Mr. Phounsy's blood sample. (Tr. III-122–31.) The County ordered a new toxicology report following the first trial and received the report on October 21, 2021, approximately five months before disclosing it to Plaintiffs. (Id.) The toxicology report was favorable to Plaintiffs because it indicated that there were not additional substances in Mr. Phounsy's blood besides those identified in earlier toxicology reports. (Doc. No. 505, Bourassa Decl. ¶¶ 13–14, Ex. A.) The County's retention of a sample of Mr. Phounsy's blood and ability to retest the sample was a significant issue at the first trial. (See Doc. Nos. 375, Tr. VI-293; 377, VII-25; 401 at 3.) During Plaintiffs' opening statement during the retrial, Plaintiffs referenced this issue: ". . . [T]he reality is that the blood work shows he was sober, period, and if they wanted to retest it to find out if there's something else, they could do that, too, and they haven't." (Tr. I-109.) After the County provided Plaintiffs with the new toxicology report on the third day of the retrial, the County acknowledged that the new toxicology report should have been provided to Plaintiffs. (Tr. III-124.)

The record, including the County's other discovery violations, supports the conclusion that the County inexcusably failed to supplement its discovery responses. At the first trial, Plaintiffs brought a § 1983 deliberate indifference to medical care claim against several of the sheriff's deputies, including Defendant Fischer, alleging the deputies failed to safely apply and monitor the maximum restraints placed on Mr. Phounsy. (Doc. No. 329 at 3, 9–12.) Plaintiffs also brought a related Monell claim against the County. (Id.) Accordingly, the County's training on maximum restraints was one of the central issues in the first trial. Viewing the training video in the light most favorable

to Plaintiffs, a reasonable jury could conclude that the training video undermined Defendants' case, providing an incentive for the County to not produce it to Plaintiffs. For example, the method the deputies used to apply maximum restraints on Mr. Phounsy was inconsistent with the method taught in the training video. (See Doc. No. 448 at 8–9.) The training video instructs deputies to attach the ankle restraint to the waist restraint near the suspect's stomach, but the deputies attached Mr. Phounsy's ankle restraints to his waist restraints with a cord running over Mr. Phounsy's handcuffs to connect near his back. (See, e.g., Attachment A, Exs. 69, 71.) Further, viewing the training video in the light most favorable to Plaintiffs, a reasonable jury could also conclude that the initial part of the training video indicates that minimal resistance from a suspect warrants maximum restraints, which raises issues regarding the San Diego County Sheriff's Department's training on excessive force.[13]

The County attempts to minimize the severity of the discovery violation by arguing that Plaintiffs had knowledge of a training video since February 2017 and, regardless, Plaintiffs "never specifically asked for it." (Doc. Nos. 551-1 at 12; 554 at 2–3.) The County argues Plaintiffs should have known about the training video from depositions conducted of its Sheriff's deputies in 2017, during which several deputies referenced an online video on maximum restraints they watched through the Sheriff's Department's Learning Management System. (Doc. No. 454-1, Lenert Decl., Ex. A.) The Court recognizes that the duty to supplement is not triggered if the "additional or corrective information has . . . otherwise been made known to the other parties during the discovery

---

[13] Had the County believed the training video was favorable to their case, the County presumably would have used the maximum restraint training video at the first trial. But the County did not even include the training video in the exhibit list for the first trial. (Doc. Nos. 291, 335.) Rather than provide the jury with the actual training video used by the San Diego County Sheriff's Department to train its deputies, the County instead attempted to perform a live demonstration using one of its deputies to illustrate the County's training on maximum restraints. (Doc. No. 372, Tr. IV-70–72; Tr. VIII-60.) The Court sustained Plaintiffs' objection under Federal Rule of Evidence 403 to the live demonstration. (Id., Tr. IV-71; VIII-60.) At a later hearing, the Court further explained that it did not permit the live demonstration because it would be difficult to make an adequate record given the Court's electronic recording equipment. (Doc. No. 557 at 35.)

3:15-cv-02692-H-MDD

process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

However, the Court disagrees with Defendants that the deputies' reference to "a video" was sufficient to shift the burden to Plaintiffs to affirmatively request discoverable information the County should have provided in the first place. See Ollier v. Sweetwater Union High Sch. Dist., 768 F.3d 843, 861–64 (9th Cir. 2014) (affirming the district court's exclusion of thirty of the defendant's witnesses who were not formally disclosed during discovery but mentioned during depositions because "the mere mention of a name in a deposition is insufficient" to notify the plaintiff that the defendant "intends to present that person at trial"). Plaintiffs could have reasonably believed that an online training video no longer existed otherwise the County would have produced it. This is further supported by the fact that conflict counsel for Defendant Fischer did not obtain the training video until after the first trial when an investigator for the County emailed her a link to the training video.[14] (Doc. No. 454-1, Lenert Decl., Ex. B; Doc. No. 496 at 15:4–7.)

The County's argument that Plaintiffs "never specifically asked for it" is also contrary to the concept of proportionality encompassed in Federal Rule of Civil Procedure 26. Rule 26(b)(1) explicitly directs courts and parties to "consider the parties' relative access to relevant information" in determining the scope of discovery. Id. The County had exclusive access to the San Diego County Sheriff's Department's training materials. In this case, the maximum restraint training video used by the San Diego

---

[14] Defendants also argue that Plaintiffs' supplemental briefing notifying the Court of the discovery violation violated the magistrate judge's general chambers rules requiring any motion related to discovery disputes to be brought "no later than thirty (30) days after the date upon which the event giving rise to the dispute occurred." (Doc. No. 551-1 at 12 n.3.) Nothing in the magistrate judge's chamber rules eliminated the duty to supplement under Federal Rule of Civil Procedure 26. The magistrate judge's scheduling orders stated that dates and times for discovery could be modified for good cause. (Doc. Nos. 37 ¶ 15; 81 ¶ 14.) Plaintiffs were informed of the training video by a third-party in October 2021 and notified the Court of the discovery violation on February 7, 2022. From late September 2021 through January 2022, one of Defendants' counsel was not available to participate in the proceedings. (Doc. Nos. 389, 396, 418.) As a result, the retrial in this case was rescheduled twice. (Doc. Nos. 399, 419.) Under these circumstances, Plaintiffs had good cause to seek an adverse inference instruction when they did. (Doc. No. 448.)

County Sheriff's Department was highly relevant to Plaintiffs' <u>Monell</u> claim. Plaintiffs' request for production on September 7, 2016 of all training on the use of maximum restraints was more than sufficient. (Doc. No. 448, Decl. of Scott, Ex. A at 5.) The "burden of responding to discovery lies heavier on the party who has more information," here the County, "and properly so." Fed. R. Civ. P. 26 Committee Rules Notes on the 2015 Amendment.

This litigation proceeded for seven years, multiple interlocutory appeals, and one trial before Plaintiffs were provided with the training video—not by the County—but by counsel in a different excessive force case against the County. In addition to not producing the training video, the County also engaged in three other serious discovery violations. The Court recognizes that the current deputy County Counsel are not the same deputy County Counsel who managed discovery in this case and the files turned over to them from prior counsel for the County were incomplete. Nevertheless, the County's inability to provide any record that the training video was produced during discovery, such as an inventory list or bate stamps, failure to put a litigation hold on highly relevant information, and other actions supports the Court's conclusion that the County's discovery violations were unjustified, harmful, and the County's fault. See <u>R & R Sails</u>, 673 F.3d at 1247.

Balancing the severity of the discovery violations with the County's need to put on its defense, the Court took a measured approached in sanctioning the County. Instead of prohibiting Defendants from using the maximum restraint training video at trial as requested by Plaintiffs, (Doc. No. 448 at 11–12), the Court permitted both parties to rely on the training video at the trial, informed the jury of the County's failure to supplement as permitted under Rule 37(c)(1)(B), and instructed the jury that they could, but were not required, to distrust the County's evidence about what training San Diego County Sheriff's Department personnel received or did not receive on the use of maximum restraints. (Doc. No. 505-4 at 1.) The Court provided a similarly restrained adverse jury instruction related to the County's failure to retain Defendant Fischer's maximum

restraints training test results. Id. at 3; see Compass Bank, 105 F. Supp. 3d at 1054 ("[T]he least harsh instruction permits (but does not require) a jury to presume that the lost evidence is both relevant and favorable to the innocent party.").

In the context of the entire trial, Defendants were not unfairly prejudiced by the adverse jury instructions. The Court only gave the training video adverse jury instruction during the trial when relevant, including when the video was raised for the first time during Plaintiffs' and Defendants' case in chief, (Tr. I-214–15; VI-113, 119–22), and after the County played several clips of the video during the examination of one of its deputies. (Tr. VIII-7–16, 30–31.) Besides the instruction given prior to voir dire and after the close of evidence, the Court also only gave the instruction at Plaintiffs' request when appropriate. (Tr. I-214–15; VI-120–22, VIII-30–31.) The Court also agreed at the County's request to postpone providing the instruction until after the County had finished its questioning on direct examination. (Tr. VI-113.) This is similar to how the Court instructed the jury on other issues, such as limiting instructions on evidence. (See, e.g., Tr. I-177; IX-64.)

Further, the mid-trial alteration of the language of the training video adverse jury instruction was in direct response to objections and suggestions by the parties. The original language of the jury instruction stated that the discovery request and subsequent violation of the duty to supplement was by "Defendants." (Doc. No. 492.) Counsel for Defendant Fischer objected to the instruction on the grounds that the discovery request was directed at the County, not Defendant Fischer. (Tr. I-258–59.) After hearing arguments from both sides and reviewing the discovery request, the Court concluded the original version of the instruction had been in error and explicitly notified the jury of the error:

> On July 20, 2016, Plaintiffs requested from Defendant, the County of San Diego, only as to the Defendant Fischer, County of San Diego -- this does not include Defendant Fischer. Earlier I had mentioned both together, and that was erroneous. It's only as to the county . . .

(Tr. VI-120–21.) Plaintiffs' counsel provided the Court with new versions of the jury

instructions that incorporated this edit. (Doc. No. 505-4; IV-71–73.) Defendants did not provide the Court with their own version of the jury instructions with different language or one instruction that applied to all discovery violations despite ample opportunity to do so. (Tr. III-130–31.) Accordingly, Defendants have failed to show that the adverse jury instructions were erroneous, abused the Courts' discretion, or were substantially prejudicial in the context of the entire record as to warrant a new trial.

## C. Evidentiary and Other Rulings

Defendants argue the Court made several evidentiary errors. (Doc. No. 551-1 at 3, 19.) To obtain a new trial based on erroneous evidentiary rulings, the moving party must show that the ruling were both "erroneous" and "substantially prejudicial." <u>Ruvalcaba v. City of Los Angeles</u>, 64 F.3d 1323, 1328 (9th Cir. 1995). Defendants have not met this burden.

### 1. Hospital Audio Tape

Defendants argue the Court inconsistently ruled against Defendants and for Plaintiffs when each party attempted to introduce the same audio recording. (Doc. No. 551-1 at 15–16.) The audio recording was of an interview of non-party Kellie Phounsy, Mr. Phounsy's sister, conducted by a detective at the hospital shortly after Mr. Phounsy was brought there. (Tr. VI-199.) In the interview, Kellie Phounsy made a statement to the detective regarding drug use by Mr. Phounsy. (<u>Id.</u>) Defendants attempted to introduce the audio clip during direct examination of Kellie Phounsy. (Tr. VI-200.) Plaintiffs objected, "I'm not sure. Is this refreshing or impeachment?" (Tr. VI-200:18–19.) The Court then stated "I don't think – we don't have the capability to play it just to the witness. So --," and Defendants interjected, "Okay. That's fine" and continued to refresh Kellie Phounsy's recollection by using a written transcript of the interview. (Tr. VI-200:22; 201:8–21.) During cross-examination of the same witness, Plaintiffs attempted to introduce the same audio recording. (Tr. VI-231.) Plaintiffs argued that the audio recording should be introduced "for context of that statement as a non-hearsay statement," and the Court allowed its introduction on that basis. (Tr. VI-231:20.) The

1  Court did not favor Plaintiffs over Defendants in admitting the audio recording because
2  Plaintiffs, unlike Defendants, provided the Court with a legal basis on which to admit the
3  audio recording.

4          **2.  Questioning During Voir Dire**

5       Next, Defendants argue the Court's questioning during voir dire regarding the jury
6  panel's experience with maximum restraints prejudiced Defendants' case. (Doc. No. 551-
7  1 at 15.) "The content and conduct of the questioning [during voir dire] are generally
8  committed to the sound discretion of the district court in both civil and criminal cases."
9  Darbin v. Nourse, 664 F.2d 1109, 1113 (9th Cir. 1981). "[V]oir dire examination must be
10  conducted in a manner that allows the parties to effectively and intelligently exercise
11  their right to peremptory challenges and challenges for cause." Id.; see also Paine v. City
12  of Lompoc, 160 F.3d 562, 564 (9th Cir. 1998). In order to accomplish this goal, the
13  district court should inquire about "important aspect[s] of the litigation about which
14  members of the public may be expected to have strong feelings or prejudices." Darbin,
15  664 F.2d at 1113. The actions of the district court in conducting voir dire are subject to
16  "the abuse of discretion standard." Id. at 1114.  "Objections to voir dire not raised at trial
17  are subject to plain error review." Vargas v. City of Los Angeles, N. 2:16-cv-08684-
18  SVW-AFM, 2020 WL 10789578, at *11 (C.D. Cal. Feb. 18, 2020) (citing United States
19  v. Mitchell, 502 F.3d 931, 952 (9th Cir. 2007)).

20       This case involves use of force by law enforcement on an individual, including the
21  use of a baton, taser, and maximum restraints. Based on its understanding of the case, the
22  Court asked prospective jurors during voir dire if they had ever been "put in maximum
23  restraints, which is sometimes called 'hobble,' sometimes called, in the vernacular, 'hog-
24  tie.'" (Tr. I-17.) Defendants argue this question was a prejudicial error because it equated
25  maximum restraints with hog-tie restraint.[15] (Doc. No. 551-1 at 15.) Defendants did not

26

27  _____

28  [15] Defendants define "maximum restraints" as "attaching ankles to a cord around the waist" and "hog-tie" as "attaching ankles to wrist." (Doc. No. 551-1 at 15.)

object to the Court's questioning of the jury and so plain error review applies. (Tr. I-17.) First, it is reasonable to expect that a potential juror who has had an experience with any restraint system, such as a four- or five-point restraint used by medical professionals or a hog-tie or hobble restraint used by law enforcement, may have "strong feelings or prejudices" about the use of maximum restraints. <u>Darbin</u>, 664 F.2d at 1113. In fact, one of the members of the jury panel who was ultimately selected as a juror responded to the Court's question that she had experience applying four-point restraints as a medic in the military. (Tr. I-19–20.) Accordingly, it was within the Court's discretion to inquire about the potential jurors' experiences with different restraint systems to "allow the parties to effectively and intelligently exercise their right to peremptory challenges and challenges for cause." <u>Darbin</u>, 664 F.2d at 1113. Second, it was Plaintiffs' position at trial through expert testimony that the maximum restraints used by the deputies on Mr. Phounsy were equivalent to a hogtie. (<u>See, e.g.</u>, I-96, 108, 101; Tr. VII-265.) Defendants' use of force expert, Mr. Meyer, also testified that if Mr. Phounsy was kept in the position depicted in Exhibit 71 for more than "one or two seconds," "that's a problem" and it would "be close" to a hogtie. (Tr. VII-265; Attachment A.) As a result, the Court's question during voir dire was not prejudicial considering the facts of this case and expert testimony characterizing the facts of this case.

### 3.  Hostile Witness Rulings

Defendants argue the Court erred by "refusing to allow defendants to take family members as hostile witnesses and sustained leading objections" while allowing Plaintiffs to lead their own witnesses. (Doc. No. 551-1 at 16.) This is not an accurate reflection of the record. Defendants called Kellie Phounsy and her husband, Alex Sayavong, as witnesses, and used leading objections with both witnesses with no objection from Plaintiffs. (Tr. VI–160–186, 197:25–198:1–2, 198–218.) The only citations Defendants provide in their Rule 59 motion of where the Court allegedly did not permit family members to be taken as hostile witnesses was during Plaintiffs' cross-examination of Kellie Phounsy. (Doc. No. 551-1 at 16.) After permitting Defendants to lead Kellie

Phounsy during direct, Defendants then objected to Plaintiffs' use of leading questions during cross-examination of Kellie Phounsy. (Tr. VI-187:18–23; 218:13–14; 220:6–22). The Court overruled Defendants' objections because, "[t]his is cross." (Tr. VI-220:6–22.) Leading questions are ordinarily permitted on cross-examination. Fed. R. Civ. P. 611(c)(1). Regardless, it is within the Court's discretion to allow leading questions on either direct or cross to "develop the witness's testimony." Id. Kellie Phounsy and Alex Savayong both had difficulty testifying, in part due to nervousness and a language barrier, and so leading questions were necessary for Defendants as well as Plaintiffs to develop the testimony of these witnesses. See, e.g., United States v. Callahan, 801 F.3d 606, 623 (6th Cir. 2015) (permitting the government to use leading questions during direct examination of victim in order "to facilitate the progression of trial and avoid wasting time"); United States v. Farlee, 757 F.3d 810, 822 (8th Cir. 2014) (permitting the government to use leading questions in examining eyewitness who "was hesitant in responding and lengthy delays preceded the answers"); United States v. Carey, 589 F.3d 187, 192 (5th Cir. 2009) (recognizing "a victim-witness's youth and nervousness" may justify leading questions).

#### 4. Videos and Photographs of Family

Defendants also argue the Court erred in admitting certain videos and photographs depicting Mr. Phounsy with his family. (Doc. No. 551-1 at 16.) Plaintiffs sought non-economic loss of services damages through their wrongful death claims and waived any claim to economic damages. (Doc. No. 503.) Factors relevant in determining non-economic damages include "closeness of the family unit, the depth of their love and affection, the character of the decedent as kind, attentive, and loving." Soto v. BorgWarner Morse TEC Inc., 191 Cal. Rptr. 3d 263, 291 (App. Ct. 2015). As a result, the videos and photographs of Mr. Phounsy with his family were highly relevant to Plaintiffs' claim for non-economic damages. Fed. R. Evid. 401. Based on the record, any danger of unfair prejudice or presenting cumulative evidence did not substantially outweigh the highly probative value of the photographs and videos. Fed. R. Evid. 403.

Further, the Court sufficiently addressed Defendants' objections at trial. (Tr. VI-8–9.) First, Defendants objected that Loan Nguyen's scrapbook was not properly admitted, and the Court heard arguments from both sides. (Id.) The Court indicated that the exhibit was received according to its record. (Id. at 8:1, 18–21.) However, the Court also directed the parties to review the daily transcripts to "see what's actually reflected" and informed the parties that witnesses could be called back to the stand if needed to ensure the exhibit was properly admitted. (Id.) The County did not raise this objection again. Defendants also objected to admitting the entire scrapbook. (Id. at 6.) The Court held it was proper to admit the scrapbook. Plaintiff Loan Nguyen testified that she made the scrapbook, and it was both relevant to her wrongful death claim and not overly prejudicial. (Tr. VI-9.) Accordingly, the Court properly admitted such evidence, and Defendants have failed to show they were prejudiced by the exhibits.

### 5. Video and Audio Clips

Defendants argue the Court erred in admitting certain video and audio clips of interview and deposition testimony prepared by Plaintiffs.[16] (Doc. No. 551-1 at 16.) "An expert may base an opinion on facts or data that the expert has been made aware of" even "if the facts or data would otherwise be inadmissible." Fed. R. Evid. 703. Rule 703 permits "hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to explain the basis of the expert's opinion." Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1261–62 (9th Cir. 1984). "Upon admission of such evidence, it . . . becomes necessary for the court to instruct the jury that the hearsay evidence is to be considered solely as a basis for the expert opinion and not as substantive evidence." Id. at 1262. Further, under Federal Rule of Evidence 611(a), district courts have broad discretion in regulating the presentation of evidence. See United States v. Gardner, 611

---

[16] Prior to trial, Defendants sought to exclude Plaintiffs' use of the video and audio clips at trial. (Doc. No. 435.) The Court denied Defendants' motion. (Doc. No. 459 at 6–12.) The Court directed the parties to meet and confer regarding any of the video and audio clips that were missing a question to a response and provided that Defendants could object at trial under Federal Rule of Evidence 106. (Id.)

F.2d 770, 776 (9th Cir. 1980) (permitting the use of charts summarizing evidence to help with the "clarity of the presentation to the jury" and to avoid the "needless consumption of time").

The video and audio clips were "evidence upon which [Plaintiffs'] expert[s] relied." Paddack, 745 F.2d at 1261–62; (See, e.g., Tr. II-183; II-195–96). Several experts testified at trial that their opinions were based on the information presented in the clips. (See, e.g., Tr. II-183; III-114–17.) The Court instructed the jury that the clips were only to be considered as a basis for expert opinion and not as substantive evidence. (See Tr. IV-196) ("The clips are not themselves evidence but is to assist your understanding of his opinion in this case."). The Court also prohibited Plaintiffs from using the clips for improper purposes. (See Tr. IV-198: 5–17.) Further, it was within the Court's sound discretion to allow Plaintiffs to use of audio and video clips rather than quoting from the written transcripts in order to make the testimony more comprehensible for the jury and avoid wasting time. Fed. R. Evid. 611(a). Accordingly, the Court did not error in allowing Plaintiffs to use the clips.

**6. Video of Deposition Testimony During Closing Argument**

Defendants argue the Court erred in allowing Plaintiffs to play video of deposition testimony during Plaintiffs' closing argument. (Doc. No. 551-1 at 16.) "[T]he trial judge has broad discretion in controlling closing argument." United States v. Guess, 745 F.2d 1286, 1288 (9th Cir. 1984). As a result, it is within the district court's discretion to permit counsel to read from the transcripts of a witness's recorded testimony or play recordings during closing argument. See Guess, 745 F.2d at 1288; see also K.C. ex rel. Calaway v. Schucker, No. 02-2715-STA-cgc, 2013 WL 5972192, at *7 (W.D. Tenn. Nov. 8, 2013) (holding plaintiffs use of deposition testimony video during closing arguments was not grounds for granting a new trial). At the time of closing arguments, Defendants only objected once to the video deposition testimony. (Tr. IX-48, 50–51, 60, 64.) When Defendants objected, the Court gave a limiting instruction regarding the deposition testimony at Defendants' request. (Tr. IX-64.) Accordingly, Defendants have not shown

1   that the use of the video deposition testimony was erroneous or substantially prejudicial.

2   ### 7. Defendant Fischer's Reporting of Uses of Force

3       Defendants argue the Court erred by allowing Plaintiffs to question Defendant

4   Fischer about incidents where he failed to report his on-duty use of force. (Doc. No. 551-

5   1 at 3–4.) This evidence was properly admitted under Federal Rule of Evidence 607 to

6   impeach Defendant Fischer by contradiction.[17] As a result, Defendants have failed to

7   show the Court's ruling was erroneous or substantially prejudicial.

8       Rule 607 provides that "[a]ny party, including the party that called the witness,

9   may attack the witness's credibility." Fed. R. Evid. 607. Rule 607 permits impeachment

10  by contradiction, or "the admission of extrinsic evidence to impeach specific errors or

11  falsehoods in a witness's testimony." United States v. Antonakeas, 255 F.3d 714, 724

12  (9th Cir. 2001) (citing United States v. Castillo, 181 F.3d 1129, 1133 (9th Cir. 1999)); see

13  also United States v. Gilmore, 553 F.3d 266, 271 (3rd Cir. 2009) ("Rule 607 of the

14  Federal Rules of Evidence authorizes impeachment by contradiction."). A party can

15  "introduce otherwise inadmissible evidence when the defendant 'opens that door' by

16  introducing potentially misleading testimony." United States v. Osazuwa, F.3d 1169,

17  1175 (9th Cir. 2009) (citing United States v. Beltran-Rios, 878 F.2d 1208, 1212 (9th Cir.

18  1989)). Therefore, if a party "believe[s] it ha[s] elicited an untruthful remark, its remedy .

19  . . [is] to impeach the witness through cross-examination." United States v. Green, 648

20  F.2d 587, 596 n.12 (9th Cir. 1981). If a party believes a witness has provided misleading

21  testimony on cross-examination, the party can "attempt on further cross-examination to

22  elicit a response from defendant contradicting his prior testimony." United States v.

23  Bosley, 615 F.2d 1274, 1276–77 (9th Cir. 1980). The admissibility of impeachment by

---

[17] At trial, the Court also cited Federal Rule of Evidence 404(b)(2) as a basis for admitting Defendant
Fischer's incidents of unreported uses of force. (Tr. IV-139:21–23.) Plaintiffs separately argued that the
incidents were also admissible under Federal Rule of Evidence 608(b) because Plaintiffs' redirect of
Defendant Fischer regarding the incidents was the functional equivalent of cross-examination. (Doc. No.
514 at 4 n.17.) The Court need not address Rule 404(b)(2) or Rule 608(b) because the incidents were
properly admitted under Rule 607.

3:15-cv-02692-H-MDD

contradiction evidence is subject to Federal Rule of Evidence 403.[18] <u>United States v. Chu</u>, 5 F.3d 1244, 1249 (9th Cir. 1993).

The Court permitted Plaintiffs to examine Defendant Fischer about incidents when he did not report his on-duty use of force in compliance with San Diego County Sheriff's Department policy only after Defendant Fischer opened the door by portraying himself as a deputy who followed such policy.[19] Prior to permitting this line of questioning, the Court had repeatedly advised Defendants about opening the door on this issue. On February 8, 2021, the Court held a pretrial conference with the parties where the Court denied Defendants' motion in limine to exclude all evidence and reference to Defendant Fischer's four felony convictions. (Doc. No. 265, 279, 308 at 4–5, 22–26, 29.) During the pretrial conference, the Court ordered Plaintiffs to tailor admitting such evidence to minimize prejudice to Defendant Fischer. (Doc. No. 308 at 26.) The Court also explicitly warned Defendants that if Defendant Fischer were to take the stand at trial and testify in a way that implied he never used excessive force, "then he can open the door." (Doc. No. 308 at 26:2–4.)

On the first day of trial, Defendants' counsel made several remarks during opening

---

[18] "By limiting the application of [Rule 608] to proof of a witness' character for truthfulness, the amendment leaves the admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction . . .) to Rules 402 and 403." Fed. R. Evid. 608 Advisory Committee's Note to the 2003 Amendment.

[19] The Reporting Use of Force section of the San Diego County Sheriffs' Department Addendum F Use of Force Guidelines requires:

> Deputies (or other employees) who use force to overcome resistance or to control or apprehend a subject must verbally inform their supervisor as soon as practical, but in no event later than the end of the shift . . . All deputies (or other employees) using force must clearly articulate the force used in writing.

(Doc. No. 509 at 1.) Addendum F also directed that "all sworn employees familiarize themselves with policy and law that related to the use of force" including "physical force" and "assaults by officers under color of authority." (<u>Id.</u> at 3–4.) In 2019, Defendant Fischer admitted to assaulting sixteen women while on the job as a Sheriff's deputy. (Doc. Nos. 511.) These incidents occurred between July 2015, three months after the present incident, and September 2017. (<u>Id.</u>; Doc. No. 510.) Defendants argue that Defendant Fischer's assaults of the sixteen women were not covered by Addendum F. (Tr. 551-1 at 3; Tr. V-62–64.) Addendum F requires deputies to report to their supervisor any "use force to overcome resistance or to control or apprehend a subject." (Doc. No. 509 at 1.) The Court disagrees with Defendants under the plain language of Addendum F.

statements that portrayed Defendant Fischer as a deputy with a minimal use-of-force history. (Tr. I-135, 145–47.) Specifically, Defendants stated that "a year and a half after the events with Mr. Phounsy, [Defendant Fischer] was fired from the Sheriff's Department under very difference circumstances." (Tr. I-135.) Defendants then stated that Plaintiffs would use the Mr. Williams and Mr. Weaver use-of-force incidents "as a distraction to make you believe that Richard Fischer frequently used excessive force in a manner consistent with the allegations against him in the Phounsy incident." (Tr. I-146.) Plaintiffs objected. (Id.) Defendants also stated in reference to Defendant Fischer's four felony convictions that "[w]e're not permitted to even explain to you how those four felonies significantly differ from the Phounsy incident, we're not going to go into that at all." (Tr. I-147.) Plaintiffs again objected. (Id.) During the break following opening statements, Plaintiffs renewed their objections to Defendants' remarks. (Tr. I-163.) The Court then warned Defendants, "I did wake up during both counsel's presentations because I thought they were going awfully close, awfully, awfully, awfully close." (Id.)

On the second day of trial during examination by the County, Defendant Fischer testified the following regarding his use-of-force reporting in a different incident:

> Q: Did you request a supervisor?
> A: Yes.
> Q: And what happened when the supervisor showed up?
> A: So, **any use of force**, you want to notify your supervisor. I just basically gave him a rundown of what happened, and just for his own knowledge, just part of the practice.

(Tr. II-36) (emphasis added). During the break following the County's examination of Defendant Fischer, Plaintiffs objected to Defendant Fischer's testimony:

> PLAINTIFFS' COUNSEL: Yes, your Honor. I just wanted to flag a portion of the possible redirect, and if we get to it before the lunch break, I want to make sure I'm on safe ground. My notes indicate that what Mr. Fischer testified to was that when he receives -- when he has use of force, he then notifies his supervisor. I want to be able to ask him, "You didn't follow that policy in your own practice?" --
> THE COURT: I think that's fair.
> PLAINTIFFS' COUNSEL: -- but I won't give numbers until the Court makes a ruling.

THE COURT: I think that's fair.

(Tr. II-82.) Plaintiffs then asked Defendant Fischer the following:

Q: Mr. Fischer, I think you were asked some questions earlier about a particular rule that applies to deputies with the San Diego Sheriff's Department. I'd like to follow up on that. There's a rule that when you use force while out on patrol, you are to notify a supervisor when that use of force occurs. Is that what you testified to?

A: Yes.

Q: And is that a hard-and-fast rule?

A: It's just policy.

Q: Policy. Okay. You yourself, on numerous occasions, failed to follow that policy. Isn't that true?

COUNSEL FOR DEFENDANT FISCHER: Objection.

THE COURT: Overruled.

A: See, I know what you're going (sic) here. I just think I disagree.

Q: I think you've got to just answer the question.

A: Well –

Q: Yes or no?

A: I guess it depends on what your definition of "use of force" is.

PLAINTIFFS' COUNSEL: You Honor, I - -

THE COURT: You may inquire, limited to the period from up to October 16, 2017.

(Tr. II-107–08.)

Through his own testimony, Defendant Fischer opened the door to be impeached by contradiction with his history of following the San Diego County Sheriff's Department's use-of-force reporting policy. Because Plaintiffs believed Defendant Fischer made "an untruthful remark" about his history of following the use-of-force reporting policy, Plaintiffs' remedy was "to impeach [Defendant Fischer] through cross-examination." Green, 648 F.2d at 596 n.12. When Defendant Fischer disagreed with Plaintiffs' question about whether he had "failed to follow" the use-of-force reporting policy on other occasions, Plaintiffs properly "attempt[ed] on further cross-examination to elicit a response from [Defendant Fischer] contradicting his prior testimony." Bosley, 615 F.2d at 1276–77. Defendants were then given an opportunity to re-examine Defendant Fischer. (Tr. II-150–51.) The Court limited Plaintiffs' inquiry to the date of

3:15-cv-02692-H-MDD

each use of force, whether Defendant Fischer was on duty as a sheriff's deputy during each incident, and whether Defendant Fischer failed to report each use of force to his supervisor. (Tr. II-110–24.) The Court did not permit Plaintiffs to inquire about the underlying nature of the uses of force or whether Defendant Fischer was disciplined or convicted for his conduct. (Id.) The Court also denied Plaintiffs' requests to impeach Defendants' expert witnesses with Defendant Fischer's incidents of unreported uses of force, cross-examine Defendant Fischer about whether he admitted to using excessive force during the incidents of unreported uses of force, and provide a curative instruction regarding Defendants' counsels remarks during opening statements. (Doc. Nos. 504, 512, 514; Tr. V-1.) As a result of these limitations, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403.

Accordingly, Defendant Fischer's incidents of not reporting his uses of force while on-duty were properly admitted to impeach Defendant Fischer by contradiction under Rule 607. As a result, Defendants have failed to show the Court's ruling was "both erroneous and substantially prejudicial." Ruvalcaba, 64 F.3d at 1328. Even if the ruling was prejudicial, the admission of Defendant Fischer's incidents of unreported uses of force would have been harmless error since the jury already heard testimony from Defendant Fischer that he had plead guilty to four felonies for assaulting four individuals while in uniform. (Tr. I-174–76.)

Defendants also argue that the Court unfairly barred Defendants from admitting evidence of prior bad acts by Mr. Phounsy, which Defendants allege gave the jury "a misleading, incomplete view of Phounsy." (Doc. No. 551-1 at 5.) Defendants' argument mischaracterizes the record. First, Defendants allege the Court erred in prohibiting Defendants from asking Loan Nguyen about Mr. Phounsy's prior DUI conviction from 2006 and related six months of incarceration. The Court held that the DUI was "so remote in time as to be 403." (Tr. V-55; Doc. No. 370, II-279.) The Court applied the same evidentiary standard to Defendants by prohibiting under Rule 403 the introduction of two misdemeanor counts of assault and battery under color of authority in violation of

1  California Penal Code § 149 by Defendant Fischer and one misdemeanor count of false
2  imprisonment in violation of California Penal Code § 236 by Defendant Fischer. (Doc.
3  No. 265 at 1.)

4          Next, Defendants argue the Court erred in excluding evidence that Mr. Phounsy
5  was on probation at the time of the incident. (Tr. V-59–61.) At trial, Defendants argued
6  Mr. Phounsy's probation was relevant to whether he was "fighting with the deputies and
7  trying to escape." (Tr. VI-58–59.) Defendants' argument ignored the fact that Mr.
8  Phounsy called 9-1-1 call for assistance. It was also highly speculative to infer that Mr.
9  Phounsy would be found in violation of probation due to trace amounts of drugs found in
10 his system. Therefore, the Court properly excluded the evidence under Rule 403.

11         Finally, Defendants argue body-worn camera footage of Mr. Phounsy fighting with
12 police officers on a different occasion should have been admitted. (Doc. No. 551-1 at 5.)
13 However, when Defendants requested permission to use this evidence at trial, Defendants
14 were unable to locate the video to show it to the Court and or provide the Court with an
15 evidentiary basis for introducing it. (Tr. VI-129–30.) The Court directed Defendants to
16 look for the body-worn camera footage and provided it to the Court to review, but
17 "absent further order from the Court, it doesn't come in." (Tr. VI-130.) Defendants never
18 followed up to provide the body-worn camera footage to the Court. Notably, the County
19 also failed to identify the body-worn camera footage in the pretrial order exhibit list.
20 (Doc. No. 493.) In sum, the Court also properly excluded this evidence.

21         The Court, however, permitted Defendants to ask Loan Nguyen about a different
22 prior incident where Mr. Phounsy had allegedly been drunk around his wife and kids. (Tr.
23 V-124, 130.) The Court also permitted Defendants to ask witnesses about Mr. Phounsy's
24 plans to go into drug rehabilitation the day after the incident, (Tr. III-95–96; V-55–57);
25 Mr. Phounsy's alcohol use leading up to the time of his death, (Tr. V-55); Mr. Phounsy's
26 attendance at a music festival, (Tr. V-99); and drug use by Mr. Phounsy. (Tr. V-169–70.)
27 As a result, Defendants have failed to show that any of the Court's evidentiary rulings or
28 the cumulative effect of such rulings were both "erroneous" and "substantially

1    prejudicial" as to warrant a new trial. Ruvalcaba, 64 F.3d at 1328.

2        **D. Plaintiffs' Counsel Conduct**

3        Defendants also argue a new trial is warranted because of improper statements

4    made during closing arguments by Plaintiffs' counsel. (Doc. No. 551-1 at 16–20.)

5    Specifically, Defendants argue Plaintiffs violated the "Golden Rule" by appealing to

6    community values, requesting the jury place themselves in Plaintiffs' position, and asking

7    the jury to value non-economic wrongful death damages based on the rate the County

8    paid its expert witnesses. (Id.)

9        Defendants did not object at trial to any of Plaintiffs' counsel's statements

10   regarding community values that Defendants are now challenging. Had Defendants

11   timely objected at trial, the Court would have ruled that "Golden Rule" statements are

12   prohibited. Instead, Defendants waited until post-trial motions to raise their objection,

13   denying the Court the opportunity to correct any alleged problem. "The trial court has

14   broad discretion in the control of closing arguments." People of the Territory of Guan v.

15   Ignacio, 852 F.2d 459, 462 (9th Cir. 1988). For misconduct in closing arguments to

16   warrant reversal, it must "so permeate[] the trial as to lead to the conclusion that the jury

17   was necessarily influenced by passion and prejudice in reaching its verdict." Cooper v.

18   Firestone Tire and Rubber Co., 945 F.2d 1103, 1107 (9th Cir. 1991) (citation omitted).

19   Plaintiffs' counsels' statements during closing reflected Plaintiffs' position that they are

20   entitled to wrongful death damages for their loss. See Settlegoode v. Portland Pub.

21   Schools, 371 F.3d 503, 518 (9th Cir. 2004) ("Using some degree of emotionally charged

22   language during trial is . . . well accepted courtroom tactic."). In the context of the entire

23   trial and considering Defendants' lack of contemporaneous objections, Plaintiffs'

24   statements did not amount to reversable error. See, e.g., Cooper, 945 F.2d at 1107

25   (declining to find reversible error where the alleged misconduct occurred only in the

26   argument phase of trial, the remarks were isolated rather than persistent, most of

27   counsel's comments were not objected to at trial, and the opposing party did not move for

28   a mistrial at the end of argument."); Mueller v. Hawaii, No. 17-00571 HG-WRP, 2022

WL 980696, at *10 (D. Haw. Mar. 31, 2022).

Next, as part of Plaintiffs' counsel's argument for the appropriate amount of non-economic wrongful death damages to compensate Plaintiffs for their loss of Mr. Phounsy, Plaintiffs' counsel referenced the daily compensation of expert witnesses as an analogy. (Tr. IX-71–72, 74–75.) Defendants contemporaneously objected. (Tr. IX-72.) However, Defendants' counsel made a similar economic comparison argument during closing arguments by asking the jury to tie Mr. Phounsy's children's loss of love, companionship, comfort, care, protection, affection, society, moral support, training, and guidance to the cost of a college scholarship. (Tr. IX-128); see Valenzuela v. City of Anaheim, No. SACV 17-00278-CJC (DFMx), 2020 WL 10574794, at *11 (C.D. Cal. Mar. 11, 2020), aff'd on other grounds, 6 F.4th 1098 (9th Cir. 2021).

Comparisons to items of value have been permitted in other cases discussing non-economic damages. For example, in Nunez v. Santos, the district court held the defendants in a § 1983 excessive force case had failed to establish prejudice by the plaintiffs' reference to the cost of aircrafts or the salary of a secretary present during Google's IPO when discussing the decedent's pain and suffering damages during closing arguments. 427 F. Supp. 1165, 1193–95 (N.D. Cal. 2019). Similarly, in Valenzuela, the district court held the defendants had failed to establish prejudice by the plaintiffs' reference to the value of a B-1 bomber, Picasso painting, and LeBron James's basketball contract when discussing non-economic loss of services damages. 2020 WL 10574794, at *11. In sum, Defendants have failed to establish prejudice by Plaintiffs' statements during closing arguments. Even if Plaintiffs' counsel's arguments were an error and the jury was "influenced by passion and prejudice in reaching its verdict," this issue is moot by the Court's grant of a new trial on wrongful death damages. Cooper, 945 F.2d at 1107.

### E. Excessive Damages Award

Finally, Defendants argue that the jury's damages award was excessive and warrants a new trial on damages or, in the alternative, a remittitur. (Doc. No. 551-1 at 20–25.) "[A] jury's award of damages is entitled to great deference, and should be upheld

3:15-cv-02692-H-MDD

1  unless the amount is clearly not supported by the evidence or only based on speculation

2  or guesswork." In re First Alliance Mortg. Co., 471 F.3d 977, 1001 (9th Cir. 2006)

3  (internal quotation marks omitted); see also Chalmers v. City of Los Angeles, 762 F.2d

4  753, 760 (9th Cir. 1985). Awards must be upheld "whenever possible, and all

5  presumptions are in favor of the judgment." DSPT Int'l, Inc. v. Nahum, 624 F.3d 1213,

6  1224 (9th Cir. 2010) (internal quotation marks omitted). If the damages award is

7  supported by the evidence, it "must be affirmed unless it is 'grossly excessive' or

8  'monstrous' or 'shocking to the conscience.'" Brady v. Gebbie, 859 F.2d 1543, 1557 (9th

9  Cir. 1988). "[A] new trial is not required even where there is an excessive damages award

10  resulting from passion or prejudice, unless there is also evidence that passion and

11  prejudice affected the liability finding." Watec Co v. Liu, 403 F.3d 645, 655 (9th Cir.

12  2005) (internal quotation marks omitted). "Where there is no evidence that passion and

13  prejudice affected the liability finding, remittitur is an appropriate method of reducing an

14  excessive verdict, although the district court still retains the option of vacating the

15  judgment and ordering a new trial." Id. (internal quotation mark omitted).

16  **1.  Pain and Suffering Damages**

17  Defendants argue that the jury's award of $5 million in pain and suffering damages

18  to Mr. Phounsy was excessive because it was not supported by the evidence. (Doc. No.

19  551-1 at 24.) Defendants also argue that the jury's award of pain and suffering damages

20  cannot be supported by Plaintiffs' state law claims because such damages are barred

21  under state law. (Doc. No. 552-1 at 22, 25.)

22  "A plaintiff who establishes liability for deprivation of constitutional rights

23  actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all

24  injuries suffered as a consequence of those deprivations." Borunda v. Richmond, 885

25  F.2d 1384, 1389 (9th Cir. 1988). A Fourth Amendment excessive force claim belongs to

26  the decedent, though it may be asserted on his behalf by his successors in interest. See

27  Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 369 (9th Cir. 1988), as

28  amended (Nov. 24, 1998). Compensatory damages in § 1983 cases "where the decedent's

death was caused by a violation of federal law" include "pre-death pain and suffering damages" as well as "loss of life damages." <u>Chaudhry v. City of Los Angeles</u>, 751 F.3d 1096, 1105 (9th Cir. 2014); <u>Valenzuela v. City of Anaheim</u>, 6 F.4th 1098, 1101–02 (9th Cir. 2021). The Court agrees with Defendants that pain and suffering damages are not available for Plaintiffs' state law claims under California Code of Civil Procedure    § 337.30. However, the jury can award pain and suffering damages under § 1983. (Doc. No. 563 at 16); <u>see</u> <u>Chaudhry</u>, 751 F.3d at 1105.

As to Mr. Phounsy's pre-ambulance pain and suffering, the Court agrees with the Defendants that Defendant Fischer is entitled to qualified immunity for his actions in the hallway and driveway because it was a "tense, uncertain, and rapidly evolving" situation that required Defendant Fischer to "make split-second judgments." <u>Hyde</u>, 23 F.4th at 870. As a result, qualified immunity precludes pre-ambulance pain and suffering damages. <u>See, e.g.</u>, <u>Willis v. City of Fresno</u>, No. 1:09-CV-01766-BAM, 2017 WL5713374, at *5 (E.D. Cal. Nov. 28, 2017) (holding that the jury could not award pain and suffering damages for gun shots the jury found were not excessive force).

The jury's award of $3 million in damages for Mr. Phounsy's pain and suffering from the ambulance until the time of his death is supported by the evidence and is not excessive. Defendant Fischer, who was over six feet tall and 225 pounds at the time, pushed as hard as he could with "9 out of 10 pressure" on Mr. Phounsy's head and torso for approximately six minutes until Mr. Phounsy coded. (Tr. I-271, II-67.) Mr. Phounsy then remained in the hospital in a coma for nearly seven days until he finally passed away. (Tr. III-229.) Plaintiffs' medical expert, Dr. Thrush, testified that Mr. Phounsy did not suffer a quick and painless death, but instead essentially suffocated to death until he suffered cardiac arrest, "brain death," and "multi-organ failure." (Tr. II-151.) Dr. Thrush also testified that dying by suffocation, "[i]t's horrible.  It's – – it is one of the worst if not the worst thing that – – that humans can experience is air hunger, to want to breathe and not to be able to." (Tr. II-221.) In sum, Plaintiffs provided sufficient evidence that Mr. Phounsy experienced significant pain and suffering from the ambulance until the time of

his death to support the jury's award.

The jury's award for Mr. Phounsy's pain and suffering is also consistent with awards in other excessive force cases, including cases cited by Defendants in their Rule 59 motion. For example, in <u>French v. City of Los Angeles</u>, No. EDCV 20-00416 JGB (SPx), 2022 WL 2189649, at *2 (C.D. Cal. May 10, 2022), the jury awarded $4 million for the decedent's pre-death pain and suffering and loss of life. In <u>Archibald v. Cnty. of San Bernardino</u>, No. ED CV 16-01128-AB (SPx), 2018 WL 6017032, at *1 (C.D. Cal. Oct. 2, 2018), the jury awarded $7 million for the decedent's loss of enjoyment of life and pre-death pain and suffering. Finally, in <u>Valenzuela</u>, 2020 WL 10574794, at *1, the jury awarded $6 million for the decedent's pre-death pain and suffering and an additional $3.6 million for the decedent's loss of life.

Finally, Defendants argue that the jury's award for Mr. Phounsy's pain and suffering amounted to punitive damages to "punish Fischer" and that the "jury based its award on a desire to punish and to send a message on behalf of the community." (Doc. No. 551-1 at 24.) However, the Court specifically instructed the jury that "[p]unitive damages may not be awarded to compensate a plaintiff" for an excessive force claim and "[p]unitive damages may not be awarded against defendant County of San Diego." (Doc. No. 531 at 50.) "[A] jury is presumed to follow the trial court's instructions." <u>Deck v. Jenkins</u>, 814 F.3d 954, 979 (9th Cir. 2016) (citing <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000)). As a result, the Court declines to disturb the jury's award of $3 million in post-ambulance pain and suffering damages.

### 2. Non-Economic Wrongful Death Damages

Defendants also challenge the jury's award of $80 million to Plaintiffs in non-economic wrongful death damages. (Doc. No. 551-1 at 20-25.) Specifically, Defendants argue the award is excessive because it is far outside the mainstream of awards in comparable cases, includes allocation for responsibility of dismissed defendants, and amounts to punitive damages. (<u>Id.</u> at 20–25.) For the reasons that follow, a new trial on wrongful death damages is warranted.

1    A jury's award of damages "should be upheld unless the amount is clearly not

2    supported by the evidence or only based on speculation or guesswork." In re First

3    Alliance Mortg. Co., 471 F.3d 977, 1001 (9th Cir. 2006) (internal quotation marks

4    omitted). As such, "an otherwise supportable verdict must be affirmed unless it is

5    'grossly excessive' or 'monstrous' or 'shocking to the conscience.'" Brady, 859 F.2d at

6    1557 (quoting Chalmers, 762 F.2d at 760).

7    During trial, Plaintiffs made a strategic decision to dismiss their claims for

8    economic wrongful death damages and seek only non-economic damages. (Doc. No.

9    503.) Non-economic wrongful death damages are "the pecuniary value of the decedent's

10    society and companionship" and do not include compensation for the grief or sorrow of

11    the death of a loved one, sad emotions, or the sentimental value of the loss. Nelson v.

12    Cnty. of Los Angeles, 113 Cal. App. 4th 783, 793 (2003). "Factors relevant when

13    assessing a claim loss of society, comfort, and affection may include the closeness of the

14    family unit, the depth of their love and affection, and the character of the deceased as

15    kind, attentive, and loving." Mendoza v. City of West Covina, 206 Cal. App. 4th 702,

16    721 (2012). The Court properly instructed the jury on how to calculate wrongful death

17    damages:

18        No fixed standard exists for deciding the amount of noneconomic damages. You
19        must use your judgment to decide a reasonable amount based on the evidence and
         your common sense . . . In determining plaintiffs' loss for this claim, do not
20        consider 1. Plaintiffs' grief, sorrow, or mental anguish; 2. Mr. Phounsy's pain and
         suffering; or 3. The poverty or wealth of plaintiffs.
21

22    (Doc. No. 531 at 47, Jury Instruction No. 43.)

23    With this direction, the jury was given the task of determining the non-economic

24    value of Plaintiffs' loss of Mr. Phounsy's comfort, society, and protection. After

25    diligently listening to the evidence presented by both sides regarding Plaintiffs'

26    relationship with Mr. Phounsy, the jury awarded Plaintiffs a total of $80 million in

27    wrongful death damages: $20 million for the loss of Mr. Phounsy's love, companionship,

28    comfort, care, assistance, protection, affection, society, moral support, training, and

3:15-cv-02692-H-MDD

guidance from April 20, 2015 through the present and $60 million for the loss of Mr. Phounsy's love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, and guidance for the future. (Doc. No. 532 at 7.)

The evidence presented at trial established that Mr. Phounsy was thirty-two years old when he died and was survived by his wife, Loan Nguyen, and his two young children, K.J.P. and K.P.P. At the time of Mr. Phounsy's death, Mr. Phounsy's son was two years old and his daughter was a few months old. At trial, Loan Nguyen testified that she started dating Mr. Phounsy when he was a junior and she was a senior in high school. (Tr. V-103.) Loan Nguyen testified that in 2009 she married Mr. Phounsy, in 2013 their son was born, in 2014 their daughter was born, and that they all lived together at the time of Mr. Phounsy's death. (Tr. V-107–08.) Loan Nguyen testified that Mr. Phounsy was "very protective of me and the kids" and shared stories of Mr. Phounsy taking care of their children when they were both in the neonatal intensive care unit. (Tr. V-107–10.) Loan Nguyen testified about her and Mr. Phounsy's future plans together and that she visited Mr. Phounsy's grave every day following his death. (Tr. V-114.) The jury also heard testimony from other family members, including Mr. Phounsy's stepfather Greg Kelley, Mr. Phounsy's cousin Breanna Chanthaphanh, Loan Nguyen's aunt Ngoc "Nicky" Truong, and Loan Nguyen's younger brother Tuan Nguyen, who each discussed Mr. Phounsy's relationship with Loan Nguyen, K.J.P., and K.P.P., and the impact Mr. Phounsy's death had on them. (Tr. V-70, 81, 100.)

There is no doubt that Plaintiffs' loss was great. However, even accounting for the great deference owed to the jury's verdict, the Court is left with the "firm conviction" that the jury's $80 million award, divorced from any economic damages, was likely "the result of passion or prejudice" and "grossly excessive."[20] <u>Landes Const. Co. v. Royal</u>

---

[20] In coming to this conclusion, the Court reviewed the cases provided by both parties. Defendants provided the Court with a survey of awards in wrongful death cases with police defendants from California district courts from 2017 to the present, (Doc. No. 551-1 at 22), and a survey of awards in wrongful death cases involving claims of excessive force against a police defendant across the Ninth Circuit from April 2012 to the present. (Doc. No. 568 at 11, Compendium A.) The Court questions why

3:15-cv-02692-H-MDD

1    Bank of Canada, 833 F.2d 1365, 1372 (9th Cir. 1987); Brady, 859 F.2d at 1557.

2    Considering the entire record, the size of the jury's wrongful death award is far out of

3    proportion to the evidence and indicates that the jury may have impermissibly included in

4    the award some measure of Plaintiffs' emotional distress, or some amount intended to

5    punish Defendants. See Nelson, 113 Cal. App. 4th at 793.

6           "When the court, after viewing the evidence concerning damages in the light most

7    favorable to the prevailing party, determines that the damages award is excessive, it has

8    two alternatives. It may grant defendant's motion for a new trial or deny the motion

9    conditional upon the prevailing party accepting a remittitur." Fenner v. Deendable

10   Trucking Co., Inc., 716 F.2d 598, 608 (9th Cir. 1983). Generally, "a new trial is not

11   required even where there is an excessive damages award resulting from passion or

12   prejudice, unless there is also evidence that passion and prejudice affected the liability

13   finding." Watec, 403 F.3d at 655 (internal quotation marks and citation omitted). "Where

14   there is no evidence that passion and prejudice affected the liability finding, remittitur is

15   an appropriate method of reducing an excessive verdict, although the district court still

16   retains the option of vacating the judgment and ordering a new trial." Id. (internal

17   quotation marks and citation omitted). "A remittitur must reflect the maximum amount

18   sustainable by the proof." Oracle Corp v. SAP AG, 765 F.3d 1081, 1094 (9th Cir. 2014)

19   (internal quotation marks and citations omitted). Based on the entire record, the Court

20   concludes that passion or prejudice did not affect the jury's liability finding or damages

21   award for Mr. Phounsy's pain and suffering. See Pumphrey v. K.W. Thompson Tool,

22

23   _____

24   the loss of services award in the present case should be compared only to loss of services awards for
     wrongful death cases with police defendants rather than wrongful death cases against other defendants.

25   The loss of services experienced by the family of a person who died due to excessive force by a police
     officer may not be different than the loss of services experienced by the family of a person who died due

26   to, for example, a wrongful act of an agent of a corporation. The cases cited by Plaintiffs were similarly
     not instructive. Three of the cases cited by Plaintiffs did not involve non-economic loss of services

27   awards. (Doc. No. 564 at 17–18.) Further, one of those cases involved a settlement, not a jury verdict.
     (Id.) The one wrongful death non-economic loss of services case cited by Plaintiffs in their supplemental

28   briefing was a state court case from New Mexico. (Doc. No. 570.)

Co., 64 F.3d 1128, 1133 (9th Cir. 1995); Warf v. Burlington N. R. Co., 60 F3d 631, 638 (9th Cir. 1995). However, due to the unfixed nature of non-economic wrongful death damages, the Court is unable to determine an appropriate amount for a remittitur. Accordingly, the Court grants Defendants' motion for a new trial on wrongful death damages.[21]

## Conclusion

For the reasons above, the Court denies Defendants' motion for judgment as a matter of law, denies Defendants' motion for a new trial as to liability and damages for Mr. Phounsy's pain and suffering, and grants Defendants' motion for a new trial on wrongful death damages.[22] Accordingly, the Court vacates the judgment dated March 16, 2022. (Doc. No. 533.) The Court also concludes based on the entire record of the case that a renewed qualified immunity appeal would be frivolous under Chuman v. Wright, 960 F.2d

---

[21] In their motion for a new trial, Defendants argue that Plaintiffs' wrongful death claim can only be supported by the jury's finding of negligence, not the jury's finding of either a violation of Mr. Phounsy's Fourth Amendment rights or Bane Act claim. (Doc. No. 551-1 at 10–11.) As a result, Defendants argue that the wrongful death special verdict form invited the jury to award impermissible damages by implying that the wrongful death claim and related damages could be supported by a "violation of one or more of his constitutional or civil rights." (Id. at 10.) Plaintiffs respond that the violation of the Bane Act and negligence each provide an independent basis for the jury's wrongful death damages award. (Doc. No. 564 at 7–8.) Because the Court grants a new trial on wrongful death damages, this issue is moot for the purposes of Defendants' present motions. Nevertheless, this is a significant issue for determining Defendants' liability for wrongful death damages. Non-economic damages for negligence are limited to a defendant's percentage of fault. See Cal. Civ. Code § 1431.2(a); C.B. v. City of Sonora, 769 F.3d 1005, 1031 (9th Cir. 2014). But non-economic damages for intentional acts are not similarly reduced. See B.B. v. Cnty. of Los Angeles, 10 Cal. 5th 1, 29 (2020). Therefore, if the jury's finding of negligence is the sole basis for non-economic wrongful death damages in this case, any such damages award must be apportioned according to section 1431.2(a). However, if the jury's finding of an intentional wrongful act can serve as a basis for the non-economic wrongful death damages, then section 1431.2(a) would not apply and Defendants may be liable for the entire wrongful death damages award. Id.; see Murchison v. Cnty. of Tehama, 69 Cal. App. 5th 867, 898 (2021) (citing Edson v. City of Anaheim, 63 Cal. App. 4th 1269, 1274 (1998)) (noting that the standard for a state law claim of battery by a police officer is the same standard applied to for a 42 U.S.C. § 1983 excessive force claim). Given the limited nature of the parties' briefing on this issue, the Court will set a new briefing schedule.

[22] The Court will schedule a status conference to schedule pretrial and trial dates on wrongful death damages and to address any remaining issues and briefing schedules. The Court orders the parties to meet and confer regarding available trial dates compatible with their and their witnesses' schedules.

104, 105 (9th Cir. 1992).

Because there is not a final judgment in this case, motions for attorneys' fees and costs pursuant to Local Civil Rule 54.1 and Federal Rule of Civil Procedure 54 are not yet due. Instead, a new period for filing motions for fees will begin when a final judgment is entered. <u>See</u> Fed. R. Civ. P. 54 Advisory Committee's Note to the 1993 Amendment ("A new period for filing will automatically begin if a new judgment is entered following…the granting of a motion under Rule 59."). As a result, Defendants' motion for reconsideration of the Court's order on attorneys' fees is moot and the Court vacates the related briefing schedule. (Doc. Nos. 571, 573, 578, 580.)

**IT IS SO ORDERED**

DATED: August 16, 2022

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT